# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF OKLAHOMA

SFF-TIR, LLC; STUART FAMILY
FOUNDATION, INC.; ALAN STUART
2012 GST FAMILY TRUST; STUART
2005 GST FAMILY TRUST;
CELEBRATION, LLC; ANURAG
AGARWAL; PETER BUCKLEY; VINCENT
SIGNORELLO and RODNEY M. REYNOLDS,

      Plaintiffs,

vs.                                      No. CIV 14-0369 JB/FHM

CHARLES C. STEPHENSON, JR.;
CYNTHIA A. FIELD; PETER BOYLAN, III;
LAWERENCE FIELD; CYPRESS
ENGERGY PARTNERS-TIR, LLC;
CEP CAPITAL PARTNERS, LLC;
CYPRESS ENERGY HOLDINGS, LLC and
TULSA INSPECTION RESOURCES, LLC,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the requests in the Plaintiffs' Motion to

Strike Affirmative Defenses, filed November 4, 2015 (Doc. 191)("Plaintiffs' Motion to Strike

Affirmative Defenses"); (ii) the requests in the Defendants' Motion for Summary Judgment on

Acquiescence Defense and Brief in Support, filed April 3, 2015 (Doc. 83)("Defendants'

Acquiescence MSJ"); (iii) the requests in the Defendants' Second Motion for Summary

Judgment and Brief in Support Thereof, filed September 14, 2015 (Doc. 154)("Defendants'

Estoppel MSJ"); (iv) the requests in the Plaintiffs' Memorandum of Law in Support of Motion

for Partial Summary Judgment on Breach of Fiduciary Duty Claims, filed September 14, 2015

(Doc. 157)("Plaintiffs' MSJ"); (v) the requests in the Plaintiffs' Motion to Strike, filed April 20,

2015 (Doc. 86), and the requests in the Plaintiffs' Motion to Strike Affidavit of Randall Lorett and Memorandum of Law in Support Thereof, filed April 20, 2015 (Doc. 87)(collectively "Motion to Strike Lorett Affidavit"); and (vi) the requests in the Plaintiffs' Motion in Limine to Preclude Evidence of Plaintiffs' Conduct, and Brief in Support, filed October 26, 2015 (Doc. 182)("Motion in Limine"). The Court held a hearing on December 27 and 28, 2016.

The Court sua sponte assesses whether it has jurisdiction over the case. The primary issues that the parties raise and that the Court resolves in this Memorandum Opinion are whether: (i) the Court should strike, or not allow evidence at trial regarding, the Defendants' affirmative defenses of acquiescence, unclean hands, estoppel, and waiver; (ii) Delaware or Oklahoma law governs the Plaintiffs' claims and the Defendants' affirmative defenses; (iii) the Plaintiffs' claims are barred under the theory of acquiescence; (iv) the Oklahoma common-law clean hands doctrine bars the Plaintiffs' claims; (v) the Oklahoma common law of waiver bars the Plaintiffs' claims; (vi) the Oklahoma common law of estoppel bars the Plaintiffs' claims; (vii) the Court should expand Securities Exchange Commission rule 10b-5 to include the force-seller doctrine; (viii) the entire fairness standard governs the Plaintiffs' claims for breach of fiduciary duty; (ix) the Defendants bear the burden of proof that the cash-out merger was entirely fair to the minority shareholders; (x) the Defendants are liable for breaching their duty of entire fairness; (xi) the Court should strike the affidavit of Randall Lorett; (xii) the Court should preclude evidence at trial of the Akin Gump Letter and other letters that the Plaintiffs and the Plaintiffs' counsel exchanged with the Defendants between September, 2013, and December, 2013; (xiii) the Court should preclude evidence at trial of letters sent to and received from the Triangle Capital mezzanine lenders; and (xiv) the Court should preclude the Defendants from mentioning during trial that the Plaintiffs' are residents of states other than Oklahoma.

The Court finds it advisable, because of this opinion's length and complexity, to summarize and clarify its holdings before it lays out the case's facts in the next section. In the Court's analysis' first section, as a preliminary threshold issue, the Court examines sua sponte whether it has jurisdiction over this case. The Court concludes that it exercises federal question jurisdiction over the federal securities claims. The Court further concludes that it exercises federal diversity jurisdiction over the case's entirety even if the securities claims do not survive a motion for summary judgment against the securities claims.

In the Court's analysis' second section, the Court examines Oklahoma choice-of-law rules to determine whether it should apply Delaware or Oklahoma law to the claims and defenses in the case. The Court concludes that: (i) Delaware law applies to the Plaintiffs' claims regarding the cash-out merger, which entails consideration of the defense of acquiescence in accordance with Delaware law; and (ii) Oklahoma law applies to the Defendants' other contract defenses of equitable estoppel, waiver, and unclean hands.

In the Court's analysis' third section, the Court evaluates the Defendants' Acquiescence MSJ. The Court concludes that: (i) the Defendants did not set up a well-functioning committee of independent directors to examine and approve the merger; (ii) a fully-informed majority of the minority shareholders never voted to approve the merger; (iii) the evidentiary burden to prove the merger's entire fairness remains with the Defendants; (iv) when the Court interprets the facts in the light most favorable to the Plaintiffs, the Defendants do not meet this evidentiary burden; and (v) Delaware common law requires the Court to allow any case where the Defendant bears the burden to prove entire fairness to proceed to trial so that the entire fairness of the transaction can be evaluated. Accordingly, the Court denies the Defendants' Acquiescence MSJ.

Because the Court denies the Defendants' Acquiescence MSJ, in the Court's analysis'

fourth section, the Court assesses the Defendants' Estoppel MSJ.  The Court concludes that: (i) the Defendants' Estoppel MSJ largely duplicates the Defendants' Acquiescence MSJ's facts; (ii) the Defendants fail to demonstrate that they reasonably relied on the Plaintiffs' merger acceptance or that the alleged reliance caused the Defendants to suffer a detrimental change of position; (iii) the Defendants fail to demonstrate that the Plaintiffs waived their right to challenge the entire fairness of the contested merger transaction; (iv) the Defendants fail to demonstrate that the Plaintiffs undertook the allegedly fraudulent and deceitful conduct of which they complain, thereby failing to show that the Plaintiffs have unclean hands; (v) the Tenth Circuit is unlikely to support the Plaintiffs' contention that the forced-seller doctrine is good law within the Tenth Circuit, and therefore the Court should not expand SEC rule 10b-5 to include the forced-seller doctrine and should dismiss the Plaintiffs' federal securities claims; and (vi) the Supreme Court of Oklahoma likely would dismiss the Plaintiffs' state securities  claims and the Court, under the Erie doctrine's required deference to a state's supreme court, should dismiss the Plaintiffs' state securities claims.  Accordingly, the Court: (i) denies the Defendants' Estoppel MSJ in part as it relates to the Oklahoma common-law clean hands doctrine, the Oklahoma common law of waiver, and the Oklahoma common law of estoppel; and (ii) grants the Defendants' Estoppel MSJ in part as it relates to securities claims, dismissing the securities claims.

Because the Court only grants in part the Defendants' Estoppel MSJ, in the Court's analysis' fifth section, the Court adjudges the Plaintiffs' MSJ.  The Court concludes that (i) the entire fairness standard governs the Plaintiffs' claims for breach of fiduciary duty; (ii) the Defendants bear the burden of proof that the merger was entirely fair to the minority shareholders; and (iii) the Defendants are liable for breaching their duty of entire fairness,

because the undisputed material facts show that the Defendants did not put into place sufficient safeguards protecting minority shareholder rights to meet this burden. Accordingly, the Court grants in part the Plaintiffs' MSJ with respect to liability under the entire fairness standard. The Court, however, leaves determination of damages -- and only damages -- to be resolved at trial.

The Court sixth investigates and adjudges the Plaintiffs' Motion to Strike Affirmative Defenses. The Court concludes that: (i) rule 12(f) motions to strike are disfavored and should be denied unless the challenged allegations have no possible relation or logical connection to the controversy's subject matter; and (ii) the Court will not "strike" Defendants' affirmative defenses of acquiescence, unclean hands, estoppel, and waiver have a possible relation or logical connection to the controversy's subject matter. Accordingly, the Court denies the Plaintiffs' Motion to Strike Affirmative Defenses. Nevertheless, given the unique procedural history and posture of this case, the Court further concludes that, because the entire fairness doctrine applies, the Defendants are precluded from raising these defenses at trial.

Further, because the Court grants the Plaintiffs' MSJ with respect to the Defendants' liability under the entire fairness standard, leaving only the determination of damages for the trial, in the Court's analysis' seventh section, the Court appraises the Plaintiffs' Motion to Strike Lorett Affidavit. The Court concludes that: (i) the Lorett Affidavit is not a pleading; (ii) the Lorett Affidavit is not redundant, immaterial, impertinent, or scandalous; and (iii) that the Court therefore cannot strike the Lorett Affidavit under rule 56 of the Federal Rules of Civil Procedure. Accordingly, the Court denies the Plaintiffs' Motion to Strike Lorett Affidavit.

Again, because the Court leaves only the determination of damages for trial, in the Court's analysis' eighth and final section, the Court also evaluates the Plaintiffs' Motion in Limine. The Court concludes that: (i) the Akin Gump letter's plain language and other letters

that the Plaintiffs and the Plaintiffs' counsel exchanged with the Defendants between September, 2013, and November, 2013, reflect that they are compromise offers under rule 408 of the Federal Rules of Evidence; (ii) the Akin Gump letter and other letters that the Plaintiffs and the Plaintiffs' counsel exchanged with the Defendants between September, 2013, and November, 2013 do not fall into any of the rule 408(b) exceptions that permit a court to admit compromise-offer evidence; (iii) letters sent to and received from Triangle Capital are not compromise offers between the Plaintiffs and the Defendants; and (iv) the Triangle Capital correspondence is not irrelevant to a determination of the TIR shares' fair price and is not likely to mislead or confuse the jury. Accordingly, the Court: (i) grants the Plaintiffs' Motion In Limine in part, precluding entry into evidence of the Akin Gump letter and other letters that the Plaintiffs and the Plaintiffs' counsel exchanged with the Defendants between September, 2013, and November, 2013; and (ii) denies the Motion In Limine in part, allowing letters sent to and received from Triangle Capital to come into evidence during the trial.

## FACTUAL BACKGROUND

"Charles Stephenson is the owner of Regent Private Capital." Defendants' Acquiescence MSJ ¶ 1, at 7 (stating this fact).[1] See Plaintiffs' Memorandum of Law in Opposition to

---

[1] During the hearing, both parties agreed that there is significant overlap between the factual sections in the Defendants' Acquiescence MSJ and the Defendants' Second MSJ. See Tr. at 370:7-374:14 (DeMuro, Kagen, Court). The Defendants indicated at the hearing that they do not object, in the light of this fact, to the Court writing the factual sections for the Defendants' two motions for summary judgment together. See Tr. at 374:9-14 (DeMuro). The parties also agreed that they approved of the Court's proposal to fold the facts from Plaintiffs' MSJ into a single factual section along with the facts from the Defendants' Acquiescence MSJ and the Defendants' Estoppel MSJ. The Court, therefore: (i) refers to facts common to both the Defendants' Acquiescence MSJ and the Defendants' Estoppel MSJ collectively by referring to the paragraph in the Defendants' Acquiescence MSJ; and (ii) places all facts from across the three summary judgment motions into a preliminary biographical section followed by facts reported in as near to chronological order as overlapping time periods permit.

Defendants' Motion for Summary Judgment on Acquiescence Defense ¶ 1, at 8, filed April 20, 2015 (Doc. 84)("Response to Defendants' Acquiescence MSJ")(not disputing this fact). "Defendant Cynthia Field is the daughter of Defendant Charles Stephenson." Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment on Breach of Fiduciary Claims ¶ 1, at 3, filed September 14, 2015 (Doc. 157)("Plaintiffs' MSJ")(stating this fact). <u>See</u> Defendants' Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment on Breach of Fiduciary Duty Claims (Doc. 157), at 2, filed October 5, 2015 (Doc. 170)("Response to Plaintiffs' MSJ")(not disputing this fact). "Defendant Lawrence Field is the husband of Defendant Cynthia Field and the son-in-law of Defendant Charles Stephenson." Plaintiffs' MSJ ¶ 2, at 3 (stating this fact). <u>See</u> Response to Plaintiff's MSJ at 2 (not disputing this fact). "Defendant CEP-TIR, LLC['s] . . . principals are Defendants Stephenson, Cynthia Field and Peter Boylan, [sic] III." Plaintiffs' MSJ ¶ 3, at 3 (stating this fact).[2] "In 2009, Regent and Mr. Stephenson individually became together TIR Inc.'s largest shareholder owning approximately 40% of the TIR Inc. shares." Defendants' Acquiescence MSJ ¶ 1, at 7 (stating this fact).[3] "At the same time a number of the Plaintiffs associated with Alan Stuart acquired a

---

[2] In the Plaintiffs' MSJ, the Plaintiffs word the fact as follows: "Defendant CEP-TIR, LLC is a Delaware corporation whose principals are Defendants Stephenson, Cynthia Field and Peter Boylan, III." Plaintiffs' MSJ ¶ 3, at 3. The Defendants dispute that CEP-TIR, LLC is a corporation, maintaining that it "is a limited liability company, not a corporation." Response to Plaintiffs' MSJ at 2. The Defendants do not dispute that Stephenson, Field, or Boylan is a principal of CEP-TIR. <u>See</u> Response to Plaintiffs' MSJ at 2. Because the Defendants do not dispute this latter assertion, the Court deems it to be undisputed and amends the fact's text to reflect that the fact's elements that are undisputed.

[3] In Response to Defendants' Acquiescence MSJ ¶ 2, at 8, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary

minority interest in TIR Inc." Defendants' Acquiescence MSJ ¶ 3, at 7 (stating this fact).[4] "Alan Stuart is a 'seasoned, successful, long-term investor with more than 40 years' experience in business development, investment management, and corporate governance.'" Defendants' Acquiescence MSJ ¶ 4, at 7 (stating this fact).[5] "The Defendant Lawrence Field, the son-in-law of Mr. Stephenson and an officer of Regent, became the chairman, and Alan Stuart became a member of the board of directors of TIR Inc." Defendants' Acquiescence MSJ ¶ 5, at 7 (stating

---

judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[4] In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[5]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

this fact).  See Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact).  "In February 2013, Alan Stuart prepared a proposal for Mr. Field, which he named 'Project Poirot' to acquire control of TIR, Inc. at $369,507 per share which he later increased to $385,175." Defendants' Acquiescence MSJ ¶ 6 (stating this fact).[6]  "On February 11, 2013, Stuart purchased individual shareholder J.W. Lorett's TIR Inc. shares for $275,000 per share."  Defendants' Acquiescence MSJ ¶ 7, at 7 (stating this fact).[7]  "On March 21, 2013, Stuart presented an offer to the TIR board for TIR Inc. shares of $380,382 per share."  Defendants' Acquiescence MSJ ¶ 8, at 7 (stating this fact).[8]  "On May 16, 2013, Alan Stuart revised his offer to the board, increasing

---

[6]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger."  Response to Defendants' Acquiescence MSJ ¶ 2, at 8.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See N.D. Okla. LCvR56.1(c).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[7]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger."  Response to Defendants' Acquiescence MSJ ¶ 2, at 8.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See N.D. Okla. LCvR56.1(c).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[8]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger."  Response to Defendants'

the repurchase price to $413,143 per share." Defendants' Acquiescence MSJ ¶ 9, at 8 (stating this fact).[9] "The Defendants [Charles C.] Stephenson, [Peter] Boylan, and [Cynthia A.] Field were principals in Cypress Energy Partners-TIR, LLC ("Cypress Energy Partners"). Defendants' Acquiescence MSJ ¶ 10, at 8 (stating this fact). See Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact). "In 2013, two TIR Inc. directors (Alan Stuart on the one hand and Lawrence Field on the other hand) [sought] to acquire control of TIR Inc." Defendants' Acquiescence MSJ ¶ 11, at 8 (stating this fact)(relying on Videotape Deposition of Rodney Reynolds Taken on Behalf of the Defendants (taken Nov. 17, 2014), filed Apr. 3, 2015 (Doc. 83-11)("Reynolds Depo.").[10] "In June 2013, the Defendants [completed] the bidding process to

---

Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[9]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[10]The Defendants state in the Defendants' Acquiescence MSJ that in 2013, "two TIR Inc directors (Alan Stuart on the one hand and Lawrence Field on the other hand) engaged in a competition to acquire control of TIR Inc." Defendants' Acquiescence MSJ ¶ 11, at 8. The Plaintiffs purport to dispute this fact, relying on a June 14, 2013, email from the Special Committee attaching a proposed Standstill and Indemnity Agreement that depicts a series of

acquire control of TIR Inc."  Defendants' Acquiescence MSJ ¶ 13, at 8 (stating this fact)(relying

on Affidavit of Randall Lorett, filed Apr. 3, 2015 (Doc. 83-2)("Lorett Aff.").[11]

  "On June 26, 2013, Defendant CEP-TIR, LLC acquired 26.45 shares of TIR from certain

other shareholders, known as the Pooled Shareholders, in *voluntary* sales transactions."

Plaintiffs' MSJ ¶ 4, at 3 (emphasis in the original)(stating this fact).  See Response to Plaintiffs'

MSJ at 2 (not disputing this fact).  "Defendants subsequently referred to this share acquisition as

the 'Control Acquisition.'"  Plaintiffs' MSJ ¶ 5, at 3 (stating this fact).  See Response to

Plaintiff's MSJ at 2 (not disputing this fact).  "Between June 2013 and October 2013, CEP-TIR

LLC also [acquired] certain other outstanding shares of TIR."  Plaintiffs' MSJ ¶ 6, at 3 (stating

this fact).  See Response to Plaintiffs' MSJ at 2 (not disputing this fact).[12]  "As a result of these

---

direct, independent offers to shareholders rather than a competition between Stuart and Field to
acquire control of TIR, Inc.  See Response to Defendants' Acquiescence MSJ ¶ 3, at 8.  The
Court concludes that, whether the bids were competitive or independent, they indicate that Stuart
and Field both sought to acquire control of TIR, Inc.  The Court therefore amends the fact as the
Defendants state it in the Defendants' Acquiescence MSJ to reflect the elements of the fact that
the parties do not dispute.

[11]The Defendants state in the Defendants' Acquiescence MSJ that in "June 2013, the
Defendants won the bidding process to acquire control of TIR Inc."  Defendants' Acquiescence
MSJ ¶ 13, at 8.  The Plaintiffs purport to dispute this fact, relying on a June 14, 2013, email from
the Special Committee attaching a proposed Standstill and Indemnity Agreement that depicts a
series of direct, independent offers to shareholders rather than a competition between Stuart and
Field to acquire control of TIR, Inc.  See Response to Defendants' Acquiescence MSJ ¶ 3, at 8-9.
The Court does not find in the fact as written any indication that the Defendants here assert any
competitive bidding between the two camps, aside perhaps from the Plaintiffs' use of the verb
"won."  To reflect the factual elements that are undisputed, the Court therefore amends the fact
as the Defendants state it in the Defendants' Acquiescence MSJ.

[12]In the Plaintiffs' MSJ, the Plaintiffs word the fact as follows: "Between June 2013 and
October 2013, CEP-TIR LLC also certain other outstanding shares of TIR."  Plaintiffs' MSJ ¶ 6,
at 3.  The fact is written as a sentence fragment without any verb.  The Defendants purport to
dispute the fact solely on the basis of "avoidance of doubt," and add the word "acquired" to the
fact.  Response to the Plaintiffs' MSJ at 2.  Because of (i) the obvious scrivener's error; and (ii)
the Plaintiffs' repeated assertions elsewhere that CEP-TIR LLC acquired the outstanding TIR
shares, the Court deems the fact -- with the Defendants' interpolation of the verb "acquired" -- to

transactions, Defendants CEP-TIR, LLC, Stephenson, and Cynthia Field . . . became, collectively, the majority shareholders of TIR, owning at least 69.4% of the outstanding shares." Plaintiffs' MSJ ¶ 7, at 3 (stating this fact).  See Response to Plaintiffs' MSJ at 2 (not disputing this fact).  CEP-TIR, LLC, Stephenson, and Field "thereby collectively gained control of TIR." Plaintiffs' MSJ ¶ 8, at 4 (stating this fact).  See Response to Plaintiffs' MSJ at 2 (not disputing this fact).

"From June 2013 through December 23, 2013, the Plaintiff SFF-TIR, LLC was represented by legal counsel."  Defendants' Acquiescence MSJ ¶ 14, at 8 (stating this fact).[13] "From June 2013 through December 23, 2013, the Plaintiffs Stuart Family Foundation, Inc.; Alan Stuart 2012 GST Family Trust; Stuart 2005 GST Family Trust; and Celebration, LLC were represented by legal counsel."  Defendants' Acquiescence MSJ ¶ 15, at 8 (stating this fact).[14]

be undisputed.

[13]In the Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger."  Response to Defendants' Acquiescence MSJ ¶ 2, at 8.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See N.D. Okla. LCvR56.1(c).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[14]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger."  Response to Defendants' Acquiescence MSJ ¶ 2, at 8.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See N.D. Okla. LCvR56.1(c).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL

"Each of the individual Plaintiffs executed and delivered a proxy to SFF-TIR, LLC to act on his or her behalf with respect to his or its TIR Inc. shares which proxies were in effect on November 2, 2013." Defendants' Acquiescence MSJ ¶ 16, at 8 (stating this fact).[15]   "[T]he Plaintiffs, led by Alan Stuart, attempted to negotiate a sale of their minority block of shares to Cypress for a substantially higher share price." Defendants' Acquiescence MSJ ¶ 19, at 9 (stating this fact).[16]

"Following the June 26, 2013 Control Acquisition, and after certain resignations, TIR's

1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[15]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger."  Response to Defendants' Acquiescence MSJ ¶ 2, at 8.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See N.D. Okla. LCvR56.1(c).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[16]The Plaintiffs purport to dispute this fact "to the extent that it suggests that there was a winner-take-all competition in 2013 to acquire control of TIR."  Response to Defendants' Acquiescence MSJ ¶ 6, at 9.  The Plaintiffs then continue, "Plaintiffs otherwise admit that Plaintiffs attempted to negotiate a substantially higher sale price for their shares, except that Plaintiffs object to this fact as immaterial and irrelevant."  Response to Defendants' Acquiescence MSJ ¶ 6, at 9.  The Court sees no evidence in the fact, as the Defendants state it, that the Defendants suggest the existence of a winner-take-all competition in 2013.  Furthermore, contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See N.D. Okla. LCvR56.1(c).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

Board of Directors had three members as of October 31, 2013: Defendant Lawrence Field, Defendant Peter Boylan, and Randall Lorett, the President and CEO of TIR." Plaintiffs' MSJ ¶ 10, at 4 (stating this fact).[17] "On September 20, 2013, Cypress Energy Partners Limited Partnership filed a Registration Statement (including the prospectus) for the public offering of partnership units of TIR shares, pursuant to the confidentiality provisions of the Jumpstart Our Business Startups Act." Defendants' Acquiescence MSJ ¶ 20, at 9 (stating this fact). See Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact). "As of November 2, 2013, all plaintiffs had granted proxies to Plaintiff SFF-TIR to vote their TIR Inc. shares and agreed among themselves not to sell their TIR Inc. shares for less than $654,632." Defendants' Acquiescence MSJ ¶ 21, at 9 (stating this fact).[18] "On October 31, 2013, Cypress and TIR Inc. made a Tender Offer [Letter from Cypress Energy Partners to Shareholders of Tulsa Inspection

---

[17]The Defendants purport to dispute this fact "[f]or avoidance of doubt," indicating that TIR, Inc.'s board of directors "had three member -- Mr. Field, Mr. Boylan, and Mr. Lorett -- and two vacant positions as of October 31, 2013." Response to Plaintiffs' MSJ at 3 (relying on Letter from Cypress Energy Partners to Shareholders of Tulsa Inspection Resources, Inc. (dated Oct. 31, 2013), at 3, filed Sept. 15, 2015 (Doc. 158-3)). The Court notes that this observation is a difference without a distinction. Analogously, if one says that a person is holding up three fingers on one hand, that statement is the equivalent of saying that one is holding up three fingers on one hand and that the other two fingers on the hand are not being held up. Furthermore, the Defendants do not dispute that L. Field., Boylan, and R. Lorett were the only three sitting TIR, Inc. board members as of October 31, 2013; the Court deems this fact to be undisputed.

[18]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

Resources, Inc. (dated Oct. 31, 2013), filed Sept. 15, 2015 (Doc. 158-3)("Tender Offer")] to TIR

Inc.'s remaining shareholders, including the Plaintiffs, for $451,000." Defendants'

Acquiescence MSJ ¶ 22, at 9 (stating this fact).  See Response to Defendants' Acquiescence MSJ

¶ 1, at 8 (not disputing this fact).

> The Tender Offer disclosed (i) that the Registration Statement had been filed, (ii)
> that Cypress Energy intended to enter into an underwriting agreement for the
> public offering of master limited partnership units and that the equity of TIR Inc.
> might be dropped into the new publicly traded entity, and (iii) the purchase of
> shares (and share prices) by which the Defendants acquired TIR Inc. shares.

Defendants' Acquiescence MSJ ¶ 23, at 9 (stating this fact)(relying on Exhibit 1 to Videotaped

Deposition of Anurag Agarwal (taken Sept. 29, 2014), filed Apr. 3, 2015(Doc. 83-20)("Agarwal

Depo. Ex. 1").[19]  In a section called "Certain Conflicts of Interest," the Tender Offer stated:

---

[19]The Plaintiffs purport to dispute this fact.  According to the Plaintiffs, the Tender Offer

contains material misstatements and omissions:

> First, the Tender Offer failed to disclose (i) the value Defendants would receive
> for their interests in TIR as a result of the MLP IPO; (ii) the fact that Defendants
> had projected internally, and to third parties (including underwriters for the MLP
> IPO), that TIR would reach $21 million adjusted EBITDA by the end of 2013;
> (iii) and TIR's substantial growth in revenues, headcount and EBITDA month-
> over-month.  *See* Kagen Decl. Ex. L.  While the Tender Offer included financials
> for September 2012 and September 2013, it did not include any financials
> showing the unprecedented growth the Company was experiencing on a monthly
> basis.  The Tender Offer also included affirmative misstatements: (i) it claimed
> certain issues with accounts receivable for TIR Canada were "material," even as
> just days earlier internal documents show Defendants had concluded the impaired
> accounts receivable amounted to less than the $300,000 reserve Defendants had
> set aside to address the issue (which can hardly be described as "material" in light
> of TIR's projected $21M adjusted EBITDA for 2013) (*see id.* Ex. D *and* Ex. M [.
> [find what this is...it appears to be mis-cited or missing from the docket]); and (ii)
> to support the offer price of $451,000 per share, it claimed Defendants had
> purchased TIR shares from 13 unnamed shareholders at a price of $451,000 or
> lower in October 2013.  Not only did this conflict with Defendants' earlier
> promise on June 26, 2013 that it would buy out all TIR shareholders at the same
> price, but also with numerous internal statements by Defendants that they in fact
> had purchased from only 4 TIR shareholders at a price of $451,000 or less in

> "As a result of the June Acquisition, Mr. Boylan, and Mr. Field (who is affiliated with Mr. Stephenson and Ms. Field) may each be deemed to have a conflict of interest related to this Offer." *Id.* [Tender Offer] at 2.

> "As a result of the foregoing potential conflicts of interest, the TIR Board has not been asked to and is not making any recommendation to you regarding this Offer." *Id.* [Tender Offer at 2]

> "None of the Purchasers, nor any of their respective affiliates has performed or commissioned any appraisal, or engaged any independent financial advisor or other third party to perform any valuation analysis or provide any opinion respecting the value of the Shares in connection with this Offer." *Id.* [Tender Offer at 2]

Plaintiffs' MSJ ¶ 12, at 4 (stating this fact). See Response to Plaintiffs' MSJ at 2 (not disputing this fact). The merger between TIR, Inc. and TIR, LLC "enabled the Controlling Shareholder Defendants to exchange their own TIR shares for equity in the new entity, Defendant TIR LLC, in proportion to their prior shareholders in TIR." Plaintiffs' MSJ ¶ 15, at 4 (stating this fact). See Response to Plaintiffs' MSJ at 2 (not disputing this fact). "The Merger was approved and carried out by the following Defendants: [(i)] The Controlling Shareholder Defendants, *i.e.*, Defendants CEP-TIR, LLC, Stephenson, and Cynthia Field; and [(ii)] TIR Directors Lawrence Field and Peter Boylan III . . . ." Plaintiffs' MSJ ¶ 16, at 4-5 (bullets and internal citations omitted)(stating this fact). See Response to Plaintiffs' MSJ at 2 (not disputing this fact). "TIR's

---

October 2013. *See, e.g.*, Kagen Decl. Exs. Q, R . at 91412, April 3, 2015 Austin Aff. [Affidavit of G. Les Austin, filed Apr. 3, 2015 (Doc. 83-19)("Austin Aff.")] ¶3.

Response to Defendants' Acquiescence MSJ ¶ 7, at 9. The Court notes, however, that the fact as the Defendants word it in their Defendants' Acquiescence MSJ, asserts certain items that were disclosed; it does not touch on items that the Plaintiffs may have <u>failed</u> to disclose. See Defendants' Acquiescence MSJ ¶ 22, at 9. Moreover, alleged misstatements in the disclosure about other issues does not fall within this asserted fact's scope. Because the Plaintiffs do not dispute the assertion that the tender offer disclosed that (i) the Registration Statement had been filed; (ii) that Cypress Energy intended to enter into an underwriting agreement for the public offering of master limited partnership units and that the equity of TIR Inc. might be dropped into the new publicly traded entity; and (iii) the purchase of shares (and share prices) by which the Defendants acquired TIR Inc. shares, the Court deems this fact to be undisputed.

Rule 30(b)(6) witness, Dan O'Keefe, admitted that because the Board composition had not changed, the same conflicts of interest that existed at the time of the Tender Offer also existed at the time of the Merger." Plaintiffs' MSJ ¶ 18, at 5 (stating this fact). See Response to Plaintiffs' MSJ at 2 (not disputing this fact).

"On November 13, 2013, Cypress Energy's SEC Registration Statement containing the prospectus for the sale of partnership units in the master limited partnership became public." Defendants' Acquiescence MSJ ¶ 24, at 9 (stating this fact). See Response to Defendants' Acquiescence MSJ ¶ 1, 8 (not disputing this fact). "Shortly after November 13, 2013, the Plaintiffs analyzed or had analyzed by one or more of their representatives the Registration Statement." Defendants' Acquiescence MSJ ¶ 25, at 9 (stating this fact).[20] "By November 26, 2013, the Plaintiffs had received and either personally reviewed the October 31 Tender Offer or had had the October 31 Tender Offer reviewed by legal counsel or SFF-TIR, LLC on their behalf." Defendants' Acquiescence MSJ ¶ 26, at 9 (stating this fact).[21] "The Plaintiffs did not

---

[20]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[21]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary

accept the October 31 Tender Offer." Defendants' Acquiescence MSJ ¶ 27, at 9 (stating this fact). See Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact). "The Plaintiffs could not have tendered their shares in response to the Tender Offer no matter what the Offer said or did not say; the Plaintiffs had contractually agreed prior to the Tender Offer not to sell their TIR Inc. shares for less than $654,632." Defendants' Acquiescence MSJ ¶ 28, at 9 (stating this fact).[22] "By November 26, 2013, the Plaintiffs had received and either (i) personally reviewed or (ii) had had reviewed by legal counsel or SFF-TIR, LLC on their behalf the Cypress Energy Partners Limited Partnership registration Statement." Defendants' Acquiescence MSJ ¶ 29, at 10 (stating this fact).[23]

---

judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[22]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[23]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not

The SEC Registration Statement included the following information respecting Cypress Energy Partners Limited Partnership and the Initial Public Offering: (a) Prospectus; (b) List of risks to its business; (c) Capitalization; (d) Cash distribution policy, projections and partnership agreement provisions relating to cash distributions; (e) Historical and projected financial data: (f) Management discussion and analysis of financial condition; (g) detailed descriptions of the industries in which Cypress Energy Partners was engaged, Cypress' business and Cypress' management; (h) Cypress Energy Partners' partnership agreement; (i) Underwriting information; (j) complete audited financial statements (as of September 30, 2013).

Defendants' Acquiescence MSJ ¶ 30, at 10 (stating this fact)(relying on Austin Aff.) .[24] "As of November 2013, TIR had (a) revenues of $346.6 million, which was and [sic] 28 percent higher than TIR's budgeted figure; (b) pretax profits of $1.6 million; and (c) $9 million year to date, which were all were [sic] the 'highest numbers [TIR] had had historically' as of that time." Plaintiffs MSJ ¶ 26, at 6 (last set of bracketed material in the original)(stating this fact)(citing

---

effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[24]The Plaintiffs purport to dispute this fact. According to the Plaintiffs, the

S-1 Registration Statement (the "S-1") did not disclose material information in Defendants' possession, including the pricing information for the IPO and how many limited liability company units in the Merger Sub Defendants would receive in exchange for their TIR shares, or the value of such equity merger consideration. Moreover, the projected financial data contained in the S-1 was incomplete as it did not include yearend 2013 EBITDA projections for TIR, or the fact that Defendants had projected internally that year-end 2013 revenues would exceed $360 million (and by year-end, they in fact reached nearly $380 million).

Response to Defendants' Acquiescence MSJ ¶ 8, at 10. The Court notes that the fact, as the Defendants word it, indicates what information the Registration Statement included -- not what it excluded. See Defendants' Acquiescence MSJ ¶ 30, at 10. One might argue that the canon of construction expressio unius est exclusio alterius suggests that the Defendants' choice to list ten items that they assert the Registration Statement contains means that other items were not included. Whether accurate or inaccurate, such an interpretation is irrelevant; the Plaintiffs do not dispute the inclusion of the ten items that the Defendants assert are in the Registration Statement. Because the Plaintiffs do not dispute this fact, the Court deems it to be undisputed.

O'Keefe Depo. at 297:16-299:13). See Response to Plaintiffs' MSJ at 2 (not disputing this fact). "TIR did not do a valuation [to inform] its merger consideration offer." Plaintiffs' MSJ ¶ 27, at 6 (internal quotation marks omitted)(stating this fact).[25] "Defendants did not disclose to Plaintiffs TIR's internal October and November 2013 financial statements . . . showing record-breaking revenues or TIR's November 16, 2013 management projections . . . of even higher revenues through 2018." Plaintiffs' MSJ ¶ 28, at 6 (internal citations omitted)(stating this fact). See Response to Plaintiffs' MSJ at 2 (not disputing this fact). "On November 26, 2013, the plaintiffs claimed each share of TIR Inc. was worth $650,000." Defendants' Acquiescence MSJ ¶ 32, at 10 (stating this fact).[26] "On November 29, 2013, Defendants advised that the Defendants could

---

[25]The Defendants purport to dispute this fact, indicating:

TIR offered the same or higher share price to Plaintiffs than TIR had offered Pooled Shareholders and other selling shareholders in the intervening months. No appraisal was appropriate. Aware of its performance through October and November 2013, TIR nonetheless stated in the Merger Notice that it believed $451,000 per share "represents a premium over the fair value of such shares."

Response to Plaintiffs' MSJ at 3 (quoting Notice to Former Shareholders of Tulsa Inspection Resources, Inc. of Shareholder Action and Appraisal Rights 2, filed Sept. 15, 2015 (Doc. 158-5))(internal citation omitted). The Defendants' assertion that an appraisal was not appropriate is a legal question, and not a factual question. The Defendants do not dispute the Plaintiffs' assertion in this fact that the Defendants did not commission another valuation to inform their merger consideration offer. Because the Defendants do not dispute this fact, the Court deems it to be undisputed.

[26]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion,

not negotiate any purchase during the tender offer period." Defendants' Acquiescence MSJ ¶ 33, at 10 (stating this fact).[27]

"The TIR Board unanimously approved the Merger in a consent dated December 9, 2013 signed by all three Directors." Plaintiffs' MSJ ¶ 19, at 5 (stating this fact). <u>See</u> Response to Plaintiffs' MSJ at 2 (not disputing this fact). "CEP-TIR, LLC, Stephenson, and Cynthia Field, the majority shareholders in TIR, approved the Merger in a similar consent dated December 9, 2013 signed by all three of the majority shareholders." Plaintiffs' MSJ ¶ 20, at 5 (stating this fact). <u>See</u> Response to Plaintiffs' MSJ at 2 (not disputing this fact). "Plaintiffs were all minority shareholders of TIR at the time of the Merger, owning the 32.882 outstanding shares that were canceled by the Merger." Plaintiffs' MSJ ¶ 21, at 5 (stating this fact). <u>See</u> Response to Plaintiff's MSJ at 2 (not disputing this fact). "The Merger Agreement stated in its 'Governing Law' provision . . . that 'the provisions of this Agreement relating to mechanics or the effects of the Merger under Delaware law shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.'" Plaintiffs' MSJ ¶ 22, at 5 (stating this fact)(quoting Merger Agreement at § 8.04).[28]

--------

and so does not materially affect the Plaintiffs' admission of the fact.

[27] In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[28] The Defendants purport to dispute this fact "[f]or avoidance of doubt," insisting that the

"On December 9, 2013, Cypress and TIR exercised their statutory right to cash-out the Plaintiffs . . . ." Defendants' Acquiescence MSJ ¶ 34, at 10 (stating this fact)(relying on Notice to Former Shareholders of Tulsa Inspection Resources, Inc. of Shareholder Action and Appraisal Rights, filed Apr. 3, 2015(Doc. 83-27)("Agarwal Depo. Ex. 7").[29] "On December 11, 2013, the Plaintiffs received timely after-the-fact notice of the Merger and their appraisal rights in accordance with the Oklahoma statutes." Defendants' Acquiescence MSJ ¶ 37, at 11 (stating this fact). See Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact). "The Merger Agreement (dated December 9, 2013), filed Apr. 3, 2015 (Doc. 83-27), provides that:

> For the avoidance of doubt, any former shareholder who surrenders his, her or its share certificate (or acceptable evidence of share ownership for payment of Merger Consideration pursuant to **Section 2.02** [payment provisions], shall be deemed to have (a) accepted the Merger Consideration and (b) forever waived any appraisal rights pursuant to this **Section 2.03** [provisions respecting dissenting share], Section 1091 of the [Oklahoma General corporation Act], or otherwise.

Defendants' Acquiescence MSJ ¶ 38, at 11 (citing Agarwal Depo. Ex. 7)(stating this fact). See

_____

"laws of the State of Oklahoma are applicable to Plaintiffs' breach of fiduciary duty claims . . . and unjust enrichment claim . . . ." Response to Plaintiffs' MSJ at 3. This objection is legal rather than factual. The Defendants do not dispute that the merger agreement language is as the Plaintiffs' report it in this fact. Because the Defendants do not dispute this fact, the Court deems the fact to be undisputed.

[29]In the Defendants' Acquiescence MSJ, the Defendants word this fact as follows: "On December 9, 2013, Cypress and TIR exercised their statutory right to cash-out the Plaintiffs at $451,000 per share." Defendants' Acquiescence MSJ ¶ 34, at 10. The Plaintiffs purport to dispute this fact, asserting that they dispute it "to the extent it suggests that Defendants had any right to cash-out Plaintiffs for an unfair price," adding that the fact "is otherwise admitted." Response to Defendants' Acquiescence MSJ ¶ 9, at 10. The Court notes that the Plaintiffs do not contest the Defendants' assertion that the Defendants' statutory rights included cashing out the Plaintiffs -- only that these statutory rights did not also encompass the right to cash the Plaintiffs out at "an unfair price." Response to Defendants' Acquiescence MSJ ¶ 9, at 10. Whether $451,000.00 is a fair share price for TIR, Inc. shares at the time the merger was effected is a legal question rather than a factual question -- a legal question that the Court will discuss at length infra in its analysis of the Defendants' Acquiescence MSJ and the Plaintiffs' Estoppel MSJ. The Court therefore amends the fact as the Defendants state it in the Defendants' Acquiescence MSJ to reflect the factual elements that are undisputed.

Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact). "On December 18-20, 2013, each Plaintiff delivered his or its TIR Inc. share certificates to the Defendant CEP-TIR, along with stock powers, pursuant to the provisions of the Merger Agreement." Defendants' Acquiescence MSJ ¶ 39, at 11 (stating this fact).[30] "On December 23, 2013, the Defendant TIR LLC paid . . . Plaintiffs . . . the $451,000 per share Merger Consideration." Defendants' Acquiescence MSJ ¶ 40, at 11 (stating this fact).[31] As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the Defendants had acquired control of TIR Inc." Defendants' Acquiescence MSJ ¶41, at 11 (stating this fact).[32]

---

[30]The Plaintiffs purport to dispute this fact, indicating that they dispute the fact "to the extent Defendants suggest Plaintiffs' delivery of their shares pursuant to the Merger Agreement was a voluntary choice. Rather, Plaintiffs as minority shareholders were forcibly squeezed out of TIR, as evidenced by the 'after-the-fact' December 11, 2013 Merger Notice, which informed Plaintiffs that their shares had already been cancelled." Response to Defendants' Acquiescence MSJ ¶ 12, at 10 (relying on Agarwal Depo. Ex. 7). Because (i) the fact as the Defendants assert it does not speak to whether the share certificate delivery was voluntary or involuntary; and (ii) the Plaintiffs do not dispute the asserted fact that each Plaintiff delivered his or its share certificates, along with stock powers, to CEP-TIR between December 18 and December 20, 2013, the Court deems the fact to be undisputed.

[31]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows: "On December 23, 2013, the Defendant TIR LLC paid, and the Plaintiffs accepted, the $451,000 per share Merger Consideration." Defendants' Acquiescence MSJ ¶ 40, at 11. The Plaintiffs purport to dispute the entire fact as the Defendants assert it, maintaining that the "Plaintiffs did not 'accept' the $451,000 per share merger consideration, but were forcibly cashed out." Response to Defendants' Acquiescence MSJ ¶ 13, at 10. As is true for Defendant's undisputed fact 39, the dispute with respect to this fact centers on the transaction's voluntariness, and not whether the transaction took place for the amount that the Plaintiffs indicate. Consequently, the Court amends the fact as the Defendants assert it to reflect the fact's elements that are undisputed.

[32]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows: "As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs knew the Defendants had acquired control of TIR Inc." Defendants' Acquiescence MSJ ¶ 41, at 11 (relying on Videotaped Deposition of Nathan Allen (taken Feb. 25, 2015), filed Apr. 3, 2015, at 73:17-74:2 (Doc. 83-23)("Allen Depo."). The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their

"As of December 9, 2013 (the date on which the Merger was consummated) and as of December

18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the

Plaintiffs knew the transactions by which the Defendants acquired controlling shares of TIR, Inc.

and the prices paid for those shares."  Defendants' Acquiescence MSJ ¶ 42, at 11 (stating this

fact).[33]

_____

TIR Inc. shares to obtain the Merger consideration.'"  Response to Defendants' Acquiescence
MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 41, at 11).  The Plaintiffs clarify that
they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the
Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants
received."  Response to Defendants' Acquiescence MSJ ¶ 14, at 10.  Regarding the second half
of the asserted fact's sentence, the Plaintiffs object that it is "immaterial as what 'Plaintiffs
knew' concerning the Merger process has no bearing upon the entire fairness of the Merger."
Response to Defendants' Acquiescence MSJ ¶ 14, at 10.  The Court has amended this asserted
fact's text to reflect the fact's elements that are undisputed.  Contending that a fact is immaterial
is not disputing a fact, nor is it specifically controverting a fact by directing the Court with
particularity to the record.  <u>See</u> N.D. Okla. LCvR56.1(c).  The Court has previously noted that
arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the
summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for
the statement of facts and is considered properly in the Court's legal analysis."  <u>Lowery v. City
of Albuquerque</u>, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  The
Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal
conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission
of the fact.

        [33]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows: "As of
December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20,
2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger
consideration), the Plaintiffs knew the transactions by which the Defendants acquired controlling
shares of TIR, Inc. and the prices paid for the shares."  Defendants' Acquiescence MSJ ¶ 42, at
11 (relying on Allen Depo. at 73:17-74:2).  The Plaintiffs purport to dispute this fact only insofar
as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger
consideration.'"  Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants'
Acquiescence MSJ ¶ 42, at 11).  The Plaintiffs clarify that they received <u>cash</u> merger
consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the
'Merger consideration' that the controlling shareholder Defendants received."  Response to
Defendants' Acquiescence MSJ ¶ 14, at 10.  Regarding the second half of the asserted fact's
sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the
Merger process has no bearing upon the entire fairness of the Merger."  Response to Defendants'
Acquiescence MSJ ¶ 14, at 10.  The Court has amended this asserted fact's text to reflect the
fact's elements that are undisputed.  Contending that a fact is immaterial is not disputing a fact,

"Defendants admit that they did not: [(i)] Form a special committee of disinterested directors or other disinterested persons to consider the proposed merger; [(ii)] Engage any independent financial advisor or other third party valuation analysis; or [(iii)] Require a majority-of-the-minority vote for the Merger to be approved."  Plaintiffs' MSJ ¶ 23, at 5-6 (bullets and internal citations omitted)(stating this fact).  See Response to Plaintiffs' MSJ at 3 (not disputing this fact).  "There is no other evidence that Defendants employed any of the above devices at the time of, and in connection with, the Merger."  Plaintiffs' MSJ ¶ 24, at 6 (stating this fact).  See Response to Plaintiffs' MSJ at 3 (not disputing this fact).

> As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the Defendants' conflicts of interest between their positions as officers, directors and shareholders of TIR Inc. and their positions as officers, directors, and equity owners of Cypress Energy and its Affiliates.

Defendants' Acquiescence MSJ ¶ 43, at 11 (stating this fact)(relying on Allen Depo. at 108:3-112:3).[34]

---

nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[34]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs knew the Defendants' conflicts of interest between their positions as officers, directors and shareholders of TIR Inc. and their positions as officers, directors, and equity owners of Cypress Energy and its Affiliates.

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the intentions of the Defendants respecting the organization of a master limited partnership, the exchange of shares of TIR Inc. for units of ownership in the master limited partnership, and an initial public offering of units of ownership in the master limited partnership.

Defendants' Acquiescence MSJ ¶ 44, at 12 (stating this fact)(relying on Allen Depo. at 191:8-193:4).[35]

---

Defendants' Acquiescence MSJ ¶ 43, at 11. The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 43, at 11). The Plaintiffs clarify that they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[35]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs knew the intentions of the Defendants respecting the organization of a master limited partnership, the exchange of shares of TIR Inc. for units of ownership in the master limited partnership, and an initial public offering of units of ownership in the master limited partnership.

Defendants' Acquiescence MSJ ¶ 44, at 11. The Plaintiffs purport to dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 44, at 11). The Plaintiffs clarify that they received <u>cash</u>

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the Defendants had not performed or commissioned any appraisal, or engaged any independent financial advisor or other third party to perform any valuation analysis or provide any opinion respecting the value of the TIR, Inc. shares.

Defendants' Acquiescence MSJ ¶ 45, at 12 (stating this fact)(relying on Allen Depo. at 99:5-104:24, Agarwal Depo. at 42:1-44:17, and Agarwal Depo. Ex. 1).[36]

---

merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiff's assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[36]In Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs knew the Defendants had not performed or commissioned any appraisal, or engaged any independent financial advisor or other third party to perform any valuation analysis or provide any opinion respecting the value of the TIR, Inc. shares.

Defendants' Acquiescence MSJ ¶ 45, at 12. The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 45, at 12). The Plaintiffs clarify that they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants'

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the Defendants had not obtained the approval of a majority of the minority in effecting the Merger: the Plaintiffs were the remaining TIR Inc. minority shareholders. As a group, the Plaintiffs had demanded in September to sell their shares for a price in excess of $600,000 per share, and in November had agreed amongst themselves not to accept the Tender Offer.

Defendants' Acquiescence MSJ ¶ 46, at 12 (stating this fact).[37]  "As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on

---

Acquiescence MSJ ¶ 14, at 10.  The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See N.D. Okla. LCvR56.1(c).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[37]In Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs knew the Defendants had not obtained the approval of a majority of the minority in effecting the Merger: the Plaintiffs were the remaining TIR Inc. minority shareholders. As a group, the Plaintiffs had demanded in September to sell their shares for a price in excess of $600,000 per share, and in November had agreed amongst themselves not to accept the Tender Offer.

Defendants' Acquiescence MSJ ¶ 46, at 12.  The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'"  Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 46, at 12).  The Plaintiffs clarify that they received cash merger consideration but did not receive equity merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received."  Response to Defendants' Acquiescence MSJ ¶ 14, at 10.  Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger."  Response to Defendants' Acquiescence MSJ ¶ 14, at 10.  The Court has amended this asserted fact's text to reflect the

which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the Defendants had not formed a special committee to consider the proposed Merger." Defendants' Acquiescence MSJ ¶ 47, at 12 (stating this fact)(relying on Allen Depo. at 272:3-273:17).[38]

---

fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[38]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs knew the Defendants had not formed a special committee to consider the proposed Merger.

Defendants' Acquiescence MSJ ¶ 47, at 12. The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 47, at 12). The Plaintiffs clarify that they received cash merger consideration but did not receive equity merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

- 29 -

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs had been provided the financial statements of TIR Inc. for 2011 and 2012, and for the nine month period ending September 30, 2013.

Defendants' Acquiescence MSJ ¶ 48, at 12 (stating this fact)(relying on Allen Depo. at 83:18-84:1, 223:21-224:3).[39]  "As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs had received the Registration Statement."  Defendants' Acquiescence MSJ ¶ 49, at 12 (stating this fact)(relying on

---

[39]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs had been provided the financial statements of TIR Inc. for 2011 and 2012, and for the nine month period ending September 30, 2013.

Defendants' Acquiescence MSJ ¶ 48, at 12.  The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'"  Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 48, at 12).  The Plaintiffs clarify that they received cash merger consideration but did not receive equity merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received."  Response to Defendants' Acquiescence MSJ ¶ 14, at 10.  Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger."  Response to Defendants' Acquiescence MSJ ¶ 14, at 10.  The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See N.D. Okla. LCvR56.1(c).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

Allen Depo. at 194:2-11).[40]

> As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs believed that the Defendants did not believe (and had no reasonable basis to believe) that $451,100 per TIR Inc. share represented a premium over the fair value of such shares.

Defendants' Acquiescence MSJ ¶ 50, at 13 (stating this fact)(relying on Allen Depo. at 206:11-208:25).[41]

---

[40]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows: "As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs had received the Registration Statement." Defendants' Acquiescence MSJ ¶ 49, at 12. The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 49, at 12). The Plaintiffs clarify that they received cash merger consideration but did not receive equity merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[41]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

> As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs believed that the Defendants did not believe (and had no reasonable basis to believe) that $451,100 per TIR Inc. share represented a premium over the fair value of such shares.

Defendants' Acquiescence MSJ ¶ 50, at 13. The Plaintiffs dispute this fact only insofar as it

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the dates on which the Plaintiffs surrendered their TIR Inc. shares . . . ), Plaintiffs believed both Plaintiffs' financial presentations and Defendants' financial presentations showed the TIR Inc. shares were worth several multiples of $451,000.

Defendants' Acquiescence MSJ ¶ 51, at 13 (stating this fact)(relying on Complaint, filed July 3, 2014 (Doc. 1)).[42]

---

"incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 50, at 13). The Plaintiffs clarify that they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[42]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the dates on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), Plaintiffs believed both Plaintiffs' financial presentations and Defendants' financial presentations showed the TIR Inc. shares were worth several multiples of $451,000.

Defendants' Acquiescence MSJ ¶ 51, at 13. The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 51, at 13). The Plaintiffs clarify that they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the

On February 4, 2014, Plaintiff SFF-TIR, LLC by its Managing Member, Alan Stuart, sent a letter to the investors in Plaintiff SFF-TIR in the form and content of Ex. 26, Allen Deposition, Ex. 116 [Letter to SFF-TIR, LLC Investors (dated Feb, 12, 2014), filed Apr. 3, 2015 (Doc. 83-31)("Letter to SFF-TIR, LLC Investors")], which stated, in part, as follows

> "We are pleased to inform our investors in SFF-TIR, LLC ('SFF[-]TIR') we were able to liquidate our equity position in Tulsa Inspection Resources, Inc. ('TIR'). On December 23, 2013 we received cash consideration of $451,000 per share for a total cash consideration of $5,763,780. The investment in TIR has generated 2.47x our original investment with a net annualized IRR of 40.42%."

Defendants' Acquiescence MSJ ¶ 53, at 13 (stating this fact)(quoting Letter to SFF-TIR, LLC Investors 1, filed April 3, 2015 (Doc. 83-32)).[43]

> After . . . December 18-20, 2013, Defendants CEP-TIR, Charles Stephenson, and Cynthia Field, believing the Plaintiffs to have waived all claims to additional consideration for their shares, contributed 50.1% of the member interest in TIR LLC to Cypress Energy Partners Limited Partnership, and Cypress Energy Partners Limited Partnership effected a sale of partnership units to the public

---

Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[43]The Plaintiffs do not dispute this fact, but they maintain that it is "immaterial and irrelevant." Response to Defendants' Acquiescence MSJ ¶ 16, at 11. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). Accordingly, the Court does not deem the Defendants' asserted fact to be disputed.

pursuant to the Registration Statement.

Defendants' Acquiescence MSJ ¶ 54, at 13 (stating this fact)(relying on Austin Aff. ¶ 5, at 2-3).[44]

"On July 3, 2014, the Plaintiffs filed this action." Defendants' Acquiescence MSJ ¶ 55, at 13 (stating this fact)(relying on Complaint). See Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact).

## PROCEDURAL BACKGROUND

With this Memorandum Opinion, the Court resolves and decides six of the motions that the parties have filed in this case and that the parties argued during motion hearings on December 27-28, 2016. The Court's analysis, infra, will reorder the motions so that they progress logically from one argument to the next argument. To increase reader comprehension, however, the Court orders the motions in this part based on the order in which the parties argued

---

[44]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

After the acceptance of the Merger consideration by the Plaintiffs on December 18-20, 2013, Defendants CEP-TIR, Charles Stephenson, and Cynthia Field, believing the Plaintiffs to have waived all claims to additional consideration for their shares, contributed 50.1% of the member interest in TIR LLC to Cypress Energy Partners Limited Partnership, and Cypress Energy Partners Limited Partnership effected a sale of partnership units to the public pursuant to the Registration Statement.

Defendants' Acquiescence MSJ ¶ 54, at 13. The Plaintiffs dispute this fact only insofar as it states that the Plaintiffs accepted the merger consideration of $451,000 per share rather than being "forcibly cashed out at that price. Response to Defendants' Acquiescence MSJ ¶ 17, at 11. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. The Plaintiffs further contend that this fact is "immaterial and irrelevant." Response to Defendants' Acquiescence MSJ ¶ 17, at 11. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.). Accordingly, the Court does not deem the Defendants' asserted fact to be disputed.

them at the hearing. First, the Defendants' Acquiescence MSJ asks the Court to grant the Defendants summary judgment on the theory that the Plaintiffs acquiesced to the merger when the Plaintiffs took merger consideration. Second, the Defendants' Estoppel MSJ asks the Court to grant the Defendants summary judgment on the theory that (i) the Oklahoma common-law clean hands doctrine; (ii) the Oklahoma common law of waiver; or (iii) the Oklahoma common law of estoppel bars the Plaintiffs' claims. Third, the Plaintiffs' Motion to Strike Lorett Affidavit moves for the Court to strike the Lorett Aff. on the grounds of alleged inconsistencies between the Lorett Aff. and the Lorett Depo. Fourth, the Plaintiffs' Motion to Strike Affirmative Defenses petitions the Court to strike the Defendants' affirmative defenses from their two summary judgment motions -- acquiescence, unclean hands, waiver, and estoppel -- under rule 12(f) of the Federal Rules of Civil Procedure. Fifth, the Plaintiffs' MSJ asks the Court to grant the Plaintiffs partial summary judgment on breach of fiduciary duty claims. Sixth and last, the Plaintiffs' Motion in Limine moves for the Court to preclude evidence of (i) a letter from Akin Gump and all letters between the Plaintiffs' and Plaintiffs' counsel and the Defendants from September, 2013, to December, 2013; (ii) all letters sent to or received from Triangle Capital; and (iii) any mention during trial that the Plaintiffs reside outside of Oklahoma. In this section's remainder, the Court will summarize each motion and the response and reply to it, along with the transcript of two days of hearings that the Court heard on these six motions.

**1.    Defendants' Motion for Summary Judgment on Acquiescence Defense and Brief in Support.**

On April 3, 2015, the Defendants filed Defendants' Acquiescence MSJ. According to the Defendants, the dispositive facts are relatively simple. See Defendants Acquiescence MSJ at 1. The Defendants say that six months after having obtained and accepted payment of the Merger consideration, the Plaintiffs filed this action. See Defendants' Acquiescence MSJ at 2. The

Defendants maintain that all eight claims alleged in the Plaintiffs' Complaint are predicated on four core allegations "repeated time after time throughout the Complaint's 212 paragraphs . . . ." Defendants' Acquiescence MSJ at 2. As the Defendants distill them, these four core allegations are as follows:

> (i) in June 2012, the Defendants    misled a group of minority shareholder (the "Pooled Shareholders") to gain control of the TIR, Inc.;  (ii) in November, 2013, the Plaintiffs were misled by a Tender Offer, which the Plaintiffs rejected; (iii) in December, 2013, the Merger Notice contained false representations upon which the Plaintiffs relied; and (iv) the Defendants did not obtain an independent appraisal of TIR Inc. or the approval of a majority of the minority shareholders or take other steps to protect the Plaintiffs.

Defendants' Acquiescence MSJ at 2-3. The Defendants respond that the equitable doctrine of acquiescence precludes the Plaintiffs from challenging the merger on these four core allegations for six different reasons. See Defendants' Acquiescence MSJ at 14. First, the Defendants insist, the Plaintiffs "engaged in an agreed competition with the Defendants to acquire control of TIR Inc." Defendants' Acquiescence MSJ at 14. Second, the Defendants contend, the Plaintiffs "lost the competition." Defendants' Acquiescence MSJ at 14. Third, the Defendants assert, the Plaintiffs "were represented by legal counsel." Defendants' Acquiescence MSJ at 14. Fourth, the Defendants aver, the Plaintiffs "were fully advised of all material facts, including all TIR Inc. financial information and the organization of, and initial public offering of limited partnerships in, Cypress Energy Partners Limited Partnership." Defendants' Acquiescence MSJ at 14. Fifth, the Defendants asseverate, the Plaintiffs "surrendered their shares in order to obtain the Merger consideration." Defendants' Acquiescence MSJ at 14. Sixth, the Defendants argue, the Plaintiffs "surrendered their shares pursuant to a Merger Agreement that expressly provided that the Plaintiffs would be deemed, by such surrender, to have accepted the Merger consideration and waived all appraisal rights, whether pursuant to the appraisal statute or otherwise."

Defendants' Acquiescence MSJ at 14.

The Defendants further insist that, even assuming that all of the Plaintiffs' allegations are true "no matter how untrue they may be," the acquiescence defense "renders the questions whether the merger process was fair and whether the value paid to the Plaintiffs was fair moot." Defendants Acquiescence MSJ at 15. Moreover, the Defendants insist, acquiescence bars all claims that the Plaintiffs allege in the Complaint, <u>see</u> Defendants' Acquiescence MSJ at 15, including unjust enrichment claims and implied causes of action that the Plaintiffs brought pursuant to SEC Rule 10b-5, <u>see</u> Defendants' Acquiescence MSJ at 15-16. The Defendants highlight three options that they believe the Plaintiffs had vis-à-vis the merger: (i) surrender their shares and receive the merger consideration in accordance with the merger agreement's terms and conditions; (ii) keep their shares and exercise their statutory appraisal rights as the merger agreement provides; or (iii) keep their shares and, as the Plaintiffs have done in this action, sue for an appraisal. <u>See</u> Defendants' Acquiescence MSJ at 16. According to the Defendants, the acquiescence doctrine makes options 1 and 3 mutually exclusive; the Plaintiffs could not surrender their shares for merger consideration and then sue. <u>See</u> Defendants' Acquiescence MSJ at 16. The Defendants finally observe that the merger agreement expressly provides that any shareholder who surrenders his or her shares shall be deemed to have waived appraisal rights, "whether pursuant to the appraisal statute or otherwise." Defendants' Acquiescence MSJ at 16.

### 2. **Plaintiffs' Response to the Defendants' Acquiescence MSJ.**

On April 20, 2015, the Plaintiffs filed the Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment on Acquiescence Defense. <u>See</u> Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment on

Acquiescence Defense, filed April 20, 2015 (Doc. 84)("Response to Defendants' Acquiescence MSJ).  Abstracting their argument, the Plaintiffs start by asserting that, under settled law, "acquiescence plays no role in the self-interested cash-out merger, which is scrutinized solely under Delaware's 'entire fairness' standard -- its most exacting standard of review."  Response to Defendants' Acquiescence MSJ at 1 (quoting Kahn v. Lynch Communications, Inc., 638 A.2d 1110, 1116-17 (Del. 1994)("Kahn v. Lynch")).  According to the Plaintiffs, the entire fairness doctrine imposes on the Defendants a fiduciary duty to ensure that the transaction is entirely fair to the Plaintiffs in two respects: (i) the use of fair procedure to protect the minority shareholders' interests; and (ii) offer of a price that is entirely fair to minority shareholders.  Response to Defendants' Acquiescence MSJ at 1.  That doctrine, the Plaintiffs insist, imposes on the Defendants the evidentiary burden of proving, at trial, each of these aspects of entire fairness.  See Response to Defendants' Acquiescence MSJ at 1.  The Plaintiffs maintain that this showing is a threshold legal burden that the Defendants must satisfy.  See Response to Defendants' Acquiescence MSJ at 1.  As the Plaintiffs see it, the Defendants admit in the Defendants' Acquiescence MSJ that they cannot satisfy this exacting burden.  See Response to Defendants' Acquiescence MSJ at 2.

According to the Plaintiffs, the Defendants ignore settled law when they assert that the Plaintiffs forewent statutory appraisal rights and acquiesced in the Defendants' "self-dealing conduct" when they received merger consideration.  Response to Defendants' Acquiescence MSJ at 2.  The Plaintiffs maintain that this assertion is incorrect and that the entire fairness standard still applies for two reasons.  See Response to Defendants' Acquiescence MSJ at 2.  First, under settled law as the Plaintiffs read it, the Defendants cannot relieve themselves of their burden to establish the transaction's entire fairness by pointing to the Plaintiffs' conduct, as such conduct

cannot establish fair procedure or fair price as <u>Kahn v. Lynch</u> requires. <u>See</u> Response to Defendants' Acquiescence MSJ at 2 (citing <u>Kahn v. Lynch</u>, 638 A.2d at 1110). The Plaintiffs insist that the doctrine of acquiescence has no role to play in the determination of fair procedure or fair price, particularly with respect to shareholders who had no say in the cash-out decision and were presented with a fait accompli. <u>See</u> Response to Defendants' Acquiescence MSJ at 2. Second, under settled law as the Plaintiffs read it, statutory appraisal against a corporation is only a non-exclusive remedy, <u>i.e.</u>, by foregoing appraisal, the Plaintiffs did not forego their separate claims against the Defendants for breach of their duties of entire fairness. <u>See</u> Response to Defendants' Acquiescence MSJ at 2.

The Plaintiffs further maintain that the Defendants do not address and cannot establish the elements of acquiescence, which the Defendants insist require a clear and decisive showing that (i) the Defendants disclosed all material facts; (ii) the Defendants gave the Plaintiffs a meaningful choice; and (iii) the Plaintiffs unequivocally approved the challenged conduct. <u>See</u> Response to Defendants' Acquiescence MSJ at 2. To the contrary, the Plaintiffs assert, in addition to giving the Plaintiffs no say in the merger, the Defendants omitted material information required for an informed decision, <u>e.g.</u>, the equity value in the Merger Sub[45] that they received on cancelling the Plaintiffs' shares. <u>See</u> Response to Defendants' Acquiescence MSJ at 2. The Plaintiffs conclude that the foregoing facts "doom" the Defendants' Acquiescence MSJ. <u>See</u> Response to Defendants' Acquiescence MSJ at 3.

**3.  <u>Reply to the Defendants' Acquiescence MSJ.</u>**

The Defendants filed the Defendants' Reply in Support of Motion for Summary

---

[45]"Merger Sub" is an abbreviation that the Agreement and Plan of Merger, (dated Dec. 9, 2013), filed Apr. 3, 2015 (Docs. 83-27 & -28) uses to signify CEP-TIR, the surviving entity after the merger. <u>See</u> Agreement and Plan of Merger 1, (dated Dec. 9, 2013), filed Apr. 3, 2015 (Docs. 83-27 & -28)("Merger Agreement").

Judgment on Acquiescence Defense on April 24, 2015.  See Defendants' Reply in Support of Motion for Summary Judgment on Acquiescence Defense, filed April 24, 2015 (Doc. 93)("Reply to Defendants' Acquiescence MSJ").  The Defendants assert that the undisputed facts present the Court with a question of law regarding the acquiescence defense.  See Reply to Defendants' Acquiescence MSJ at 1.  Asserting that the Plaintiffs respond to a motion that the Defendants did not file -- "a motion for summary judgment on the question whether the TIR Inc. merger process was fair" -- the Defendants assert that all of the Plaintiffs' arguments in the response are for naught.  Reply to Defendants' Acquiescence MSJ at 1-2.

As the Defendants see it, the only relevant facts with regard to the Defendants' Acquiescence MSJ are the facts establishing the Plaintiffs' knowledge when they surrendered their shares in exchange for merger consideration on December 18-20, 2013.  See Reply to Defendants' Acquiescence MSJ at 2.  The Defendants insist that the acquiescence defense bars the Plaintiffs' claims if the Plaintiffs had knowledge of the facts they allege in their Complaint on the date when the Plaintiffs surrendered their shares.  See Reply to Defendants' Acquiescence MSJ at 2.  The Defendants' further insist that the single issue before the Court is one of Oklahoma common law, viz. whether the Plaintiffs may both surrender their shares "in order to induce payment of the Merger consideration by the Defendants," and "sue for rescission and rescissionary damages."  Reply to Defendants' Acquiescence MSJ at 2.  The Defendants assert that Delaware law applies only to provisions relating the merger's mechanics or effects.  See Reply to Defendants' Acquiescence MSJ at 3.  As the Defendants see it, none of the Plaintiffs' eight claims relates to the merger's mechanics or effects, and, consequently, all eight claims are subject to the acquiescence defense.  See Reply to Defendants' Acquiescence MSJ at 3-4.

The Defendants maintain that the Plaintiffs can challenge the applicability of neither

Oklahoma law nor the acquiescence defense.  See Reply to Defendants' Acquiescence MSJ at 8.

According to the Defendants, the Plaintiffs obtained the merger consideration "knowing every

fact material to their decision and intending to obtain payment."   Reply to Defendants'

Acquiescence MSJ at 8.  The Defendants aver that the Plaintiffs knew, thanks to the Merger

Agreement, that the merger consideration would not be paid unless they surrendered their stock

certificates along with executed powers of attorney.  See Reply to Defendants' Acquiescence

MSJ at 8.  Thus, the Defendants assert, the Plaintiffs had only four options open to them.  See

Reply to Defendants' Acquiescence MSJ at 8.  The Plaintiffs could (i) obtain payment of the

merger consideration; (ii) have their shares appraised; (iii) simultaneously seek a statutory

appraisal of their share and sue for rescission and rescissionary damages; or (iv) file suit seeking

rescission and rescissionary damages.  See Reply to Defendants' Acquiescence MSJ at 8.  The

Defendants argue that the Plaintiffs could not "deceitfully obtain payment of the Merger

consideration pursuant to the Merger Agreement and, after eight months' delay, file suit seeking

rescission and rescissionary damages."  Reply to Defendants' Acquiescence MSJ at 8 (emphasis

in the original)(citing Bershad at 848 (Del. 1987)).  According to the Defendants, because the

Plaintiffs "voluntarily rejected each of the four [options] in order to inequitably obtain payment

of the Merger consideration prior to filing this action," the Plaintiffs acquiesced in the

transaction, and the Defendants are entitled to summary judgment.  Reply to Defendants'

Acquiescence MSJ at 10 (emphasis in the original).

### 4.    The Defendants' Estoppel MSJ.

The Defendants filed the Defendants' Estoppel MSJ on September 14, 2015.  The

Defendants argue that the Plaintiffs delivered their share certificates to induce the Defendants to

pay the merger consideration once the Plaintiffs discovered that they had no legal ability to block

the merger. See Defendants' Estoppel MSJ at 16. The Defendants then argue that: (i) they established an independent committee, which secured neither an appraisal nor a majority vote of the minority shareholders necessary for the cash out to satisfy fair process. See Defendants' Estoppel MSJ at 17. Furthermore, the Defendants contend, the Plaintiffs engaged in "legal blackmail to extract a premium price" after having failed to acquire control of TIR in a competitive bidding war, and then bragging about the price they received as a result of the cash out. Defendants' Estoppel MSJ at 17.

According to the Defendants, the Defendants had a statutory right to effect a cash-out merger with after-the-fact notice, and the Plaintiffs received notice of their appraisal rights. See Defendants' Estoppel MSJ at 17. The Defendants insist that the Plaintiffs' claims regarding the Defendants' alleged breach of fiduciary duty and unjust enrichment therefore fail under settled Oklahoma law, because: (i) the Oklahoma common-law clean hands doctrine bars the claims; (ii) the Oklahoma common law of waiver bars the claims; and (iii) the Oklahoma common law of estoppel bars the claims. See Defendants' Estoppel MSJ at 17-18. The Defendants further assert that the Plaintiffs' claims under the Oklahoma Securities Act fail, because: (i) the Plaintiffs have no private right of action; and (ii) the Oklahoma common law of unclean hands, waiver, and estoppel bar the claims. See Defendants' Estoppel MSJ at 18. Finally, the Defendants maintain that the Oklahoma common law of unclean hands, waiver, and estoppel also bar the Plaintiffs' claims under the Securities Exchange Act of 1934. See Defendants' Estoppel MSJ at 18.

Circling back through these sets of claims, the Defendants argue that the Oklahoma common law of unclean hands bars the Plaintiffs' claims on the grounds that Stuart orchestrated this litigation despite (i) having attempted to seize control of TIR, Inc.; (ii) having entered into an agreement with the other Plaintiffs to attempt to extract an unjustified premium for the Plaintiffs'

shares; and (iii) filing false allegations against the Defendants in an attempt to justify a trial on their surrendered shares' value. See Defendants' Estoppel MSJ at 19-20. The Defendants then argue that Oklahoma common law of waiver indicates that a contract may achieve waiver provided that the contract is founded on a valuable consideration and made by a party whose benefit is being waived. See Defendants' Estoppel MSJ at 20. According to the Defendants, the Plaintiffs delivered their share certificates to the Defendants to induce the Defendants to pay the merger consideration, and in accordance with the merger agreement's express provision that any former shareholder who surrendered his or her share certificates would be deemed to have forever waived any appraisal rights or quasi-appraisal rights pursuant to the Oklahoma appraisal statute or otherwise. See Defendants' Estoppel MSJ at 21. The Defendants then argue that the Plaintiffs are equitably estopped from unwinding the merger, because, in reliance on the Plaintiffs' voluntary and knowing surrender of their share certificates, the Plaintiffs: (i) consummated the merger of TIR, Inc. and TIR LLC; (ii) contributed 50.1% of their member interests in TIR LLC to Cypress Energy Partners L.P.; and (iii) effected a sale of partnership units to the public pursuant to the Registration Statement. See Defendants' Estoppel MSJ at 22. With regard to the Plaintiffs' federal securities claims, the Defendants assert that the Plaintiffs must allege and prove both a misleading statement or omission of a material fact and reliance to have a claim under Securities and Exchange Act § 10(b) and rule 10b-5. See Defendants' Estoppel MSJ at 23-24. According to the Defendants, the Plaintiffs' federal securities claims fail, because the Plaintiffs do not satisfy the reliance requirement. See Defendants' Estoppel MSJ at 23-24.

     **5.**     <u>**The Plaintiffs' Response to Defendants' Estoppel MSJ.**</u>

     The Defendants filed the Plaintiffs' Memorandum of Law in Opposition to Defendants'

Second Motion for Summary Judgment on October 12, 2015.  See Plaintiffs' Memorandum of Law in Opposition to Defendants' Second Motion for Summary Judgment, filed October 12, 2015 (Doc. 171)("Response to Defendants' Estoppel MSJ").  The Defendants argue that, separate and apart from the fact that the Defendants' affirmative defenses are barred as a matter of law, the Defendants fail to establish any of the elements of waiver, estoppel, or unclean hands. Responding to the Defendants' arguments out of order, the Plaintiffs first contend that the Defendants cannot satisfy waiver elements, because the Plaintiffs did not voluntarily and intentionally release each of the Defendants from personal liability either under common law or under securities law.  See Response to Defendants' Estoppel MSJ at 13.  According to the Plaintiffs, the Defendants ignore settled law that "a stockholder who . . . accepts the consideration from . . . a merger effected by a controlling stockholder is ***not barred by the doctrine of . . . waiver*** . . . from challenging the fairness of the merger in an equitable action." Response to Defendants' Estoppel MSJ at 13 (emphasis in the original)(quoting In re JCC Holding Co., Inc., 843 A.2d 713, 723 (Del. Ch. 2003)(Strine, V.C.)).  The Plaintiffs argue that the Defendants' argument also fails on its own terms, because (i) waiver requires the "voluntary and intentional relinquishment of a known right,"  Response to Defendants' Estoppel MSJ at 13 (quoting Barringer v. Baptist Healthcare of Oklahoma, 22 P.3d 965, 700-01 (Okla. 2001)); and (ii) a contractual waiver requires a "'contract . . . made by the party whose benefit is being waived.'"  Response to Defendants' Estoppel MSJ at 13 (quoting Smith v. Minneapolis Threshing Mach. Co., 214 P.2d 178, 180 (Okla. 1923)).  The Plaintiffs maintain that they did not enter a contract with the Defendants; rather, the Defendants unilaterally cancelled the Plaintiffs' shares.  See Response to Defendants' Estoppel MSJ at 13-14.  Moreover, the Plaintiffs say, 18 O.S. § 1091 leaves the Plaintiffs free to exercise, or decline to exercise, statutory appraisal rights,

a decision not to exercise the appraisal rights has no effect with regard to waiver. See Response to Defendants' Estoppel MSJ at 14. In summary, the Plaintiffs contend that the waiver defense fails on three grounds: (i) nothing in the merger notice declared such a broad waiver; (ii) 18 O.S. § 1091 does not impose a waiver; and (iii) settled law holds that foregoing an appraisal does not immunize the Defendants from liability for any breach of their duty of entire fairness in undertaking a self-interested merger transaction. See Response to Defendants' Estoppel MSJ at 15.

The Plaintiffs argue that the Defendants' estoppel argument also fails. See Response to Defendants' Estoppel MSJ at 16-17. Again invoking In re JCC Holding Co., Inc., the Plaintiffs say that settled law is that acceptance of merger consideration does not allow an estoppel defense to bar challenges to a self-interested merger's entire fairness. See Response to Defendants' Estoppel MSJ at 16. Furthermore, the Plaintiffs maintain, the Defendants cannot satisfy estoppel's core elements: (i) that the Plaintiffs intended to induce a detrimental chance of position; (ii) that a detrimental chance of position in fact occurred; and (iii) that reasonable reliance upon a belief that the Plaintiffs inculcated induced the detrimental change. See Response to Defendants' Estoppel MSJ at 16 (citing Spaulding v. United Transp. Union, 279 F.3d 901, 909-10 (10th Cir. 2002)). First, according to the Plaintiffs, the Defendants were committed to paying the merger consideration upon demand regardless what the Defendants believed or did not believe about their personal liability. See Response to Defendants' Estoppel MSJ at 17. Second, according to the Plaintiffs, 18 O.S. § 1090.2(B)(3) required the Defendants to fix the merger consideration as part of any freeze-out merger. See Response to Defendants' Estoppel MSJ at 17. The Plaintiffs assert that these two facts left Defendants with no choice whether to pay the merger consideration, and the Plaintiffs therefore could have induced neither

belief nor reasonable reliance in the Defendants  <u>See</u> Response to Defendants' Estoppel MSJ at 17.

Turning to the Defendants' unclean-hands argument, the Plaintiffs contend that the Defendants cannot show unclean hands, because (i) the Plaintiffs' conduct did not cause the Defendants' unilateral adoption, execution, and implementation of the freeze-out merger; and (ii) the Plaintiffs did not commit fraud or deceit.  <u>See</u> Response to Defendants' Estoppel MSJ at 18. As a threshold argument, the Plaintiffs again invoke <u>In Re JCC Holding</u>, saying that case disallows defendants from asserting any equitable doctrine to avoid entire fairness review, a prohibition that the Plaintiffs insist includes the unclean hands defense.  <u>See</u> Response to Defendants' Estoppel MSJ at 18.  Regardless, the Plaintiffs continue, the Defendants' argument fails on its own merits.  <u>See</u> Response to Defendants' Estoppel MSJ at 18.  First, the Plaintiffs insist, the Defendants make no showing that the Plaintiffs tainted the transaction that they are challenging by undertaking the very "***fraudulent and deceitful conduct***" of which they complain.  Response to Defendants' Estoppel MSJ at 18 (quoting <u>Yeager v. Fort Know Sec. Products</u>, 602 F. App'x 423, 429 (10th Cir. 2015))(emphasis added in Response to Defendants' Estoppel MSJ).  According to the Plaintiffs, they did not induce the Defendants' payment of the required merger consideration, through fraud and deceit or otherwise.  <u>See</u> Response to Defendants' Estoppel MSJ at 18.  Consequently, the Plaintiffs say, the unclean hands doctrine cannot apply or block an entire fairness review.  <u>See</u> Response to Defendants' Estoppel MSJ at 18-19.

The Plaintiffs then attack the Defendants' securities claim arguments as a straw man.  <u>See</u> Response to Defendants' Estoppel MSJ at 19.  The Plaintiffs assert that their securities claims rest only on the forced-seller doctrine, which the Plaintiffs maintain provides a cause of action

under securities laws to plaintiffs who are forced to convert their shares or to sell their shares for consideration, and there has been deception in the transaction. See Response to Defendants' Estoppel MSJ at 19-20. According to the Plaintiffs, the Defendants practiced deception when they omitted material facts concerning the MLP IPO when inducing the pooled shareholders to sell their shares to the Defendants. See Response to Defendants' Estoppel MSJ at 21-22. Furthermore, the Plaintiffs assert, the Defendants materially misrepresented (i) the Plaintiffs' competing offer to the pooled shareholders; and (ii) the payments and employment provisions offered to TIR, Inc. management. See Response to Defendants' Estoppel MSJ at 22-23. The Plaintiffs contend that the misrepresentations amassed the Defendants enough shares to enact the cash-out merger of the Plaintiffs, thereby making the Defendants guilty of securities fraud and liable to the Plaintiffs under the forced seller doctrine. See Response to Defendants' Estoppel MSJ at 22-24.

6.      **The Defendants' Reply to the Defendants' Estoppel MSJ.**

The Defendants filed the Defendants' Reply in Support of Second Motion for Summary Judgment (Doc. 154) on October 23, 2015. See Defendants' Reply in Support of Second Motion for Summary Judgment (Doc. 154), filed October 23, 2015 (Doc. 178)("Reply to Defendants' Estoppel MSJ"). The Defendants repeat their assertion that the merger process was fair, that the Plaintiffs engaged in legal blackmail in an attempt to block the merger they opposed, and that the Plaintiffs  bragged about how good the merger price they received was. See Reply to Defendants' Estoppel MSJ at 3. Furthermore, the Defendants assert, the Plaintiffs were fully informed and knowingly induced the Defendants to pay the merger consideration. See Reply to Defendants' Estoppel MSJ at 3. As a consequence, the Defendants maintain, the Oklahoma clean-hands doctrine, equitable estoppel, and waiver all bar the Plaintiffs from attacking the

merger's entire fairness.  See Reply to Defendants' Estoppel MSJ at 3.  The Defendants then

seem to make a concession to the Plaintiffs:

> Plaintiffs' only response [to the Defendants' Oklahoma equity and waiver
> arguments] is to argue this well-settled Oklahoma law is an acquiescence defense
> in another dress.  **So be it.  To the extent this Court determines Oklahoma law
> should follow Delaware law, <u>Bershad v. Curtis-Wright Corp.</u>, 525 A.2d 840,
> 842, 848 (Del. 1987) is controlling.**

Reply to Defendants' Estoppel MSJ at 3-4 (emphasis added).  The Defendants then shortly

restate acquiescence defense arguments from the Defendants' Acquiescence MSJ and Reply to

Defendants' Acquiescence MSJ.  See Reply to Defendants' Estoppel MSJ at 3.

The Defendants then tackle the Plaintiffs' securities arguments, highlighting that the

Plaintiffs concede that their securities claims rest entirely on the forced-seller doctrine -- a

doctrine that the Defendants insist the United States Court of Appeals for the Tenth Circuit twice

has declined to apply and that does not apply under the Oklahoma Uniform Securities Act.  See

Reply to Defendants' Estoppel MSJ at 4-6 (citing <u>Katz v. Gerardi</u>, 655 F.3d 1212, 1221 n.8 (10th

Cir. 2011), and <u>Anderson v. Dixon</u>, 86 F.3d 1166, **2-3 (10th Cir. 1996)(unpublished)).

Moreover, the Defendants assert, the United States Court of Appeals for the Seventh Circuit, in

an opinion that then-Chief Judge Posner wrote and Judges Cummings and Manion joined, held

that the forced-seller doctrine is inconsistent with basic federal securities precedents, because it

penalizes conduct that is too remote from the fraud to be actionable, <u>i.e.</u>, does not induce a third

party to do anything.  See Reply to Defendants' Estoppel MSJ at 5-6 (citing <u>Isquith v. Caremark</u>

<u>International, Inc.</u>, 136 F.3d 531 (7th Cir. 1998)).  The Defendants also note that the forced-seller

doctrine appears to be losing credence among the district courts even in circuits in which it

previously has been recognized.  See Reply to Defendants' Estoppel MSJ at 6 n. 8 (citing <u>Howe</u>

v. Bank for Intern. Settlements, 194 F. Supp. 2d 6, 11 (D. Mass. 2002)(Lindsay, J.)[46]; Koppel v. 4987 Corp., 1999 WL 608783, at *4 (S.D.N.Y. Aug. 11, 1999)(Carter, J.); Sarafianos v. Shandong Tada Auto-Parking Co., Ltd., 2014 WL 7238339, at *4 (S.D.N.Y. Dec. 19, 2014)(Scheindlin, J.); and Gunther v. Ridgewood Energy Corp., 32 F. Supp. 2d 166, 178 (D.N.J. 1998)(Walls, J.)). The Defendants say that the Plaintiffs' securities claims also fail, because the Plaintiffs premise them on the pooled shareholders' implausible and demonstrably false allegations. See Reply to Defendants' Estoppel MSJ at 7. According to the Defendants, rule 10b-5 requires that the Defendants failed to advise the pooled shareholders of their business plan with scienter. See Reply to Defendants' Estoppel MSJ at 7. The Defendants assert that they "disclosed and openly advocated their business plan to the Pooled Shareholders as they competed with Plaintiffs to acquire control of TIR." Reply to Defendants' Estoppel MSJ at 10. Consequently, the Defendants maintain, (i) there is no rule 10b-5 material misrepresentation or omission; (ii) there is no rule 10b-5 scienter; and (iii) the pooled shareholders had a proven ability to know of the Defendants business plan. See Reply to Defendants' Estoppel MSJ at 10. The Defendants argue that they therefore are entitled to summary judgment in the Defendants' Estoppel MSJ. See Reply to Defendants' Estoppel MSJ at 11.

**7.      The Plaintiffs' Motion to Strike Lorett Affidavit.**

The Plaintiffs filed Plaintiffs' Motion to Strike Lorett Affidavit on April 20, 2015. The Plaintiffs argue that the Defendants' Acquiescence MSJ

> relies on an Affidavit by Randall Lorett, the President and CEO of Defendant Tulsa Inspection Resources, LLC containing numerous sworn statements which, by the affiant's own admission under oath at his deposition nine days after swearing the Affidavit, were in fact wholly beyond his personal knowledge, and

---

[46]The Defendants incorrectly cite the starting page and pincite for this case. See Howe v. Bank for Intern. Settlements, 194 F. Supp. 2d 6 (D. Mass 2002)(Lindsay, J.). The Court corrects this error in the main body text.

about which he was not competent to testify.

Motion to Strike at 1. According to the Plaintiffs, the Lorett Aff. purports to provide the Court with testimony concerning critical issues, including that: (i) $451,000.00 was the fair value for TIR's shares, including as of June 26, 2013; October 2013; and December 2013, when the Plaintiffs were cashed out; (ii) TIR was experiencing slow collections in Canada at the time of the October, 2013, Tender Offer; (iii) around the same time, TIR also continued to contend with a large amount of factoring debt, which created a drag on the company's value; (iv) the Plaintiffs did not tender their share in response to a tender offer issued October 21, 2013; and (v) the Plaintiffs were promptly paid $451,000.00 per share. See Motion to Strike at 1 (internal quotation marks and citations omitted). The Plaintiffs assert that, in his deposition, R. Lorett admitted that he had no personal knowledge of any of these statements. See Motion to Strike at 1. The Plaintiffs therefore urge the Court (i) to strike these statements; (ii) to disregard them in deciding the Defendants' Acquiescence MSJ; and (iii) to award the Plaintiffs expenses and attorney fees related to filing this motion. See Motion to Strike at 2.

Delving into their argument, the Plaintiffs insist that the Federal Rules of Civil Procedure require any affidavit to be considered with regard to a motion for summary judgment to "be made on personal knowledge, [to] set out facts that would be admissible in evidence, *and* [to] show that the affiant or declarant is competent to testify on the matters stated." Motion to Strike at 2 (citing Fed. R. Civ. P. 56(c)(4))(emphasis added in the Motion to Strike). According to the Plaintiffs, the Lorett Aff. satisfies none of the three requirements. See Motion to Strike at 2. The Plaintiffs assert that R. Lorett has no personal knowledge regarding: (i) TIR shares' fair value, see Motion to Strike at 3-6; (ii) TIR's purportedly slow collections in Canada, see Motion to Strike at 6-7; (iii) factoring debt, see Motion to Strike at 7-8; or (iv) how much the Plaintiffs

were paid for their shares, <u>see</u> Motion to Strike at 9. The Defendants therefore urge the Court to strike the statements in Lorett Aff. ¶¶ 19, 23, 24, 25, and 27, together with such other and further relief as the Court deems just. <u>See</u> Motion to Strike at 9.

### 8. <u>The Defendants' Response to Plaintiffs' Motion to Strike Lorett Affidavit.</u>

The Defendants filed the Defendants' Response to Plaintiffs' Motion Strike Affidavit of Randall Lorett on May 7, 2015. <u>See</u> Defendants' Response to Plaintiffs' Motion Strike Affidavit of Randall Lorett, filed May 7, 2015 (Doc. 101)("Response to Motion to Strike Lorett Affidavit"). The Defendants dismiss the Motion to Strike as a vain attempt to defeat the Defendant's Acquiescence MSJ in roundabout fashion. Response to Motion to Strike Lorett Affidavit at 2. According to the Defendants, the Lorett Aff. supports only four of the undisputed facts on which the Defendants' acquiescence defense is bottomed, and the Motion to Strike implicates only limited parts of five of the Lorett Aff.'s twenty-seven paragraphs. <u>See</u> Response to Motion to Strike Lorett Affidavit at 2. Furthermore, the Defendants maintain, none of the Plaintiff's five challenges to the Lorett Aff. implicate facts specifically material to the Defendants' Acquiescence MSJ. <u>See</u> Response to Motion to Strike Lorett Affidavit at 3-5.

In any event, the Defendants argue, none of the limited parts of those paragraphs that the Plaintiffs challenge contradict R. Lorett's deposition testimony. <u>See</u> Response to Motion to Strike Lorett Affidavit at 5 (referring to R. Lorett Dep. 51:11-22 (taken Apr. 9, 2015), filed MMDDYY). According to the Defendants, the deposition testimony is not incompatible with the Aff. ¶ 19, which states: "Knowing all that I knew about TIR, I believed $451,000 was more than fair value for a share of TIR stock at that time. I believe it was a premium over fair value resulting from the competition between the Cypress and Stuart groups to gain control of TIR." Response to Motion to Strike Lorett Affidavit at 6. The Defendants highlight that R. Lorett

spoke of his "belief," which the Defendants maintains is almost inescapably what others have said to someone.  <u>See</u> Response to Motion to Strike Lorett Affidavit at 6.  Casting R. Lorett's statements in a more favorable light, the Defendants insist "that Mr. Lorett does not express an <u>opinion</u> of fair value as contemplated by the Oklahoma appraisal statute is not probative whether Mr. Lorett <u>believed</u> $451,000 represented a premium over fair value in the colloquial sense." Response to Motion to Strike at 6.  In the Defendants' estimation, the "Plaintiffs' counsel has hoisted himself by his own petard."  Response to Motion to Strike Lorett Affidavit at 6.

The Defendants also insist that nothing in R. Lorett's deposition is at odds with ¶ 23 of his affidavit, which states:

> During the same time period, TIR became aware of serious problems with Trent Foley and the TIR-Canada/Foley Inspection Services management team.  I and U.S. management learned that in addition to continuing slow collections in Canada, Mr. Foley had been focusing much of his attention on his own company, which shared office space with TIR-Canada and Foley.  Extended involvement with TIR counsel was needed to negotiate a solution and resolve those disputes.

Response to Motion to Strike Lorett Affidavit at 7.  The Defendants insist that the "paragraph 23 challenge occurs when there is no issue before the Court with respect to which the Court can determine whether the paragraph is or is not prohibited hearsay."  Response to Motion to Strike Lorett Affidavit at 7.  The Defendants indicate that the Lorett Aff. "provides the general background of, and puts in context, the substantive matters of which Mr. Lorett does have personal knowledge.  Mr. Lorett testified to the matters which management <u>learned</u>.  That management <u>learned</u> those matters is separate and apart from the question whether what they learned was true."  Response to Motion to Strike Lorett Affidavit at 8 (emphases in the original). Lest they be misunderstood, the Defendants concede that the Plaintiffs have every right to challenge the truth of what management learned if and when the truth of what management learned is challenged before the Court.  <u>See</u> Response to Motion to Strike Lorett Affidavit at 8.

At the same time, the Defendants remind the Court that the Plaintiffs bear a burden to prove that the belief of those tendering the offer was false.  <u>See</u> Response to Motion to Strike Lorett Affidavit at 8.  As the Defendants see it, to the extent that R. Lorett's belief can establish the belief of those who tendered the offer, what R. Lorett learned from others is "clearly probative and admissible."  Response to Motion to Strike Lorett Affidavit at 8.

Turning then to ¶ 24, the Defendants insist that paragraph is unrelated to any issue before the Court.  <u>See</u> Response to Motion to Strike Lorett Affidavit at 8.  The Defendants assert that R. Lorett testified that he knew what factoring is, but does not know what factoring debt is.  <u>See</u> Response to Motion to Strike Lorett Affidavit at 8.  The Defendants' adjudge that "[t]he squabble is not worth the Court's time.  Whether TIR is burdened by 'factoring its receivables' or burdened by 'factoring debt' is immaterial, and hardly serves as a matter deserving of the attention of this Court, much less an order striking the Lorett Affidavit."  Response to Motion to Strike Lorett Affidavit at 8.

The Defendants' next tackle ¶ 25, which states:

In October 2013, Cypress came to agreement with Triangle Capital[47] and purchased the mezzanine lenders'' ordinary shares of TIR for $451,000 each.  The $451,000 share price had been more than the share value in June, and given the personnel, accounting and financing issues the company faced, the price

---

[47]Triangle Capital Corporation ("Triangle Capital"), according to its website, aims "to be the premier provider of capital to companies operating in the lower middle market."  Triangle Capital Corporation: Profile, http://www.tcap.com/profile (last visited Apr. 21, 2017).  Triangle Capital typically invests five to fifty million dollars for (i) acquisition financings; (ii) leveraged buyouts; (iii) management buyouts; (iv) recapitalizations; (v) growth financings; and (vi) employee stock ownership plans.  <u>See</u> Triangle Capital Corporation: Profile, http://www.tcap .com/profile (last visited Apr. 21, 2017).  Triangle Capital's portfolio includes energy sector investments alongside investments in other sectors.  <u>See</u> Triangle Capital Corporation: Profile, http://www.tcap.com/profile (last visited Apr. 21, 2017).  Triangle Capital ran a consortium of mezzanine lenders that held shares and waivers in TIR, Inc. before the contested merger.  The Court will refer to the entire consortium of mezzanine lenders that Triangle Capital ran, collectively, as Triangle Capital from this point forward in this Memorandum Opinion and Order.

continued to be more than fair in October.

Response to Motion to Strike Lorett Affidavit at 9.  The Defendants assert that, in context, "it is perfectly clear that, in this paragraph, Mr. Lorett is referring to the $451,000 price to which reference is made twice in line three of the paragraph."  Response to Motion to Strike Lorett Affidavit at 9.  The Defendants also insist that it "is also clear that that <u>price</u> continued to be fair."  Response to Motion to Strike Lorett Affidavit at 9 (emphasis in the original). Disregarding "the difference between Mr. Lorett's belief as to the fairness of $451,000 as a price, and Plaintiffs' questioning concerning fair value in an appraisal action discussed with respect to paragraph 19," the Defendants assert that the Motion to Strike is "an absurd abuse of the Court's time."  Response to Motion to Strike Lorett Affidavit at 9.

Turning to ¶ 27, the Defendants note that it states:

> After the plaintiffs did not tender their shares in response to a tender offer issued October 31, 2013, Tulsa Inspection Resources, Inc. merged with Tulsa Inspection Resources, LLC, and the plaintiffs were offered $451,000 for each of their shares. The plaintiffs returned their shares to the company, and they were promptly paid $451,000 per share just as the other shareholders had been.  I believe this price was more than fair value for the shares.  I was very surprised, six months later, to see that the plaintiffs filed this lawsuit.

Response to Motion to Strike Lorett Affidavit at 9.  The Defendants portray the Plaintiffs as arguing that, because R. Lorett was not involved in the tender offer pursuant to which the Plaintiffs were offered $451,000.00 per share for their shares, the Court should strike each sentence in ¶ 27.  <u>See</u> Response to Motion to Strike Lorett Affidavit at 9.  According to the Defendants, that argument is "frivolous" for five reasons.  Response to Motion to Strike Lorett Affidavit at 9.  First, the Defendants contend, the Plaintiffs admit and all accept that the tender offer was made.  <u>See</u> Response to Motion to Strike Lorett Affidavit at 9.  Second, the Defendants aver, the Plaintiffs admit and all accept that the tender price was $451,000.00 per share.  <u>See</u>

- 54 -

Response to Motion to Strike Lorett Affidavit at 9. Third, the Defendants maintain, the Plaintiffs admit and all accept that the Plaintiffs returned their shares to the company. <u>See</u> Response to Motion to Strike Lorett Affidavit at 9. Fourth, the Defendants attest, the Plaintiffs admit and all accept that the Plaintiffs were promptly paid $451,000.00 per share. <u>See</u> Response to Motion to Strike Lorett Affidavit at 9. Fifth, the Defendants avouch, the Plaintiffs do not and cannot challenge that R. Lorett was surprised when the Plaintiffs filed this action six months after they had accepted the merger consideration. <u>See</u> Response to Motion to Strike Lorett Affidavit at 9-10. Broadly speaking, the Defendants assert that, when R. Lorett expressed his belief that $451,000.00 per share was a fair price, he is entitled to state both what he learned, and what all generally know and accept to be true. <u>See</u> Response to Motion to Strike Lorett Affidavit at 10. As the Defendants see it, the Plaintiffs can cross-examine R. Lorett at trial in an effort to impeach his credibility if they believe he lacks personal knowledge of any fact. <u>See</u> Response to Motion to Strike Lorett Affidavit at 10. To challenge R. Lorett's credibility at this stage in the case, the Defendants pronounce, it both irrelevant and quixotic. <u>See</u> Response to Motion to Strike Lorett Affidavit at 10. Quickly recapitulating their argument, the Defendants close with an observation that none of the Plaintiffs' five challenges to the Lorett Aff. implicate any undisputed fact material to the Defendants'' Acquiescence MSJ. <u>See</u> Response to Motion to Strike Lorett Affidavit at 10. Moreover, the Defendants assure the Court, nothing in the ¶¶ that the Plaintiff challenge contradicts anything in R. Lorett's Depo. testimony. <u>See</u> Response to Motion to Strike Lorett Affidavit at 11. The Defendants, therefore, conclude that the Motion to Strike "lacks sufficient merit to be worth the Court's attention and should be summarily denied." Response to Motion to Strike Lorett Affidavit at 11.

**9.     Plaintiff's Reply to the Motion to Strike Lorett Affidavit.**

The Plaintiffs filed Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Strike Affidavit of Randall Lorett on May 21, 2015. See Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Strike Affidavit of Randall Lorett, filed May 21, 2015 (Doc. 108)("Reply to Motion to Strike Lorett Affidavit"). The Plaintiffs reiterate their position that, "despite swearing under penalty of perjury to his personal knowledge of certain facts in an Affidavit submitted in support of Defendants' motion for summary judgment," R. Lorett "in fact lacked any personal knowledge with regard to a series of those averments." Reply to Motion to Strike Lorett Affidavit at 1. The Plaintiffs, believing that they have exposed the Defendants submitting an improper affidavit, ridicule the Defendants' defense that the challenged statements are irrelevant and do not implicate the facts on which their summary judgment lies. See Reply to Motion to Strike Lorett Affidavit at 1. Although the Plaintiffs concede that a court ordinarily should not decide witness credibility on a motion to dismiss, the Plaintiffs insist that a court cannot credit a witness' testimony for purposes of summary judgment if it had been exposed as incompetent or false. See Reply to Motion to Strike Lorett Affidavit at 1.

Expanding on this core argument, the Plaintiffs assert that R. Lorett admitted in his Depo. that he did not have an opinion -- or even the tools to formulate such an opinion -- about the TIR stock's fair value. See Reply to Motion to Strike Lorett Affidavit at 2. The Defendants' assertions to the contrary notwithstanding, the Plaintiffs contend that R. Lorett's belief cannot be based on what other told him, for two reasons. See Reply to Motion to Strike Lorett Affidavit at 2. First, the Plaintiffs aver, the Defendants' response is directly contrary to R. Lorett's testimony. See Reply to Motion to Strike Lorett Affidavit at 3. Second, the Defendants press, for a statement to be considered on summary judgment, it must be shown to rest on concrete

facts "grounded in the affiant's own observation, perception, and recollection." Reply to Motion to Strike Lorett Affidavit at 3 (citing <u>Tavery v. United States</u>, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)("[S]tatements of mere belief must be disregarded[.]")). The Defendants, therefore, argue that the Court should strike Lorett Aff. ¶¶ 19, 25, and 27 and preclude R. Lorett from testifying on the fair price issue. <u>See</u> Reply to Motion to Strike Lorett Affidavit at 3.

Regarding Lorett Aff. ¶ 23, the Plaintiffs contend that the Defendants admit in their Response to the Motion to Strike Lorett Affidavit that R. Lorett's statement is hearsay. Reply to Motion to Strike Lorett Affidavit at 3. Accordingly, the Plaintiffs assert, the statement (i) has no bearing on the factual issues; (ii) cannot be used to establish the absence of any disputed factual issue for summary judgment purposes; and (iii) must be stricken. <u>See</u> Reply to Motion to Strike Lorett Affidavit at 4-5. Regarding Lorett Aff. ¶ 24, the Plaintiffs purport that R. Lorett admitted at his deposition that he had never heard the phrase "factoring debt" and that he does not know what it means. Reply to Motion to Strike Lorett Affidavit at 5. The Plaintiffs argue that, because ¶ 24 uses the term despite R. Lorett's professed ignorance of it, the Court should strike Lorett Aff. ¶ 24 and prevent R. Lorett from testifying on the issue of factoring debt. <u>See</u> Reply to Motion to Strike Lorett Affidavit at 5. Turning to ¶ 27, the Plaintiffs assert that the Court should strike R. Lorett's reference to a tender offer, because R. Lorett admitted in his deposition that he was not involved in the tender offer and does not understand the tender offer. <u>See</u> Reply to Motion to Strike Lorett Affidavit at 6. Also with regard to paragraph 27, the Plaintiffs urge the Court to strike R. Lorett's statement concerning how much the Plaintiffs were paid for their shares. <u>See</u> Reply to Motion to Strike Lorett Affidavit at 6. According to the Plaintiffs, R. Lorett lacks any personal knowledge concerning the merger consideration paid for the shares and admitted during his Depo. that he relied on Boylan for this information. <u>See</u> Reply to Motion to

Strike Lorett Affidavit at 6. The Defendants insist that the Court therefore strike R. Lorett's statement about the payment amount and preclude R. Lorett from testifying at trial about the issue. See Reply to Motion to Strike Lorett Affidavit at 6.

Telescoping out, the Plaintiffs then contend that the Court should strike the Lorett Aff. in its entirety, because R. Lorett's multiple incompetent and potentially false statements impeach his credibility. See Reply to Motion to Strike Lorett Affidavit at 7. The Plaintiffs characterize R. Lorett's affidavit as "untrue" and "without personal knowledge," and insist that it is basic hornbook law that the Court must deny summary judgment and allow the case to proceed to trial if "'the credibility of the movant's witnesses is challenged the by the [sic] opposing part and specific bases for possible impeachment are shown . . . .'" Reply to Motion to Strike Lorett Affidavit at 7 (quoting 10A Wright, Miller & Kane, Federal Practice and Procedure 2726, at 446 (3d ed. 1998).

### 10. **Plaintiffs' Motion to Strike Affirmative Defenses.**

The Plaintiffs filed Plaintiffs' Motion to Strike Affirmative Defenses on November 4, 2015. The Plaintiffs ask the Court to strike the affirmative defenses that the Defendants raise in their two motions for summary judgment: (i) unclean hands; (ii) accord and satisfaction; (iii) acquiescence; (iv) acceptance; (v) waiver; (vi) laches; (vii) estoppel; (viii) and release. See Plaintiffs' Motion to Strike Affirmative Defenses at 3. According to the Plaintiffs, each defense fails as matter of law, because and cannot succeed under any circumstances, because each depends on a false premise that the Plaintiffs voluntarily relinquished the right to bring breach of fiduciary duty claims when the Plaintiffs accepted the merger consideration in lieu of statutory appraisal. See Plaintiffs' Motion to Strike Affirmative Defenses at 3. The Plaintiffs argue that the Delaware Court of Chancery held in In re JCC Holding Co. that a corporations' controlling

shareholders, directors, and officers cannot invoke any of the equitable defenses that the Defendants adduce if they have adopted a self-interested merger at the minority shareholders' expense. See Plaintiffs' Motion to Strike Affirmative Defenses at 3. Invoking In re Best Lock, the Plaintiffs contend that plaintiffs "who cho[o]se to forego the statutory appraisal remedy were entitled to receive the merger consideration for their shares regardless of the resolution of any equitable claims they cho[o]se to bring." See Plaintiffs' Motion to Strike Affirmative Defenses at 3 (quoting In re Best Lock, 845 A.2d 1057, 1078 (Del. Ch. 2001)(Chandler, V.C.)(emphases omitted). Moreover, the Plaintiffs maintain, the Plaintiffs' did not waive their state and federal securities law claims, and Oklahoma common-law principles of equity and estoppel do not bar the Plaintiffs' securities claims. See Plaintiffs' Motion to Strike Affirmative Defenses at 5. Consequently, the Plaintiffs say, the Court should not only deny the Defendants' Acquiescence MSJ and Defendants' Estoppel MSJ, but also strike the Defendants' affirmative defenses as insufficient as a matter of law under rule 12(f)(1) of the Federal Rules of Civil Procedure. See Plaintiffs' Motion to Strike Affirmative Defenses at 5-6.

**11.     Defendants' Response to Motion to Strike Affirmative Defenses.**

The Defendants responded on November 5, 2015. See Defendants' Response to Plaintiffs' Motion to Strike Affirmative Defenses (Doc. 191), filed November 5, 2015 (Doc. 192)("Defendants' Response to Motion to Strike Affirmative Defenses"). The Defendants take issue with what the Defendants characterize as the Motion to Strike Affirmative Defense's untimeliness. See Defendants' Response to Motion to Strike Affirmative Defenses 1-2. The Defendants maintain that the Plaintiffs seek to eliminate defenses that have been part of the case since August 5, 2014 -- even though the rule 12(f)(2) deadline for challenging pleadings' sufficiency was August 26, 2014 -- by resetting the clock with an amended complaint. See

Defendants' Response to Motion to Strike Affirmative Defenses at 2.  The Defendants argue that the Plaintiffs "cannot reopen the long shut window to file a motion to strike by looking to Defendants' Amended Answer (containing exactly the same affirmative defenses as pled in the August 2014 Original Answer)," and request that the Court "not permit such a manipulation of the Rules of Civil Procedure."  Defendants' Response to Motion to Strike Affirmative Defenses 2-3.

The Defendants then highlight and heartily agree with the Plaintiffs' characterization that the Motion to Strike Affirmative Defenses is "unnecessary."  Defendants' Response to Motion to Strike Affirmative Defenses at 3 (quoting Motion to Strike Affirmative Defenses at 5 n.2). According to the Defendants, the Plaintiffs' Motion to Strike Affirmative Defenses merely recites arguments that the Plaintiffs already made in opposing the Defendants' summary judgment motions.  See Delaware Limited Liability Company Act at 3.  The Defendants posit that the Court can strike the Defendants' affirmative defenses "on its own" when addressing the summary judgment motions.  Defendants' Response to Motion to Strike Affirmative Defenses at 3 (citations omitted).  The Defendants thus contend that the "Plaintiffs' current Motion repeats points already argued, needlessly wastes the time of both parties and the Court, and should be denied for these reasons."  Defendants' Response to Motion to Strike Affirmative Defenses at 3 (citing E.E.O.C. v. Unit Drilling Co., 2014 WL 2211011, at *1 (N.D. Okla. 2014)(Kern, J.))(internal quotation marks omitted in Response).  The Defendants add that "a motion to strike is strongly disfavored as a means of resolving disputes where, as here, facts outside the pleadings, such as those on which Plaintiffs' summary judgment briefs rest, need to be considered."  Defendants' Response to Motion to Strike Affirmative Defenses at 4.

Dovetailing with this latter argument, the Defendants contend that the Plaintiffs' Motion

to Strike Affirmative Defenses "impermissibly relies on matters outside the pleadings." Defendants' Response to Motion to Strike Affirmative Defenses at 4. The Defendants note that the Plaintiffs rely on their earlier arguments in response to the summary judgment motions, and assert that, under rule 12(f), a motion to strike defenses "must be based solely on the matters set forth in the pleadings themselves." Defendants' Response to Motion to Strike Affirmative Defenses at 4-5 (emphasis in original)(citing 5C Wright & Miller, Federal Practice and Procedure, § 1380, at 404). According to the Defendants, "Plaintiffs' reliance on the facts they sought to marshal in opposition to Defendants' summary judgment motions flouts this rule, and their Motion should be denied for this reason as well." Defendants' Response to Motion to Strike Affirmative Defenses at 5.

Finally, the Defendants aver that, should the Court consider the Motion to Strike Affirmative Defense's merits, the Court should nevertheless deny it. See Defendants' Response to Motion to Strike Affirmative Defenses at 5. The Defendants posit that "Rule 12(f) permits the Court to strike only a defense that cannot succeed, as a matter of law, under any circumstances." Defendants' Response to Motion to Strike Affirmative Defenses at 5 (citing E.E.O.C. v. Unit Drilling Co., 2014 WL 2211011, at *1). The Defendants note that their answer includes forty-five pages of factual allegations and say that, "[w]here factual allegations sufficient to support a defense have been made, it cannot be stricken." Defendants' Response to Motion to Strike Affirmative Defenses at 5 (citing Baum v. Faith Technologies, Inc., 2010 WL 2365451, at *2 (N.D. Okla. 2010)(Eagan, C.J.)). In the Defendants' view, their lengthy factual allegations "more than adequately support the ten affirmative defenses asserted." Defendants' Response to Motion to Strike Affirmative Defenses at 6.

12.    **Plaintiffs' Reply to Motion to Strike Affirmative Defenses**.

The Plaintiffs replied on November 19, 2015.  <u>See</u> Plaintiffs' Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Strike Affirmative Defenses, filed November 19, 2015 (Doc. 200)("Reply to Motion to Strike Affirmative Defenses").  The Plaintiffs contend that the Defendants' affirmative defenses are foreclosed under Delaware law, because a stockholder who accepts merger consideration in which they had no say "'is not barred by the doctrine of acquiescence, or any other related equitable doctrine such as waiver, from challenging the fairness of the merger.'"  Reply to Motion to Strike Affirmative Defenses at 1 (quoting <u>In re JCC Holding Co.</u>, 843 A.2d 713, 721 (Del. Ch. 2003)(emphasis omitted).  Accordingly, the Plaintiffs contend, the Defendants' affirmative defenses "are 'legally unsupported,' and 'cannot succeed under any circumstances' as a defense to Plaintiffs' claims."  Reply to Motion to Strike Affirmative Defenses at 1 (quoting <u>Birabent v. Hudiburg Auto Grp., Inc.</u>, 2012 WL 1438921, at *2-3 (W.D. Okla. 2012)(Miles-LaGrange, C.J.)).  The Plaintiffs assert that the Defendants are "[u]nable to refute that showing" and posit that, as a result, the Defendants instead focus on the Motion to Strike Affirmative Defenses' timeliness and factual bases, while asserting that the Motion to Strike Affirmative Defenses is "properly suited for decision via Defendants' two summary judgment motions."  Reply to Motion to Strike Affirmative Defenses at 2 (quoting Response to Motion to Strike at 1-2)(internal quotation marks omitted).  The Plaintiffs address these arguments in turn.

First, the Plaintiffs contend that they timely filed the Motion to Strike Affirmative Defense.  <u>See</u> Reply to Motion to Strike at 2.  The Plaintiffs note that the Defendants answered the Amended Complaint on October 14, 2015, and that the Plaintiffs moved to strike on November 4, 2015, within the 21-day window that rule 12(f)(2) allows for such a motion to be

filed.  <u>See</u> Reply to Motion to Strike Affirmative Defenses at 2.  Contrary to the Defendants'

objection, the Plaintiffs assert that rule 12(f) does not qualify the 21-day window in the event

that an answer to an amended complaint contains the same affirmative defenses as an answer to

an original complaint, and that "the federal courts have resoundingly rejected Defendants'

contention."  Motion to Strike Affirmative Defenses at 2 (citing, among others, <u>F.D.I.C. v.

Bayer</u>, 2015 WL 686952, at *1 (M.D. Fla. 2015)(Steele, J.)).

Second, the Plaintiffs contend that the Court "need not decide any factual issues to strike

Defendants' defenses as legally insufficient."  Reply to Motion to Strike Affirmative Defenses at

3.  Rather, the Plaintiffs argue, the Defendants' affirmative defenses "must be stricken because

they are facially insufficient as a matter of settled and authoritative law" under rule 12(f).  Reply

to Motion to Strike Affirmative Defenses at 3.  The Plaintiffs argue that the Court need only

consider (i) the Answer; and (ii) the Merger Agreement and Tender Offer, because those

documents' authenticity is "undisputed" and "are deemed incorporated by reference and properly

considered in deciding the motion."  Reply to Motion to Strike Affirmative Defenses at 3 (citing,

among others, <u>Smith v. United States</u>, 561 F.3d 1090, 1098 (10th Cir. 2009)).  The Plaintiffs

assert that these documents, along with the pleadings, "show that as a matter of law, all of

Defendants' defenses are foreclosed."  Reply to Motion to Strike Affirmative Defenses at 4.  The

Plaintiffs reason, for example, that the acquiescence defense is foreclosed under the Answer's

factual allegations, because the "Plaintiffs' receipt of the merger consideration *unilaterally set by

the Defendants* cannot eliminate their claims against the controlling shareholders and directors

charged with a fiduciary duty to protect Plaintiffs' interests as minority shareholders when they

adopted and approved the transaction."  Reply to Motion to Strike Affirmative Defenses at 4-5

(relying on <u>In re JCC Holding Co.</u>, 843 A.2d at 721)(italics in the original).  The Plaintiffs

contend that "[n]one of the 'facts' that Defendants purport to adduce in the pending motions" change that, in these circumstances, Delaware law forecloses equitable defenses such as acquiescence. Reply to Motion to Strike Affirmative Defenses at 5. The Plaintiffs conclude that "what goes for acquiescence and waiver goes for '*any other equitable doctrine*' such as unclean hands, accord and satisfaction, acceptance, laches, estoppel, and release." Reply to Motion to Strike Affirmative Defenses at 6 (bolding omitted)(italics in the original)..

Finally, the Plaintiffs argue that the Court should strike the Defendants' defenses at this stage "to simplify trial." Reply to Motion to Strike Affirmative Defenses at 7. The Plaintiffs assert that the Defendants' motions for summary judgment "rest upon the same unsustainable legal contention as the affirmative defenses set forth in their Answer," and that, consequently, "the same law requires striking these defenses also requires denial of Defendants' motions." Reply to Motion to Strike Affirmative Defenses at 7 (citations omitted). At the same time, the Plaintiffs contend that "[i]t is not sufficient . . . merely to deny the motions." Reply to Motion to Strike Affirmative Defenses at 7. The Plaintiffs request that the Court "strike the defenses at this juncture under Rule 12(f) to eliminate any jury confusion at trial." Reply to Motion to Strike Affirmative Defenses at 7 (citing, among others, <u>New England Health Care Emp. Welf. Fund v. iCare Mgmt., LLC</u>, 792 F. Supp. 2d 269, 288 (D. Conn. 2011)(Haight, J.)).

### 13. **Plaintiffs' Motion for Partial Summary Judgment on Breach of Fiduciary Duty Claims.**

The Plaintiffs filed Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment on Breach of Fiduciary Duty Claims on September 14, 2015. <u>See</u> Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment on Breach of Fiduciary Duty Claims, filed September 14, 2015 (Doc. 157)("Plaintiffs' MSJ"). With this motion, the Plaintiffs seek partial summary judgment on two claims: (i) the Plaintiffs' First

Claim for Relief against the Controlling Shareholder Defendants; and (ii) the Plaintiffs' Second Claim for Relief against the Director Defendants, for breach of fiduciary duty. <u>See</u> Plaintiffs' MSJ at 7.

In relation to these claims, the Plaintiffs first petition the Court to grant partial summary judgment holding that the entire-fairness standard governs the merger, because the merger was a self-dealing transaction.[48] <u>See</u> Plaintiffs' MSJ at 9-10. The Plaintiffs insist that a showing of self-dealing suffices to require the Court to apply the entire-fairness doctrine, <u>see</u> Plaintiffs' MSJ at 11, and that the undisputed material evidence shows that the merger was self-dealing, as corporate fiduciaries stood on both sides of the transaction and -- the Plaintiffs assert -- did nothing to disable themselves from this conflict, <u>see</u> Plaintiffs' MSJ at 12-13. The need for the entire-fairness standard to apply is especially acute in this case, the Plaintiffs contend, because (i) the Defendants had a direct interest in making the "fair value" as low as possible as owners and directors of the surviving entity, Plaintiffs' MSJ at 13; and (ii) the Defendants made a determination to allocate different consideration to themselves and to the Plaintiffs when they

_____

[48]The entire-fairness standard, the Plaintiffs assert, imposes both a substantive and a procedural requirement on directors and controlling shareholders. <u>See</u> Plaintiffs' MSJ at 9. Substantively, the Plaintiffs maintain, the entire-fairness standard requires proof that the merger was the product of both fair dealing and fair price. <u>See</u> Plaintiffs' MSJ at 9. Procedurally, the Plaintiffs contend, the entire-fairness standard imposes the burden of persuasion on the defendant directors and controlling shareholders, throughout the trial, to prove that the challenged merger met the entire-fairness test's substantive requirements. <u>See</u> Plaintiffs' MSJ at 9.

The Plaintiffs define "fair dealing" by reference to <u>Weinberger v. UOP, Inc.</u>, 457 A.2d 701 (Del. 1983), indicating that fair dealing "'embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.'" Plaintiffs' MSJ at 10 (quoting <u>Weinberger v. UOP, Inc.</u>, 457 A.2d at 711). The Plaintiffs also define "fair price" by reference to <u>Weinberger v. UOP, Inc.</u>, indicating that fair price "'relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.'" Plaintiffs' MSJ at 10 (quoting <u>Weinberger v. UOP, Inc.</u>, 457 A.2d at 711)).

obtained for themselves the benefit of TIR's rapidly increasing cash flow as qualified income for the profitable MLP[49] IPO they planned to conduct and to award themselves equity in that public entity while denying the same benefit to the Plaintiffs, see Plaintiffs' MSJ at 13-14.

The Defendants also petition the Court to grant partial summary judgment holding that the Defendants bear the burden throughout the trial to prove the merger's entire fairness, because they used no procedural mechanisms to cure their conflict of interest. See Plaintiffs' MSJ at 9-10, 15. As the Plaintiffs read Delaware law, the Defendants may shift the burden of persuasion on the entire-fairness issue only by either (i) showing that a well-functioning committee of independent directors approved the transaction; or (ii) showing that a majority of the minority shareholders approved the merger transaction via an informed vote. See Plaintiffs' MSJ at 15. The Plaintiffs insist that the Defendants took neither of these curative measures. See Plaintiffs' MSJ at 15-17. Accordingly, the Plaintiffs seek for the Court to grant summary judgment that the Defendants bear the burden to prove entire fairness at trial. See Plaintiffs' MSJ at 17.

Under the entire-fairness standard, the Plaintiffs argue, the undisputed material facts

---

[49]An MLP, a master limited partnership, is a state law entity that has publicly traded securities listed on major exchanges, but that differ from corporations in that revenue is passed through to the shareholders for tax purposes. See Michael Cumming, Morningstar. What Is a Master Limited Partnership?, August 9, 2007, http://news.morningstar.com/articlenet/article .aspx?id=203288 (last visited April 22, 2017). MLPs typically are found only in the energy sector. See David T. Kwon, Vanguard Research, User's Guide to Master Limited Partnerships, Sept. 2014, https://personal.vanguard.com/pdf/ISGPMLP.pdf (last visited April 3, 2017). At the time of the case's merger, companies formed MLPs to secure a variety of benefits, including the following: (i) monetization of assets at fair market value; (ii) high value of assets in a separate company; (iii) lower cost of capital; (iv) tax benefits upon contribution and ongoing tax benefits; (v) retention of control over assets; (vi) incentive distribution rights; (vii) ability to limit fiduciary duties to public unitholders; (viii) high-yield security with reliable distributions; (ix) one taxation level, leaving more cash available for distribution; (x) expected increases in distributions; (xi) potential unit appreciation; (xii) limited liability similar to corporate common stock; (xiii) tax shield typically equivalent to 80-90% of cash distributions; and (xiv) tax-deferred portion not taxable until unitholder sells securities. See Paul Hastings LLP, Master Limited Partnership Overview: August 2013, slide 5, https://www.paulhastings.com/docs/default -source/PDFs/mlp-primer.pdf (last visited April 22, 2017).

show that the Defendants breached their fiduciary duty of fair dealing.  <u>See</u> Plaintiffs' MSJ at 17.

The Plaintiffs allege that the Defendants intentionally structured the merger so that it was not

negotiated with the Plaintiffs and never obtained the Plaintiffs' approval.  <u>See</u> Plaintiffs' MSJ at

18.  The Plaintiffs assert that the Defendants intended the merger transaction to eliminate the

Plaintiffs as stockholders to prevent them from receiving any benefit from the planned Cypress,

L.P. IPO, and that the Defendants forced the Plaintiffs out at a price which greatly

underestimated the true share value.  <u>See</u> Plaintiffs' MSJ at 18-20.  As the Plaintiffs see it, the

Defendants' alleged failure to use any procedures to independently determine fair value, by

itself, establishes their breach of duty, even if the Defendants believed that the price they offered

was fair.  <u>See</u> Plaintiffs' MSJ at 20-21.  The Defendants reject the proposition that the

Defendants could have discharged their duties simply by following the statutory merger

procedure and offering the Plaintiffs an appraisal.  <u>See</u> Plaintiffs' MSJ at 21.  The Defendant,

therefore, reiterate their request that the Court grant partial summary judgment that: (i) the entire

fairness standard governs the Plaintiffs' claims for breach of fiduciary duty; and (ii) the

Defendants bear the burden of proving that the merger satisfies the entire fairness standard.  <u>See</u>

Plaintiffs' MSJ at 22.  The Defendants further ask the Court to grant partial summary judgment

holding that Defendants CEP-TIR, LLC, Stephenson, C. Field, L. Field, and Boylan are liable for

breaches of the duty of entire fairness, reserving for trial the issue of damages.  <u>See</u> Plaintiffs'

MSJ at 22.

### 14.  <u>The Defendants' Response to the Plaintiffs' MSJ.</u>

The Defendants filed Defendants' Response in Opposition to Plaintiffs' Motion for

Partial Summary Judgment on Breach of Fiduciary Duty Claims (Doc. 157) on October 5, 2015.

<u>See</u> Defendants' Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment on

Breach of Fiduciary Duty Claims, filed October 5, 2015 (Doc. 170)("Response to Plaintiffs MSJ").  The Defendants argue that the Court should deny the Plaintiffs' MSJ for four reasons: (i) the Plaintiffs, being fully informed, acquiesced in the merger and cannot now be heard to challenge it; (ii) the undisputed facts establish that the merger process was fair as a result of the statutory appraisal which was the Plaintiffs' exclusive remedy; (iii) Oklahoma common law clean hands doctrine and the Oklahoma common law of estoppel bar the Plaintiffs' breach-of-fiduciary-duty claims; and (iv) the Plaintiffs have waived their breach-of-fiduciary-duty claims contractually and by conduct under the Oklahoma common law of waiver.  See Response to Plaintiffs' MSJ at 7.

The Defendants insist, first, that the Plaintiffs, being fully informed, acquiesced in the merger and cannot now be heard to challenge it.  See Response to Plaintiffs' MSJ at 7-9. Referring the Court to its discussion on this point in the Defendants' Acquiescence MSJ, the Defendants maintain that the only facts relevant to this proposition are the facts establishing the Plaintiffs' knowledge when they surrendered their share in exchange for the payment of the merger consideration pursuant to the merger agreement's terms.  See Response to Plaintiffs' MSJ at 8.  According to the Defendants, if the Plaintiffs had knowledge of the facts they allege in their Complaint on the date that the Plaintiffs surrendered their shares, the defense of acquiescence bars their claims.  See Response to Plaintiff's MSJ at 8.  The Defendants then contend that the Plaintiffs admit to having had such knowledge at that time.  See Response to Plaintiff's MSJ at 8.

Revisiting a taxonomy that they had used in earlier briefings, the Defendants indicate that the Plaintiffs had only four choices regarding how to proceed when they confronted a merger which they opposed: (i) obtain payment of the merger consideration; (ii) have their shares appraised; (iii) seek a statutory appraisal of their shares, and sue for rescission and rescissionary

damages; or (iv) file suit seeking rescission and rescissionary damages.  See Response to Plaintiffs' MSJ at 8-9.  The Defendants emphasize that the Plaintiffs did not have the option to obtain the merger consideration, and then file suit seeking rescission and rescissionary damages. See Response to Plaintiffs' MSJ at 9.

Switching gears, the Defendants then assert that the undisputed facts establish that the merger process was fair, and that the alleged lack of an independent committee or appraisal does not "support a claim for a quasi-appraisal trial on the Merger price."  Response to Plaintiffs' MSJ at 9-10.  The Defendants argue that the Plaintiffs fundamentally misconceive the entire fairness doctrine, which the Defendants say shifts the burden to a defendant to prove both fair process and fair price.  See Response to Plaintiffs' MSJ at 10.  By definition, the Defendants maintain, entire fairness cannot apply where the undisputed facts show that the merger process was fair. See Response to Plaintiffs' MSJ at 11.  The Defendants insist yet again that it was fair under Oklahoma law, which expressly grants the majority the right to cash out a merger without the consent of, or even prior notice to, the minority shareholders.  See Response to Plaintiffs' MSJ at 11.  According to the Defendants, minority shareholders have a right under Oklahoma law to have a court appraise their shares but not to the formation of an independent committee.  See Response to Plaintiffs' MSJ at 11.

After walking the Court through a condensed chronology of the merger and the events leading to it, see Response to Plaintiffs' MSJ at 11-15, the Defendants turn their attention to the clean-hands doctrine, see Response to Plaintiffs' MSJ at 16.  As the Defendants read the doctrine, Oklahoma common law requires that, to receive equity, a person must do equity.  See Response to Plaintiffs' MSJ at 16 (citing Krumme v. Moody, 910 P.2d 993 (Okla. 1995)).[50]  The

_____

[50]The Defendants cite this case as Krumme v. Moody, 810 P.2d 1262, 1269 (1995).  See

Defendants insist that Stuart orchestrated the litigation after having (i) illicitly vied for control of TIR in 2012 and 2013; (ii) directly solicited TIR's shareholders; (iii) attempted to hold the merger hostage with the end of extracting a higher price; and (iv) delivering his shares -- with braggadocio -- when he discovered that he lacked veto power over the merger. See Response to Plaintiffs' MSJ at 17. The Defendants urge the Court not to lend its aid to one who allegedly "has been guilty of such inequitable conduct." Response to Plaintiffs' MSJ at 17.

The Defendants then insist that the Oklahoma common law of estoppel also bars the Plaintiffs' breach-of-fiduciary-duty claims. See Response to Plaintiffs' MSJ at 17. As the Defendants read the law, equitable estoppel prevents a party from taking a legal position inconsistent with an earlier statement or action that places the counterparty at a disadvantage. See Response to Plaintiffs' MSJ at 17 (citing W. Keeton et al., Prosser and Keeton on the Law of Torts § 05, at 733 (5th ed. 1984)). Drawing on a 1956 case from the Supreme Court of Oklahoma, the Defendants explain that "[e]quitable estoppel holds a person to . . . a position assumed, where otherwise inequitable consequences would result to another, who, having a right to do so under the circumstances, has in good faith relied thereon." Response to Plaintiffs' MSJ at 17-18 (quoting Apex Siding and Roofing Co. v. First Federal Savings and Loan Ass'n, 1956 OK 195, 195, 301 P.2d 352, 355)(internal quotation marks omitted)(ellipses in the Response to Plaintiffs' MSJ). According to the Defendants, the Plaintiffs are estopped to unwind the merger, because the Defendants, in reliance on the Plaintiffs' "voluntary and knowing surrender of their share certificates," (i) contributed 50.1% of their member interests in TIR LLC to Cypress Energy Partners Limited Partnership; and (ii) effected a sale of partnership units to the public

---

Response to Plaintiffs' MSJ at 16. This citation appears to have been an incorrect citation one, which directs the Court to McDonald v. Humphries, located at 810 P.2d 1262, 1269 (1995). McDonald v. Humphries is the case that the Supreme Court of Oklahoma overruled in Krumme v. Moody.

pursuant to the Registration Statement. Response to Plaintiffs' MSJ at 18.

As the Defendants see it, the Plaintiffs also waived their breach-of-fiduciary-duty claims contractually and by conduct under the Oklahoma common law of waiver. See Response to Plaintiffs' MSJ at 18. Under Oklahoma law, the Defendants say, waiver is the "intentional relinquishment of a known right." Response to Plaintiffs' MSJ at 18 (citing Barringer v. Baptist Healthcare of Okla., 2001 OK 29, 22 P.3d 695, 700). Dusting off a Supreme Court of Oklahoma case from nearly a century ago, the Defendants explicate that waiver "may be achieved contractually, provided that the contract is founded on a valuable consideration and made by the party whose benefit is being waived." Response to Plaintiffs' MSJ at 18 (citing Smith v. Minneapolis Threshing Mach. Co., 1923 OK 84, 214 P.2d 178, 180). The Defendants then intone their earlier repeated assertion that, in December, 2013, the Plaintiffs delivered their share certificates to the Defendants "to induce the Defendants to pay the Merger consideration," and in accordance with a merger agreement that expressly provided that any former shareholder who surrendered share certificates would be deemed to have forever waived any appraisal rights "pursuant to the Oklahoma appraisal statute or otherwise." Response to Plaintiffs' MSJ at 18. Extending their argument on this point, the Defendants insist that the Plaintiffs even waived their right to a quasi-appraisal under Oklahoma common law, as delivering the share certificates and accepting merger consideration for them constitutes an implied waiver in Oklahoma. See Response to Plaintiffs' MSJ at 19 (citing Barringer v. Baptist, 22 P.3d at 701).

### 15. **The Plaintiffs' Reply to the Plaintiffs' MSJ.**

The Plaintiffs filed the Plaintiffs' Reply Memorandum of Law in Further Support of Motion for Partial Summary Judgment on Breach of Fiduciary Duty Claims on October 19, 2015. See Plaintiffs' Reply Memorandum of Law in Further Support of Motion for Partial

Summary Judgment on Breach of Fiduciary Duty Claims, filed October 19, 2015 (Doc. 177)("Reply to Plaintiffs' MSJ"). The Plaintiffs first assert that the undisputed material facts establish that the Plaintiffs are entitled to judgment as a matter of law that the controlling shareholders and director defendants breached their fiduciary duty of fair dealing. Reply to Plaintiffs' MSJ at 3. According to the Plaintiffs, the Defendants could have created a level playing field designed to protect the Plaintiffs' interests as minority shareholders by (i) appointing an independent special committee; (ii) engaging an independent financial advisor or other third party to perform a valuation analysis; (iii) condition merger approval on a fully-informed vote of the majority of minority shareholders; or (iv) providing an "opportunity for genuine negotiations regarding the merger." Reply to Plaintiffs' MSJ at 3 (quoting In re Sunbelt Beverage Corp. S'Holder Litig., 2010 WL 26539, at *5 (Del. Ch. January 5, 2010)(Chandler, C.). The Plaintiffs assert that the Defendants undertook none of these protections and that "[l]iability inexorably follows" where the Defendants "approved a squeeze out merger, devoid of procedural protections, as a final means of forcing [the Plaintiffs] out of the company and obtaining [their] . . . stake . . . ." Reply to Plaintiffs' MSJ at 4-5 (bracketed material and first set of ellipses in the Reply to Plaintiffs' MSJ)(quoting Sunbelt, 2015 WL 5052214, at *5). According to the Plaintiffs, the Defendants admit that they did not go through the motions of establishing fair dealing and that there is no fact left warranting a trial on the issue, because the "Defendants cannot possibly prove the independence of measures they never took." Reply to Plaintiffs' MSJ at 5 (emphatic italics removed).

Turning to the fair price issue, the Plaintiffs insist that fair price is relevant only to the amount of damages which the Defendants must pay on account of their failure to deal fairly with the Plaintiffs. See Reply to Plaintiffs' MSJ at 6. For three reasons, the Plaintiffs insist, the fair

price issue is not before the Court on the Plaintiffs' MSJ or on any other pending motion, and must abide trial.  <u>See</u> Reply to Plaintiffs' MSJ at 6.  First, the Plaintiffs note, neither the Plaintiffs nor the Defendants has moved for summary judgment on fair price, and fair value is "a quintessentially factual -- and sharply-disputed -- issue, which can only be resolved at trial by expert testimony."  Reply to Plaintiffs' MSJ at 6.  Second, the Plaintiffs contend, the Defendants fail to address the underlying procedure used to adopt the merger.  <u>See</u> Reply to Plaintiffs' MSJ at 6.  Third, the Plaintiffs emphasize, fiduciaries employing grossly inadequate process can be found liable even if the transaction price might otherwise be considered fair.  <u>See</u> Reply to Plaintiffs' MSJ at 6 (citing <u>In re Nine Sys. Corp. S'Holders Litig.</u>, 2014 WL 4383127, at *47 (Del. Ch. Sept. 4, 2014)).

The Plaintiffs then dismiss the Defendants' frequent invocation of the Plaintiffs' merger consideration acceptance, arguing that the acceptance is irrelevant to and does not meet the Defendants' burden to prove fair dealing.  <u>See</u> Reply to Plaintiffs' MSJ at 7.  According to the Plaintiffs, fair dealing required the Defendants to take <u>prophylactic</u> measures to remove the taint of their own conflict; <u>post</u>-merger conduct, <u>e.g.</u>, share surrender when fully informed, is irrelevant to a showing of fair dealing.  <u>See</u> Reply to Plaintiffs' MSJ at 7-8.  Likewise, the Plaintiffs insist, the limited exception to entire fairness for short-form mergers that the Defendants invoke -- the availability of a statutory appraisal -- has no application to this conflicted long-form merger.  <u>See</u> Reply to Plaintiffs' MSJ at 8.  According to the Plaintiffs, statutory appraisal, unlike the entire fairness doctrine, does not provide a complete remedy for unfair dealing.  <u>See</u> Reply to Plaintiffs' MSJ at 8-9.  Furthermore, the Plaintiffs insist, statutory appraisal applies only to short-form mergers, and the Defendants admit that the merger in this case was effected pursuant to 18 O.S. § 1090.2 -- the long-form merger statute.  <u>See</u> Reply to

Plaintiffs' MSJ at 9.

In concluding, the Plaintiffs assert that the Defendants cannot escape their personal liability by mischaracterizing the Plaintiffs' fiduciary duty claims as claims for "quasi-appraisal." Reply to Plaintiffs' MSJ at 10. Distinguishing quasi-appraisal from statutory appraisal, the Plaintiffs maintain that the former is a damages award at the conclusion of a trial in which a defendant's liability for breach of fiduciary duty has been established. See Reply to Plaintiffs' MSJ at 10 (citing In re Orchard Enters., Inc., 88 A.3d 1, 42, 47-48 (Del. Ch. 2014)). The Defendants' lexical legerdemain, the Plaintiffs assert, is "merely a variant of their failed arguments of acquiescence, estoppel, waiver and unclean hands." Reply to Plaintiffs' MSJ at 10. Accordingly, the Plaintiffs repeat their petition from the Plaintiffs' MSJ that the Court grant partial summary judgment that: (i) the entire fairness standard governs the Plaintiffs' claims for breach of fiduciary duty; (ii) the Defendants bear the burden of proving that the merger satisfies the entire fairness standard; and (iii) the Defendants CEP-TIR, LLC, Stephenson, C. Field., L. Field, and Boylan are liable for breaching their duty of entire fairness, reserving for trial the damages issue. See Reply to Plaintiffs' MSJ at 10.

16.    **The Plaintiffs' Motion in Limine to Preclude Evidence of the Plaintiffs' Conduct.**

The Plaintiffs filed Plaintiffs' Motion In Limine to Preclude Evidence of Plaintiffs' Conduct, and Brief in Support on October 26, 2015. See Plaintiffs' Motion *In Limine* to Preclude Evidence of Plaintiffs' Conduct, and Brief in Support, filed October 25, 2015 (Doc. 182)("Plaintiffs' Motion in Limine"). The Plaintiffs argue that the Court should preclude the Defendants from offering any evidence, testimony, or argument concerning: (i) the Plaintiffs' offers to sell their TIR shares to the Defendants, and Triangle Capital's sales of TIR shares; (ii) alleged "blackmail" or "threats"; (iii) prices the Plaintiffs paid for their TIR shares and post-

merger Plaintiff communications; (iv) "certain irrelevant and pejorative facts about plaintiffs contained in Defendants' pretrial briefs"; and (v) improper evidence or argument based on the fact that the Plaintiffs were from the New York area rather than from Oklahoma. Plaintiffs' Motion in Limine at 1. The Plaintiffs assert that the Court should exclude material related to these issue, because: (i) it is irrelevant under rule 402 of the Federal Rules of Evidence; (ii) it has a prejudicial effect that outweighs its probative value under rule 403 of the Federal Rules of Evidence; or (iii) in the alternative on the specific issue of share sale price offers, it represents a compromise offer under rule 408 of the Federal Rules of Evidence. See Plaintiffs' Motion in Limine at 1. As a codicil to this request, the Plaintiffs also ask the Court to exclude any settlement evidence that the Defendants may seek to introduce, under rule 408 of the Federal Rules of Evidence. See Plaintiffs' Motion in Limine at 1-15.

## 17.    __The Defendants' Response to the Plaintiffs' Motion in Limine__.

The Defendants filed Defendants' Response to Plaintiffs' Motion in Limine to Preclude Evidence of Plaintiff's Conduct (Doc. 193) on November 16, 2015. See Defendants' Response to Plaintiffs' Motion in Limine to Preclude Evidence of Plaintiff's Conduct (Doc. 182), filed November 16, 2015 (Doc. 193)("Response to Plaintiffs' Motion in Limine"). The Defendants deride the Plaintiffs' motion as an attempt to engineer a "one-sided trial in which Plaintiffs are entitled to accuse Defendants of inequitable conduct while Defendants are barred from presenting any evidence of Plaintiffs' inequitable conduct." Response to Plaintiffs' Motion in Limine at 1. As the Defendants see it, the Plaintiffs' security law claims require the Plaintiffs to establish their reliance on an alleged material misrepresentation, which necessarily involve an examination of the Plaintiffs' actions, knowledge, and motives before, during, and immediately after the merger. See Response to Plaintiffs' Motion in Limine at 2. The Defendants therefore

diagnose the Plaintiffs' Motion in Limine as "dead on arrival," as each of the broad evidentiary categories that the Plaintiffs seek to exclude is probative of the Plaintiffs' actions, knowledge, or motives surrounding the Plaintiffs' acceptance of the merger consideration. Response to Plaintiffs' Motion in Limine at 2. According to the Defendants, the Court should refrain from granting a motion in limine unless the moving party meets its burden of showing that the evidence in question is clearly inadmissible on all potential grounds -- a burden that the Defendants insist the Plaintiffs do not meet. See Response to Plaintiffs' Motion in Limine at 3.

Turning first to rule 408 of the Federal Rules of Evidence, the Defendants assert that that rule is inapplicable, because the communications at issue were between arm's-length commercial parties engaged in business negotiations, i.e., not in settlement discussions in lieu of pending or imminent claims. See Response to Plaintiffs' Motion in Limine at 4. If the Court were to adopt the Plaintiffs' proposed scope of rule 408, the Defendants maintain, the Court would allow the exclusion to swallow the rule, creating a result in which the exclusion would apply to "virtually all contested commercial negotiations." Response to Plaintiffs' Motion in Limine at 4. Specifically regarding the Triangle Capital's[51] sale of TIR shares for $451,000.00, the Defendants say that the Plaintiffs cannot wield rule 408 to exclude the material, because: (i) the Plaintiffs were not a party to that transaction; (ii) the issues involved are not being litigated in this case; and (iii) Triangle Capital's purchase of TIR shares in an arms-length commercial transaction for the same price and near the same time as the merger is probative of the fair value

---

[51]Mezzanine financing is a popular investment vehicle, especially for smaller companies. See William J. Torpey & Jerry A. Viscione, Mezzanine Money for Smaller Businesses, Harv. Bus. Rev. (May 1987), available at https://hbr.org/1987/05/mezzanine -money-for-smaller-businesses (last visited Apr. 22, 2017)("Harvard Business Review"). It is called mezzanine financing, because companies in the intermediate sales range ($5 million to $100 million) are the primary market and, because the risk level is intermediate, falling midway between low-risk senior debt and high-risk equity financing. See Harvard Business Review at 1.

analysis.  See Response to Plaintiffs' Motion in Limine at 4 (citing Towerridge, Inc. v. T.A.O., Inc., 111 F.3d 758, 770 (10th Cir. 1997)).  Specifically regarding the letters from September, 2013, and November, 2013, the Defendants assert that the Plaintiffs mischaracterize the letters when they call them settlement discussions in lieu of litigation.  See Response to Plaintiffs' Motion in Limine at 5.  The Defendants maintain that, even though the parties staked out certain legal positions in the letters, neither side threatened to file a lawsuit or even mentioned the possibility of filing a lawsuit.  See Response to Plaintiffs' Motion in Limine at 6.  As the Defendants see it, the Plaintiffs simply are trying to keep the letters out of the Court's sight, because the letters: (i) represent a price for TIR shares dramatically lower than the Plaintiffs' trial expert's $1.2 million per share estimate for fair price; and (ii) show that the Plaintiffs acted as a group under Stuart's leadership.  See Response to Plaintiffs' Motion in Limine at 6.  The latter fact, according to the Defendants, is important in that it negates the Plaintiffs' argument that the Defendants improperly failed to obtain input from the majority of the minority shareholders, because the entire minority was contractually bound to speak as a single voice under Stuart's control.  See Response to Plaintiffs' Motion in Limine at 6.  Specifically regarding Triangle Capital's sale of TIR shares in December, 2013, the Defendants argue that the agreement by which Triangle Capital sold its shares and warrants to Cypress Energy Partners is a typical commercial transaction document, not a classic settlement agreement, and is completely separate and distinct from the Plaintiffs' claims in this case.  See Response to Plaintiffs' Motion in Limine at 7-11.  Accordingly, the Defendants maintain, any letters about Triangle Capital's transactions fall far outside rule 408's scope.  See Response to Plaintiffs' Motion in Limine at 11.

The Defendants further object to the Plaintiffs' attempts to exclude and "censure any

language more colorful than milk toast." Response to Plaintiffs' Motion in Limine at 12. The Defendants maintain that the Court easily can police the parties' alleged inflammatory language at trial, and the Defendants insist that any attempt to enforce milquetoast language would "strip the trial of all evidence of the human motives that underlie every commercial dispute." Response to Plaintiffs' Motion in Limine at 12-13. "To assess the quality and credibility of the parties' positions," the Defendants contend, "the jury is entitled to hear the entire story, not the one sided version Plaintiffs hope to peddle." Response to Plaintiffs' Motion in Limine at 13.

Penultimate, the Defendants assert that evidence of the price that the Plaintiffs paid for their shares and evidence of Stuart's post-merger report to his investors, both are relevant to valuation and impeachment. See Response to Plaintiffs' Motion in Limine at 14. The Defendants flag Stuart's announcement after the merger that he was "pleased" to liquidate SFF-TIR's position in TIR at $451,000.00 per share as an assertion that undermines the Plaintiffs' current assertion that the merger process and price were unfair. See Response to Plaintiffs' Motion in Limine at 14. The jury, the Defendants contend, is entitled to consider Stuart's investor communications when assessing not only fair value and fair price, but also the Plaintiffs' credibility in general. See Response to Plaintiffs' Motion in Limine at 14. Moreover, the Defendants argue, evidence of when and for what price the Plaintiffs acquired their TIR shares is relevant background information, and are relevant data points for the valuation analysis -- and possibly even relevant to impeach the Plaintiffs' trial testimony regarding their satisfaction or dissatisfaction with the result. See Response to Plaintiffs' Motion in Limine at 14.

Last, the Defendants seek to disabuse the Court of any notion that any reference to the Plaintiffs' out-of-state residency will unduly inflame the jury. See Response to Plaintiffs' Motion in Limine at 15. For one thing, the Defendants contend that references to the location of

relevant events and general background information about the parties are permissible and necessary to give the jury context to the evidence. See Response to Plaintiffs' Motion in Limine at 14. For another thing, the Defendants insist, the Plaintiffs do not give Oklahomans enough credit; the Defendants assure the Court that Oklahomans will not "hiss with prejudicial bias" with every passing reference to New York. Response to Plaintiffs' Motion in Limine at 14.

18.     **The Plaintiffs' Reply to the Plaintiffs' Motion in Limine.**

The Plaintiffs filed Plaintiffs' Reply Memorandum of Law In Further Support of Plaintiffs' Motion In Limine to Preclude Evidence of Plaintiffs' Conduct on November 30, 2015. See Plaintiffs' Reply Memorandum of Law In Further Support of Plaintiffs' Motion *In Limine* to Preclude Evidence of Plaintiffs' Conduct, filed November 30, 2015 (Doc. 204)("Reply to Plaintiffs' Motion in Limine"). The Plaintiffs take issue with the Defendants' assertion that the Plaintiffs' offers and the Triangle Capital sales are admissible, because they are not settlement offers and are merely business negotiations. Reply to Plaintiffs' Motion in Limine at 1-2. According to the Plaintiffs, the text and context of the Defendants' letters clearly establishes that the letters were offers to compromise a claim -- for less than its fair market value -- under rule 408 of the Federal Rules of Evidence. See Reply to Plaintiffs' Motion in Limine at 2-4. For example, the Plaintiffs note, the Plaintiffs' September 26, 2013, letter[52] proposes to "*forego* the long-term *future* value of TIR's shares that they would receive in litigation, and instead settle their claim for a *lower* share value, calculated solely on the basis of TIR's *historic, backward-*

_____

[52]The Plaintiffs do not specifically identify the letter to which they refer at this point in their Reply to Plaintiffs' Motion in Limine. See Plaintiffs' Motion in Limine at 4. The Court notes that there is only one letter that either party has submitted in its case filings that is dated September 26, 2013, and that the Plaintiffs wrote: Letter from Tulsa Inspection Resources, Inc. to Regent Private Capital, LLC (Sept. 26, 2013), filed April 3, 2015 (Doc. 83-18)("Sept. 26, 2013, Letter"). The Court therefore interprets the Plaintiffs' mention of the Plaintiffs' "September 26 letter" to refer to the Sept. 26, 2013 Letter.

*looking* financial performance data as of the date of the proposed sale." Reply to Plaintiffs' Motion in Limine at 4 (emphasis in the Reply to Plaintiff's Motion in Limine). The Plaintiffs insist that rule 408 mandates that parties who attempt settlement should be guaranteed that unsuccessful attempts at compromise will not be used to their detriment, and that, accordingly, the Could should exclude settlement offers that, the Plaintiffs allege, the Defendants wish to introduce at trial to the Plaintiffs' detriment. See Reply to Plaintiffs' Motion in Limine at 5.

The Plaintiffs further maintain that the Plaintiffs' letters, the Defendants' assertions notwithstanding, are irrelevant to any trial issue. See Reply to Plaintiffs' Motion in Limine at 7. According to the Plaintiffs, their letters predate the merger by months and reject the Defendants' offer. See Reply to Plaintiffs' Motion in Limine at 7. Consequently, the Plaintiffs aver, the letters cannot possibly supply "the nonexistent proof Defendants need that *during the Merger process, Defendants* adopted any such procedures to ensure that the Offer Price was fair." Reply to Plaintiffs' Motion in Limine at 7 (internal quotation marks omitted)(emphasis in the original). In summary on this point, the Defendants urge the Court to preclude the allegedly "irrelevant" letters from evidence on the grounds that admitting them would run counter to rule 408's fundamental purpose. See Reply to Plaintiffs' Motion in Limine at 7-8.

As the Plaintiffs see it, the Court also should preclude Triangle Capital's' sale from trial. See Reply to Plaintiffs' Motion in Limine at 8. The Plaintiffs insist that they have shown that Triangle Capital's sales did not represent the highest true estimate of the TIR shares' value. See Reply to Plaintiffs' Motion in Limine at 8. Instead, the Plaintiffs maintain, the sales were made to resolve the ongoing dispute that Triangle Capital had with the Defendants -- a dispute in which, the Plaintiffs allege, Boylan had threatened Triangle Capital with litigation and had promised to reserve for Triangle Capital the right to" gross-up" to fair value after the sale. Reply

to Plaintiffs' Motion in Limine at 8.  For that reason, the Plaintiffs contend, it would violate rule 408's rationale to admit Triangle Capital's sales for less than fair value as evidence of fair value. See Reply to Plaintiffs' Motion in Limine at 8.

The Plaintiffs then conclude by attempting to dispatch a number of the Defendants' points in short order.  See Reply to Plaintiffs' Motion in Limine at 9-10.  The Plaintiffs assert that any evidence concerning alleged blackmail or threats is inadmissible under rules 401-403 of the Federal Rules of Evidence, because such allegations are not probative of any fact, are irrelevant, and would unduly prejudice the jury against the Plaintiffs.  See Reply to Plaintiffs' Motion in Limine at 9-10.  The Plaintiffs insist that, the Defendants' accusation notwithstanding, they do not seek to hide or shield any relevant evidence from the jury, seeking instead to avoid wasting trial time, confusing the jury, and suffering prejudice to themselves.  See Reply to Plaintiffs' Motion in Limine at 10.  Last, the Plaintiffs dismiss the Defendants' proposal that the Court "'police the parties' use of alleged inflammatory language at trial,'" urging the Court to preclude irrelevant evidence entirely so that the trial is focused on presentation of proof of legally valid claims and defenses.  Reply to Plaintiffs' Motion in Limine at 10 (quoting Response to Plaintiffs' Motion in Limine at 12).

19.     **The Hearing.**

The Court held a hearing on December 27-28, 2016.  See Transcript of Motion Hearing Before the Honorable James O. Browning United States Judge (taken December 27, 2016), filed January 17, 2017 (Doc. 248)("Tr."); Transcript of Motion Hearing Before the Honorable James O. Browning United States Judge (taken December 28, 2016), filed January 23, 2017 (Doc. 250)("Tr.").[53]  The hearing was quite long, but the parties largely stuck to their briefing.  The

---

[53]The hearing lasted two days and the court reporter filed a separate transcript for each

parties raised a few new issues, however.

Cognizant that all the district court judges from the United States District Court for the Northern District of Oklahoma had recused themselves from the case, the Court -- in from Albuquerque, New Mexico to hear the case -- made some disclosures to the parties about possible conflicts of interest before assuring that parties that it believed it could be fair and impartial in this case. <u>See</u> Tr. at 4:6-5:10 (Court). The Court noted that there were eleven outstanding motions to hear, and it suggested to the parties that they concentrate their initial arguments on the motions for summary judgment and motions to strike, informing the parties that the Court had thoroughly reviewed those materials. <u>See</u> Tr. at 5:11-6:4 (Court). The Court also oriented the parties by revealing that its early inclinations were that (i) Delaware law applies to this case; (ii) Delaware Court of Chancery opinions after <u>Bershad</u> had limited its scope but not overruled it; (iii) a number of factual issues preclude the Court from saying as a matter of law that the claims are barred or that the affirmative defenses should be stricken, whether under the theory of acquiescence, waiver or estoppel; and (iv) it would not strike the Defendants' proffered expert's affidavit. <u>See</u> Tr. at 6:5-7:11 (Court). After the Court and the parties sorted through sundry housekeeping issues, the Court invited the Defendants to discuss their Motion for Summary Judgment on Acquiescence. <u>See</u> Tr. at 7:12-11:2 (Court, Kagen, DeMuro).

The Defendants started by saying that, if the Court determines that <u>Bershad</u>'s holding applies to this case, then the outcome is already determined in the Defendants' favor on the Motion for Summary Judgment on Acquiescence. <u>See</u> Tr. at 11:3-8 (DeMuro). When the Court asked the Defendants how it then should handle "a bundle of lower court opinions" since

---

day of the hearing. The pagination between the two documents is, however, continuous. In light of this fact and for readers' ease, the Court refers to both transcript documents as though they were a single, continuously-paginated document.

<u>Bershad</u> that "seem to have carved back and chopped at <u>Bershad</u>," Tr. at 11:9-21 (Court), the Defendants suggested multiple ways for the Court to handle them, <u>see</u> Tr. 11:22- (DeMuro). First, the Defendants said, under the <u>Erie</u> doctrine -- from <u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64 (1938) -- a federal court sitting in diversity only ought to consider intermediate court cases if there is no clear decision from the relevant state's highest court on an issue. <u>See</u> Tr. at 11:23-12:13 (DeMuro). Applying the <u>Erie</u> doctrine to this case, the Defendants asserted, the Court will see that, the Plaintiffs' contentions notwithstanding, the Delaware Courts of Chancery cannot "implicitly overrule[]" the Supreme Court of Delaware's holding in <u>Bershad</u>. Tr. at 12:14-20 (DeMuro).

The Court agreed with the Defendants that it would feel uncomfortable writing an opinion that says the lower courts can overturn the Supreme Court of Delaware, but it asked the Defendants whether it would be accurate to hold that the lower courts have limited, refined, or clarified <u>Bershad</u>'s scope over the last three decades. <u>See</u> Tr. at 13:12-18 (Court). The Defendants adamantly insisted that such a holding both would violate the <u>Erie</u> doctrine and would ride roughshod over the Supreme Court of Delaware's authority. <u>See</u> Tr. at 13:19-14:11 (DeMuro). A better approach to determining <u>Bershad</u>'s continued applicability and scope, the Defendants suggested, is to take a look at <u>In Re Celera Corp. Shareholder Litigation</u>, 59 A.3d 418 (Del. 2012)("<u>In Re Celera Corp.</u>"); which the Defendants said is the last case in which the Supreme Court of Delaware -- rather than lower courts -- spoke of <u>Bershad</u> in terms of its acquiescence defense. <u>See</u> Tr. at 14:11-22 (DeMuro, Court). As the Defendants read <u>In Re Celera Corp.</u>, the Supreme Court of Delaware applied <u>Bershad</u> as recently as 2012. <u>See</u> Tr. at 14:23-16:13 (DeMuro). The Defendants found it inconceivable that a federal court sitting in diversity could need to look at lower state court opinions if the Supreme Court of Delaware's last

word on the subject applied the Bershad rule.  See Tr. at 16:14-19 (DeMuro).  Moreover, the Defendants emphasized, the same judge authored three of the Delaware Court of Chancery opinions that "discard" Bershad: then-Chancellor Leo E. Strine, whom the Defendants characterize as a lower-court judge simply discontent with the Supreme Court of Delaware's rule.  See Tr. at 16:20-17:7 (DeMuro).[54]  According to the Defendants, other Delaware Court of Chancery cases -- and recently the United States District Court for the Northern District of California and the United States Court of Appeals for the Fourth Circuit -- applied the Bershad rule.  See Tr. at 17:14-18:24 (DeMuro)(citing without referring by case name to Kaul v. Mentor Graphics Corp., 2016 WL 6249024 (N.D. Cal. Oct. 26, 2016)(Labson-Freeman, J.);[55] Schwartz v. Blum,  309 Fed. Appx. 718 (4th Cir. 2009)(per curiam)(Traxler, J., Shedd, J., and Hamilton, S.J.)("Schwartz")).  It is especially noteworthy, the Defendants added, that the Schwartz court applied Bershad in a case that involved a self-dealing transaction, which then-Chancellor Strine surmised in lower court Delaware cases was outside of Bershad's scope.  See Tr. at 19:13-22 (DeMuro).

Telescoping from such granular details, the Defendants reemphasized that the Supreme Court of Delaware has never expressly overruled Bershad.  See Tr. at 20:4-14 (DeMuro).  The Defendants averred that, despite the Plaintiffs' assertions, the Supreme Court of Delaware did not even mention Bershad in its 1994 case Kahn v. Lynch, let alone overturn Bershad.  See Tr. at

---

[54]Leo E. Strine, Jr. has been the Chief Justice of the Supreme Court of Delaware since February 28, 2014.  See Delaware Court, Supreme Court: Judicial Officers, http://courts .delaware.gov/supreme/justices.aspx (last visited Apr. 22, 2017).

[55]The Plaintiffs did not provide the Court with the name of the case to which they were referring at this point.  See Tr. at 17:22-18:5 (DeMuro).  The Plaintiffs identified, however, the decision's author, district, and year, and they mentioned that the decision applied Bershad.  See Tr. at 17:22-18:5 (DeMuro).  Kaul v. Mentor Graphics Corp. is the only case available in Westlaw that satisfies these criteria.

20:15-21:22 (DeMuro). Twenty years later, the Defendants said, the Supreme Court of Delaware heard Kahn v. M.F. Worldwide, 88 A.3d 635 (Del. 2014), another case on a self-dealing merger, and again failed to even mention Bershad's acquiescence defense. See Tr. at 21:23-24:10 (DeMuro). Both Kahn v. Lynch and Kahn v. M.F. Worldwide, the Defendants asserted, simply set out what the proper standard of review is in a conflicted merger situation: the business judgment rule if the defendants employed certain procedures to protect minority shareholders' rights and entire fairness review if the defendants did not employ those procedures. See Tr. at 25:3-15 (DeMuro).

Realizing that the discussion had meandered in a few different directions up to that point, the Defendants closed their argument with a clarification of the core position that they were arguing. In short, that argument was that: (i) entire fairness review normally applies under Bershad and both Kahn v. Lynch and Kahn v. M.F. Worldwide when, as the Defendants admit was the case in the merger at issue in this case, there is a self-dealing merger and the defendants do not follow certain standard procedures to safeguard the minority shareholders; but, (ii) under Bershad, entire fairness review does not apply even under those circumstances if a fully informed minority shareholder accepted the merger consideration, i.e., acquiesced to the merger.. See Tr. at 25:22-27:6 (DeMuro). Any attempt that the Plaintiffs might make to read In re Celera Corp., In re Best Lock Corp. Shareholder Litigation, 845 A.2d 1057 (Del. Ch. 2001)("Best Lock"), or any other case in a lower court to have expressly overturned the Bershad rule, the Defendants asserted, is an act of "great contortionism" and a fundamental misreading of the law. See Tr. at 27:7-30:17 (DeMuro).

The Court then turned to the Plaintiffs to ask whether they were arguing that: (i) "the Supreme Court of Delaware has overruled, or impliedly overruled" Bershad; or that "Bershad

doesn't have to be read as broadly as the Defendants are reading it and that the . . . lower courts in Delaware are reading it more narrowly but without overruling <u>Bershad</u>[.]" Tr. at 31:16-24 (Court). The Plaintiffs indicated that they were arguing the latter, saying that <u>Bershad</u> still is good law but does not apply in the context of a self-dealing merger. <u>See</u> Tr. at 31:25-32:15 (Kagen, Court). Beginning to unpack their argument on this point, the Plaintiffs chose to "begin at the beginning," telling the Court that, under Delaware law, the merger in this case was a long-form merger, because the minority shareholders who were cashed out held more than ten percent of the outstanding shares. Tr. at 32:18-34:8 (Kagen). In the long-form merger context, the Defendants explained, the Delaware courts have sought to safeguard minority shareholders rights to not be summarily cashed out against their will by giving minority shareholders a right either to sue or to seek an appraisal. <u>See</u> Tr. at 34:9-35:1 (Kagen). The Plaintiffs asserted that these protections are self-evident even in <u>Bershad</u>, which they argued requires courts to determine whether entire fairness review with respect to transactions that involve self-dealing. <u>See</u> Tr. at 35:1-36:13 (Kagen). According to the Plaintiffs, the Supreme Court of Delaware in <u>Bershad</u> only allowed an acquiescence defense to apply for three reasons. <u>See</u> Tr. at 36:14-37:12 (Kagen). First, the Plaintiffs contended, the Supreme Court of Delaware in that case determined that the merger had not been tainted with self-dealing. <u>See</u> Tr. at 36:14-37:1 (Kagen). Second, the Plaintiffs maintained, the plaintiff in <u>Bershad</u> was fully apprised; everything concerning the transaction had been disclosed to him and he had voted on the merger. <u>See</u> Tr. 37:7-10 (Kagen). Third, the Plaintiffs noted, the plaintiff in <u>Bershad</u> took the merger consideration. <u>See</u> Tr. at 37:11-12 (Kagen).

Having acknowledged the importance of <u>Bershad</u> for setting an analytical framework, the Plaintiffs nevertheless insisted that three decades of subsequent cases have clarified its scope.

See Tr. at 37:13-15 (Kagen). The Plaintiffs asserted that, in Kahn v. Lynch, in 1994, the Supreme Court of Delaware put forth a more stringent standard for the very issue that Bershad did not consider: a merger completed in a self-dealing context. See Tr. at 37:16-20 (Kagen). Rather than defaulting to the business judgment rule, the Plaintiffs insisted, Kahn v. Lynch requires courts to apply entire fairness review in cases that involve self-dealing, as there is a rebuttable assumption that the majority shareholders acted improperly. See Tr. at 37:21-38:15 (Kagen). According to the Plaintiffs, the mandatory entire fairness review has two parts: fair dealing and fair price. See Tr. at 28:15-18 (Kagen). Fair dealing, the Plaintiffs explained, requires that the majority shareholders: (i) put into place a special committee of disinterested directors to review the process and make sure that it is fair to the minority shareholders who are to be cashed out; (ii) hold a vote in which the majority of the minority shareholders agree to complete the merger; or (iii) get a fairness opinion from a respected investment bank. See Tr. at 38:19-39:9 (Kagen). Fair price, the Plaintiffs explained, requires that the cash-out price represent all future value discounted to the present value. See Tr. at 39:10-18 (Kagen). As the Plaintiffs read Kahn v. Lynch, entire fairness is not satisfied in the absence of such fair process and fair price even if the majority shareholders pay the minority shareholders the merger consideration despite the latter's desire not to be cashed out. See Tr. at 39:24-41:1 (Kagen).

The Plaintiffs then proposed that In re Celera Corp., contrary to the Defendants' reading of the case, actually supports the Plaintiffs' argument on this point. See Tr. at 41:2-42:17 (Kagen). In that case, the Plaintiffs said, a minority shareholder holding six percent of Celera Corporation's shares was dissatisfied with a proposed merger between Celera Corporation and another company. See Tr. at 42:18-43:5 (Kagen). The merger proposal was self-dealing insofar as it was conditioned on Celera Corporation's Chief Executive Office ("CEO") being paid

$800,000.00 a year and receiving a one-time cash payment of $2.3 million.  See Tr. at 43:5-44:2 (Kagen).  The Plaintiffs said that the minority shareholders were cashed out.  See Tr. 44:9-45:17 (Kagen).  The lead plaintiffs in the resulting class action on the minority shareholders' behalf settled the case, but the other plaintiffs were dissatisfied with the settlement.  See Tr. at 47:2-13 (Kagen).  The Supreme Court of Delaware, the Plaintiffs said, determined that the other minority shareholder plaintiffs had not acquiesced to the settlement.   See Tr. at 47:6-52:1 (Kagen). Rather, the Plaintiffs maintained, the Supreme Court of Delaware held that the plaintiff minority shareholders aside from the lead plaintiff had a supportable claim for substantial monetary damages.  See Tr. at 46:15-55:4 (Kagen).   Referring to the Delaware Court of Chancery case Best Lock, the Plaintiffs say, the Supreme Court of Delaware in In re Celera Corp. held that, where minority shareholders face a choice between accepting an inadequate merger buyout or pursing an adequate appraisal, the shareholders did not acquiescence to the merger.  See Tr. at 52:2-14 (Kagen).

The Plaintiffs then mentioned that four esteemed Delaware Chancery Judges all come to the same conclusion in the years since In re Celera Corp.  See Tr. at 55:19-56:23 (Kagen).  In contrast, the Plaintiffs noted, the Defendants do not cite any Delaware case aside from 1989's Bershad in support of their position on the acquiescence defense, relying instead on cases from outside Delaware.  See Tr. at 56:24-57:4 (Kagen).  The Plaintiffs said that even those out-of-state cases do little, however, to support the Defendants' position.  See Tr. at 57:5-58:21 (Kagen). According to the Plaintiffs, the Fourth Circuit case Schwartz predates In re Celera Corp. by three years and so offers no insight into how to read self-dealing merger law in a post-In re Celera Corp. world.  See Tr. at 57:11-58:8 (Kagen).  The Plaintiffs contended that none of the parties in the  2016 case out of the Northern District of California, Kaul v. Mentor Graphics Corp., 2016

$800,000.00 a year and receiving a one-time cash payment of $2.3 million.  See Tr. at 43:5-44:2 (Kagen).  The Plaintiffs said that the minority shareholders were cashed out.  See Tr. 44:9-45:17 (Kagen).  The lead plaintiffs in the resulting class action on the minority shareholders' behalf settled the case, but the other plaintiffs were dissatisfied with the settlement.  See Tr. at 47:2-13 (Kagen).  The Supreme Court of Delaware, the Plaintiffs said, determined that the other minority shareholder plaintiffs had not acquiesced to the settlement.   See Tr. at 47:6-52:1 (Kagen). Rather, the Plaintiffs maintained, the Supreme Court of Delaware held that the plaintiff minority shareholders aside from the lead plaintiff had a supportable claim for substantial monetary damages.  See Tr. at 46:15-55:4 (Kagen).   Referring to the Delaware Court of Chancery case Best Lock, the Plaintiffs say, the Supreme Court of Delaware in In re Celera Corp. held that, where minority shareholders face a choice between accepting an inadequate merger buyout or pursing an adequate appraisal, the shareholders did not acquiescence to the merger.  See Tr. at 52:2-14 (Kagen).

The Plaintiffs then mentioned that four esteemed Delaware Chancery Judges all come to the same conclusion in the years since In re Celera Corp.  See Tr. at 55:19-56:23 (Kagen).  In contrast, the Plaintiffs noted, the Defendants do not cite any Delaware case aside from 1989's Bershad in support of their position on the acquiescence defense, relying instead on cases from outside Delaware.  See Tr. at 56:24-57:4 (Kagen).  The Plaintiffs said that even those out-of-state cases do little, however, to support the Defendants' position.  See Tr. at 57:5-58:21 (Kagen). According to the Plaintiffs, the Fourth Circuit case Schwartz predates In re Celera Corp. by three years and so offers no insight into how to read self-dealing merger law in a post-In re Celera Corp. world.  See Tr. at 57:11-58:8 (Kagen).  The Plaintiffs contended that none of the parties in the  2016 case out of the Northern District of California, Kaul v. Mentor Graphics Corp., 2016

WL 6249024 (N.D. Cal. Oct. 26, 2016), appeal filed sub nomine Sanjiv Kaul et al. v Mentor Graphics Corp. (9th Cir. Nov. 22, 2016), cited In re Celera Corp. in its briefings. See Tr. at 58:9-16 (Kagen). The Plaintiffs extrapolated from that fact that the judge deciding Kaul v. Mentor Graphics Corp. was unaware that the Supreme Court of Delaware had even handled a case on the acquiescence defense since Bershad. See Tr. at 58:17-19 (Kagen). Moreover, the Plaintiffs stated, Kaul v. Mentor Graphics Corp. is currently being appealed. See Tr. at 58:20 (Kagen).

Turning then to the Delaware Court of Chancery cases that they asserted had applied Bershad and Kahn v. Lynch in tandem -- unlike the Fourth Circuit and Northern District of California cases -- the Plaintiffs maintained that a large share of the Delaware Chancellors has taken the same position on acquiescence in self-dealing merger contexts as the Plaintiffs have taken. See Tr. at 59:3-10 (Kagen). The Plaintiffs first mentioned In re Ezcorp Inc. Consulting Agreement Derivative Litigation, 2016 WL 301245 (Del. Ch. Jan., 25, 2016)(Laster, V.C.), decided just last year,[56] in which, the Plaintiffs asserted, Vice Chancellor J. Travis Laster held that the doctrine of acquiescence does not apply to cases with a self-dealing merger context. See Tr. at 59:11-19 (Kagen). The Plaintiffs then referred to In re Best Lock, in which, the Plaintiffs contend, Chancellor Chandler indicated that acceptance of merger consideration does not automatically mean merger acquiescence. See Tr. at 59:20-60:1 (Kagen). The Plaintiffs thereafter adduced Gesoff v. IIC Industries, Inc., 902 A.2d 1130 (Del. Ch. 2006)(Lamb, C.), in which, the Plaintiffs maintain, Chancellor Lamb agreed with Chancellor Chandler's position in In re Best Lock. See Tr. at 60:2-4 (Kagen). Last, the Plaintiffs marshal In re JCC Holding Co,

---

[56]At the hearing on December 27, 2016, the Plaintiffs stated that the Delaware Court of Chancery decided the case last year, i.e., 2015. See Tr. at 59:11-19 (Kagen). This chronology is incorrect, as the Delaware Chancery Court decided the case on January 25, 2016. See In re Ezcorp Inc. Consulting Agreement Derivative Litigation, 2016 WL 301245, at *1. The Court nevertheless, in the main body text, reports the chronology as the Plaintiffs asserted it.

Inc. Shareholders Litigation, 843 A.2d 713 (2003)(Strine, C.), and In re PNB Holding Co. Shareholder Litigation, 32 Del. J. Corp. L. 654 (not reported in A.2d)(Strine, C.), in which, the Plaintiffs asserted, then-Chancellor Strine held that it is nonsensical to apply Bershad in an entire fairness scenario under Kahn v. Lynch simply by the mere acceptance of merger consideration. See Tr. at 60:6-10 (Kagen). Distilling and combining the holdings in these cases, the Plaintiffs asserted that the current rule in Delaware is that entire fairness applies in any merger case that involves self-dealing, because the minority shareholders rights must be protected and the courts need to replicate the protections found in cases that do not involve self-dealing. See Tr. at 60:15-69:7 (Kagen, Court).

Beginning to draw their argument on the Defendants' Acquiescence MSJ to a close, the Plaintiffs contended that it is not sufficient under Delaware law to adjudge whether entire fairness was satisfied by looking at actions the dissenting minority shareholders took after the merger. See Tr. at 69:8-16 (Kagen). The only period of time that the Court should consider, according to the Plaintiffs, is the time of the merger itself. See Tr. at 69:17-70:20 (Kagen). According to the Plaintiffs, even if the Court determines that the price was fair, the absence of fair process requires that the Plaintiffs prevail and are to be awarded attorney fees under In Re Nine Systems Corporation Shareholders Litigation, 2014 WL 4383127 (Del. Chan. Sept. 4, 2014)(Noble, V.C.)("In re Nine Systems"). See Tr. at 70:21-71:3 (Kagen). The Plaintiffs thereafter repeated their earlier contention that the Delaware Courts of Chancery have held multiple times in the years since In re Celera Corp. that the acquiescence defense does not apply in self-dealing mergers without fair process and fair price, see Tr. at 71:8-73:12 (Kagen), and that there is no convincing evidence that the Supreme Court of Delaware would hold to the contrary, see Tr. at 73:13-74:4 (Kagen). Accordingly, the Plaintiffs said, the Court must apply the law of the

Delaware Courts of Chancery under the Erie doctrine.  See Tr. at 73:13-25 (Kagen).

Detouring into a discussion on Oklahoma law, the Plaintiffs asserted that Oklahoma law follows Delaware law on these points, because the Oklahoma statute "is patterned, copied from the Delaware statute, and judges in . . . Oklahoma says that where there is a question we follow the decisional law of the state where the statute is from," i.e., Delaware.  Tr. at 75:11-16 (Kagen). The Plaintiffs also indicated that Oklahoma has no statute that specifically concerns self-dealing merger transactions, and that the Oklahoma courts have applied Delaware law to such scenarios. See Tr. at 75:22-76:2 (Kagen)(citing Woolf v. Universal Fidelity Life Ins. Co., 849 P.2d 1093 (Okla. Civ. App. 1992)(Enos, J.), which the Plaintiffs alleged applied Cavalier Oil Corp. v. Harnett, 564 A.2d 1137 (Del. 1989)).   After lurching into a short discussion about (i) how Norberg v. Security Storage Co. of Washington, 2000 WL 1375868 (Del. Ch. 2000)(Steele, J.) is easy to distinguish from this case, because the plaintiffs in that case took merger consideration after filing suit; and (ii) how entire fairness and appraisal are not identical concepts, see Tr. at 76:3-77:16 (Kagen), the Plaintiffs concluded by answering the Court's original question as to what an opinion that agreed with the Plaintiffs' position would look like:

> So to conclude, if I were the judge, what would I write with regard to this matter?  I would apply the Delaware law as Celera has applied it, as we have discussed, and what I would say is, in a case involving entire fairness and self-dealing allegations and breaches of the duty of loyalty, such as are present here, in those cases where Bershad by its terms does not reach and as Celera teaches and applies and holds, that case does not state that the mere acceptance of transactional consideration in which the plaintiffs have no choice to set it, no choice to participate, the mere taking of money that was mandated by statute does not work a forfeiture upon them, does not work an acquiescence upon them, and no case holds so.
>
> I would cite in support Celera, PNB, Gesoff, which I didn't talk about[57] but is another case on the same point, Best Lock, and all the other cases that I

---

[57]The Plaintiffs misremembered this fact, as they had discussed Gesoff v. IIC Industries, Inc. earlier in the hearing.  See Tr. at 60:2-4 (Kagen).

mentioned. I think it's actually not a difficult issue to deal with given the holdings of those cases and the holding of <u>Celera</u> itself, it's a factual holding.

Tr. at 77:17-78:11 (Kagen).

The Court then offered the Defendants an opportunity to reply on Plaintiffs' Acquiescence MSJ. <u>See</u> Tr. at 78:14-16 (Court). Taking a festive lexical cue from the holiday season that had just finished, the Defendants notified the Court that they "bring tidings of good news to the Court, and those tidings are that we've now cleared away the underbrush of Plaintiffs' opposition to the <u>Bershad</u> rule." Tr. at 78:19-22 (DeMuro). <u>Cf.</u> Lk. 2:10 (KJV). Seeking to buttress this assertion, the Defendants maintained that the Plaintiffs had just admitted that <u>Bershad</u> is still valid law, thereby relegating all contrary Delaware Court of Chancery opinions to the dustbin. <u>See</u> Tr. at 78:23-79:7 (DeMuro). Further good news, the Defendants declared, arose from the agreement between the parties that <u>In re Celera Corp.</u> is the controlling case on acquiescence with regard to contested merger transactions. <u>See</u> Tr. at 79:8-12 (DeMuro).

The Court interrupted the Defendants at this point, indicating that it understood the Plaintiffs to have argued that <u>Bershad</u> still is good law but that subsequent Delaware Court of Chancery decisions had chalked out its boundaries. <u>See</u> Tr. at 79:14-21 (Court). The Defendants replied that they interpret the Delaware Courts of Chancery in a much less favorable light, viz. as "a direct assault on <u>Bershad</u> in an attempt to impose . . . these few judges' view of what the law ought to be." Tr. at 79:22-80:1 (DeMuro). Furthermore, the Defendants said, the Plaintiffs build a straw man when they assert that the Defendants believe mere acceptance of the merger consideration qualifies as acquiescence. <u>See</u> Tr. at 80:3-8 (DeMuro). According to the Defendants, this rule is not what they assert or what <u>Bershad</u> held. <u>See</u> Tr. at 80:8-9 (DeMuro). On the contrary, the Defendants contended, they argue that <u>Bershad</u> has a two-pronged test to

determine whether a minority shareholder has acquiesced to a contested merger transaction.  See Tr. at 80:9 (DeMuro).  As the Defendants interpret those two prongs, the minority shareholder has to be fully informed and has to have accepted the merger consideration.  See Tr. at 80:10-12 (DeMuro).  The Defendants noted that the Plaintiffs had spoken at length about the second prong but had not mentioned the first prong.  See Tr. at 80:12-13 (DeMuro).

The Defendants then argued that In re Celera Corp., which concerned a merger case tainted with self-dealing, applied Bershad.  See Tr. at 80:14-82:5 (DeMuro).  The Plaintiffs' alternative reading of the case, the Defendants asserted, constitutes little more than mental gymnastics and contortionism of first rank.  See Tr. at 82:6-10 (DeMuro).  The Court asked the Defendants whether instead of contortionism, the Plaintiffs had identified decisions from the Delaware Courts of Chancery that had sorted out a doctrine in Bershad, which is an old case.  See Tr. at 82:12-20 (Court).  The Court suggested that it might be "a little bit dangerous under Erie just to say . . . we're going to take the broad language in Bershad and not look at maybe the case development underneath it."  Tr. at 82:22-25 (Court).  The Defendants sought to allay the Court's concern by proposing that the Court divide the Delaware Court of Chancery cases into two groups: pre-In re Celera Corp. cases and post-In re Celera Corp. cases.  See Tr. at 83:1-10 (DeMuro).  When the Court observed that In re Celera Corp. did not do anything with the intermediate court cases, just saying that they exist, the Defendants countered that the Bershad acquiescence rule was not doomed in In re Celera Corp. merely on the basis that the Supreme Court of Delaware did not discuss it.  See Tr. at 83:14-84:16 (DeMuro).  The Defendants maintained that it is wrongheaded to infer that a rule was overturned just because no party in In re Celera Corp. argued that plaintiff BVF Partners L.P. had acquiesced to the merger contested in that case.  See Tr. at 85:13-23 (DeMuro).  The Defendants then asserted that: (i) Bershad says

that a court does not even reach the entire fairness decision if the minority shareholder contesting the merger was a fully informed shareholder who accepted the merger transaction's benefits, <u>see</u> Tr. at 86:16-87:8 (DeMuro); and (ii) <u>In re Celera Corp.</u> did not expressly limit this holding from <u>Bershad</u>, <u>see</u> Tr. at 87:9-18 (DeMuro).

The Defendants closed their argument on law regarding the Plaintiffs' Acquiescence MSJ on that point, and the Court advised the parties of its initial take on how it would rule on the motion. <u>See</u> Tr. at 87:19-89:1 (DeMuro, Court). The Court said:

> I obviously will take this issue under advisement and try to get you an opinion and we'll talk about timing in a moment or before we all leave the next couple of days. So I really need to immerse myself in Delaware law and try to get a feel for both the tune as well as the melody of what they're doing in Delaware.
>
> But I am still inclined to think that there is a way to square what -- and maybe I'm more optimistic in my abilities than the case law will allow -- that I can square these lower court opinions with <u>Bershad</u> without saying that it's overruled or impliedly overruled and that, in fact, there's more consistency there than at least the Defendants believe.
>
> So I'm inclined to think that these claims go forward, at least to this defense, and that <u>Bershad</u> does not preclude all eight claims on the basis of acquiescence. There may be some other reason for the claims not to proceed, but at least after reviewing the briefs and reviewing the law and then hearing the arguments today, I'm still inclined to think that <u>Bershad</u> doesn't preclude these claims.

Tr. at 88:8-89:1 (Court).

The Court then invited the Defendants, as a follow-up to their arguments thus far on the law regarding acquiescence in contested merger transactions, to discuss the facts related to the Plaintiffs' alleged acquiescence in this case:

> All right. Let's tackle the facts. Let me ask you this. Let's say I went your way after I sit down and I write this opinion. How does a court grant summary judgment to you on the basis . . . that the Plaintiffs were fully-informed shareholders? How do you . . . do that with a summary judgment? How do you take the ability of the Plaintiffs to go to trial on that issue even if I find that <u>Bershad</u>, as you read it, is correct?

Tr. at 89:2-11 (Court). The Defendants responded that the Court could render summary judgment, because the Defendants had presented "extraordinary evidence." Tr. at 89:12-13 (DeMuro). The Defendants first feinted that they were going to speak about Nate Allen's deposition testimony, noting that Nate Allen is the lead financial adviser on behalf of the Stuart plaintiffs, including all of the corporate entities. See Tr. at 89:16-19 (DeMuro). The Defendants immediately thereafter, however, went in a different direction, arguing that this case concerns "highly unique" facts the like of which no Delaware Court of Chancery or any other court that the Defendants had identified has seen. See Tr. at 89:25-90:3 (DeMuro). This case's uniqueness, the Defendants maintained, was evident from the very start, when, the Defendants alleged, Cypress Energy Partners and the Stuart group engaged in an internecine bidding war for control of the company. See Tr. at 90:5-19 (DeMuro). When the Stuart group lost, the Defendants recounted, Stuart received all the other Plaintiffs' proxy agreement to (i) negotiate on their behalf with respect to the selling of their shares; and (ii) not accept any merger price below approximately $641,000.00 per share. See Tr. at 90:20-91:4 (DeMuro).

Making the case yet more idiosyncratic, the Defendants argued, is the Plaintiffs' misapprehension that Delaware law -- rather than Oklahoma law -- applied to the merger. See Tr. at 91:9-11 (DeMuro). The Defendants asserted that this erroneous belief had led the Plaintiffs astray, giving them the impression that they had blocking rights over the merger, because they controlled approximately thirty percent of the shares. See Tr. at 91:12-16 (DeMuro). Under Oklahoma law 71 O.S. 1081(c), the Defendants said, such blocking rights do not exist in the case of a long-form merger, because a long-form merger requires only the

approval of fifty percent plus one of the shareholders.[58]  See Tr. at 91:17-20 (DeMuro).

Nodding back in the direction of Nate Allen's testimony, the Defendants then told the Court that Allen's deposition is important as an exemplar of the full information that all the Plaintiffs had at the time of the merger.  See Tr. at 91:21-92:12 (DeMuro, Court).  The Defendants argued that other Plaintiffs also were demonstrably fully informed, including Reynolds -- who was an inside director in the company for years and was a member of the special committee that was formed before the control acquisition -- and Stuart -- who had been a member of TIR's board for years and "knew . . . fully well about the IPO plans, the merger plans before . . . the June bidding."  Tr. at 92:13-20 (DeMuro).

Treating the discussion about deposition testimony from Allen and others as more of a parenthetical than as their argument's main thrust, the Defendants then reverted to recounting the unique characteristics that hallmark this case.  See Tr. at 93:3-23 (DeMuro).  As the Defendants remembered it, the Cypress Energy Partners group met with the Stuart group in April, 2013, in Stuart's Connecticut home to discuss Cypress Energy Partners' IPO plan.  See Tr. at 93:3-6 (DeMuro).  Cypress Energy Partners' plan, as the Defendants described it, was to merge Cypress Energy Partners' saltwater disposal company with TIR's pipeline inspection company, using the merger to: (i) recapitalize TIR; and (ii) use TIR as a pass-through entity to go public through a master limited partnership ("MLP") -- a corporate form that were a "big deal" at the time in the

---

[58]Later in the hearing, the Defendants indicated that 18 O.S. § 1081(c) requires "more than 50 percent of the consent of the shareholders," which the Defendants interpreted to mean at least fifty-one percent of the shareholders.  Tr. at 125:14-19 (DeMuro).  The Court believes that the Defendants simply made a mathematical error during their second reference to what "more than 50 percent" means.  An illustration should make this clear.  Assume that a company has 1,000 shareholders.  Fifty percent of that total is 500 shareholders, and fifty-one percent of that total is 510 shareholders.  If 501 shareholders are in favor of the merger, they make up more than fifty percent of all shareholders even though they are only 50.1% of all shareholders, i.e., less than fifty-one percent.

energy sector. Tr. at 93:6-15 (DeMuro). The Defendants said that Cypress Energy Partners' plan did not convince Stuart, and spawned a bidding contest for company control. See Tr. at 93:19-23 (DeMuro).

As the Defendants tell it, after the Cypress Energy Partners group won the bidding war and gained the company's control, it started to negotiate with Triangle Capital to try to acquire their shares and to plan the IPO. See Tr. at 95:1-5 (DeMuro). The Defendants argued that, a few months later on October 31, 2013, the tender notice was issued. See Tr. at 94:16-24; 95:5-7 (DeMuro, Court). The Defendants asserted that, at the time of the tender offer, the Plaintiffs were attempting to negotiate a higher price for their shares than the $451,000. 00 per share price offered to the pooled shareholders, based on their allegedly erroneous belief that they could block the transaction. See Tr. at 95:8-24 (DeMuro). According to the Defendants, the Cypress Energy Partners group went ahead with the tender offer, disclosing fully and completely the IPO plans, what they intended to do with the merged entity's shares, and that a registration statement had been filed. See Tr. at 100:23-101:2 (DeMuro).

The Court interjected at that point to ask the Defendants how one could conclude that the Plaintiffs were fully informed just because they received the tender offer. See Tr. at 101:16-21 (Court). The Defendants repeated its point that all information about the merger and IPO was fully disclosed, and then continued to recite the merger's history. See Tr. at 101:22-102:5 (DeMuro). According to the Defendants, after they sent out the tender offer, they filed an S-1 on November 19, 2013 for Cypress Energy Partners, LP, detailing "in excruciating degree" the plans to merge and the IPO. Tr. at 102:5-12 (DeMuro). Combined with the Plaintiffs' history as inside directors and the tender offer notice, the Defendants argued, the 600-page S-1 filing proves beyond a shadow of a doubt that the Plaintiffs were fully informed about the merger and

IPO plans.  See Tr. at 102:13-20 (DeMuro).

Flipping back to Allen's deposition testimony, the Defendants highlighted that Allen said, after some deliberation and reflection, that he was not lacking any information he thought he should have had at the time that he accepted the merger consideration about the merger or the IPO plans.  See Tr. at 103:1-105:10 (DeMuro).  The Defendants also noted that Allen and Reynolds in his deposition testimony acknowledge that there had been a competitive bidding process between the two groups of shareholders, and that Allen had pegged $451,000.00 per share as a fair price at the time of the purported bidding war.  See Tr. at 105:12-107:22 (DeMuro, Court).  Under questioning, the Defendants insisted that these details are irrelevant, because it reveals that the $451,000.00 per share offer price was a fair price that competing shareholder groups had been bid up and selected.  See Tr. at 107:23-108:13 (Court, DeMuro).  According to the Defendants, the Court can grant summary judgment for the Defendants on acquiescence defense grounds in that Allen and Reynolds' deposition testimony proves that $451,000.00 per share exceeded the fair price -- as it built in a control premium -- at which a fully informed Stuart group arrived.  See Tr. at 108:24-112:5 (DeMuro).  The Defendants further stated that $451,000.00 per share remained within the range of fair value for the shares six months later when the shareholders were cashed out at that price.  See Tr. at 110:25-111:2 (DeMuro).

Spotlighting Allen's deposition testimony from another angle, the Defendants then noted that Allen had mentioned that he had not done an appraisal on the shares for reasons dealing with tax advice and legal advice.  See Tr. at 112:20-115:13 (DeMuro).  Arguing that they have discovered a dog that did not bark, the Defendants argue that Allen's failure to assert that he lacked sufficient information is proof that he had sufficient information.  See Tr. at 113:1-6 (DeMuro).  Consequently, the Defendants said, the Plaintiffs' disputation of their full

knowledge, captured in their objection for the Defendants' undisputed facts 41-51 from the

Response to Defendants' Acquiescence MSJ, do not carry any water, and the Plaintiffs' full

knowledge ought to be deemed undisputed. <u>See</u> Tr. at 115:14-118:10 (DeMuro). Putting a finer

point on it, the Defendants asserted that "this whole notion that they weren't fully informed is a

bit of a hoax . . . ." Tr. at 119:5 (DeMuro).

After lunch, the Defendants gave the Court a short biographical sketch of each listed

Plaintiff and Defendant. <u>See</u> Tr. 122:11-125:4 (DeMuro). The Defendants then returned to the

pre-lunch discussion whether the Plaintiffs were fully possessed of the facts regarding the

merger. <u>See</u> Tr. at 125:24-126:4 (DeMuro). Referencing undisputed fact 6 from the Defendants'

Acquiescence MSJ, the Defendants noted that Stuart first prepared a proposal to acquire control

of TIR in February, 2013, that he named "Project Poirot."[59] Tr. at 126:5-21 (DeMuro).

According to the Defendants, Stuart offered to buy the pooled shareholder shares -- and the

shares of whomever else wished to sell to him -- at approximately $369,000.00 per share. <u>See</u>

Tr. at 126:21-24 (DeMuro). That same month, the Defendants said, Stuart purchased some

shares from Lorett, who was one of the founding shareholders, for $275,000.00 per share. <u>See</u>

Tr. at 127:6-10 (DeMuro).[60] The Defendants argued that R. Lorett then became the lead

spokesman -- along with his son, J.W. Lorett -- for the group of pooled shareholders who were

---

[59]The Court asked the Defendants why Stuart had called the proposal by this name. <u>See</u> Tr. at 126:25 (Court). The Defendants responded that they thought "it's because he -- he has a fascination or an affinity for the Agatha Christie novels and the detective in her novels whose name is Poirot. I think that's -- it had no other significance other than that as I recall from his deposition." Tr. at 127:1-5 (DeMuro). <u>Cf.</u> Agatha Christie, <u>Hercule Poirot: The Complete Short Stories</u> (2013). The Plaintiffs have a different interpretation for why Stuart chose this proposal title, as the Court notes in a separate footnote <u>infra</u>.

[60]The Court asked the Defendants why Lorett would sell at a price lower than what Stuart had offered to other shareholders. <u>See</u> Tr. at 127:12-13 (Court). The Defendants responded that there was a prior agreement for Stuart to buy Lorett out at a certain price, and Lorett was honoring that prior agreement. <u>See</u> Tr. at 127:14-18 (DeMuro).

looking at them to negotiate with both the Stuart group and the Cypress Energy Partners group. See Tr. at 128:1-7 (DeMuro).

Then referencing undisputed facts 8 and 9 from the Defendants' Acquiescence MSJ, the Defendants said that, from March to June, 2013, Field brought in Cypress Energy Partners and Boylan, who was that firm's principal. See Tr. at 128:8-13 (DeMuro). The Defendants asserted that TIR was looking to recapitalize at that time, because some of its debt obligations were coming due and the pooled TIR shareholders wanted liquidity, so "we had these underlying events that were going on in the capital structure of the corporation." Tr. at 128: 13-18 (DeMuro). From March to May, 2013, the Defendants contended, the Stuart group was submitting their offers and then the Cypress Energy Partners group started to submit their offers, which led to Stuart and Boylan competing for control of the company. See Tr. at 128:19-24 (DeMuro). According to the Defendants, there is no evidence to refute that this competition was a bidding process, and the proof that it was competitive is that the Cypress Energy Partners group wanted to possibly take the company into an MLP structure through an IPO. See Tr. at 128:25-129:14 (DeMuro). The Defendants indicated that the Cypress Energy Partners group wished to convert to the new structure, because an MLP is taxed on a pass-through basis. See Tr. at 129:16-130:2 (DeMuro).

In June, the Defendants maintained, the Stuart group and the Cypress Energy Partners group submitted competing bids -- both bids with the same price of $451,000.00 per share. See Tr. at 130:3-5 (DeMuro). The Defendants noted that, leading to the bidding process, TIR formed a special committee to look at the $451,000.00 per share price. See Tr. at 130:3-7 (DeMuro). According to the Defendants, both Reynolds and Foley were on that special committee, see Tr. at 130:7-10 (DeMuro), and counsel represented everyone during the bidding process, see Tr. at

130:11-14 (DeMuro). The Defendants also contended that, leading to the bidding process, there was a gentlemen's agreement between the Stuart group and the Cypress Energy Partners group that the side that lost in the bidding war would sell its shares to the winning side at the winning price. See Tr. at 130:15-22 (DeMuro). The two groups, the Defendants said, also drafted an agreement that attempted to put that gentlemen's agreement into writing, but that the draft agreement was never signed. See Tr. at 130:23-131:6 (DeMuro).

Clarifying that they were walking the Court through all these facts as a way to build to the relevant question whether the Plaintiffs were fully informed shareholders, the Defendants noted that the Stuart group attempted to block the sale of the shares for a substantially higher price instead of letting the winner-take-all deal come into effect. See Tr. at 131:25-132:10 (DeMuro). The Defendants brought the Court's attention to a letter that Stuart wrote on all the Plaintiffs' behalf on September 30, 2013, just two and half months after he had been removed from the TIR board. See Tr. at 132:11-16 (DeMuro). In that letter, the Defendants said, Stuart used an EBITDA[61] valuation methodology to arrive at an estimate of $20.26 million of projected EBITDA by the end of 2013. See Tr. at 132:16-133:17 (DeMuro).

The Plaintiffs interjected at this point to object that the Stuart letter is a rule 408 settlement communication that is inadmissible and one which the Court should not rely for

---

[61]EBITDA is an acronym standing for "earnings before interest, taxes, depreciation, and amortization." Benton Gup & Rawley Thomas, The Valuation Handbook: Valuation Techniques from Today's Top Practitioners 526 (2010)("Gup and Thomas"). EBITDA became popular in the mid-1980s among leveraged buyout sponsors and bankers to evaluate cash flow, and to calculate multiples for companies in a near-bankruptcy state, on the theory that noncash depreciation and amortization charges should be available to service debt if large-scale capital expenditure programs would not be necessary for the foreseeable future. See Pamela Strup, Moody's Investors Service, Inc., Putting EBITDA in Perspective: 10 Critical Failings of EBITDA as the Principal Determinant of Cash Flow (June 2000). During the dot-com bubble era of the mid-1990s until the 2001 recession, EBITDA became a widely used profitability and performance measure for most companies, and was used to calculate companies' enterprise value, because it is easy to understand and to calculate. See Gup and Thomas at 527-28.

summary judgment. See Tr. at 133:22-134:1 (Kagen). The Defendants rejoined that the Plaintiffs were trying to tactically get rid of anything that hurts them in any way. See Tr. at 134:4-6 (DeMuro). The Defendants clarified that the exhibit is the subject of a Plaintiffs' motion in limine, where -- as the Defendants characterize it -- the Plaintiffs "essentially . . . move in limine to get any evidence out of the case of anything we ever did." Tr. at 134:7-9 (DeMuro). The Defendants contended that the letter had been an exhibit in almost every deposition throughout the case, and that the Plaintiffs had not objected to the letter's use on the deposition trail or in the summary judgment papers as a settlement offer. See Tr. at 134:7-17 (DeMuro). The Defendants asserted that it is clear that the letter is not a settlement offer, as it does not reflect any of a settlement offer's intricacies. See Tr. 134:15-17 (DeMuro). To the contrary, the Defendants asserted, the Plaintiffs want to exclude the letter, because it shows that the Plaintiffs already were sufficiently aware and informed by September, 2013, to be able to make projections that TIR would grow to over twenty million dollars in EBITDA by the end of that year. See Tr. at 134:18-22 (DeMuro). As the Defendants read the tea leaves, the Plaintiffs also do not want the Court to see the letter, because the Plaintiffs want to be able to assert to a jury -- should the case ever reach the trial stage -- that the shares' fair price is $1.2 million per share. See Tr. at 134:22-135:5 (DeMuro).

Continuing with their chronology, the Defendants turned to the tender offer. See Tr. at 135:14-18 (DeMuro). The Defendants said that they decided to move forward with the merger and to make a preceding tender offer on October 31, 2013, after the Stuart group attempted to extract the higher share price in its letter. See Tr. at 135:19-136:7 (DeMuro). According to the Defendants, Douglas Vaughn, Triangle Capital's representative and a member of the TIR board, voted to approve the tender price of $451,000.00 per share. See Tr. at 136:15-19 (DeMuro). The

tender offer, the Defendants maintained, contained a "very accurate" discussion of the planned merger, the MLP, the conflict of interest, and that the Cypress Energy Partners group purchased other shareholders' shares at prices from $437,000.00 per share to $451,000.00 per share. See Tr. at 137:6-138: 5 (DeMuro). The Defendants further noted that the tender offer disclosed the fact that the Cypress Energy Partners group had not gotten an appraisal from a third party. See Tr. at 138: 10-12 (DeMuro). After all, the Defendants declaimed, TIR had just received an appraisal from the Halifax Group,[62] a national search firm, a few months earlier in December, 2012, and had just gone through a competitive bidding process where two inside directors were bidding up the share price. See Tr. at 138:12-19 (DeMuro). The Court interjected, acknowledging that the Defendants had at hand the price at which the market had valued TIR shares a few months before the tender offer, but inquiring why the Defendants did not get another appraisal done to get ready for the tender offer. See Tr. at 138:22-25 (DeMuro). The Defendants asserted that: (i) they had not considered it necessary to have a second appraisal so soon after the first appraisal; (ii) "the appraisal isn't the sine qua non of value"; and (iii) appraisers tell client companies whatever the companies want to hear. Tr. at 139:1-9 (DeMuro).

Continuing their argument's main line, the Defendants recounted how every arm's-length transaction for shares in October, 2013, had resulted in a per-share price at or below

---

[62]The Halifax Group describes itself as "a private investment firm dedicated to partnering with founders and managers of lower middle-market businesses with total enterprise values generally between $50 million and $250 million." The Halifax Group, About Us, http://www.thehalifaxgroup.com/us/about-overview/ (last visited Apr. 22, 2017). The Halifax Group's primary areas of expertise are in three primary industry areas: Business Services, Health and Wellness, and Infrastructure. See The Halifax Group, FAQs, http://www.thehalifaxgroup .com/us/faqs/ (last visited Apr. 22, 2017). The Halifax Group's current portfolio has included at least one pipeline manufacturer -- PolyPipe, Inc. from February 2005 to April 2012 -- that produces pipes for oil and gas production and natural gas distribution. See The Halifax Group, Our Portfolio: PolyPipe, http://www .thehalifaxgroup.com/portfolio/polypipe/ (last visited Apr. 22, 2017).

$451,000.00.  See Tr. at 139:10-21 (DeMuro).  The Defendants contended that the Plaintiffs quibble with this assertion on the basis that Triangle Capital had a gross-up provision.  See Tr. at 139:22-23 (DeMuro).  The Defendants seemed to characterize the gross-up provision as a future option to retroactively receive a higher sale price if TIR had "to pay these disgruntled shareholders anything more than" $451,000.00 per share for the latter group's shares.  Tr. at 139:24-140:3 (DeMuro).

Backtracking for a moment in their chronology, the Defendants said that TIR hired Duff & Phelps Corp. ("Duff & Phelps")[63] to do a market search when TIR was considering a different capital structure at the end of 2012.  See Tr. at 140:6-8 (DeMuro).  According to the Defendants, Duff & Phelps solicited more than two-hundred potential offers to buy the company, and TIR picked the best one -- from The Halifax Group -- at around $371,000.00 per share.  See Tr. at 140:8-11 (DeMuro).  The Defendants asserted that they believed it would be a waste of shareholder money -- to the tune of $300,000.00 -- to commission a second independent price assessment so soon after the first assessment, especially when the bidding war had led to the exact price per share in the tender offer.  See Tr. at 140:14-22 (DeMuro).

The Defendants then pushed forward again in their timeline, noting that Cypress Energy Partners then filed the S-1 registration statement, albeit confidentially.  See Tr. at 140:23-141:5 (DeMuro).  The Defendants asserted that the S-1 fully set forth their plans for the IPO, even though the Plaintiffs had contended that it misled them by failing to disclose the share value that

---

[63]Duff & Phelps describes itself as "the premier global valuation and corporate finance advisor with expertise in complex valuation, disputes and investigations, M&A [mergers and acquisitions], real estate, restructuring, and compliance and regulatory consulting."  Duff & Phelps, About Us, http://www.duffandphelps.com/about-us/index (last visited Apr. 22, 2017). Duff& Phelps says that it also "advise[s] the world's leading standard setting bodies on valuation issues and best practices," leveraging more than two thousand professionals located in seventy offices in twenty countries.  Duff & Phelps, About Us, http://www.duffandphelps.com/about-us/index (last visited Apr. 22, 2017).

ultimately would become part of the MLP.  See Tr. at 141:6-16 (DeMuro).  The Defendants protested that, when the S-1 registration was published in October, 2013, the MLP shares' value was completely unknowable for two reasons: (i) markets price IPOs; and (ii) there were still many intermediate steps where everything needed to fall into place before the IPO, e.g., getting a roadshow, lining up investors, and obtaining United States Securities and Exchange Commission ("SEC") approval.  See Tr. at 141:17-142:6 (DeMuro).

In November, 2013, the Defendants said, the Plaintiffs bound themselves together to reject any share price offer below $654,000.00 per share, on the belief that they had sufficient shares to block the merger.  See Tr. at 142:18-22 (DeMuro).  The Defendants interpreted this pact as proof that the Plaintiffs were "as fully informed as they needed or wanted to be because all they did was look at the price, and if [it is not $654,000.00 per share,] I don't care what's in the tender notice, I don't care what's in the S-1."  Tr. at 143:14-144:11 (DeMuro).  Not convinced on this last point, the Court indicated that it was wary to suppose that "the minute somebody makes an offer, they're no longer interested in the truth."  Tr. at 145:18-23 (Court). The Defendants seemed to hem in their response, before indicating to the Court that they understood its point but did not think that the point implicates whether the Stuart group shareholders were as fully informed as they thought they needed to be.  See Tr. at 145:24-148:1 (Court, DeMuro).

The Defendants, continuing along their timeline, began to observe that their S-1 was made public on November 13, 2013.  See Tr. at 148:2-4 (DeMuro).  The Court interjected, however, noting that reliance is a big issue in securities law, and asking the Defendants whether there needs to be reliance as the Defendants read Bershad's take on fully informed shareholders. See Tr. at 150:17-21 (Court).  The Defendants indicated that Bershad was a fiduciary duty case

and that -- even though reliance is not technically one of fiduciary duty's listed elements -- reliance plays a part in causation in fiduciary duty: "I mean, you can't just make abstract breaches that aren't causally related to the harm so I think reliance plays a part." Tr. at 150:22-151:2 (DeMuro). Getting at the same issue from another angle, the Court then proposed a scenario in which TIR had prospected out what it thought in June, 2013, would be a good well, but that it became a gusher after Stuart was ousted from the TIR board. See Tr. at 151:10-24 (Court, DeMuro). The Court asked the Defendants whether the mere fact that Stuart, in this example, would know about the well -- but not the change in its expected output -- still make him and the rest of the Stuart group fully informed shareholders. See Tr. at 151:10-16 (Court). The Defendants argued that the Stuart group still would be fully informed, as (i) the underlying geology of a place is known before a company begins to drill, leading to some approximate guess of its reserves' size; and (ii) wells do not get drilled overnight. See Tr. at 151:25-152:10 (Court).

The Plaintiffs interrupted, indicating that they are not contesting that they were fully-informed shareholders and that the Defendants' prolonged discussion about the issue was entirely irrelevant: "[W]e're going to say if fully informed is the issue, we're not contesting it. So none of this has any bearing at all on anything that's at issue today. I understand [the Defendants want] to go great length on it and we've heard lots about it but it's irrelevant." Tr. at 158:7-159:8 (Kagen). The Plaintiffs then cabined this concession, saying that it did not apply to the pooled shareholders on the forced seller theory. See Tr. at 159:23-25 (Kagen). The Defendants' counsel closed his notebook at that point, leading the Court to surmise that the Plaintiffs had given the Defendants what they wanted. See Tr. at 159:19-20 (Court). The Defendants confirmed that they believed the Plaintiffs' stance to be "wonderful news" that

"shortened things up." Tr. at 160:5-15 (DeMuro). According to the Defendants, because the Defendants conceded that they were fully informed minority shareholders at the time that they accepted the merger consideration, the only inquiry for the Court is whether the <u>Bershad</u> rule, as <u>In re Celera Corp.</u> perpetuated it, still is the law. <u>See</u> Tr. at 160:16-21 (DeMuro).

Bringing the discussion home by using this new concession to recolor its previous arguments about <u>Bershad</u>, the Defendants said that no Delaware Court of Chancery case suggests that there should be a carve out to the <u>Bershad</u> rule. <u>See</u> Tr. at 160:22-25 (DeMuro). The Defendants speculated that no Delaware Court of Chancery -- even under now-Justice Strine -- would have hesitated to apply the <u>Bershad</u> rule if there had been an admission that the minority shareholders were fully informed at the time of the merger transaction. <u>See</u> Tr. at 161:1-9 (DeMuro). The Defendants end with that thought, noting that the admission of full information was one for which the Defendants had been fighting, had spent hundreds of thousands of dollars getting, and knew all along is case dispositive. <u>See</u> Tr. at 161:10-166:7 (DeMuro).

The Court then allowed the Plaintiffs another chance to speak to the foregoing issues, asking them first to concentrate on what the boundaries are inside which a court should apply <u>Bershad</u>'s plain language. <u>See</u> Tr. at 166:11-167:5 (Court, Kagen). The Plaintiffs submitted to the Court that the answer to that question lies in <u>In re Celera Corp.</u> <u>See</u> Tr. at 167:6-9 (Kagen). The Plaintiffs reminded the Court that <u>In re Celera Corp.</u> started in the Delaware Court of Chancery and that the Supreme Court of Delaware affirmed the Delaware Court of Chancery in pertinent part. <u>See</u> Tr. at 167:9-16 (Kagen). The Plaintiffs directed the Court's attention to one specific passage in <u>In re Celera Corp.</u>, in which then-Vice Chancellor Donald F. Parsons wrote that "the mere act of tendering one's shares while simultaneously pursuing an equitable claim is not sufficient to show acquiescence." Tr. at 168:11-19 (Kagen)(internal quotation marks

removed). The Plaintiffs then pointed the Court to footnote 44 in <u>In re Celera Corp.</u>, in which then-Vice Chancellor Parsons cited <u>In Re Best Lock</u>. <u>See</u> Tr. at 168:22-24 (Kagen). According to the Plaintiffs, the <u>In re Celera Corp.</u> court also cited <u>In re Best Lock</u> in footnote 38, where the Delaware Court of Chancery found that a shareholder's acceptance of freeze-out merger consideration did not operate as acquiescence, because, in part, the plaintiff did no more than accept the amount about which she was powerless to do anything. <u>See</u> Tr. at 170:5-9 (Kagen). Drawing an analogy to the case before the Court, the Plaintiffs indicated that they likewise took no voluntary act and did not even make the decision about the merger consideration: "All we did . . . is what <u>Celera</u> itself says is not acquiescence; we just took the cash." Tr. at 170:12-15 (Kagen). For the Plaintiffs to have acquiesced under <u>In re Celera Corp.</u>, the Plaintiffs said, they would have needed to take an affirmative action such as voting in the merger's favor, participating in the merger discussions, sitting on the board of directors, participating in a shareholder vote, or taking some other meaningful role where they have a say in the merger and could affect its outcome. <u>See</u> Tr. at 171:12-19 (Kagen).

The Plaintiffs asserted that the Defendants get close to grasping this point, but then misconstrue the requirement as fully informed consent, which the Plaintiffs contended is off point. <u>See</u> Tr. at 172:19-20 (Kagen). According to the Plaintiffs, informed disclosure implies some decision that is voluntary and that has a reliance causation effect. <u>See</u> Tr. at 172:20-23 (Kagen). The Plaintiffs contended that acquiescence -- and waiver, which the Plaintiffs asserted are synonyms for acquiescence in this case -- requires a clear relinquishment of a known right, and that acquiescence therefore cannot by committed by inaction. <u>See</u> Tr. at 172:25-173:6 (Kagen). As another synonym of acquiescence in this case, the Plaintiffs purported, estoppel requires detrimental reliance, and there was no detrimental reliance in this case. <u>See</u> Tr. at

173:7-11 (Kagen). According to the Plaintiffs, no Delaware Court of Chancery has held that acquiescence arises where there is nothing but a victim. See Tr. at 173:12-16 (Kagen). Contrariwise, the Plaintiffs asserted, the Plaintiffs in this case are just victims,

> who took no action, who had no choice, certainly no meaningful choice, who w[ere] merely the victim of a cash-out, and received a notice. The notice on December 9th, [which] said that you shares are canceled, your rights are dissolved, if you want your check, just send us your canceled certificates.

Tr. at 173:17-22 (Kagen). The Plaintiffs contended that the Defendants had to pay the merger consideration regardless what the Plaintiffs did. See Tr. at 173:23-24 (Kagen).

Turning to explain why they dropped their claims related to whether they had been fully informed shareholders, the Plaintiffs indicated that the question of full information only arises in cases where the minority shareholders took some action or had a role in the merger process. See Tr. at 174:14-175:6 (Kagen). The Plaintiffs argued that, in cases where the minority shareholders do not have a role or a say in the merger process, as they maintain happened in the merger transaction underlying this case, this basic threshold is not met and, accordingly, the question of full information is irrelevant. See Tr. at 174:14-177:23 (Kagen).

After a short break, the Court permitted the Plaintiffs to continue their argument. See Tr. at 177:24-178:5 (Court, Kagen). The Plaintiffs verbally provided the Court with an outline for how they would structure their points. See Tr. at 178:6-9 (Kagen). First, the Plaintiffs said, they wanted to talk a little more about the law, what acquiesce is and what it is not. See Tr. at 178:10-11 (Kagen). Second, the Plaintiffs foreshadowed, they wanted to talk about the facts of this matter so the Court could get an overall picture of them. See Tr. at 178:12-20 (Kagen). Third, the Plaintiffs adumbrated, they wanted to talk about this hearing's procedure. See Tr. at 178:21-179:1 (Kagen). Fourth, the Plaintiffs telegraphed, they wanted to talk about the securities claim that they have in this case, because the Defendants also had moved for summary judgment on

that issue.  See Tr. at 179:2-6 (Kagen).  The Defendants immediately objected that the Plaintiffs were hijacking the Defendants' Estoppel MSJ, advising that the Court and the parties tackle one issue at a time, sticking with the acquiescence defense at that point.  See Tr. at 179:8-11 (DeMuro).  The Court acknowledged the objection but noted that the Defendants themselves had floated freely among the eight claims during the hearing and that it would listen to what the Plaintiffs had to say on their projected fourth point.  See Tr. at 179:12-14 (Court).

The Plaintiffs began their discussion on the first point -- about the law regarding acquiescence -- by noting that in In re PNB Holding Company, then-Vice Chancellor Strine held that acquiescence -- based on mere transactional acceptance of merger consideration in a freeze-out merger where the party taking the money played no role and took no act -- is not enough. See Tr. at 180:15-25 (Kagen).  Seguing prematurely[64] from there into their second point -- on the case's facts -- the Defendants reported that the Defendants had dissolved TIR on December 9, 2013, and merged it into another company without a shareholder meeting or even notifying the Plaintiffs in advance.  See Tr. at 181:7-13 (Kagen).  The Plaintiffs asserted that, pursuant to Oklahoma statute, the Defendants were required to fix and pay merger consideration, meaning that the payment cannot be imputed to the Plaintiffs as an action on their part.  See Tr. at 181:23-182:2 (Kagen).  Making three quick observations on other legal issues before wrapping up this section, the Plaintiffs also noted that: (i) for the purposes of entire fairness, the only actions that matter are those that were undertaken at the time of the merger, and not any actions that happened beforehand; (ii) Delaware allows insiders to complain about a merger transaction despite their status as insiders; and (iii) the Defendants could have satisfied the entire fairness

_____

[64]The Court uses this adverb in its positive rather than its normative sense, because the Plaintiffs began talking about the case's facts before they should have if they had been following their advertised structure, zigzagging for a brief time period between their first and second points.

requirement for the merger transaction if they had constituted a special committee of disinterested directors to review the merger or had obtained an independent fairness opinion at the time of the merger. See Tr. at 182:9-187:3 (Kagen).

Moving to their second point, the Plaintiffs began with a jab to the Defendants, saying that they had objected to the Defendants' factual discussion, because the facts which the Defendants had adduced were irrelevant. See Tr. at 187:11-12 (Kagen). The Defendants therefore began to outline their version of the relevant facts. See Tr. at 188:1-3 (Kagen). According to the Plaintiffs, the company at hand was a company called Tulsa Inspection Resources ("TIR"), a pipeline inspection company. See Tr. at 188:4-9 (Kagen). The Defendants reported that TIR hired pipeline inspectors, possessing no assets but charging a fee to inspect pipelines. See Tr. at 188:11-15 (Kagen). The recent boom in fracking, the Plaintiffs asserted, had resulted in a corresponding boom in the general construction of pipelines nationwide. See Tr. at 188:16-20 (Kagen). The Plaintiffs contended that the pipelines need to be inspected constantly and rigorously for structural integrity. See Tr. at 188:21-25 (Kagen). TIR, the Plaintiffs maintained, had a virtually monopoly supply in the niche field of pipeline inspectors, leading to enormous business success. See Tr. at 189:1-7 (Kagen). Fortuitously, the Plaintiffs continued, the United States Department of Energy ("DOE") put into place stringent new safety controls and protocols at the same time as the fracking boom in response to pipeline explosions. Tr. at 189:8-15 (Kagen). According to the Plaintiffs, the new DOE regulations were so onerous -- and required such constant pipeline inspection -- that they may as well have been giftwrapped for TIR; TIR became "a phenomenal -- a phenomenal -- success." Tr. at 189:16-190:6 (Kagen). In 2012, as the Plaintiffs read TIR's financials, company revenue and earnings in 2012 exceeded revenue and earnings from 2011 by sixty percent. See Tr. at 190:14-17 (Kagen). Some

shareholders other than the Plaintiffs wanted to cash out already in 2012, the Plaintiffs said, but ultimately TIR was not sold at that time. See Tr. at 190:17-24 (Kagen).

In 2013, the Plaintiffs remembered, they put forth Project Poirot.[65]  See Tr. at 190:25-191:2 (Kagen).  Every month that year, the Plaintiffs asserted, TIR's profits were "blowing past how it had done in the past."  Tr. at 191:22-24 (Kagen).  The Plaintiffs were removed from the board in July, 2013, so they did not see financials for August through December, 2013, until discovery, but the Plaintiffs maintained that phenomenal profit growth continued throughout that time period as well.  See Tr. at 192:2-14 (Kagen).

As the Plaintiffs recounted it, the merger was one of unequal partners: TIR, the terrifically successful pipeline inspection company, with Cypress Energy Partners, a very unprofitable company that supplied water for fracking operations.  See Tr. at 192:25-193:8 (Kagen).  The reason that the Cypress Energy Partners group wanted to merge the two companies, the Plaintiffs alleged, was that Cypress Energy Partners has insufficient qualifying income to qualify for the tax-advantaged MLP structure and Cypress Energy Partners needed a cash cow to meet the IRS income requirements.  See Tr. at 193:8-17 (Kagen).  Stuart, the Plaintiffs said, did not want TIR to be merged with a mediocre, or even substandard and inferior, company such as Cypress Energy Partners, thereby chaining a racehorse to a donkey.  See Tr. at 196:22-197:3 (Kagen).  Switching metaphors, the Plaintiffs parenthetically explained that the Plaintiffs' assertions that the merged company's unprofitability since the merger is an oblique

_____

[65]The Defendants earlier had speculated, in response to the Court's inquiry, that Stuart had christened the plan "Project Poirot" on the basis of his "affinity for the Agatha Christie novels . . . ."  Tr. at 127:2-3 (DeMuro).  The Plaintiffs advertised that Stuart had put more thought into the title.  See Tr. at 191:5-6 (Kagen).  Hercule Poirot, the Plaintiffs noted, is an inspector in Agatha Christie's novels.  See Tr. at 191:5-6 (Kagen).  The Plaintiffs thought, they reminisced, that it "was a nice touch to indicate how successful this business was" by referring "to 'Project Poirot.'  It was an inspection company."  Tr. at 7-9 (Kagen).

way to get to the same point: that Stuart was correct that the "shotgun marriage" between TIR and Cypress Energy Partners would dampen TIR's core business profits. Tr. at 197:4-12 (Kagen).

According to the Plaintiffs, they were kept in the dark from July to December, 2013, about TIR's continued levels of profitability even us the Defendants had ready access to TIR's financials. See Tr. at 197:13-17 (Kagen). The Plaintiffs asserted that TIR was projecting that its shares would be worth $1,436,000.00 each by 2017. See Tr. at 197:17-201:9 (Kagen). The pooled shareholders sold their shares in June, 2013, however, for $451,000.00 per share. See Tr. at 201:21-203:14 (Kagen). Based on the pooled shareholders' testimony, the Plaintiffs asserted that the pooled shareholders had sold at such a low price, because (i) they needed liquidity; and (ii) none of them knew what TIR's financials were or what TIR's plans for an IPO were. See Tr. at 203:15-23 (Kagen). A few of the pooled shareholders, the Plaintiffs noted, sold their shares at $451,000.00 per share only after TIR signed long-term agreements with them in which these shareholders were paid substantial amounts of money. See Tr. at 204:2-13 (Kagen). Once the pooled shareholders had sold their shares, the Plaintiffs asserted, the Defendants had control over more than fifty percent of TIR shares and, consequently, had the ability to enact the freeze-out merger. See Tr. at 204:23-25 (Kagen).

The Defendants and the Plaintiffs then engaged in an extended back and forth whether the Plaintiffs' table of undisputed facts -- which it had handed to the Court earlier that day -- correctly re-characterized Plaintiffs' objections to facts as "immaterial" or "irrelevant" as meaning that those facts were deemed undisputed, Tr. at 208:10-215:4 (Kagen, DeMuro, Court). The Plaintiffs believed the re-characterization to be inaccurate, e.g., the Plaintiffs asserted that they dispute that they agreed to sell their shares to the Defendants if the Plaintiffs lost the share

bidding war.  See Tr. at 215:5-12 (Kagen).  The Plaintiffs asserted that, rather than there being such an agreement, the Defendants refused to sign onto such an agreement, on the grounds that the agreement could not work without Triangle Capital signing it as well.  See Tr. at 216:3-217:11 (Kagen).  According to the Plaintiffs, the Defendants are being "dishonest" when they assert that their undisputed fact on this matter is "deemed admitted" on the grounds that the Plaintiffs do not dispute it, because the Plaintiffs have five pieces of evidence disputing it.  Tr. at 217:12-218:2 (Kagen).  The Plaintiffs lamented that they dislike such dishonesty and entreated the Court not to put any stock in the Defendants' table of undisputed facts.  See Tr. at 218:3-219:12 (Kagen).

The jeremiad against the Defendants' purported dishonesty seemed to trigger a memory for the Plaintiffs, who then cited the Defendants assertion that Triangle Capital sold its shares for $451,000.00 per share as one example of such dishonesty.  See Tr. at 220:23-221:4 (Kagen).  According to the Plaintiffs, the mezzanine lenders were a consortium of entities that Triangle Capital mostly ran.  See Tr. at 221:5-6 (Kagen).  The Plaintiffs asserted that those mezzanine lenders had two categories of equity: shares and warrants.  See Tr. at 221:11-12 (Kagen).  As the Plaintiffs described the latter, warrants have the ability to be turned into shares on a one-to-one basis, and the mezzanine lenders' warrants also had the right to be used to block self-interested transactions.  See Tr. at 221:12-15 (Kagen).  The Plaintiffs maintained that this second right -- to block self-interested transactions -- forced the Defendants' hand, because "the defendants realized that they couldn't continue with their scheme to expropriate this business away from [the Plaintiffs] unless they got the mezzanine lenders to sign off."  Tr. at 221:16-18 (Kagen).  Accordingly, as the Plaintiffs told it, the Defendants offered the mezzanine lenders $650,000.00 per share for their warrants but only $451,000.00 per share for their shares.  See Tr. at 221:20-21

(Kagen).  The Plaintiffs asserted that at least some of the mezzanine lenders considered the share price to be too low, but that they had accepted the price on four  grounds: (i) it was a group deal; (ii) these mezzanine lenders felt that the $650,000.00 per warrant that they received compensated somewhat for the purported underpriced shares; (iii) the Defendants threatened to sue one of the resisting mezzanine lenders -- who also was a board member -- for breach of fiduciary duty if he failed to sign off on the deal; and (iv) the deal with the mezzanine lenders provided a prospective gross-up option.  See Tr. at 221:22-223:7 (Kagen).  The Plaintiffs then accused the Defendants of having shrouded the deal's particulars from the Stuart group's eyes, writing into the terms that "nobody can mention it to Mr. Stuart . . . ."  Tr. at 223:8-11 (Kagen).  According to the Plaintiffs, when the board member cum mezzanine lender, Vaughn, indicated that he would tell Stuart about the deal, because he was worried that the minority shareholders were getting frozen out and mistreated, Boylan threatened him with suit and dereliction of his board duties.  See Tr. at 223:11-18 (Kagen).

The Plaintiffs maintained that they attempted to compromise their claims after they were ousted from the board in June.  See Tr. at 224:5-6 (Kagen).  The Plaintiffs argued that those were settlement discussions inadmissible as testimony -- discussions in which the Plaintiffs engaged -- because they did not want to have to sue a company on whose board they recently had served. See Tr. at 225:1-229:4 (Kagen).  According to the Plaintiffs, the Defendants knowingly use inadmissible material and then have the gall to try to secure summary judgment based on it.  See Tr. at 228:7-12 (Kagen).  The Plaintiffs further asserted that the Defendants then double down on their deceit by mischaracterizing the Plaintiffs as persons dashing to a jury for relief.  See Tr. at 228:12-16 (Kagen).  According to the Plaintiffs, the Letter from Akin Gump to Richard M. Carson, Vice President and General Counsel of Cypress Energy Partners -- TIR, LLC, Nov. 26,

2013, filed April 3, 2015 (Doc. 83-25)("Akin Gump letter"), also is related to settlement negotiations and therefore is inadmissible. See Tr. at 229:5-231:18 (Kagen). If one combines the two documents, the Plaintiffs contended, they show that:

> We wanted to settle. We were willing to be reasonable. We understood the risks of litigation, the concerns, the combative nature of these entities. . . . We know who we were getting into bed with here. We understood what they were going to be doing. We wanted to settle. We weren't given that opportunity. We were shown the door and thrown out in the cold.

Tr. at 231:20-232:10.

Wrapping this section of their arguments -- the section on the facts -- the Plaintiffs adduced a letter from John O'Connor, TIR's general counsel in May, 2013, in which O'Connor, according to the Plaintiffs, specifically advised the board that the entire fairness standard (i) would apply to the merger transaction under Delaware law; and (ii) has two components: fair dealing and fair price. See Tr. at 232:20-234:7 (Kagen). The Plaintiffs maintained, therefore, that TIR knew the legal standard long before the Plaintiffs filed suit, but that they "just chose to ignore it." Tr. at 234:8-10 (Kagen). The Plaintiffs then noted that the only securities claim that they bring against the Defendants is based on the following position:

> The third parties who sold, the pooled shareholders, we did not drop disclosure duties for them. I said we're not arguing for us we are for them. The pooled shareholders who sold were not told of an IPO. They did not receive the tender in the merger, and the reason they didn't is because they sold in . . . June 26th, they sold a month earlier, so they didn't get it in those disclosures.
>
> When they sold in June, they weren't looking to be cashed out. I told Your Honor most of them said that liquidity was their primary reason for the sale. Defendants did not tell them of the projections that they had, which was their special knowledge that they had a dut[y] to disclose as directors. They didn't tell them. Defendants didn't tell them about an IPO.

Tr. at 242:10-22 (Kagen). The Plaintiffs asserted that they have proof in the form of statements that TIR made to the pooled shareholders in which TIR did not inform the pooled shareholders of

internal value projections.  See Tr. at 243:8-14 (Kagen).  The Plaintiffs therefore characterized the statements as misstatements -- misstatements that caused the Plaintiffs harm when they induced the pooled shareholders to sell their shares and thereby allow the Cypress Energy Partners group to obtain the majority of shares needed to orchestrate a freeze-out merger.  See Tr. at 243:14-17 (Kagen).

After the Court took a break to help reduce the risk of the court reporter developing rapid-onset carpal tunnel and working out the second day's schedule with the parties, the Court reminded the parties that there are many motions to argue and that they should be mindful of their use of time if they wanted to fully argue any of them before the Court had to return to Albuquerque, New Mexico.  See Tr. at 243:19-247:12 (Court).  The Court then permitted the Plaintiffs to continue with their argument.  See Tr. at 247:13-14 (Court).  The Plaintiffs returned to their argument that the Defendants could not have qualified for a freeze-out merger had they not acquired the pooled shareholders' shares and thereby gained a majority of TIR shares.  See Tr. at 250:23-251:2 (Kagen).  This argument means that the Plaintiffs suffered harm as a result of the Defendants' alleged misstatements to the pooled shareholders.  See Tr. at 251:2-25 (Kagen).  The Plaintiffs termed this harm as one that arose under the forced-seller doctrine, which the Plaintiffs asserted is equivalent to the damage provisions of the state law claims under Delaware of Oklahoma law.  See Tr. at 252:5-8 (Kagen). The Plaintiffs then reasserted that this forced seller theory is the extent of their securities claims; the issue of disclosure, according to the Plaintiffs, is outside the scope of and unrelated to their claim.  See Tr. at 252:16-22 (Kagen).

Breaking from the argument structure that they had signposted during the hearing earlier that afternoon, the Plaintiffs then indicated that the last issue that they wished to address was the proper share valuation.  See Tr. at 252:23-24 (Kagen).  The Plaintiffs first recapitulated on what

they allege the Defendants to have focused: the price at which other shareholders willingly sold their shares.  See Tr. at 252:24-25 (Kagen).  According to the Plaintiffs, these sales are not the relevant criterion.  See Tr. at 253:1 (Kagen).  Under clear Delaware law, the Plaintiffs contended, the one method of share valuation that is allowed requires the shares to be priced with a discounted cash flow method on the date that unwilling minority shareholders were forcibly removed.  See Tr. at 253:2-7 (Kagen).  The Plaintiffs asserted that Delaware requires the DCF model,[66] because it looks at the company's future earning value in a systematic and methodical way, and then discounts that value to net present value, discounting for money's time value and capital's weighted average cost.  See Tr. at 253:8-254:3 (Kagen).  The DCF analysis, which, the Plaintiffs maintained, is based on known and knowable data from the valuation date, and based on what people knew at the time, results in a TIR share value of $1.2 million per share.  See Tr. at 254:10-16 (Kagen).  Acknowledging that the $1.2 million per share figure is much higher than other figures that the Court had seen in the briefing and heard to that point during the hearing, the Plaintiffs noted that the reason that the number does not match any other prior number is that nobody did a DCF analysis before.  See Tr. at 254:19-255:24 (Kagen).

The Plaintiffs having completed their argument, the Court allowed the Defendants to have the last word on their motion for summary judgment on acquiescence.  See Tr. at 257:1-2 (Court).  The Defendants' counsel told the Court that he felt uncannily like the protagonist in My Cousin Vinny, feeling that he could stand and say that everything the Plaintiffs had just told the

---

[66]Discounted cash flow ("DCF") refers to a basket of related valuation approaches of greater or lesser complexity that calculate value using the four factors of (i) investments; (ii) cash flows; (iii) assets' economic life; and (iv) the cost of capital.  See Daniela Venanzi, Financial Performance Measures and Value Creation: The State of the Art 1-15 (Springer Briefs in Business 2012).

Court is hogwash.[67]    See Tr. at 257:3-14 (DeMuro).    Resisting the temptation to be so

reductionist, the Defendants' counsel said that he would stick with the Court's question with

respect to the Bershad motion.    See Tr. at 257:15-17 (DeMuro).    According to the Defendants,

the Plaintiffs never answered the Court's question what is left of Bershad if the Delaware Courts

of Chancery have modified or cabined it.    See Tr. at 257:18-22 (DeMuro).    Referring to the way

that the Defendants read the case in the context of the Plaintiffs' proposed standard, the

Defendants argued that nothing at all remains of the Bershad rule if the Court adopts the

Plaintiffs' interpretation of Bershad and subsequent Delaware Court of Chancery opinions.    See

Tr. at 257:22-258:24 (DeMuro).

      The Defendants then said that, under Bershad, an informed shareholder who either votes

or accepts the merger consideration, the Supreme Court of Delaware has equated those acts as

affirmative action and that the shareholder cannot subsequently attack the merger price's

fairness.    See Tr. at 259:7-12 (DeMuro).    The Court pushed back on this point, suggesting that

the verb "accept" is an active verb, and so a person who is not either voting in favor of or

voluntarily accepting the benefits does not really have a choice.    See Tr. at 259:19-24 (DeMuro).

The Defendants, referring to In re Celera Corp., noted that the Supreme Court of Delaware had

not narrowed Bershad in such a way, observing that Westlaw headnote 7 in In re Celera Corp.

did not limit Bershad to situations where there is something more than merger consideration.

See Tr. at 261:20-262:1 (DeMuro).    The Defendants saw this alleged decision not to limit

Bershad as probative, as the In re Celera Corp. court had a full opportunity to clarify Bershad but

only applied a two-step rule: if you accept the consideration or vote for the merger.    See Tr. at

_____

[67]The Plaintiffs appear to have been referring to My Cousin Vinny at 1:15:40-1:15:48
(Palo Vista Productions & Peter V. Miller Investment Corp. 1992)("Everything that guy just said
is [hogwash].    Thank you.").

262-6-9 (DeMuro). The Defendants said that, not only did the <u>In re Celera Corp.</u> court not expressly overrule <u>Bershad</u>, but that the court did not even narrow <u>Bershad</u>. <u>See</u> Tr. at 263:12-264:9 (DeMuro). The court in <u>Kaul</u>, the Defendants maintained, also faithfully applied <u>Bershad</u> as a district court sitting in diversity. <u>See</u> Tr. at 263:16-28 (DeMuro). The Defendants then rhetorically asked in which case the Supreme Court of Delaware limited <u>Bershad</u> in the manner in which the Plaintiffs suggest, so that <u>Bershad</u> applies only if the shareholder does more than accept, namely both accept and vote. <u>See</u> Tr. at 264:20-25 (DeMuro). The Defendants wrapped their argument by recommending that, rather than attempting to divine how the Delaware Courts of Chancery have changed <u>Bershad</u>'s contours, the Court would be on steadier ground by looking <u>In re Celera Corp.</u>'s plain language. <u>See</u> Tr. at 265:8-11 (DeMuro).

Drawing the day's hearing to a close, the Court gave the parties insight into its inclinations how it intended to rule on the motion for summary judgment on acquiescence. <u>See</u> Tr. at 266:5-6 (DeMuro). The Court indicated:

> I think that Mr. Kagen's version of what Delaware law is [is] closer to it than what the Defendants are, but I'll take a hard look at that.
>
> It doesn't seem to me that there are any factual issues here. I know that you are arguing around the edges, and I'll have to sort that out. In doing so, maybe I'll give you some 408 rulings as to whether I think some of this evidence can come in or not. So I'll be -- but I don't think there's any factual issues that are going to keep me from reaching a legal conclusion on this, and we've already had pretty much an agreement that the Plaintiffs are not arguing that they're not fully informed.
>
> I'm a little -- trying to figure out exactly how the securities claim fits in to this, but I think that it's unlikely I'm going to find that there's a securities claim here. I'm familiar enough with <u>Vine</u> in the Ninth Circuit, Seventh Circuit, the Fifth Circuit, and also the Tenth Circuit opinions on this, that I don't think in 2016 that either I or the Tenth Circuit will expand 10b-5 to include this doctrine. I will take a hard look at the cases that have been cited, but I do think that the trend had not been favorable to <u>Vine</u>, even though it's still controlling law in the Second Circuit and I understand why.

But the cases from the Fifth and from the Ninth, I believe the oldest one -- or the newest, youngest one is 1995. I think the Seventh Circuit case is probably a more accurate reflection of where 10b-5 law has developed, so I'm unlikely to find that that claim exists. I'm not sure how to -- whether that will really be necessary to say that in this motion but it's likely the end result.

So I'm inclined to deny this motion, but I probably will say a few things along the way on some of these issues along the lines that I've said.

Tr. 266:7-267:13 (Court).

The Defendants asked for permission to respond briefly to what the Court had just said. See Tr. at 267:15 (DeMuro). The Court granted this permission. See Tr. at 267:16 (Court). The Defendants then said that they never had a chance to respond to the rule 408 issue. See Tr. at 267:17-18 (DeMuro). As the Defendants saw the issue, the rule 408 issue is "completely misplaced," as the Plaintiffs never objected to the letters when the Defendants filed their motion for summary judgment on acquiescence. Tr. at 267:18-20 (DeMuro). The Plaintiffs insisted that the proper procedure for the Plaintiffs to follow would have been to move to strike, which the Defendants insisted the Plaintiffs had not done. See Tr. at 267:20-21 (DeMuro). As the Defendants reported the timeline, the Plaintiffs waited for months before filing the motions in limine. See Tr. at 267:21-23 (DeMuro). The Defendants asserted that the rule 408 issue was not framed as part of the motion for summary on acquiescence and that, consequently, it would be improper for the Court to entertain that issue as part of the motion. See Tr. at 268:4-6 (DeMuro). The Court responded that, "since I can't consider on summary judgment things that are not admissible at trial, I think I'm going to have to tackle the issue." Tr. at 268:12-14 (Court). The first day of hearings thus concluded. See Tr. at 270:1.

The Court held a second day of hearings on December 28, 2016. See Transcript of Motion Hearing Before the Honorable James O. Browning United States Judge (taken December 28, 2016), filed January 23, 2017 (Doc. 250)("Tr."). After working with the parties to schedule a

trial date, the Court invited the parties to begin discussing the Defendants' second motion for summary judgment. See Tr. at 274:3-282:21 (Court, DeMuro, Kagen). The Plaintiffs first asked the Court for permission to ask a question before the Defendants presented their argument, and the Court granted them permission. See Tr. at 283:10-13 (Kagen, Court). The Plaintiffs contended that the Defendants' second motion for summary judgment is a repetitive motion, and they requested that the Defendants and Court therefore, for the purpose of efficiency, also deal with the rule 12(f) motion to strike, as the same issues underlie both motions. See Tr. at 283:14-284:1 (Kagen). The Court asked the Defendants whether they objected to the change, and the Defendants indicated that they objected, saying that they preferred that the parties address the motions one at a time. See Tr. at 284:2-12 (Court, DeMuro). The Court decided to allow the Defendants to put on their motions the way that they wanted. See Tr. at 284:13-15 (Court).

As a preliminary, the Court told the parties what its initial thoughts were with regard to the rule 408 issue. After reading the briefs, the Court divulged: "I'm inclined to agree with the Plaintiff on the Akin Gump letter, but my thoughts were on the triangular -- or Triangle mezzanine consideration I would not exclude it. So after looking at that 408, that was my initial tentative reaction to that material." Tr. at 286:4-8 (Court). The Defendants reiterated their belief that there is not a rule 408 issue, because rule 408 was never meant to reach business negotiations, even as to price, and consequently that the letters do not constitute a settlement offer or a compromise of a disputed claim. See Tr. at 287:9-288:14 (DeMuro). The Defendants asserted that it was important to admit the letter, because it is evidence of the Plaintiffs'

> mistaken belief that they could hold us up for a higher price, number one; and then when Mr. Stuart found out that he was wrong, he had to report back to his powers-to-be and he was embarrassed by the fact that he was wrong and he ends up six months later suing.
>
> So it's important, number one, that we see these in a course of

> communications. In other words, there's a stream of correspondence that reflect[s] that dynamic, the Plaintiffs attempting to hold us up for a higher price in which they make certain admissions and so it goes to the course of dealing. So we can't just pull out one letter and say, why do I want this?
>
> Why do I specifically want this? Number one, I wanted to show that they were presented by capable counsel during this entire time period, which goes to show that they are sophisticated, that they understood the information they were getting, they understood how to ask for information if they weren't getting it. So that's an important fact for us, that they were represented by counsel.

Tr. at 289:22-290:1 (DeMuro). The Defendants argued that the Akin Gump letter does not even contain a threat of litigation, which the Defendants maintained United States Court of Appeals for the Tenth Circuit has set as a clear cut-off line between evidence admissible versus inadmissible under rule 408. See Tr. at 291:8-22 (DeMuro). Moreover, according to the Defendants, the letter was written eight months before the Plaintiffs filed suit under a different counsel. See Tr. at 291:23-292:2 (DeMuro).

Turning to another letter, filed as exhibit 18 to the Defendants' motion for summary judgment on acquiescence, the Defendants said that the letter follows the bidding war in which Stuart lost and what the Defendants asserted was Stuart's subsequent inequitable course of conduct. See Tr. at 292:6-11 (DeMuro). The letter, as the Defendants read it, also demonstrates the Stuart group's sophistication, and their ability in late September, 2013, to do their own analysis and arrive at numbers about which they insisted earlier in the hearing that they had been kept in the dark. See Tr. at 292:12-293:4 (DeMuro). Moving to a third letter, filed as exhibit 16 to the Defendants' Acquiescence MSJ, the Defendants noted that letter likewise contained no hallmarks of settlement or litigation. See Tr. at 293:5-20 (DeMuro). To the contrary, the Defendant contended, the letter talks about the history of the Halifax Group offer in 2012, which the Defendants assert the Plaintiffs are using as a benchmark for a fair price. See Tr. at 293:21-294:6 (DeMuro). Returning to the Akin Gump letter, the Defendants say that the letter was the

next letter in the series of these other letters and that the Court should interpret it in these other letters' context. See Tr. at 294:14-16 (DeMuro). The Defendants then referenced the next letter in the series, filed as exhibit 26 to Defendants' Acquiescence MSJ, as further proof that the Akin Gump letter was part of a larger continuum. See Tr. at 295:15-16 (DeMuro).

The Court then asked the Defendants whether the Defendants could get the points they needed out of letters if the Court admitted everything from the letters aside from the discussions of share price. See Tr. at 298:18-22 (Court). The Defendants argued that they could not extract this needed information, saying that the share price discussion is "part and parcel of the inequitable conduct . . . ." Tr. at 298:23-25 (DeMuro). Recounting the related events from their perspective, the Defendants said that:

> Mr. Stuart first attempted to steal the company from the pooled shareholders out of way below market price. You'll remember that $275,000 price. He offered them lowball offers. And this is in the May time frame. He tried to saddle the company with hugely expensive new mezzanine debt to benefit himself. He tried to put his friends on the board. He was doing all these things that were contrary to the interests of the company during the June time frame.
>
> He assured everybody that he was going to win. He assured . . . the other Plaintiffs, I think we've got this, we're going to win, and the loss was a huge stinging blow to his ego. This whole case . . . the fountainhead of this whole case is Mr. Stuart's bruised ego over the fact that he lost the bid.
>
> And so what did he do after that? He embarked on this unequitable attempt to interfere with the IPO. We would have gone -- we would have had the merger consummated way earlier if it wasn't for Mr. Stuart's efforts. We would have had a road that was much simpler to the IPO if it wasn't for Mr. Stuart's efforts, and his efforts were designed around this false notion that he could block the IPO and so he started throwing out these share prices.

Tr. at 299:4-25 (DeMuro). The Defendants asserted that there is no law to support a contention that a letter is a settlement discussion in the classic rule 408 sense just because it states a share price. See Tr. at 300:1-4 (DeMuro). Summarizing and ending their argument on the rule 408 issue, the Defendants told that Court that it "would be really, really fundamentally prejudicial to

the Defendants' case to not -- to keep from the jury what we believe was this shakedown attempt that was going on post-bidding and almost ten months before litigation was filed." Tr. at 300:23-301:2 (DeMuro).

Before allowing the Plaintiffs to respond on the rule 408 issue, the Court revealed to them its inclination:

> If you weren't thinking about litigation in that . . . October, November time frame, then I guess it would seem to me that [the letters are] just offers and counteroffers and that sort of stuff that goes along in the business community rather than trying to compromise a claim, which is what 408 talks about.

Tr. at 302:4-9 (Court). The Court then asked the Plaintiffs whether they were thinking about litigation during that time period. See Tr. at 302:11-12 (Court). The Plaintiffs did not directly answer that question, saying that every letter which the Defendants had mentioned talks about claims in the language of the law about claims. See Tr. at 302:17-22 (DeMuro). According to the Plaintiffs, a communication does not need to have a header that marks it as a rule 408 communication to fall under rule 408, and the letters show that the Plaintiffs are seeking to compromise. See Tr. at 302:25-303:15 (DeMuro). The Plaintiffs maintained that, whatever minimal prejudice the Defendants might sustain as a result of the letter being inadmissible under rule 408 is outweighed by the prejudice that admitting it would cause to the Plaintiffs. See Tr. at 304:4-14 (Kagen). The Plaintiffs contended that the letter was written on Akin Gump letterhead, that it was written by a trial lawyer, and that it "is as plain as one can reasonably be that a legal claim is in the offing and actively being contemplated and discussed with opposing parties. See Tr. at 304:15-307:16 (Kagen). The Plaintiffs ended this portion of their argument with a reference to fair process. See Tr. at 307:17-19 (Kagen). According to the Plaintiffs, Delaware case law is clear that fair process is only about one thing: "When the self-dealing, controlling shareholder made the decision to effectuate the merger, that's fair process, that's when it kicks

in." Tr. at 308:2-8 (Kagen).

The Defendants interjected at that point to confirm with the Court that the Court had signaled that its inclination was to admit all the letters possibly aside from the Akin Gump letter.

See Tr. at 308:25-309:2 (Kagen). The Court elucidated as follows:

> I guess when I was reading the . . . Plaintiffs' motion in limine to preclude evidence of Plaintiffs' conduct, I guess I focused on the Akin Gump [letter. But I don't see . . . a material difference. But I'm inclined to . . . keep these out. They look to me like they're trying to settle claims.
>
> I'll say this: I realize that when I'm trying to decide the acquiescence motion, it's a little bit putting the cart before the horse in the sense that I'm trying to decide what evidence is admissible at trial to determine the motion that real[ly] defines the scope of the trial. So it's a difficult task and it's a little bit awkward, but I don't know of any other way to do it. I think that is what the Tenth Circuit requires, is that I look at it to determine whether the evidence would be admissible at trial.
>
> And it just looks to me like when you got lawyers writing letters like this, Akin Gump could have written a stronger letter. They could have written a letter saying we're going to sue you if you don't take this offer. But some lawyers have different styles and some of the very best litigators have a light touch when they're doing settlement negotiations, so I'm a little bit reluctant to say this isn't an offer to compromise just because of the style that a particular lawyer has.
>
> . . . .
>
> I guess part of it boils down to the parties here have a fundamental disagreement about Delaware law. I mean, you felt that you could make an offer or do a cash-out without them having the ability to go to court and they felt like you couldn't. And so they may have been -- well, you were thinking they couldn't go to court and they're thinking they are going to go to court.

Tr. at 309:3-311:9 (Court). The Defendants took umbrage with this assessment, which the Defendants characterized as "a little bit of a misstatement. . . ." Tr. at 311:10-11 (DeMuro). According to the Defendants, it is not the law that any communication in which the parties haggle over price implicates rule 408. See Tr. at 312:4-22 (DeMuro). The Defendants further argues that the merger transaction was a process, and not just a singular event on December 9.

2013 -- a process in which Cypress Energy Partners initially sought to involve the Stuart group in a collaborative process that "would allow them to come along, exchange shares, and to join in the IPO with us." Tr. at 313:20-24 (DeMuro). The Defendants asserted that the

> entire theory that somehow we kicked them to the curb out in the cold is another
> falsehood. We discussed this business plan. We said . . . our presentation is we
> want to do an IPO. We're going to have to do a new company to do this. We
> want you to come along, if you want to, and exchange your shares . . . in TIR for
> the shares in this new IPO entity.

Tr. at 313:25-314:7 (DeMuro). The Defendants contended that the merger process started when the negotiations regarding the IPO, the MLP, and the merger were discussed, i.e., not when the Plaintiffs received merger notice. See Tr. at 314:8-12 (DeMuro). This timeline is important, the Defendants said, because entire fairness embraces questions when the merger transaction is timed. See Tr. at 314:13-315:1 (DeMuro). If the Court does not permit the Defendants to admit the contested letters, the Defendants averred, the ruling would "leave a huge hole in our case and the jury will be left wondering . . . what Cypress was doing between July 1st and December[.] What were they doing, twiddling their thumbs?" Tr. at 315:2-16 (DeMuro). Last, the Defendants maintained that -- if nothing else -- the letters are relevant to show fair process under controlling Delaware law and that it would be unfair to the Defendants to hold them to the standard of proving fair process while simultaneously excluding the letters from evidence. See Tr. at 315:20-316:8 (DeMuro). The Court responded: "I may let some of the letters in without the price, but the price makes me very nervous. I'll review it with that in mind, but I just don't think that price is going to come in on those letters." Tr. at 316:9-12 (Court).

The Defendants then shifted their argument to the Defendants' Estoppel MSJ. See Tr. at 316:16-318:8 (DeMuro). The Defendants first signaled their chagrin with the Plaintiffs' frequent suggestions that they were disingenuous, were dishonest, and made misrepresentations in the

merger notice upon which the Plaintiffs relied.  <u>See</u> Tr. at 318:9-15 (DeMuro).  Seeing a direct

link between this point and the forced seller doctrine, the Defendants diagnosed that doctrine as

being on life support.  <u>See</u> Tr. at 318:16-19 (DeMuro).  The Defendants quoted Judge Posner of

the United States Court of Appeals for the Seventh Circuit as calling the doctrine "esoteric" and

a "dubious judge-made doctrine," and noted that no circuit has adopted the doctrine since 1977.

<u>See</u> Tr. at 318:23-319:6 (DeMuro).  According to the Defendants, the whole notion of the forced

seller doctrine "offends the purpose of the securities law," which the Defendants characterize as

not being to police every act of corporate misconduct.   Tr. at 319:7-11 (DeMuro).   The

Defendants' then spelled out this last point in more detail, indicating that the purpose is "not to

police what are quintessentially claims of oppression by the majority shareholders over the

minority, it's to govern fraud in a purchase and sale of securities."  Tr. at 319:11-14 (DeMuro).

     The Defendants then introduced a Tenth Circuit case that also, as the Defendants

interpreted it, sought to bury the forced seller doctrine.   <u>See</u> Tr. at 320:24-25 (DeMuro).

According to the Defendants, in <u>Melnyk[68] v. Consonus, Inc.</u>, 2005 WL 2263950 (D. Utah

2005)(Benson, J.) the United States District Court for the District of Utah demonstrated that it

would not adopt the forced-seller doctrine.  <u>See</u> Tr. at 320:24-322:11 (DeMuro).  According to

the Defendants, the Ninth Circuit also signaled, in <u>Jacobson v. AEG Capital Corp.</u>, 50 F.3d 1493

(9th Cir. 1995), a decision that Judge Poole wrote and Judges Beezer and Nelson joined, that the

forced seller doctrine only applies in "exceedingly narrow instances."   Tr. at 322:16-18

(DeMuro).  The Defendants maintained that two cases out of the United States District Court for

the Southern District of New York also question the forced seller doctrine's validity that the

Second Circuit adopted in <u>Vine</u> approximately fifty years ago.  <u>See</u> Tr. at 322:19-23 (DeMuro).

---

[68]The hearing transcript incorrectly transcribes the case's Plaintiff's name as "Melnick."
<u>See</u> Tr. at 320:25 (DeMuro).

The Defendants were confident that, "if the Supreme Court ever gets a chance to, I'm certain that it's going to pull the plug on it."  Tr. at 322:24-25 (DeMuro).

The Defendants identified three consequences of what they characterized as nationwide ebbing from the forced-seller doctrine.  See Tr. at 323:1-324:4 (DeMuro).  First, the Defendants contended, a court sitting in diversity trying to apply Oklahoma's state law -- as the Defendants asserted the Court is doing -- "should be loathe to create and adopt a new doctrine, hesitant and reluctant to create new law in a state law case, in a diversity case, particularly in the face of such hostile precedent."  Tr. at 323:1-10 (DeMuro).  Second, the Defendants asserted, there is an even stronger basis to not apply the forced-seller doctrine if the Court looks at the Oklahoma Securities Act claims, which are the Plaintiffs' fifth and sixth claims for relief, as the Defendants know of no case that has applied the forced-seller doctrine to state securities law.  See Tr. at 323:11-20 (DeMuro).  Third, the Defendants contended, the Court should be even more reluctant to apply the forced seller doctrine, as the state statute's language is materially different than the 10b-5 statute and does not lend itself to any suggestion that anything other than a purchase, sale, and fraud in connection with a purchase and sale should be actionable.  See Tr. at 323:21-324:1 (DeMuro).

The Defendants then began to speak to the facts with respect to the forced-seller doctrine.  See Tr. at 324:2-3 (DeMuro).  According to the Defendants, the Plaintiffs err when they assert that the Defendants defrauded the pooled shareholders, relying on miscitations or incomplete recitations of pooled shareholders' testimony.  See Tr. at 324:18-325:7 (DeMuro).  The Defendants asserted that there is "no fraud on these pooled shareholders because all they wanted was the cash as each and every one of them say."  Tr. at 325:16-20 (DeMuro).  As the Defendants read pooled shareholders' testimony, they did not care whether the Defendants

disclosed the planned IPO or about the future increase in the shares' value before buying their shares. See Tr. at 325:24-327:12 (DeMuro). The one exception, the Defendants noted, was Foley, a former president of TIR's Canadian division. See Tr. at 327:13-328:3 (DeMuro). As the Defendants read Foley's testimony, he accused TIR of fraud on the grounds that "the Defendants should have told him that they had, quote, presold the shares allegedly to go public at the time of the sale." See Tr. at 328:1-3 (DeMuro). The Defendants described this assertion as complete "gibberish," based on what it divined was Foley's apparent belief that American companies need to sell their shares to the stock exchange in advance of an IPO. Tr. at 328:4-10 (DeMuro).

The Defendants then turned to the issue whether the Defendants did not disclose the IPO. See Tr. at 328:11-13 (DeMuro). According to the Defendants, Dan O'Keefe, who at the time was TIR's financial official, was circulating to some of the Plaintiffs the board presentation for the board meeting at which both the Cypress Energy Partners group and the Stuart group were going to present their proposals for the company in the bidding war. See Tr. at 328:21-330:2 (DeMuro). The Defendants asserted that the presentation contained an executive summary of what Cypress Energy Partners' offer was going to be, who Cypress Energy Partners was, and that they sought to form a new company. See Tr. at 330:3-5 (DeMuro). The board presentation, the Defendants continued, included: (i) the CEP offer and valuation; (ii) a discussion about the MLP; (iii) notice that that Cypress Energy Partners was actively working an MLP IPO; and (iv) notice that Cypress Energy Partners already had obtained a private letter ruling. See Tr. at 330:7-14 (DeMuro).

In a verbal parenthetical, the Defendants then took umbrage with the Plaintiffs' assertion earlier in the hearing that Cypress Energy Partners added no value to TIR, i.e., that it had been a

mule chained to a racehorse.  See Tr. at 331:11-13 (DeMuro).  The truth, the Defendants averred, was that Cypress Energy Partners had conceived of the idea that TIR's pipeline inspection services might be able to obtain IRS approval to qualify for profit pass-through treatment as part of an MLP.  See Tr. at 330:15-331:10  (DeMuro).  The preferential tax structure, the Defendants asserted, proved to be of "huge value" to TIR.  Tr. at 331:6 (DeMuro).  Furthermore, the Defendants contended, Cypress Energy Partners independently always had been a profitable entity, even if it had a different cash flow than TIR did.  See Tr. at 331:17-21 (DeMuro).  Returning to their argument's main thread, the Defendants said that the board presentation offered all TIR shareholders a choice between immediate liquidation or continued exposure to TIR equity via the merged company structured as an MLP.  See Tr. at 332:8-12 (DeMuro).  According to the Defendants, Stuart received the same offer to join the tax-advantaged MLP structure.  See Tr. at 332:13-18 (DeMuro).  The Defendants assessed these facts as very important in that they allegedly "demolishes the suggestion . . . that we kept the IPO secret from the pooled shareholders" and "shows very clearly . . . that this merger process didn't start with sending out a merger notice on December 9th."  Tr. at 332:19-333:3 (DeMuro).

After a short break, the Defendants returned to their arguments on the forced-seller doctrine and on the Plaintiffs' securities claims.  See Tr. at 333:19-335:12 (DeMuro).  According to the Defendants, the securities claims impact Defendants' Motion in Limine.  See Tr. at 335:12-21 (DeMuro).  If the securities claims are out, the Defendants reasoned, the Court also should grant the Defendants' motion in limine. See Tr. at 335:22-336:5 (DeMuro).

Taking one step back in their discussion, the Defendants returned to their presentation of the relevant event timeline.  See Tr. at 337:19 (DeMuro).  The Defendants asserted that the TIR board of directors had a meeting on May 13, 2013, at which they appointed a special committee

to evaluate the competing Stuart and Cypress Energy Partners offers. See Tr. at 337:21-338:1 (DeMuro). According to the Defendants, Reynolds was committee chair; Stuart, Vaughn, R. Lorett, and O'Connor all attended the meeting in person; and Foley conferenced via telephone. See Tr. at 338:3-12; id. at 339:24-340:12; id. at 341:11-13 (DeMuro). The Defendants contended that the special committee considered both the Cypress Energy Partners and the Stuart proposals, but that the special committee deemed Stuart's proposal as "very vague about how he was going to get funding to do his deal." Tr. at 340:12-14 (DeMuro). The Defendants contrasted the purportedly vague Stuart proposal with the Cypress Energy Partners proposal, which the Defendants asserted: (i) showed how the Cypress Energy Partners group had obtained a private letter ruling; (ii) that they proposed forming an MLP; and (iii) that the pooled shareholders had an option to join the MLP if they so desired. See Tr. at 341:14-342:2 (DeMuro).

The Defendants then segued into a discussion how the offer price accompanying these competing bids rose "with no relation to economics" from $371,000.00 per share to $451,000.00 per share from May, 2013, to June, 2013. Tr. at 342:3-11 (DeMuro). The Defendants read this price spike as evidence that the Cypress Energy Partners and Stuart groups were adding a control premium to their bids, a reading that the Defendants said later deposition testimony confirms. See Tr. at 342:12-343:9 (DeMuro). The Defendants posited that the existence of a control premium is relevant, because it shows that the Stuart group -- now the Plaintiffs -- believed that $451,000.00 per share was higher than fair market value in June, 2013, but are now saying that the share value should have been $1.2 million per share. See Tr. at 344:22-345:4 (DeMuro). Trying to force the Plaintiffs to navigate between Scylla and Charybdis, the Defendants then rhetorically asked the Plaintiffs "why did you offer 451 to the shareholders? Is that a fair price?

Or were you . . . shortchanging your shareholders to whom you had a fiduciary duty at the time because you were the director?" Tr. at 345:5-8 (DeMuro).

The Defendants then abruptly changed course to discuss a number of apparently unrelated issues. See Tr. at 345:9 (DeMuro). First, the Defendants sought to explain why it took months for the merger transaction to be completed. See Tr. at 345:9-16 (DeMuro). According to the Defendants, there were two reasons for the delay: (i) the Plaintiffs were attempting to block the merger; and (ii) immediately following the control process, the Plaintiffs aligned themselves with Triangle Capital. See Tr. at 345:17-22 (DeMuro). Second, the Defendants spotlighted one case complexity that they asserted had not yet been discussed adequately -- the blocking rights attached to Triangle Capital's warrants. See Tr. at 345:25-346:13 (DeMuro). As the Defendants described the blocking rights, Triangle Capital had to approve any transaction that changed TIR's corporate structure -- a right that the Defendants stated is a common feature in financing agreements with mezzanine lenders. See Tr. at 346:14-22 (DeMuro). The Defendants contended that these blocking rights meant that TIR needed Triangle Capital's approval to effectuate the proposed merger, but that Stuart went to Triangle Capital and asked it to negotiate on the Stuart group's behalf for the best possible price under the threat of having the merger blocked. See Tr. at 346:23-347:4 (DeMuro).

The Defendants interjected at this point, questioning when the Defendants would begin to discuss the motion that he was supposed to be arguing. See Tr. at 347:6-17 (Kagen). The Court revealed that it also was having difficulty following the Defendants' arguments:

> I guess this just seems to be throwing a lot of facts at the Court, and I'm sitting here thinking that I just don't know how much of this is going to come into the trial. So if it's not going to come into the trial, I guess I'm having a hard time figuring out why . . . I would use this material to dismiss the Plaintiffs' claims.

Tr. at 347:21-348:1 (DeMuro). The Court continued:

I just think this is going back way too far in ancient history. I'm going to have to cut it off at some point and just say, here's the transaction we're talking about. When I look at <u>Bershad</u> and what they're talking about, they talk about the transaction. I don't think . . . we're going back to <u>Genesis</u> . . . . I think the transaction is the merger, the tender, and the freeze-out. That's what we're talking about here.

Tr. at 348:3-13 (Court). The Court and the Defendants thereafter engaged in a dialogue that the Court, with an eye toward rendering this account as comprehensible as possible, here reproduces verbatim:

[MR. DEMURO:] I'm talking about the merger. And as I quoted the Delaware law, if the Court's going to apply the entire fairness law about the timing of the transaction, which is the merger, the timing of the merger was interrupted, interfered with, and delayed because of these facts.

THE COURT: Well, I'm going to let you argue it, but I must say I probably am not agreeing with it. I think that's way too far back.

MR. DEMURO: Your Honor, the facts I'm talking about are in September, October, and November of 2013.

THE COURT: Well, when you're talking about -- you [have] got up on the screen right now a control premium. I think that's the period of time in May, isn't it?

MR. DEMURO: That's the bidding war, June 26th. That's what tipped this whole thing off.

THE COURT: And I'm having a hard time seeing how that would come into trial.

MR. DEMURO: Is Your Honor saying that you're having a hard time seeing how the whole bidding process would come into trial?

THE COURT: I don't think so.

MR. DEMURO: Well, then we have a major disagreement with that.

THE COURT: I understand.

MR. DEMURO: And all of the -- all of the documents that I've shown Your Honor demonstrate that we were talking about the merger well before that. So I really think that that's going to inject a real problem into this record if we're cut off that way.

> THE COURT: I'm letting you make your record. I'm not cutting you off, but I am --
>
> MR. DEMURO: No. I meant if the evidence at trial cuts us off --
>
> THE COURT: I am sitting here thinking that a lot of this is probably not coming into trial.

Tr. at 348:18-350:2 (DeMuro, Court)(capitalization in the transcript). The Court then told the parties that it had expected to hear about "the difference between the first motion and the second motion" for summary judgment that the Defendants had filed,

> and I thought we would be talking about helping me to write the opinion, is there any way I can merge the first motion and the second one together, because the facts do seem to overlap a lot. I guess another question I was going to have was, why -- I understand you all have some unique rules here in the Northern District about filing one motion, but was this motion filed before the first motion; and if so, why was that the case? That sort of tips the hand that this was the important motion, because you filed it first rather than the one we argued yesterday, and then I thought we would probably have a little clean-up on . . . because of the overlap with some of the Delaware law that we were talking about.

Tr. at 350:21:351-8 (Court). The Defendants protested that the Plaintiffs had been allowed to range freely over a large number of tenuously connected topics during the hearing's first day, and that the event timeline that they were presenting mirrored arguments contained in Defendants' Estoppel MSJ. See Tr. at 351:13-23 (DeMuro). The Defendants asserted that they had only deviated from their motion by discussing Triangle Capital's warrants and blocking rights more in depth than they had discussed them in the motion. See Tr. at 351:24-352:1 (DeMuro). In response to the Court's second question, the Defendants contended that they filed Defendants' Acquiescence MSJ first, because they believed that it was case dispositive. See Tr. at 352:11-18 (DeMuro). According to the Defendants, the fact that the parties were arguing both Defendants' Acquiescence MSJ and Defendants' Estoppel MSJ during the same set of hearings was "simply a function of the judicial reassignments that we had no control over." Tr. at 352:20-

21 (DeMuro). Distinguishing Defendants' Acquiescence MSJ from Defendants' Estoppel MSJ, the Defendants stated that Defendants' Acquiescence MSJ (i) rides on a particularized application of the Bershad acquiescence defense in the context of a cash-out merger; and (ii) relies on Delaware law, given that there is no Oklahoma line of cases addressing acquiescence in a cash-out merger. See Tr. at 353:1-12 (DeMuro). The Defendants contrasted this focus with Defendants' Estoppel MSJ's focus, which the Defendants maintained is asserting Oklahoma law on estoppel, waiver, and unclean hands, as Oklahoma has a well-developed body of law on those points and the Defendants conclude that Oklahoma law applies to those defenses. See Tr. at 353:13-19 (DeMuro).

The Defendants and the Court then discussed whether the forced-seller doctrine could be applied in a state securities context, which the Defendants asserted would be "a big step and unwarranted." Tr. at 356:21 (DeMuro). Furthermore, the Defendants alerted the Court that 71 O.S. § 1-509(c) diverges from 10b-5's language. See Tr. at 356:22-25 (DeMuro). Unlike 10b-5, the Defendants asserted, the Oklahoma statute does not encompass indirectly fraudulent activity; it is expressly limited to fraud on the seller, i.e., is limited to a material misrepresentation to the seller. See Tr. at 357:1-8 (DeMuro). Sinking a stake into the ground on this point, the Defendants argued that "respectfully, . . . it would be a tremendous overreach by a court sitting in diversity to come into Oklahoma and apply something that's never been applied nationwide that has its roots in a doctrine that belongs in the dustbin." Tr. at 357:23-358:2 (DeMuro).

Expressly pushing back at that point on the Court's instinct that the extended bidding process is irrelevant, the Defendants chose to "move forward with the presentation, which is coming to a close." Tr. at 358:4-5 (DeMuro). According to the Defendants, this chronology is important insofar as it makes the case unique. See Tr. at 358:8 (DeMuro). Not fully convinced

that the case is indeed sui generis, the Court pushed back slightly as well, generating another

rapid-fire exchange between the Court and the Defendants:

> THE COURT:  Well, I guess when I hear that, that sort of sends my antennas up. I mean, these sort[s] of mergers are done all the time and you're trying to make it unique.  It's really not unique if we exclude all that prior history.  Then it's just another Delaware freeze-out.

> MR. DEMURO: I don't' understand how you could defrock a case of its facts and then apply the law.  The law is made by facts.

> THE COURT: Well, but you're saying it's unique because it's got this enormous history before it.  If I say I don't think that's very relevant to the fairness of the transaction that occurred in November or December, then it's not terribly unique. I mean, it seems to me to fit into the sort of normal facts of the Delaware cases that deal with these sort[s] of cash-out transactions.

> MR. DEMURO: Sure. Obviously, if Your Honor neutered all the facts and took out all the unique facts and just focused on the merger, then it becomes more like those other cases.  But that is not fair to the Defendants and it's not fair to the jury when they need to understand how did we get here, particularly when . . . the whole timing of the merger . . . was interfered with and elongated because of the conduct of the Plaintiffs.

Tr. at 358:10-359:7 (Court, DeMuro).  The Defendants asserted that they were surprised that,

among other things, the Court would prevent the jury from hearing that the Plaintiffs believed

$451,000.00 per share to represent a control premium in June, 2013, but that the fair market

value had shot up to approximately $1.2 million per share five months and one week later.  See

Tr. at 359:8-13 (DeMuro).  According to the Defendants, such an exclusion would thwart any

attempt that the Defendants could make to tell the jury what the Defendants allege to be the

merger's fair story.  See Tr. at 359:13-16 (DeMuro).  The Defendants insisted that Delaware

cases such as Bershad and In re Celera Corp. are dense with factual history, that law is not an

abstract concept untethered to facts, and that the Court does not have the discretion to limit the

transaction to the time that the Defendants sent the tender notice.  See Tr. at 359:17-361:19

(DeMuro).  Moreover, the Defendants asserted, they see no practical way to discuss the rationale

behind the share price in the tender offer without providing the jury with historical context. <u>See</u>

Tr. at 361:23-364:21 (DeMuro).

> The Court responded to the Defendants concerns with an analogy:

> Well, let's say I have a securities case and somebody's alleging a misrepresentation in the S-1. The S-1 may come into evidence, 10-K may come into evidence, and we focus on a tiny amount. But . . . if somebody then started trying to prove . . . some background information in the 10-K separate and apart from the misrepresentation, I'd probably say we don't need to get into that, that's going to take way too much time with the jury, and it doesn't really have anything to do with the misrepresentations made sometimes in just a sentence or two.

> . . . .

> But you're saying I should let you talk about everything in the tender offer if I allow the tender offer to come in. I guess I'm saying . . . I don't' think so."

Tr. at 364:22-365:18 (Court). Unsatisfied with the analogy, the Defendants remonstrated that

> what Your Honor is saying is the Plaintiff gets to put their [sic] view of the process on, we don't get to put ours. I'm not asking for things out of left field. Everything in this tender offer is about the merger process and how we got there, everything. So I'm having a hard time understanding what in here Your Honor would let us get into and what you wouldn't to be fair to us.

> . . . .

> I think the Court taking the view that the transaction that's under issue somehow started . . . within a couple days before the merger notice is completely inconsistent with the . . . entire fairness standard, the Delaware case law that looks at all of the facts, as I've talked about, basic principles of equitable . . . estoppel under Oklahoma law, and would really resort to a fundamentally unfair trial. I really think that you'd be injecting some real risk in this record that we have to come back here and do the whole thing again if we're not allowed to tell our side of the story.

Tr. at 366:10-367:21 (DeMuro).

The Defendants, indicating a desire not to argue with the Court, began to conclude their

argument by speedily addressing a number of outstanding points. <u>See</u> Tr. at 375:18-19

(DeMuro). First, the Defendants contended that the Plaintiffs, ironically, had misrepresented the

Defendants' position the previous day when they asserted that the Defendants misrepresented whether the parties dispute whether there exists a winner-take-all agreement between the Cypress Energy Partners group and the Stuart group. See Tr. at 374:15-19 (DeMuro). Presenting the Court with a table of undisputed facts, the Defendants asserted that they clearly show that the Defendants acknowledge this dispute to exist. See Tr. at 374:19-375:17 (DeMuro). Last, the Defendants argued that no Delaware case of which they know -- either from the Delaware Courts of Chancery or from the Supreme Court of Delaware -- suggests that the Court should take the narrow view about which the Court earlier had suggested when the merger transaction began. See Tr. at 375:18-377:8 (DeMuro).

After lunch, the Plaintiffs began their response to the Defendants' Estoppel MSJ indirectly, first focusing on to what they referred as housekeeping matters. See Tr. at 377:22-378:3 (Kagen). The Plaintiffs first rhetorically repeated the Court's earlier question to the Defendants why they filed two motions for summary judgment. See Tr. at 378:4-10 (Kagen). The Plaintiffs suggested a reason that differed from the reason which the Defendants provided to the Court that morning. See Tr. at 378:11-381:3 (Kagen). The Plaintiffs noted that, early on in the case, the Defendants offered the Plaintiffs judgment under Oklahoma law. See Tr. at 378:10-12 (Kagen). The Plaintiffs noted that the applicable Oklahoma law allows fee-shifting if a party loses, which introduces an element of financial risk for the Plaintiffs should the Court rule against them. See Tr. at 378:12-23 (Kagen). As the Plaintiffs remembered it, when the Defendants informed the Plaintiffs that they wanted to bring another motion for summary judgment under the theory of acquiescence -- which would be decided under Delaware law -- the Plaintiffs immediately agreed to the new motion for summary judgment in hopes of an expedited trial. See Tr. at 378:24-379:6 (Kagen). The Defendants lamented that "the vagaries of this

judicial system" left the fully briefed motions for summary judgment languishing in limbo since April, 2015, undermining the Plaintiffs desire for an expedited trial. Tr. at 379:7-24 (Kagen). When Judge Kern, United States District Judge for the Northern District of Oklahoma, later set a date for all summary motions to be filed by September 14, 2015, the Plaintiffs said, the Defendants refiled the same motion for summary judgment again. See Tr. at 379:25-380:9 (Kagen). As the Plaintiffs saw it, the Defendants' Estoppel MSJ is as meritless as the Defendants' Acquiescence MSJ, and it is results in a waste of the court's time and resources. See Tr. at 380:17-18 (Kagen).

The Plaintiffs then turned to a second housekeeping issue: factual representations. See Tr. at 381:4-5 (Kagen). Defending their metaphor the previous day that Cypress Energy Partners was a mule chained to TIR's racehorse, the factuality of which the Defendants had contested earlier in the day, the Plaintiffs showed the Court Cypress Energy Partners' S-1, which it filed with the SEC on November 14, 2013. See Tr. at 381:11-382:3 (Kagen). The Plaintiffs contrasted TIR, whose revenues in 2013 were $300 million, with Cypress Energy Partners, whose revenues for 2013 were $12.2 million. See Tr. at 382:11-16 (Kagen). Like the Aesop fable, the Plaintiffs asserted that the horse in this case bore the weight of a dead donkey after Cypress Energy Partners and TIR, Inc. merged, as a company that could not even make a profit bought the one with nearly $20 million in profits in 2012. See Tr. at 382:5-384:23 (Kagen). Cf. Aesop, Aesop's Fables 34-35 (Laura Gibbs trans. 1787).

Then pivoting to speak directly to the Defendants' Estoppel MSJ, the Plaintiffs asserted that both the factual section and the legal analysis in the Defendants' Estoppel MSJ are substantively identical to the factual section and the legal analysis in the Defendants' Acquiescence MSJ. See Tr. at 384:24-387:18 (Kagen). According to the Plaintiffs, the

Defendants for the most part "cut and paste[d]" these sections from Defendants' Acquiescence MSJ into the Defendants' Estoppel MSJ. Tr. at 387:20-389:3 (Kagen). The Plaintiffs maintained that there are six new things in the Defendants' Estoppel MSJ. See Tr. at 389:4-5 (Kagen). First, the Plaintiffs contended, the Defendants assert in Defendants' Estoppel MSJ that TIR valued its stock at Stuart's request. See Tr. at 389:14-15 (Kagen). The Plaintiffs stated that this fact is irrelevant and that the Defendants failed to mention it during their argument. See Tr. at 389:18-390:2 (Kagen). Second, the Plaintiffs maintained, the Defendants assert that Stuart did not agree with their plans to take TIR into an MLP. See Tr. at 390:3-6 (Kagen). The Plaintiffs told the Court that fact also is irrelevant and that the Defendants had made no argument about it. See Tr. at 390:6-21 (Kagen). Third, the Plaintiffs said, the Defendants assert that Stuart rejected a standstill agreement that the special committee proposed. See Tr. at 391:16-18 (Kagen). The Plaintiffs confessed that this fact confused them, because, the Plaintiffs averred, the Defendants had just argued the opposite, i.e., that Stuart agreed to the standstill agreement. See Tr. at 391:25-392:6 (Kagen). Fourth, the Plaintiffs contended, the Defendants assert a new fact about the pooled shareholders in a footnote, but the Plaintiffs said that the Defendants made no argument at the hearing about this fact. See Tr. at 392:7-18 (Kagen). Fifth, the Plaintiffs maintained, the Defendants add one new sentence to paragraph 11 -- which, the Plaintiffs contended otherwise replicates paragraph 13 in the Defendant's Acquiescence MSJ -- in which the Defendants assert that Stuart lost the competition to control TIR. See Tr. at 392:19-25 (Kagen). According to the Plaintiffs, this fact is new to the Defendants' Estoppel MSJ, but the Defendants already had covered it as part of their argument on the Defendants' Acquiescence MSJ the previous day. See Tr. at 392:25-393:7 (Kagen). Sixth and last, the Plaintiffs averred, the Defendants collapse all the materials that they assert they provided to the Plaintiffs as part of

the SEC registration statement into a catchall category called "all material information."  Tr. at 394:25-395:15 (Kagen).  The Plaintiffs saw no substantive difference between the two isotopes of this same factual element.  See Tr. at 395:15-22 (Kagen).  Aside from combining, subdividing, and differentially distributing some other facts in various ways, the Plaintiffs argued, the Defendants repeat the remaining facts almost word for word across their two motions for summary judgment.  See Tr. at 395:23-398:20 (Kagen).

Turning its and the Court's attention to the legal arguments that the Defendants make in Defendants' Estoppel MSJ, the Plaintiffs then contended that the Defendants first premise their legal argument on five false core allegations that the Plaintiffs withdrew by the time they filed the Complaint.  See Tr. at 399:24-401:1 (Kagen).  According to the Plaintiffs, the Defendants three legal arguments -- on unclean hands, waiver, and estoppel -- also are unconvincing and largely duplicative of their acquiescence defense from Defendants' Acquiescence MSJ.  See Tr. at 401:3-21 (Kagen).  The Plaintiffs distilled the Defendants' argument about unclean hands to as assertion that Stuart had acted inequitably by bragging about the share price and return he was able to obtain for his TIR shares when he tendered them.  See Tr. at 402:25-403:15 (Kagen).  As the Plaintiffs read Oklahoma law, conduct needs to involve fraudulent and deceitful acts if it is to be rightly adjudged as being inequitable.  See Tr. at 403:17-25 (Kagen).  The Plaintiffs made a similar contention about the Defendants' estoppel argument, saying that estoppel requires evidence of deceitful, fraudulent conduct by Stuart that does not exist.  See Tr. at 404:3-406:11 (Kagen).

The Plaintiffs also maintained that the Defendants' waiver argument is unavailing.  As the Defendants remembered it, the Defendants assert that Smith v. Minneapolis Threshing, a hoary case from 1923, defined waiver as a known right's relinquishment.  See Tr. at 407:1-6

(Kagen).  The Plaintiffs stated that the Defendants then assert that the Plaintiffs acceptance of the merger consideration constitute such a waiver.  <u>See</u> Tr. at 407:7-11 (Kagen).  The Plaintiffs saw this as just a doppelganger for the Defendants acquiescence defense.  <u>See</u> Tr. at 407:11-24 (Kagen).  According to the Plaintiffs, the only right that they ever waived with respect to the merger transaction was the right to seek appraisal, which they asserted the Oklahoma statute permits them to waive.  <u>See</u> Tr. at 408:1-6 (Kagen).  Furthermore, the Plaintiffs contended: (i) Delaware case law precludes a waiver argument from challenging an equitable action's fairness, <u>see</u> Tr. at 408:14-410:3 (Kagen)(citing <u>JCC Holding</u>, <u>In re Best Lock</u> and <u>Clements</u>); and (ii) the Plaintiffs never even entered into a contract with the Defendants to which contractual waiver could apply, <u>see</u> Tr. at 411:4-415:3 (Kagen).

Wrapping up their response to the Defendants' legal arguments pertaining to Defendants' Estoppel MSJ, the Plaintiffs sought to discredit the Defendants' assertion that the Plaintiffs are equitably estopped from challenging the merger transaction, because the Defendants "relied on our voluntary and knowing surrender of the share certificates."  Tr. at 415:4-17 (Kagen).  According to the Plaintiffs this estoppel argument is simply new wine in an old bottle, the acquiescence defense repeated with a different nom de guerre.  <u>See</u> Tr. at 415:18-417:3 (Kagen).  The Plaintiffs maintained that Delaware case law and, they believed, also the Federal Rules of Civil Procedure, clearly forbid such claim duplication.  <u>See</u> Tr. at 416:5-417:5 (Kagen).  Even if the Defendants were making an estoppel claim rather than another acquiescence claim masquerading as an estoppel claim, the Plaintiffs contended, the that hypothetical claim would fail, as the Plaintiffs never induced the Defendants to detrimentally rely on anything the Plaintiffs did.  <u>See</u> Tr. at 417:6-419:11 (Kagen).

Satisfied that they had fully responded to all the legal arguments the Defendants had

presented in the Defendants' Estoppel MSJ, the Plaintiffs touched briefly on whether the forced seller doctrine has any viability in common law or under state securities statutes. See Tr. at 420:9-23 (Kagen). The Plaintiffs maintained that the doctrine has purchase under common law, because (i) "this is minority shareholder impression in its most classic form," Tr. at 420:25-421:1 (Kagen); and (ii) the forced seller doctrine is incorporated into the entire fairness doctrine, see Tr. at 421:7-10 (Court, Kagen). Responding to a question from the Court, the Plaintiffs then conceded that they were unaware of any state blue sky law that similarly has incorporated the forced seller doctrine. See Tr. at 421:11-16 (Court, Kagen). Turning back to the common law point, the Plaintiffs ridiculed the Defendants' argument against the forced seller doctrine as "old, ancient, high-bound [sic], and decrepit" because the case is sixteen years old, contending that such an argument is inconsistent with the Defendants' reliance on Bershad, which is nearly twice as old. See Tr. at 422:10-24 (Kagen). Expressing bemusement, the Plaintiffs inquired whether old law "is no good when we cite it, but old law that's contradicted by the very state that originally had it is fine when they want it?" Tr. at 423:3-4 (Kagen). Such asymmetry, the Plaintiffs argued, "doesn't work." Tr. at 423:6 (Kagen). The Plaintiffs then noted that the forced seller doctrine is still good law in the Second, Fifth, and Ninth Circuits, which the Plaintiffs maintained demonstrates that the Defendants' reports of the forced seller doctrine's death are premature. See Tr. at 423:24-424:6 (Kagen).

Tying up loose ends, the Plaintiffs then insisted that the Defendants' assertions about what certain pooled shareholders' mean when they speak about what they considered material information regarding the merger transaction are wrongheaded for two reasons. First, the Plaintiffs said, the pooled shareholders' intended meaning behind quotations is a question for a jury, not an issue that a court can dispose of at the summary judgment stage. See Tr. at 424:23-

426:4 (Kagen). Second, the Plaintiffs continued, the pooled shareholders' subjective conceptions of what information about the merger transaction was material are not binding; under Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds, 133 S, Ct. 1184 (2013), the Plaintiffs argued, the materiality determination turns on an objective standard -- the significance of an omitted or misrepresented fact to a reasonable investor. See Tr. at 426:15-427:16 (Kagen).

Following an afternoon break, the Defendants began their reply to the Plaintiffs' response on the Defendants' Estoppel MSJ. See Tr. at 433:6-8 (DeMuro). Brushing off what they characterized as the Plaintiffs' "feigned outrage about the second motion," the Defendants explained that they had filed a second motion, with court leave, after unanticipated delays in getting the Defendants' Acquiescence MSJ heard. Tr. at 433:9-23 (DeMuro). In the Defendants' Estoppel MSJ, the Defendants told the Court, "we had to assert all other defenses that were then available based on the same facts" as those facts that the Defendants had asserted in Defendants' Acquiescence MSJ

> So that part of the motion, which is similar in the facts, is just a function of the fact that you have one set of undisputed facts that can give rise to several different legal theories, and we were all hoping that the acquiescence motion would have been ruled on first. So that's . . . the reason for how it came out.

Tr. at 433:21-434:4 (DeMuro). In addition, the Defendants stated, they had filed a second motion for summary judgment to address the Plaintiffs' securities claims. See Tr. at 434:5-11 (DeMuro).

The Defendants then turned their sights onto the Plaintiffs' assertion that the Defendants objected to the forced seller doctrine on account of its age. See Tr. at 434:12 (DeMuro). According to the Defendants, such an assertion grotesquely oversimplifies the Defendants' position on Vine and the forced seller doctrine. See Tr. at 434:12-17 (DeMuro). The Defendants asserted that Vine did not enfeeble with age; the Supreme Court of the United States kneecapped

it in <u>Blue Chip</u> and <u>Santa Fe</u>, the Defendants argued, in which the Supreme Court of the United States noted that securities law's antifraud provisions are not to be used "when the case is really about minority oppression and a fiduciary duty claim." Tr. at 434:18-435:1 (DeMuro). In <u>Blue Chip</u> and <u>Santa Fe</u>'s wake, the Defendants asserted, all the United States Courts of Appeals started to recognize that there was a new test they needed to apply to such claims. <u>See</u> Tr. at 435:2-9 (DeMuro). According to the Defendants, the contrast between this history and <u>Bershad</u>'s history could not be starker. <u>See</u> Tr. at 435:10-12 (DeMuro). The Defendants said that, unlike with <u>Vine</u>, neither the Supreme Court of the United States nor the Supreme Court of Delaware ever has called the doctrine in <u>Bershad</u> into question. <u>See</u> Tr. at 435:12-15 (DeMuro). The Defendants asserted that the exact opposite is the case, <u>i.e.</u>, that subsequent authority from the Supreme Court of Delaware, including <u>In re Celera Corp.</u>, applied the <u>Bershad</u> rule rather than abrogating it. <u>See</u> Tr. at 435:15-19 (DeMuro).

Turning to their second motion for summary judgment's merits, the Defendants then argued that the Supreme Court of Delaware's decision in <u>Kahn v. Lynch</u> shows that the Court should grant Defendants' Estoppel MSJ. <u>See</u> Tr. at 436:19-437:17 (DeMuro). The facts in <u>Kahn v. Lynch</u>, the Defendants suggested, are strikingly similar to the facts in this case. <u>See</u> Tr. at 437:15-17 (DeMuro). In <u>Kahn v. Lynch</u>, the Defendant said, the company and its directors and the shareholders started to talk about a possible takeover acquisition in the spring of 1986. <u>See</u> Tr. at 437:18-20 (DeMuro). The Defendants chronicled the rest of the case's factual history in the following manner:

> There were several different ups and downs and bumps in the road and directors who voted for it, committees that were formed, new committees that were formed over the ensuing months, disputes about what directors believed what and who was independent and who wasn't. There was a number of those type of disputes among and between the interested parties from September -- the actual vote to approve the merger, the cash-out merger, wasn't until November 24th and the

actual transaction didn't occur until after that so it's a remarkably similar time period. The court considered that whole process, didn't limit it, considered the whole process.

Tr. 437:20-438:5 (DeMuro). Focusing on the <u>Kahn v. Lynch</u> court's consideration of the "whole process," Tr. at 438:5 (DeMuro), the Defendants contended that they are entitled to show that there were "arm's length negotiations going on, that there was [sic] these back-and-forth communications about this entire process," Tr. at 438:18-19 (DeMuro). Putting it less abstractly, the Defendants clarified that they are entitled to show "the facts about when it [the merger process] started, about Mr. Stuart not wanting to join the MLP, about bidding up the value of the company," because "all of those facts have to do with their position vis-à-vis . . . the controlling shareholders." Tr. at 438:22-439:1 (DeMuro). Precedent constrains the Court, the Defendants maintained, to consider "all the facts . . . not at the point it's voted to do it, but at the beginning of the time that the [merger] idea begins to be discussed by the relevant parties." Tr. at 439:4-7 (DeMuro). With that, the Defendants reasserted their overall contention that the entire merger process was fundamentally and entirely fair to the Plaintiffs and then closed their argument on the Defendants' Estoppel MSJ. <u>See</u> Tr. at 439:19-23 (DeMuro).

> The Court followed up on the Defendants' argument with a question probing their position on <u>Bershad</u>'s limits. <u>See</u> Tr. at 439:24-440:4 (Court). If the Court were to adopt the Defendants' position that subsequent chancery court decisions have not limited <u>Bershad,</u> the Court inquired, why would a corporation that's cashing out its minority shareholders ever have an incentive to set up an appraisal process, disinterested committee, anything along that line? Because in this case you admitted you didn't want to spend the $300,000 to do the appraisal. So doesn't your sort of rule just disincentivize corporations from ever doing those things?

Tr. 440:5-11 (Court). The Defendants did not subscribe to Court's hypothetical's logic. The Defendants first questioned the Court's hypothetical's premise, asserting that the expense associated with an appraisal had not been the sole reason they had foregone one:

> We didn't do the appraisal -- and it's set out clear in the tender offer, by the way -- . . . the reason we didn't do the appraisal is the whole process. We had this bidding war. It bid up to a premium. We had arm's length sales. . . . We had all that data to say that this was a fair price.

Tr. at 440:14-21 (DeMuro). The Defendants also challenged the Court's hypothetical's conclusion, indicating that corporations are entitled to make a business judgment as to whether they need to get an appraisal or set up an independent committee to make the process fair ex ante or whether they, instead, will be subjected to the entire fairness standard from Bershad ex post. See Tr. at 440:23-441:10 (DeMuro).

In response, the Court posited an "extreme example," in which (i) a corporation's merger negotiations with fully-informed shareholders reach an impasse; (ii) the corporation forcibly cashes the opposed shareholders out for one dollar for each of their shares; and (iii) the corporation maintains that any shareholder who accepts the Washingtons loses his or her right to come to court. Tr. at 441:20-25 (Court). In such a scenario, the Court asked the Defendants, "[d]oesn't that just impose sort of a disincentive for the corporation to do anything to sort of set a different price?" Tr. at 442:1-2 (Court). The Defendants caveated that, in some private companies, a cash-out price of one dollar per share could be a good deal for the opposed shareholders. See Tr. at 442:3-7 (DeMuro). Assuming, however, that the fair market share value exceeds one dollar per share, the Defendants continued, "I don't think that shareholders who were getting $1 for $100 wouldn't exercise . . . their statutory right to an appraisal." Tr. at 442:7-10 (DeMuro). Furthermore, the Defendants pointed out, other colorable claims would exist in such a case, such as bad faith. See Tr. at 442:10-12 (DeMuro).

The Court thereupon asked the Defendants whether they had any more comments on Defendants' Estoppel MSJ, and the Defendants indicated that they did. See Tr. at 442:13-14 (DeMuro). The Defendants divulged that they were struggling to understand what they

perceived

> to be the Court's unease with the fact that these shareholders were squeezed out to begin with, discomfort with that, which is what my perception is, both in you and in the Court's willingness to look at the Chancery Court opinions because the -- particularly now-Chief Justice Strine is uncomfortable with that notion, that you can squeeze people out, and I wanted to address that.
>
> There's a reason for that, there's a flip side to that, it's very important in this case, and that's embraced in this concept of tyranny of the minority. These securities law, these corporate laws, are designed to encourage the accumulation of talent and capital, encourage growth of corporations, encourage change and innovation. And if you have a situation where the minority shareholders -- like in this case, only 30 percent of the owners of this company were trying to block this completely inventive and creative idea of getting a private letter ruling from the IRD on inspection revenue, dropping an inspection company into an MLP structure, which was on the cutting-edge, if 30 percent of a company could prevent that type of innovation, that's not good for anyone . . . .

Tr. at 442:16-443:10 (DeMuro). The Court rejoined that "that's more of a justification for cash-out options . . . which we're well beyond." Tr. at 443:12-15 (Court). The Defendants agreed with the statement's main clause, but not with its subordinate clause. See Tr. at 443:14-16 (DeMuro). Mirroring the Defendants' question, the Court inquired whether

> the flip side . . . what these rules in Delaware advance is that they put the burden on the person cashing out, either going through some of these procedural safeguards . . . or to the entire fairness to force really the parties to deal with this out of court, because if you don't deal with it out of court, then you get a court deciding whether there was entire fairness. So the burden, it's meant to be a little bit onerous on the people that are cashing out the minority, isn't it?

Tr. at 443:17-444:2 (Court). The Defendants indicated their full-throated support of this idea: "Yes. You better be sure, agreed." Tr. at 444:3 (DeMuro). According to the Defendants, the controlling shareholders or directors who are effectuating the cash-out merger have to be very confident that they are offering the minority shareholders a fair price if they choose not to use protective devices such as a special committee or a minority shareholder vote. See Tr. at 444:3-16 (DeMuro). Sensing an opportunity to leverage this concession to their advantage on a point

they earlier had discussed, the Defendants closed this colloquy by insisting that this very need for

corporate confidence in a fair price is

> why, Your Honor, it's so vital that we be able to prove by the history of dealings why we thought a great deal . . . 451 price was a premium price in June, why we thought that, why we were so confident of that, because we were confident because there was a bidding process of two inside directors, followed by arm's length sales, followed by all the things we talked about.

Tr. at 444:17-23 (DeMuro).

The Court then tipped its hand to the parties on what its inclination were with regard to

the Defendants' Estoppel MSJ.  See Tr. at 445:4-5 (Court).  The Court revealed at the time that:

> I'm inclined to deny it, I think, largely for the reasons I mentioned yesterday.  I don't see a great deal of difference between the defense of acquiescence and the defenses of waiver and estoppel [that] are being advanced here.  They seem to me, and Delaware law seems to suggest, they're very similar.  So I'm not on at least the fairness issue inclined to grant the motion.

> I'm a little unfamiliar with the claims here, breach of fiduciary duty.  I think that probably is the merger process unfairness.  Controlling shareholder liability and not just enrichment, I'm not sure what those additional claims are.  But I think I can fairly say that I don't think that the evidence has been presented here, whether it's the long version or short version, is going to preclude as a matter of law those claims from going forward.

> As far as the securities claims, I don't have the feel for Oklahoma Supreme Court an securities that I might in my own state, but I don't have any reason to think that Oklahoma would ingraft [sic] the forced seller doctrine on to its blue sky or state securities law, and to the extent that that's really what the fifth and sixth claims are, I would be inclined to dismiss those and grant the motion in part.

> Same with the seventh claim and the eighth claim, I don't see that the Tenth Circuit would adopt the forced seller doctrine in the federal securities context.  I'd be inclined to grant the motion to the seventh and eighth claim.

> So I think it's probably a grant in part and deny in part, leaving the first four claims for trail or further work and dismissing the state and federal securities claims.

Tr. at 445:6-446:9 (Court).

The Court then invited the parties to take up the motion to exclude Randall Lorett's affidavit. <u>See</u> Tr. at 446:10-11 (Court). To give the parties a sense of how the Court was inclined to decide the issue after having read the briefing materials, the Court said that its

> impression [after] going through the Lorett motion was that I would need to probably take those things that he . . . testified about one at a time.
>
> Some of the things he said I thought probably were admissible, some things were not. For example, some things that he was trying to say seemed to me he lacked personal knowledge of those things, and so he really didn't offer anything that would be admissible at trial.
>
> But in any case, I was inclined to think that probably in the writing of the motions for summary judgment -- and I am -- have at least convinced myself that I think I can put the two motions we've argued so far . . . into one opinion -- I may have to work with these additional facts and some of the additional discovery . . . I think I can probably write one opinion, and then largely in the footnotes figure out what I'm going to do with Randall Lorett's testimony.

Tr. at 446:16-447:7 (Court). The Plaintiffs indicated that they were happy to rest on their written submissions and have the Court proceed in conformity with its inclination on the Motion to Strike. <u>See</u> Tr. at 447:10-14 (Kagen). The Defendants had more to say. According to the Defendants, the Plaintiffs' argument's essence is that R. Lorett's affidavit lacks foundation, because R. Lorett admits in his deposition that he does not know what the TIR fair market share value is. <u>See</u> Tr. at 448:12-21 (DeMuro). The Defendants maintained that this argument is wrongheaded, in that R. Lorett is "absolutely qualified" to testify about what he believed a fair price for his shares was. Tr. at 448:22-25 (DeMuro). After all, the Defendants reminded the Court, R. Lorett "was the CEO, the president of the company. He operated the company for a number of years. He was deeply involved in the bidding process, the pooled shareholder process, etcetera, and so he was obviously competent to say that he believed that it was a good price." Tr. at 449:1-5 (DeMuro).

The crux of the Plaintiffs' argument in support of their Motion to Strike, as best the

Defendants could discern it, is that there is a distinction between fair price and fair value.  See Tr. at 449:6-11 (DeMuro).  The Defendants argued that such hair-splitting has no basis; as the Defendants saw it, fair value and fair price, in this case's context at least, are synonymous, and R. Lorett offers in his deposition that he believes the tender offer to have represented the fair value of TIR shares.  See Tr. at 449:11-14 (DeMuro).  When it comes to the other sticking point of "factoring receivables," the Defendants espied a similar, purely phraseological issue at the core of the apparent contradiction between R. Lorett's affidavit and his deposition testimony; according to the Defendants', R. Lorett knows what "factoring debt" is, but was unfamiliar with the synonymous term "factoring receivables" means.  See Tr. at 449:15-22 (DeMuro).  In both these issues, the Defendants asserted, the Plaintiffs' attempts to split hairs does nothing but reveal a bald truth that no real contradiction exists between R. Lorett's affidavit and his deposition testimony.  See Tr. at 449:23-450:2 (DeMuro).  Consequently, the Defendants maintained, the Court should not strike R. Lorett's affidavit.

With the ball back in their court, the Plaintiffs decided to argue their motion despite their earlier position that they simply would reset on the papers.  See Tr. at 450:5-7 (Kagen).  Despite indicating that they "[d]on't have much to say here," the Plaintiffs alleged that the Defendants' presentation had just completely mischaracterized what the Motion to Strike concerns.  See Tr.at 450:7-9 (Kagen).  According to the Plaintiffs, they attack R. Lorett's affidavit not because it is an expert opinion, but rather because R. Lorett

> had no such opinion, his affidavit is not true, and we found it troubling that . . . the defendants filed such a thing.  Because what happened is, during the course of the deposition . . . Mr. Lorett . . . stated as if it were his opinion in this affidavit that he swore to be true under penalty of perjury that 451,000 was more than fair value.

Tr. at 450:19-451:1 (Kagen).  As the Plaintiffs recounted R. Lorett's deposition testimony, the

Plaintiffs asked R. Lorett if he had any idea what TIR's share value was, and the R. Lorett responded that he did not. See Tr. at 451:2-7 (Kagen). Contrasting that testimony with R. Lorett's affidavit, in which R. Lorett expressed an opinion on TIR share value, the Plaintiffs asserted that the decision whether to strike R. Lorett's affidavit centers on honesty and not on qualification. See Tr. at 451:8-16 (Kagen).

The Court asked the Plaintiffs whether any doctrine exists that "allows me to just strike something because a guy is inconsistent? Let's say at the deposition he said on page 1, my name is John Brown; and on page 10, he said, well it's John Less. I mean, you don't strike that, you just go, that's odd." Tr. at 452:9-13 (Court). The Plaintiffs replied that they find the purported inconsistencies between R. Lorett's affidavit and deposition testimony to be "terrifically disquieting." Tr. at 452:14-21 (Kagen). Furthermore, the Plaintiffs contended, Tenth Circuit law holds that one cannot make statements for summary judgment purposes unless it pertains to personal knowledge -- and R. Lorett indicated at his deposition that he has no knowledge related to important parts of his affidavit. See Tr. at 452:22-24 (Kagen). As the Plaintiffs saw it, "Lorett properly should be precluded from testifying on these issues when he says one thing under a written statement of oath, an affidavit, and then in deposition on cross admits not only that it's not his position[, but also that] he has no opinion on it at all." Tr. at 453:15-19 (Kagen). The Plaintiffs perceived R. Lorett's purportedly contradictory statements about fair valuation as part of a disturbing larger pattern of equivocation rooted in passing off hearsay as his own personal knowledge, with respect to issues ranging even to factoring debt. See Tr. at 453:20-456:24 (Kagen).

After discussing with the parties hearing and trial scheduling, and a special jury questionnaire, see Tr. at 456:25-468:1 (Court, Kagen, DeMuro, Wild), the Court invited the

Plaintiffs to finish their argument on their Motion to Strike, see Tr. at 468:2-3 (Court). Returning to their argument that the Lorett Aff. and the R. Lorett Dep. did not match on the fair value issue, the Plaintiffs quoted at length from the R. Lorett Dep. See Tr. at 468:22-474:3 (Kagen). The Court will repeat much of that quotation here, eliding wherever doing so increases readability without doing injury to the substance, because (i) the Motion to Strike relies so heavily on what transpired during the exchange; and (ii) the rapid-fire question and answer format becomes byzantine when transcribed using indirect speech and summary. In the R. Lorett Dep., which took place a few weeks after R. Lorett signed the Lorett Aff., the Plaintiff's counsel reported that he engaged in the following exchange with Lorett:

QUESTION: I'm talking about December of 2013. Remember that time?

ANSWER: I know when December 2013 was.

QUESTION: In that time period, did you have an opinion as to what the fair value of the price for . . . TIR shares was?

ANSWER: No opinion.

Tr. at 468:22-469:3 (Kagen). The Plaintiffs highlighted at that point when reciting R. Lorett's testimony that R. Lorett's attestation that he had no opinion as to fair share price contradicted his affidavit. See Tr. at 469:4-6 (Kagen). The Plaintiffs then returned to their recitation:

QUESTION: No opinion at all; is that right?

ANSWER: No.

QUESTION: So you didn't believe that $451,000 was fair value for a TIR share at that time; right?
. . . .

ANSWER: I didn't say that.

QUESTION: I'm asking you.

ANSWER: I will tell you 451 is an excellent price for a share in Tulsa Inspection.

QUESTION: Okay.  So I wasn't asking excellent; I was asking fair.  Did you think $451,000 in December of 2013 was a fair value for TIR stock?

ANSWER: I have no valuation.  I don't know.

Tr. at 469:7-20 (Kagen).  After emphasizing that R. Lorett apparently "[d]idn't even know what I was talking about," Tr. at 469:25 (Kagen), the Plaintiffs continued:

QUESTION:  You would never testify about fair value for TIR shares in December 2013 given you have no knowledge of it; right?

. . . .

THE WITNESS: I told you, I don't know the value.  I don't.  I have no opinion.

. . . .

QUESTION: Right.  So you wouldn't come to a federal court, would you, and testify about something you have no opinion about, like fair value, would you?

THE WITNESS: Not a deal guy.  I don't know how to do the value.  That's how it is.  I don't know.

QUESTION: You understand you're under oath?

ANSWER: I understand that.

QUESTION: And you understand your testimony under oath can be used in federal court; right?

ANSWER: I understand that.

QUESTION: Would you -- okay.  Would you give testimony under oath in federal court about fair value of TIR shares at any time period?

. . . .

ANSWER: I don't know.  I don't know.  I don't know.  I don't' understand the question you're asking me.

QUESTION: What don't you understand about it?

ANSWER: You're asking me, will I give testimony?  Are they asking me if I'm sitting in the witness stand?  I'll tell you the truth, I don't know.

QUESTION: Got it.  So if a judge were to ask you now, do you have any understanding, sir, of TIR's fair value for its shares in 2013 at any time, what would your answer be?

. . . .

THE WITNESS: All I have is an opinion.  I don't have the wherewithal to tell you the value.

Tr. at 470:1-471:21 (Kagen).  According to the Plaintiffs, Plaintiffs' counsel then asked R. Lorett whether he thought that the $451,000.00 per share price for TIR shares incorporated a premium over fair value and discovered that R. Lorett did not understand the phrase "premium over fair value."  Tr. at 471:23-474:3 (Kagen).  In response to the Defendants' assertions that R. Lorett (i) had the qualifications to make a fair value assessment; and (ii) had context for such a fair value determination, even if (iii) he did not have personal knowledge of the fair share value, the Plaintiffs contended that the Federal Rules of Civil Procedure do not have a context exception to them: "He either knows it or he doesn't."  Tr. at 474:16-25 (Kagen).  The Plaintiffs repeated this same point in a few other ways and then concluded their argument.  See Tr. at 475:1-476:11 (Kagen).

At that point, the Court tipped its hand to the parties on how it likely would decide the Motion to Strike, indicating:

I'm inclined to deny the Motion to Strike.  I'm not probably going to use a motion to strike in this case to strike testimony or briefing or things like that.  I think it's reserved for pleadings and so I'll probably limit my motions to strike.

As I indicated, though, there were some things about Lorett, particularly whether he had knowledge to testify about certain things.  I'll try to sort it out.  I guess I'm inclined to think that if a witness says one time he didn't know and at another time he said he did, it's not the summary judgment stage to sort that out.  There is some testimony.

I don't think it's going to make any difference if I consider Lorett's testimony because if I understood what was going on in the motions for summary judgment, there was other testimony to support the factual statements.  But I will

- 156 -

try to sort it out and so I'll deal with this motion.

> In the motion we're going to write, there might be some nicking and excluding of some things or I'm not considering some of Lorett's testimony, but I'll sort that out when I write the opinion.

Tr. at 476:13-477:7 (Court). The Court then invited the parties to argue the Plaintiff's Motion to Strike the Affirmative Defenses, and asked the Plaintiffs whether it could roll the facts from the Motion to Strike the Affirmative Offense into one comprehensive factual section along with the facts from the other motions that the parties had argued over the previous day and a half. <u>See</u> Tr. at 477:8-15 (Court). The Plaintiffs assured the Court that they had no objection to the Court economizing in such a way, indicating that they indeed preferred to have "it all handled in one fell swoop," as they thought that "this issue is the same issue all over again." Tr. at 477:16-19 (Kagen).

The Plaintiffs stated that they did not plan to rehash the factual bases for the Motion to Strike Affirmative Defenses, as they were convinced that they mapped perfectly onto the facts as the parties had adduced them in earlier motions. <u>See</u> Tr. at 477:20-25 (Kagen). The Plaintiffs agreed with the Court's distillation of the Motion to Strike Affirmative Defenses, explaining that they wanted the Court to preclude the Defendants from mentioning affirmative defenses they had raised in Defendants' Acquiescence MSJ and Defendants' Estoppel MSJ in the event that the Court denies these two MSJs. <u>See</u> Tr. at 479:1-10 (Court, Kagen). The Court told the parties that its position on whether to strike affirmative defenses had evolved over the years, but that it presently "seems to me that in the face of these two motions for summary judgment, it's hard for me to say that under no circumstances could those affirmative defenses have any merit and since those go to really the pleading stage, affirmative -- motions to strike, I shouldn't strike them." Tr. at 479:11-480:16 (Court). The Court clarified, however, that

it's a different issue as to what we do at trial after I . . . deny the motions for summary judgment, if I continue to do that. But sticking strictly with the standards for motions to strike, even if you win [in your opposition to] these two motions for summary judgment, I shouldn't strike the affirmative defenses.

Tr. at 480:17-22 (Court). Giving a hint at where it then stood, the Court then offered:

I guess I'm thinking that I shouldn't grant this motion. I should leave them there and then sort out at trial what I think is your real concern, not that you care what's in the pleadings at this stage. What you really care about is what's going to occur at the trial, and that I ought to sort out later on rather than going back and sanitizing pleadings.

Tr. at 480:23-481:3 (Court). Expanding on these thoughts, the Court continued:

[L]et's say I had picked up this motion before they ever filed a motion for summary judgment. I don't think I'd have granted it. I couldn't have imagined a situation in which they could not have raised these equitable defenses. I would have said no.

Is it really any different now? We spent two days on these things. I can't sit here and say they're not in good faith, there's no possible way I'm going to grant them. I'm going to take them back to Albuquerque and think about them. So should my standard be any different? Just because I'm leaning toward denying their motion, I shouldn't change the standard for a motion to strike.

Tr. 482:2-13 (Court). In response, the Plaintiffs acknowledged that courts typically disfavor rule 12(f) motions, but they emphasized that they were concerned about the trial. See Tr. at 483:14-16 (Kagen). According to the Plaintiffs, the Defendants keep trying to stretch the timeline for what constituted the merger transaction beyond what the law allows, which the Plaintiffs averred should be solely the process whereby the Defendants kicked them out of the company. See Tr. at 484:1-13 (Kagen). Wielding an analogy, the Defendants told the Court that the Defendants' position is akin to saying that the relevant action in a battery case in which the tortfeasor and his victim long have known each other is the entire background story of their relationship rather than the one instance of battery. See Tr. at 484:14-24 (Kagen). Otherwise, the Plaintiffs maintained, the court in such a case ends up adjudging a multigenerational vendetta rather than a tort. See

Tr. at 484:24-485:3 (Kagen). The Plaintiffs argued that none of the four defenses that the Defendants offer their two motions for summary judgment -- acquiescence, unclean hands, waiver, and estoppel -- are "out as a matter of law," and should not inhabit some liminal space in which they are considered out for summary judgment purposes but in for trial purposes. Tr. at 485:4-487:1 (Kagen).

The Plaintiffs assured the Court that they understood that the Court would not deign to strike the Defendants' affirmative defenses sua sponte. See Tr. at 487:17-20 (Kagen). At the same time, however, the Plaintiffs maintained that they had timely moved to strike the affirmative defenses twenty-one days after the Defendants filed their amended answer. See Tr. at 487:21-488:21 (Kagen). The Plaintiffs also acknowledged the Court's hesitation to prevent new information about these affirmative defenses from emerging during the trial, but they were confident that the Court already had heard these defenses in their entirety. See Tr. at 488:22-489:7 (Kagen).

After a short break, the Court offered the Defendants an opportunity to respond to the Motion to Strike Affirmative Defenses. See Tr. at 491:25-492:1 (Court). The Defendants agreed with the Plaintiffs that the Court could combine the facts from the Motion to Strike Affirmative Defenses with the facts from the Defendants' two summary judgment motions. See Tr. at 492:9-12 (DeMuro). The Defendants otherwise disagreed with the Plaintiffs' positions in the Motion to Strike Affirmative Defenses, asserting that the Plaintiffs themselves introduce facts that start in 2003 in support of their own points but then chide the Defendants for wanting to introduce events that occurred in 2013. See Tr. at 492:25-501:16 (DeMuro).[69] According to the

---

[69]The hearing transcript is ambiguous as to the earliest date to which the Defendants are referring. The transcription reads as follows: "The relevant fact background, here it starts in 2000 -- 2000 -- (discussion held off the record) . . . . So here's the background of the relevant

Defendants, the Plaintiffs cannot soundly seek a double standard, whereby they are allowed to submit evidence concerning events that occurred years before the merger was culminated and the Defendants are not allowed to introduce evidence of events that occurred only months before the merger was consummated. See Tr. at 501:10-16 (DeMuro). The Defendants asserted that applying the same standard to both parties means ipso facto denying the Motion to Strike Affirmative Defenses. See Tr. at 501:25-502:12 (DeMuro).

The Plaintiffs argued in their reply on the Motion to Strike Affirmative Defenses that the Defendants correctly note that the Plaintiffs' arguments mention events that reach back years in their Complaint, but not in their causes of action. See Tr. at 504:6-12 (Kagen). In their claims, the Plaintiffs maintained, they talk only about the self-dealing merger and not events that took place before it. See Tr. at 504:13-24 (Kagen). Furthermore, the Plaintiffs asserted, the timeline issue is an argument that the Defendants do not make in their filing opposing the Motion to Strike Affirmative Defenses, which means that it is out of place in a motion hearing, where the Plaintiffs asserted "you argue the arguments you make in your motion or your opposition. You don't get at oral argument to concoct new theories or fabricate new arguments." Tr. at 504:25-505:15 (Kagen). Quickly tackling each of what they contended are the Defendants' sole arguments in opposition to the Motion to Strike Affirmative Defenses, the Plaintiffs argued that (i) they did not file the motion in an untimely fashion -- a contention so weak, the Plaintiffs

_____

facts and you see it starts in 2013, there's some background -- 2003." Tr. at 495:2-7 (DeMuro). The transcription makes it appear that the Defendants first assert that the Plaintiffs' timeline begins in 2000 and then contradict themselves by saying that it begins in 2003. The Court concludes that such a contradiction did not occur. In spoken English, one begins saying 2003 with the words "two thousand." The Defendants repetition of these two words, the hesitation between the repetitions, and the Defendants' immediate discussion off the record all suggest that the Defendants were searching for the precise year within the decade of the Aughts to which they wished to refer. The Defendants follow-up reference to "2003" most naturally reads as the year that the Defendants originally intended to say before hemming. The Court therefore reports the year as 2003 here.

contended, that the Defendants did not even mention it earlier during their oral argument; (ii) the motion need not be denied as being duplicative of the Plaintiffs' papers related to the Defendants' two summary judgment motions; (iii) the Defendants did not raise in oral argument their argument that the Plaintiffs impermissibly relied on matters outside the pleadings; and (iv) the Defendants argue that the Motion to Strike Affirmative Defenses should fail, because of what the Defendants say in their Answer -- an assertion that the Plaintiffs protest the Defendants manufactured "on the fly." Tr. at 505:16-506:21 (Kagen).

The Court then shared with the parties that its inclination at that point was that it probably would need to be consistent and

> hold motions to strike affirmative defenses to the highest standards, and I don't think that -- I think these are . . . issues that have to be sorted out largely with the facts or law, and so I can't just looking at the pleadings make that determination. So I think that they don't meet the highest standards.
>
> I think what the Plaintiffs are really trying to achieve is to limit the evidence at trial. I think that's probably at this stage going to be done more with motions for summary judgment or with motions in limine but not motions to strike. And if you start encouraging motions to strike to be used for those purposes, I think you're going to get some disfavored motions being brought later in the case. I realize the timing on this one is a little different, but I'm inclined to deny that motion. I'll give some thought to what Mr. Kagen has said, but I'm inclined to deny the motion.

Tr. at 506:25-507:15 (Court). The Court then invited the Plaintiffs to discuss Plaintiffs' MSJ. See Tr. at 507:16-18 (Court). Noting that the Court had a hard deadline for closing arguments that day and that the deadline was only an hour away, the Plaintiffs conveyed that they were hesitant to begin discussion on a motion that the parties might not have sufficient time to argue fully. See Tr. at 507:19-508:3 (Kagen). The Court then asked whether it could ask the Plaintiffs a few questions about the Plaintiffs' MSJ then instead of hearing a full-blown argument, and the Plaintiffs readily agreed. See Tr. at 508:4-8 (Court, Kagen).

The Court first asked the Plaintiffs what the factual basis is for the Plaintiffs' MSJ. See Tr. at 508:10-12 (Court). The Plaintiffs responded that the Plaintiffs' MSJ is based entirely on undisputed facts, but they did not immediately accept the Court's invitation to describe what those facts are. See Tr. at 508:21-509:25 (Kagen). Instead, the Plaintiffs summarized for the Court the three orders that they were seeking to obtain in Plaintiffs' MSJ. See Tr. at 509:1-510:5 (Kagan). First, the Plaintiffs said, they wanted an order that says that the entire fairness standard governs the Plaintiffs' claims for breach of fiduciary duty -- a standard that the Plaintiffs asserted the Defendants have conceded applies. See Tr. at 509:1-9 (Kagen). Second, the Plaintiffs indicated, they want an order that the Defendants bear the burden of proof that the merger was entirely fair to the minority shareholders, i.e., that it was the product of both fair dealing and fair price. See Tr. at 509:10-15 (Kagen). Third, the Plaintiffs stated, they want an order that the Defendants are liable for breaching their duty of entire fairness, because the undisputed material facts shows that the Defendants have not and cannot meet their burden to show fair dealing. See Tr. at 509:22-510:2 (Kagen). According to the Plaintiffs, they seek to reserve for trial the issue of damages resulting from that breach of fiduciary duty. See Tr. at 510:2-5 (Kagen).

The Defendants, seemingly returning full circle to their assertion early in the morning of the hearing's first day that they were bearing tidings of good news, see supra, told the Court:

> I think I can simplify this because Mr. Kagen is correct. We've got an area of agreement, which is a great way to end the day for anybody in the courtroom. And that is, we agree that if Your Honor denies the acquiescence motion outright and says it's no longer an issue, or even if you submit that to the trial, which we think you should, the trial court at a minimum, that if we don't get dismissed on acquiescence, okay, and it's a trial issue, we agree that the entire fairness standard applies to the fiduciary duty claims.

Tr. at 510:10-19 (DeMuro). To ensure that it correctly interpreted what the Defendants were saying, the Court probed the Defendants with a collection of short questions. See Tr. at 510:23-

511:19 (Court, DeMuro).  Because of the exchange's importance, the Court recites the exchange

verbatim here:

> THE COURT: But you would agree with his statement that the entire fairness standard governs Plaintiffs' claims for breach of fiduciary duty if the acquiescence motion is denied?
>
> MR. DEMURO: Correct.
>
> THE COURT: And would you also agree that the Defendants bear [the] burden of proving that the merger satisfies the entire fairness standard if the acquiescence motion for summary judgment is denied?
>
> MR. DEMURO: As it pertains to the fiduciary duty claim, yes.

Tr. at 510:23-511:8 (Court, DeMuro).  Inquiring about the Defendants' assertion that they might

still quibble what the jury instruction looks like regarding the entire fairness standard and from

what specific case law the jury instruction would be pulled, the Court asked the Defendants

whether their quibble would just be about the Defendants' liability under the entire-fairness

standard.  See Tr. at 511:9-10 (Court).  The Defendants responded that "that's the claim, yes."

Tr. at 511:11 (DeMuro).  The Court then turned to the Plaintiffs and asked whether, in writing its

opinion, it could subsume all the facts relevant to the Plaintiffs' MSJ into the factual sections

combined from the Defendants' two summary judgment motions so that it might write one

opinion to decide all the motions the Court had heard over the previous two days.  See Tr. at

511:18-513:7 (Court).  The Defendants asserted that the Court could not glean sufficient facts

about the merger's history from the Defendants' summary judgment motions to accomplish that

feat; the Court, the Plaintiffs asserted, needed also to incorporate facts from Plaintiffs' MSJ.  See

Tr. at 512:8-516:24 (Kagen).  As one example, the Plaintiffs said, if entire fairness rather than

the business-judgment rule applies, then the burden to prove entire fairness shifts to the

Defendants from the beginning of the case to its end.  See Tr. at 518:10-521:4 (Kagen)(citing In

re Nine Systems, affirmed in Fuchs v. Wren Holdings, LLC, 129 A.3d 882 (Del. 2015). [70] As another example, the Plaintiffs continued, the facts in the Defendants' two summary judgment motions do not provide sufficient detail about the parties involved for the Court to see -- or in the Plaintiffs' opinion, to show -- how none of the individual Defendants was a disinterested actor in the merger transaction. See Tr. at 521:5-523:19 (Kagen).

Veering a bit from the question at that point, the Plaintiffs began to delve into their legal arguments regarding the liability issue in Plaintiffs' MSJ. See Tr. at 523:20 (Kagen). The Plaintiffs asserted that, because the Defendants were not disinterested actors in the merger transaction, Delaware law required them to put into place protections to safeguard minority shareholders' rights at the time of the merger on December 9, 2013. See Tr. at 524:4-546:13 (Kagen)(citing In re Cornerstone Therapeutics Inc., Stockholder Litig., 115 A.3d 1173 (Del. 2015); In re Sunbelt Beverage Corp. S'holder Litig., 2010 WL 26539 (Del. Ch. Jan. 5, 2010)(Chandler, C.), as revised Feb. 15, 2010; Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983); Zutrau v. Jansing, 2014 WL 3772859 (Del. Ch. July 31, 2014)(Parsons, V.C.); and Rice[71]). The Plaintiffs maintained that the Defendants did not "have to follow a particular recipe" when it came to designing or implementing these protections, but that the Defendants needed to take some protections to avoid entire-fairness review. Tr. at 526:14-18 (Kagen). The Plaintiffs alleged, however, that the Defendants took no prophylactic actions to protect minority shareholders' rights at all. See Tr. at 526:18-24 (Kagen). On account of this lack of prophylactic action and what the Plaintiffs asserted is the Defendants' inability to demonstrate fair process,

---

[70] At the hearing, the Plaintiffs did not provide the case name or citation for the case they alleged affirmed In re Nine Systems. The Court has backfilled the case name and citation based on Westlaw's report of In re Nine Systems' subsequent history.

[71] It is not clear from the Plaintiffs' motion filings or from the hearing transcript to which case "Rice" refers.

the Plaintiffs contended that Delaware law says that liability attaches to the Defendants.  <u>See</u> Tr. at 527:10-528:23 (Kagen)(citing <u>In re Trados Inc. S'holder Litig.</u>, 73 A.3d 17 (Del. Ch. 2013)(Laster, V.C.); <u>Owen v. Cannon</u>, 2015 WL 3819204 (Del. Ch. June 17, 2015)(Bouchard, C.); <u>In re Celera Corp.</u>; and <u>Lampton Welding Supply Co. v. Stobaugh</u>, 2012 WL 5398790 (N.D. Okla. Nov. 2, 2012)(Kern, J.))).  After offering the Court their thoughts on how the opinion should be structured, the Plaintiffs then concluded their argument.  <u>See</u> Tr. at 530:1 (Kagen). The Court then asked the Defendants the same question it had asked the Plaintiffs -- whether the Defendants objected to the Court's plan to pull the facts from the Plaintiffs' MSJ into one factual pool along with the facts from the Defendants' two summary judgment motions.  <u>See</u> Tr. at 530:5-13 (Court).  The Defendants responded that this approach is identical to the approach that they would take were they the Court.  <u>See</u> Tr. at 530:14-533:2 (DeMuro).

The Court then permitted the Defendants to present their argument on the liability issue that the Plaintiffs raise in the Plaintiffs' MSJ, asking first whether the Defendants could point to any case that disputes the Plaintiffs' assertion that the Defendants' failure to take prophylactic protections is a per se violation of entire fairness  <u>See</u> Tr. at 533:8-13 (Court).  The Defendants went even further, indicating that no case exists that supports the Plaintiffs' position.  <u>See</u> Tr. at 533:14-25 (DeMuro).  The Defendants insisted that having a burden-shifting rule in entire-fairness standard cases would be nonsensical if failure to take steps to protect the minority shareholders resulted in per se violation of the entire fairness standard.  <u>See</u> Tr. at 534:18-535:24 (DeMuro).

The Court asked the Defendants what they would emphasize as proof that their merger process was entirely fair if the burden only shifts rather than there being a per se violation.  <u>See</u> Tr. at 535:25-536:16 (Court).  The Defendants adduced (i) the bidding process, by which, the

Defendants said, they had established a premium value for the TIR shares; (ii) the arm's-length share sales that the Defendants disclosed to shareholders; and (iii) the Plaintiffs' concession that they were fully informed of all the material facts regarding the merger. See Tr. at 536:19-537:25 (DeMuro). The Plaintiffs then quickly argued a reply to Plaintiffs' MSJ, noting that the Court only had twelve minutes left before it would be forced to stop argumentation for the day. See Tr. at 539:14-17 (Kagen). According to the Plaintiffs, their belief that the merger price was fair is insufficient to prevent liability from attaching if the merger transaction and cash-out were not procedurally fair. See Tr. at 539:18-540:24 (Kagen). The Plaintiffs maintained that this insufficiency is evident from In re Nine Systems, in that the minority shareholders in that case "got an amazing price" for their shares, but that the defendant company directors had not provided sufficiently fair process. Tr. at 540:25-541:6 (Kagen). The court in that case, the Plaintiffs contended, decided that the defendant directors still were liable, because of the lack of fair process, ultimately holding that there were no damages to award on account of the fair price but still awarding the plaintiffs millions of dollars in attorney fees. See Tr. at 541:7-13 (Kagen). The Plaintiffs then closed their argument by reiterating and summarizing some of their previous points. See Tr. at 541:22-543:2 (Kagen).

Starting to draw the hearing to a close, the Court divulged to the parties:

I got to look at these cases, . . . but I'm inclined to agree what I have read so far with Mr. Kagen, that you got to point to something more than the bidding process and those sort of things, you got to have some reasonable substitute for probably the things that pass for procedural fairness. I'm not seeing them here.

So I think if I stick with the inclinations I've had on the two other motions, motions for summary judgment, it's going to lead me to probably grant the motion that the Plaintiff has here on breach of fiduciary duty, leaving us . . . really a valuation trial. So that's what I'm envisioning right at the present time as I head back to Albuquerque to work on this opinion.

Tr. at 543:4-17 (Court). Engaging in some housekeeping regarding its inclinations on other

motions that the parties had discussed in their briefs and during the two days of hearing, the

Court further intimated:

> I went back and reviewed . . . [the] Plaintiffs' Motion in Limine to Preclude
> Evidence of Plaintiffs' Conduct. I think I gave a . . . tentative ruling . . . on what I
> though on the Akin Gump [letter], that those types of letters would be out. I
> thought that the letters as to the . . . Triangle mezzanine . . . group, I thought that
> price should come in.
>
> I went back and looked and there was some more materials there, and
> without prejudging anything, I wasn't inclined to keep that out. I don't . . .
> sanitize a trial that much and so I was not inclined to grant those portions of it.
>
> I also spent some time on the . . . Plaintiffs' Motion to Exclude the
> Defendants' Proffered Expert. . . . In a case called Trujillo[ v. Rio Arriba County].
> . . I had to make a critical use about whether I was going to allow the police
> officer to testify about a particular test that was administered for a DWI.
>
> In New Mexico, they said a police officer cannot testify that way. I said,
> well, that's all nice and good, but this is federal court, I'm bound by Daubert [v.
> Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), I think he can testify to
> this. And so I think that may be a little bit relevant. Even if Delaware might have
> a little bit of an issue as to whether this person could testify, I think the evidence
> may be more procedural.
>
> So I was inclined -- and I need to study this more -- but I was inclined to
> think that that was a denial to exclude the Defendants' proffered expert, because it
> seemed to me most of the criticism in a federal court would go to sort of cross-
> examination, the weight of the evidence, rather than excluding the expert entirely.
>
> But you might want to take a look at that opinion in the footnotes there
> where I dealt with that tension between what New Mexico would allow and what
> I as a federal judge would allow under Daubert. I think they were taking a
> restricted view and more so than a federal court would as to what an expert could
> testify to.

Tr. at 543:21-545:16 (Court). Therewith, the second day of hearings ended. See Tr. at 546:2-4

(Court).

## LAW REGARDING DIVERSITY JURISDICTION

"Subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) requires: (i) complete diversity

among the parties; and (ii) that 'the matter in controversy exceeds the sum or value of $75,000,

exclusive of interest and costs.'"[72]  Thompson v. Intel Corp., No. CIV 12-0620 JB/LFG, 2012

---

[72]The Constitution of the United States of America permits -- but does not mandate -- Congress to authorize an even broader scope of federal subject-matter jurisdiction than Congress has chosen to enact: "The judicial power shall extend to all cases, in law and equity, . . . between citizens of different states."  U.S. Const. art. III, § 2, cl. 1.  This clause permits federal jurisdiction: (i) in cases with minimum diversity -- those in which any one party is a citizen of a different state than any opposing party -- in addition to cases with complete diversity; and (ii) in cases in which the amount in controversy is below the statutory amount-in-controversy requirement.  See State Farm Fire & Cas. v. Tashire, 386 U.S. 523 (1967).

For the federal courts to have jurisdiction over a matter, however, jurisdiction must be both constitutionally empowered and congressionally authorized.  The Honorable John J. Sirica, then-Chief United States District Judge for the District of Columbia, has stated:

> For the federal courts, jurisdiction is not automatic and cannot be presumed.  Thus, the presumption in each instance is that a federal court lacks jurisdiction until it can be shown that a specific grant of jurisdiction applies.  Federal courts may exercise only that judicial power provided by the Constitution in Article III and conferred by Congress.  All other judicial power or jurisdiction is reserved to the states.  And although plaintiffs may urge otherwise, it seems settled that federal courts may assume only that portion of the Article III judicial power which Congress, by statute, entrusts to them.  Simply stated, Congress may impart as much or as little of the judicial power as it deems appropriate and the Judiciary may not thereafter on its own motion recur to the Article III storehouse for additional jurisdiction.  When it comes to jurisdiction of the federal courts, truly, to paraphrase the scripture, the Congress giveth, and the Congress taketh away.

Senate Select Comm. on Pres. Campaign Activities v. Nixon, 366 F. Supp. 51, 55 (D.D.C. 1973) (footnotes omitted).  The complete-diversity and amount-in-controversy requirements are two ways in which Congress has authorized a narrower scope of subject-matter jurisdiction than the full measure that the Constitution permits.  Congress has similarly narrowed federal-question jurisdiction.  Congress may authorize federal "arising under" jurisdiction over all cases in which "the constitution[] forms an ingredient of the original cause" of action.  U.S. Const. art. III, § 2, cl. 1 ("The judicial power shall extend to all cases, in law and equity, arising under this Constitution . . . .").

> We think, then, that when a question to which the judicial power of the Union is extended by the constitution, forms an ingredient of the original cause, it is in the power of Congress to give the Circuit Courts jurisdiction of that cause, although other questions of fact or of law may be involved in it.

Osborn v. Bank of U.S., 22 U.S. 738, 822 (1824)(Marshal, C.J.).   The federal-question jurisdiction statute, however, requires that a substantial, actually disputed question of federal law be present on the face of the well-pleaded complaint, and that its resolution be necessary to the disposition of the claim over which jurisdiction is being asserted.  See 28 U.S.C. § 1331; Grable

WL 3860748, at *12 (D.N.M. Aug. 27, 2012)(Browning, J.)(citing 28 U.S.C. § 1332(a)).  As the Court has previously explained, "[t]he Supreme Court of the United States has described this statutory diversity requirement as 'complete diversity,' and it is present only when no party on one side of a dispute shares citizenship with any party on the other side of a dispute."  McEntire v. Kmart Corp., No. CIV 09-0567 JB/LAM, 2010 WL 553443, at *3 (D.N.M. Feb. 9, 2010) (Browning, J.)(citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267-68 (1806), overruled in part by Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149 (1908); McPhail v. Deere & Co., 529 F.3d 947, 951 (10th Cir. 2008)).  The amount-in-controversy requirement is an "estimate of the amount that will be put at issue in the course of the litigation."  Valdez v. Metro. Prop. & Cas. Ins. Co., No. CIV 11-0507 JB/KBM, 2012 WL 1132374, at *15 (D.N.M. March 19, 2012)(Browning, J.)(citing McPhail v. Deere & Co., 529 F.3d at 956).  The Court will discuss the two requirements in turn.

### 1. Diversity of Citizenship.

For diversity jurisdiction purposes, a person's domicile determines citizenship.  See Crowley v. Glaze, 710 F.2d 676, 678 (10th Cir. 1983).  "A person's domicile is defined as the place in which the party has a residence in fact and an intent to remain indefinitely, as of the time of the filing of the lawsuit."  McEntire v. Kmart Corp., 2010 WL 553443, at *3 (citing Crowley v. Glaze, 710 F.2d at 678).  See Freeport-McMoRan, Inc. v. KN Energy, Inc., 498 U.S. 426, 428 (1991)("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events.").  If neither a person's residence nor the location where the person has an intent to remain can be established, the person's domicile is that of his or her parents at the time of the person's birth.  See Gates v. Comm'r of

---

& Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312 (2005); Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 154 (1908).

Internal Revenue, 199 F.2d 291, 294 (10th Cir. 1952)("[T]he law assigns to every child at its birth a domicile of origin. The domicile of origin which the law attributes to an individual is the domicile of his parents. It continues until another domicile is lawfully acquired."). Additionally, "while residence and citizenship are not the same, a person's place of residence is prima facie evidence of his or her citizenship." McEntire v. Kmart Corp., 2010 WL 553443, at *3 (citing State Farm Mut. Auto. Ins. Co. v. Dyer, 19 F.3d 514, 520 (10th Cir. 1994)). A corporation, on the other hand, is "deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." Gadlin v. Sybron Int'l Corp., 222 F.3d 797, 799 (10th Cir. 2000)(quoting 28 U.S.C. § 1332(c)(1)).

In this case, two of the Plaintiffs and four of the Defendants are organized as limited liability companies ("LLC"). See Complaint at 1. The Supreme Court of the United States concluded in Carden v. Arkoma Assoc., 494 U.S. 185 (1990) that LLCs do not qualify as corporations under 38 U.S.C. § 1332(c)(1) for personhood separate from their members. See 494 U.S. at 190. The United States Court of Appeals for the Tenth Circuit has not yet addressed the question how an LLC's citizenship should be determined for diversity jurisdiction purposes. Every other United States Court of Appeals has decided, however, that for diversity jurisdiction purposes, an LLC shares its members' citizenship. See Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc., 435 F.3d 51, 54-55 (1st Cir. 2006)("Every circuit to consider this issue has held that the citizenship of a limited liability company is determined by the citizenship of all of its members."; Handelsman v. Bedford Vill. Assocs. Ltd. P'ship, 213 F.3d 48, 51-52 (2d Cir. 2000)(" [F]or purposes of diversity jurisdiction, a limited liability company has the citizenship of its membership.")(citing Cosgrove v. Bartolotta, 150 F.3d 729, 731 (7th Cir.1998)); Zambelli Fireworks Mfg. Co., Inc. v. Wood, 592 F.3d 412, 420 (3d Cir. 2010)("[T]he

citizenship of an LLC is determined by the citizenship of its members."); <u>Gen. Tech.</u> <u>Applications, Inc. v. Exro Ltda</u>, 388 F.3d 114, 121 (4th Cir. 2004)("A limited liability company organized under the laws of a state is not a corporation and cannot be treated as such under section 1332 until Congress says otherwise.  It is an unincorporated association, akin to a partnership for diversity purposes, whose citizenship is that of its members.")(internal citations omitted); <u>Harvey v. Grey Wolf Drilling Co.</u>, 542 F.3d 1077, 1080 (5th Cir. 2008)("All federal appellate courts that have addressed the issue have reached the same conclusion: like limited partnerships and other unincorporated associations or entities, the citizenship of a LLC is determined by the citizenship of all of its members."); <u>Delay v. Rosenthal Collins Grp., LLC</u>, 585 F.3d 1003, 1005 (6th Cir. 2009)("The general rule is that all unincorporated entities -- of which a limited liability company is one -- have the citizenship of each partner or member."); <u>GMAC Commercial Credit, LLC v. Dillard Dep't. Stores, Inc.</u>, 357 F.3d 827, 829 (8th Cir. 2004)("Holding an LLC's citizenship is that of its members for diversity jurisdiction purposes, we are unable, from this record, to determine the citizenship of GMAC's members."); <u>Johnson v.</u> <u>Columbia Props. Anchorage, LP</u>, 437 F.3d 894, 899 (9th Cir. 2006)("We therefore join our sister circuits and hold that, like a partnership, an LLC is a citizen of every state of which its owners/members are citizens."); <u>Rolling Greens MHP, LP v. Comcast SCH Holdings, LLC</u>, 374 F.3d 1020, 1022 (11th Cir. 2004)("The federal appellate courts that have answered this question have all answered it in the same way: like a limited partnership, a limited liability company is a citizen of any state of which a member of the company is a citizen. We join them in this holding.")  Wright and Miller agree that a given LLC has the combined citizenship of every member of that LLC.  <u>See</u> 13F Charles Alan Wright et al., <u>Federal Practice & Procedure: Juris.</u> § 3630 (3d ed. 2017).

## 2.    **Amount in Controversy.**

The statutory amount-in-controversy requirement, which presently stands at $75,000.00, must be satisfied as between a single plaintiff and a single defendant for a federal district court to have original jurisdiction over the dispute; "a plaintiff cannot aggregate independent claims against multiple defendants to satisfy the amount-in-controversy requirement," nor can multiple plaintiffs aggregate their claims against a single defendant to exceed the threshold.  Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *18 (D.N.M. Mar. 30, 2010) (Browning, J.).  If multiple defendants are jointly liable, or jointly and severally liable, on some of the claims, however, the amounts of those claims may be aggregated to satisfy the amount-in-controversy requirement as to all defendants jointly liable for the claims.  See Alberty v. W. Sur. Co., 249 F.2d 537, 538 (10th Cir. 1957); Martinez v. Martinez, 2010 WL 1608884, at *18. Similarly, multiple plaintiffs may aggregate the amounts of their claims against a single defendant if the claims are not "separate and distinct."  Martin v. Franklin Capital Corp., 251 F.3d 1284, 1292 (10th Cir. 2001)(Seymour, C.J.), abrogated on other grounds by Dart Cherokee Basin Operating Co. v. Owens, 135 S. Ct. 547 (2014).  Multiple claims by the same plaintiff against the same defendant may be aggregated, even if the claims are entirely unrelated.  See 14AA Charles A. Wright, Arthur R. Miller, Edward H. Cooper, Vikram D. Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman, & Catherine T. Struve, Federal Practice and Procedure, Jurisdiction § 3704, at 566-95 (4th ed. 2011).  While the rules on aggregation sound complicated, they are not in practice: if a single plaintiff -- regardless whether he or she is the only plaintiff who will share in the recovery -- can recover over $75,000.00 from a single defendant -- regardless whether the defendant has jointly liable co-defendants -- then the court has original jurisdiction over the dispute between that plaintiff and that defendant.  The court can

then exercise supplemental jurisdiction over other claims and parties that "form part of the same case or controversy under Article III," 28 U.S.C. § 1367(a), meaning that they "derive from a common nucleus or operative fact," United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).

Satisfaction of the amount-in-controversy requirement must be established by a preponderance of the evidence. See McPhail v. Deere & Co., 529 F.3d at 953. In the context of establishing an amount-in-controversy, the defendant seeking removal could appear to be bound by the plaintiff's chosen amount of damages in the complaint, which would seem to allow a plaintiff to avoid federal jurisdiction "merely by declining to allege the jurisdictional amount [in controversy]." McPhail v. Deere & Co., 529 F.3d at 955. The United States Court of Appeals for the Tenth Circuit's decision in McPhail v. Deere & Co. has foreclosed such an option from a plaintiff who wishes to remain in state court. McPhail v. Deere & Co. holds that a defendant's burden in establishing jurisdictional facts is met if the defendant proves "jurisdictional facts that make it possible that $75,000 is in play." 529 F.3d at 955.

The Supreme Court recently clarified that a defendant seeking removal to federal court need only include in the notice of removal a plausible allegation that the amount in controversy exceeds the jurisdictional threshold. See Dart Cherokee Basin Operating Co. v. Owen, 135 S. Ct. 547, 554 (2014). The district court should consider outside evidence and find by a preponderance of the evidence whether the amount in controversy is satisfied "only when the plaintiff contests, or the court questions, the defendant's allegation." Dart Cherokee Basin Operating Co. v. Owen,. 135 S. Ct. at 554.

### LAW REGARDING FEDERAL-QUESTION JURISDICTION

A federal district court has "original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Federal-question jurisdiction exists when "a federal question is presented on the face of the plaintiff's properly pleaded complaint." Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)(citing Gully v. First Nat'l Bank, 299 U.S. 109, 112-13 (1936)). As "the master of the claim," the plaintiff may choose to sue in state court rather than in federal court "by exclusive reliance on state law." Caterpillar, Inc. v. Williams, 482 U.S. at 392.

The defendant may not try to sneak a federal question through the back door by raising a federal defense, for "it is now settled law that a case may not be removed to federal court on the basis of a federal defense . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." Caterpillar, Inc. v. Williams, 482 U.S. at 393 (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 12 (1983)). See Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1236 (10th Cir. 2003)("It is well settled that '[a] defense that raises a federal question is inadequate to confer federal jurisdiction.'" (quoting Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 808 (1986))). While a plaintiff is free to plead a federal question in his complaint, "a defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated." Caterpillar, Inc. v. Williams, 482 U.S. at 399. Even the plaintiff can only go so far in attempting to invoke federal-question jurisdiction, because "[a]ny statements in the complaint which go beyond a statement of the plaintiff's claim and anticipate or reply to a probable defense are to be disregarded" in deciding whether federal-question jurisdiction exists. Mescalero Apache Tribe v. Martinez, 519 F.2d 479, 481 (10th Cir. 1975).

In addition to the requirement that the federal question appear on the complaint's face, a "plaintiff's cause of action must either be (i) created by federal law, or (ii) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'" Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 808). As for the second method, beyond the requirement of a substantial question of federal law at the case's heart, the federal question must also be "contested." Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. 308, 313 (2005). Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. at 313. In particular, the court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state law claim that will overwhelm the judiciary with cases traditionally heard in state courts. Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. at 318-19 (explaining that "there must always be an assessment of any disruptive portent in exercising federal jurisdiction" in accepting "garden variety" state law claims).

In Bar J Sand & Gravel, Inc. v. w. Mobil N.M. Inc., No. Civ. 05-800JBWPL, 2005 WL 3663689 (D.N.M. Sept. 29, 2005)(Browning, J.), the plaintiff's complaint stated causes of action for breach of contract, breach of the covenant of good faith and fair dealing, and unfair trade practices. See 2005 WL 3663689, at *7. The defendants argued that a federal question was apparent on the face of the complaint

> because, as a necessary first step in proving a breach of contract, Bar J [Sand and Gravel, Inc.] must show that a valid contract actually exists between Bar J and the Defendants. To establish that the parties entered into a valid contract, Bar J must show that all conditions precedent were met, including Bar J's possession of a valid [Sand and Gravel] Permit [that the Pueblo of San Felipe issued to Bar J Trucking, Inc.]. In turn, whether Bar J [Sand and Gravel, Inc.] acquired a valid

> Permit requires reference to the federal regulations governing the issuance of those permits. Reaching the last link in their chain of argument, the Defendants assert that the federal question is whether the creation of the Permit complied with those regulations.

2005 WL 3663689, at *8 (internal citations omitted). The Court determined that the defendants' argument confused "a condition precedent to contract <u>performance</u> with a condition precedent to contract <u>formation</u>" and that the argument was raising an issue of federal law as a potential defense, rather than as an element of the plaintiff's case; as such, the issue did not appear on the face of the plaintiff's complaint. 2005 WL 3663689, at *8-9 (emphasis in original). The defendants also argued that whether the plaintiffs validly assigned the Permit to the defendants raised an issue of federal law, because, "[u]nder federal regulations, an assignment of the Permit would be invalid without approval by the Secretary of the Interior"; the Court rejected this argument, because the plaintiff did not request "vindication of any assignment" in the complaint, and the Court determined the plaintiff was justified in that choice. 2005 WL 3663689, at *9. The Court further determined that the Supreme Court's decision in <u>Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.</u> did not change the result, because,

> [u]nlike <u>Grable</u>, Bar J does not premise its breach of contract claim on any point of federal law. Bar J does not assert that it has a right to recover from the Defendants because of the existence of some federal law. Bar J argues neither that the Defendants violated a federal statute nor that the [contract's] validity requires the interpretation or application of any provision of the United States Code.

2005 WL 3663689, at *12 (internal citations omitted). The Court concluded that, because the plaintiff grounded its right to relief in "basic contract law," without "referencing any federal law," the well-pleaded complaint did not raise an issue of federal law and, thus, the Court did not have federal-question jurisdiction. 2005 WL 3663689, at *13.

In <u>Olsen v. Quality Continuum Hospice, Inc,</u> 380 F. Supp. 2d 1225 (D.N.M.

2004)(Browning, J.), the Court determined that the plaintiff's claims did not present any federal questions; although the plaintiff asserted that the defendant violated the "United States Social Security Act of 1965 [and] . . . the Medicare program,"[73] the Court concluded that those provisions do not create a private right of action and, thus, did not create the plaintiff's causes of action. 380 F. Supp. 2d at 1229. The Court also determined that, because the plaintiff's causes of action were essentially medical malpractice claims and arose under New Mexico common law or New Mexico statutes, they would not depend on resolution of a question of federal law. See 380 F. Supp. 2d at 1230-31.

## OKLAHOMA CHOICE OF LAW

As the Court previously has noted, where "a plaintiff invokes a federal district court's diversity jurisdiction, the district court looks to the forum state's choice-of-law rules to determine which state's substantive law to apply." Hunt v. North Carolina Logistics, Inc., 193 F. Supp. 3d 1253 (D.N.M. 2016)(Browning, J.)(citing Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir.2005)). Oklahoma's contractual choice-of-law jurisprudence is rooted in a directive from 15 Okla. Stat. § 162, which provides: "A contract is to be interpreted according to the law and usage of the place where it is to be performed, or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." 15 Okla. Stat. § 162. Remarkably, this statutory text has remained unchanged since Oklahoma's territorial days. See Stat. 1890, § 864; R.L. 1910, § 956; Comp. Stat. § 5049 (1921)("A contract is to be interpreted according to the law and usage of the place where it is to be performed, or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."). The Supreme Court of Oklahoma held in Panama Processes v. Cities Serv. Co., 1990

---

[73] Social Security Act of 1965, Pub. L. 89-97, 79 Stat. 286, and Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, 117 Stat. 2066.

OK 66, 796 P.2d 276, that 15 Okla. Stat. § 162 does not default to the hoary <u>lex loci contractus</u> rule,[74] but rather that the state Legislature intended to make the default rule <u>lex loci solutionis</u>,[75] with <u>lex loci contractus</u> only becoming the interpretive rule when a contract does not specify where performance is supposed to occur.  <u>See</u> <u>Panama Processes v. Cities Serv. Co.</u>, 1990 OK 66, ¶ 26, 796 P.2d at 287.  The Supreme Court of Oklahoma has stated:

> Section 162 is not a declaration of the rule of *lex loci contractus*, as [the Plaintiff] maintains, but instead is a declaration that generally a contract is to be interpreted under the rule of *lex loci solutionis*, the law of the place of performance.  It is only when there is *no indication in the contract* where performance is to occur that the interpretation would apply the *lex loci contractus* rule.  In this situation, we look to the contract to determine if there is a place of performance indicated; if there is, the law of the place of performance controls under our statute, and there is no need to determine the law of the place where the contract was made, nor to adopt any other approach to determine the applicable law.

<u>Panama Processes v. Cities Serv. Co.</u>, 1990 OK 66, ¶ 26, 796 P.2d at 287.  The Supreme Court of Oklahoma later carved out two -- but only two -- exceptions to this interpretive hierarchy: (i) contracts for sales of goods under Article II of the Uniform Commercial Code; and (ii) motor vehicle insurance contracts.  <u>See</u> <u>Bohannan v. Allstate Ins. Co.</u>, 1991 OK 64, 820 P.2d 787, 795.

Oklahoma recognizes parties' selection of a particular state's law to control a contract

---

[74]Black's Law Dictionary defines this rule as "[t]he law of the place where a contract is executed or to be performed.  <u>See</u> Black's Law Dictionary 995 (10th ed. 2014).  Black's Law Dictionary then explains:

> "The *lex loci contractus* controls the nature, construction, and validity of the contract; and on this broad foundation the law of contracts, founded on necessity and commercial convenience, is said to have been originally established.  If the rule were otherwise, the citizens of one country could not safely contract, or carry on commerce, in the territories of another."

Black's Law Dictionary 995 (10th ed. 2014)( quoting 2 James Kent, <u>Commentaries on American Law</u> 454 (George Comstock ed., 11th ed. 1866).

[75]Black's Law Dictionary defines this term as "[t]he law of the place where a contract is to be performed (esp. by payment)."  Black's Law Dictionary 995 (10th ed. 2014).

agreement as long as the selected law is not contrary to Oklahoma's established public policy. See, e.g., Dean Witter Reynolds, Inc. v. Shear, 1990 OK 67 ¶ 6 n.12, 796 P.2d at 299 n.12 (stating choice-of-law clause may be invalidated if: (i) application of the chosen law is "contrary to a fundamental policy" of a state with a greater interest in the controversy; (ii) that state's law would govern absent a choice-of-law provision in the contract)(emphasis omitted)(citing Restatement (Second) of Conflict of Laws § 188 (1971))). The selection of a particular state's laws can be implicit, see Atchison, T. & S. F. Ry. Co. v. Smith, 1913 OK 162, ¶ 16, 132 P. 494, 497, or explicit, see Carmack v. Chem. Bank N.Y. Trust Co., 1975 OK 77, 536 P.2d 897. On the flip side, if another state's law would be repugnant to Oklahoma's established law or public policy, Oklahoma law will govern the contract, trumping the parties' choice of law. See Pate v. MFA Mut. Ins. Co., 1982 OK CIV APP 36, ¶ 11, 649 P.2d 809, 811 (stating that "general rule" does not apply if the law of that place is "contrary to the law or public policy of the state where enforcement of the contract is attempted")(citing Telex Corp. v. Hamilton,[76] 576 P.2d 767 (1978) and Clark v. First. Nat. Bank, 59 Okla. 2, 157 P. 96 (1916)).

Oklahoma law on what state's law Oklahoma requires federal courts to apply when a contract has multiple places of performance remains scarce, but it points in the direction of applying the law of the state of the principal place of performance. In 1913, just six years after Oklahoma became a state, Atchison, T. & S.F. Ry. Co. v. Smith, 38 Okla. 157, 132 P. 494, the Supreme Court of Oklahoma concluded that the law of the principal place of performance should govern an agreement when a contract's parties contemplate more than one place of performance. See Atchison, T. & S.F. Ry. Co. v. Smith, 132 P. at 496. In 1990, the Supreme Court of

---

[76]At least in the Westlaw version of its opinion in Pate v. MFA Mut. Ins. Co. as of April 11, 2017, the Court of Appeals of Oklahoma miscites this case as "Telex Corp. v. Hamilton, Okl.," but cites the correct reporter information. See Pate v. MFA Mut. Ins. Co., 1982 OK CIV APP 36, ¶ 11, 649 P.2d 809, 811. The Court makes a correction to the citation in the body text.

Oklahoma revisited this question for the first time in seventy-seven years in <u>Panama Processes v.</u> <u>Cities Serv. Co.</u>  In that case, the Supreme Court of Oklahoma needed to decide whether the laws of Brazil or New York should govern a letter of agreement between a minority shareholder and the majority shareholder of a Brazilian corporation. <u>See</u> <u>Panama Processes v. Cities Serv. Co.</u>, 796 P.2d at 278-79.  The parties had negotiated and signed the agreement in New York at the majority shareholder's principal place of business, but the Supreme Court of Oklahoma concluded that the contract was to be performed in major part in Brazil even though some of the contract was to be performed in New York.  <u>See</u> <u>Panama Processes v. Cities Serv. Co.</u>, 796 P.2d at 288.  The Supreme Court of Oklahoma held that Brazil's law should govern, because Brazil was the principal place of performance.  <u>See</u> <u>Panama Processes v. Cities Serv. Co.</u>, 796 P.2d at 287-88.

## <u>LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT</u>

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  <u>Herrera v. Santa Fe Pub. Sch.</u>, 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991)).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, <u>or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."</u>  <u>Celotex</u>, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a

showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Norway ASA, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.) (emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[77] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the

_____

[77]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States of America, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.")(citation and internal quotation marks omitted).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448

(1871)); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 550-55 (1999); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In <u>Scott v. Harris</u>, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was

appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.

550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

> The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County and explained:
>
> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[78]] explained that the

---

[78]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R.

blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted). See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the United States Court of Appeals for the Tenth Circuit, stated

---

32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009), and United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING MOTIONS TO STRIKE

Rule 12(f) of the Federal Rules of Civil Procedures provides:

(f) **Motion to Strike.** The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

(1) on its own; or

(2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed. R. Civ. P. 12(f). Professors Charles Wright and Arthur Miller have recognized, however, that such motions are not favored and, generally, should be denied:

The district court possesses considerable discretion in disposing of a Rule 12(f) motion to strike redundant, impertinent, immaterial, or scandalous matter. However, because federal judges have made it clear, in numerous opinions they have rendered in many substantive contexts, that Rule 12(f) motions to strike on any of these grounds are not favored, often being considered purely cosmetic or "time wasters," there appears to be general judicial agreement, as reflected in the extensive case law on the subject, that they should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy . . . .

5C C. Wright & A. Miller, <u>Federal Practice & Procedure</u> § 1382, at 433-36 (3d. ed. 2004)(footnotes omitted).  <u>Accord</u> <u>Burget v. Capital W. Sec., Inc.</u>, No. CIV-09-1015-M, 2009 WL 4807619, at *1 (W.D. Okla. December 8, 2009)(Miles-LaGrange, C.J.)(citing <u>Scherer v. U.S. Dep't of Educ.</u>, 78 F. App'x 687, 689 (10th Cir. 2003)(unpublished))("While motions to strike are generally disfavored, the decision to grant a motion to strike is within the discretion of the court.").

"Allegations will not be stricken as immaterial under this rule unless they have no possible bearing on the controversy." <u>Estate of Gonzales v. AAA Life Ins. Co.</u>, No. CIV 11-0486 JB/WDS, 2012 WL 1684599, at *5 (D.N.M. May 8, 2012)(Browning, J.)(quoting <u>Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc.</u>, No. 09-CV-0455-CVE-FHM, 2010 WL 132414, at *5 (N.D. Okla. January 8, 2010)(Egan, J.).  "The Court must be convinced that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defenses succeed." <u>Friends of Santa Fe Cnty. v. LAC Minerals, Inc.</u>, 892 F. Supp. 1333, 1343 (D.N.M. 1995)(Hansen, J.)(quoting <u>Carter-Wallace, Inc. v. Riverton Lab., Inc.</u>, 47 F.R.D. 366, 368 (S.D.N.Y. 1969)(Cannella, J.)(internal quotation marks omitted).  Professors Wright and Miller have also commented on what constitutes "immaterial" matter in the context of a motion to strike.  "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded, or a statement of unnecessary particulars in connection with and descriptive of that which is material."  5C Wright & Miller, <u>supra</u>, § 1382, at 458-60 (footnotes omitted).

Moreover, "[o]nly material included in a 'pleading' may be the subject of a motion to strike, and courts have been unwilling to construe the term broadly.  Motions, briefs, . . . memoranda, objections, or affidavits may not be attacked by the motion to strike." <u>Dubrovin v.</u>

Ball Corp. Consol. Welfare Ben. Plan for Emps., No. 08-CV-00563-WYD-KMT, 2009 WL 5210498, at *1 (D. Colo. Dec. 23, 2009)(Wiley, J.).   Accord Ysais v. N.M. Judicial Standard Comm'n, 616 F. Supp. 2d 1176, 1184 (D.N.M. 2009)(Browning, J.)(citing Searcy v. Soc. Sec. Admin., 956 F.2d 278, 1992 WL 43490, at *1, *4 (10th Cir. 1998)(unpublished table decision))("Generally . . . motions, briefs, and memoranda may not be attacked by a motion to strike.").   "The Federal Rules of Civil Procedure define 'pleadings' as a complaint or third-party complaint; an answer to a complaint, a third-party complaint, a counterclaim, or a crossclaim; and, 'if the court orders one, a reply to an answer.'"  Ysais v. N.M. Judicial Standard Comm'n, 616 F. Supp. 2d at 1184 (quoting Fed. R. Civ. P. 7(a)).

"Striking a pleading or part of a pleading is a drastic remedy and because a motion to strike may often be made as a dilatory tactic, motions to strike under Rule 12(f) generally are disfavored." Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1684599, at *5 (quoting Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc., 2010 WL 132414, at *5)(internal quotation marks omitted)).   "The exception to this principle is that a Court may 'choose to strike a filing that is not allowed by local rule, such as a surreply filed without leave of court.'"  Ysais v. N.M. Judicial Standard Comm'n, 616 F. Supp. 2d at 1184 (citing In re Hopkins, 162 F.3d 1173, 1998 WL 704710, at *3 n.6 (10th Cir. 1998)(unpublished table decision)).

For example, in Skyline Potato, Co., Inc. v. Hi-Land Potato, Co., Inc., No. CIV 10-698, 2012 WL 6846386 (D.N.M. December 31, 2012)(Browning, J.), the Court denied a motion to strike a letter filed with the Court, because the letter was not a pleading and did not pertain to either party's legal defenses or arguments -- the letter expressed one party's position regarding whether the Court should rule on summary judgment motions pending at the close of a bench trial.  See 2012 WL 6846386, at *6.   Similarly, in Great Am. Ins. Co. v. Crabtree, No. CIV 11-1129

JB/KBM, 2012 WL 3656500 (D.N.M. August 23, 2012)(Browning, J.), the Court denied a plaintiff's motion to strike exhibits attached to the defendant's motion to dismiss, because they were neither pleadings nor irrelevant. See 2012 WL 3656500, at *18. In Applied Capital, Inc. v. Gibson, 2007 WL 5685131 (D.N.M. September 27, 2007)(Browning, J.), the Court refused the plaintiff's request to strike a motion to dismiss because rule 12(f) applies only to pleadings, and not to a motion to dismiss. See 2007 WL 5685131, at *18. In Estate of Anderson v. Denny's, Inc., No. CIV 12-0605 JB/GBW, 2013 WL 690809 (D.N.M. February 7, 2013)(Browning, J.), the Court denied the plaintiff's request to strike a notice of completion of briefing for similar reasons. See 2013 WL 690809, at *12.

## DELAWARE MERGER LAW

For the first century after Delaware's 1792 state constitution authorized it to charter corporations, see Del. Const. art. VIII, § 8 (1792), the state did so at a glacial pace. For four decades, an average of only one business per year incorporated in the state.[79] Then, feeling that even this small number disadvantaged the state in business contracts,[80] the state legislature nearly brought the glacier to a standstill by imposing onerous regulations on corporate certification.[81]

---

[79]This rate is based on the Court's calculation. One incorporation took place over the time period 1792 to 1800. See 2 Del. Laws 1025-1379; 3 Del. Laws 3-113. Twelve incorporations took place 1800-1810. See 3 Del. Laws 119-399; 4 Del. Laws 3-343. Eighteen incorporations took place before enactment of a new state constitution in 1831. See 6-8 Del. Laws.

[80]In 1819, the Supreme Court of the United States held in the landmark case Dartmouth College v. Woodward, 17 U.S. (4 Wheat) 518 (1819), that a corporate charter is a contract between the state and the corporation, and that the state cannot unilaterally change a corporate charter without running afoul of Article I, Section 10 of the Constitution of the United States of America, which bars states from enacting laws which would impair the obligations of contract. See U.S. Const. art. I § 8. In response, states became warier about granting corporate charters.

[81]Under the Delaware General Incorporation Act of 1875, 15 Del. Laws 3, for instance, a business that wished to incorporate in the state needed to have at least two Delawareans sign a

The state climate began to change vis-à-vis corporations at the turn of the twentieth century. See generally Russell Carpenter Larcom, The Delaware Corporation 4 (2013)(1937). The citizenry was the first to warm to welcoming more corporations into the state, using the state constitutional convention of 1897 to supplant the state legislature's exclusive authority to incorporate businesses via specific state acts with a general corporation law. See Del. Const. art. IX, § 2 (1897). The legislature did not, however, lag too far behind. Enacting Delaware's first version of the General Corporation Law the following year, the legislature simplified incorporation procedures, lowered corporate taxes, and granted corporations broad powers. See Act of March 10, 1899, 21 Del. Laws 303.

The change's timing, from Delaware's perspective, could not have been more propitious. A quarter century of economic development since the Civil War had interlinked regional American economies as never before,[82] a truth first hammered home via a golden spike connecting east and west at Promontory Point in Utah in 1869[83] and then increasing with the rise of the first nationwide monopolies and trusts in American history. See, e.g., H.W. Brands,

---

certificate of incorporation that the business then could submit to an associate judge of the Superior Court in the county where the aspirant corporation planned to be situated. The business could submit the certificate to a judge only during a court vacation and only after having published advanced notice of this action in the country newspaper for at least thirty days. See 15 Del. Laws 3. If the associate judge found nothing objectionable or detrimental to the commonweal in the aspirant corporation's objects, articles, or conditions, then the would-be corporation needed to post notice of this action in the country newspaper for at least three weeks. See 15 Del. Laws 3. If no one raised an objection to the incorporation over that time period, then the judge -- in the next term of court -- had the option to file the incorporation certificate with the Delaware Secretary of State. See 15 Del. Laws 3.

[82]See, e.g., H.W. Brands, American Colossus: The Triumph of Capitalism, 1865-1890, at 43-69 (Oxford History of the United States)(2011).

[83]At the culmination of a three-day ceremony at Promontory Point stretching May 8-10, 1869, Civil War veterans from both the Union and the Confederacy collectively tapped a golden spike into the last tie on the transcontinental railroad. See Stephen E. Ambrose, Nothing Like It in the World: The Men Who Built the Transcontinental Railroad 356-368 (2000).

American Colossus: The Triumph of Capitalism, 1865-1890, at 43-69 (Oxford History of the United States)(2011). For the first few years, Americans seemed to get a rise out of vertical integration.[84] By the late 1880s, however, this golden age started to lose its luster for many Americans as monopolists -- in a move at least as old as Aristotle[85] and one about which Adam Smith more recently had forewarned[86] -- used monopoly power to raise prices far above the marginal costs of production.[87]

A backlash against monopolies and trusts began in the several states, fifteen of which had incorporated antitrust provisions into their constitutions by 1890. See 2 Report of the United States Industrial Commission 264 (1900-1902)(on file with the University of California)(scanned version available via Google Books at https://archive.org/details/reportsindustri29clargoog). Under the spur of then-President Benjamin Harrison, Congress took up the antitrust crusade as well, clamping down on monopolies and corporate collusion that restrained interstate commerce in the Sherman Antitrust Act of 1890, 26 Stat. 209 (1890), codified at 15 U.S.C. §§ 1-7.[88] One

---

[84]A common belief, indebted in part to an industrial application of the then-prevalent theory of Social Darwinism, was that vertical integration and national monopolization increased overall supply and the local market penetration of many consumer goods while decreasing prices thanks to economies of scale. See, e.g., Louis M. Hacker & Helene S. Zahler, 2 The Shaping of the American Tradition 809 (quoting Andrew Carnegie to this effect).

[85]See Aristotle, Politics 1259a.

[86]See Adam Smith, The Wealth of Nations 128.

[87]See, e.g., Gerald Leinwand, A History of the United States Federal Bureau of Corporations (1903-1914), at 13 (1962)(unpublished Ph.D. dissertation, New York University).

[88]For an overview of the radically different federal regulatory stance toward corporations in the years just before the Sherman Antitrust Act, see Theodore L. Taron, Congressional Concepts of Competition, 1865-1890 (1961)(unpublished Ph.D. dissertation, Yale University)(microfilmed by University Microfilms International), available with subscription via ProQuest Dissertations & Theses Global, https://search.proquest.com/docview/302130098. For

weapon in the antitrust arsenal to defeat collusion became a prohibition on any corporation acquiring stock in another corporation incorporated in another state.[89]

To sidestep state diversity, large numbers of businesses began to feel the urge to incorporate in just a few states, and the early beneficiary of this trend was New Jersey, which had rushed a statute through the state legislature shortly after the Sherman Antitrust Act was enacted that authorized New Jersey corporations to buy and sell other corporations' stock and to issue their own stock as payment.  See Edward Q. Keasbey, New Jersey and the Great Corporations, 13 Harv. L. Rev. 198, 200-04 (1899). Thousands of corporations flocked to New Jersey from New York and other states over the course of the 1890s.  See Edward Q. Keasbey, New Jersey and the Great Corporations, 13 Harv. L. Rev. at 200-02.

When an ascendant Progressive Party in New Jersey began to more tightly regulate New Jersey corporations, Delaware sensed an opportunity to transplant corporations from its Garden State neighbors.  See Joel Seligman, A Brief History of Delaware's General Corporation Law of 1899, 1 Del. J. of Corp. L. 271 (1976)("Seligman").  The Delaware state legislature passed its 1899 General Corporation Law.  An Act to Raise Revenue for This State By Taxing Certain Corporations, 22 Del. Laws 22 (1899).  The 1899 law, like the New Jersey laws it used as a template, was broadly affirmative in its statement of corporate powers.  See Seligman at 273.  It greatly simplified the process of incorporation and substantially lowered corporate taxes.  Cf.

_____

an introduction to how much of a paradigm shift the Sherman Antitrust Act was and how quickly it captured the fancy and channeled the energy of federal politicians from then- President Benjamin Harrison on down, see Charles W. Calhoun & Arthur M. Schlesinger, Benjamin Harrison 92-94 (2005).

[89]The intellectual progeny of John D. Rockefeller and the general counsel of Standard Oil, large stock purchases in other corporations had become the hallmark of trusts in the last decades of the nineteenth century, because they enabled corporations to evade state chartering restrictions on corporation size.  See Harold Underwood Faulkner, Consolidation of Business in Roosevelt, Wilson, and the Trusts 1-18 (Edwin C.  Rozwenc ed. 1950).

Seligman at 273.  Even more importantly, both because of its vivid counterpoint to Sherman Antitrust Act and for this case's purposes, the 1899 law also granted to Delaware corporations (i) the express power to conduct business in any other state, territory, colony, or foreign country; (ii) the power to hold stocks and bonds of other companies; and (iii) the power to merge.  A wave of incorporation requests quickly rolled in from New Jersey over to Dover.  When Woodrow Wilson assumed the governorship of New Jersey in 1910 and allied himself with legislators from the Progressive Party to cinch the state's corporate regulations even tighter, the wave swelled yet further. [90]  By 1932, approximately forty-two thousand corporations -- including one third of the corporations listed on the New York Stock Exchange -- called Delaware home.  See John T. Flynn, Why Corporations Leave Home, Atlantic Monthly 270 (Sept. 1932).

After World War II, more than thirty states revised their corporate laws to bite into Delaware's incorporation market share.  See William L. Cary, Federalism and Corporate Law: Reflections Upon Delaware, 83 Yale L.J. 663, 665-68 (1974).  Delaware responded by revising its own General Corporation law in 1963 to make it more corporation-friendly.  See, e.g., Law of

---

[90]Wilson made corporate regulation a cornerstone of his gubernatorial years, noting in his Message to the New Jersey Legislature on January 17, 1911, the day that he assumed the governorship:

> Corporations are no longer hobgoblins which have sprung at us out of some mysterious ambush, not yet unholy inventions of rascally rich men, not yet the puzzling devices by which ingenious lawyers build up huge rights out of a multitude of small wrongs; but merely organizations of a perfectly intelligible sort which the law has licensed for the convenience of extensive business; organizations which have proved very useful but which have for the time being slipped out of the control of the very law that gave them leave to be and that can make or unmake them at pleasure.  We have now set ourselves to control them, soberly but effectively, and to bring them thoroughly within the regulation of the law. . . . No man who wishes to enjoy the public confidence dare hold back, and, if he is wise, he will not resort to subterfuge.

Woodrow Wilson, Message to the New Jersey Legislature, January 17, 1911, reprinted in Thomas F. Fitzgerald, Manual of the Legislature of New Jersey 572 (1911).

December 31, 1963, 54 Del. Laws 724 ("WHEREAS, the General Assembly of the State of Delaware declares it the public policy of the State to maintain a favorable business climate and to encourage corporations to make Delaware their domicile . . . ."). The legislative committee tasked with drafting the revisions even directly solicited suggestions from General Foods, Shell Oil, and at least 125 other major corporations of the day. See Comment, Law for Sale: A Study of the Delaware Corporation Law of 1967, 117 U. Pa. L. Rev. 861, 867-68 (1969). Barely a decade after the 1963 revisions, Delaware was home to approximately half of the thousand largest industrial corporations in the country. See Ralph Nader, Mark Green & Joel Seligman, Constitutionalizing the Corporation: The Case for the Federal Chartering of Giant Corporations 501-05 (1976). The proportion has grown even larger over time; today approximately two out of every three corporations in the United States -- more than one million business entities in all -- have chosen Delaware as their legal home. See State of Delaware, Division of Corporations, About Agency, http://corp.delaware.gov/aboutagency.shtml (last visited Apr. 4, 2017).

**REGULATORY TEXT OF 1934 SECURITIES AND EXCHANGE ACT RULE 10B-5**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

# RELEVANT FEDERAL SECURITIES LAW

In the aftermath of Black Tuesday, the infamous Wall Street crash of 1929, see generally Liaquat Ahamed, Lords of Finance: The Bankers Who Broke the World 307-373 (2009), Congress enacted the Securities Act of 1933, 48 Stat. 74, and the Securities Exchange Act of 1934, 48 Stat. 881.  These two Acts sought to ensure legitimacy in the securities market by, among other things, regulating and preventing deceptive conduct in securities transactions." Nathan Lee, The Extraterritorial Reach of United States Securities Actions After Morrison v. National Australian Bank, 13 Rich. J. Global L. & Bus. 623, 623 (2015).

> The [Securities] Act was described as an Act "to provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof, and for other purposes."  The Securities Exchange Act . . . was described as an Act "to provide for the regulation of securities exchanges and of over-the-counter markets operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges and markets, and for other purposes."

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 727-28 (1975).  The Securities Act deals with the initial issuance of securities, and with the required contents of registration statements and prospectuses.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. at 728.  The Exchange Act, on the other hand, is primarily known for prohibiting fraud in connection with the purchase or sale of securities.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. at 728-29.

"The principal difference between § 17(a) and § 10(b) lies in the element of scienter, which the SEC must establish under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3).  By contrast, § 10(b) always requires a showing of scienter."  SEC v. Wolfson, 539 F.3d at 1256-57 (citing Aaron v. SEC, 446 U.S. 680, 697 (1980))(citation omitted)(footnote omitted).  Additionally, under § 17(a) of the Securities Act, the SEC must prove that the fraud occurred "'in the offer or sale of any securities,'" rather than "'in connection with the purchase or sale of

any security.'" SEC v. Wolfson, 539 F.3d at 1256 n.12 (quoting 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b)).

"The purpose of both [§ 10(b) and § 17(a)] is protection of investors from fraudulent practices." SEC v. Int'l Chem. Dev. Corp., 469 F.2d 20, 26 (10th Cir. 1972). "In cases of alleged misstatements in public filings submitted to the Commission, the scope of the two sections is essentially coextensive because the fraudulent conduct touches upon both purchases and sales of publicly-traded securities." SEC v. Wolfson, 539 F.3d at 1257 (citing SEC v. Power, 525 F. Supp. 2d 415, 419-20 (S.D.N.Y.2007)(Sweet, J.)).

### a. Material Statements or Omissions.

"To satisfy the first element of a 10b-5 claim, a plaintiff must allege facts showing the defendant made an untrue statement of material fact, or failed to state a material fact necessary for make the statements that were made not misleading." Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997)(citing 17 C.F.R. § 240.10b-5). The statement or omission must not merely be false now; rather, it must have been false at the time that the document containing it was created. See Grossman v. Novell, Inc., 120 F.3d at 1124 ("What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation . . . ." (quoting In re GlenFed, Inc. Sec. Litig., 42 F.3d 1548-49 (9th Cir. 1994)(en banc), superseded by statute as recognized in SEC v. Todd, 642 F.3d 1207, 1216 (9th Cir. 2011)).

A statement of fact is material if "'a reasonable person would consider it important in determining whether to buy or sell'" securities. Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d 1082, 1126 (D.N.M. 2011)(Browning, J.)(quoting Schaffer v. Evolving Sys., Inc., 29 F. Supp. 2d 1213, 1220-21 (D. Colo. 1998)(citing Grossman v. Novell,

Inc., 120 F.3d at 1119).  In a similar context -- a claim under § 14 of the Exchange Act -- the Supreme Court has said that a statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the public.  TSC Indus., Inc. v. Northway, Inc., 426 U.S. at 449.  Courts in the Tenth Circuit should "not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial."  McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 997 (10th Cir. 2002)(quoting Grossman v. Novell, Inc., 120 F.3d at 1118).  The Tenth Circuit, in the context of securities fraud claims under § 10b-5 and rule 10b-5 of the Exchange Act, has identified two categories of statements that are, as a matter of law, not materially misleading: vague statements of corporate optimism and "statements considered immaterial because other documents available to the investing public 'bespoke caution' about the subject matter of the alleged misstatement at issue."  Grossman v. Novell, 120 F.3d at 1120.  The Supreme Court, however, has recently emphasized that "[a]ny approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive."  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1318 (2011)(quoting Basic, Inc. v. Levinson, 485 U.S. at 236).  Likewise, the Supreme Court reiterated that it was "careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information."  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. at 1318 (internal quotation marks omitted)(quoting Basic, Inc. v. Levinson, 485 U.S. at 231).  In analyzing materiality in the context of a 12(b)(6) motion to dismiss, a court should consider whether the "allegations suffice to 'raise a reasonable expectation that discovery will reveal evidence' satisfying the materiality

requirement, and to 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. at 1323 (citations omitted)(quoting Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)).

"Alleged omissions create another hurdle for the plaintiff.  Unlike statements, omissions are actionable only if the plaintiff can establish that the defendant had a duty to disclose the omitted information."  Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d at 1127 (citing McDonald v. Kinder-Morgan, Inc., 287 F.3d at 998 (stating that, in the context of the Exchange Act, "a duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement.")).  See Basic v. Levinson, 485 U.S. 224, 239 n.17 (1988)("To be actionable, of course, a statement must also be misleading.  Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); United States v. Nacchio, 519 F.3d 1140, 1161-62 (10th Cir. 2008)("Information is material if it adds materially to the mix of information already available to investors."  (citing TSC Indus. v. Northway, 426 U.S. at 449), vacated in part 555 F.3d 1234 (10th Cir. 2009); Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996)(stating that, in the context of §§ 11 and 12(a)(2) of the Securities Act, "[t]he proposition that silence, absent a duty to disclose, cannot be actionably misleading, is a fixture in federal securities law"), abrogated on other grounds by 15 U.S.C. § 78u-4(B)(2)).  That principle is also found in the language of the sections of the Exchange Act at issue here.  Section 10(b) of the Exchange Act makes unlawful "any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," 15 U.S.C. § 78j(b), and § 17(a) of the Securities Act makes it unlawful "to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," 15 U.S.C. § 77q(a). A defendant can therefore be liable under these sections only if he or she omitted material information or made incomplete disclosures that would leave the reader with a false impression that is material. See Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d at 1127.

"The 'bespeaks caution' rule is an application of the common-sense principle that the more a speaker qualifies a statement, the less people will be misled if the statement turns out to be false." United States v. Nacchio, 519 F.3d at 1161-62. "At bottom, the 'bespeaks caution' doctrine stands for the 'unremarkable proposition that statements must be analyzed in context' when determining whether or not they are materially misleading." Grossman v. Novell, Inc., 120 F.3d at 1120 (quoting Rubinstein v. Collins, 20 F.3d 160, 167 (5th Cir. 1994)). See Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002)(holding that, under the bespeaks caution doctrine, "[c]ertain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering"). Plaintiffs can overcome cautionary language if the "language did not expressly warn or did not directly relate to the risk that brought about plaintiffs' loss." Halperin v. eBanker USA.com, Inc., 295 F.3d at 359. See Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008)(Crotty, J.)("[G]eneral risk disclosures in the face of specific known risks which border on certainties do not bespeak caution."). Furthermore, the bespeaks caution doctrine normally applies only to forward-looking statements such as projections or forecasts, and not to representations of present fact. See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 773 (1st Cir. 2011); Iowa Pub. Emps. Ret. Sys. v. MF

Global, Ltd., 620 F.3d 137, 142 (2d Cir. 2010).  Similarly, the bespeaks caution doctrine does not

apply to statements which "may be construed as indicating the speakers' beliefs concerning then-

present factual conditions."  Grossman v. Novell, Inc., 120 F.3d at 1123.  A court may properly

apply the bespeaks caution doctrine when considering a motion to dismiss.  See Grossman v.

Novell, Inc., 120 F.3d at 1120 n.7.

### b.    Scienter.

Scienter "refers to the mental state embracing intent to deceive, manipulate, or defraud."

Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976).  When asserting a claim under

§ 17(a)(1) of the Securities Act or § 10(b) of the Exchange Act, the SEC must establish at least

recklessness, but the SEC must establish only negligence for a claim under §§ 17(a)(2) or

17(a)(3) of the Securities Act.  See SEC v. Smart, 678 F.3d 850, 857 (10th Cir. 2012)("Section

10(b) and § 17(a)(1) require the SEC to establish at least recklessness, whereas negligence is

sufficient for § 17(a)(2) and § 17(a)(3).");  SEC v. Wolfson, 539 F.3d at 1256; C.E. Carlson, Inc.

v. SEC, 859 F.2d 1429, 1435 (10th Cir. 1988)).

The Tenth Circuit has defined recklessness sufficient to state a claim under § 10(b) of the

Exchange Act as "'conduct that is an extreme departure from the standards of ordinary care, and

which presents a danger of misleading buyers or sellers that is either known to the defendants or

is so obvious that the actor must have been aware of it.'"  Dronsejko v. Grant Thornton, 632 F.3d

at 665 (quoting City of Phila. v. Fleming Cos., Inc., 264 F.3d at 1457-58).  The Tenth Circuit has

emphasized that it "'is the danger of misleading buyers that must be actually known or so

obvious that any reasonable man would be legally bound as knowing.'"  City of Phila. v.

Fleming Cos., 264 F.3d at 1260 (emphasis in original)(quoting Schlifke v. Seafirst Corp., 866

F.2d 935, 946 (7th Cir. 1989).  In other words, when asserting a defendant's liability for an

omission,

> to establish scienter . . . the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors. The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors.

City of Phila. v. Fleming Cos., 264 F.3d at 1261. The Tenth Circuit has held that "'divergence between internal reports and external statements on the same subject' and 'disregard of the most current factual information before making statements' can be factors supporting scienter." In re Level 3 Commc'ns, Inc. Sec. Litig., 667 F.3d at 1345 (quoting Frank v. Dana Corp., 646 F.3d 954, 959 n.2 (6th Cir. 2011)(holding that inconsistencies between internal reports and defendants' public statements did not evidence scienter, because "some of the critical terms at issue" in the reports were "open to multiple interpretations," and, therefore, the "strongest inference" the Tenth Circuit could "draw is that defendants were negligent in failing to put together the pieces")). See Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc., 537 F.3d 527, 540 (5th Cir. 2008)(holding that corporate officers' receipt of internal reports did not demonstrate scienter because the reports did not necessarily include information inconsistent or at odds with the corporation's public statements).

### c.     **Primary Liability.**

Primary liability under § 10(b) of the Exchange Act is "limited in its reach to 'only the making of a material misstatement (or omission) or the commission of a manipulative act.'" SEC v. Wolfson, 539 F.3d at 1257 (quoting Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177-178 (1994)). "There is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach."

Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226 (citing SEC v. Holschuh, 694 F.2d 130, 142 (7th Cir. 1982)). Secondary actors, however, such as "accountants, lawyers, or bankers" may be liable for a primary violation of § 10(b) of the Exchange Act in "certain cases." SEC v. Wolfson, 539 F.3d at 1257.

> Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met.

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. at 191 (emphasis in original). Secondary actors, therefore, may be liable under § 10(b) of the Exchange Act "so long as they themselves made a material misstatement or omission (or committed some other fraudulent act), and each of the remaining elements of liability under § 10(b) are satisfied." SEC v. Wolfson, 539 F.3d at 1257-58 (citing Cent. Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A., 511 U.S. at 191; Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226). See Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226-27 ("[I]n order for accountants to [be primarily liable under § 10(b)], they must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors.").

### i.      Liability for Makers of Misstatements or Omissions.

"[T]he maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it." Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2303 (2011). In Janus Capital Group, Inc. v. First Derivative, the Supreme Court discussed the scope of liability under rule 10b-5 for those who, "'directly or indirectly, . . . make any untrue statement of a material fact' in connection with the purchase or sale of securities." 131 S. Ct. at 2301 (quoting 17 C.F.R. § 240.10b-5(b)). Looking to the usage and

definition of the verb "make," the Supreme Court determined that, in rule 10b-5(b), "'[t]o make any . . . statement' is thus the approximate equivalent of 'to state.'" 131 S. Ct. at 2302. The Supreme Court reasoned that a person or entity's control over the statement proscribes liability, because, without control over the statement, "a person or entity can merely suggest what to say, not 'make' a statement in its own right." 131 S. Ct. at 2302. The Supreme Court stated that this interpretation is "supported by our recent decision in Stoneridge [Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148 (2008)]," in which the Supreme Court concluded that entities which agreed to arrangements which allowed another company to mislead its auditor and investors could not be liable for the false statements, because "'nothing [the defendants] did made it necessary or inevitable for [company] to record the transactions as it did.'" Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. at 2303 (emphasis added in original)(quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. at 152-53). In Janus Capital Group, Inc. v. First Derivative Traders, the Supreme Court ruled that an investment adviser and administrator that was "significantly involved in preparing" a prospectus which contained fraudulent statements and omissions could not be liable for those misstatements and omissions under Exchange Act § 10(b) and rule 10b-5(b). 131 S. Ct. at 2299, 2305. The Supreme Court held that only the company which issued the prospectus could be liable for misstatements and omissions, because any assistance the investment advisor provided was subject to the company's ultimate control. See 131 S. Ct. at 2304-05. The Supreme Court noted that the company was legally independent from the investment advisor and administrator, and had its own board of trustees.[91] See 131 S. Ct. at 1204-05. In contrast, in a case which predates

---

[91]The Supreme Court also discussed in Janus Capital Group, Inc. v. First Derivative Traders the relevance of to whom a statement is attributed when determining who its "maker" is. 131 S. Ct. at 2302. "[I]n the ordinary case, attribution within a statement or implicit from

Janus Capital Group, Inc. v. First Derivative Traders, the Tenth Circuit held that an accountant could be primarily liable under § 10(b) of the Exchange Act for issuing opinions and certifying financial statements which contained false and misleading statements that were ultimately incorporated into a company's prospectus.  See Anixter v. Home-Stake Prod., Co., 77 F.3d at 1227.  The Supreme Court cited Anixter v. Home-Stake Prod., Co. with approval in Janus Capital Group, Inc. v. First Derivative Traders, emphasizing that the accountant's signature on an "Auditor's Report" supported the Tenth Circuit's conclusion that the accountant committed a primary securities law violation.  Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. at 2305 n.11 (internal quotation marks omitted)(citing Anixter v. Home-Stake Prod. Co., 77 F.3d at 1220 & n.4).

Before Janus Capital Group, Inc. v. First Derivative Traders, the Tenth Circuit stated that a person may be primarily liable for an alleged misstatement or omission if the person was "so involved in creating or communicating the offending misstatement (or omission) that he can fairly be said to have caused it to be made," and he "knew or should have known that the statements would reach investors."  SEC v. Wolfson, 539 F.3d at 1261, 1261 n.18 (citing Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226 n.10).  It is unclear whether this standard still applies after Janus Capital Group, Inc. v. First Derivative Traders.  In Janus Capital Group, Inc. v. First

surrounding circumstances is strong evidence that a statement was made by -- and only by -- the party to whom it is attributed."  131 S. Ct. at 2302.  Janus Capital Group, Inc. v. First Derivative Traders was a case in which a private plaintiff asserted a right under rule 10b-5(b), a cause of action which requires a private plaintiff to demonstrate reliance upon a fraudulent misstatement or omission.  See 131 S. Ct. at 2301, 2301, n.3.  Neither reliance, nor attribution, are necessary elements in an SEC enforcement action.  See SEC v. Wolfson, 539 F.3d at 1259-60.  The Tenth Circuit does not require the SEC to plead and prove reliance in an action under § 10(b) of the Exchange Act.  See Geman v. SEC, 334 F.3d at 1191.  The Tenth Circuit has reasoned that the attribution is related to a private plaintiff's need to prove reliance on an allegedly fraudulent statement, and, therefore, "given the unambiguous connection between reliance and attribution, and the fact that the SEC need not prove reliance, we decline to impose an attribution element in an SEC enforcement action."  SEC v. Wolfson, 539 F.3d at 1260, 1260 n.17.

Derivative Traders, the Supreme Court rejected an interpretation of rule 10b-5(b) that would impose liability for misstatements and omissions on those who "create" the statements. 131 S. Ct. at 2303. The Supreme Court determined that this interpretation would conflict with its previous decisions by allowing "private plaintiffs to sue a person who provides the false or misleading information that another person then puts into the statements." 131 S. Ct. at 2303. In SEC v. Wolfson, the Tenth Circuit held that a non-employee consultant could be primarily liable under § 17(a) of the Securities Act and § 10(b) of the Exchange Act, because the consultant "played an integral role in preparing those filings that contained the misstatements and omissions at issue," through drafting the filings which contained the misstatements and omissions that a company filed without modifications, and because the consultant knew from his previous experience that the filings "were calculated to reach investors." 539 F.3d at 1261. The Tenth Circuit reasoned that the consultant "caused [the company] to make the relevant statements," even though the filings were issued in the name of the company. 539 F.3d at 1261. This holding is similar to the theory of liability that the Supreme Court rejected in Janus Capital Group, Inc. v. First Derivative Traders -- an interpretation of rule 10b-5(b) which would allow a plaintiff to sue those who provide misleading information that another entity incorporates into a statement. See Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. at 2303. On the other hand, the facts before the Tenth Circuit in SEC v. Wolfson may have been sufficient to satisfy Janus Capital Group, Inc. v. First Derivative Traders' standard of "control" over the statement. In a footnote, the Tenth Circuit noted that it did not rely on the defendant's title as a "consultant" in its decision. SEC v. Wolfson, 539 F.3d at 1261 n.19. The Tenth Circuit explained that the defendant was "[f]ar from being a typical outsider to the company," but, rather, "played a central role in the management of [the company] akin to that of a core member

of management." 539 F.3d at 1261 n.19. The Tenth Circuit noted that the defendant negotiated with note holders, analyzed potential business opportunities in the industry, and "regularly interfaced with [the company's] independent auditors as a representative of the company." 539 F.3d at 1261 n.19. These facts may have demonstrated that, in addition to contributing to the creation of misstatements and omissions, the defendant controlled their communication. Were SEC v. Wolfson before the Tenth Circuit today, the Tenth Circuit, therefore, may very well reach the same conclusion as it has in the past, although with a different rationale.

### ii.  Liability for Manipulative and Deceptive Conduct.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device." 15 U.S.C. § 78(j)(b). "[C]onduct itself can be deceptive," and there is no requirement that "there must be a specific oral or written statement before there could be liability under § 10b or Rule 10b-5." Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 128 S. Ct. at 769. "Fraud by conduct is a violation of Rule 10b-5(a) and (c)." O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 898 (10th Cir. 1992). Although the Supreme Court has rejected a private cause of action for aiding and abetting securities violations, the Supreme Court has expressly reserved a cause of action for secondary actors based upon deceptive and manipulative conduct.

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5.

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. at 191 (emphasis added). See Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 128 S. Ct. at 772-73 (discussing the scope of the implied private right of action under § 10(b) of the Exchange Act, and stating

that it "continues to cover secondary actors who commit primary violations" (citing <u>Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. at 191)). Manipulation in this context is "virtually a term of art," and "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." <u>Santa Fe. Indus., Inc. v. Green</u>, 430 U.S. 462, 476 (1977).

Although the Tenth Circuit has not used the term "scheme liability," "the two circuit courts that traditionally see the most securities cases[,] the Second and Ninth Circuits," along with a majority of the other circuits, have adopted the term to describe the liability rule 10b-5(a) and (c) creates. Nicholas Fortune Schanbaum, <u>Scheme Liability: Rule 10b-5(a) and Secondary Actor Liability after Central Bank</u>, 26 Rev. Litig., 183, 197 (Winter 2007). <u>See</u> <u>Pub. Pension Fund Grp. v. KV Pharm. Co.</u>, 679 F.3d 972, 987 (8th Cir. 2012)("Claims brought under Rules 10b-5(a) and (c) are generally referred to as 'scheme liability' claims."); <u>In re DVI, Inc. Sec. Litig.</u>, 639 F.3d 623, 643 n.29 (3d Cir. 2011)("We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements."), <u>abrogated on other grounds by</u> <u>Amgen Inc. v. Conn. Ret. Plans & Trust Funds</u>, 133 S. Ct. 1184 (2013); <u>Pac. Inv. Mgmt. Co. v. Mayer Brown, LLP</u>, 603 F.3d 144, 151 (2d Cir. 2010)(addressing whether a plaintiff's "allegations in the complaint are sufficient to state a claim for 'scheme liability' under Rule 10b-5(a) and (c)"); <u>Desai v. Deutsche Bank Sec. Ltd.</u>, 573 F.3d 931, 938 (9th Cir. 2009)("Misrepresentations and most omissions fall under the prohibition of Rule 10b-5(b), whereas manipulative conduct typically constitutes 'a scheme . . . to defraud' in violation of Rule 10b-5(a) or a 'course of business which operates . . . as a fraud or deceit upon any person' in violation of Rule 10b-5(c)."); <u>Pugh v. Tribune Co.</u>, 521 F.3d 686, 696 (7th Cir. 2008)(finding that a private plaintiff

may not assert a claim of "scheme liability" under § 10(b) of the Exchange Act against a defendant who "participated in a fraudulent scheme but had no role in preparing or disseminating Tribune's financial statements or press releases"); Regents of Univ. of Ca. v. Credit Suisse First Boston (USA), Inc., 482 F.3d 372, 378-79 (5th Cir. 2007)(recognizing a claim of scheme liability under rule 10b-5(a) for a defendant's allegedly deceptive conduct, but finding that the plaintiffs failed to demonstrate reliance).

The Second, Eighth, and Ninth Circuits have held that scheme liability encompasses only actions which include deceptive conduct beyond assistance with a material misstatement or omission.  See Pub. Pension Fund Grp. v. KV Pharm. Co., 679 F.3d at 987 ("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)."); WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011)("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."); Lentell v. Merill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005)("[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c).").  This formulation is consistent with the Supreme Court's sharp division between those who may be liable as primary violators of the securities laws, and those who may be liable for only aiding and abetting the violation of another.

In Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., the Supreme Court highlighted the distinction between primary violators, and "those who do not engage in the manipulative or deceptive practice."  511 U.S. at 167.  The Supreme Court explained that, unlike primary liability under § 10(b) of the Exchange Act, "aiding and abetting liability reaches

persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." 511 U.S. at 176. The Supreme Court held in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A. that §10(b) of the Exchange Act did not include a cause of action for aiding and abetting. See 511 U.S. at 176. In response to this holding, Congress created a cause of action for aiding and abetting through the PSLRA exclusively for the SEC's enforcement. See 15 U.S.C. § 78t(e). Subsequently, in Stoneridge Investment Partners v. Scientific-Atlanta, Inc., the Supreme Court rejected a theory of scheme liability which would allow private plaintiffs to hold secondary actors liable absent any evidence that the private plaintiffs relied upon the secondary actors' deceptive or manipulative conduct, a required pleading element for private plaintiffs. See 552 U.S. at 159. Although the Supreme Court's decision was dispositive on the plaintiffs' inability to prove reliance, the Supreme Court reasoned that, to hold the secondary actors liable for another's misrepresentations would run afoul of Congress' "specific response to Central Bank in § 105 of the PSLRA," which authorizes the SEC, but not private plaintiffs, to bring claims of aiding and abetting a securities violation. 552 U.S. at 162-63. In Stoneridge Investment Partners v. Scientific-Atlanta, Inc., without evidence of reliance upon the secondary actors' deceptive conduct, the only primary securities violation which the plaintiffs could allege was that a company made material misstatements and omissions in its financial statements and to its auditors. Although the secondary actors' agreements with the company facilitated the company's misstatements and omissions, the Supreme Court determined that assisting the company's violation of § 10(b) of the Exchange Act alone was insufficient to demonstrate that the plaintiffs relied on the secondary actors' conduct. To hold otherwise would allow the plaintiffs to bring a claim for aiding and abetting, contrary to Congress' specific statutory intent in the PSLRA. See 128 S. Ct. at 770-72. Similarly, the

Second, Eighth, and Ninth Circuits' formulation of scheme liability differentiates between those who engage in manipulative or deceptive conduct, and those who merely help others to manipulate or deceive.  Just as the Supreme Court would not allow the plaintiffs to hold secondary actors liable for another's misstatements and omissions, absent evidence that the secondary actors engaged in deceptive conduct upon which the plaintiffs relied, the Second, Eight, and Ninth Circuits require the plaintiffs to demonstrate that a scheme to defraud included manipulative or deceptive conduct beyond a primary actor's misrepresentation or omission. Liability under § 10(b) of the Exchange Act, therefore, does not attach to secondary actors by "repackaging a fraudulent misrepresentation [as] a 'scheme to defraud.'"  <u>SEC v. St. Anselm Exploration Co.</u>, 936 F. Supp. 2d at 1298 (citing <u>Pub. Pension Fund. Grp. v. KV Pharm. Co.</u>, 679 F.3d at 987).

Consistent with the Supreme Court's description of manipulative conduct in the context of § 10(b) of the Exchange Act as a "term of art," <u>Santa Fe. Indus., Inc. v. Green</u>, 430 U.S. at 463, "scheme liability requires proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance," <u>SEC v. St. Anselm Exploration Co.</u>, 936 F. Supp. 2d at 1299 (citing <u>SEC v. Daifotis</u>, No. C 11-00137 WHA, 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011)). <u>See</u> <u>Pub. Pension Fund Grp. v. KV Pharm. Co.</u>, 679 F.3d at 987 (finding that the plaintiffs' allegations that corporate officers were aware of misrepresentations and omissions that a company made is insufficient to state a claim for scheme liability).  This restriction on scheme liability recognizes "the importance of maintaining a distinction among the various Rule 10b-5 claims from one another, [and] that the lines dividing the different claims are . . . 'carefully maintained' and are 'well-established.'"  <u>WPP Luxembourg Gamma Three Sarl v. Spot Runner,</u>

Inc., 655 F.3d at 1057 (quoting Desai v. Deutsche Bank Sec. Ltd., 573 F.3d 931, 941 (9th Cir. 2009)).

For example, in SEC v. Kelly, the Honorable Colleen McMahon, United States District Judge for the Southern District of New York, determined that a claim of scheme liability failed because, apart from the defendant's public representations about its advertising transactions, the transactions were not inherently deceptive. See 817 F. Supp. 2d at 344. Similarly, in SEC v. Lucent Techs., Inc., the Honorable William H. Walls, Senior United States District Judge for the District of New Jersey, held that, because the sales at issue "were legitimate business transactions and the customers purchased the product from [defendants] with every intention of using it or selling it to end customers," the SEC's allegation that the defendants schemed to defraud by not disclosing certain details of the transactions was an improper attempt to re-cast a rule 10b-5(b) claim as one for scheme liability. 610 F. Supp. 2d at 360-61. Additionally, as long as inherently deceptive conduct is present, a claim for scheme liability does not fail, because the alleged scheme was in furtherance of a misrepresentation or omission. In SEC v. Familant, 910 F. Supp. 2d 83 (D.D.C. 2012), the Honorable James E. Boasberg, United States District Judge for the District of the District of Columbia, held that allegations that the defendants had used false transactions to overstate a company's performance sufficiently pleaded scheme liability, notwithstanding that the goal of the scheme was a misrepresentation in accounting statements. See 910 F. Supp. 2d at 100. Judge Boasberg expressly rejected a reading of scheme liability which would preclude allegations of a scheme to make a misrepresentation or omission. See 910 F. Supp. 2d at 94. Judge Boasberg based this conclusion on his finding that: (i) neither § 10(b) nor rule 10b-5 of the Exchange Act's language precluded liability for a scheme to defraud through public misrepresentations: (ii) the Supreme Court has interpreted the nearly-identical

language of § 17(a) of the Securities Act as creating multiple forms of liability which are not limited by one another: and (iii) the SEC wrote rule 10b-5 specifically and unambiguously to create liability for schemes, as well as for misstatements and omissions. See 910 F. Supp. 2d at 94-95 (citing United States v. Naftalin, 441, U.S. 768, 773 (1979)); United States v. Naftalin, 441 U.S. at 773 (discussing Securities Act Section 17(a) and stating that "[e]ach succeeding prohibition is meant to cover additional kinds of illegalities -- not to narrow the reach of the prior sections. There is, therefore, no warrant for narrowing alternative provisions which the legislature has adopted with the purpose of affording added safeguards."); SEC v. Lucent Techs., Inc., 610 F. Supp. 2d at 359 (rejecting an argument that "a defendant cannot be liable if his course of conduct was merely participation in a scheme whose purpose was to make a misstatement. There is no support for such a reading and such a rule would be nonsensical."). Accordingly, scheme liability does not preclude, outright, claims based upon a scheme to misrepresent or omit material facts. See IBEW Local 90Pension Fund v. Deutsche Bank AG, 2013 WL 1223844, at *8 (finding that a plaintiff may allege "a fraudulent scheme without being tethered to whether specific statements were themselves material misstatements or omissions; such statements may simply be part of the fabric of the fraudulent scheme alleged").

## OKLAHOMA LAW REGARDING WAIVER

"Waiver is the voluntary and intentional relinquishment of a known right." Barringer v. Baptist Healthcare of Oklahoma, 2001 OK 29, 22 P.3d 695, 701 (Okla. 2001)(citing Faulkenberry v. Kansas City Southern Ry. Co., 1979 OK 142, 602 P.2d 203, 206-07). "The doctrine is essentially a matter of intention, focusing on the intent of the party against whom waiver is asserted." Barringer v. Baptist Healthcare of Oklahoma, 2001 OK 29, 22 P.3d at 701 (citing State ex rel. Gaines v. Beaver, 1945 OK 318, 166 P.2d 776; Archer v. Wedderien, 1968

OK 186, 446 P.2d 43).  "Waiver can be accomplished either expressly or implicitly." <u>Barringer v. Baptist Healthcare of Oklahoma</u>, 2001 OK 29, 22 P.3d at 701 (citing <u>Crowell v. Thoreau Center, Partnership</u>, 1981 OK 85, 631 P.2d 751, 752).

"An implied waiver can be established by action or conduct which warrants an inference of intent to relinquish." <u>Barringer v. Baptist Healthcare of Oklahoma</u>, 2001 OK 29, 22 P.3d at 701 (Okla. 2001)(citing <u>Crowell v. Thoreau Center, Partnership</u>, 1981 OK 85, 631 P.2d at 752). "When the evidence concerning waiver is conflicting or disputed, or when more than one reasonable inference may be drawn from the evidence, the existence of waiver is a question of fact for the jury."  <u>Murphy Oil USA, Inc. v. Wood</u>, 438 F.3d 1008 (10th Cir. 2006)(in an opinion that Judge Kelly wrote and Judge Seymour joined)(quoting <u>Kincaid and Associates v. Black Angus Motel, Inc.</u>, 1999 OK 54, 983 P.2d 1016, 1021). When, however, the facts are not disputed and are subject to only one interpretation, the waiver question becomes one of law for the court to decide. <u>General Finance Corp. v. Jackson</u>, 1956 OK 129, 296 P.2d 141, 143.

## OKLAHOMA LAW REGARDING EQUITBLE ESTOPPEL

"Although waiver and estoppel are closely akin, and the terms 'estoppel' and 'waiver' are often loosely used interchangeably, nevertheless, they are separate doctrines.  Indeed, there are well-recognized distinctions between the two, and one of them may exist without or apart from the other."  28 Am. Jur. 2d Estoppel and Waiver § 35.

> The essential elements necessary to establish equitable estoppel are: first, there must be a false representation or concealment of facts; second, it must have been made with actual or constructive knowledge of the real facts; third, the party to whom it was made must have been without knowledge, or the means of discovering the real facts; fourth, it must have been made with the intention that it should be acted upon; and fifth, the party to whom it was made relied on, or acted upon it to his or her detriment.

<u>Sullivan v. Buckhorn Ranch Partnership</u>, 119 P.3d 192, 202 (Okla. 2005).  <u>Accord</u> <u>Board of</u>

County Com'rs of Marshall County v. Snellgrove, 428 P.2d 272, 276 (Okla. 1967); Poteau Ford Mercury, Inc. v. Zurich American Ins. Co., 2009 WL 9508739, at *15 (Okla. Civ. App. May 8, 2009)(Adams, J.).

## OKLAHOMA LAW REGARDING THE UNCLEAN HANDS DOCTRINE

"He who seeks equity must do equity and come into court with clean hands." Story v. Hefner, 540 P.2d 562 (Okla. 1975). Accord Manufacturers Guild, Inc. v. City of Enid, 239 P.3d 986 (Okla. Civ. App. 2010). "An unclean hands defense requires showing that Plaintiffs tainted the transaction that they are challenging by undertaking the very 'fraudulent and deceitful conduct' of which they complain." Yeager v. Fort Knox Sec. Products, 602 F. App'x 423, 429 (10th Cir. 2015). "Oklahoma law declares that 'to receive equity, [a person] must do equity.'" Krumme v. Moody, 1995 OK 140, 910 P.2d 993, 996 (1995). "Equity provides no relief when its aid becomes necessary through the party's own fault." McDonald v. Humphries, 1990 OK 1262, 810 P.2d 1262, 1269 (1990).

> Under the maxim, [h]e who comes into equity must come with clean hands, a court of equity will not lend its aid in any manner to one who has been guilty of unlawful or inequitable conduct in a transaction from which he seeks relief, nor to one who has been a participant in a transaction the purpose of which was to defraud a third person, to defraud creditors, or to defraud the government . . . .

Camp v. Camp, 196 Okla. 199, 163 P.2d 970, 972 (1945)(internal quotation marks omitted).

## RELEVANT TEXT OF RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 56(d) provides:

> (d) **When Facts Are Unavailable to the Nonmovant**. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > (1) defer considering the motion or deny it;
> >
> > (2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). Before 2010, this rule was rule 56(f); rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56(d) advisory committee committee's notes to the 2010 amendments. "A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary judgment motion." Fed. R. Civ. P. 56(d) advisory committee committee's notes to the 2010 amendments. The rule permits a nonmovant to show by affidavit or declaration the need for additional discovery; a formal affidavit is thus not required. See Fed. R. Civ. P. 56(d). The rule permits a "written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit." Fed. R. Civ. P. 56(c) advisory committee committee's notes to the 2010 amendments.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the court's discretion. See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d 1550, 1553-54 (10th Cir. 1993). "Unless dilatory or lacking in merit," a party's 56[(d)] application "should be liberally treated." Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554 (citations omitted)(internal quotation marks). "The general principle of Rule 56(d) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to opposition." Price ex rel. Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000). Rule 56(d) does not require, however, that summary judgment not be entered until discovery is complete. See Price ex rel. Price v. W. Res., Inc., 232 F.3d at 784.

"Rule 56[(d)] is not a license for a fishing expedition . . . ." Lewis v. Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990). To invoke rule 56(d), the party filing the affidavit or declaration

must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  A party opposing summary judgment may not invoke rule 56(d) based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Moreover, while the summary-judgment movant's exclusive control of information weighs heavily in favor of relief under 56(d), see Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783, merely asserting such is insufficient to justify denial of summary judgment, see Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Furthermore, "if the party filing the Rule 56[(d)] affidavit has been dilatory, or the information sought is either irrelevant to the summary judgment motion or merely cumulative, no extension will be granted."  Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554 (denying a rule 56(d) request and stating that "the record reflect[ed] that plaintiffs were dilatory in pursuing discovery prior to the filing of their 56[(d)] affidavit").  See Johnson v. Holmes, 377 F. Supp. 2d 1039, 1044-45 (D.N.M. 2004)(Browning, J.)(denying a 56(d) request where plaintiff did not explain why, during the discovery period that the court allowed, he did not obtain the discovery sought in his motion).  The Tenth Circuit has summarized rule 56(d)'s requirements as follows:

> A prerequisite to granting relief pursuant to Rule 56[(d)] is an affidavit furnished by the nonmovant.  Although the affidavit need not contain evidentiary facts, it must explain why facts precluding summary judgment cannot be presented.  This includes identifying the probable facts not available and what steps have been taken to obtain these facts.  In this circuit, the nonmovant also must explain[, with specificity,] how additional time will enable him to rebut movant's allegations of no genuine issue of fact.

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783 (internal quotations and citations omitted).  See Tadlock v. Lahood, 550 F. App'x 541, 547 (10th Cir. 2013)(unpublished)(citing Price ex rel.

Price v. W. Res., Inc. for rule 56(d)'s requirements after the 2010 amendment); Douglass v. United Auto Workers Local Union 31, 188 F. App'x 656, 658 (10th Cir. 2006)(unpublished) (stating that the affidavit must state how the additional time would enable the party to meet its burden "with specificity").  A rule 56(d) affidavit or declaration must state, with specificity, what additional discovery is believed necessary.  See Burke v. Utah Transit Auth. & Local 382, 462 F.3d 1253, 1264 (10th Cir. 2006); Chavez v. Perry, 142 F. App'x 325, 334 (10th Cir. 2005) (unpublished)("To resist summary judgment on this basis (56[(d)]), a party must specifically identify what facts it seeks to discover and show how those facts would materially aid its case on the dispositive issues.").  If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery.  See Tadlock v. Lahood, 550 F. App'x at 547.

## RELEVANT SECTIONS OF THE DELAWARE MERGER STATUTE

> Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, who continuously holds such shares through the effective date of the merger or consolidation, who has otherwise complied with subsection (d) of this section and who has neither voted in favor of the merger or consolidation nor consented thereto in writing pursuant to § 228 of this title shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock under the circumstances described in subsections (b) and (c) of this section. As used in this section, the word "stockholder" means a holder of record of stock in a corporation; the words "stock" and "share" mean and include what is ordinarily meant by those words; and the words "depository receipt" mean a receipt or other instrument issued by a depository representing an interest in 1 or more shares, or fractions thereof, solely of stock of a corporation, which stock is deposited with the depository.

Del. Code tit. 8, § 262(a).

## LAW REGARDING STATING AFFIRMATIVE DEFENSES

Rule 8(c) of the Federal Rules of Civil Procedure requires that a responsive pleading must set forth certain enumerated substantive defenses as well as "any other matter constituting an avoidance or affirmative defense."  5 Charles Alan Wright et al., Federal Practice & Procedure

§ 1270 (3d ed. 2017).  Modelled off the English and New York rules in force when the Federal Rules of Civil Procedure first were drafted, see Judicature Act (The Annual Practice, 1937) O.19, r. 15; N.Y.C.P.A. (1937) § 242, rule 8(c) makes no attempt to define the concept of affirmative defense.  Instead, it obligates a defendants to plead affirmatively any of nineteen defenses that rule 8(c)(1) lists that the defendant wishes to assert.  See Fed. R. Civ. P. 8(c).  If the district court or jury hearing a case accepts that case's defendant's affirmative defense, the defense defeats that case's plaintiff's claim.  See 5 Charles Alan Wright et al., Federal Practice & Procedure § 1270 (3d ed. 2017); Rural Water Dist. No. 2 v. City of Glenpool, 698 F.3d 1270 (10th Cir. 2012) ("[O]nce the court's jurisdiction has been properly invoked in the plaintiff's complaint, the assertion of such a defense is relevant only to whether the plaintiff can make out a successful claim for relief, and not to whether the court has original jurisdiction over the claim itself."), quoting Southern New England Telephone Co. v. Global NAPs Inc., 624 F.3d 123, 132 (2d Cir. 2010)).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions: (i) where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").  The defense of limitations is the affirmative defense most likely to

be established by the uncontroverted facts in the complaint.  See 5 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1277 (3d ed. 2014).  If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.). The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense).  It appears, from case law in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not squarely addressed this practice, the Court has permitted this avoidance practice, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1208–09, 1234–38 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING RULE 56(d)

Rule 56(d) of the Federal Rules of Civil Procedure provides:

**(d)    When Facts Are Unavailable to the Nonmovant.**

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

**(1)**    defer considering the motion or deny it;

**(2)**    allow time to obtain affidavits or declarations or to take discovery; or

**(3)**    issue any other appropriate order.

Fed. R. Civ. P. 56(d).  Before 2010, this rule was rule 56(f); rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)."  Fed. R. Civ. P. 56(d) advisory committee's notes to the 2010 amendments.  "A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion."  Fed. R. Civ. P. 56(d) advisory committee's notes to the 2010 amendments.  The rule permits a nonmovant to show by affidavit or declaration the need for additional discovery; a formal affidavit is thus not required.  <u>See</u> Fed. R. Civ. P. 56(d).  The rule permits a "written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit."  Fed. R. Civ. P. 56(c) advisory committee's notes to the 2010 amendments.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the court's discretion.  <u>See</u> <u>Jensen v. Redevelopment Agency of Sandy City</u>, 998 F.2d 1550, 1553-54 (10th Cir. 1993).  "'Unless dilatory or lacking in merit,'" a party's 56[(d)] application "'should be liberally treated.'"  <u>Jensen v. Redevelopment Agency of Sandy City</u>, 998 F.2d at 1554 (quoting <u>Comm. for 1st Amend. v. Campbell</u>, 962 F.2d 1517, 1522 (10th Cir. 1992)).  "The general principle of Rule 56(d) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition."  <u>Price ex rel. Price v. W. Res., Inc.</u>, 232 F.3d 779, 783 (10th Cir.

2000).  Rule 56(d) does not require, however, that summary judgment not be entered until discovery is complete.  See Price ex rel. Price v. W. Res., Inc., 232 F.3d at 784.

"Rule 56[(d)] is not a license for a fishing expedition . . . ."  Lewis v. Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990).  To invoke rule 56(d), the party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Rule 56(d) may not be invoked based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Moreover, while the summary judgment movant's exclusive control of information weighs heavily in favor of relief under 56(d), see Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783, merely asserting that the movant has the evidence is insufficient to justify denial of summary judgment, see Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Furthermore, "if the party filing the Rule 56[(d)] affidavit has been dilatory, or the information sought is either irrelevant to the summary judgment motion or merely cumulative, no extension will be granted."  Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554 (denying a 56(d) request stating "the record reflect[ed] that plaintiffs were dilatory in pursuing discovery prior to the filing of their 56[(d)] affidavit").  See Johnson v. Holmes, 377 F. Supp. 2d 1039, 1044-45 (D.N.M. 2004)(Browning, J.), aff'd, 455 F.3d 1133 (10th Cir. 2006)(denying a 56(d) request where plaintiff did not explain why, during the discovery period that the court allowed, he did not obtain the discovery sought in his motion).  The Tenth Circuit has summarized rule 56(d)'s requirements as follows:

A prerequisite to granting relief pursuant to Rule 56[(d)] is an affidavit furnished by the nonmovant.  Although the affidavit need not contain evidentiary facts, it

> must explain why facts precluding summary judgment cannot be presented. This includes identifying the probable facts not available and what steps have been taken to obtain these facts. In this circuit, the nonmovant also must explain[, with specificity,] how additional time will enable him to rebut movant's allegations of no genuine issue of fact.

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783 (quoting Comm. for 1st Amend. v. Campbell, 962 F.2d at 1522). See Tadlock v. Lahood, 550 F. App'x at 547 (citing Price ex rel. Price v. W. Res., Inc. for the requirements of rule 56(d) after the 2010 amendment); Douglass v. United Auto Workers Local Union 31, 188 F. App'x at 658 (stating that the affidavit must state "with specificity" how the additional time would enable the party to meet its burden). A rule 56(d) affidavit or declaration must state, with specificity, what additional discovery is believed necessary. See Burke v. Utah Transit Auth. & Local 382, 462 F.3d 1253, 1264 (10th Cir. 2006); Chavez v. Perry, 142 F. App'x at 334 ("To resist summary judgment on this basis, a party must specifically identify what facts it seeks to discover and show how those facts would materially aid its case on the dispositive issues."). If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery. See Tadlock v. Lahood, 550 F. App'x at 547.

In determining whether a party has been dilatory in pursuing discovery, courts should consider: (i) "the length of the pendency of the case prior to the Rule 56[(d)] request"; (ii) "whether and when plaintiff could have anticipated its need for the requested discovery"; (iii) "the previous efforts, if any, made by plaintiff to obtain the needed information either through Rule discovery or otherwise"; (iv) "the degree and nature of discovery already undertaken"; (v) "any limitations placed upon discovery previously by the trial court"; (vi) "any prior solicitations of or provisions for discovery by the trial court"; (vii) "any warning which plaintiff might have had that, absent a speedier request, discovery might be denied and his claim

be dismissed"; and (viii) "whether the requested information was inaccessible to plaintiff, <u>e.g.</u> as when within defendant's exclusive control, or whether alternative, accessible sources existed but were foregone." <u>Paul Kadair, Inc. v. Sony Corp. of Am.</u>, 694 F.2d 1017, 1031 (5th Cir. 1983). <u>See</u> <u>Jensen v. Redevelopment Agency of Sandy City</u>, 998 F.2d at 1555 n.7 (noting that the "Fifth Circuit enumerates eight factors to be considered in determining whether a party has been dilatory in seeking discovery" (citing <u>Paul Kadair, Inc. v. Sony Corp. of Am.</u>, 694 F.2d at 1031)); <u>Klick v. Hercules, Inc.</u>, No. 90-C-1067-B at *4 n.3 (stating that <u>Paul Kadair, Inc. v. Sony Corp. of America</u> enumerates "eight factors which should be considered by the court before determining whether a party has been dilatory in conducting discovery"); <u>Patty Precision v. Brown & Sharpe Mfg. Co.</u>, 742 F.2d 1260, 1264 n.4 (1984)(same).

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.[</u>, 509 U.S. 579, 594-95 (1993)("<u>Daubert</u>")], trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, whether the opinion testimony is the product of a reliable methodology." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d at 1224. "<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u> requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d at 1224.

1. **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994).

Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004).

The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be

helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Electric Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

2.     **The Standard in** Daubert.

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. 03-1160 BB/LAM, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)). The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert, 509 U.S. 594-95. The court is also to consider: (i) whether the witness' conclusion represents an "unfounded extrapolation" from the data; (ii) whether the witness has adequately accounted for alternative explanations for the effect at issue; (iii) whether the opinion was

reached for the purposes of litigation or as the result of independent studies; or (iv) whether it unduly relies on anecdotal evidence.   See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).   The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable."   [Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)](quoting Daubert, 509 U.S. at 589 . . .).   This obligation involves a two-part inquiry.   Id.   "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'"   Id. (quoting Daubert, 509 U.S. at 592 . . . .).   In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ."   Id.   (quoting Daubert, 509 U.S. at 592-93 . . .).   Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand."   Daubert, 509 U.S. at 597.

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted).   "The second inquiry is related to the first.   Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case . . . .   The evidence must have a valid scientific connection to the disputed facts in the case."   Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert, 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court)); Daubert, 509 U.S. at 591)).   If the expert's proffered testimony fails on the first prong, the Court does not reach the second prong.   See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.

In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert v. Merrell Dow Pharm., Inc., to non-scientific expert testimony.   See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on

'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow Pharm., Inc., will not apply to all cases:

> Our emphasis on the word 'may' thus reflects Daubert's description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert, the court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619 JB/DJS, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert, 509 U.S. at 595). "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations omitted)(internal quotation marks omitted).

The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury. See Norris v. Baxter Healthcare Corp., 397 F.3d at 881. The United States Court of Appeals for the Ninth Circuit noted in Claar v. Burlington Northern Railroad Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03 (citation omitted).

> Once reliability is established, however, it is still within the district court's
> discretion to determine whether expert testimony will be helpful to the trier of
> fact. In making that determination, the court should consider, among other
> factors, the testimony's relevance, the jurors' common knowledge and experience,
> and whether the expert's testimony may usurp the jury's primary role as the
> evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *10 (Dec. 15,

2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir.

2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.

See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated

connective tissue disease is an untested hypothesis. At worst, the link has been tested and found

to be untenable. Therefore, there is no scientific basis for any expert testimony as to its specific

presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d at 1228 ("An untested

hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not

required "to admit opinion evidence that is connected to existing data only by the ipse dixit of

the expert. The court may conclude that there is simply too great an analytical gap between the

data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). See

Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of

similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp.

2d 1239, 1244 (N.D. Okla. 1998)("Test results on animals are not necessarily reliable evidence

of the same reaction in humans.").

Courts have also excluded experts' opinions when the experts depart from their own

established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir.

2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N. R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3. The Necessity of Evaluating an Issue Under Daubert.

Daubert's restrictions apply to both "novel" expert testimony and "well-established propositions." Daubert, 509 U.S. at 593 n.11 ("Although the Frye[92] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." Daubert, 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert, 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . ." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the

---

[92]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule Fed. R. Evid. 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. at 1014.

courts are not unfamiliar with the [polymerase chain reaction] methodology, and in fact some courts have indicated their acceptance of it.").

## LAW REGARDING EXPERT TESTIMONY ON ULTIMATE ISSUES

Rule 704 of the Federal Rules of Evidence states:

(a)     **In General -- Not Automatically Objectionable.**   An opinion is not objectionable just because it embraces an ultimate issue.

(b)     **Exception.**   In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

Fed. R. Evid. 704.   "Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact."   Vondrak v. City of Las Cruces, No. 05-0172, 2009 WL 3241555, at *10 (D.N.M. Aug. 25, 2009)(Browning, J.).   "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury."   Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10 (quoting 1 K. Broun, McCormick on Evidence § 12 (6th ed. 2006 update)).   The Federal Rules of Evidence reflect that the ultimate-issue rule no longer applies.   See United States v. Smith, 156 F.3d 1046, 1054 (10th Cir. 1998).   Although rule 704(a) permits an expert to testify about areas that embrace an ultimate issue, there are some other limitations, aside from those that rule 704(b) expresses, regarding testimony on ultimate issues.

Expert witnesses are permitted to testify regarding a broad scope of matters.   First, experts may testify regarding ultimate questions of fact.   See Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue."); United States v. Richter, 796 F.3d 1173, 1195 (10th Cir. 2015)("Federal Rule of Evidence 704 allows an expert witness to testify about an ultimate question of fact.").   Second, experts may refer to the law in expressing their

opinions.  See United States v. Bedford, 536 F.3d 1148, 1158 (10th Cir. 2008); Specht v. Jensen, 853 F.2d 805, 809 (10th Cir. 1988)("We recognize that a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible.").  Third, experts may testify "to facts or opinions from which the jury could conclude or infer that the defendant had the requisite mental state."  United States v. Ganadonegro, No. 09-0312, 2012 WL 592170, at *5 (D.N.M. Feb. 17, 2012)(Browning, J.)(citing United States v. Torres, 53 F.3d 1129, 1141-42 (10th Cir. 1995)).  In short, "[p]ermissible testimony provides the jury with the tools to evaluate an expert's ultimate conclusion and focuses on questions of fact that are amenable to the scientific, technical, or other specialized knowledge within the expert's field."  United States v. Richter, 796 F.3d at 1195.

The Tenth Circuit has also barred numerous forms of expert testimony.  "Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state[.]"  United States v. Ganadonegro, 2012 WL 592170, at *5.  "[Rules 701, 702, and 403] afford ample assurances against the admission of opinions [under rule 704] which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day."  United States v. Barile, 286 F.3d 749, 759-60 (4th Cir. 2002).  Expert testimony is similarly inadmissible when a jury can evaluate the matter itself.  In U.S. Rodella, No. CR 14-2783 JB, 2014 WL 6634154, (D.N.M. Nov. 18, 2014)(Browning, J.), the United States alleged that the defendant used unreasonable force during an unlawful arrest.  See 2014 WL 6634154, at *1.  The defendant attempted to introduce expert testimony that the arrestee's booking photograph did not show evidence of bruising.  See 2014 WL 6634154, at *18.  The Court rejected this evidence, explaining:

> While Dr. Sanders' methodology is detailed, his methodology boils down to
> looking at the photograph and deciding whether Tafoya's face appears to be

bruised. Whether a person's face appears to be bruised or swollen falls within a juror's common knowledge and experience, and permitting expert testimony on the issue would usurp the jury's primary role as the evaluator of evidence.

2014 WL 6634154, at *18 (quotations omitted). Expert testimony is likely inadmissible when the expert's testimony tracks the language of the legal principle or statute at issue or when terms employed have a specialized legal meaning. See United States v. Perkins, 470 F.3d at 158. In Vondrak v. City of Las Cruces, for example, the defendant sought to introduce testimony from an experienced police officer to show that a police officer reasonably handcuffed the plaintiff during an arrest for driving under the influence. See 2009 WL 3241555, at *1. The police officer stated in his report that the defendant acted reasonably and that the amount of time the plaintiff spent in handcuffs was reasonable. See 2009 WL 3241555, at *18. The Court rejected this evidence, explaining that it impermissibly applied the law to the facts:

Tipton may not say that McCants acted reasonably, because such testimony involves the application of a legal standard to the facts. . . . [W]hile the ultimate evidence rule has been abolished outside of the context of rule 704(b), experts still are not allowed to express opinions involving the application of legal standards to facts. Okland Oil Co. v. Conoco Inc., 144 F.3d 1308, 1328 (10th Cir. 1998)("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts."). Tipton therefore may not express an opinion that the length of time that Vondrak spent in handcuffs was reasonable.

2009 WL 3241555, at *18.

The distinction between permissible and impermissible expert testimony is not always obvious. See United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006)("The line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern."); United States v. Simpson, 7 F.3d 186, 189 (10th Cir. 1993)("In this case, defense counsel sought to admit testimony by the expert as to whether the transactions in question constituted misapplication or concealment. Whether or not this proffered testimony amounts to a legal conclusion, devoid of helpfulness to the trier of fact, is a close question."); 3-

704 Federal Rules of Evidence Manual § 704.02 (2015)("Despite the … Court's effort to distinguish ultimate factual conclusions from ultimate legal conclusions, the distinction can be blurry.").  In 1991, for example, the Tenth Circuit stated that "an expert may not state legal conclusions drawn by applying the law to the facts."  <u>A.E. By & Through Evans v. Indep. Sch. Dist. No. 25, of Adair Cty., Okl.</u>, 936 F.2d 472, 476 (10th Cir. 1991).  More recently, however, it has explained that witnesses "are permitted to testify about how the law applies to a certain set of facts, so long as they provide adequate explanations for their conclusions."  <u>United States v. Richter</u>, 796 F.3d at 1196.  It is unclear how an expert witness could describe "how the law applies to a certain set of facts" without reaching a "legal conclusion."  Cases discussing these issues are not always clear.  In <u>United States v. Buchanan</u>, 787 F.2d 477 (10th Cir. 1986), an officer with the Bureau of Alcohol, Tobacco and Firearms testified that a firebomb would "have to be registered" with his agency.  787 F.2d at 483.  The defendant objected on the grounds that the testimony "constituted an improper legal conclusion."  787 F.2d at 484.  The Tenth Circuit noted that "[t]he question before the jury involved the consideration of a particular homemade device against an array of statutory definitions," but nonetheless affirmed the district court's decision to admit the testimony.  787 F.2d at 483.  It explained:

> While unadorned legal conclusions are impermissible, *see Frase v. Henry,* 444 F.2d 1228, 1231 (10th Cir. 1971), courts have allowed the expression of expert opinions on ultimate issues of fact.  *See, e.g., United States v. Logan,* 641 F.2d 860, 863 (10th Cir. 1981).  Experts are allowed to testify that certain drugs come within a particular statutory classification, *see United States v. Carroll,* 518 F.2d 187, 188 (6th Cir. 1975), and that certain expenses are deductible under the federal tax laws, *see United States v. Fogg,* 652 F.2d 551, 556–57 (5th Cir. 1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1751, 72 L.Ed.2d 162 (1982).

787 F.2d at 484.  The Tenth Circuit placed the officer's testimony into the "ultimate issues of fact" category.  787 F.2d at 484.  <u>See United States v. Bedford</u>, 536 F.3d 1148, 1158 (10th Cir. 2008)("[W]e agree that a properly qualified IRS agent may analyze a transaction and give expert

testimony about its tax consequences.")(quotation omitted).

"Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state; it does not prevent an expert from testifying to facts or opinions from which the jury could conclude or infer that the defendant had the requisite mental state." United States v. Ganadonegro, 2012 WL 592170, at *5 (D.N.M. Feb. 17, 2012)(Browning, J.)(citing United States v. Torres, 53 F.3d 1129, 1141-42 (10th Cir. 1995)). The restrictions in rule 704(b) do not apply to lay witnesses, see United States v. Goodman, 633 F.3d 963, 968 (10th Cir. 2011), although the lay witnesses' testimony must still be helpful to the trier of fact to satisfy rule 701, see Fed. R. Evid. 701(b). "[Rules 701, 702, and 403] afford ample assurances against the admission of opinions [under rule 704] which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day." United States v. Barile, 286 F.3d 749, 759-60 (4th Cir. 2002). Pursuant to rule 704, it is the Court's task "to distinguish [helpful] opinion testimony that embraces an ultimate fact from [unhelpful] opinion testimony that states a legal conclusion." United States v. Perkins, 470 F.3d at 158 (internal quotation marks omitted). In making that determination, a court should consider whether the question tracks the language of the legal principle or statute at issue, and then consider whether any terms employed have a specialized legal meaning. See United States v. Perkins, 470 F.3d at 158.

## LAW REGARDING RULE 401 OF THE FEDERAL RULES OF EVIDENCE

The threshold issue in determining the admissibility of evidence is relevance. As a baseline, under the Federal Rules of Evidence, all evidence that is relevant is admissible -- unless another law or rule excludes the evidence -- and any evidence that is not relevant is not admissible. See Fed. R. Evid. 402. The standard for relevance is liberal. See United States v. Leonard, 439 F.3d 648, 651 (10th Cir. 2006)("Rule 401 is a liberal standard.")(citing United

States v. McVeigh, 153 F.3d 1166, 1190 (10th Cir. 1998)).  The evidence need only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  See United States v. Leonard, 439 F.3d at 651.  "[A] fact is 'of consequence' when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict," but it only needs to have "any tendency" to do so.  United States v. Jordan, 485 F.3d 1214, 1218 (10th Cir. 2007).  See United States v. Leonard, 439 F.3d at 651; United States v. McVeigh, 153 F.3d at 1190.  Although the threshold burden is low, the rules do "not sanction the carte blanche admission of whatever evidence a defendant would like.  The trial judge is the gatekeeper under the Rules of Evidence."  United States v. Jordan, 485 F.3d at 1218.

### LAW REGARDING RULE 403 OF THE FEDERAL RULES OF EVIDENCE

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."  United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)).  The United States Court of Appeals for the Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and

should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). As the Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(omission in case but not quoted treatise)(quoting 1 Steven A. Childress & Martha S. Davis, Federal Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999). Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 543 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 453 F.3d at

1301 (quoting Fed. R. Evid. 403 advisory committee's notes).

## LAW REGARDING RULE 408 OF THE FEDERAL RULES OF EVIDENCE

Rule 408 of the Federal Rules of Evidence reads as follows:

(a) **Prohibited Uses**. Evidence of the following is not admissible -- on behalf of any party -- either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

> (1) furnishing, promising, or offering -- or accepting, promising to accept, or offering to accept -- a valuable consideration in compromising or attempting to compromise the claim; and

> (2) conduct or a statement made during compromise negotiations about the claim -- except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

(b) **Exceptions**. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408. Various United States Courts of Appeals have interpreted rule 408 to make inadmissible only statements that (i) are made in settlement negotiations, see, e.g., Mendelovitz v. Adolph Coors Co., 693 F.2d 570 (5th Cir. 1982); Trans Union Credit Information Co. v. Associated Credit Services, Inc., 805 F.2d 188 (6th Cir. 1986); General Leaseways, Inc. v. National Truck Leasing Ass'n, 830 F.2d 716 (7th Cir. 1987); Vulcan Hart Corp. (St. Louis Div.) v. N.L.R.B., 718 F.2d 269 (8th Cir. 1983); (ii) relate to issues involved in the proceedings, see, e.g., Southern Pacific Transp. Co. v. Chabert, 973 F.2d 441 (5th Cir. 1992); Vulcan Hart Corp. (St. Louis Div.) v. N.L.R.B., 718 F.2d at 269; and (iii) offer to compromise or settle any claim in the action being litigated, see, e.g., Mendelovitz v. Adolph Coors Co., 693 F.2d at 570; General Leaseways, Inc. v. National Truck Leasing Ass'n, 830 F.2d at 716.

> [E]ven where the settlement relates to prior claims that arguably arose out of different events and transactions, where these claims are related inasmuch as they arose in the course of the same large scale project operated by the defendant, and

the claims sued upon are similar enough to be relevant, there is a sufficient basis for bringing the evidence concerning the compromises and settlements under the umbrella of Fed. R. Evid. 408.

12 John Bourdeau et al., Federal Procedure § 33:238 (2017)(citing Bradbury v. Phillips Petroleum Co., 815 F.2d 1356 (10th Cir. 1987), an opinion that Judge Barrett wrote and then-Chief Judge Holloway and Judge Logan joined, in which seven prior claims brought by landowners arose in the course of the same large scale uranium exploration project conducted by the defendant). "Fed. R. Evid. 408 does not prevent the same party who submitted the material in the course of settlement discussions from using the material later at trial, because Fed. R. Evid. 408 is designed to avoid one party using material against the party who submitted the material for settlement purposes." 12 John Bourdeau et al., Federal Procedure § 33:238 (2017)(citing Hulter v. C.I.R., 83 T.C. 663 (1984)). The 2006 amendment to rule 408 "excludes compromise evidence even when a party seeks to admit its own settlement offer or statements made in settlement negotiations. See 12 John Bourdeau et al., Federal Procedure § 33:238 (2017)(citing Advisory Committee Notes to Fed. R. Evid. 408 (2006 Amendment)).

Courts have regarded discussions between two parties as settlement negotiations if: (i) the parties met to talk about their interpretation of the disputed matter, with outside counsels' assistance, after the plaintiff filed an action, see Trans Union Credit Information Co. v. Associated Credit Services, Inc., 805 F.2d at 189-93; Olin Corp. v. Insurance Co. of North America, 603 F. Supp. 445 (S.D.N.Y. 1985), on reargument, 607 F. Supp. 1377 (S.D.N.Y. 1985); (ii) parties' counsel agreed that the discussions in the meeting would not be later used for any purpose, see Trans Union Credit Information Co. v. Associated Credit Services, Inc., 805 F.2d at 189-93; and (iii) parties' counsel conceded in a written communication between themselves that litigation was possible, see Olin Corp. v. Insurance Co. of North America, 603 F.

Supp. at 445.

If litigation has not yet been threatened, communications between the parties are not considered compromise negotiations.  See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365 (10th Cir. 1977)(an opinion that then-Chief Judge Lewis wrote and Judges Pickett and Barrett joined).  In business communications between companies which have not crystallized to such a point of threatened litigation, "an admission in a conversation during an informal investigation, an effort to head off a criminal prosecution rather than resolve a civil claim, and a mere effort to buy time in which to pay an obligation, even though the validity of the obligation is later disputed[,] have been considered admissible as outside the rule."  12 John Bourdeau et al., Federal Procedure § 33:239 (2017)(citations omitted).  An itemized bill or a demand for payment, even under threat of legal action, is not a settlement offer that rule 408 excludes.  See Winchester Packaging, Inc. v. Mobil Chemical Co., 14 F.3d 316 (7th Cir. 1994).

## RELEVANT TEXT FROM THE OKLAHOMA STATUTES

CONSENT OF SHAREHOLDERS IN LIEU OF MEETING

A.   Except as provided in subsection B of this section or unless otherwise provided for in the certificate of incorporation, any action required by the provisions of the Oklahoma General Corporation Act to be taken at any annual or special meeting of shareholders or any action which may be taken at any annual or special meeting of shareholders, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take the action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the corporation by delivery to its registered office in this state, its principal place of business, or an officer or agent of the corporation having custody of the book in which proceedings of meetings of shareholders are recorded.  Delivery made to a corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

MERGER OR CONSOLIDATION OF DOMESTIC CORPORATIONS

A.  Any two or more corporations existing under the laws of this state may merge into a single corporation, which may be any one of the constituent corporations or may consolidate into a new corporation formed by the consolidation, pursuant to an agreement of merger or consolidation, as the case may be, complying and approved in accordance with the provisions of this section.

B.  The board of directors of each corporation which desires to merge or consolidate shall adopt a resolution approving an agreement of merger or consolidation and declaring its advisability.  The agreement shall state:

1.  The terms and conditions of the merger or consolidation;

2.  The mode of carrying the same into effect;

3.  In the case of a merger, the amendments or changes in the certificate of incorporation of the surviving corporation as are desired to be effected by the merger, or, if no amendments or changes are desired, a statement that the certificate of incorporation of the surviving corporation shall be its certificate of incorporation of the surviving or resulting corporation;

4.  In the case of a consolidation, that the certificate of incorporation of the resulting corporation shall be as is set forth in an attachment to the agreement;

5.  The manner, if any, of converting the shares of each of the constituent corporations into shares or other securities of the corporation surviving or resulting from the merger or consolidation, or of canceling some or all of the shares, and, if any shares of any of the constituent corporations are not to remain outstanding, to be converted solely into shares or other securities of the surviving or resulting corporation or to be canceled, the cash, property, rights, or securities of any other corporation or entity which the holders of the shares are to receive in exchange for or upon conversion of the shares and the surrender of any certificates evidencing them, which cash, property, rights, or securities of any other corporation or entity may be in addition to or in lieu of shares or other securities of the surviving or resulting corporation; and

6.  Other details or provisions as are deemed desirable, including

without limiting the generality of the foregoing, a provision for the payment of cash in lieu of the issuance or recognition of fractional shares, interests or rights, or for any other arrangement with respect thereto, consistent with the provisions of Section 1036 of this title. The agreement so adopted shall be executed and acknowledged in accordance with the provisions of Section 1007 of this title. Any of the terms of the agreement of merger or consolidation may be made dependent upon facts ascertainable outside of the agreement; provided, that the manner in which these facts shall operate upon the terms of the agreement is clearly and expressly set forth in the agreement of merger or consolidation. The term "facts" as used in this paragraph, includes, but is not limited to, the occurrence of any event, including a determination or action by any person or body, including the corporation.

C. The agreement required by the provisions of subsection B of this section shall be submitted to the shareholders of each constituent corporation at an annual or special meeting thereof for the purpose of acting on the agreement. Due notice of the time, place, and purpose of the meeting shall be mailed to each holder of stock whether voting or nonvoting, of the corporation at the address which appears on the records of the corporation, at least twenty (20) days before the date of the meeting. The notice shall contain a copy of the agreement or a brief summary thereof, as the directors shall deem advisable; provided, however, the notice shall be effective only with respect to mergers or consolidations for which the notice of the shareholders meeting to vote thereon has been mailed after November 1, 1988. At the meeting the agreement shall be considered and a vote taken for its adoption or rejection. If a majority of the outstanding stock of the corporation entitled to vote thereon shall be voted for the adoption of the agreement, that fact shall be certified on the agreement by the secretary or the assistant secretary of the corporation. If the agreement shall be so adopted and certified by each constituent corporation, it shall then be filed and shall become effective in accordance with the provisions of Section 1007 of this title. In lieu of filing an agreement of merger or consolidation required by this section, the surviving or resulting corporation may file a certificate of merger or consolidation executed in accordance with the provisions of Section 1007 of this title and which states:

    1. The name and state of incorporation of each of the constituent corporations;

    2. That an agreement of merger or consolidation has been approved, adopted, certified, executed, and acknowledged by each of the constituent corporations in accordance with the provisions of this section;

    3. The name of the surviving or resulting corporation;

4. In the case of a merger, the amendments or changes in the certificate of incorporation of the surviving corporation, which may be amended and restated, that are desired to be effected by the merger, or, if no amendments or changes are desired, a statement that the certificate of incorporation of the surviving corporation shall be its certificate of incorporation;

5. In the case of a consolidation, that the certificate of incorporation of the resulting corporation shall be as is set forth in an attachment to the certificate;

6. That the executed agreement of consolidation or merger is on file at the principal place of business of the surviving corporation, stating the address thereof; and

7. That a copy of the agreement of consolidation or merger will be furnished by the surviving corporation, on request and without cost, to any shareholder of any constituent corporation. For purposes of Sections 1084 and 1086 of this title, the term "shareholder" shall be deemed to include "member".

D. Any agreement of merger or consolidation may contain a provision that at any time prior to the time that the agreement, or a certificate filed with the Secretary of State in lieu thereof, becomes effective in accordance with Section 1007 of this title, the agreement may be terminated by the board of directors of any constituent corporation notwithstanding approval of the agreement by the shareholders of all or any of the constituent corporations; provided, if the agreement of merger or consolidation is terminated after the filing of the agreement, or a certificate filed with the Secretary of State in lieu thereof, but before the agreement or certificate has become effective, a certificate of termination of merger or consolidation shall be filed in accordance with Section 1007 of this title. Any agreement of merger or consolidation may contain a provision that the boards of directors of the constituent corporations may amend the agreement at any time prior to the time that the agreement, or a certificate filed with the Secretary of State in lieu thereof, becomes effective in accordance with Section 1007 of this title; provided, that an amendment made subsequent to the adoption of the agreement by the shareholders of any constituent corporation shall not:

1. Alter or change the amount or kind of shares, securities, cash, property, or rights to be received in exchange for or on conversion of all or any of the shares of any class or series thereof of the constituent corporation;

2. Alter or change any term of the certificate of incorporation of the surviving corporation to be effected by the merger or consolidation; or

3.   Alter or change any of the terms and conditions of the agreement if an alteration or change would adversely affect the holders of any class or series thereof of the constituent corporation.

If the agreement of merger or consolidation is amended after the filing of the agreement, or a certificate in lieu thereof, with the Secretary of State, but before the agreement or certificate has become effective, a certificate of amendment of merger or consolidation shall be filed in accordance with Section 1007 of this title.

E.   In the case of a merger, the certificate of incorporation of the surviving corporation shall automatically be amended to the extent, if any, that changes in the certificate of incorporation are set forth in the certificate of merger.

F.   Notwithstanding the requirements of subsection C of this section, unless required by its certificate of incorporation, no vote of shareholders of a constituent corporation surviving a merger shall be necessary to authorize a merger if:

1.   The agreement of merger does not amend in any respect the certificate of incorporation of the constituent corporation;

2.   Each share of stock of the constituent corporation outstanding immediately prior to the effective date of the merger is to be an identical outstanding or treasury share of the surviving corporation after the effective date of the merger; and

3.   Either no shares of common stock of the surviving corporation and no shares, securities, or obligations convertible into such stock are to be issued or delivered under the plan of merger, or the authorized unissued shares or the treasury shares of common stock of the surviving corporation to be issued or delivered under the plan of merger plus those initially issuable upon conversion of any other shares, securities, or obligations to be issued or delivered under the plan do not exceed twenty percent (20%) of the shares of common stock of the constituent corporation outstanding immediately prior to the effective date of the merger.  No vote of shareholders of a constituent corporation shall be necessary to authorize a merger or consolidation if no shares of the stock of the corporation shall have been issued prior to the adoption by the board of directors of the resolution approving the agreement of merger or consolidation.  If an agreement of merger is adopted by the constituent corporation surviving the merger, by action of its board of directors and without any vote of its shareholders

pursuant to the provisions of this subsection, the secretary or assistant secretary of that corporation shall certify on the agreement that the agreement has been adopted pursuant to the provisions of this subsection and:

a.     if it has been adopted pursuant to paragraph 1 of this subsection, that the conditions specified have been satisfied, or

b.     if it has been adopted pursuant to paragraph 2 of this subsection, that no shares of stock of the corporation were issued prior to the adoption by the board of directors of the resolution approving the agreement of merger or consolidation.

The agreement so adopted and certified shall then be filed and shall become effective in accordance with the provisions of Section 1007 of this title. Filing shall constitute a representation by the person who executes the certificate that the facts stated in the certificate remain true immediately prior to filing.

G.

1.     Notwithstanding the requirements of subsection C of this section, unless expressly required by its certificate of incorporation, no vote of shareholders of a constituent corporation shall be necessary to authorize a merger with or into a single direct or indirect wholly owned subsidiary of the constituent corporation if:

a.   the constituent corporation and the direct or indirect wholly owned subsidiary of the constituent corporation are the only constituent entities to the merger,

b.   each share or fraction of a share of the capital stock of the constituent corporation outstanding immediately before the effective time of the merger is converted in the merger into a share or equal fraction of share of capital stock of a holding company having the same designations, rights, powers, and preferences, and the qualifications, limitations, and restrictions thereof, as the share of stock of the constituent corporation being converted

in the merger,

c.   the holding company and the constituent corporation are corporations of this state and the direct or indirect wholly owned subsidiary that is the other constituent entity to the merger is a corporation or limited liability company of this state,

d.   the certificate of incorporation and bylaws of the holding company immediately following the effective time of the merger contain provisions identical to the certificate of incorporation and bylaws of the constituent corporation immediately before the effective time of the merger, other than provisions, if any, regarding the incorporator or incorporators, the corporate name, the registered office and agent, the initial board of directors, and the initial subscribers of shares and provisions contained in any amendment to the certificate of incorporation as were necessary to effect a change, exchange, reclassification, subdivision, combination or cancellation of stock, if a change, exchange, reclassification, or cancellation has become effective,

e.   as a result of the merger, the constituent corporation or its successor corporation becomes or remains a direct or indirect wholly owned subsidiary of the holding company,

f.   the directors of the constituent corporation become or remain the directors of the holding company upon the effective time of the merger,

g.   the organizational documents of the surviving entity immediately following the effective time of the merger contain provisions identical to the certificate of incorporation of the constituent corporation immediately before the effective time of the merger, other than provisions, if any, regarding the incorporator or incorporators, the corporate or entity name, the registered office and agent, the initial board of directors and the initial subscribers for shares, references to members rather than shareholders, references to interests, units or the

like rather than stock or shares, references to managers, managing members or other members of the governing body rather than directors and such provisions contained in any amendment to the certificate of incorporation as were necessary to effect a change, exchange, reclassification, subdivision, combination or cancellation of stock, if such change, exchange, reclassification, subdivision, combination or cancellation has become effective; provided, however, that:

(1) if the organizational documents of the surviving entity do not contain the following provisions, they shall be amended in the merger to contain provisions requiring that:

(a) any act or transaction by or involving the surviving entity, other than the election or removal of directors or managers, managing members or other members of the governing body of the surviving entity, that requires for its adoption under this act or its organizational documents the approval of the shareholders or members of the surviving entity shall, by specific reference to this subsection, require, in addition, the approval of the shareholders of the holding company (or any successor by merger), by the same vote as is required by

this act and/or by the organizational documents of the surviving entity; provided, however, that for purposes of this subdivision, any surviving entity that is not a corporation shall include in such amendment a requirement that the approval of the shareholders of the holding company be obtained for any act or transaction by or involving the surviving entity, other than the election or removal of directors or managers, managing members or other members of the governing body of the surviving entity, which would require the approval of the shareholders of the surviving entity if the surviving entity were a corporation subject to this act,

(b) any amendment of the organizational documents of a surviving entity that is not a corporation, which amendment would, if adopted by a corporation subject to this act, be required to be included in the certificate of

incorporation of such corporation, shall, by specific reference to this subsection, require, in addition, the approval of the shareholders of the holding company, or any successor by merger, by the same vote as is required by this act and/or by the organizational documents of the surviving entity, and

(c) the business and affairs of a surviving entity that is not a corporation shall be managed by or under the direction of a board of directors, board of managers or other governing body consisting of individuals who are subject to the same fiduciary duties applicable to, and who are liable for breach of such duties to the same extent as, directors of a corporation subject to this act, and

(2) the organizational documents of the surviving entity may be amended in the merger:

(a) to reduce the number of classes and shares of capital stock or other equity interests or units that

the surviving entity is authorized to issue, and

(b) to eliminate any provision authorized by subsection D of Section 1027 of this title; and

h. the shareholders of the constituent corporation do not recognize gain or loss for federal income tax purposes as determined by the board of directors of the constituent corporation.

neither division (1) of subparagraph g of paragraph 1 of this subsection nor any provision of a surviving entity's organizational documents required by division (1) of subparagraph g of paragraph 1 of this subsection shall be deemed or construed to require approval of the shareholders of the holding company to elect or remove directors or managers, managing members or other members of the governing body of the surviving entity.

(2) As used in this subsection, the term "holding company" means a corporation which, from its incorporation until consummation of a merger governed by this subsection, was at all times a direct or indirect wholly owned subsidiary of the constituent corporation and whose capital stock is issued in a merger.

(3) As used in this subsection, the term "organizational documents" means, when used in reference to a corporation, the certificate of incorporation of the corporation and, when used in reference to a limited liability company, the articles of organization and the operating agreement of the limited liability

company.

(4)  From and after the effective time of a merger adopted by a constituent corporation by action of its board of directors and without any vote of shareholders pursuant to this subsection:

(a)    to the extent the restriction of Section 1090.3 of this title applied to the constituent corporation and its shareholders at the effective time of the merger, restrictions shall apply to the holding company and its shareholders immediately after the effective time of the merger as though it were the constituent corporation, and all shareholders of stock of the holding company acquired in the merger shall for purposes of Section 1090.3 of this title be deemed to have been acquired at the time that the shares of stock of the constituent corporation converted in the merger were acquired; provided, that any shareholder who immediately before the effective time of the merger was not an interested shareholder within the

meaning of Section 1090.3 of this title shall not solely by reason of the merger become an interested shareholder of the holding company,

(b) if the corporate name of the holding company immediately following the effective time of the merger is the same as the corporate name of the constituent corporation immediately before the effective time of the merger, the shares of capital stock of the holding company into which the shares of capital stock of the constituent corporation are converted in the merger shall be represented by the stock certificates that previously represented the shares of capital stock of the constituent corporation, and

(c) to the extent a shareholder of the constituent corporation immediately before the merger had standing to institute or maintain derivative litigation on behalf of

the constituent corporation, nothing in this section shall be deemed to limit or extinguish such standing.

(5) If any agreement of merger is adopted by a constituent corporation by action of its board of directors and without any vote of shareholders pursuant to this subsection, the secretary or assistant secretary of the constituent corporation shall certify on the agreement that the agreement has been adopted pursuant to this subsection and that the conditions specified in paragraph 1 of this subsection have been satisfied. The agreement so adopted and certified shall then be filed and become effective in accordance with Section 1007 of this title. Filing shall constitute a representation by the person who executes the agreement that the facts stated in the certificate remain true immediately before the filing.

18 O.S. § 1081

## § 1-501. General fraud

It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:

1. To employ a device, scheme, or artifice to defraud;

2. To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading; or

3. To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

Oklahoma Uniform Securities Act of 2004 § 1-501 (emphasis in the original).

## LAW REGARDING THE FORCED-SELLER DOCTRINE

SEC rule 10b-5, as the Supreme Court confirmed in <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. at 723, requires that one be a purchaser or seller of securities to pursue a private claim alleging fraud under Securities and Exchange Act of 1934's § 10(b).  <u>See</u> <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. at 727-28.  The forced-seller doctrine, as the United States Court of Appeals for the Second Circuit first enunciated it in <u>Vine v. Beneficial Finance Co.</u>, 374 F.2d 627, <u>cert denied</u> 389 U.S. 970 (1967), was a particularized response to the difficulties many dissenting shareholders face when a short form merger situation requires dissenters to cash out -- constructively sell -- their shares.  In the years since <u>Vine v. Beneficial Finance Co.</u>, the federal courts gradually expanded the forced-seller doctrine to encompass situations where the fundamental nature of the plaintiff's investment has changed even in the absence of a sale as a consequence of circumstances beyond the plaintiff's control.  In 1976, the Second Circuit reconfirmed its position from <u>Vine v. Beneficial Finance Co.</u> in <u>Green v. Santa Fe Industries, Inc.</u>, 533 F.2d 1283 (1976), <u>rev'd on other grounds in</u> 430 U.S. 462 (1977), ruling that minority shareholders in a company dissolved as part of a short-form merger have standing to bring suit under SEC rule 10b-5, alleging that the corporation's majority shareholders had breached their fiduciary duty to them by undervaluing the minority shares for purposes of the cash-out share price.  <u>See</u> <u>Santa Fe Industries, Inc.</u>, 533 F.2d at 1292.  Two years later, the Delaware Court of Chancery held, in <u>Valente v. Pepsico, Inc.</u>, 454 F. Supp. 1228 (Del. Ch. 1978), that shareholders confronted with an allegedly deceptive tender offer which resulted in the defendants obtaining sufficient stock to effect a short-form merger were forced sellers with standing on a rule 10b-5 claim.  <u>See</u> <u>Valente v. Pepsico, Inc.</u>, 454 F. Supp. at 1236.

Other courts' positions on the forced-seller doctrine have been mixed.  In Securities

Investor Protection Corp. v. Vigman, 803 F.2d 1513 (9th Cir. 1986), the United States Court of

Appeals for the Ninth Circuit, in an opinion that Judge Wright authored and Judges Nelson and

Kozinski joined, held that there is an equivalent of a forced sale whenever a shareholder's

investment substantially changes in character or when a shareholder is forced to accept a

liquidated value for the shareholder's shares.  See 803 F.2d at 1518-19.  Multiple United States

District Courts have followed the Ninth Circuit's lead, concluding that there is the equivalent of

a forced sale when an interest in an ongoing enterprise is converted to a right only to receive

money for that interest.  See, e.g., Brewer v. Lincoln Intern. Corp., 148 F. Supp. 2d 792, 806

(W.D. Ky. 2000)(Simpson, C.J.); Umstead v. Durham Hosiery Mills, Inc. 578 F. Supp. 342

(M.D.N.C. 1984)(Ward, C.J.).

Multiple United States Courts of Appeals also adopted the forced-seller doctrine in the

1970s.  In Dudley v. Southeastern Factor and Finance Corp., 446 F.2d 303 (5th Cir.), cert denied

sub nom. McDaniel v. Dudley, 404 U.S. 858 (1971), in an opinion that Judge Davis wrote and

Judges Wisom and Goldberg joined, and again in Coffee v. Permian Corp., 434 F.2d 383 (5th

Cir.), cert denied, 412 U.S. 920 (1973), in a case that Judge Adams wrote and Judges Gewin and

Morgan joined, the Fifth Circuit adopted and applied the forced-seller doctrine as it found the

doctrine in Vine v. Beneficial Finance Co.  See 446 F.2d at 307; 434 F.2d at 386.  The Sixth

Circuit, in Marsh v. Armada Corp., 533 F.2d 978 (6th Cir. 1976), cert denied, 430 U.S. 954

(1977), relied heavily upon the reasoning in Vine v. Beneficial Finance Co. when it recognized

the forced-seller doctrine.

Courts have become increasingly split over the forced-seller doctrine over the last few

decades.  Reviewing the forced-seller doctrine in 1995, the Ninth Circuit, in Jacobson v. AEG

Capital Corp., concluded that "the forced sale doctrine does not cut a wide swath. Although recognized by the Ninth Circuit, we have rarely encountered instances where it applies." 50 F.3d at 1499 (citing Stitt v. Williams, 919 F.2d 516, 525 (9th Cir. 1990)(refinancing which damaged underlying equity of limited partnership but not the ownership interest not a forced sale); Securities Investor Protection Corp. v. Vigman, 803 F.2d 1513, 1519 (9th Cir. 1986)(reimbursements to defrauded investors not a forced sale); Mosher v. Kane, 784 F.2d at 1389 (stating that no forced sale where plaintiffs failed to allege actual liquidation or a fundamental change in the nature of their investments); Shivers v. Amerco, 670 F.2d 826, 830 (9th Cir.1982)(stating that 100–1 reverse stock split to eliminate fractional shares followed by new but lower permissive repurchase agreement from majority shareholder not a forced sale)). The Ninth Circuit did not, however, kill the forced-seller doctrine in Jacobson v. AEG Capital Corp. or at any time since.

The Second, Fifth, Eighth, and Eleventh Circuits also still recognize the forced-seller doctrine as Vine v. Beneficial Finance Co. envisioned it. The Second Circuit, in Rand v. Anaconda-Ericsson, Inc., 794 F.2d 843 (2d Cir. 1986), in an opinion that Judge Winter wrote, and Judges Oakes and Newman joined, confirmed the forced-seller doctrine's existence, even though the court said that the doctrine was inapplicable given the case's facts. See 794 F.2d at 847-48. The Fifth Circuit, in 7547 Corp v. Parker & Parsley Dev. Partners, L.P., 38 F.3d 211 (5th Cir. 1994), in an opinion that Judge King wrote, and Judges Jolly and Stewart joined, concluded that a forced-seller exception exists to the purchaser-seller requirement that the Supreme Court of the United States announced in Blue Chip Stamps. See 38 F.3d at 226-27. The Eighth Circuit, in Bold v. Simpson, 802 F.2d 314 (8th Cir. 1986), in an opinion that Senior Judge Bright wrote, and Chief Judge Lay and Judge Ross joined, noted the forced-seller

doctrine's existence even though it refused to apply it to the case before the court.  See 802 F.2d at 320-21.  The Eleventh Circuit has never spoken directly to the forced-seller doctrine, but the Eleventh Circuit was part of the Fifth Circuit before October 1, 1981, and the Eleventh Circuit has adopted opinions that the Fifth Circuit issued before September 30, 1981 as binding precedent.  See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981). Because the Fifth Circuit affirmed the existence of forced- seller doctrine after Blue Chip Stamps and before September 30, 1981, multiple United States District Courts within the Eleventh Circuit have held that the Eleventh Circuit has binding precedent affirming the validity of the forced-seller doctrine.  See, e.g., Badger v. Southern Farm Bureau Life Ins., 2008 WL 1884887, at *10 (M.D. Fla. Apr. 25, 2008)(Spaulding, M.J.)("The forced seller doctrine was adopted and expanded by the United States Court of Appeals for the Fifth Circuit in Coffee v. Permian Corporation . . ., which decision is binding on this Court."); APA Excelsior III, L.P. v. Windley, 348 F. Supp. 2d 1357, 1360 n.2 (N.D. Ga. 2004)("The Eleventh Circuit itself has not addressed the application of the forced seller doctrine.  Consequently, this Court is forced to rely on Fifth Circuit authorities predating the creation of the Eleventh Circuit for binding appellate precedent regarding the doctrine's application.").

The First, Third, Fourth, and Sixth Circuits, and the United States Court of Appeals for the District of Columbia Circuit have not decided the forced-seller doctrine's continuing validity since the Supreme Court decided Blue Chips, but district courts within those Circuits have held that the forced-seller doctrine remains good law.  The United States District Court for the District of Massachusetts, in Jacobs v. Winthrop Financial Assocs., 77 F. Supp. 2d 206 (D. Mass. 1999)(Young, C.J.), held that the First Circuit's district courts have "collectively articulate[d] a sound and consistent application of the forced seller doctrine" even though the First Circuit has

not spoken to the doctrine.  77 F. Supp. 2d at 209.  Accord Dowling v. Narragansett Capital Corp., 735 F. Supp. 1105, 1120-21 (D.R.I. 1990)(Torres, J.)(applying the forced-seller doctrine despite acknowledging that the First Circuit has never considered the doctrine's availability); Batchelder v. Northern Fire Lites, Inc., 630 F. Supp. 1115, 1120-21 (D.N.H. 1986) (adopting the forced-seller doctrine but declining to apply it on the grounds of the case's facts); Rodriguez Cadiz v. Mercado Jimenez, 579 F. Supp. 1176, 1180-81 (D.P.R. 1983) (same).  The United States District Court for the Eastern District of Pennsylvania, in Goldberg v. Hankin, 835 F. Supp. 815 (E.D. Pa. 1993)(Giles, J.), concluded that the forced-seller doctrine is good Third Circuit law even though it did not apply to that case's facts, see 835 F. Supp. at 818, reconfirming a position that the same court had taken in two separate cases seven years earlier in Carapico v. Enflo Corp., 1986 WL 14202, at *5 (E.D. Pa. 1986) and Herskowitz v. Nutri/System, Inc., 1986 WL 5561, at *2 (E.D. Pa. 1986)(Weiner, J.).  The United States District Court for the Western District of Pennsylvania agreed with its Keystone State sister district in Engl v. Berg, 511 F. Supp. 1146 (W.D. Pa. 1981)(Huyett, J.), where the court held that "Blue Chip did not refute the 'forced seller' doctrine."  511 F. Supp. at 1152.  The United States District Court for the District of Delaware also recognized the forced-seller doctrine in Valente v. PepsiCo, Inc., 454 F. Supp. 1228 (D. Del. 1978)(Wright, S.J.), in which the court noted that a "shareholder who retains his shares at the time of a tender offer, but who is required at the time of a subsequent short form merger either to surrender them in exchange for cash or to request appraisal, is a 'forced seller.'"  454 F. Supp. at 1236.[93] In the Fourth Circuit, the United States District Court

---

[93]The widespread support within the Third Circuit for the forced-seller doctrine seems to have subsided somewhat since the Third Circuit signaled in Scattergood v. Perelman, 945 F.2d 618 (3d Cir. 1991), in an opinion that Judge Stapleton wrote and Judge Hutchinson and Senior Judge Rosenn joined, that there are some limits to the doctrine in the case of fraudulent mergers. See, for instance, Gunter v. Ridgewood Energy Corp., 32 F. Supp. 2d 166, 178 (D.N.J.

for the Eastern District of Virginia, in <u>Arnold v. Moran</u>, 687 F. Supp. 232 (E.D. Va. 1988)(Cacheris, J.), concluded that the forced-seller doctrine's scope is limited, but that the doctrine still is viable. <u>See</u> 687 F. Supp. at 234 n.5 ("This court finds that the 'forced seller' doctrine remains a viable, though limited, exception to the 10b-5 'purchaser-seller' requirement."). The United States District Court for the Western District of North Carolina, in <u>FDIC v. Kerr</u>, 637 F. Supp. 828 (W.D.N.C. 1986)(Potter, C.J.), held that <u>Blue Chip Stamps</u> did not invalidate the forced-seller doctrine. <u>See</u> 637 F. Supp. at 836. In the Sixth Circuit, the United States District Court for the Western District of Kentucky, in <u>Brewer v. Lincoln Int'l Corp.</u>, 148 F. Supp. 2d 792 (W.D. Ky. 2000)(Simpson, C.J.), concluded that the forced-seller doctrine as <u>Vine v. Beneficial Finance Co.</u> proposed it remained valid. <u>See</u> 148 F. Supp. 2d at 806 ("[W]e believe that the central holding of *Vine* remains relevant . . . ."). The United States District Court for the Southern District of Ohio, in <u>Matthey v. KDI Corp.</u>, 699 F. Supp. 135 (S.D. Ohio 1988)(Rubin, C.J.), held that the forced-seller doctrine exists within the Sixth Circuit even though it did not apply to the facts of that case. <u>See</u> 699 F. Supp. at 139-140. Last, in the D.C. Circuit, the United States District for the District of Columbia, in <u>Houlihan v. Anderson-Stokes, Inc.</u>, 434 F. Supp. 1330 (D.D.C. 1977)(Richey, J.), concluded that the forced-seller doctrine applies when some of a limited partnership's partners are involuntarily cashed out. <u>See</u> 434 F. Supp. at 1337-39.

The Tenth Circuit and the United States Courts of Appeals for the Seventh Circuit are the only United States Courts of Appeals never to have endorsed the forced-seller doctrine in any form or at any level. The Tenth Circuit, in <u>Katz v. Gerardi</u>, 655 F.3d 1212 (10th. Cir. 2011), in an opinion that then-Judge and now Chief Judge Tymkovich wrote, and Judges Brorby and

_____

1998)(Walls, J.)("[T]he 'forced seller' concept has been criticized and recently described as defunct.").

- 258 -

Matheson joined, noted that "[w]e have previously declined to adopt the fundamental change doctrine[94] and we decline to do so again here for several reasons."  655 F.3d at 1221.  One of these reasons was that "the doctrine only applies to claims under the 1934 Act, where Katz's claims here arise under the 1933 Act." 655 F.3d at 1221.  The second reason is that the forced-seller doctrine is something of a misnomer, insofar as it only applies when the plaintiff purchases shares -- not when the plaintiff sells them.  See 655 F.3d at 1221.  Because that case's defendants had cashed Katz' shares out against Katz' will and Katz had not purchased new units in the post-merger entity, the Tenth Circuit held that the forced-seller doctrine did not apply.  See 655 F.3d at 1221-22.  The Tenth Circuit insisted that is was on solid ground on this second point, quoting from a Seventh Circuit opinion on the same case and facts when the Seventh Circuit heard the case's appeal regarding removal to federal court:

> Katz depicts himself as a buyer by characterizing the supposed failure to honor the terms of the A-1 Units as if he had sold those securities and "bought" what Katz calls "new A-1 Units," which he then sold for cash. (A "purchase" of "new A-1 Units" would have been involuntary, but an involuntary purchase is still a purchase.)
>
> What Katz calls the "fundamental change doctrine" that turns a sale into a purchase is word play designed to overcome the actual text of the securities laws, and this circuit follows the statutes rather than trying to evade them with legal fictions. Katz sold his units for cash; he did not buy any new security. The "new A-1 Units" are figments of a lawyer's imagination. Using legally fictitious (and factually nonexistent) "new A–1 Units" to nullify a legislative decision that only buyers have rights under the 1933 Act would be wholly unjustified.

Katz v. Gerardi, 552 F.3d 558, 560 (7th Cir. 2009)(Easterbrook, J.,[95] joined by Kanne and Skyes,

---

[94]Earlier in the opinion, the Tenth Circuit noted that other courts variously have referred to the same doctrine as either the "forced seller doctrine" or the "fundamental change doctrine." Katz v. Gerardi, 655 F.3d at 1221.  The Tenth Circuit then chose to refer to the doctrine as the "fundamental change doctrine" through the opinion's remainder.  See Katz v. Gerardi, 655 F.3d at 1221-23.

[95]At the time that the Seventh Circuit decided Katz v. Gerardi, Judge Easterbrook was the

JJ.)(citations omitted in <u>Katz v. Gerardi</u>, 655 F.3d at 1221).

In the Seventh Circuit the doctrine's rejection in two Seventh Circuit cases in 1998 in some ways was a seismic rejection of the position that the United States District Court for the Northern District of Illinois had taken in at least seven cases over two decades endorsing the forced-seller doctrine.[96]  Seen in the light of the limitations that the Northern District of Illinois frequently had placed on the forced-seller doctrine even when recognizing its existence, however, the Seventh Circuit's rejection of the forced-seller doctrine was not a complete bolt from the blue.  In <u>Isquith v. Caremark Int'l, Inc.</u>, 136 F.3d 531 (7th Cir. 1998), in an opinion that then-Chief Judge Posner wrote and Judges Cummings and Manion joined, and to which the Defendants referred repeatedly in the Defendants' Estoppel MSJ and at the motion hearing, the Seventh Circuit pilloried the forced-seller doctrine as "esoteric and dubious judge-made doctrine" that was "defunct." 136 F.3d at 535-36.  The Seventh Circuit reaffirmed this position --

---

Seventh Circuit's Chief Judge.

[96]<u>See</u> <u>Issen v. GSC Enters., Inc.</u>, 508 F. Supp. 1278, 1285 (N.D. Ill. 1981)("It appears to be settled that a minority shareholder forced to exchange his shares in a corporation pursuant to a merger or going private transaction is a 'seller' within the meaning of the securities laws."); <u>Ridings v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas) Ltd.</u>, 94 F.R.D. 147, 151 n.4 (N.D. Ill. 1982)(Aspen, J.)("It is well settled ... that a minority shareholder forced to exchange his shares in a corporation pursuant to a merger is a 'seller' within the meaning of the securities laws entitled to assert a cause of action for securities fraud."); <u>Grossman v. Waste Mgmt. Inc.</u>, 589 F. Supp. 395, 413 (N.D. Ill. 1984)(Marshall, J.)( forced-seller doctrine exists but is not applicable to the case's facts); <u>Yabsley v. Conover</u>, 644 F. Supp. 689, 699 (N.D. Ill. 1986)(Kocoras, J.)("[N]umerous cases have found that minority shareholders forced to exchange shares in a corporation pursuant to a merger or 'going private' transaction are 'sellers' within the meaning of the securities laws, even if the shareholders have not yet tendered their shares at the time the suit is brought."); <u>Gault v. Foster</u>, 1990 WL 17145, at *2-3 (N.D. Ill. Jan. 19, 1990)(recognizing existence of the forced-seller doctrine but not applying it in that case); <u>Beale v. EdgeMark Fin. Corp.</u>, 164 F.R.D. 649, 655 (N.D. Ill. 1995)("The 'forced seller' doctrine broadly construes the term 'sale' in Rule 10b-5 and considers shareholders to be sellers under the Act when the nature of the investment had been fundamentally and involuntarily changed even though they had not actually sold or purchased shares of stock."); <u>Gilford Partners, L.P. v. Sensormatic Elecs. Corp.</u>, 1997 WL 757495, at *9 (N.D. Ill. Nov. 12, 1997)(forced-seller doctrine exists but does not apply to the case's facts);

albeit in less strident tones -- a few months later in <u>SEC v. Jakubowski</u>, 150 F.3d 675 (7th Cir. 1998), in an opinion that Judge Easterbrook wrote, and Judge Cudahy and then-Judge and now Chief Judge Wood joined, holding that the Seventh Circuit "reject[s] . . . the forced-seller doctrine and the fundamental-change doctrine and insist[s] that the wrongdoing affect an investment decision . . . ." 150 F.3d at 680.

## ANALYSIS

The Court disposes of six different motions with this Memorandum Opinion: (i) the Plaintiffs' Motion to Strike Affirmative Defenses; (ii) the Defendants' Acquiescence MSJ; (iii) the Defendants' Estoppel MSJ; (iv) the Plaintiffs' MSJ; (v) Plaintiffs' Motion to Strike Lorett Affidavit; and (vi) the Plaintiffs' Motion in Limine to Preclude Evidence of Plaintiffs' Conduct. The Court: (i) denies the Plaintiffs' Motion to Strike Affirmative Defenses, but also will not allow evidence of those defenses at trial; (ii) denies the Defendants' Acquiescence MSJ; (iii) denies in part and grants in part the Defendants' Estoppel MSJ, dismissing only the securities claims; (iv) grants the Plaintiffs' MSJ as to liability with respect to entire fairness (leading to the Court's conclusion that it will not allow evidence of the Defendants' affirmative defenses at trial), and leaving only a damages determination to be resolved at trial; (v) denies Plaintiffs' Motion to Strike Lorett Affidavit; and (vi) grants in part and denies in part the Plaintiffs' Motion in Limine to Preclude Evidence of Plaintiffs' Conduct, granting the motion as to the Akin Gump letter and as to the letters that the Plaintiffs and Plaintiffs' counsel exchanged with the Defendants between September, 2013, and November, 2013, and denying the motion as to the letters sent to and received from Triangle Capital. The Court will now analyze each motion.

I.  **THE COURT EXERCISES FEDERAL-QUESTION JURISDICTION OVER THE FEDERAL SECURITIES CLAIMS AND FEDERAL DIVERSITY JURISDICTION OVER THE CASE.**

The Constitution of the United States of America limits federal courts' jurisdiction under Section 2 of Article III, which provides that "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ."  U.S. Const., art III, § 2, cl. 1.  Congress gave the federal courts general original jurisdiction over federal question cases in 1875.  See Act of March 3, 1875, § 1, 18 Stat. 470, codified at 28 U.S.C. § 1331.  The statute confers original jurisdiction on the federal courts over federal-question cases in language that is substantially identical to the language in Section 2 of Article III of the Constitution of the United States.  See 13D Charles Alan Wright et al., Federal Practice and Procedure § 3562 (3d ed. 2017).

The Supreme Court has imposed three restrictions on the phrase in 28 U.S.C. § 1331 that confers original jurisdiction to federal courts over claims "arising under" the Constitution and the laws of the United States.  First, the well-pleaded complaint rule requires that a case's claim contains the federal element; the federal element may not be found in a defense or a counterclaim.  See 13D Charles Alan Wright et al., Federal Practice and Procedure § 3562 (3d ed. 2017).  Second, the federal question that the plaintiff's complaint poses must be sufficiently substantial to justify the exercise of federal district courts' original jurisdiction.  See 13D Charles Alan Wright et al., Federal Practice and Procedure § 3562 (3d ed. 2017).  Third, the federal law that the plaintiff's well-pleaded complaint injects must be sufficiently central to the dispute to justify federal question jurisdiction.  See 13D Charles Alan Wright et al., Federal Practice and Procedure § 3562 (3d ed. 2017).  The Plaintiffs satisfy all three elements with respect to their

federal securities claims. First, the Plaintiffs plead these claims in their Complaint as their seventh and eighth claims for relief. See Complaint ¶¶ 192-211, at 37-41. Second, the federal question that the Plaintiffs pose of alleged securities fraud in the millions of dollars is sufficiently substantial to justify the Court's exercise of federal original jurisdiction. Third, federal Securities Exchange Act of 1934 and SEC rule 10b-5, see Complaint ¶¶ 25, 192-211, and federal laws are central to the claim, and not a mere ingredient in the claim, see 13D Charles Alan Wright et al., Federal Practice and Procedure § 3562 (3d ed. 2017). Accordingly, the Court concludes that it has federal-question jurisdiction over the Plaintiffs' federal securities claims.

Again, the Constitution limits federal courts' jurisdiction under Section 2 of Article III, which provides that "[t]he judicial Power shall extend to all Cases . . . between citizens of different states." U.S. Const., art. III, § 2, cl. 1. Federal courts have had diversity jurisdiction since the Judiciary Act of 1789, 1 Stat. 73 (Sept. 24, 1789), which allowed a case to be removed from state court if "a suit be commenced in any state court against an alien, or by a citizen of the state in which the suit is brought against a citizen of another state, and the matter in dispute exceeds the aforesaid sum or value of five hundred dollars, exclusive of costs . . . ." An Act to Establish the Judicial Courts of the United States, 1 Stat. 79 (1789). The Supreme Court clarified twenty years later, in Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806), that party diversity for purposes of federal jurisdiction means complete diversity, i.e., diversity jurisdiction is not available if any party to the case has the same citizenship as the adverse party. Strawbridge v. Curtiss, 7 U.S. (3 Cranch) at 267. In the two centuries since, Congress has amended the "amount in controversy" threshold that the Judiciary Act of 1789 sets forth, with the requirement now set that the amount in controversy exceed $75,000.00, exclusive of interests and costs, for a federal district court to have jurisdiction. 28 U.S.C. § 1332(a). The complete

diversity requirement, on the other hand, has remained unchanged.  See 13E Charles Alan Wright et al., Federal Practice and Procedure § 3605 (3d ed.)(2017).

Neither the Plaintiffs nor the Defendants have challenged federal diversity jurisdiction in this case.  Rule 12(h)(3) of the Federal Rules of Civil Procedure allows, however, for the Court to raise this question sua sponte.  See, e.g., Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 108 (2d Cir. 1997)(construing the rule).  The Court finds it advisable to interrogate the diversity jurisdiction question, because: (i) there is a large number of parties in this case -- including six LLCs; and (ii) undiscovered non-diversity risks vacatur, a result that would implicate poor stewardship of the parties' and the Court's time and resources. Parties' citizenship for federal diversity jurisdiction purposes is determined at the time of filing. See 13E Charles Alan Wright et al., Federal Practice and Procedure § 3522 (3d ed. 2017)("In diversity of citizenship cases . . . jurisdiction is assessed as of the time the case is commenced, and thus cannot be ousted by post-filing changes of citizenship.")(footnote omitted); Mollan v. Torrance, 22 U.S. (9 Wheat) 537, 539 (1824). Accordingly, the Court refers to the Complaint to establish the parties' residency/citizenship when the Plaintiffs filed the case on July 3, 2014.

When an LLC's members themselves are unincorporated associations such as additional LLCs or limited partnerships, the citizenship of the LLC party is determined by a complete upstream analysis of its organizational structure.  See, e.g., Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Management, LLC, 692 F.3d 42, 49 (2d Cir. 2012).  Such upstream analysis is not immediately straightforward in this case, as some of the LLCs in this case are arranged structurally like Russian nesting dolls, and a non-overlapping subset of LLCs has multiple principals per LLC.  To avoid confusion, the Court therefore captures all these structures and principals into the flow chart found below at figure 1.



**Figure 1. LLC Principals' Structure and Residency**

In this flow chart, every principal in an LLC is found at the base of an arrow that ends at that LLC. For example, CEP Capital Partners, LLC's three principals are C. Stephenson, C. Field, and Boylan. Under the rule from <u>Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Management, LLC</u>, the Court completes the upstream citizenship analysis by following the arrows until they reach every Defendant listed in the Complaint. Accordingly, for example, CEP Capital Partners, LLC has Oklahoma citizenship for federal diversity jurisdiction purposes, because all three of its principals have Oklahoma citizenship. The Court conducts the same analysis for all LLC in the flow chart, and tabulates the resulting residency data along with the Plaintiffs' residency data in figure 2 below. Based on that analysis, which shows complete party diversity, the Court concludes that it has diversity jurisdiction to hear this case.

| Plaintiff | Incorporation state/ Principals' residency | Defendant | (Principals') Residency |
|-----------|--------------------------------------------|-----------|-------------------------|

| SFF-TIR, LLC | CT, FL, MA, NY, OH, RI, England[97] | Charles C. Stephenson, Jr. | OK |
|---|---|---|---|
| Stuart Family Foundation, Inc | CT | Cynthia A. Field | OK |
| Alan Stuart 2012 GST family trust | CT | Peter Boylan III | OK |
| Celebration, LLC | CA, CT, MA[98] | Lawrence Field | OK |
| Anurag Agarwal | NY | Cypress Energy Partners-TIR, LLC | OK |

---

[97]Neither the English residency of an SFF-TIR, LLC principal nor Reynolds' Canadian residency frustrates the Court's jurisdiction over the case. Section 2 of Article III of the Constitution of the United States of America indicates that the federal "judicial Power shall extend . . . to Controversies . . . between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." U.S. Const. art. III, § 2. In apportioning this judicial power among the Article III courts, 28 U.S.C. § 1332(a)(2) clarifies:

> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and cost, and is between . . . citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State . . . .

28 U.S.C. § 1332(a)(2)(emphasis added). See generally 13E Charles Alan Wright et al., Federal Practice and Procedure § 3604 (3d. ed 2017)(listing cases and explaining possible rationales why the federal courts have jurisdiction over cases involving foreign citizens). The Court cannot determine, based on the case filings, whether the United States has lawfully admitted either the SFF-TIR, LLC principal or Reynolds for permanent residence. It need not, however, make this determination, because of the statutory conjunctive in 28 U.S.C. § 1332(a)(2) that the Court above emphasizes. It is sufficient for the SFF-TIR, LLC principal and Reynolds to be domiciled anywhere other than Oklahoma for the Court to have federal diversity jurisdiction over the case. The SFF-TIR, LLC principal's residence in England and Reynolds' residence in Canada meet this sufficiency requirement.

[98]Celebration, LLC is a Delaware LLC, Secretary of State file number 3032610, that Celebration II, L.P. owns. See https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch .aspx. (last visited Apr. 12, 2017). Celebration II, L.P.'s general partner is a trust whose trustees are Connecticut citizens. See Complaint ¶ 34, at 7. Celebration II, L.P.'s limited partners are citizens of Massachusetts and California. See Complaint ¶ 34, at 7.

| Peter Buckley | CT | CEP Capital Partners, LLC | OK |
|---|---|---|---|
| Vincent Signorello | FL | Cypress Energy Holdings, LLC | OK |
| Rodney M Reynolds | Canada | Tulsa Inspection Resources, LLC | OK |

II.    **THE COURT DETERMINES THAT OKLAHOMA CHOICE OF LAW RULES INDICATE THAT: (i) DELAWARE LAW APPLIES TO THE PLAINTIFFS' CLAIMS REGARDING THE CASH-OUT MERGER; (ii) OKLAHOMA LAW WOULD APPLY TO THE DEFENDANTS' CONTRACT DEFENSES OF EQUITABLE ESTOPPEL, WAIVER, AND UNCLEAN HANDS IF THE MERGER PROCESS IS ENTIRELY FAIR; AND (iii) OKLAHOMA LAW APPLIES TO THE PLAINTIFFS' STATE SECURITIES CLAIMS.**

The parties in this case present arguments under both Delaware and Oklahoma law. The Court has not found any place in the briefings -- and did not hear at the hearing -- a systematic justification why the Court should apply Delaware law when deciding some issues and Oklahoma law when it is deciding other issues. The Court therefore precedes its analysis of the motions' requests by evaluating under Oklahoma choice-of-law rules which state's law it should apply to each claim. The Court concludes that: (i) Delaware law applies to the Plaintiffs' claims regarding the entire fairness of the cash-out merger: (ii) Oklahoma law applies to the Defendants' contract defenses of equitable estoppel, waiver, and unclean hands if the merger process was entirely fair; and (iii) Oklahoma law applies to the Plaintiffs' state securities claims.

A.    **DELAWARE LAW APPLIES TO THE PLAINTIFFS' CLAIMS.**

Distilled to its essence, the Plaintiffs' claims challenge the merger's entire fairness. After examining a concatenation of choice-of-law rules, the Court determines that it must adjudicate these claims under Delaware law. First, the Erie doctrine requires a federal court sitting in diversity to apply the substantive law of the state in which it sits. See Erie R. Co. v. Tompkins, 304 U.S. at 64. See also Yavuz v. 61 MM, Ltd., 576 F.3d 1166, 1178 (10th Cir. 2009)(then-

Judge and now Chief Judge Tymkovich writing the opinion, and Judges Murphy and Seymour joining); Vitkus v. Beatrice Co., 127 F.3d 936, 941 (10th Cir. 1997)(then-Chief Judge Seymour writing the opinion, and Judges Porfilio and Tacha joining). Second, the Supreme Court held in Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941), that a state's choice of law rules are substantive law for Erie purposes. See 313 U.S. at 498. Oklahoma choice-of-law rules therefore apply to the Plaintiffs' claims.

Third, as the United States District Court for the Northern District of Oklahoma previously has noted, Oklahoma follows the Restatement (Second) of Conflicts of Laws when a corporation is one party to a contract. See Yale South Corp. v. Eclipse Servs., Inc. 2010 WL 2854687 (N.D. Okla. July 19, 2010)(Eagen, C.J.)(citing Robert A. Wachsler, Inc. v. Florafax, Int'l, Inc., 778 F.2d 547, 549 (10th Cir. 1985)("Because the issue in this case concerns a peculiar question of a contract affirmation that arises only when a corporation is one party to the contract, Delaware law should govern this issue.")) Fourth, under Restatement (Second) of Conflict of Laws § 302(2), the local law of the state of incorporation will be applied to determine choice-of-law rules, "except in the unusual case in where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties." Yale South Corp. v. Eclipse Services, Inc., 2010 WL 2854687, at *2. The Tenth Circuit has determined that the Supreme Court of Oklahoma would follow Restatement (Second) Conflict of Laws § 302(2), and that "the law of the state of incorporation shall be applied to determine . . . the liabilities of a corporation, unless it is shown that some other state has a more significant relationship to the occurrence and the parties." Yale South Corp. v. Eclipse Servs., Inc., 2010 WL 2854687, at *2 (citing Robert A. Wachsler, Inc. v. Florafax, Int'l, Inc., 778 F.2d at 550). The Plaintiffs' claim involves the liability of the surviving Delaware entity. No other state has a more significant

relationship to the occurrence and the parties: (i) Cypress Energy Partners is a Delaware entity; (ii) the merger agreement states Delaware law applies to the mechanics and effects of the merger: and (iii) the merger was effected pursuant to Section 18-214 of the Delaware LLC Act, Del. Code Ann. tit. 18, § 214, which covers the conversion of corporations and "other entit[ies]" to a limited liability company. See Merger Agreement § 1.01 ("in accordance with the Delaware Limited Liability Company Act").[99]  Accordingly, the Court must apply Delaware law to the Plaintiff's claims regarding the cash-out merger.

### B. OKLAHOMA LAW APPLIES TO THE DEFENDANTS' CONTRACT DEFENSES OF EQUITABLE ESTOPPEL, WAIVER, AND UNCLEAN HANDS THAT THE DEFENDANTS ARGUE IN THE DEFENDANTS' ESTOPPEL MSJ IF THE MERGER PROCESS WAS ENTIRELY FAIR.

As it must, the Court assesses what law to apply to the Defendants' contract defenses by first returning to Erie.  Under the Erie doctrine, a federal court sitting in diversity must apply the substantive law of the state in which it sits.  See Erie R. Co. v. Tompkins, 304 U.S. at 64.  See also Yavuz v. 61 MM, Ltd., 576 F.3d at 1178 (10th Cir. 2009).  Under Klaxon Co. v. Stentor Electric Mfg. Co., a state's choice-of-law rules are substantive law for Erie purposes, and Oklahoma's choice-of-law rules therefore apply to this case.  See 313 U.S. at 498.  See Yavuz v. 61 MM, Ltd., 576 F.3d at 1178.  In Oklahoma, the state choice-of-law rule for contracts is that the Oklahoma courts will enforce a contract's choice-of-law clause whenever that choice-of-law clause is valid under ordinary Oklahoma contract law principles.  See Tucker v. Cochran Firm-Criminal Defense Birmingham L.L.C., 2014 OK 112, 341 P.3d 673, 688 (Okla. 2014).  Merger Agreement § 8.04 states the following choice-of-law rule to govern the Merger Agreement:

---

[99]The Merger Agreement references the merger being subject to the conditions that the Delaware Limited Liability Act, which spans Del. Code. Ann. tit. 18, §§101-1109, sets forth.  See Merger Agreement § 1.01.  The only subsection in that range which relates to the conversion of corporate entities into LLCs is Del. Code. Ann. tit. 18m § 214.

**Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of Oklahoma without giving effect to any choice or conflict of law provision or rule (whether of Oklahoma or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of Oklahoma; provided, however, the provisions of this Agreement relating to mechanics or the effects of the Merger under Delaware law shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

Merger Agreement § 8.02 (emphasis in the original). Oklahoma law is the basis of law and the default. See Merger Agreement § 8.02, at 10 ("The Agreement shall be governed by and be construed in accordance with the internal laws of Oklahoma . . . .") The Court is to ignore, however, choice-of-law rules, whether they are Oklahoma's or some other state's that would lead to a result that some state's law -- other than Oklahoma law -- would apply. See Merger Agreement § 8.04, at 10 ("without giving effect to any choice or conflict of law provision or rule (whether of Oklahoma or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of Oklahoma . . . ."). There is an exception, however: "the provisions of this Agreement relating to mechanics or the effects of the Merger under Delaware law shall be governed by and construed and enforced in accordance with the laws of the State of Delaware." Merger Agreement § 8.04, at 10.

Under the Merger Agreement's terms, therefore, the Court is to apply Oklahoma law when adjudicating any claim other than a claim that arises out of the Merger's "mechanics or effects." Merger Agreement § 8.02. The core jurisdictional question regarding the Defendants' defenses of unclean hands, waiver, and estoppel thus becomes whether these defenses relate to the merger's mechanics or effect. The Court concludes that they do not relate to the merger's mechanics. The Plaintiffs acceptance of the merger consideration occurred after the merger was effected, making it temporally impossible for the Plaintiffs' alleged unclean hands, estoppel, or waiver to have impacted the merger's mechanics.

The Plaintiffs alleged unclean hands, which the Defendants contend extended long before the date the merger took effect, centered on Plaintiff Stuart's alleged attempts to blackmail TIR, Inc., and extort a higher price than the $450,000.00 per whole share that the Plaintiffs were offered in the Tender Offer and the cash-out price that they eventually received. Such conduct did not generate any effects on the merger of the capital stock as Merger Agreement § 2.01 describes these effects. CEP-TIR, CCS, and CAF all were able to convert their pre-merger shares into TIR LLC membership units under Merger Agreement § 2.01(b). Other non-dissident shareholders, e.g., the Pooled Shareholders, were able to cash out their pre-merger shares under Merger Agreement § 2.01(a). Further, all equity in the Merger Sub that CEP-TIR owned before the merger was immediately cancelled at the time the merger took effect. The Plaintiffs' conduct in which the Defendants see unclean hands also did not prevent or impede the rights, responsibilities, assets, and liabilities of TIR and the Merger Sub from vesting in the Surviving Entity at the time the merger took effect, thereby not having an effect on the merger or the merger mechanics as Merger Agreement § 1.04 presents them.

The Plaintiffs' estoppel argument, in theory, should be the most likely of the four affirmative defenses to implicate merger mechanics or effects. The Plaintiffs allege detrimental reliance on the Plaintiffs' voluntary and knowing surrender of their share certificates when they: (i) contributed 50.1% of their member interests in TIR LLC to Cypress Energy Partners; (ii) and effected the sale of partnership units to the public pursuant to the Registration Statement. See Response to Plaintiffs' MSJ at 18. If such detrimental reliance actually occurred, then the Plaintiffs' conduct that motivates the estoppel defense would be intricately intertwined with the merger's mechanics. The undisputed facts, however, represent that such detrimental reliance did not occur. As the Defendants have conceded, the Plaintiffs did not have veto power over the

merger. See Defendants' Estoppel MSJ at 20. The Merger Agreement's plain language emphasizes this lack of detrimental reliance, indicating that the existence of Dissenting Shareholders will have no effect on TIR, Inc.'s merger plans and no effect on the merger's capital stock. See Merger Agreement §§ 2.01 -.03. The Tender Offer that the Plaintiffs received likewise indicates a lack of detrimental reliance, simply notifying the Dissenting Shareholders that the merger was effected without their input, their shares were extinguished, and the Dissenting Shareholders can cash the extinguished shares out if they wish. See Notice to Former Shareholders at 1. The Plaintiffs' lack of detrimental reliance on the Plaintiffs' conduct or lack of conduct translated into no impact on the merger mechanics or effects.

Section 1090.2(B)(3) of title 18 of the Oklahoma Statutes required the Defendants to fix the merger consideration as part of the cash-out merger process. See 18 O.S. § 1090.2(B)(3). The Plaintiffs' alleged unclean hands, estoppel, and waiver also do not relate to the merger's effect. The Merger Agreement defines what the merger's effects were to be

> **Effects of the Merger.** The Merger shall have the effects set forth herein and in the applicable provisions of the DLLCA and the OGCA. Without limiting the generality of the foregoing, and subject thereto, from and after the Effective Time, all assets, property, rights, privileges, immunities, powers, franchises, licenses and authority of each of the Company and the Merger Sub shall vest in the Surviving Entity, and all debts liabilities, obligations, restrictions and duties of each of the Company and Merger Sub shall become the debts, liabilities, obligations, restrictions and duties of the Surviving Entity.

Merger Agreement § 1.04. None of the Plaintiffs' conduct impaired or prevented the Defendants from completing a transfer of all the "assets, property, rights, privileges, immunities, powers, franchises, licenses[,] . . . authority[,] . . . debts, liabilities, obligation, restrictions and duties of each of the Company and the Merger Sub" from vesting in the Surviving Entity. Merger Agreement § 1.04. The merger took place as contracted. Merger Agreement § 2.01 speaks the specific effects of the merger on capital stock:

**Effect of the Merger on Capital Stock.** At the Effective Time, as a result of the Merger and without any action on the part of parties hereto or the holder of any capital stock or limited liability company interest of the parties hereto or any other Person:

> (a) Each issued and outstanding share of the Company Common Stock, or fractional share thereof, held by each Company shareholder *other than* (i) CEP-TIR, (ii) CCS, (iii) CAF, and (IV the Dissenting Shares shall, by virtue of the Merger, be automatically canceled and extinguished and be converted automatically into a right to receive an amount in cash equal to $451,000 per whole share of Company Common Stock *plus* interest in the amount of 4%, compounded daily, from the effective date of the Merger until the date of payment of the Cash Merger Consideration pursuant to **Section 2.02** below. Payments to each shareholder will be rounded up to the nearest whole cent (the **"Cash Merger Consideration"**).

> (b) Each issued and outstanding share of Company Common Stock, or fractional share thereof, held by CEP-TIR, CCS, and CAF shall be automatically cancelled and each of CEP-TIR, CCS and CAF shall automatically receive, in exchange for such cancelled shares, such number of newly issued, fully paid and non-assessable membership units representing limited liability company interest (each, a **"TIR LLC Unit"**) in the Surviving Entity (the **"Equity Merger Consideration"** and, collectively with the Cash Merger Consideration, the **"Merger Consideration"**) as set forth in **Section 2.01(d)** below and CCS and CAF shall each be admitted as a member of the Surviving Entity. CEP-TIR shall remain a member of the Surviving Entity.

> (c) All equity in Merger Sub owned by CEP-TIR immediately before the Effective Time shall be automatically cancelled in consideration of CEP-TIR's right to receive the Equity Merger Consideration set forth in **Section 2.01(d)** below.

> (d) On the Effective Time, after giving effect to the transactions contemplated herein, there shall be 85.059899 TIR LLC Units issued and outstanding of which CEP-TIR shall own 59.90579 (or 70.43%), Mr. Stephenson, individually, shall own 18.26636 (or 21.47%), and Ms. Field, individually, shall own 6.88775 (or (8.10%), respectively.

Merger Agreement § 2.01. None of the Plaintiffs' conduct impaired or prevented the Defendants from timely completing any of the effects of the merger on capital stock. CEP-TIR, CCS, and

CAF exchanged their cancelled shares for newly issued membership units in the Surviving Entity. The other shareholders other than the dissenting shareholders -- the Plaintiffs -- had their shares automatically canceled and extinguished, and converted into a right to receive an amount of cash equal to $451,000.00 per whole share. Equity that CEP-TIR owned in Merger Sub was automatically cancelled in consideration of CEP-TIR's right to receive the Equity Merger Consideration in Merger Agreement § 2.01(d). In short, the Plaintiffs' conduct did not have impair the effect of the merger on capital stock. Because the Plaintiffs' alleged acquiescence, unclean hands, estoppel, and waiver also do not relate to the merger's effect, Oklahoma law by default applies to these defenses.

One aspect of the Plaintiffs' conduct implicated, however, the merger's effects under the Merger Agreement's terms. Before the Plaintiffs' decision to cash out their dissenting shares, those shares fell under Merger Agreement § 2.03's provision for dissenting shares. That provision states that dissenting shares "shall not be converted into a right to receive the Merger Consideration, but instead shall be entitled to only such rights as are granted by Section 1091 of the OGCA . . . ." Merger Agreement § 2.03 When the Plaintiffs cashed out their shares, they caused a change to the merger's effect on capital stock by then falling under Merger Agreement § 2.01(a) and having their shares automatically converted into a right to receive an amount in cash equal to $451,000.00 per whole share plus interest in the amount of four percent, compounded daily, from the merger's effective date. See Merger Agreement § 2.01(a). Moreover, the cash out also implicated the Merger Agreement's effects under Merger Agreement § 2.02, which obligated CEP-TIR to fund and pay the cash merger consideration due under Merger Agreement § 2.01 to the Dissenting Shareholders who cashed out their shares. See Merger Agreement § 2.02. By thus implicating the Merger Agreement's effect, the cash out

action made Delaware law govern the cash out and all the Plaintiffs' conduct related under the cash out. See Merger Agreement § 8/02 ("This Agreement shall be governed by and construed in accordance with the internal laws of Oklahoma without giving effect to any choice or conflict of law provision or rule . . . ; provided, however, the provisions of this Agreement relating to mechanics or the effects of the Merger under Delaware law shall be governed by and construed and enforced in accordance with the laws of the State of Delaware."

Under Delaware law, as the Delaware Court of Chancery enunciated it in 2003 in In re JCC Holding, when it summarized two earlier Delaware Court of Chancery decisions:

> a stockholder who cases a vote in favor of, or later accepts the consideration from, a merger effected by a controlling stockholder is not barred by the doctrine of acquiescence, or any other related equitable doctrine such as waiver, from challenging the fairness of the merger in an equitable action.

In re JCC Holding Co., Inc., 843 A.2d at 724 (citing Clements v. Rogers, 790 A.2d at 1222 & In re Best Lock Corp. Shareholder Litig., 2001 WL 1398580, at *1078). Furthermore, the Defendants admit that they engaged in a self-interested merger. Under Delaware law, defendants to a claim that involves a self-interested merger cannot shield the merger from entire fairness review by invoking equitable defenses. See In re JCC Holding Co., Inc., 843 A.2d at 724. Once the Court determines -- as it has here -- that the Defendants did not engage in what Delaware considers procedural fairness, the only issue left to decide is whether the Defendants gave the Plaintiffs' fair value. Delaware law decides whether the Oklahoma equitable defenses apply. The Oklahoma equitable defenses do not apply under Delaware merger value. In short, the Court concludes that Oklahoma law would govern the Defendants' defenses of acquiescence, estoppel, waiver, and unclean hands if the Delaware law governing the merger allowed the Court to consider these defenses. It does not; under Delaware law, a defendant cannot escape entire fairness review by invoking an equitable defense -- under Oklahoma law or the law of any other

state.[100]

## C. OKLAHOMA LAW GOVERNS THE PLAINTIFFS' STATE SECURITIES CLAIMS.

The Plaintiffs raise two state securities claims against the Defendants. See Amended Complaint ¶¶ 161-173, at 30-32. First, they assert that the Defendants violated the Oklahoma Uniform Securities Act of 2004 by making material misrepresentations to the pooled shareholders under the Pooled Shareholders by not disclosing to them the Defendants' IPO plans. See Amended Complaint ¶ 162, at 30. Second, the Plaintiffs contend that the Defendants Stephenson, C. Field, and CEP-TIR, as TIR's controlling shareholders, violated Oklahoma Uniform Securities Act of 2004 § 1-509(G) -- regarding control person liability for the same alleged material misrepresentations that the Plaintiffs allege the Defendants made to the Pooled Shareholders. See Amended Complaint ¶¶ 166-173, at 31-32. Under the Erie doctrine, a federal court sitting in diversity must apply the substantive law of the state in which it sits. See Erie R. Co. v. Tompkins, 304 U.S. at 64. Oklahoma's state securities law is part of Oklahoma's substantive law, and the Court concludes that Oklahoma law governs the Plaintiffs' state securities law claims.

## III. THE COURT DENIES THE REQUESTS IN THE DEFENDANTS' ACQUIESCENCE MSJ.

The Court denies the Defendants' request for summary judgment on the basis of the Plaintiffs' alleged acquiescence to the merger when they accepted the merger consideration. The Court concludes that (i) the Defendants did not set up a well-functioning committee of independent directors to examine and approve the merger; and (ii) a fully informed majority of the minority shareholders never voted to approve the merger, and that the evidentiary burden to

---

[100]Latter in this opinion, the Court will conclude that these defenses also are not available for trial under Delaware law.

prove the entire fairness of the merger remains with the Defendants.  See, e.g., Kahn v. Lynch

Communication Systems, Inc., 638 A.2d 1110 (Del. 1994).  The Court further concludes that,

when the Court interprets the facts in the light most favorable to the Plaintiffs, the Defendants do

not meet this evidentiary burden.  Delaware common law requires the Court to allow any case

where the Defendant bears the burden to prove entire fairness to proceed to trial so that the entire

fairness of the transaction can be evaluated.  See, e.g., In re Cornerstone Therapeutics Inc.

Stockholder Litigation, 2014 WL 4418169, at *8 (Del. Ch. 2014), rev'd on other grounds in In re

Cornerstone Therapeutics Inc. Stockholder Litigation, 115 A.3d 1173 (Del. 2015)

> **A.**  **BERSHAD, AND SUBSEQUENT SUPREME COURT OF DELAWARE AND DELAWARE COURT OF CHANCERY CASES, REQUIRE THE COURT TO APPLY THE ENTIRE-FAIRNESS STANDARD TO THE CONTESTED MERGER, WITH THE DEFENDANTS REQUIRED TO SHOULDER THE BURDEN TO PROVE ENTIRE FAIRNESS.**

When the Court sits in a diversity case, the Erie doctrine requires the Court to interpret

state law as the state's highest court would interpret it.  See Erie R. Co. v. Tompkins, 304 U.S. at

64.  Both parties agree that the Court should begin its analysis with the Supreme Court of

Delaware's decisions in Weinberger v. UOP, Inc. and Bershad, which combined to set the

template for how Courts are to adjudicate cash-out mergers.  In 1983, the Supreme Court of

Delaware planted itself firmly as a guardian of minority shareholder's rights during corporate

mergers in Weinberger v. UOP, Inc.  Delaware historically usually had applied the business

judgment rule to corporate actions.  In Weinberger v. UOP, Inc., however, the Supreme Court of

Delaware found a case where the company to be subsumed in the merger made no "attempt to

structure th[e] transaction on an arm's length basis."  457 A.2d at 710.  The Defendants had

allowed interested directors to have input into the special committee the company had

established to examine the merger and had not provided disinterested directors with important

financial data.  See 457 A.2d at 707-10.  Concluding that the lack of structures or procedures that would keep the merger decision at arm's length violated the company's fiduciary duty to its minority shareholders, the Delaware Supreme Court decided that such "divided loyalties" had no safe harbor in the state.  Weinberger v. UOP, Inc., 457 A.2d at 710.  Instead of reviewing such mergers under the deferential business-judgment rule, the Supreme Court of Delaware said that it would review them under the entire-fairness rule.  See 457 A.2d at 710-11.

> The Supreme Court of Delaware disserted at length on what this test needs to capture:
>
> The concept of fairness has two basic aspects: fair dealing and fair price.  The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.  The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.

457 A.2d at 711.  Lest this description be misinterpreted, the Supreme Court of Delaware then clarified that "the test for fairness is not a bifurcated one as between fair dealing and price.  All aspects of the issue must be examined as a whole since the question is one of entire fairness." 457 A.2d at 711.

Four years later, the Supreme Court of Delaware saw a different fact pattern in the cash-out merger of minority shareholders in Bershad.  In contrast with the defendants in Weinberger v. UOP, Inc., the defendant company in Bershad took multiple steps to safeguard minority shareholders' rights during the merger process before they were cashed out.  See Bershad, 535 A.2d passim.  At the same meeting in which the Curtiss-Wright board of directors decided that a merger might be beneficial, it hired a nationally recognized investment bank to evaluate the fairness of the proposed cash-out share offer price.  See Bershad, 535 A.2d at 842.  After the investment bank had reported its independent opinion that the cash-out share offer price was fair,

see 535 A.2d at 843, the Curtiss-Wright board of directors scheduled a shareholder meeting at which a large majority of Curtiss-Wright's minority shareholders approved of the merger, see 535 A.2d at 843.

The Bershad court did not diverge from Weinberger v. UOP, Inc.'s rule that the entire fairness test should apply in cash-out mergers, concluding that the entire fairness standard is necessary to "protect those rights of minority shareholders which have been tainted with unfairness." 535 A.2d at 848. The Supreme Court of Delaware added a twist, however. In a merger case in which the defendant company put substantial structures and processes in place to ensure that a controlling shareholder did not simply steamroll minority shareholders, the defendants "retain the burden of proving complete disclosure of all material facts relevant to the merger vote." 535 A.2d at 846. If the defendants prove complete disclosure, however, by an informed vote of a majority of the minority shareholders, they shift the entire-fairness burden onto the plaintiffs. See 535 A.2d at 846. In other words, the plaintiff must then bear the burden of proving that the merger was not entirely fair. See 535 A.2d at 846. If the plaintiff was fully informed, and then either voted in favor of the merger or accepted the transaction's benefits, the Supreme Court of Delaware continued, the plaintiff (i) would not meet its evidentiary burden; (ii) would be deemed to have acquiesced to the merger; and (iii) would no longer be able to attack the merger in court. See 535 A.2d at 848.

Were Weinberger and Bershad the last two statements that the Delaware courts made on the issue of minority rights in cash-out mergers, the parties likely would not have much of a disagreement over what law the Court should apply to the Defendants' Acquiescence MSJ. Like in baseball, however, plaintiffs and defendants whose arguments run through the same two bases oftentimes still only bring the Court halfway home. This observation is decidedly true in this

case, as the Plaintiffs correctly assert that the Supreme Court of Delaware and the Delaware Courts of Chancery have implicitly revisited and cabined <u>Weinberger</u> and especially <u>Bershad</u> over the past three decades.  The Defendants, on the other hand, state that <u>Weinberger</u> and <u>Bershad</u> remain good law.

The Court agrees with the Defendants that the Court must be careful not to hold that subsequent Delaware Court of Chancery decisions can implicitly overrule the Supreme Court of Delaware's decision in <u>Bershad</u>.  Such Chancery chicanery incontrovertibly would violate the <u>Erie</u> doctrine, which precludes federal courts sitting in diversity from cherry-picking cases from state intermediate courts to circumvent what a state's highest court had determined to be state law.  At the same time, nothing in the <u>Erie</u> doctrine suggests that a state's intermediate courts cannot clarify the contours of a state supreme court's decisions.  The Court indeed concludes that ignoring three decades of Supreme Court of Delaware and Delaware Court of Chancery cases that seem to sketch <u>Bershad</u>'s limits would itself amount to the very cherry-picking that the <u>Erie</u> doctrine forbids.  Insofar as <u>Erie</u> requires a federal court sitting in diversity to apply a state's common law, it demands that the Court aim to understand precisely what the contours and limits (if any) are of the Supreme Court of Delaware's position on minority shareholder acquiescence in cash-out mergers.

The Delaware Courts of Chancery's unique stature fortifies the Court's conclusion that examining their decisions related to <u>Bershad</u> is wise and prudent.  Legal scholars and even the Supreme Court of Delaware hold Delaware's Court of Chancery decisions in unique esteem.  As one former longtime chief justice of the Supreme Court of Delaware expressed this regard in a law review article after his retirement:

> The Court of Chancery makes much of our corporate law.  The judges of that court perform prolifically and promptly in an extraordinary manner on the ground,

daily, as the world's most respected business trial court. . . . About 85% to 90% of the court's final judgments in corporate cases are never appealed. The low rate of appeal is due to several factors, including the extraordinarily high international respect for the expertise of the court; the fact that those judgments are mostly correct; the fact that they usually are affirmed on appeal anyway; the fact that many cases are decided by interlocutory order . . . ; and the practical reality that business must move on from the answer provided by the Court of Chancery. This phenomenon is a high tribute to that court and is the chief reason that Delaware is the prevailing corporate domicile of choice.

E. Norman Veasey, 153 U. Pa. L. Rev. at 1408. In light of such respect, the Court concludes that consideration of Delaware Court of Chancery decisions related to Bershad, rather than imperiling its attempts to understand and apply state common law in conformity with the Erie doctrine, contribute to that understanding and application. Accordingly, the Court considers both Supreme Court of Delaware and Delaware Court of Chancery cases, subordinating the latter to the former wherever and whenever they irreconcilably conflict.

To that end, the Court has examined twenty-eight Supreme Court of Delaware and Delaware Court of Chancery decisions related to cash-out mergers since 1987, the year in which the Supreme Court of Delaware handed down Bershad. Three decades in, Bershad largely has withstood the test of time. The Supreme Court of Delaware has issued nine decisions over that time that relate to minority shareholder rights in cash-out mergers. See Kahn v. M.F. Worldwide Corp., 88 A.3d 635 (Del. 2014); In Re Celera Corp. Shareholder Litigation, 59 A.3d 418 (Del. 2012); Montgomery Cellular Holding Co., Inc. v. Dobler, 880 A.2d 206 (Del. 2005); Aspen Advisors LLC v. United Artists Theatre CO., 861 A.2d 1251 (Del. 2004); Skeen v. Jo-Ann Stores, Inc., 750 A.2d 1170 (Del. 2000); M.P.M. Enterprises, Inc. v. Gilbert, 731 A.2d 790 (Del. 1999); Cede & Co., v. Technicolor, Inc., 684 A.2d 289 (Del. 1996); Kahn v. Lynch Communication Systems, Inc., 638 A.2d 1110 (Del. 1994); Cavalier Oil Corp. v. Harnett, 564 A.2d 1137 (Del. 1989). As the Defendants argue and as the Court discussed earlier in this

Memorandum Opinion's section on law regarding cash-out mergers after Bershad, supra, the Supreme Court of Delaware has never expressly overturned Bershad. Tellingly, however, the Supreme Court of Delaware also has not dismantled limits on Bershad that nineteen Delaware Courts of Chancery read into the Bershad opinion over a span of thirty years. The Court interprets this silence as a textbook example of the dog that did not bark.[101] The Supreme Court of Delaware's choice not to flag Delaware Courts of Chancery's limits as misinterpretations, despite repeated opportunities to flag them as such, overwhelmingly suggests that the Delaware Courts of Chancery did not in fact misidentify Bershad's limits. Accordingly, both the Bershad frame and subsequent Delaware Court of Chancery decisions that filled in the jigsaw puzzle of Delaware cash-out merger law indicate that the Court must apply the entire-fairness standard when it assesses the merger contested in this case.

Under Delaware's entire-fairness standard, the burden of proving that the merger transaction was the product of both fair price and fair dealing defaults to the Defendants. The Court may shift the burden of evidence for proving entire fairness to the plaintiff under the following conditions: (i) the defendants set up a well-functioning committee of independent directors to examine and approve the merger; and (ii) a fully informed majority of the minority shareholders voted to approve the merger. See, e.g., Kahn v. Lynch Communication Systems, Inc., 638 A.2d 1110 (Del. 1994); In re PNB Holding Co. Shareholder Litigation, 32 Del. J. Corp. L. 654 (2006)(Strine, J.); Clements v. Rogers, 790 A.2d 1222 (2001)(Strine, J.)

---

[101]The "dog didn't bark" canon derives from a short story from Sir Arthur Conan Doyle, in which Sherlock Holmes deduces the identity of the villain after realizing that the dog of the house did not bark when the individual came to the house. See Sir Arthur Conan Doyle, The Adventure of Silver Blaze, The Complete Sherlock Holmes 347 (A.C. Doyle Memorial ed. 1960). The Supreme Court of the United States repeatedly has invoked this unofficial canon of statutory construction. See, e.g., Zuni Pub. Sch. Dist. No. 89 v. Dep't of Ed., 550 U.S. 81, 88, 127 S. Ct. 1534, 167 L. Ed. 2d 449 (2007); Scheidler v. National Organization for Women, 547 U.S. 9, 20, 126 S. Ct. 1264, 164 L.Ed.2d 10 (2006).

In this case, the Defendants satisfied neither criterion needed to shift the evidentiary burden. The Defendants did not form a special committee to consider the merger, nor did they schedule and hold a minority shareholder vote on the merger. Instead, the Defendants informed minority shareholders after the merger had been consummated that their shares had been "automatically canceled and extinguished," and "converted into a right to receive an amount in cash equal to $451,000" a share. Merger Agreement § 2.01(a). The Plaintiffs asserted at the motion hearing that, under what they interpret as <u>Kahn v. M.F. Worldwide Corp.</u>'s modification of <u>Kahn v. Lynch</u>'s burden shifting elements, they could make the Plaintiffs shoulder the evidentiary burden if even one -- but not both -- of the <u>Kahn v. Lynch</u>'s criteria were to hold. <u>See</u> Tr. at 23:6-10 (DeMuro). Even were the Court to accept this argument as a correct interpretation of Delaware common law, doing so would not shift the burden, for the Defendants failed to implement either safeguard to protect minority shareholder rights. The Court therefore concludes that the evidentiary burden for proving the merger's entire fairness remains with the Defendants.

**B.    INTERPRETING THE FACTS IN THE LIGHT MOST FAVORABLE TO THE PLAINTIFFS, THE COURT (I) CONCLUDES THAT THE DEFENDANTS DO NOT PROVE THE ENTIRE FAIRNESS OF THE MERGER TRANSACTION; AND, THEREFORE, (II) DENIES THE DEFENDANTS' ACQUIESCENCE MSJ.**

That the Defendants retain the burden of proving the merger's entire fairness does not end the analysis that the Court must conduct when adjudging the Defendants' Motion for Summary Judgment. Under <u>Weinberger</u>, <u>Bershad</u>, and subsequent Delaware case law, the Defendants still can prove that the Plaintiffs acquiesced in the transaction if the following conditions were met: (i) there was fair dealing; (ii) the share price at which the minority shareholders were cashed out was fair; (iii) the minority shareholders who were cashed out were

fully informed; and (iv) the minority shareholders who were cashed out voluntarily accepted the merger consideration. See Weinberger v. UOP, Inc., 457 A.2d at 710-13, Bershad, 535 A.2d at 845-48; Kahn v. Lynch Communication Systems, Inc., 638 A.2d at 1115-18. If the Defendants successfully prove each of these conditions, then the Plaintiffs lose their right to challenge the merger in court, and the Court must grant the Defendants' Acquiescence MSJ.

As the Court noted in the law regarding section on Delaware merger law, supra, the Supreme Court of Delaware discoursed at length about how the courts should interpret the terms "fair dealing" and "fair price" in cash-out merger cases in Weinberger v. UOP, Inc. In that court's words

> [t]he concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.

457 A.2d at 711. The Supreme Court of Delaware then clarified that "the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." 457 A.2d at 711.

Reviewing the facts in the light most favorable to the Plaintiffs, the Court concludes that fair dealing was not a hallmark of the merger transaction. Weinberger v. UOP, Inc. does not provide a court with an algorithm to weigh each of the six components it categorizes under fair process. The Court concludes that each component in fact points in unfairness' direction. First, TIR initiated the merger with Cypress Energy Partners after a TIR board of directors purge. Second, TIR and Cypress Energy Partners structured and negotiated the merger in a way that certain shareholder subgroups received sweeteners alongside the tender price, such as promises

of lucrative future employment or the option to gross up at a later date. Third, TIR and Cypress Energy Partners failed to disclose significant financial information and projections. Fourth, TIR did not seek minority shareholders' approval -- by vote or otherwise -- before it cancelled their shares and presented the opposed minority shareholders with a fait accompli. Accordingly, because (i) every component points in in the direction of the absence of fair dealing; and (ii) the resulting sum axiomatically cannot therefore point in the direction of fair dealing, the Court concludes that the Defendants have not proven fair dealing in the merger.

Examining the facts in the light most favorable to the Plaintiffs, the Court also concludes that this merger transaction was not a paragon of fair pricing. As with its multifactor test for fair dealing, the Supreme Court of Delaware in Weinberger does not provide the Court with an algorithm to weigh the four specified and ambiguous number of unspecified "other" elements that it categorizes under fair pricing. The Court interprets "any other elements" to solely be financial factors that "affect the intrinsic or inherent value of a company's stock" in the same manner that "assets, market value, earnings, [and] future prospects" affect its intrinsic or inherent value. To the Court, as to the Plaintiffs during the motion hearing, see Tr. at 68:10-12 (Kagen), this factor list intones a discounted cash flow model that uses EBITDA inputs -- the very model that the Delaware Code strongly prefers for a corporation to employ when it or a respected investment bank it hires calculates the corporation's shares' fair price.

The Defendants did not hire an investment bank to conduct a discounted cash flow analysis at the time of the merger. Cf. Tr. at 536:19-537:25 (DeMuro). Indeed, the Defendants did not contend that it hired an investment bank to calculate a fair price at the time of the merger at all. Cf. Tr. at 536:19-537:25 (DeMuro). The Defendants asserted at the motion hearing that this was a fiduciary choice, as the Defendants did not wish to pay a substantial amount of money

for an investment bank fairness opinion that (i) would duplicate the Halifax Group's December 2012 appraisal; and (ii) would solicit whatever valuation the Defendants "want[ed] to hear." Tr. at 138:10-139:6 (DeMuro). Were this case about the merger of a mature corporation with little change in its market capitalization over short periods of time, the Defendants' argument might withstand some scrutiny. As corporate financials demonstrate, however, revenues grew rapidly in the year after the December, 2012, appraisal, sprinting forward at an uneven pace month by month but generally running at a sixty percent year-on-year YTD growth. See Defendants' Acquiescence MSJ ¶ 51, at 13. To borrow a management consulting term, TIR was a rare corporate "star." Bruce Henderson, Boston Consulting Group, The Product Portfolio (1970), available at https://www.bcgperspectives.com/content/Classics/strategy_the_product_portfolio/ (last visited Apr. 5, 2017); Martin Reeves et al., Boston Consulting Group, BCG Classics Revisited: The Growth Share Matrix (June 4, 2014), available at https://www.bcgperspectives.com/content /articles/corporate_strategy_portfolio_management_strategic_planning_growth_share_matrix_bc g_classics_revisited/ (last visited Apr. 5, 2017)(estimating that only five percent of companies in 2012 qualified as BCG "stars").

TIR's choice not to commission an updated investment bank fairness opinion kept even the Defendants in the dark about a fair cash-out share price even if the Court were to interpret the facts in the light most favorable to the Defendants. A fortiori, interpreting the facts, as the Court must when considering the Defendants' Acquiescence MSJ, in the light most favorable to the Plaintiffs -- including the Plaintiff's assertions that the Defendants' internal metrics and valuations not disclosed to the minority shareholders showed much higher valuations than the $451,000.00 a share tender offer -- the Court must conclude that the Defendants have not met

their burden to prove that the tender price was fair.

The Court need not do extensive analysis of the third condition. At the hearing, the Plaintiffs conceded that they were fully informed. See Tr. at 158:20-159:5 (Court, Kagen). The Court made certain that it understood this concession correctly, particularly because the Defendants considered it to be a considerably important concession. See Tr. at 159:2-3 (Court); id. at 160:16-21 (DeMuro). The Plaintiffs left no room for misinterpreting their position:

> THE COURT: Well, I think what he's [Defendants' counsel] arguing is that you were . . . a fully-informed shareholder. You're not willing to concede that yet, are you?
>
> MR. KAGEN: We're saying that we're not contesting that issue, and we're further saying that for the Bershad analysis that's irrelevant.
>
> THE COURT: Well, I know you're saying it's legally irrelevant, and I've got to write an opinion on that. But are you conceding that you're wholly --
>
> MR. KAGEN: We're not contesting informed. We're not contesting disclosure. It's not an issue.

Tr. at 158:20-159:5 (Court, Kagen). Accordingly, the Court concludes that the Defendants have satisfied the third condition. The parties strenuously differ on whether the Plaintiffs voluntarily accepted the merger consideration and, correspondingly, whether the Defendants satisfied the fourth condition. The Court need not resolve this issue, because the four conditions that Weinberger and Bershad require are conjunctive. The Defendants failure to meet either of the first two conditions precludes the Court from granting the Defendants' Acquiescence MSJ under Delaware common law, and the Court accordingly denies the Defendants' Acquiescence MSJ.

## IV.   THE COURT DENIES IN PART AND GRANTS IN PART THE DEFENDANTS' ESTOPPEL MSJ.

The Court denies in part and grants in part the Defendants' Estoppel MSJ, dismissing the

Plaintiffs' securities claims but rejecting the Defendants' arguments that they are entitled to summary judgment on the basis of Oklahoma common law of equitable estoppel, waiver, or unclean hands. The Court concludes that: (i) the Defendants' Estoppel MSJ largely duplicates the Defendants' Acquiescence MSJ's facts; (ii) the Defendants do not demonstrate that they reasonably relied on the Plaintiffs' merger acceptance or that the alleged reliance caused the Defendants to suffer a detrimental change of position; (iii) the Defendants do not demonstrate that the Plaintiffs waived their right to challenge the entire fairness of the contested merger transaction; (iv) the Defendants do not demonstrate that the Plaintiffs undertook the allegedly fraudulent and deceitful conduct of which they complain, thereby failing to show that the Plaintiffs have unclean hands; (v) the Tenth Circuit is unlikely to support the Plaintiffs' contention that the forced-seller doctrine is good law within the Tenth Circuit, and the Court will not expand SEC rule 10b-5 to include the forced-seller doctrine, and the Court will dismiss the Plaintiffs' federal securities claims; and (vi) the Supreme Court of Oklahoma likely would dismiss the Plaintiffs' state securities claims and the Court, under the <u>Erie</u> doctrine's required deference to a state's supreme court, should dismiss the Plaintiffs' state securities claims. The Court will expand upon its reasoning for each of these conclusions in the pages to follow.

## A. OKLAHOMA LAW APPLIES TO THE ISSUES OF ACQUIESCENCE, EQUITABLE ESTOPPEL, WAIVER, AND UNCLEAN HANDS.

The Court conducted a choice-of-law analysis in section II of its analysis, <u>supra</u>, in which the Court concluded that Oklahoma law applies to the acquiescence, estoppel, waiver, and unclean hands defenses. In addition to the Court's previous analysis, the Court notes that for contract claims, Oklahoma choice-of-law requires federal courts to apply the law of that state which is the principal place of performance, <u>see</u> <u>Panama Processes v. Cities Serv. Co.</u>, 796 P.2d at 287-88, unless that state's law is repugnant to Oklahoma's establish law or public policy, <u>see</u>

Pate v. MFA Mut. Ins. Co., 649 P.2d at 811.  The purchase agreements that the Defendants entered into with the pooled shareholders and the tender offer that the Defendants made to the Plaintiffs both indicate that the law governing the agreements and offers is "the laws of the State of Oklahoma without regard to any conflicts of law principles."  E.g., Purchase Agreement between Celebration, LLC and J.W. Lorett 1 (Feb. 11, 2013), filed Apr. 3, 2015 (Doc. 83-6).  The Defendants' Notice to Former Shareholders of Tulsa Inspection Resources, Inc. of Shareholder Action and Appraisal Rights (dated Dec. 11, 2013), filed Apr. 3, 2015 (Doc. 83-27)("Notice to Former Shareholders"), by which the Defendants notified the Plaintiffs that the merger had been effected and the Plaintiffs retained no shares in the surviving entity and offering the Plaintiffs an option to accept the merger consideration of $451,000.00 per share, also invokes Oklahoma law.  See Notice for Former Shareholders at 1.  Oklahoma is the principal place of performance for the purchase agreements, tender offer, and the cash-out option mentioned in Notice to Former Shareholders.  Moreover, the Court sees no sound reason to conclude that Oklahoma would consider parties' choice to apply Oklahoma law to be repugnant to established Oklahoma public policy.  The Court therefore reconfirms its previous analysis that it should apply Oklahoma law to the equitable estoppel, waiver, and unclean hands defenses.

**B.     THE DEFENDANTS' ESTOPPEL MSJ LARGELY DUPLICATES THE FACTS OF THEIR FIRST MOTION FOR SUMMARY JUDGMENT.**

When the Court asked the Defendants at the motion hearing to explain the differences between Defendants' Acquiescence MSJ and Defendants' Estoppel MSJ, see Tr. at 350:21-351:8 (Court), the Defendants stated that Defendants' Acquiescence MSJ (i) rides on a particularized application of the Bershad acquiescence defense in the context of a cash-out merger; and (ii) relies on Delaware law, given that there is no Oklahoma line of cases addressing acquiescence in a cash-out merger.  See Tr. at 353:1-12 (DeMuro).  The Defendants contrasted this focus with

Defendants' Estoppel MSJ's focus, which the Defendants maintained is asserting Oklahoma law on estoppel, waiver, and unclean hands, as Oklahoma has a well-developed body of law on those points and the Defendants conclude that Oklahoma law applies to those defenses. See Tr. at 353:13-19 (DeMuro).

When the Plaintiffs responded to the Defendants' Estoppel MSJ later during the hearing, they could find much less daylight separating Defendants' Estoppel MSJ from Defendants' Acquiescence MSJ. See Tr. at 384:24-398:20 (Kagen). According to the Plaintiffs, both the factual section and the legal analysis in the Defendants' Estoppel MSJ are substantively identical to the factual section and the legal analysis in the Defendants' Acquiescence MSJ. See Tr. at 384:24-387:18 (Kagen). The Plaintiffs admitted that there seem to be six new numbered facts in Defendants' Estoppel MSJ, but argued that the difference is illusory, as the Defendants merely subdivide facts that they assert in Defendants' Acquiescence MSJ. See Tr. at 395:23-398:20 (Kagen). The Court has studied the factual sections of both Defendants' Acquiescence MSJ and Defendants' Estoppel MSJ and agrees with the Plaintiffs that the second largely duplicates the first, down to the word choice, syntax, sentence structure, and punctuation. Assessing whether the Defendants' arguments of equitable estoppel, waiver, and unclean hands are, as the Plaintiffs maintain, identical to the Defendants' acquiescence argument requires more intense study than the Plaintiffs seem ready to concede, and the Court turns to that next.

C.   **THE DEFENDANTS FAIL TO DEMONSTRATE THAT THEY REASONABLY RELIED ON THE PLAINTIFFS' MERGER ACCEPTANCE OR THAT THIS RELIANCE CAUSED THE DEFENDANTS TO SUFFER A DETRIMENTAL CHANGE OF POSITION, PRECLUDING THE COURT FROM GRANTING SUMMARY JUDGMENT ON EQUITABLE ESTOPPEL GROUNDS.**

Oklahoma law requires a defendant to establish five essential elements for a defense of equitable estoppel to succeed. The Supreme Court of Oklahoma clearly enumerated these five

elements in 2005 in <u>Sullivan v. Buckhorn Ranch Partnership</u>, which itself recited the same elements that the Supreme Court of Oklahoma had listed in 1967 in <u>Board of County Com'rs of Marshall County v. Snellgrove</u>:

> The essential elements necessary to establish equitable estoppel are: first, there must be a false representation or concealment of facts; second, it must have been made with actual or constructive knowledge of the real facts; third, the party to whom it was made must have been without knowledge, or the means of discovering the real facts; fourth, it must have been made with the intention that it should be acted upon; and fifth, the party to whom it was made relied on, or acted upon it to his or her detriment.

<u>Sullivan v. Buckhorn Ranch Partnership</u>, 119 P.3d 192, 202 (Okla. 2005). <u>Accord</u> <u>Board of County Com'rs of Marshall County v. Snellgrove</u>, 428 P.2d 272, 276 (Okla. 1967). The Court highlights that the five elements are conjunctive; in other words, the Defendants may not invoke the equitable estoppel defense if they fail to prove any of the five elements.

The Defendants do not prove any of the five elements, let alone prove all of them as the equitable estoppel defense requires. Indeed, it appears to the Court that the Defendants misread Oklahoma law on the five elements needed to prove equitable estoppel to be <u>disjunctive</u> rather than conjunctive -- interpreting "and" as "or" -- as the Defendants rest their argument on their alleged reliance on the Plaintiffs' delivery of their share certificates. Defendants' Estoppel MSJ at 21. According to the Defendants, the share certificate delivery induced the Defendants to: (i) pay the merger consideration; (ii) consummate the merger; (iii) and effect the sale of partnership units to the public pursuant to the Registration Statement. <u>See</u> Defendants' Estoppel MSJ at 21. Even if the Defendants successfully proved reliance, which the Court does not agree they have proved, such reliance on its own would not suffice to establish equitable estoppel under <u>Sullivan v. Buckhorn Ranch Partnership</u>. The facts show that the Defendants were bounds and determined to cash out the Plaintiffs; they were not waiting or relying on the Plaintiffs for

anything.  The Court cannot conclude even based even based on the Defendants' own statement of undisputed facts, that the Defendants have proven that they satisfied the reliance element.  The Defendants already had consummated the merger before they cashed out the Plaintiffs, and the Defendants were statutorily required to pay the merger consideration.  The assertion that the Plaintiffs induced detrimental reliance by causing the Defendants to effect the sale of partnership units to the public pursuant to the Registration Statement does not hold water, because this transaction was the very action that the Defendants wished to take regardless the Plaintiffs' actions.  By the Defendants' own admission, the Plaintiffs did not have veto power over the merger.  See Defendants' Estoppel MSJ at 20.

The Court, interpreting the facts in the light most favorable to the Plaintiffs, therefore does not conclude that such detrimental reliance existed.  This determination is dispositive by itself.  The Defendants do not, however, prove any of the five elements that Oklahoma law requires them to prove to be able to successfully put forth an equitable estoppel defense.  The Court therefore denies the Plaintiffs' request for summary judgment on the grounds of equitable estoppel.

> **D. THE DEFENDANTS FAIL TO DEMONSTRATE THAT THE PLAINTIFFS WAIVED THEIR RIGHT TO CHALLENGE THE ENTIRE FAIRNESS OF THE CONTESTED MERGER TRANSACTION.**

The Defendants assert that the Plaintiffs delivered their share certificates to the Defendants to induce the Defendants to pay the merger consideration, and in accordance with the Merger Agreement's express provision that any former shareholder who surrendered his or her share certificates would be deemed to have forever waived any appraisal rights or quasi-appraisal rights pursuant to the Oklahoma appraisal statute or otherwise.  See Defendants' Estoppel MSJ at 21.  The Plaintiffs counter that: (i) the Defendants' waiver defense is barred as a matter of law;

and (ii) even if the waiver defense were not barred, the Defendants fail to establish any of the waiver elements that Oklahoma law requires.  <u>See</u> Response to Defendants' Estoppel MSJ at 13. According to the Plaintiffs, the waiver defense fails on three grounds: (i) nothing in the merger notice declared such a broad waiver; (ii) 18 O.S. § 1091 does not impose a waiver; and (iii) settled law holds that foregoing an appraisal does not immunize the Defendants from liability for any breach of their duty of entire fairness in undertaking a self-interested merger transaction. <u>See</u> Response to Defendants' Estoppel MSJ at 15.

Under Oklahoma law, the waiver question only becomes one for the court to decide as a matter of law if the fact of the waiver is undisputed and is subject to only one interpretation.  <u>See</u> <u>General Finance Corp. v. Jackson</u>, 296 P.2d at 143.  If, on the other hand, the evidence of alleged waiver is conflicting or disputed, <u>or</u> if the Court can draw more than one reasonable inference about the existence of waiver from the evidence, then the waiver question becomes a question of fact for the jury.  <u>See</u> <u>Murphy Oil USA, Inc. v. Wood</u>, 438 F.3d at 1008.  Because the parties unquestionably dispute whether the Plaintiffs waived their right to challenge the merger when they accepted the merger consideration, the Court need not resolve the second question whether the evidence likewise if sufficiently conflicted that the Court would be able to draw more than one reasonable inference from the evidence.   Nevertheless, the Court comes to this second conclusion as well.  The Defendants make a reasonable case for their position that the Plaintiffs waived their right to challenge the merger when they accepted the merger consideration when they invoke the Merger Agreement to argue that its provision that a shareholder could cash out <u>or</u> seek an appraisal.  <u>See</u> Defendants' Estoppel MSJ at 21.  <u>See also</u> Notice to Former Shareholders at 1.  On the other hand, the Plaintiffs also make a reasonable case that they did not waive their right to challenge the merger when they received the merger consideration on the grounds that (i)

a contractual waiver in Oklahoma requires a contract; and (ii) the Plaintiffs never had a contract to be cashed out; rather, the Defendants unilaterally cancelled the Plaintiffs shares.  See Response to Defendants' Estoppel MSJ.  Section 1091 of title 18 of the Oklahoma Statutes favors the Plaintiffs' position, in that it does not expressly impose a waiver on shareholders if they accept merger consideration.  The Court concludes that, in addition to the existence of a party dispute over whether the Plaintiffs waived their right to challenge the price at which they were cashed out, the Court can draw more than one reasonable inference from the evidence. Indeed, the Court concludes that the Supreme Court of Oklahoma would find that its law does not allow for waiver merely from taking the cash-out consideration.  Accordingly, while under Oklahoma law, the question of waiver is one for the jury, the Court finds that, as a matter of law, waiver of Delaware merger rights is not available from the mere taking of the cash-out consideration, and the Court consequently denies the Defendants summary judgment on their waiver defense.

**E.  THE DEFENDANTS FAIL TO DEMONSTRATE THAT THE PLAINTIFFS UNDERTOOK THE ALLEGEDLY FRAUDULENT AND DECEITFUL CONDUCT OF WHICH THEY COMPLAIN, THEREBY FAILING TO SHOW THAT THE PLAINTIFFS HAVE UNCLEAN HANDS.**

The Defendants argue that the Oklahoma common law of unclean hands bars the Plaintiffs' claims on the grounds that Stuart orchestrated this litigation despite: (i) having attempted to seize control of TIR, Inc.; (ii) having entered into an agreement with the other Plaintiffs to attempt to extract an unjustified premium for the Plaintiffs' shares; (iii) filing false allegations against the Defendants in an attempt to justify a trial on their surrendered shares' value; and (iv) bragging about the cash-out share price that the Plaintiffs received.  See Defendants' Estoppel MSJ at 19-20.  The Plaintiffs counter that they do not have unclean hands,

because (i) the Plaintiffs' conduct did not cause the Defendants' unilateral adoption, execution, and implementation of the cash-out merger; and (ii) the Plaintiffs did not induce the Defendants' merger consideration payment by committing the very fraudulent and deceitful conduct of which they complain.

In Oklahoma, an unclean-hands defense requires a defendant to show that the plaintiff tainted the transaction that they are challenging by undertaking "the very fraudulent and deceitful conduct of which they complain." Yeager v. Fort Knox Sec. Products, 602 F. App'x at 429 (internal quotation marks omitted). The Defendants' allegation that Stuart attempted to extract a price premium does not support a sound conclusion that the Plaintiffs challenge the very fraudulent and deceitful conduct of which they complain; the Plaintiffs challenge the involuntary cash out of their shares and the fair price. The Defendants' allegation that the Plaintiffs filed false allegations against them is now moot, because the Plaintiffs withdrew these allegations in their Amended Complaint, which they filed more than fifteen months before the hearing in December, 2016. Even if they were not moot and even if the allegations were false, such conduct does not constitute the very fraudulent and deceitful conduct of which the Plaintiffs complain. Last, Stuart's alleged braggadocio in the Letter from Alan L. Stuart to Investors (dated Feb. 4, 2014), filed September 14, 2015 (Doc. 154-31), in no way demonstrates that the Plaintiffs now challenge the very fraudulent and deceitful conduct of which they complain; bragging about a sale is not the same conduct as cashing out minority shareholders or paying an unfair price. The Court accordingly concludes that the Defendants have offered insufficient proof for summary judgment on the theory that the Defendants have unclean hands.

**F.    THE COURT CONCLUDES THAT IT SHOULD NOT EXPAND SEC RULE 10(b)(5) TO INCLUDE THE FORCED-SELLER DOCTRINE, AS THE SECOND CIRCUIT DISCUSSED IT IN <u>VINE V. BENEFICIAL FINANCE CO.</u>, AND THAT THE COURT THEREFORE SHOULD GRANT THE DEFENDANTS' REQUEST FOR SUMMARY JUDGMENT ON THE PLAINTIFFS' FEDERAL SECURITIES CLAIMS.**

The Defendants contend that the Plaintiffs, under SEC rule 10(b)(5), must allege and prove both (i) a misleading statement or omission of a material fact; and (ii) reliance, if the Plaintiffs are to prevail on their securities claims.  <u>See</u> Defendants' Estoppel MSJ at 23-24.  The Defendants argue that the Plaintiffs fail to prove that the Defendants made any misleading statement or omitted any material fact about the merger in their communications with the Plaintiffs, and correspondingly fail to prove any reliance on nonexistent misleading or omission.  <u>See</u> Defendants' Estoppel MSJ at 24.  The Defendants therefore ask the Court to grant summary judgment on the Plaintiffs' securities claims.

In response, the Plaintiffs assert that the Defendants misunderstand the claims they challenge, maintaining that the Plaintiffs bottom their securities claims on the forced-seller doctrine that the Second Circuit recognized in <u>Vine v. Beneficial Finance Co.</u>  The Plaintiffs maintain that triable factual issues exist concerning what the Plaintiffs characterize as the Defendants' misrepresentations and omissions of material fact to the pooled shareholders.  <u>See</u> Response to Defendants' Estoppel MSJ at 20.  <u>Vine v. Beneficial Finance Co.</u>, the Plaintiffs maintain, held that, in securities cases where the defendant deceives a third party and then forces it to convert or sell its shares, a plaintiff has automatically stated a securities fraud claim -- even if that plaintiff did not personally rely on the alleged misrepresentation -- as long as the fraud practiced on the third party caused the plaintiff's loss.  <u>See</u> Response to Defendants' Estoppel MSJ at 20 (citing <u>Vine v. Beneficial Finance Co.</u>, 374 F.2d at 635; <u>Jacobson v. AEG Capital Corp.</u>, 50 F.3d 1493, 1498 (9th Cir. 1995); <u>Brown v. Kinross Gold, U.S.A.</u>, 343 F. Supp. 2d 957,

962 (D. Nev. 2004)). The Plaintiffs contend that the plaintiff in <u>Vine v. Beneficial Finance Co.</u> was similarly situated to them, because (i) the <u>Vine v. Beneficial Finance Co.</u> defendants had pushed through a cash-out merger by fraudulently inducing shareholders other than the plaintiff to tender their shares; and (ii) the Defendants in this case allegedly deceived the pooled shareholders to obtain shares without which they would have controlled insufficient shares to enable a cash-out merger. <u>See</u> Response to Defendants' Estoppel MSJ at 20-22.

The Court recognizes that the Defendants in this case would have been unable to cash out the Plaintiffs had they not obtained the pooled shareholders shares. Even if the Plaintiffs are correct that the Defendants greased the skids for obtaining the pooled shareholders' shares with all varieties of snake oil, a question that the Court does not need to address or resolve at this time, the Court is not convinced that the Tenth Circuit would expand SEC Rule 10(b)(5) to capture the forced-seller doctrine that the Second Circuit applied in <u>Vine v. Beneficial Finance Co.</u> fifty years ago. The Plaintiffs, in a footnote to their Response to Defendants' MSJ, introduce the Court to the Tenth Circuit's decision in <u>Katz v. Gerardi</u>, an opinion that then-Judge and now Chief Judge Tymkovich wrote, and Judges Brorby and Matheson joined, asserting that the Tenth Circuit recognized the forced-seller doctrine's existence, but then did not reach the question whether to apply the doctrine in that case, because the plaintiff's claims arose under the Securities Act of 1933, rather than under the Securities Exchange Act of 1934 and SEC Rule 10(b)5. <u>See</u> Response to Defendants' Estoppel MSJ at 20 n.11.

The Court reads <u>Katz v. Gerardi</u> differently. The Tenth Circuit in <u>Katz v. Gerardi</u> noted that "[w]e have previously declined to adopt the fundamental change doctrine and we decline to do so again here for several reasons." 655 F.3d at 1221. One of these reasons, which the Plaintiffs correctly identify, is that "the doctrine only applies to claims under the 1934 Act,

where Katz's claims here arise under the 1933 Act." Katz v. Gerardi, 655 F.3d at 1221. The second reason, however, is that the forced-seller doctrine is something of a misnomer, insofar as it applies only when the plaintiff purchases shares -- not when the plaintiff sells them. See 655 F.3d at 1221. Because that case's defendants had cashed Katz' shares out against Katz' will and Katz had not purchased new units in the post-merger entity, the Tenth Circuit held that the forced-seller doctrine did not apply. See 655 F.3d at 1221-22. The Tenth Circuit insisted that it was on solid ground on this second point, quoting from a Seventh Circuit opinion on the same case and facts when the Seventh Circuit heard the case's appeal regarding removal to federal court:[102]

> Katz depicts himself as a buyer by characterizing the supposed failure to honor the terms of the A-1 Units as if he had sold those securities and "bought" what Katz calls "new A-1 Units," which he then sold for cash. (A "purchase" of "new A-1 Units" would have been involuntary, but an involuntary purchase is still a purchase.)

---

[102]The Tenth Circuit recounts Katz v. Geradi's unusual case history:

> In May 2008, Katz filed a class action in Cook County, Illinois state court asserting securities fraud claims in connection with the merger. That case was removed to federal court, where the defendants requested it be transferred to the District of Colorado. Katz opposed removal and the transfer. The district court remanded the case to state court, which defendants challenged.

> On appeal, the Seventh Circuit vacated the district court's decision and remanded for a hearing on issues regarding removal. *See Katz v. Gerardi*, 552 F.3d 558 (7th Cir. 2009). On remand to the district court, both parties sought to transfer the case to Colorado. The case was transferred in June 2009.

> . . . .

> In August 2010, the district court dismissed the amended complaint. . . . The court dismissed Katz's 1933 Act claims because he was not a purchaser of securities and therefore lacked standing under the statute. Katz and Infinity appeal this decision.

655 F.3d at 1216.

What Katz calls the "fundamental change doctrine" that turns a sale into a purchase is word play designed to overcome the actual text of the securities laws, and this circuit follows the statutes rather than trying to evade them with legal fictions. Katz sold his units for cash; he did not buy any new security. The "new A-1 Units" are figments of a lawyer's imagination. Using legally fictitious (and factually nonexistent) "new A-1 Units" to nullify a legislative decision that only buyers have rights under the 1933 Act would be wholly unjustified.

Katz v. Gerardi, 655 F.3d at 1223 (quoting Katz v. Gerardi, 552 F.3d 558, 560 (7th Cir. 2009))..

At the motion hearing, the Court indicated that it did not "have any reason to think that Oklahoma would []graft the forced seller doctrine on to its blue sky or state securities law, and to the extent that that's really what the fifth and sixth claims are, I would be inclined to dismiss those and grant the motion in part." Tr. at 445:6-446:9 (Court). The Court also indicated at the hearing that it was inclined to grant the Defendants' request that it dismiss the Plaintiffs' federal securities claims, because "I don't see that the Tenth Circuit would adopt the forced seller doctrine in the federal securities context." Tr. at 446:7-9 (Court). Further reflection has fortified the Court's earlier inclinations. As in Katz v. Gerardi, the Plaintiffs in this case were cashed out against their will, but did not purchase any shares in the new merged company. Although the Plaintiffs are correct that Katz v. Gerardi did not definitively decide the question whether the forced-seller doctrine applies in the Tenth Circuit, the case's dicta suggests that the doctrine is inapplicable when a plaintiff is only a seller, i.e., not also a buyer.

The Court concludes that the Tenth Circuit's choice to decline to apply the forced-seller doctrine is the right call. As the Seventh Circuit reasoned in Isquith v. Caremark Intern., Inc., a cashed out shareholder sells his or her shares, but the very nature of this sale as a forced sale means that the seller has not been induced to sell based on a misrepresentation, a misleading omission, or a compulsion of any kind. See 136 F.3d at 535. Especially in a post-Blue Chip Stamps world, where it is clear that the relevant portions of the forced-seller doctrine are limited

to purchases and sales, the rationale behind the forced-seller doctrine appears to be at odds with securities' laws purpose: "to protect investors from being induced to make unsound sales or purchases by misrepresentations or misleading omissions."  Isquith by Isquith v. Caremark Intern., Inc., 136 F.3d at 536.

The Tenth Circuit, in Katz v. Gerardi, 655 F.3d 1212 (10th Cir. 2011), in an opinion that then-Judge and now Chief Judge Tymkovich wrote, and Judges Brorby and Matheson joined, noted that "[w]e have previously declined to adopt the fundamental change doctrine[103] and we decline to do so again here for several reasons."  655 F.3d at 1221.  One of these reasons is that "the doctrine only applies to claims under the 1934 Act, where Katz's claims here arise under the 1933 Act." 655 F.3d at 1221.  The second reason is that the forced-seller doctrine is something of a misnomer, insofar as it applies only when the plaintiff purchases shares -- not when the plaintiff sells them.  See 655 F.3d at 1221.  Because that case's defendants had cashed Katz' shares out against Katz' will, and Katz had not purchased new units in the post-merger entity, the Tenth Circuit held that the forced-seller doctrine did not apply.  See 655 F.3d at 1221-22.  The Tenth Circuit insisted that is was on solid ground on this second point, quoting from a Seventh Circuit opinion on the same case and facts when the Seventh Circuit heard the case's appeal regarding removal to federal court:

> Katz depicts himself as a buyer by characterizing the supposed failure to honor the terms of the A-1 Units as if he had sold those securities and "bought" what Katz calls "new A-1 Units," which he then sold for cash. (A "purchase" of "new A-1 Units" would have been involuntary, but an involuntary purchase is still a purchase.)
>
> What Katz calls the "fundamental change doctrine" that turns a sale into a

---

[103]Earlier in the opinion, the Tenth Circuit noted that other courts variously have referred to the same doctrine as either the "forced seller doctrine" or the "fundamental change doctrine."  Katz v. Gerardi, 655 F.3d at 1221.  The Tenth Circuit then chose to refer to the doctrine as the "fundamental change doctrine" through the opinion's remainder.  See 655 F.3d at 1221-23.

> purchase is word play designed to overcome the actual text of the securities laws, and this circuit follows the statutes rather than trying to evade them with legal fictions. Katz sold his units for cash; he did not buy any new security. The "new A-1 Units" are figments of a lawyer's imagination. Using legally fictitious (and factually nonexistent) "new A–1 Units" to nullify a legislative decision that only buyers have rights under the 1933 Act would be wholly unjustified.

Katz v. Gerardi, 655 F.3d at 1223 (quoting Katz v. Gerardi, 552 F.3d at 560). The Tenth Circuit ultimately held that the forced-seller doctrine is inconsistent with basic federal securities precedents, because it penalizes conduct that is too remote from the fraud to be actionable, i.e., does not induce a third party to do anything. See Reply to Defendants' Estoppel MSJ at 5-6 (citing Isquith v. Caremark International, Inc., 136 F.3d 531 (7th Cir. 1998)). For a fifty-year-old doctrine that the Defendants at the hearing correctly assessed as "being on life-support," Tr. at 322:23-24 (DeMuro), the Court sees no sound reason to ignore the Tenth Circuit's guidance and revivify the doctrine. The Court accordingly grants the Defendants the summary judgment they seek on the Plaintiffs' securities claims, dismissing those claims.

### G. THE COURT GRANTS THE DEFENDANTS SUMMARY JUDGMENT ON THE PLAINTIFFS' STATE SECURITIES CLAIMS.

The Plaintiffs raise two state securities claims against the Defendants. See Amended Complaint ¶¶ 161-173, at 30-32. First, they assert that the Defendants violated the Oklahoma Uniform Securities Act of 2004 by making material misrepresentations to the pooled shareholders under the Pooled Shareholders Agreement by not disclosing to them the Defendants' IPO plans. See Amended Complaint ¶ 162, at 30. Second, the Plaintiffs contend that Stephenson, C. Field, and CEP-TIR, as TIR's controlling shareholders, violated Oklahoma Uniform Securities Act of 2004 § 1-509(G) -- regarding control person liability for the same alleged material misrepresentations that the Plaintiffs allege the Defendants made to the Pooled Shareholders. See Amended Complaint ¶¶ 166-173, at 31-32.

The Defendants ask the Court to grant summary judgment on these state securities claims on four grounds.  See Defendants' Estoppel MSJ at 22-23.  First, the Defendants assert, 71 O.S. § 1-509M provides that no private right of action arises under 71 O.S. § 1-501.  See Defendants' Estoppel MSJ at 23.  Second, the Defendants maintain, the Plaintiffs' Oklahoma Securities Act claims are bottomed solely on three false allegations that the Plaintiffs included in their Complaint but removed from their Amended Complaint.  See Defendants' Estoppel MSJ at 23.  Third, the Defendants contend, the Plaintiffs have waived their Oklahoma Securities Act claims by contract and conduct.  See Defendants' Estoppel MSJ at 23.  Fourth, the Defendants argue, the Oklahoma common-law principles of equity and estoppel bar the Plaintiffs' Securities Act claims.  See Defendants' Estoppel MSJ at 23.  The Plaintiffs respond that: (i) the forced-seller doctrine establishes a prima facie case of securities fraud; and (ii) the Plaintiffs' "securities fraud claims rest solely on the forced seller doctrine, based on Defendants' material misrepresentations and omission to the Pooled Shareholders."  Response to Defendants' Estoppel MSJ at 19-20.

As the Court noted in its analysis of the Plaintiffs' federal securities claims, infra, the Court concludes that the Tenth Circuit twice has declined to apply the forced-seller doctrine, one of those times adopting the Seventh Circuit's reasoning that the forced-seller doctrine "turns a sale into a purchase [and] is word play designed to overcome the actual text of the securities laws, and this circuit follows the statutes rather than trying to evade them with legal fictions." Katz v. Gerardi, 655 F.3d at 1223 (quoting Katz v. Gerardi, 552 F.3d at 560).  The Court also has been unable to locate any Supreme Court of Oklahoma case that applies the forced-seller doctrine to state securities laws.  Under the Erie doctrine, a federal court sitting in diversity must apply the laws of the state in which it sits.  The Court considers it doubtful that the Supreme Court of Oklahoma would now adopt the forced-seller doctrine when: (i) the Supreme Court of

Oklahoma never has adopted the doctrine in the past: (ii) no federal court has adopted the forced-seller doctrine for the first time for decades; and (iii) the force-seller doctrine appears to violate the core purpose of securities law: to protect investors from fraudulent practices.  See SEC v. Int'l Chem. Dev. Corp., 469 F.2d 20, 26 (10th Cir. 1972).  The Court has not, in its independent review of the record, located any state law that has interpreted its state securities laws as allowing the forced-seller doctrine.  The Court doubts the Supreme Court of Oklahoma would be the first state supreme court -- especially in 2017 -- to graft the doctrine to its state securities law. Accordingly, the Court concludes that the Supreme Court of Oklahoma would be unlikely to apply the forced-seller doctrine to Oklahoma state securities claims.  Because the Plaintiffs rest their entire opposition to the Defendants' request for summary judgment on the state securities claims on the forced-seller doctrine, the Court grants the Defendants request for summary judgment on the Plaintiffs' state securities claims.

## V.  THE COURT GRANTS THE REQUESTS IN THE PLAINTIFFS' MSJ, BUT LEAVES A DETERMINATION OF DAMAGES TO BE RESOLVED AT TRIAL.

The Court grants the Plaintiffs' request for summary judgment.  The Court concludes that (i) the entire fairness standard governs the Plaintiffs' claims for breach of fiduciary duty; (ii) the Defendants bear the burden of proof that the merger was entirely fair to the minority shareholders; and (iii) the Defendants are liable for breaching their duty of entire fairness, because the undisputed material facts show that the Defendants did not put into place sufficient safeguards protecting minority shareholder rights to meet this burden.  The Plaintiffs' and Defendants' competing valuation assumptions, models, projections, and experts do not allow the Court to calculate damages at this time, and the Court accordingly leaves a determination of damages to be resolved at trial.

## A.    THE ENTIRE FAIRNESS STANDARD GOVERNS THE PLAINTIFFS' CLAIMS FOR BREACH OF FIDUCIARY DUTY.

The Court discussed the entire fairness doctrine at length in its analysis of the Defendants' Acquiescence MSJ supra and will not needlessly rehash the analysis it completed there.   The Court highlights, however, that the Defendants agreed with the Plaintiffs at the motion hearing:

> We've got an area of agreement, which is a great way to end the day for anybody in the courtroom.   And that is, we agree that if Your Honor denies the acquiescence motion outright and says it's no longer an issue, or even if you submit that to the trial, which we think you should, the trial court at a minimum, that if we don't get dismissed on acquiescence, okay, and it's a trial issue, we agree that the entire fairness standard applies to the fiduciary duty claims.

Tr. at 510:10-19 (DeMuro).   To ensure that it correctly interpreted what the Defendants were saying, the Court probed the Defendants at that time with a collection of short questions.   See Tr. at 510:23-511:19 (Court, DeMuro).   Because of the exchange's importance, the Court recites the exchange verbatim here:

> THE COURT: But you would agree with his statement that the entire fairness standard governs Plaintiffs' claims for breach of fiduciary duty if the acquiescence motion is denied?
>
> MR. DEMURO: Correct.
>
> THE COURT: And would you also agree that the Defendants bear [the] burden of proving that the merger satisfies the entire fairness standard if the acquiescence motion for summary judgment is denied?
>
> MR. DEMURO: As it pertains to the fiduciary duty claim, yes.

Tr. at 510:23-511:8 (Court, DeMuro).   Inquiring about the Defendants' assertion that they might still quibble what the jury instruction looks like regarding the entire fairness standard and from what specific case law the jury instruction would be pulled, the Court asked the Defendants whether their quibble would just be about the Defendants' liability under the entire-fairness

standard.  <u>See</u> Tr. at 511:9-10 (Court).  The Defendants responded that "that's the claim, yes."

Tr. at 511:11 (DeMuro).

As the Court concluded in its analysis of the Defendants' Acquiescence MSJ <u>supra</u>, the

Court has denied the requests in the Defendants' Acquiescence MSJ.  The Court sees no sound

reason to manufacture a controversy or disagreement between the parties about whether (i) the

entire fairness standard should apply to the Plaintiffs' fiduciary duty claim when both parties

agree that it does apply; or (ii) the Defendants bear the burden of proving that the merger

satisfies the entire fairness standard with respect to the Plaintiffs' fiduciary duty claim when both

parties agree that the Defendants bear this burden.  The Court accordingly concludes that: (i) the

entire fairness standard applies to the Plaintiffs' fiduciary duty claims; and (ii) the Defendants

bear the burden of proving that the merger satisfies the entire fairness standard with respect to

the Plaintiffs' fiduciary duty claims.

> **B.      THE DEFENDANTS ARE LIABLE FOR BREACHING THEIR DUTY OF ENTIRE FAIRNESS, BECAUSE THE UNDISPUTED MATERIAL FACTS SHOW THAT THE DEFENDANTS DID NOT PUT INTO PLACE SUFFICIENT      SAFEGUARDS      PROTECTING      MINORITY SHAREHOLDER RIGHTS.**

At the hearing, the Plaintiffs argued that the Defendants have not and cannot meet their

burden to show the entire fairness of the merger transaction.  <u>See</u> Tr. at 509:22-510:2 (Kagen).

Even looking at the undisputed facts in the light most favorable to the Defendants, the Court

agrees with the Plaintiffs' position.  Under Delaware law, a breach of fiduciary duty requires

proof of two elements: (i) that a fiduciary duty existed; and (ii) that the defendant breached that

duty.   <u>See</u>, <u>e.g.</u>, <u>In re Mobilactive Media, LLC</u>, 2013 WL 297950 (Del. Ch. Jan. 25,

2013)(Parsons, V.C.).   <u>See also</u> <u>Palmer v. Reali</u>, __ F. Supp. 3d __, 2016 WL 5662008, at *8 (D.

Del. Sept. 29, 2016)(Robinson, J.)(applying Delaware law).  The entire fairness standard satisfies

the first element by requiring a company to ensure that minority shareholders receive fair dealing and a fair price if the company cashes out their shares in a merger's wake. The Defendants can only avoid satisfying the second element in this case if they plausibly can show that they offered the Plaintiffs both fair dealing and fair price in the merger transaction. Under the entire fairness standard, the Defendants could show fair dealing under the following conditions: (i) the Defendants set up a well-functioning committee of independent directors to examine and approve the merger; or (ii) a fully-informed majority of the minority shareholders voted to approve the merger. See, e.g., Kahn v. Lynch Communication Systems, Inc., 638 A.2d 1110 (Del. 1994); In re PNB Holding Co. Shareholder Litigation, 32 Del. J. Corp. L. 654 (2006)(Strine, J.); Clements v. Rogers, 790 A.2d 1222 (2001)(Strine, J.)

In this case, the Defendants satisfied neither criterion needed to shift the evidentiary burden. The Defendants did not form a special committee to consider the merger, nor did they schedule and hold a minority shareholder vote on the merger. Instead, the Defendants informed minority shareholders after the merger had been consummated that their shares had been "automatically canceled and extinguished" and "converted into a right to receive an amount in cash equal to $451,000" a share. Merger Agreement § 2.01(a). The Plaintiffs asserted at the hearing that, under what they interpreted as Kahn v. M.F. Worldwide Corp.'s modification of Kahn v. Lynch's burden shifting elements, they could make the Plaintiffs shoulder the evidentiary burden if even one -- but not both -- of the Kahn v. Lynch's criteria were to hold. See Tr. at 23:6-10 (DeMuro). Even were the Court to accept this argument as a correct interpretation of Delaware common law, doing so would not shift the burden to the Plaintiffs, for the Defendants failed to implement either safeguard to protect minority shareholder rights. The Court therefore concludes that the undisputed facts demonstrate that the Defendants failed to

meet their burden to prove that they satisfied their fiduciary duty of fair dealing. The Court

therefore grants the Plaintiffs' request for summary judgment on the Defendants' liability for

breaching their fiduciary duty of fair dealing with respect to the merger transaction.

**C. THE PLAINTIFFS' AND DEFENDANTS' COMPETING VALUATION ASSUMPTIONS, MODELS, PROJECTIONS, AND EXPERTS DO NOT ALLOW THE COURT TO CALCULATE DAMAGES AT THIS TIME, AND THE COURT ACCORDINGLY LEAVES A DETERMINATION OF DAMAGES TO BE RESOLVED AT TRIAL.**

The Plaintiffs finally request in the Plaintiffs' MSJ that the Court leave a determination of

damages to be determined at trial. See Plaintiffs' MSJ at 1-2. As the Defendants disclosed in the

tender offer and conceded at the hearing, no investment bank was hired to appraise TIR shares'

fair value at the time the merger was effected and the Plaintiffs involuntarily cashed out their

shares. See Tr. at 138: 10-12 (DeMuro). The Defendants insist that such a valuation was

unnecessary, because (i) the Halifax Group had appraised TIR shares a few months before the

merger; (ii) the pooled shareholders had sold their shares at or below $451,000.00 per share; and

(iii) TIR had just gone through a competitive bidding process where two inside directors were

bidding up the share price. See Tr. at 138:12-19 (DeMuro). Were this case about the merger of

a mature corporation with little change in its revenue streams over short periods of time, the

Defendants' argument might withstand some scrutiny. As the Court discussed in its analysis of

Defendants' Acquiescence MSJ supra, TIR's corporate financials demonstrate that revenues

grew rapidly in the year after the December 2012 appraisal. See Defendants' Acquiescence MSJ

¶ 51, at 13. Furthermore, pooled shareholders' testimony indicates that the Plaintiffs asserted

that the pooled shareholders had sold their shares at or below $451,000.00 per share, because

they needed liquidity or did not know what TIR's financials or plans for an IPO were. See Tr. at

203:15-23 (Kagen).

At the hearing, the Plaintiffs contended that the one method of share valuation that Delaware allows for pricing shares in a cash out merger is a discounted cash flow model on the date that unwilling minority shareholders were forcibly removed. See Tr. at 253:2-7 (Kagen). Delaware requires the discounted cash flow model, because it looks at the company's future earning value in a systematic and methodical way, and then discounts that value to net present value, discounting for money's time value and capital's weighted average cost. See Weinberger 457 A.2d 701, passim. In this case, however, the share valuation math is less clear cut than the share valuation law. The DCF model incorporates substantial amounts of math complete with a fraternity's worth of Greek letters to camouflage relatively straightforward computation. The final summation is at best only as precise, however, as its least precise input. Moreover, precision is not the same as accuracy. See, e.g., Nate Silver, The Signal and the Noise: Why So Many Predictions Fail--But Some Don't 45-46 (2015)("Silver")(discussing, in the context of the 2008 financial crisis, how even extremely precise predictions can be wildly inaccurate). This lack of equivalence between precision and accuracy is especially probable when a model uses multiple inputs, the parameters, values, or weights of which incorporate an element of subjective choice. See Silver at 120-123; Mark M. Meerschaert, Mathematical Modeling 41-49 (4th ed. 2013)(discussing need for rigorous sensitivity analyses in multivariate models).

The valuation issue in this case therefore presents an analytical challenge, because (i) each variable in the DCF model leaves an appraiser with a degree of discretion to choose rates or coefficients that he or she concludes best fits present data and future trends; and (ii) TIR's status as a pipeline inspection company within the oil and gas industry leaves some reason as to the proper SIC code for appraisers to use when computing TIR's cost of capital. The Defendants' and Plaintiffs' dueling valuations, which result under certain scenarios with valuations that vary

by almost $800,000.00 per share, attest to the degree of subjectivity that calculating DCF entails. The Court cannot pin down the correct assumptions upon which to build the model based on the undisputed facts and, accordingly, must leave the determination of damages for the Defendants' breach of their fiduciary duty to be decided at trial.

## VI. THE COURT DENIES THE REQUESTS IN PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' AFFIRMATIVE DEFENSES OF ACQUIESCENCE, ESTOPPEL, WAIVER, AND UNCLEAN HANDS.

The Court denies the Plaintiff's Motion to Strike Affirmative Defenses. The Court concludes that the Motion to Strike Affirmative Defenses does not prove that the Defendants' affirmative defenses of acquiescence, unclean hands, estoppel, and waiver will have no possible relation or logical connection to the controversy's subject matter, as the standards for striking under rule 12(f) of the Federal Rules of Civil Procedure require. See 5C C. Wright & A. Miller, Federal Practice & Procedure § 1382, at 433-36 (3d. ed. 2004). As the Court said in another case, "[s]triking a pleading or part of a pleading is a drastic remedy and . . . [is] generally disfavored." Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1684599, at *5 (D.N.M. 2012)(Browning, J.)(quoting Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc., 2010 WL 132414, at *5)(N.D. Okla. 2010)(Eagan, C.J.)(internal quotation marks omitted)). The Court sees no sound reason to prescribe such a drastic remedy as regards the Defendants' affirmative defenses.

The Court supra denies the Defendants summary judgment on the grounds of the Plaintiffs' alleged acquiescence, waiver, or unclean hands, or on the defense of equitable estoppel. The Plaintiffs argue that the Court should take the further step of precluding the Defendants from raising these defenses in any form at the trial. See Motion to Strike Affirmative Defenses at 6. Unpacking this argument further at the hearing, the Plaintiffs argued that if the

Court were to deny the Defendants' Acquiescence MSJ and the Defendants' Estoppel MSJ, then the Defendants' affirmative defenses are "out totally." Tr. at 410:10-11 (Kagen). Continuing in the same vein, the Plaintiffs contended:

> They're not out and then they can raise them at trial. These are legal issues. It's a purely legal issue as to whether we've acquiesced, waived, estopped, and Your Honor is going to decide that one way or the other. If they win, we'll have consequences; it they lose, [the affirmative defenses are] gone. They don't get to resuscitate them at trial. They're not fact issues.

Tr. at 410:11-17 (Kagen). The Plaintiffs acknowledged that courts typically disfavor rule 12(f) motions to strike, but they emphasized that they were concerned about the trial. See Tr. at 483:14-16 (Kagen). According to the Plaintiffs, the Defendants keep trying to stretch the timeline for what constituted the merger transaction beyond what the law allows, which the Plaintiffs averred should be solely the process whereby the Defendants ejected them from TIR. See Tr. at 484:1-13 (Kagen). Otherwise, the Plaintiffs maintained, the court in such a case ends up adjudging a multigenerational vendetta rather than a tort. See Tr. at 484:24-485:3 (Kagen). The Plaintiffs argued that none of the four defenses that the Defendants offer their two motions for summary judgment -- acquiescence, unclean hands, waiver, and estoppel -- are "out as a matter of law," and should not inhabit some liminal space in which they are considered out for summary judgment purposes but in for trial purposes. Tr. at 485:4-487:1 (Kagen). The Plaintiffs also acknowledged the Court's hesitation to prevent new information about these affirmative defenses from emerging during the trial, but they were confident that the Court already had heard these defenses in their entirety. See Tr. at 488:22-489:7 (Kagen).

The Defendants opposed the Plaintiffs' Motion to Strike Affirmative Defenses, asserting that the Plaintiffs themselves introduce facts that start in 2003 in support of their own points but then chide the Defendants for wanting to introduce events that occurred in 2013. See Tr. at

492:25-501:16 (DeMuro). According to the Defendants, the Plaintiffs' Motion to Strike Affirmative Defenses seeks a double standard, whereby the Plaintiffs are at liberty to refer to events from the distant past but the Defendants are forbidden from referring to events that occurred only months before the merger took effect. See Tr. at 501:10-16 (DeMuro). The Defendants asserted that applying the same standard to both parties means ipso facto denying the Motion to Strike Affirmative Defenses. See Tr. at 501:25-502:12 (DeMuro).

The Court does not fully embrace the Defendants' argument about geese and ganders. Even if the Plaintiffs' causes of action reach to dates as far back as the Defendants maintain -- an assertion that the Plaintiffs denied at the hearing, see Tr. at 504:6-12 (Kagen) -- justice does not necessarily always oblige the Court to force-fit every claim in a given case into the same timeline; conduct relevant to one claim may occur at a time that is either earlier or later than the conduct relevant to another claim occurs. The Court nevertheless concurs with the Defendants' conclusion. At the hearing, the Court acknowledged that its position on whether to strike affirmative defenses had evolved over the years, but that it presently "seems to me that in the face of these two motions for summary judgment, it's hard for me to say that under no circumstances could those affirmative defenses have any merit and since those go to really the pleading stage, affirmative -- motions to strike, I shouldn't strike them." Tr. at 479:11-480:16 (Court). The Court clarified that

> I guess I'm thinking that I shouldn't grant this motion. I should leave them there and then sort out at trial what I think is your real concern, not that you care what's in the pleadings at this stage. What you really care about is what's going to occur at the trial, and that I ought to sort out later on rather than going back and sanitizing pleadings.

Tr. at 480:23-481:3 (Court). Expanding on these thoughts, the Court continued:

> [L]et's say I had picked up this motion before they ever filed a motion for summary judgment. I don't think I'd have granted it. I couldn't have imagined a

situation in which they could not have raised these equitable defenses. I would have said no.

Is it really any different now? We spent two days on these things. I can't sit here and say they're not in good faith, there's no possible way I'm going to grant them. I'm going to take them back to Albuquerque and think about them. So should my standard be any different? Just because I'm leaning toward denying their motion, I shouldn't change the standard for a motion to strike.

Tr. 482:2-13 (Court).

After further research, the Court concludes that there is no sound reason for it to vary from the inclination it divulged to the parties at the hearing. As Professors Charles Wright and Arthur Miller recognize, rule 12(f) motions to strike are disfavored and should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy. See 5C Charles Alan Wright et al., Federal Practice & Procedure § 1382 (3d. ed. 2017)(footnotes omitted). See also Estate of Gonzales v. AAA Life Ins. Co., No. CIV 11-0486 JB/WDS, 2012 WL 1684599, at *5 (D.N.M. May 8, 2012)(Browning, J.)("Allegations will not be stricken as immaterial under this rule unless they have no possible bearing on the controversy."). Generally, a court can only strike a defense only if it concludes that there is no set of circumstances under which the defense could succeed at trial. See Friends of Santa Fe Cnty. v. LAC Minerals, Inc., 892 F. Supp. at 1343. The Court cannot reach this conclusion based on the pleadings as rule 12(f) requires. The Court consequently will not take the drastic action that the Plaintiffs request in their Motion to Strike Affirmative Defenses, and it denies the Plaintiffs' Motion to Strike Affirmative Defenses.

The Court recognizes that the Plaintiffs filed their motion to strike on November 4, 2015, early in the case. The Court also recognizes that, because the judges in Oklahoma recused themselves, and this Judge did not come into the case until October 26, 2016, a lot of work had been done before the Court's entry into the case. The Court and the parties are now into

summary judgments and trial preparations. So the Motion to Strike is a bit antiquated and obsolete now, but stands in more as a motion in limine with respect to the import of the equitable defenses at trial. The Court certainly would not have granted Plaintiffs' Motion to Strike Affirmative Defenses at the very beginning of the case. It does not appear appropriate now, after summary judgments have been filed, and the Memorandum Opinion and Order prepared, to strike those same affirmative defenses. After all of this work, the Court could not have said then, nor could it say today, that there is no set of circumstances under which the defense could succeed at trial. See Friends of Santa Fe Cnty. v. LAC Minerals, Inc., 892 F. Supp. at 1343. Seeing that problem, the Plaintiffs now try to connect their Motion to Strike Affirmative Defenses, which is usually filed early in a case -- as was done here -- in the pleadings phase, to a motion in limine, which is typically filed after motions for summary judgment or before trial.

Given the case's history, the Court is not unsympathetic to the Plaintiffs' effort to get some guidance on what evidence will come in at trial. The trial is near. Thus, while the Court will deny the Plaintiffs' Motion to Strike Affirmative Defenses, the Court will nonetheless preclude the Defendants from raising the affirmative defenses at trial. Earlier in this opinion, the Court granted the Plaintiffs' request for summary judgment that: (i) the entire fairness standard applies to the Plaintiffs' fiduciary duty claims; (ii) the Defendants bear the burden of proving that the merger satisfies the entire fairness standard with respect to the Plaintiffs' fiduciary duty claims; (iii) the Defendants failed to meet their burden to prove that they satisfied their fiduciary duty of fair dealing; and (iv) the Defendants therefore are liable for breaching their fiduciary duty of fair dealing with respect to the merger transaction. The Court left, however, the determination of damages for trial. Under Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the Court's summary judgment decision implicates the substantive evidentiary standard

of proof that would apply at trial on the damages determination.  See 477 U.S. 242, 242 (1986).

As Justice White wrote in the Supreme Court's opinion in that case, judges no longer

> are required to submit a question to a jury merely because some evidence had been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.  Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any evidence upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.

Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (emphases in original).  Under this standard, the Court must decide, as a preliminary question, whether there is any evidence that the Defendants' affirmative defenses of acquiescence, waiver, unclean hands, and estoppel, if presented at trial, could cause a jury to reasonably proceed to find a verdict in favor of the Defendants on the fair price issue and determination of damages, despite its grant of the Plaintiff's request for summary judgment on entire fairness.  The Court concludes that there is thus not a scintilla of evidence that the affirmative defenses could have such an effect on the jury, as none of the defenses sheds light on what the fair price for TIR, Inc. shares was at the time of the merger.  Accordingly, the Court decides that the Defendants will not be allowed to present their affirmative defenses of acquiescence, waiver, unclean hands, and estoppel at trial. Ultimately, the Court has decided that, under Delaware's merger and cash-out law, once it is clear that the Defendants did not provide procedural fairness, they cannot raise affirmative equitable defenses to the fairness of value issue.  Cf. Petition of Rubenstein, 637 A.2d 1131, 1134 n.2 (Del. 1994); Turner v. Bernstein, 776 A.2d 530, 530 (Del. Ch. 2000)(Strine, V.C.);  In re Best Lock Corp. Shareholder Litigation, 845 A.2d 1057, 1080-83 (Del. Ch. 2001)(Chandler, C.);  Kahn v. Household Acquisition Corp., 1982 WL 8778, at **3-4 (Del Ch. Jan. 19,

1982)(Brown, V.C.). Thus, the Defendants cannot raise or discuss at trial the equitable defenses, which relate more to the procedural fairness side than to the fairness of value side. Consequently, the Court will exclude evidence related to these equitable defenses. Furthermore, all evidence admissible at trial should be relevant to the remaining issue -- whether the price paid to the Plaintiffs is fair. Evidence that is not relevant to that sole issue is not admissible.

## VII.  THE COURT DENIES THE REQUESTS IN PLAINTIFFS' MOTION TO STRIKE LORETT AFFIDAVIT.

The Court denies the requests in the Plaintiff's Motion to Strike Lorett Affidavit. At issue is what the Plaintiffs contend are material inconsistencies between the Lorett Depo. And the Lorett Aff. According to the Plaintiffs, Lorett Aff. ¶¶ 23-27 contain R. Lorett's testimony that (i) $451,000.00 was a fair value for TIR shares when the Plaintiffs were cashed out in December, 2013; (ii) TIR was experiencing slow collections in Canada at the time of the October, 2013 tender offer; (iii) TIR was hobbled by a large amount of "factoring debt" in late 2013; (iv) the Plaintiffs did not tender their shares in response to the October, 2013 tender offer; and (v) the Plaintiffs were "promptly paid $451,000 per share." Motion to Strike Lorett Affidavit at 2. The Plaintiffs allege that Lorett admitted in his Depo. that he had no personal knowledge about any of these five assertions that he made in his affidavit. See Motion to Strike Lorett Affidavit at 2. As the Plaintiffs read the law, the Court consequently must strike the Lorett Aff., because rule 56(c)(4) of the Federal Rules of Civil Procedure requires every submitted affidavit to "be made on personal knowledge, set out facts that would be admissible in evidence, *and* show that the affiant or declarant is competent to testify on the matters stated." Motion to Strike Lorett Affidavit at 2 (emphasis in the original).

The Defendants respond that the Plaintiffs' challenges to the Lorett Aff. do not implicate any of the four undisputed facts material to the Defendants' acquiescence defense, which the

Lorett Aff. supports.  <u>See</u> Response to Motion to Strike Lorett Affidavit at 3.  According to the Defendants, the Lorett Aff. supports only four undisputed facts: (i) "Regent and Stephenson individually became together TIR Inc.'s largest shareholder owning approximately 40% of the TIR Inc. shares"; (ii) "Lawrence Field, the son-in-law of Mr. Stephenson and an office of Regent, became the chairman, and Alan Stuart became a member, of the board of directors of TIR Inc."; (iii) "In June 2013, the Defendants won the bidding process to acquire control of TIR Inc."; and (iv) "The $451,000 per share price was equal to or in excess of the prices paid to, and accepted by, the founding shareholders, management, the mezzanine debt holders, and other selling shareholders during the second half of 2013." Response to Motion to Strike Lorett Affidavit at 3-4.  The Defendants contend that the Plaintiffs admit these first two facts and do not challenge the corresponding assertions in the Lorett Aff., and cite no Lorett Aff. portion that is inconsistent with the Lorett Depo. respecting those two facts.  <u>See</u> Response to Motion to Strike Lorett Affidavit at 3-4.  The Defendants further maintain that the Plaintiffs deny the third fact, but that the Plaintiffs do not challenge the Lorett Aff.'s corresponding assertion, and cite no Lorett Aff. portion that is inconsistent with the Lorett Depo. respecting this fact.  <u>See</u> Response to Motion to Strike Lorett Affidavit at 4-5.  The Defendants assert that the Plaintiffs: (i) deny the fourth fact and the Lorett Aff.'s corresponding assertions, but not on the factual basis that UF 36 alleges; and (ii) cite no Lorett Aff. portion that is inconsistent with the Lorett Depo. regarding that fact.  <u>See</u> Response to Motion to Strike Lorett Affidavit at 5.  In any event, the Defendants argue, the Lorett Depo. does not contradict any of the limited parts of the five Lorett Aff. paragraphs that the Plaintiffs challenge.  <u>See</u> Response to Motion to Strike Lorett Affidavit at 5-10.

Broadly speaking, the Defendants assert that, when R. Lorett expressed his belief that

$451,000.00 per share was a fair price, he is entitled to state both what he learned, and what all generally know and accept to be true. See Response to Motion to Strike Lorett Affidavit at 10. As the Defendants see it, the Plaintiffs can cross-examine R. Lorett at trial in an effort to impeach his credibility if they believe he lacks personal knowledge of any fact. See Response to Motion to Strike Lorett Affidavit at 10. To challenge R. Lorett's credibility at this stage in the case, the Defendants pronounce, is both irrelevant and quixotic. See Response to Motion to Strike Lorett Affidavit at 10. The Defendants, therefore, conclude that the Motion to Strike Lorett Affidavit "lacks sufficient merit to be worth the Court's attention and should be summarily denied." Response to Motion to Strike Lorett Affidavit at 11.

The Plaintiffs reply that they concede that a court ordinarily should not decide witness credibility at this stage, but insist that the Court cannot credit a witness' testimony for purposes of summary judgment if it had been exposed as incompetent or false. See Reply to Motion to Strike Lorett Affidavit at 1. According to the Plaintiffs, the Lorett Depo. admitted that R. Lorett did not have an opinion -- or even the tools to formulate such an opinion -- about the TIR stock's fair value, which the Plaintiffs contend directly contradicts the Lorett Aff. See Reply to Motion to Strike Lorett Affidavit at 2-3. The Defendants, therefore, argue that the Court should strike Lorett Aff. ¶¶ 19, 25, and 27, and preclude R. Lorett from testifying on the fair price issue. See Reply to Motion to Strike Lorett Affidavit at 3. Regarding Lorett Aff. ¶ 23, the Plaintiffs contend that the Defendants admit in their Response to the Motion to Strike Lorett Affidavit that R. Lorett's statement is hearsay and that the Court therefore must strike it, because the Defendants cannot use hearsay to establish the absence of any disputed factual issue for summary judgment purposes. See Reply to Motion to Strike Lorett Affidavit at 4-5. Regarding Lorett Aff. ¶ 24, the Plaintiffs purport that R. Lorett admitted at his deposition that he had never

heard the phrase "factoring debt" and that he does not know what it means.  Reply to Motion to Strike Lorett Affidavit at 5.  The Plaintiffs argue that, because ¶ 24 uses the term despite R. Lorett's professed ignorance of it, the Court should strike Lorett Aff. ¶ 24, and prevent R. Lorett from testifying on the issue of factoring debt.  See Reply to Motion to Strike Lorett Affidavit at 5.  Turning to ¶ 27, the Plaintiffs assert that the Court should strike R. Lorett's reference to a tender offer, because the Lorett Depo. admits that he was not involved in the tender offer and does not understand the tender offer.  See Reply to Motion to Strike Lorett Affidavit at 6.  Also with regard to ¶ 27, the Plaintiffs urge the Court to strike R. Lorett's statement concerning how much the Plaintiffs were paid for their shares.  See Reply to Motion to Strike Lorett Affidavit at 6.  According to the Plaintiffs, R. Lorett lacks any personal knowledge concerning the merger consideration paid for the shares and admitted during his deposition that he relied on Boylan for this information.  See Reply to Motion to Strike Lorett Affidavit at 6.  The Defendants insist that the Court therefore strike R. Lorett's statement about the payment amount and preclude R. Lorett from testifying at trial about the issue.  See Reply to Motion to Strike Lorett Affidavit at 6.  Painting with a broader brush, the Plaintiffs finally contend that the Court should strike the Lorett Aff. in its entirety, because R. Lorett's multiple incompetent and potentially false statements impeach his credibility.  See Reply to Motion to Strike Lorett Affidavit at 7.

At the hearing, the Defendants maintained that R. Lorett is "absolutely qualified" to testify about what he believed a fair price for his shares was.  Tr. at 448:22-25 (DeMuro).  After all, the Defendants reminded the Court, R. Lorett "was the CEO, the president of the company. He operated the company for a number of years.  He was deeply involved in the bidding process, the pooled shareholder process, etcetera, and so he was obviously competent to say that he believed that it was a good price."  Tr. at 449:1-5 (DeMuro).  The Plaintiffs dismissed the

Plaintiffs' attempts to distinguish "fair price" from "fair value," and "factoring debt" from "factoring receivables," as caviling. Tr. at 449:6-22 (DeMuro). In both these issues, the Defendants asserted, the Plaintiffs' attempts to split hairs does nothing but reveal a bald truth that no real contradiction exists between R. Lorett's affidavit and his deposition testimony. See Tr. at 449:23-450:2 (DeMuro). Consequently, the Defendants maintained, the Court should not strike the Lorett Aff. For their part, the Plaintiffs countered that the decision whether to strike the Lorett Aff. centers on honesty. See Tr. at 451:8-16 (Kagen).

The Court noted at the hearing that it was disinclined to strike the Lorett Aff., because no doctrine provides the Court the power to strike testimony solely on the grounds of testimonial inconsistency. See Tr. at 452:9-13 (Court). Clarifying its inclination at the time, the Court continued:

> I'm inclined to deny the Motion to Strike. I'm not probably going to use a motion to strike in this case to strike testimony or briefing or things like that. I think it's reserved for pleadings and so I'll probably limit my motions to strike.
>
> As I indicated, though, there were some things about Lorett, particularly whether he had knowledge to testify about certain things. I'll try to sort it out. I guess I'm inclined to think that if a witness says one time he didn't know and at another time he said he did, it's not the summary judgment stage to sort that out. There is some testimony.
>
> I don't think it's going to make any difference if I consider Lorett's testimony because if I understood what was going on in the motions for summary judgment, there was other testimony to support the factual statements. But I will try to sort it out and so I'll deal with this motion.
>
> In the motion we're going to write, there might be some nicking and excluding of some things or I'm not considering some of Lorett's testimony, but I'll sort that out when I write the opinion.

Tr. at 476:13-477:7 (Court). Upon further study, the Court sees no sound reason to abandon this inclination. Rule 12(f) of the Federal Rules of Civil Procedure gives federal district courts discretion to strike any "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ.

P. 12(f).  As the Court noted at some length in its analysis of Plaintiff's Motion to Strike Affirmative Defenses, supra, motions to strike are disfavored except under extraordinary circumstances.  See 5C C. Wright & A. Miller, Federal Practice & Procedure § 1382, at 433-36 (3d. ed. 2004).  See also Scherer v. U.S. Dep't of Educ., 78 F. App'x at 689 (10th Cir. 2003)(unpublished).  Moreover, as the Court has held in previous cases, it may use rule 12(f) only to strike pleadings.  See, e.g., Great Am. Ins. Co. v. Crabtree, 2012 WL 3656500, at *18 (denying plaintiff's motion to strike exhibits attached to the defendant's motion to dismiss, because they were neither pleadings nor irrelevant); Applied Capital, Inc. v. Gibson, 2007 WL 5685131, at *18 (refusing the plaintiff's request to strike a motion to dismiss because rule 12(f) applies only to pleadings, and not to a motion to dismiss); Estate of Anderson v. Denny's, Inc., 2013 WL 690809, at *12 (denying the plaintiff's request to strike a notice of completion of briefing for similar reasons).  The Lorett Aff. (i) is not a pleading; and (ii) even if the Plaintiffs correctly assess Lorett's affidavit and deposition testimony to be contradictory, is not redundant, immaterial, impertinent, or scandalous.  The Court therefore denies the Plaintiffs' request to strike the Lorett Affidavit.  The Court noted at the hearing that it would sort out Lorett's factual claims in the factual section of this opinion, and the Court has sorted them out supra in footnotes to the relevant undisputed facts.

## VIII.  THE COURT GRANTS IN PART AND DENIES IN PART THE PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE EVIDENCE OF PLAINTIFFS' CONDUCT, (i) PRECLUDING THE AKIN GUMP LETTER, AND LETTERS THAT THE PLAINTIFFS AND PLAINTIFFS' COUNSEL EXCHANGED WITH THE DEFENDANTS; (ii) NOT PRECLUDING LETTERS TIR SENT TO AND RECEIVED FROM THE TRIANGLE MEZZANINE LENDERS; AND (iii) NOT PRECLUDING THE DEFENDANTS FROM MENTIONING THAT THE PLAINTIFFS RESIDE OUTSIDE OF OKLAHOMA.

The Court grants in part and denies in part the Plaintiffs' Motion *In Limine* to Preclude Evidence of Plaintiffs' Conduct.  The Court concludes that (i) the Akin Gump letter's plain

language, and other letters that the Plaintiffs and the Plaintiffs' counsel exchanged with the

Defendants between September, 2013, and November, 2013, reflect that they are compromise

offers under rule 408 of the Federal Rules of Evidence; (ii) the Akin Gump letter and other

letters that the Plaintiffs and the Plaintiffs' counsel exchanged with the Defendants between

September, 2013, and November, 2013 do not fall into any of the rule 408(b) exceptions that

permit a court to admit compromise-offer evidence; (iii) letters sent to and received from

Triangle Capital are not compromise offers between the Plaintiffs and the Defendants; and (iv)

the Triangle Capital correspondence is not irrelevant to a determination of the TIR shares' fair

price and is not likely to mislead or to confuse the jury.

**A.  THE COURT WILL PRECLUDE THE AKIN GUMP LETTER, AND ALL OTHER LETTERS BETWEEN THE PLAINTIFFS AND THE DEFENDANTS FROM SEPTEMBER, 2013, TO NOVEMBER, 2013, BECAUSE THESE LETTERS WERE COMPROMISE OFFERS UNDER RULE 408 OF THE FEDERAL RULES OF EVIDENCE.**

The Plaintiffs argue that the Court should preclude the Defendants from offering any

evidence, testimony, or argument concerning: (i) the Plaintiffs' offers to sell their TIR shares to

the Defendants, and mezzanine lenders' sales of TIR shares; (ii) alleged "blackmail" or "threats";

(iii) prices which the Plaintiffs paid for their TIR shares and post-merger Plaintiff

communications; (iv) "certain irrelevant and pejorative facts about plaintiffs contained in

Defendants' pretrial briefs"; and (v) improper evidence or argument based on the fact that the

Plaintiffs are from the New York area rather than from Oklahoma.  Plaintiffs' Motion in Limine

at 1.  The Plaintiffs assert that the Court should exclude material related to these issue, because:

(i) it is irrelevant under rule 402 of the Federal Rules of Evidence; (ii) it has a prejudicial effect

that outweighs its probative value under rule 403 of the Federal Rules of Evidence; or (iii) in the

alternative on the specific issue of share sale price offers, it represents a compromise offer under

rule 408 of the Federal Rules of Evidence.  <u>See</u> Plaintiffs' Motion in Limine at 1.

As the Defendants see it, each broad evidentiary category that the Plaintiffs seek to exclude is probative of the Plaintiffs' actions, knowledge, or motives surrounding the Plaintiffs' acceptance of the merger consideration.  <u>See</u> Response to Plaintiffs' Motion in Limine at 2. Moreover, the Defendants maintain, the Akin Gump letter and other letters between the Plaintiffs and the Defendants from September, 2013, to November, 2013, were business negotiations between arm's-length commercial parties engaged in business negotiations, <u>i.e.</u>, not settlement discussions in lieu of pending or imminent claims that would fall under rule 408 of the Federal Rules of Evidence.  <u>See</u> Response to Plaintiffs' Motion in Limine at 4.  If the Court were to adopt the Plaintiffs' proposed scope of rule 408, the Defendants maintain, the Court would allow the exclusion to swallow the rule, creating a result in which the exclusion would apply to "virtually all contested commercial negotiations."  Response to Plaintiffs' Motion in Limine at 4-5.  The jury, the Defendants contend, is entitled to consider Stuart's investor communications when assessing not only fair value and fair price, but also the Plaintiffs' credibility in general. <u>See</u> Response to Plaintiffs' Motion in Limine at 14.

At the hearing, the Plaintiffs maintained that they attempted to compromise their claims after they were ousted from the board in June, 2013, and reiterated that the letters between them and the Defendants were settlement discussions inadmissible as testimony -- discussions in which the Plaintiffs engaged, because they did not want to have to sue a company on whose board they recently had served.  <u>See</u> Tr. at 224:5-229:4 (Kagen).  According to the Plaintiffs, the Akin Gump Letter, by its plain language, is an example of such settlement negotiations.  <u>See</u> Tr. at 229:5-232:10 (Kagen).   The Defendants reiterated their belief that there is not a rule 408 issue, because rule 408 was never meant to reach business negotiations, even as to price, and

consequently that the letters do not constitute a settlement offer or a compromise of a disputed claim. See Tr. at 287:9-288:14 (DeMuro). The Defendants asserted that it was important to admit the letter, because it is evidence of the Plaintiffs'

> mistaken belief that they could hold us up for a higher price, number one; and then when Mr. Stuart found out that he was wrong, he had to report back to his powers-to-be and he was embarrassed by the fact that he was wrong and he ends up six months later suing.

> So it's important, number one, that we see these in a course of communications. In other words, there's a stream of correspondence that reflect[s] that dynamic, the Plaintiffs attempting to hold us up for a higher price in which they make certain admissions and so it goes to the course of dealing. So we can't just pull out one letter and say, why do I want this?

> Why do I specifically want this? Number one, I wanted to show that they were presented by capable counsel during this entire time period, which goes to show that they are sophisticated, that they understood the information they were getting, they understood how to ask for information if they weren't getting it. So that's an important fact for us, that they were represented by counsel.

Tr. at 289:22-290:1 (DeMuro). The Defendants argued that the Akin Gump letter does not even contain a threat of litigation, which the Defendants maintained the Tenth Circuit has set as a clear cut-off line between evidence admissible versus inadmissible under rule 408. See Tr. at 291:8-22 (DeMuro). Moreover, according to the Defendants, the letter was written eight months before the Plaintiffs filed suit under a different counsel. See Tr. at 291:23-292:2 (DeMuro).

Turning to another letter between the Plaintiffs and the Defendants, the Defendants said that the letter follows the bidding war in which Stuart lost and what the Defendants asserted was Stuart's subsequent inequitable course of conduct. See Tr. at 292:6-11 (DeMuro). The letter, as the Defendants read it, also demonstrates the Stuart group's sophistication, and their ability in late September, 2013, to do their own analysis and arrive at numbers about which they insisted earlier in the hearing that they had been kept in the dark. See Tr. at 292:12-293:4 (DeMuro). A third letter, the Defendants said, likewise contains no hallmarks of settlement or litigation. See

Tr. at 293:5-294:6 (DeMuro).  Returning to the Akin Gump letter, the Defendants say that the letter was the next letter in the series of these other letters and that the Court should interpret it in these other letters' context.  See Tr. at 294:14-295:16 (DeMuro).  The Defendants insisted that it is vital for the Court to allow the letters between the Plaintiffs and the Defendants to be introduced into evidence, because "the fountainhead of this whole case is Mr. Stuart's bruised ego over the fact that he lost the bid . . . [and] embarked on this unequitable attempt to interfere with the IPO."  Tr. at 299:15-19 (DeMuro).  Summarizing and ending their argument on the rule 408 issue, the Defendants told that Court that it "would be really, really fundamentally prejudicial to the Defendants' case to not -- to keep from the jury what we believe was this shakedown attempt that was going on post-bidding and almost ten months before litigation was filed."  Tr. at 300:23-301:2 (DeMuro).

The Court indicated at the hearing that it was inclined to consider the Akin Gump letter and other letters between the Plaintiffs and the Defendants to be just offers and counteroffers typical of business negotiations and, therefore, not within rule 408's scope.  See Tr. at 302:4-9 (Court).  Unpacking its thoughts further, the Court continued:

> And it just looks to me like when you got lawyers writing letters like this, Akin Gump could have written a stronger letter.  They could have written a letter saying we're going to sue you if you don't take this offer.  But some lawyers have different styles and some of the very best litigators have a light touch when they're doing settlement negotiations, so I'm a little bit reluctant to say this isn't an offer to compromise just because of the style that a particular lawyer has.

Tr. at 309:20-310:3 (Court).  The Court has looked further into the Plaintiffs' Motion in Limine since the hearing and sees no sound reason to diverge from this inclination.  The Akin Gump letter's plain language clearly establishes that the letter was an offer to compromise a claim for less than what the Plaintiffs held to be the fair market value for their shares.  The Akin Gump letter's third through fifth full paragraphs are especially clear on this point:

> **Without waiving any of our clients' rights** or the rights of the other individual shareholders, all of which are expressly reserved, we renew the offer to engage in a meaningful and disciplined dialogue concerning the true value of the Company. As Mr. Stuart informed the Board, the same valuation methodology used over the summer -- which is the *same* valuation methodology on which the Offer Price purportedly is based -- indicates that the company is worth approximately $650,000 per share.
>
> To be clear, **we are willing to negotiate mutually agreeable terms**, and to do so on an expedited basis.
>
> Please **let me know when you are available to discuss a mutually agreeable resolution** to this matter.

Akin Gump Letter at 2 (emphases added). In the third paragraph, the Akin Gump letter paraphrases "without prejudice," a term that courts regularly have held to be a mark of a settlement negotiation with the words "[w]ithout waiving any of our clients' rights." Akin Gump Letter at 2. In the fourth and fifth paragraphs, the Akin Gump Letter states in unmistakable terms that the Plaintiffs are willing to "negotiate mutually agreeable terms" and that the Plaintiffs are willing to discuss with the Defendants how to resolve this matter in a mutually agreeable fashion. Akin Gump Letter at 2.

The Plaintiffs' September 26, 2013 letter has a similar tenor, proposing to forego the long-term future value of TIR's shares that they would receive in litigation, and instead settle their claim for a lower share value, calculated solely on the basis of TIR's historic, backward-looking financial performance data as of the date of the proposed sale. At the hearing, the Defendants vividly told the Court that the challenged letters, when taken together, show:

> We wanted to settle. We were willing to be reasonable. We understood the risks of litigation, the concerns, the combative nature of these entities. . . . We knew who we were getting into bed with here. We understood what they were going to be doing. We wanted to settle. We weren't given that opportunity. We were shown the door and thrown out in the cold.

Tr. at 231:20-232:10 (Kagen). The Court concludes that the Defendants' account here is credible.

These letters, individually and collectively, represent settlement negotiations that fall within rule 408's scope. Accordingly, the Court will preclude the Akin Gump letter, and the letters between the Plaintiffs and Plaintiffs' counsel and the Defendants.

**B.**     **THE COURT WILL NOT PRECLUDE LETTERS SENT TO AND RECEIVED FROM TRIANGLE CAPITAL, BECAUSE THOSE LETTERS: (i) ARE NOT COMPROMISE OFFERS BETWEEN THE PLAINTIFFS AND THE DEFENDANTS; AND (ii) THOSE LETTERS ARE UNLIKELY TO MISLEAD OR CONFUSE THE JURY.**

The Plaintiffs argue that the Court also should preclude the Defendants from offering any evidence, testimony, or argument concerning Triangle Capital's sales of TIR shares. <u>See</u> Plaintiffs' Motion in Limine at 1. The Plaintiffs assert that the Court should exclude material related to this issue under rule 408(a)(1) of the Federal Rules of Evidence, because the mezzanine lenders' sale to TIR also constituted accepting a valuable consideration in compromising a claim. <u>See</u> Plaintiffs' Motion in Limine at 7. According to the Plaintiffs, TIR's mezzanine lenders: (i) did not believe that $451,000.00 per share was a fair value for TIR's shares; and (ii) accepted that sale price only as a compromise, reserving the right to retroactively receive a higher price at a future date by means of a gross-up provision and seeking to resolve an ongoing contentious dispute over the shares with the Defendants, in which Boylan made a threat to bring suit against the mezzanine lenders. <u>See</u> Plaintiffs' Motion in Limine at 7 & n.2.[104] The Plaintiffs concede that the transaction between the Defendants and the mezzanine lenders would

---

[104]At the hearing, the Plaintiffs expanded upon the reasons that they asserted motivated the mezzanine lenders to sell their TIR shares at what the Plaintiffs contended was below the shares' fair market value. <u>See</u> Tr. at 221:22-223:7 (Kagen). According to the Plaintiffs, at least some of the mezzanine lenders considered the share price to be too low, but that they had accepted the price on four grounds: (i) it was a group deal; (ii) these mezzanine lenders felt that the $650,000.00 per warrant that they received compensated somewhat for the purported underpriced shares; (iii) the Defendants threatened to sue one of the resisting mezzanine lenders -- who also was a board member -- for breach of fiduciary duty if he failed to sign off on the deal; and (iv) the deal with the mezzanine lenders provided a prospective gross-up option. <u>See</u> Tr. at 221:22-223:7 (Kagen).

seem to fall within rule 408's exception regarding the settlement of a claim different than the one being litigated, but they nevertheless argue that the Court should preclude mention of the mezzanine lenders sale on the grounds that that sale was "*similar* to Plaintiffs' fair value claim." Plaintiffs' Motion in Limine at 8 (emphasis in the original).  In the alternative, the Plaintiffs argue that the Court should preclude admission of evidence regarding the sales under rules 401, 402, and 403 of the Federal Rules of Evidence, because the substantial likelihood that it would mislead the jury and confuse the issues outweighs any probative value this information might have.  <u>See</u> Plaintiffs' Motion in Limine at 8.

The Defendants counter that sale similarity is not enough, maintaining that the Plaintiffs cannot wield rule 408 to exclude the mezzanine lenders' sale price, because: (i) the Plaintiffs were not a party to that transaction; (ii) the issues involved are not being litigated in this case; and (iii) the mezzanine lenders' sale of TIR shares in an arms-length commercial transaction for the same price and near the same time as the merger is probative of the fair value analysis.  <u>See</u> Response to Plaintiffs' Motion in Limine at 4 (citing <u>Towerridge, Inc. v. T.A.O., Inc.</u>, 111 F.3d 758, 770 (10th Cir. 1997)).  The Defendants argue that the agreement by which the mezzanine lenders sold their shares and warrants to Cypress Energy Partners is a typical commercial transaction document, not a classic settlement agreement, and is completely separate and distinct from the Plaintiffs' claims in this case.  <u>See</u> Response to Plaintiffs' Motion in Limine at 7-11. Accordingly, the Defendants maintain, any letters about the mezzanine lenders' transactions fall far outside rule 408's scope.  <u>See</u> Response to Plaintiffs' Motion in Limine at 11.

Rule 408(b) of the Federal Rules of Evidence provides:

(a) **Prohibited Uses**. Evidence of the following is not admissible -- on behalf of any party -- either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

> (1) furnishing, promising, or offering -- or accepting, promising to accept, or offering to accept -- a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or a statement made during compromise negotiations about the claim -- except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
>
> (b) **Exceptions**. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408. The Court listed numerous United States Courts of Appeals cases in its law regarding section on rule 408 supra that show that the United States Courts of Appeals have interpreted rule 408 to make inadmissible only statements that (i) are made in settlement negotiations; (ii) relate to issues involved in the proceedings; and (iii) offer to compromise or settle any claim in the action being litigated. Under some circumstances, rule 408 can cover what the Plaintiffs referred to in Plaintiffs' Motion in Limine as "similar" claims. See Plaintiffs' Motion in Limine at 8. As one set of treatise writers posit when interpreting a Tenth Circuit case:

> [E]ven where the settlement relates to prior claims that arguably arose out of different events and transactions, where these claims are related inasmuch as they arose in the course of the same large scale project operated by the defendant, and the claims sued upon are similar enough to be relevant, there is a sufficient basis for bringing the evidence concerning the compromises and settlements under the umbrella of Fed. R. Evid. 408.

12 John Bourdeau et al., Federal Procedure § 33:238 (2017)(citing Bradbury v. Phillips Petroleum Co., 815 F.2d 1356 (10th Cir. 1987), an opinion that Judge Barrett wrote and then-Chief Judge Holloway and Judge Logan joined, in which seven prior claims brought by landowners arose in the course of the same large scale uranium exploration project conducted by the defendant). The Plaintiffs argue that Triangle Capital's sale of TIR shares was such an

instance of a similar claim. <u>See</u> Plaintiffs' Motion in Limine at 8 (asserting that Triangle Capital's sale was "*similar* to Plaintiffs' fair value claim")(emphasis in the original).

The Court disagrees with the Plaintiffs that the "similarity loophole" to rule 408's exception is large enough to allow the Court to preclude Triangle Capital's sales. In <u>Bradbury v. Phillips Petroleum Co.</u>, the very case that the treatise writers cite, the Tenth Circuit considered a trespass and battery case in which drill workers from one an independent contractor that the defendant hired drilled on the incorrect parcel of land and then pursued that landowner's neighbor onto the neighbor's property and battered him when the neighbor began taking photographs of the drillers' equipment at the landowner's behest. <u>See Bradbury v. Phillips Petroleum Co.</u>, 815 F.2d at 1358-60. After a jury had awarded actual and exemplary damages to both the landowner whose property the contractor drillers had impermissibly drilled and the landowner's neighbor whom they battered,[105] the defendant appealed the case to the Tenth Circuit on the grounds that the district court had erred in admitting exhibits and testimony regarding compromises of previous claims by landowners against the defendant. <u>See Bradbury v. Phillips Petroleum Co.</u>, 815 F.2d at 1359. The defendant argued that those settlements should have been excluded as compromises or offers of compromise pursuant to rule 408 of the Federal Rules of Evidence. <u>See Bradbury v. Phillips Petroleum Co.</u>, 815 F.2d at 1359. The Tenth Circuit reviewed seven prior settlements or compromises that the United States District Court for the District of Colorado allowed into evidence, each of which involved the same independent

---

[105]The Tenth Circuit noted that principal-agent law normally would not impose tort liability on a defendant for the actions of its independent contractors who committed a tort outside of their employment's scope, but also stated that that it would consider the record, because (i) "there were no special interrogatories regarding the agency issue"; and (ii) "the relationship of principal and agent is ordinarily a question of fact and a finding on the issue is binding on appeal if it is supported by substantial evidence or not clearly erroneous." <u>Bradbury v. Phillips Petroleum Co.</u>, 815 F.2d at 1361 (citing <u>Mitton v. Granite State Fire Insurance Co.</u>, 196 F.2d 988 (10th Cir.1952)).

contractor trespassing upon private land to drill or conduct uranium exploration on the defendant's behalf. See Bradbury v. Phillips Petroleum Co., 815 F.2d at 1362. The Tenth Circuit deduced that rule 408's plain language supported the district court's conclusion that these settlements and compromises did not fall within rule 408's scope and that, accordingly, evidence of these settlements and compromises was not precluded. See Bradbury v. Phillips Petroleum Co., 815 F.2d at 1363.

The Tenth Circuit decided that there are some cases, such as Bradbury v. Phillips Petroleum Co., it is best practice for a district court to let policy considerations and the exact pattern or mosaic of similar claims combine to override rule 408's plain language, i.e., preclude such settlement and compromise offers. See Bradbury v. Phillips Petroleum Co., 815 F.2d at 1363 (buttressing this conclusion by reference to the Advisory Committee notes). The Tenth Circuit held that the seven prior settlement or compromise offers at issue in Bradbury v. Phillips Petroleum Co. made rejecting rule 408's plain language a close call, because the offers betrayed similar "reckless conduct and disregard of personal and property rights" and awareness of the independent contractor's personnel's conduct on Phillips' part. Bradbury v. Phillips Petroleum Co., 815 F.2d at 1363. Even that degree of similarity, in the Tenth Circuit's estimation, provided insufficient grounds for the Tenth Circuit to conclude that the United States District Court for the District of Colorado had erred when it allowed the offers into evidence as not being precluded under rule 408, and the Tenth Circuit affirmed the district court's decision. See Bradbury v. Phillips Petroleum Co., 815 F.2d at 1363.

Despite making an argument about how similar Triangle Capital's sale and the Plaintiffs' sales were, the Plaintiffs undercut their own position when they simultaneously argue in regard to various motions that Triangle Capital's sale was structured so differently from the Plaintiffs'

sale as to make Triangle Capital's sale price a poor barometer of TIR shares' value. For instance, the Plaintiffs argue that Triangle Capital: (i) was selling two different equities -- warrants and shares -- as opposed to the Plaintiffs' sale of only shares; and (ii) Triangle Capital retained a prospective gross-up option on the shares it sold. See Tr. at 221:22-223:7 (Kagen). Triangle Capital and the Plaintiffs also were differently situated: unlike the Plaintiffs, Triangle Capital was bargaining from a position of power, as it was able to frustrate merger plans if it chose not to sell its shares. It seems safe to conclude that Triangle Capital's sale and the Plaintiffs' sale were less "similar" to each other than the settlements and compromise offers were in Bradbury v. Phillips Petroleum Co.

Insofar as the Tenth Circuit held that the similarity in Bradbury v. Phillips Petroleum Co., even when coupled to persuasive public policy considerations, was insufficient to hold that the United States District Court for the District of Colorado had erred by applying rule 408's plain meaning, the Court reasons that, a fortiori, more dissimilar settlement or compromise offers in this case make it even less likely that the Court would be justified in diverging from rule 408's plain meaning. Thus, even if the Plaintiffs are correct that Triangle Capital's letters reveal compromise and settlement offers, see Reply to Plaintiffs' Motion in Limine at 2-4 -- a characterization with which the Defendants disagree, see Response to Plaintiffs' Motion in Limine at 7-11 -- the Court would not be in a position to preclude the letters under rule 408. The Court also trusts that the parties can easily explain to the jury -- just as they straightforwardly have explained to the Court through their briefings and at the hearing -- the differences between Triangle Capital's sale and the Plaintiffs' sale. The Court therefore does not agree with the Plaintiffs that rules 401, 402, and 403 of the Federal Rules of Evidence create an ironclad argument for disallowing the Defendants from putting letters sent to and received from Triangle

Capital into evidence.

At the end of the hearing's second day, the Court gave the parties its inclination as to how it would rule on the Plaintiffs' Motion in Limine.  The Court then stated:

> I went back and reviewed . . . [the] Plaintiffs' Motion in Limine to Preclude Evidence of Plaintiffs' Conduct.  I think I gave a . . . tentative ruling . . . on what I though on the Akin Gump [letter], that those types of letters would be out.  I thought that the letters as to the . . . Triangle mezzanine . . . group, I thought that price should come in.

> I went back and looked and there was some more materials there, and without prejudging anything, I wasn't inclined to keep that out.  I don't . . . sanitize a trial that much and so I was not inclined to grant those portions of it.

Tr. at 543:21-544:8 (Court).  The Court concludes that there is no sound reason to depart from its inclination.  Accordingly, the Court denies the Plaintiffs' request to preclude letters sent to and received from Triangle Capital, because (i) those letters are not compromise offers between the Plaintiffs and the Defendants; and (ii) Triangle Capital's sale and the Plaintiffs' sale, although remotely similar, are not sufficiently similar for a district court within the Tenth Circuit to recognize that they necessarily fall within rule 408's scope.

### C.  THE COURT DENIES THE PLAINTIFFS' REQUEST TO PRECLUDE MENTION THAT THE PLAINTIFFS RESIDE OUTSIDE OF THE STATE OF OKLAHOMA.

The Plaintiffs finally request that the Court preclude any mention that the Plaintiffs reside outside of the State of Oklahoma.  See Plaintiffs' Motion in Limine at 1.  The Defendants take umbrage with what they perceive to be a New York lawyer's request's implication that Oklahomans are so provincial and unsophisticated that the mere mention of the fact that the Defendants reside outside of the State of Oklahoma will inflame sectarian passions and unfairly prejudice the Defendants.  See Response to Plaintiffs' Motion in Limine at 15.  Furthermore, the Defendants contend that references to the location of relevant events and general background

information about the parties are permissible and necessary to give the jury context to the evidence.  See Response to Plaintiffs' Motion in Limine at 14.

From the United States' very beginnings, when Federalists tussled with Anti-Federalists and secession movements arose in every corner of the country, American citizens have felt loyalties both to the states in which they reside and the country as a whole.  Data from decades' worth of the University of Chicago's General Social Survey, which the Court captures in figures 2 and 3 infra, show that this double loyalty persists to this day, even if surveyed Americans are twice as likely to feel a close connection to their country as to their state.[106]  As the Court understands the Plaintiffs' argument for preclusion on the issue of state residency, for which the Plaintiffs did not lay out a comprehensive rationale in their briefings or at the hearing, the Plaintiffs must deduce that they would suffer undue prejudice as the proverbial Other if their state residency is divulged to the jury, on the grounds that Oklahomans' state loyalty (i) is guardedly provincial; and (ii) would override Oklahomans' sense of civic duty in judging out-of-state plaintiffs on the merits of the case rather than entrenched prejudices.

---

[106]In 2014, less than one in four Americans surveyed who provided a response indicated that he or she felt very close to his or her state, a rate nearly unchanged for a decade.  Compare University of Chicago, General Social Survey q.4 (2014), with University of Chicago, General Social Survey q.4 (2004), available at  https://gssdataexplorer.norc.org/variables/4818/vshow (last visited Apr. 20, 2017).  In contrast, nearly half of Americans in 2014 felt very close to their country.  See University of Chicago, General Social Survey q.4 (2014), available at  https ://gssdataexplorer.norc.org/variables/4819/vshow (last visited Apr. 20, 2017).  Calculations from the survey data and the data visualizations in figures 2 and 3 are the Court's own.





**Figure 2 "How close do you feel to your state?,"**
**General Social Surveys, 1996-2014**

**Figure 3 "How close do you feel to America?,"**
**General Social Surveys, 1996-2014**

Social psychological literature on jury decision-making suggests that the Plaintiffs' concerns about jury bias against parties that are dissimilar to themselves are not entirely phantasmagorical. Some empirical studies have shown in-group bias to be a real phenomenon, one that causes jurors -- sometimes unwittingly -- to, ceteris paribus, favor whichever party is more similar to them. See, e.g., Nancy J. King, Postconviction Review of Jury Discrimination: Measuring the Effects of Juror Race on Jury Decisions, 92 Mich. L. Rev. 63, 79-99 (1993)(surveying the literature). Some social cognition research has shown this bias to be resistant to various de-biasing procedures, such that it colors a juror's impression of a case before the conscious mind actively engages the evidence presented at trial. See Linda Hamilton Krieger, The Content of Our Categories: A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity, 47 Stan. L. Rev. 1161, 1188 (1995)(discussing how, in the process of deciding cases, biases influence the decision-maker's judgment long before the decisional moment and often beyond the reach of the decision-maker's self-awareness). The studies that uncover such bias, however, have found it to be correlated only with race and gender, i.e., a white male juror would be biased toward a white or male party, and a Latina juror would be biased toward a Latino or female party. See John Guinther, The Jury in America 93

n.12 (1988)(reporting on research that the RAND Corporation undertook). Nevertheless, the Court has found no empirical study that has uncovered a geographical in-group bias of the sort that the Plaintiffs appear to fear. It is an article of faith among many in the legal profession that American jurors are xenophobic toward foreign parties. See Kimberly A. Moore, Xenophobia in American Courts, 97 Nw. U. L. Rev. 1497, 1502-03 (reporting survey data). Empirical studies of civil cases defy, however, this common perception. See Kevin Clermont & Theodore Eisenberg, Xenophilia in American Courts, 109 Harv. L. Rev. 1120 (1996)(finding that: (i) foreign parties win a higher percentage of cases in court than domestic parties win; and (ii) the widespread perception that American jurors are hostile to foreign parties is unsubstantiated and at most exaggerated). But see Kimberly A. Moore, Xenophobia in American Courts, 97 Nw. U. L. Rev. at 1509-13 (finding an exception in patent cases).

Under social psychological theory, jurors' in-group bias should be larger against foreign parties than against out-of-state parties, ceteris paribus, on the grounds that jurors will feel an out-of-state party to be more similar to them than a foreign party is. The lack of measurable in-group bias against foreign parties, therefore, suggests that fear of intense bias against out-of-state defendants likely is misplaced. Data support this conclusion; out-of-state plaintiffs who sue in-state defendants prevail in forty-seven percent of jury trials. See Kimberly A. Moore, Xenophobia in American Courts, 97 Nw. U. L. Rev. at 1519. This percentage is a slight minority of trials, and below the fifty percent success rate that one would expect given the law of large numbers if in-state and out-of-state parties had equally strong cases on average.[107] The slight minority appears, however, to at least partially be a result of out-of-state parties' weaker cases:

---

[107]See Law of Large Numbers, Encyclopedia of Mathematics (Michiel Hazewinkel ed. 2001), available at https://www.encyclopediaofmath.org/index.php/Law_of_large_numbers (last visited Apr. 21, 2017).

out-of-state parties win only twenty-seven percent of civil cases that a judge decides compared to the forty-seven percent of civil cases that a jury decides. See Kimberly A. Moore, Xenophobia in American Courts, 97 Nw. U. L. Rev. at 1519 n. 74. Until scholars conduct more robust multivariate analyses, the prevailing evidence shows that -- if a geographical juror bias exists at all -- it more likely is a bias in favor of out-of-state parties than against them.

Even given the nationwide data that suggest a lack of the category of geographical in-group bias to which the Plaintiffs fear they will be subjected if the Court allows the Defendants to mention that the Plaintiffs hail from other states, the Plaintiffs might argue that the Court would commit the decomposition fallacy by imputing a similar lack of geographic bias to Oklahomans. What is true about the whole may not be true about each of its individual subpopulations. At least theoretically, Oklahomans might exhibit greater geographic in-group bias than Americans as a whole exhibit.

The Plaintiffs do not explicitly make this argument in their briefings, nor did they posit such enhanced geographical in-group bias at the hearing. Nor can the Court identify any evidence in support of such a proposition that would rise to the level that the Plaintiffs would face undue prejudice under rule 401, 402, or 403 of the Federal Rules of Evidence. The Court, even during the brief time that it has spent out-of-district in Tulsa, has recognized that Oklahomans are proud of their state. Rightly so. Oklahoma was the continental United States' last frontier,[108] gritted its teeth against the sandpaper winds of the Dust Bowl,[109] and dominated

---

[108]In 1889, Congress placed two million acres of territory that later would become Oklahoma into the public domain. See Act of March 2, 1899, 50 Stat. 341. At noon on April 22, 1889, more than fifty-thousand settlers stampeded into the territory to stake out their claims, and within a few hours, all the available land was claim. See Into Oklahoma at Last: Thousands Wildly Dashing in for Homes, N.Y. Times, Apr. 22, 1889; William Willard Howard, The Rush to Oklahoma, 33 Harper's Weekly 391 (May 18, 1889). The following year, Frederick Jackson Turner, who at the time was the Superintendent of the United States Census Bureau, declared the

the gridiron for seven college football national championships, among many other calls to fame

and indicia of hardiness, drive, and resolve.[110]   The Court finds no evidence in the Plaintiffs'

briefing or the Plaintiffs' remarks on the Plaintiffs' Motion in Limine, however, which suggests

that Oklahomans are more of the mold of Oklahoma state chauvinist Grampa Joad[111] than of

other Oklahoma native son and moral cosmopolitan Woody Guthrie.[112]   Absent concrete

evidence that the Plaintiffs would suffer undue prejudice if the Defendants merely mention their

states of residence, the Court cannot assume that other Oklahomans are state chauvinists.

Even were the Plaintiffs correct to presume that Oklahomans' state pride has a dark side

of guarded provincialism, the Court finds no evidence in the Plaintiffs' briefing or in the

Plaintiffs' discussion of Plaintiffs' Motion in Limine at the hearing that one can assume ex ante

---

frontier to be closed. See Frederick Jackson Turner, The Frontier in American History 297
(1921).

[109]See, e.g., Timothy Egan, The Worst Hard Time: The Untold Story of Those Who
Survived the Great American Dust Bowl 196 (The "train sputtered its way east, stopping
frequently so the crews could shovel sand from the tracks . . . .   It looked awful outside: all of the
Oklahoma Panhandle blowing and dead, no life of any form in the fields . . . . ")

[110]The Oklahoma Sooners have won six college football national championships outright
and shared a seventh, in 1974, with the University of Southern California.   See National
Collegiate Athletic Association, FBS Football Championship History, http://www.ncaa.com
/history/football/fbs (last visited Apr. 20, 2017).

[111]Of all John Steinbeck's characters residing in Oklahoma at the beginning of The
Grapes of Wrath, Grampa Joad is the only one who seems to show state chauvinism, particularly
as the Joad family readies itself to move to California. See, e.g., John Steinbeck, The Grapes of
Wrath 116-17 (75th Anniversary ed. 2014).

[112]Woody Guthrie was born in Okemah, Oklahoma, in 1912.  See Woody Guthrie, Bound
for Glory: The Hard-Driving, Truth-Telling, Autobiography of America's Great Poet-Folk
Singer 38 (1983).   In his most famous ballad, preserved in the Library of Congress' National
Recording Registry, Woody Guthrie wrote that he felt that all the land in the United States --
including, apropos, "New York Island" -- is part of the same vast tract that transcends parochial
identities.   See Woody Guthrie, This Land Is Your Land, on Woody Guthrie: The Ultimate
Collection, disc 1, track 2 (Not Now Music Ltd. 2007)(1944).

that this state pride would override Oklahomans' sense of civic duty in judging out-of-state plaintiffs on the merits of the case before them. Social scientific research which models civic behavior and engagement on twelve different dimensions ranks Oklahoma as above average among the fifty states, ahead of the Court's home state of New Mexico and significantly ahead of the State of New York, which ranks fourth-to-last among the states on this composite civic measure. See Corporation for National & Community Service, Volunteering in America 11-12 (2007). Such civic-mindedness is not, of course, a failsafe against prejudice insinuating itself into the jury box. Combined with voir dire, however, the Court concludes that there are adequate safeguards in place to produce a jury of Oklahomans who, in the vivid imagery that the Defendants provided in their Reply to Plaintiffs' Motion in Limine, will not "hiss with prejudicial bias" with every passing reference to New York. Response to Plaintiffs' Motion in Limine at 14. The Court has a high degree of confidence that it and an Oklahoman jury will do in this case what federal courts have done in federal case after federal case for over two-hundred years: provide out-of-state parties a fair trial. The Court also will caution the Defendants not to highlight or unfairly argue about the Plaintiffs' residency or make any argument that the jury should rule on that basis rather than on the law as the Court gives the law to it and the facts as presented. The Court is confident of its ability to control the case to assure the Plaintiffs a fair trial regardless of their residency. Accordingly, the Court denies the Plaintiffs' request that the Court preclude the Defendants from making any reference to the Plaintiffs' out-of-state residency.

**IT IS ORDERED** that: (i) the requests in the Defendants' Motion for Summary Judgment on Acquiescence Defense and Brief in Support, filed April 3, 2015 (Doc. 83), are denied; (ii) the requests in the Defendants' Second Motion for Summary Judgment and Brief in

Support Thereof, filed September 14, 2015 (Doc. 154), are denied in part as they relate to the Oklahoma common-law clean hands doctrine, the Oklahoma common law of waiver, and the Oklahoma common law of estoppel, and granted in part as they relate to securities claims, thus dismissing those securities claims; (iii) the requests in the Plaintiffs' Motion to Strike, filed April 20, 2015 (Doc. 86), and the Plaintiffs' Motion to Strike Affidavit of Randall Lorett and Memorandum of Law in Support Thereof, filed April 20, 2015 (Doc. 87), are denied; (iv) the requests in the Plaintiffs' Motion to Strike Affirmative Defenses, filed November 4, 2015 (Doc. 191), are denied, although the Court will not allow evidence of those affirmative defenses at trial, because it has granted the Plaintiffs' MSJ with respect to entire fairness; (v) the requests in the Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment on Breach of Fiduciary Duty Claims, filed September 14, 2015 (Doc. 157), are granted, with determination of damages -- and only damages -- left to be resolved at trial; and (vi) the requests in Plaintiffs' Motion in Limine to Preclude Evidence of Plaintiffs' Conduct, and Brief in Support, filed October 26, 2015 (Doc. 182), are granted in part, precluding entry into evidence of the Letter from Akin Gump to Richard M. Carson, Vice President and General Counsel of Cypress Energy Partners -- TIR, LLC, Nov. 26, 2013, filed April 3, 2015 (Doc. 83-25), and other letters that the Plaintiffs and the Plaintiffs' counsel exchanged with the Defendants between September, 2013, and November, 2013, and denied in part, not precluding letters sent to and received from Triangle Capital and not precluding references to the Plaintiffs' out-of-state residence.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Jamison A. Diehl
Akin Gump Strauss Hauer & Feld LLP (NY)
New York, New York

-- and --

R. Stratton Taylor
Mark H. Ramsey
Clinton Derek Russell
Taylor Burrage Foster Mallett Downs Ramsey & Russell
Claremore, Oklahoma

-- and --

Stuart Kagen
Daniel A. Cohen
Joshua C. Gillette
Kyla Janine Grant
Kagen & Caspersen
New York, New York

  *Attorneys for the Plaintiffs*

Toney Daniel Foster
Taylor Burrage Foster Mallett Downs Ramsey & Russell
Claremore, Oklahoma

  *Attorneys for Plaintiff Stuart 2005 GST Family Trust*

Frederic Dorwart
Paul DeMuro
Sarah Wishard Poston
Nora Rose O'Neill
Fredric Dorwart Lawyers
Tulsa, Oklahoma

  *Attorneys for the Defendants*