# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF OKLAHOMA

SFF-TIR, LLC; STUART FAMILY
FOUNDATION, INC.; ALAN STUART
2012 GST FAMILY TRUST; STUART
2005 GST FAMILY TRUST;
CELEBRATION, LLC; ANURAG
AGARWAL; PETER BUCKLEY; VINCENT
SIGNORELLO and RODNEY M. REYNOLDS,

      Plaintiffs,

vs.                               No. CIV 14-0369 JB/FHM

CHARLES C. STEPHENSON, JR.;
CYNTHIA A. FIELD; PETER BOYLAN, III;
LAWERENCE FIELD;
CYPRESS ENGERGY PARTNERS-TR, LLC;
CEP CAPITAL PARTNERS, LLC;
CYPRESS ENERGY HOLDINGS, LLC and
TULSA INSPECTION RESOURCES, LLC,

      Defendants.

## MEMORANDUM OPINION AND ORDER

     **THIS MATTER** comes before the Court on Plaintiffs' Motion for Bench Trial on Plaintiffs' First Through Fourth Claims for Relief, and Brief in Support, filed February 17, 2017 (Doc. 253)("Motion for Bench Trial"). The Court held a hearing on April 26-27, 2017. The primary issues are whether: (i) the Plaintiffs' breach-of-fiduciary-duty claims against the Defendants are equitable or legal claims; (ii) the Plaintiffs' breach-of-fiduciary-duty claims fall within the scope of the Seventh Amendment's civil jury trial right; and (iii) the Defendants consequently enjoy a constitutional right to a jury trial rather than a bench trial with regard to the Plaintiffs' breach-of-fiduciary-duty claims. To resolve these issues, the Court applies a two-prong test that the Supreme Court of the United States devised in Granfinanciera v. Nordberg,

492 U.S. 33 (1989). The first prong consists of an historical evaluation of whether breach-of-fiduciary-duty claims were within the jurisdiction of English law or equity courts in 1791, the year of the Seventh Amendment's ratification. See Granfinanciera v. Nordberg, 492 U.S. at 42. The second prong consists of an assessment of the nature of the remedies that the Plaintiffs seek with their breach-of-fiduciary-duty claims. See Granfinanciera v. Nordberg, 492 U.S. at 42. After a lengthy historical analysis, which includes review of 346 English law and equity cases between 1789 and 1791, the Court concludes with regard to the first prong that breach-of-fiduciary-duty claims were equitable in England in 1791. Analyzing the nature of the Plaintiff's remedies under the second prong, the Court determines those remedies to be legal in nature. Both because of the Granfinanciera v. Nordberg Court's instructions to weigh the second prong more heavily than the first prong and because of a strong judicial tradition of wariness to wrest issues from the jury in borderline cases, the Court concludes that: (i) the Plaintiffs' claims fall within the Seventh Amendment's scope; and (ii) the Defendants enjoy a right to a jury trial in this case with regard to the breach-of-fiduciary-duty claims. Accordingly, the Court denies the Plaintiffs' Motion for Bench Trial.

## FACTUAL BACKGROUND

The Court adopts the factual background it previously stated in its Memorandum Opinion and Order, filed April 25, 2017 (Doc. 274). Defendant "Charles Stephenson is the owner of Regent Private Capital." Defendants' Motion for Summary Judgment on Acquiescence Defense and Brief in Support ¶ 1, at 7, filed April 3, 2015 (Doc. 83)("Defendants' Acquiescence MSJ")(stating this fact).[1] See Plaintiffs' Memorandum of Law in Opposition to Defendants'

---

[1]During the December 27 and 28, 2016, hearing in this case, both parties agreed that there is significant overlap between the factual sections in the Defendants' Acquiescence MSJ and the Defendants' Second Motion for Summary Judgment and Brief in Support, filed September 14,

Motion for Summary Judgment on Acquiescence Defense ¶ 1, at 8, filed April 20, 2015 (Doc. 84)("Response to Defendants' Acquiescence MSJ")(not disputing this fact). "Defendant Cynthia Field is the daughter of Defendant Charles Stephenson." Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment on Breach of Fiduciary Claims ¶ 1, at 3, filed September 14, 2015 (Doc. 157)("Plaintiffs' MSJ")(stating this fact). See Defendants' Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment on Breach of Fiduciary Duty Claims (Doc. 157), at 2, filed October 5, 2015 (Doc. 170)("Response to Plaintiffs' MSJ")(not disputing this fact). "Defendant Lawrence Field is the husband of Defendant Cynthia Field and the son-in-law of Defendant Charles Stephenson." Plaintiffs' MSJ ¶ 2, at 3 (stating this fact). See Response to Plaintiff's MSJ at 2 (not disputing this fact). "Defendant CEP-TIR, LLC['s] . . . principals are Defendants Stephenson, Cynthia Field and Peter Boylan, [sic] III." Plaintiffs' MSJ ¶ 3, at 3 (stating this fact).[2] "In 2009, Regent and Mr. Stephenson individually became together

_____

2015 (Doc. 154)("Defendants' Estoppel MSJ"). See Transcript of Motion Hearing Before the Honorable James O. Browning, United States District Judge (taken December 28, 2016), filed January 23, 2017 (Doc. 250)("December Tr."), at 370:7-374:14 (DeMuro, Kagen, Court). The Defendants indicated at the hearing that they do not object, in the light of this fact, to the Court writing the factual sections for the Defendants' two motions for summary judgment together. See December Tr. at 374:9-14 (DeMuro). The parties also agreed that they approved of the Court's proposal to fold the facts from Plaintiffs' MSJ into a single factual section along with the facts from the Defendants' Acquiescence MSJ and the Defendants' Estoppel MSJ. The Court, therefore: (i) refers to facts common to both the Defendants' Acquiescence MSJ and the Defendants' Estoppel MSJ collectively by referring to the paragraph in the Defendants' Acquiescence MSJ; and (ii) places all facts from across the three summary judgment motions into a preliminary biographical section followed by facts reported in as near to chronological order as overlapping time periods permit.

[2]In the Plaintiffs' MSJ, the Plaintiffs word the fact as follows: "Defendant CEP-TIR, LLC is a Delaware corporation whose principals are Defendants Stephenson, Cynthia Field and Peter Boylan, III." Plaintiffs' MSJ ¶ 3, at 3. The Defendants dispute that CEP-TIR, LLC is a corporation, maintaining that it "is a limited liability company, not a corporation." Response to Plaintiffs' MSJ at 2. The Defendants do not dispute that Stephenson, Field, or Boylan is a principal of CEP-TIR. See Response to Plaintiffs' MSJ at 2. Because the Defendants do not

TIR Inc.'s largest shareholder owning approximately 40% of the TIR Inc. shares." Defendants'

Acquiescence MSJ ¶ 1, at 7 (stating this fact).[3] "At the same time a number of the Plaintiffs

associated with Alan Stuart acquired a minority interest in TIR Inc." Defendants' Acquiescence

MSJ ¶ 3, at 7 (stating this fact).[4] "Alan Stuart is a 'seasoned, successful, long-term investor with

more than 40 years' experience in business development, investment management, and corporate

governance.'" Defendants' Acquiescence MSJ ¶ 4, at 7 (stating this fact).[5] "The Defendant

_____

dispute this latter assertion, the Court deems it to be undisputed and amends the fact's text to
reflect that the fact's elements that are undisputed.

[3]In Response to Defendants' Acquiescence MSJ ¶ 2, at 8, the Plaintiffs do not dispute this
fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness
standard of review that governs the Tender Offer and Merger." Response to Defendants'
Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it
specifically controverting a fact by directing the Court with particularity to the record. See N.D.
Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary
judgment is immaterial to the Court's disposition of the summary judgment motion is not
effective to contest a fact: "Materiality is not proper grist for the statement of facts and is
considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL
1336670, at *4 n.8 (D.N.M. March 31, 2011)(Browning, J.). The Plaintiffs' assertion that the
entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion,
and so does not materially affect the Plaintiffs' admission of the fact.

[4] In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this
fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness
standard of review that governs the Tender Offer and Merger." Response to Defendants'
Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it
specifically controverting a fact by directing the Court with particularity to the record. See N.D.
Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary
judgment is immaterial to the Court's disposition of the summary judgment motion is not
effective to contest a fact: "Materiality is not proper grist for the statement of facts and is
considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL
1336670, at *4 n.8. The Plaintiffs' assertion that the entire fairness standard is the operative
standard is a legal conclusion, and not a factual assertion, and so does not materially affect the
Plaintiffs' admission of the fact.

[5]In Response to Defendants' Acquiescence MSJ ¶ 2, the Plaintiffs do not dispute this
fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness
standard of review that governs the Tender Offer and Merger." Response to Defendants'
Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it

Lawrence Field, the son-in-law of Mr. Stephenson and an officer of Regent, became the chairman, and Alan Stuart became a member of the board of directors of TIR Inc." Defendants' Acquiescence MSJ ¶ 5, at 7 (stating this fact). See Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact). "In February 2013, Alan Stuart prepared a proposal for Mr. Field, which he named 'Project Poirot' to acquire control of TIR, Inc. at $369,507 per share which he later increased to $385,175." Defendants' Acquiescence MSJ ¶ 6, at 7 (stating this fact).[6] "On February 11, 2013, Stuart purchased individual shareholder J.W. Lorett's TIR Inc. shares for $275,000 per share." Defendants' Acquiescence MSJ ¶ 7, at 7 (stating this fact).[7] "On

_____

specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at the summary- judgment stage is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[6]In Response to Defendants' Acquiescence MSJ ¶ 6, at 7, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at the summary- judgment stage is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[7]In Response to Defendants' Acquiescence MSJ ¶ 7, at 9, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary judgment motion is not

March 21, 2013, Stuart presented an offer to the TIR board for TIR Inc. shares of $380,382 per

share." Defendants' Acquiescence MSJ ¶ 8, at 7 (stating this fact).[8] "On May 16, 2013, Alan

Stuart revised his offer to the board, increasing the repurchase price to $413,143 per share."

Defendants' Acquiescence MSJ ¶ 9, at 8 (stating this fact).[9] "The Defendants [Charles C.]

Stephenson, [Peter] Boylan, and [Cynthia A.] Field were principals in Cypress Energy Partners-

TIR, LLC ("Cypress Energy Partners"). Defendants' Acquiescence MSJ ¶ 10, at 8 (stating this

fact)(brackets added). See Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing

---

effective to contest a fact: "Materiality is not proper grist for the statement of facts and is
considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL
1336670, at *4 n.8. The Plaintiffs' assertion that the entire fairness standard is the operative
standard is a legal conclusion, and not a factual assertion, and so does not materially affect the
Plaintiffs' admission of the fact.

[8]In Response to Defendants' Acquiescence MSJ ¶ 8, at 7 the Plaintiffs do not dispute this
fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness
standard of review that governs the Tender Offer and Merger." Response to Defendants'
Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it
specifically controverting a fact by directing the Court with particularity to the record. See N.D.
Okla. LCvR56.1(c). The Court has previously noted that arguing at the summary-judgment stage
a proposed fact is immaterial to the Court's disposition of the summary judgment motion is not
effective to contest a fact: "Materiality is not proper grist for the statement of facts and is
considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL
1336670, at *4 n.8. The Plaintiffs' assertion that the entire fairness standard is the operative
standard is a legal conclusion, and not a factual assertion, and so does not materially affect the
Plaintiffs' admission of the fact.

[9]In Response to Defendants' Acquiescence MSJ ¶ 9, at 8, the Plaintiffs do not dispute this
fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness
standard of review that governs the Tender Offer and Merger." Response to Defendants'
Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it
specifically controverting a fact by directing the Court with particularity to the record. See N.D.
Okla. LCvR56.1(c). The Court has previously noted that arguing at the summary-judgment stage
a proposed fact is immaterial to the Court's disposition of the summary judgment motion is not
effective to contest a fact: "Materiality is not proper grist for the statement of facts and is
considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL
1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative
standard is a legal conclusion and not a factual assertion, and so does not materially affect the
Plaintiffs' admission of the fact.

this fact).  "In 2013, two TIR Inc. directors (Alan Stuart on the one hand and Lawrence Field on the other hand) [sought] to acquire control of TIR Inc."  Defendants' Acquiescence MSJ ¶ 11, at 8 (stating this fact)(relying on Videotape Deposition of Rodney Reynolds Taken on Behalf of the Defendants (taken November 17, 2014), filed April 3, 2015 (Doc. 83-11)("Reynolds Depo.").[10]  "In June 2013, the Defendants [completed] the bidding process to acquire control of TIR Inc."  Defendants' Acquiescence MSJ ¶ 13, at 8 (stating this fact)(relying on Affidavit of Randall Lorett, filed April 3, 2015 (Doc. 83-2)("Lorett Aff.").[11]

"On June 26, 2013, Defendant CEP-TIR, LLC acquired 26.45 shares of TIR from certain other shareholders, known as the Pooled Shareholders, in *voluntary* sales transactions."  Plaintiffs' MSJ ¶ 4, at 3 (emphasis in the original)(stating this fact).  See Response to Plaintiffs' MSJ at 2 (not disputing this fact).  "Defendants subsequently referred to this share acquisition as

---

[10]The Defendants state in the Defendants' Acquiescence MSJ that, in 2013, "two TIR Inc directors (Alan Stuart on the one hand and Lawrence Field on the other hand) engaged in a competition to acquire control of TIR Inc."  Defendants' Acquiescence MSJ ¶ 11, at 8.  The Plaintiffs purport to dispute this fact, relying on a June 14, 2013, email from the Special Committee attaching a proposed Standstill and Indemnity Agreement that depicts a series of direct, independent offers to shareholders rather than a competition between Stuart and Field to acquire control of TIR, Inc.  See Response to Defendants' Acquiescence MSJ ¶ 3, at 8.  The Court concludes that, whether the bids were competitive or independent, they indicate that Stuart and Field both sought to acquire control of TIR, Inc.  The Court therefore amends the fact as the Defendants state it in the Defendants' Acquiescence MSJ to reflect the elements of the fact that the parties do not dispute.

[11]The Defendants state in the Defendants' Acquiescence MSJ that, in "June 2013, the Defendants won the bidding process to acquire control of TIR Inc."  Defendants' Acquiescence MSJ ¶ 13, at 8.  The Plaintiffs purport to dispute this fact, relying on a June 14, 2013, email from the Special Committee attaching a proposed Standstill and Indemnity Agreement that depicts a series of direct, independent offers to shareholders rather than a competition between Stuart and Field to acquire control of TIR, Inc.  See Response to Defendants' Acquiescence MSJ ¶ 3, at 8-9.  The Court does not see in the fact as written any indication that the Defendants here assert any competitive bidding between the two camps, aside perhaps from the Plaintiffs' use of the verb "won."  To reflect the factual elements that are undisputed, the Court therefore amends the fact as the Defendants state it in the Defendants' Acquiescence MSJ.

the 'Control Acquisition.'"  Plaintiffs' MSJ ¶ 5, at 3 (stating this fact).  See Response to Plaintiff's MSJ at 2 (not disputing this fact).  "Between June 2013 and October 2013, CEP-TIR LLC also [acquired] certain other outstanding shares of TIR."  Plaintiffs' MSJ ¶ 6, at 3 (stating this fact).[12]  "As a result of these transactions, Defendants CEP-TIR, LLC, Stephenson, and Cynthia Field . . . became, collectively, the majority shareholders of TIR, owning at least 69.4% of the outstanding shares."  Plaintiffs' MSJ ¶ 7, at 3 (stating this fact).  See Response to Plaintiffs' MSJ at 2 (not disputing this fact).  CEP-TIR, LLC, Stephenson, and Field "thereby collectively gained control of TIR."  Plaintiffs' MSJ ¶ 8, at 4 (stating this fact).  See Response to Plaintiffs' MSJ at 2 (not disputing this fact).

"From June 2013 through December 23, 2013, the Plaintiff SFF-TIR, LLC was represented by legal counsel."  Defendants' Acquiescence MSJ ¶ 14, at 8 (stating this fact).[13]  "From June 2013 through December 23, 2013, the Plaintiffs Stuart Family Foundation, Inc.;

---

[12]In the Plaintiffs' MSJ, the Plaintiffs word the fact as follows: "Between June 2013 and October 2013, CEP-TIR LLC also certain other outstanding shares of TIR."  Plaintiffs' MSJ ¶ 6, at 3.  The fact is written as a sentence fragment without any verb.  The Defendants purport to dispute the fact solely on the basis of "avoidance of doubt" and add the word "acquired" to the fact.  Response to the Plaintiffs' MSJ at 2.  Because of (i) the obvious scrivener's error; and (ii) the Plaintiffs' repeated assertions elsewhere that CEP-TIR LLC acquired the outstanding TIR shares, the Court deems the fact -- with the Defendants' interpolation of the verb "acquired" -- to be undisputed.

[13]In the Response to Defendants' Acquiescence MSJ ¶ 14, at 8 the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger."  Response to Defendants' Acquiescence MSJ ¶ 2, at 8.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See N.D. Okla. LCvR56.1(c).  The Court has previously noted that arguing at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8.  The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion, and not a factual assertion and so does not materially affect the Plaintiffs' admission of the fact.

Alan Stuart 2012 GST Family Trust; Stuart 2005 GST Family Trust; and Celebration, LLC were

represented by legal counsel." Defendants' Acquiescence MSJ ¶ 15, at 8 (stating this fact).[14]

"Each of the individual Plaintiffs executed and delivered a proxy to SFF-TIR, LLC to act on his

or her behalf with respect to his or its TIR Inc. shares which proxies were in effect on November

2, 2013." Defendants' Acquiescence MSJ ¶ 16, at 8 (stating this fact).[15] "[T]he Plaintiffs, led

by Alan Stuart, attempted to negotiate a sale of their minority block of shares to Cypress for a

substantially higher share price." Defendants' Acquiescence MSJ ¶ 19, at 9 (stating this fact).[16]

---

[14]In Response to Defendants' Acquiescence MSJ ¶ 15, at 8 the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[15]In Response to Defendants' Acquiescence MSJ ¶ 16, at 8, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[16]The Plaintiffs purport to dispute this fact "to the extent that it suggests that there was a winner-take-all competition in 2013 to acquire control of TIR." Response to Defendants' Acquiescence MSJ ¶ 6, at 9. The Plaintiffs then continue: "Plaintiffs otherwise admit that Plaintiffs attempted to negotiate a substantially higher sale price for their shares, except that Plaintiffs object to this fact as immaterial and irrelevant." Response to Defendants'

"Following the June 26, 2013 Control Acquisition, and after certain resignations, TIR's Board of Directors had three members as of October 31, 2013: Defendant Lawrence Field, Defendant Peter Boylan, and Randall Lorett, the President and CEO of TIR." Plaintiffs' MSJ ¶ 10, at 4 (stating this fact).[17] "On September 20, 2013, Cypress Energy Partners Limited Partnership filed a Registration Statement (including the prospectus) for the public offering of partnership units of TIR shares, pursuant to the confidentiality provisions of the Jumpstart Our Business Startups Act." Defendants' Acquiescence MSJ ¶ 20, at 9 (stating this fact). See Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact). "As of November 2, 2013, all plaintiffs had granted proxies to Plaintiff SFF-TIR to vote their TIR Inc. shares and agreed among themselves not to sell their TIR Inc. shares for less than $654,632." Defendants'

---

Acquiescence MSJ ¶ 6, at 9. The Court sees no evidence in the fact, as the Defendants state it, that the Defendants suggest the existence of a winner-take-all competition in 2013. Furthermore, contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[17]The Defendants purport to dispute this fact "[f]or avoidance of doubt," indicating that TIR, Inc.'s board of directors "had three members -- Mr. Field, Mr. Boylan, and Mr. Lorett -- and two vacant positions as of October 31, 2013." Response to Plaintiffs' MSJ at 3 (relying on Letter from Cypress Energy Partners to Shareholders of Tulsa Inspection Resources, Inc. at 3 (dated October 31, 2013), filed September 15, 2015 (Doc. 158-3)). The Court notes that this observation is a difference without a distinction. Analogously, if one says that a person is holding up three fingers on one hand, that statement is the equivalent of saying that one is holding up three fingers on one hand and that the other two fingers on the hand are not being held up. Furthermore, the Defendants do not dispute that L. Field., Boylan, and R. Lorett were the only three sitting TIR, Inc. board members as of October 31, 2013; the Court deems this fact to be undisputed.

Acquiescence MSJ ¶ 21, at 9 (stating this fact).[18]  "On October 31, 2013, Cypress and TIR Inc.

made a Tender Offer [Letter from Cypress Energy Partners to Shareholders of Tulsa Inspection

Resources, Inc. (dated October 31, 2013), filed September 15, 2015 (Doc. 158-3)(Tender Offer)]

to TIR Inc.'s remaining shareholders, including the Plaintiffs, for $451,000."  Defendants'

Acquiescence MSJ ¶ 22, at 9 (stating this fact).  See Response to Defendants' Acquiescence MSJ

¶ 1, at 8 (not disputing this fact).

> The Tender Offer disclosed (i) that the Registration Statement had been filed, (ii)
> that Cypress Energy intended to enter into an underwriting agreement for the
> public offering of master limited partnership units and that the equity of TIR Inc.
> might be dropped into the new publicly traded entity, and (iii) the purchase of
> shares (and share prices) by which the Defendants acquired TIR Inc. shares.

Defendants' Acquiescence MSJ ¶ 23, at 9 (stating this fact)(relying on Videotaped Deposition of

Anurag Agarwal (taken September 29, 2014), filed April 3, 2015(Doc. 83-20)("Agarwal Depo.

Ex. 1").[19]  In a section called "Certain Conflicts of Interest," the Tender Offer states:

---

[18]In Response to Defendants' Acquiescence MSJ ¶ 23, at 9, the Plaintiffs do not dispute
this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness
standard of review that governs the Tender Offer and Merger."  Response to Defendants'
Acquiescence MSJ ¶ 2, at 8.  Contending that a fact is immaterial is not disputing a fact, nor is it
specifically controverting a fact by directing the Court with particularity to the record.  See N.D.
Okla. LCvR56.1(c).  The Court has previously noted that arguing a proposed fact at summary
judgment is immaterial to the Court's disposition of the summary judgment motion is not
effective to contest a fact: "Materiality is not proper grist for the statement of facts and is
considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL
1336670, at *4 n.8.  The Plaintiffs' assertion that the entire fairness standard is the operative
standard is a legal conclusion, and not a factual assertion, and so does not materially affect the
Plaintiffs' admission of the fact.

[19]The Plaintiffs purport to dispute this fact.  According to the Plaintiffs, the Tender Offer
contains material misstatements and omissions:

> First, the Tender Offer failed to disclose (i) the value Defendants would receive
> for their interests in TIR as a result of the MLP IPO; (ii) the fact that Defendants
> had projected internally, and to third parties (including underwriters for the MLP
> IPO), that TIR would reach $21 million adjusted EBITDA by the end of 2013;
> (iii) and TIR's substantial growth in revenues, headcount and EBITDA month-

"As a result of the June Acquisition, Mr. Boylan, and Mr. Field (who is affiliated with Mr. Stephenson and Ms. Field) may each be deemed to have a conflict of interest related to this Offer." *Id.* [Tender Offer] at 2.

"As a result of the foregoing potential conflicts of interest, the TIR Board has not been asked to and is not making any recommendation to you regarding this Offer." *Id.* [Tender Offer at 2]

"None of the Purchasers, nor any of their respective affiliates has performed or commissioned any appraisal, or engaged any independent financial advisor or other third party to perform any valuation analysis or provide any opinion respecting the value of the Shares in connection with this Offer." *Id.* [Tender Offer at 2]

Plaintiffs' MSJ ¶ 12, at 4 (stating this fact)(internal citation omitted).  See Response to Plaintiffs'

MSJ at 2 (not disputing this fact).  The merger between TIR, Inc. and TIR, LLC "enabled the

---

over-month. . . . While the Tender Offer included financials for September 2012 and September 2013, it did not include any financials showing the unprecedented growth the Company was experiencing on a monthly basis.  The Tender Offer also included affirmative misstatements: (i) it claimed certain issues with accounts receivable for TIR Canada were "material," even as just days earlier internal documents show Defendants had concluded the impaired accounts receivable amounted to less than the $300,000 reserve Defendants had set aside to address the issue (which can hardly be described as "material" in light of TIR's projected $21M adjusted EBITDA for 2013); and (ii) to support the offer price of $451,000 per share, it claimed Defendants had purchased TIR shares from 13 unnamed shareholders at a price of $451,000 or lower in October 2013.  Not only did this conflict with Defendants' earlier promise on June 26, 2013 that it would buy out all TIR shareholders at the same price, but also with numerous internal statements by Defendants that they in fact had purchased from only 4 TIR shareholders at a price of $451,000 or less in October 2013.

Response to Defendants' Acquiescence MSJ ¶ 7, at 9 (internal citation omitted).  The Court notes, however, that the fact as the Defendants word it in their Defendants' Acquiescence MSJ asserts certain items that were disclosed; it does not touch on items that the Plaintiffs may have failed to disclose.  See Defendants' Acquiescence MSJ ¶ 22, at 9.  Moreover, alleged misstatements in the disclosure about other issues does not fall within this asserted fact's scope. Because the Plaintiffs do not dispute the assertion that the tender offer disclosed that (i) the Registration Statement had been filed; (ii) that Cypress Energy intended to enter into an underwriting agreement for the public offering of Master Limited Partnership units and that the equity of TIR Inc. might be dropped into the new publicly traded entity; and (iii) the purchase of shares (and share prices) by which the Defendants acquired TIR Inc. shares, the Court deems this fact to be undisputed.

Controlling Shareholder Defendants to exchange their own TIR shares for equity in the new entity, Defendant TIR LLC, in proportion to their prior shareholders in TIR." Plaintiffs' MSJ ¶ 15, at 4 (stating this fact). See Response to Plaintiffs' MSJ at 2 (not disputing this fact). "The Merger was approved and carried out by the following Defendants: [(i)] The Controlling Shareholder Defendants, *i.e.*, Defendants CEP-TIR, LLC, Stephenson, and Cynthia Field; and [(ii)] TIR Directors Lawrence Field and Peter Boylan III . . . ." Plaintiffs' MSJ ¶ 16, at 4-5 (bullets and internal citations omitted)(stating this fact). See Response to Plaintiffs' MSJ at 2 (not disputing this fact). "TIR's Rule 30(b)(6) witness, Dan O'Keefe, admitted that because the Board composition had not changed, the same conflicts of interest that existed at the time of the Tender Offer also existed at the time of the Merger." Plaintiffs' MSJ ¶ 18, at 5 (stating this fact). See Response to Plaintiffs' MSJ at 2 (not disputing this fact).

"On November 13, 2013, Cypress Energy's SEC Registration Statement containing the prospectus for the sale of partnership units in the master limited partnership became public." Defendants' Acquiescence MSJ ¶ 24, at 9 (stating this fact). See Response to Defendants' Acquiescence MSJ ¶ 1, 8 (not disputing this fact). "Shortly after November 13, 2013, the Plaintiffs analyzed or had analyzed by one or more of their representatives the Registration Statement." Defendants' Acquiescence MSJ ¶ 25, at 9 (stating this fact).[20] "By November 26,

---

[20]In Response to Defendants' Acquiescence MSJ ¶ 25, at 9, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion and not a factual assertion, and so does not materially affect the

- 13 -

2013, the Plaintiffs had received and either personally reviewed the October 31 Tender Offer or

had had the October 31 Tender Offer reviewed by legal counsel or SFF-TIR, LLC on their

behalf." Defendants' Acquiescence MSJ ¶ 26, at 9 (stating this fact).[21] "The Plaintiffs did not

accept the October 31 Tender Offer." Defendants' Acquiescence MSJ ¶ 27, at 9 (stating this

fact). See Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact). "The

Plaintiffs could not have tendered their shares in response to the Tender Offer no matter what the

Offer said or did not say; the Plaintiffs had contractually agreed prior to the Tender Offer not to

sell their TIR Inc. shares for less than $654,632." Defendants' Acquiescence MSJ ¶ 28, at 9

(stating this fact).[22] "By November 26, 2013, the Plaintiffs had received and either (i) personally

---

Plaintiffs' admission of the fact.

[21]In Response to Defendants' Acquiescence MSJ ¶ 26, at 9, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[22]In Response to Defendants' Acquiescence MSJ ¶ 28, at 9, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

reviewed or (ii) had had reviewed by legal counsel or SFF-TIR, LLC on their behalf the Cypress

Energy Partners Limited Partnership registration Statement." Defendants' Acquiescence MSJ ¶

29, at 10 (stating this fact).[23]

> The SEC Registration Statement included the following information respecting
> Cypress Energy Partners Limited Partnership and the Initial Public Offering: (a)
> Prospectus; (b) List of risks to its business; (c) Capitalization; (d) Cash
> distribution policy, projections and partnership agreement provisions relating to
> cash distributions; (e) Historical and projected financial data: (f) Management
> discussion and analysis of financial condition; (g) detailed descriptions of the
> industries in which Cypress Energy Partners was engaged, Cypress' business and
> Cypress' management; (h) Cypress Energy Partners' partnership agreement; (i)
> Underwriting information; (j) complete audited financial statements (as of
> September 30, 2013).

Defendants' Acquiescence MSJ ¶ 30, at 10 (stating this fact)(relying on Austin Aff.) .[24] "As of

---

[23]In Response to Defendants' Acquiescence MSJ ¶ 29, at 10, the Plaintiffs do not dispute
this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness
standard of review that governs the Tender Offer and Merger." Response to Defendants'
Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it
specifically controverting a fact by directing the Court with particularity to the record. See N.D.
Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment
stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is
not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is
considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL
1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative
standard is a legal conclusion and not a factual assertion, and so does not materially affect the
Plaintiffs' admission of the fact.

[24]The Plaintiffs purport to dispute this fact. According to the Plaintiffs, the

> S-1 Registration Statement (the "S-1") did not disclose material information in
> Defendants' possession, including the pricing information for the IPO [Initial
> Public Offering] and how many limited liability company units in the Merger Sub
> Defendants would receive in exchange for their TIR shares, or the value of such
> equity merger consideration. Moreover, the projected financial data contained in
> the S-1 was incomplete as it did not include yearend 2013 EBITDA [Earnings
> Before Interest, Tax, Depreciation, and Amortization] projections for TIR, or the
> fact that Defendants had projected internally that year-end 2013 revenues would
> exceed $360 million (and by year-end, they in fact reached nearly $380 million).

November 2013, TIR had (a) revenues of $346.6 million, which was and [sic] 28 percent higher

than TIR's budgeted figure; (b) pretax profits of $1.6 million; and (c) $9 million year to date,

which were all were [sic] the 'highest numbers [TIR] had had historically" as of that time.

Plaintiffs MSJ ¶ 26, at 6 (last set of bracketed material in the original)(stating this fact)(citing

O'Keefe Depo. at 297:16-299:13). See Response to Plaintiffs' MSJ at 2 (not disputing this fact).

"TIR did not do a valuation [to inform] its merger consideration offer." Plaintiffs' MSJ ¶ 27, at 6

(internal quotation marks omitted)(stating this fact).[25] "Defendants did not disclose to Plaintiffs

TIR's internal October and November 2013 financial statements . . . showing record-breaking

revenues or TIR's November 16, 2013 management projections . . . of even higher revenues

through 2018." Plaintiffs' MSJ ¶ 28, at 6 (internal citations omitted)(stating this fact). See

Response to Plaintiffs' MSJ at 2 (not disputing this fact). "On November 26, 2013, the plaintiffs

_____

Response to Defendants' Acquiescence MSJ ¶ 8, at 10. The Court notes that the fact, as the
Defendants word it, indicates what information the Registration Statement included and not what
it excluded. See Defendants' Acquiescence MSJ ¶ 30, at 10. One might argue that the canon of
construction expressio unius est exclusio alterius suggests that the Defendants' choice to list ten
items that they assert the Registration Statement contains means that other items were not
included. Whether accurate or inaccurate, such an interpretation is irrelevant; the Plaintiffs do
not dispute the inclusion of the ten items that the Defendants assert are in the Registration
Statement. Because the Plaintiffs do not dispute this fact, the Court deems it to be undisputed.

[25]The Defendants purport to dispute this fact, indicating:

TIR offered the same or higher share price to Plaintiffs than TIR had offered
Pooled Shareholders and other selling shareholders in the intervening months. No
appraisal was appropriate. Aware of its performance through October and
November 2013, TIR nonetheless stated in the Merger Notice that it believed
$451,000 per share "represents a premium over the fair value of such shares."

Response to Plaintiffs' MSJ at 3 (quoting Notice to Former Shareholders of Tulsa Inspection
Resources, Inc. of Shareholder Action and Appraisal Rights at 2, (dated December 11, 2013)
filed September 15, 2015 (Doc. 158-5))(internal citation omitted). The Defendants' assertion
that an appraisal was not appropriate is a legal question and not a factual question. The
Defendants do not dispute the Plaintiffs' assertion in this fact that the Defendants did not
commission another valuation to inform their merger consideration offer. Because the
Defendants do not dispute this fact, the Court deems it to be undisputed.

claimed each share of TIR Inc. was worth $650,000." Defendants' Acquiescence MSJ ¶ 32, at 10 (stating this fact).[26] "On November 29, 2013, Defendants advised that the Defendants could not negotiate any purchase during the tender offer period." Defendants' Acquiescence MSJ ¶ 33, at 10 (stating this fact).[27]

"The TIR Board unanimously approved the Merger in a consent dated December 9, 2013 signed by all three Directors." Plaintiffs' MSJ ¶ 19, at 5 (stating this fact). See Response to Plaintiffs' MSJ at 2 (not disputing this fact). "CEP-TIR, LLC, Stephenson, and Cynthia Field, the majority shareholders in TIR, approved the Merger in a similar consent dated December 9, 2013 signed by all three of the majority shareholders." Plaintiffs' MSJ ¶ 20, at 5 (stating this fact). See Response to Plaintiffs' MSJ at 2 (not disputing this fact). "Plaintiffs were all minority

---

[26]In Response to Defendants' Acquiescence MSJ ¶ 32, at 10, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[27]In Response to Defendants' Acquiescence MSJ ¶ 33, at 10, the Plaintiffs do not dispute this fact, but they contend that this fact is "immaterial and irrelevant under the entire fairness standard of review that governs the Tender Offer and Merger." Response to Defendants' Acquiescence MSJ ¶ 2, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

shareholders of TIR at the time of the Merger, owning the 32.882 outstanding shares that were canceled by the Merger."  Plaintiffs' MSJ ¶ 21, at 5 (stating this fact).  <u>See</u> Response to Plaintiff's MSJ at 2 (not disputing this fact).  "The Merger Agreement stated in its 'Governing Law' provision . . . that 'the provisions of this Agreement relating to mechanics or the effects of the Merger under Delaware law shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.'"  Plaintiffs' MSJ ¶ 22, at 5 (stating this fact)(quoting Merger Agreement at § 8.04).[28]

"On December 9, 2013, Cypress and TIR exercised their statutory right to cash-out the Plaintiffs . . . ."  Defendants' Acquiescence MSJ ¶ 34, at 10 (stating this fact)(relying on Notice to Former Shareholders of Tulsa Inspection Resources, Inc. of Shareholder Action and Appraisal Rights (dated December 11, 2013), filed April 3, 2015 (Doc. 83-27).[29]  "On December 11, 2013, the Plaintiffs received timely after-the-fact notice of the Merger and their appraisal rights in

---

[28]The Defendants purport to dispute this fact "[f]or avoidance of doubt," insisting that the "laws of the State of Oklahoma are applicable to Plaintiffs' breach of fiduciary duty claims . . . and unjust enrichment claim . . . ."  Response to Plaintiffs' MSJ at 3.  This objection is legal rather than factual.  The Defendants do not dispute that the merger agreement language is as the Plaintiffs' report it in this fact.  Because the Defendants do not dispute this fact, the Court deems the fact to be undisputed.

[29]In the Defendants' Acquiescence MSJ, the Defendants word this fact as follows: "On December 9, 2013, Cypress and TIR exercised their statutory right to cash-out the Plaintiffs at $451,000 per share."  Defendants' Acquiescence MSJ ¶ 34, at 10.  The Plaintiffs purport to dispute this fact, asserting that they dispute it "to the extent it suggests that Defendants had any right to cash-out Plaintiffs for an unfair price," adding that the fact "is otherwise admitted."  Response to Defendants' Acquiescence MSJ ¶ 9, at 10.  The Court notes that the Plaintiffs do not contest the Defendants' assertion that the Defendants' statutory rights included cashing out the Plaintiffs, but only that these statutory rights did not also encompass the right to cash the Plaintiffs out at "an unfair price."  Response to Defendants' Acquiescence MSJ ¶ 9, at 10.  Whether $451,000.00 is a fair share price for TIR, Inc. shares at the time the merger was effected is a legal question rather than a factual question, or at least a fact for the jury to find -- a legal question or jury question that the Court discussed at length in its analysis of the Defendants' Acquiescence MSJ and the Plaintiffs' Estoppel MSJ in its MOO.  The Court therefore reports the fact as it is undisputed.

accordance with the Oklahoma statutes." Defendants' Acquiescence MSJ ¶ 37, at 11 (stating this

fact). See Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact). "The

Merger Agreement (dated December 9, 2013), filed April 3, 2015 (Doc. 83-27), provides that:

> For the avoidance of doubt, any former shareholder who surrenders his, her or its share certificate (or acceptable evidence of share ownership for payment of Merger Consideration pursuant to **Section 2.02** [payment provisions], shall be deemed to have (a) accepted the Merger Consideration and (b) forever waived any appraisal rights pursuant to this **Section 2.03** [provisions respecting dissenting share], Section 1091 of the [Oklahoma General corporation Act], or otherwise.

Defendants' Acquiescence MSJ ¶ 38, at 11 (citing Agarwal Depo. Ex. 7)(stating this fact). See

Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact). "On December

18-20, 2013, each Plaintiff delivered his or its TIR Inc. share certificates to the Defendant CEP-

TIR, along with stock powers, pursuant to the provisions of the Merger Agreement."

Defendants' Acquiescence MSJ ¶ 39, at 11 (stating this fact).[30] "On December 23, 2013, the

Defendant TIR LLC paid . . . Plaintiffs . . . the $451,000 per share Merger Consideration."

Defendants' Acquiescence MSJ ¶ 40, at 11 (stating this fact).[31] "As of December 9, 2013 (the

---

[30] The Plaintiffs purport to dispute this fact, indicating that they dispute the fact "to the extent Defendants suggest Plaintiffs' delivery of their shares pursuant to the Merger Agreement was a voluntary choice. Rather, Plaintiffs as minority shareholders were forcibly squeezed out of TIR, as evidenced by the 'after-the-fact' December 11, 2013 Merger Notice, which informed Plaintiffs that their shares had already been cancelled." Response to Defendants' Acquiescence MSJ ¶ 12, at 10 (relying on Agarwal Depo. Ex. 7). Because (i) the fact as the Defendants assert it does not speak to whether the share certificate delivery was voluntary or involuntary; and (ii) the Plaintiffs do not dispute the asserted fact that each Plaintiff delivered his or its share certificates, along with stock powers, to CEP-TIR between December 18 and December 20, 2013, the Court deems the fact to be undisputed.

[31] In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows: "On December 23, 2013, the Defendant TIR LLC paid, and the Plaintiffs accepted, the $451,000 per share Merger Consideration." Defendants' Acquiescence MSJ ¶ 40, at 11. The Plaintiffs purport to dispute the entire fact as the Defendants assert it, maintaining that the "Plaintiffs did not 'accept' the $451,000 per share merger consideration, but were forcibly cashed out." Response to Defendants' Acquiescence MSJ ¶ 13, at 10. As is true for Defendant's undisputed fact 39, discussed in footnote 30, supra, the dispute with respect to this fact centers on the transaction's

- 19 -

date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the Defendants had acquired control of TIR Inc." Defendants' Acquiescence MSJ ¶41, at 11 (stating this fact).[32]

"As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the transactions by which the Defendants acquired controlling shares of TIR, Inc. and the prices paid for those shares." Defendants' Acquiescence MSJ ¶ 42, at 11 (stating this

---

voluntariness, and not whether the transaction took place for the amount that the Plaintiffs indicate. Consequently, the Court amends the fact as the Defendants assert it to reflect the fact's elements that are undisputed.

[32]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows: "As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs knew the Defendants had acquired control of TIR Inc." Defendants' Acquiescence MSJ ¶ 41, at 11 (relying on Videotaped Deposition of Nathan Allen at 73:17-74:2 (taken February 25, 2015), filed April 3, 2015 (Doc. 83-23)("Allen Depo.")). The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 41, at 11). The Plaintiffs clarify that they received cash merger consideration but did not receive equity merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial as what 'Plaintiffs knew' concerning the Merger process [because knowledge] has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

fact).[33]

"Defendants admit that they did not: [(i)] Form a special committee of disinterested directors or other disinterested persons to consider the proposed merger; [(ii)] Engage any independent financial advisor or other third party valuation analysis; or [(iii)] Require a majority-of-the-minority vote for the Merger to be approved." Plaintiffs' MSJ ¶ 23, at 5-6 (bullets and internal citations omitted)(stating this fact). See Response to Plaintiffs' MSJ at 3 (not disputing this fact). "There is no other evidence that Defendants employed any of the above devices at the time of, and in connection with, the Merger." Plaintiffs' MSJ ¶ 24, at 6 (stating this fact). See

---

[33]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

> As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs knew the transactions by which the Defendants acquired controlling shares of TIR, Inc. and the prices paid for the shares.

Defendants' Acquiescence MSJ ¶ 42, at 11 (relying on Allen Depo. at 73:17-74:2). The Plaintiffs purport to dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 42, at 11). The Plaintiffs clarify that they received cash merger consideration but did not receive equity merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger [because knowledge] process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

Response to Plaintiffs' MSJ at 3 (not disputing this fact).

> As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the Defendants' conflicts of interest between their positions as officers, directors and shareholders of TIR Inc. and their positions as officers, directors, and equity owners of Cypress Energy and its Affiliates.

Defendants' Acquiescence MSJ ¶ 43, at 11 (stating this fact)(relying on Allen Depo. at 108:3-112:3).[34]

> As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the intentions of the Defendants respecting

---

[34]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

> As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs knew the Defendants' conflicts of interest between their positions as officers, directors and shareholders of TIR Inc. and their positions as officers, directors, and equity owners of Cypress Energy and its Affiliates.

Defendants' Acquiescence MSJ ¶ 43, at 11. The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 43, at 11). The Plaintiffs clarify that they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

the organization of a master limited partnership, the exchange of shares of TIR Inc. for units of ownership in the master limited partnership, and an initial public offering of units of ownership in the master limited partnership.

Defendants' Acquiescence MSJ ¶ 44, at 12 (stating this fact)(relying on Allen Depo. at 191:8-193:4).[35]

> As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the Defendants had not performed or commissioned any appraisal, or engaged any independent financial advisor or other third party to perform any valuation analysis or provide any opinion respecting the value of the TIR, Inc. shares.

---

[35]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

> As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs knew the intentions of the Defendants respecting the organization of a master limited partnership, the exchange of shares of TIR Inc. for units of ownership in the master limited partnership, and an initial public offering of units of ownership in the master limited partnership.

Defendants' Acquiescence MSJ ¶ 44, at 11. The Plaintiffs purport to dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 44, at 11). The Plaintiffs clarify that they received cash merger consideration but did not receive equity merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

Defendants' Acquiescence MSJ ¶ 45, at 12 (stating this fact)(relying on Allen Depo. at 99:5-104:24, Agarwal Depo. at 42:1-44:17, and Agarwal Depo. Ex. 1).[36]

> As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the Defendants had not obtained the approval of a majority of the minority in effecting the Merger: the Plaintiffs were the remaining TIR Inc. minority shareholders. As a group, the Plaintiffs had demanded in September to sell their shares for a price in excess of $600,000 per share, and in November had agreed amongst themselves not to accept the Tender Offer.

---

[36]In Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

> As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs knew the Defendants had not performed or commissioned any appraisal, or engaged any independent financial advisor or other third party to perform any valuation analysis or provide any opinion respecting the value of the TIR, Inc. shares.

Defendants' Acquiescence MSJ ¶ 45, at 12. The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 45, at 12). The Plaintiffs clarify that they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

Defendants' Acquiescence MSJ ¶ 46, at 12 (stating this fact).[37] "As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs knew the Defendants had not formed a special committee to consider the proposed Merger." Defendants' Acquiescence MSJ ¶ 47, at 12 (stating this fact)(relying on Allen Depo. at 272:3-273:17).[38]

---

[37]In Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs knew the Defendants had not obtained the approval of a majority of the minority in effecting the Merger: the Plaintiffs were the remaining TIR Inc. minority shareholders. As a group, the Plaintiffs had demanded in September to sell their shares for a price in excess of $600,000 per share, and in November had agreed amongst themselves not to accept the Tender Offer.

Defendants' Acquiescence MSJ ¶ 46, at 12. The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 46, at 12). The Plaintiffs clarify that they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> N.D. Okla. LCvR56.1(c The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[38]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs had been provided the financial statements of TIR Inc. for 2011 and 2012, and for the nine month period ending September 30, 2013.

Defendants' Acquiescence MSJ ¶ 48, at 12 (stating this fact)(relying on Allen Depo. at 83:18-84:1, 223:21-224:3).[39]    "As of December 9, 2013 (the date on which the Merger was

---

Inc. shares to obtain the Merger consideration), the Plaintiffs knew the Defendants had not formed a special committee to consider the proposed Merger.

Defendants' Acquiescence MSJ ¶ 47, at 12.  The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'"  Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 47, at 12).  The Plaintiffs clarify that they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received."  Response to Defendants' Acquiescence MSJ ¶ 14, at 10.  Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger."  Response to Defendants' Acquiescence MSJ ¶ 14, at 10.  The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  <u>See</u> N.D. Okla. LCvR56.1(c).  The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8.  The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[39]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs had been provided the financial statements of TIR Inc. for 2011 and 2012, and for the nine month period ending September 30, 2013.

Defendants' Acquiescence MSJ ¶ 48, at 12.  The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'"  Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants'

- 26 -

consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs had received the Registration Statement." Defendants' Acquiescence MSJ ¶ 49, at 12 (stating this fact)(relying on Allen Depo. at 194:2-11).[40]

---

Acquiescence MSJ ¶ 48, at 12). The Plaintiffs clarify that they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[40]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows: "As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs had received the Registration Statement." Defendants' Acquiescence MSJ ¶ 49, at 12. The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 49, at 12). The Plaintiffs clarify that they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8. The

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares . . . ), the Plaintiffs believed that the Defendants did not believe (and had no reasonable basis to believe) that $451,100 per TIR Inc. share represented a premium over the fair value of such shares.

Defendants' Acquiescence MSJ ¶ 50, at 13 (stating this fact)(relying on Allen Depo. at 206:11-208:25).[41]

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the dates on which the Plaintiffs surrendered their TIR Inc. shares . . . ), Plaintiffs believed both Plaintiffs' financial presentations and

---

Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[41]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the date on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), the Plaintiffs believed that the Defendants did not believe (and had no reasonable basis to believe) that $451,100 per TIR Inc. share represented a premium over the fair value of such shares.

Defendants' Acquiescence MSJ ¶ 50, at 13. The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 50, at 13). The Plaintiffs clarify that they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

Defendants' financial presentations showed the TIR Inc. shares were worth several multiples of $451,000.

Defendants' Acquiescence MSJ ¶ 51, at 13 (stating this fact)(relying on Complaint, filed July 3, 2014 (Doc. 1)).[42]

On February 4, 2014, Plaintiff SFF-TIR, LLC by its Managing Member, Alan Stuart, sent a letter to the investors in Plaintiff SFF-TIR in the form and content of [Letter from Alan Stuart to SFF-TIR, LLC investors (dated February 12, 2014), filed April 3, 2015 (Doc. 83-31)("Letter to SFF-TIR, LLC Investors")], which stated, in part, as follows

"We are pleased to inform our investors in SFF-TIR, LLC ('SFF[-]TIR') we were able to liquidate our equity position in Tulsa Inspection Resources, Inc. ('TIR'). On December 23, 2013 we received cash consideration of $451,000 per share for a total cash

_____

[42]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

As of December 9, 2013 (the date on which the Merger was consummated) and as of December 18-20, 2013 (the dates on which the Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration), Plaintiffs believed both Plaintiffs' financial presentations and Defendants' financial presentations showed the TIR Inc. shares were worth several multiples of $451,000.

Defendants' Acquiescence MSJ ¶ 51, at 13. The Plaintiffs dispute this fact only insofar as it "incorrectly states that 'Plaintiffs surrendered their TIR Inc. shares to obtain the Merger consideration.'" Response to Defendants' Acquiescence MSJ ¶ 14, at 10 (quoting Defendants' Acquiescence MSJ ¶ 51, at 13). The Plaintiffs clarify that they received <u>cash</u> merger consideration but did not receive <u>equity</u> merger consideration in the Merger Sub, "which was the 'Merger consideration' that the controlling shareholder Defendants received." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. Regarding the second half of the asserted fact's sentence, the Plaintiffs object that it is "immaterial[,] as what 'Plaintiffs knew' concerning the Merger process has no bearing upon the entire fairness of the Merger." Response to Defendants' Acquiescence MSJ ¶ 14, at 10. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

consideration of $5,763,780. The investment in TIR has generated 2.47x our original investment with a net annualized IRR of 40.42%."

Defendants' Acquiescence MSJ ¶ 53, at 13 (stating this fact)(quoting Letter to SFF-TIR, LLC

Investors 1, filed April 3, 2015 (Doc. 83-32)).[43]

> After . . . December 18-20, 2013, Defendants CEP-TIR, Charles Stephenson, and Cynthia Field, believing the Plaintiffs to have waived all claims to additional consideration for their shares, contributed 50.1% of the member interest in TIR LLC to Cypress Energy Partners Limited Partnership, and Cypress Energy Partners Limited Partnership effected a sale of partnership units to the public pursuant to the Registration Statement.

Defendants' Acquiescence MSJ ¶ 54, at 13 (stating this fact)(relying on Austin Aff. ¶ 5, at 2-3).[44]

---

[43]The Plaintiffs do not dispute this fact, but they maintain that it is "immaterial and irrelevant." Response to Defendants' Acquiescence MSJ ¶ 16, at 11. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

[44]In the Defendants' Acquiescence MSJ, the Defendants word the fact as follows:

> After the acceptance of the Merger consideration by the Plaintiffs on December 18-20, 2013, Defendants CEP-TIR, Charles Stephenson, and Cynthia Field, believing the Plaintiffs to have waived all claims to additional consideration for their shares, contributed 50.1% of the member interest in TIR LLC to Cypress Energy Partners Limited Partnership, and Cypress Energy Partners Limited Partnership effected a sale of partnership units to the public pursuant to the Registration Statement.

Defendants' Acquiescence MSJ ¶ 54, at 13. The Plaintiffs dispute this fact only insofar as it states that the Plaintiffs accepted the merger consideration of $451,000.00 per share rather than being "forcibly cashed out at that price." Response to Defendants' Acquiescence MSJ ¶ 17, at 11. The Court has amended this asserted fact's text to reflect the fact's elements that are undisputed. The Plaintiffs further contend that this fact is "immaterial and irrelevant." Response to Defendants' Acquiescence MSJ ¶ 17, at 11. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the

"On July 3, 2014, the Plaintiffs filed this action." Defendants' Acquiescence MSJ ¶ 55, at 13 (stating this fact)(relying on Complaint). See Response to Defendants' Acquiescence MSJ ¶ 1, at 8 (not disputing this fact).

## PROCEDURAL BACKGROUND

With this Memorandum and Opinion, the Court resolves and decides the Plaintiff's Motion for a Bench Trial. In this section, the Court will summarize the Motion for a Bench Trial, the Defendants' response, Plaintiffs' reply, and the Defendants' surreply. The Court also recapitulates the parties' arguments during the motion hearing, during which the parties, with only two main exceptions, adhered to the points and arguments they raised in their briefings.

1.      **Plaintiffs' Motion for a Bench Trial.**

On February 17, 2017, the Plaintiffs filed Plaintiffs' Motion for a Bench Trial. The Plaintiffs first assert that the Court's dismissal of the Plaintiffs' securities claims leaves no claims that are triable by a jury. See Motion for a Bench Trial at 5. According to the Plaintiffs, the Seventh Amendment to the Constitution of the United States of America provides that "[in] Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." Motion for a Bench Trial at 5 (quoting U.S. Const., amend. VII). The Plaintiffs report that the Supreme Court has interpreted "Suits at common law" to encompass cases involving "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies

---

record. See N.D. Okla. LCvR56.1(c). The Court has previously noted that arguing that at the summary-judgment stage a proposed fact is immaterial to the Court's disposition of the summary-judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8. The Plaintiffs' assertion that the entire-fairness standard is the operative standard is a legal conclusion, and not a factual assertion, and so does not materially affect the Plaintiffs' admission of the fact.

were administered." Motion for a Bench Trial at 5 (quoting Granfinanciera v. Nordberg, 492 U.S. at 41). As the Plaintiffs read the law, whether a claim is entitled to a jury trial in diversity cases is, therefore, a decision that a court must make according to federal law. See Motion for a Bench Trial at 5 (citing Mile High Industries v. Cohen, 222 F.3d 845, 856 (10th Cir. 2000)).

The Plaintiffs contend that Granfinanciera v. Nordberg creates a two-part test to determine whether a claim should go before a jury. See Motion for a Bench Trial at 5. The first part, the Plaintiffs say, is historical: a court must compare the statutory action to Eighteenth Century actions brought more than a century before the merger of the courts of law and equity. See Motion for a Bench Trial at 5. The second part, the Plaintiffs maintain, is taxonomic: a court must examine whether the remedy that a plaintiff seeks is legal or equitable in nature. See Motion for a Bench Trial at 5. According to the Plaintiffs, the second part of the test is more important than the first part. See Motion for a Bench Trial at 6 (citing Granfinanciera v. Nordberg, 492 U.S. at 42).

Under the Granfinanciera v. Nordberg test's first part, the Plaintiffs assert, the Plaintiffs' fiduciary duty and unjust enrichment claims -- the only claims remaining after the Court dismissed the Plaintiffs' securities claims -- are not triable by a jury, because they are equitable claims.[45] See Motion for a Bench Trial at 6. The Plaintiffs maintain that Delaware law defines claims against a corporation's controlling shareholders, officers, and directors for breaches of fiduciary duty of loyalty and entire fairness as "equitable," even those claims seen as a damages remedy  Motion for a Bench Trial at 6 (quoting In re JCC Holding Co., 843 A.2d 713, 724 (Del. Ch. 2003)). Accordingly, the Plaintiffs assert, these breach-of-fiduciary-duty claims carry with

---

[45]The Plaintiffs later withdrew the unjust enrichment claim at the motion hearing. See Transcript of Motion Hearing Before the Honorable James O. Browning United States District Judge, April 26, 2017, at 452:13-453:16 (Kagen), filed June 5, 2017 (Doc. 282).

them no right to a jury trial.  See Motion for a Bench Trial at 6 (citing Miller v. Sun Capital

Partners, Inc., 2016 WL 4941989, at *6-7 (D. Del. September 15, 2016)(Andrews, J.)).  Invoking

Cantor v. Perelman, 2006 WL 318666 (D. Del. February 10, 2006)(Jordan, J.), to explain why

they conclude that it is inarguable that a breach-of-fiduciary-duty claim under Delaware

corporate law is historically equitable, the Plaintiffs maintain that TIR's corporate officers,

directors, and controlling shareholders

> "Are not permitted to use their position of trust and confidence to further their
> private interests.  While technically not trustees, they stand in a fiduciary relation
> to the corporation and its stockholders.  Thus, a violation of those duties is treated
> as a breach of fiduciary duty analogous to that owed by a trustee to a
> beneficiary[,] [which is a] type of claim historically within the exclusive
> jurisdiction of courts of equity. . . .  [S]uch claims historically carry with them no
> right to a trial by jury."

Motion for a Bench Trial at 7 (quoting Cantor v. Perelman, 2006 WL 318666, at *6-

7)(alterations in the Motion for a Bench Trial).  Pointing the Court to three federal district court

cases, the Plaintiffs contend that their unjust-enrichment claims likewise is equitable and,

therefore, not triable by a jury.  See Motion for a Bench Trial at 7-8 (citing United States v.

DeFelice, 2016 WL 538464, at *3 (E.D. Okla. February 9, 2016); Bustillos v. Bd. Of Cty.

Commissioners of Hidalgo Cty., 2015 WL 8014565, at *23-24 (D.N.M. October 20,

2015)(Browning, J.); U.S. Bank Nat. Ass'n v. Verizon Communications Inc., 2012 WL 987539,

at *1 n.1 (N.D. Tex. Mar. 21, 2012)(Fish, S.J.)).

    Under the Granfinanciera v. Nordberg test's second part, the Plaintiffs assert, the

Plaintiffs' fiduciary-duty and unjust-enrichment claims are not triable by a jury, because those

claims sought equitable remedies.  See Motion for a Bench Trial at 8.  The Plaintiffs refer to their

Amended Complaint, filed September 30, 2015 (Doc. 167)("Amended Complaint"), in which

they maintain they seek disgorgement from the Defendants of the benefits of a "grossly unfair

transaction."  Motion for a Bench Trial at 8 (quoting Amended Complaint ¶ 160, at 30).  The Plaintiffs state that, in the alternative, they also seek the equitable remedies of (i) rescissionary damages; (ii) a judgment requiring the Defendants to "'pay forthwith the judgment amount awarded in favor of Plaintiffs'"; and (iii) "'such other and further relief as the Court deems just and proper.'"  Motion for a Bench Trial at 8 (quoting Amended Complaint ¶¶ G & H, at 34).  The Plaintiffs assert that, as claims that are entirely equitable in nature, these claims are not triable by a jury under <u>Granfinanciera v. Nordberg</u>, even though the Plaintiffs also seek monetary relief in the form of "'compensatory'" damages, "'punitive damages,'" and costs and expenses, in addition to, or in the alternative to, equitable remedies.  Motion for a Bench Trial at 9-10 (quoting Amended Complaint ¶¶ A-F, at 34)

Proceeding to their <u>Granfinanciera v. Nordberg</u>'s next part, the Plaintiffs then contend that the Defendants have no right to a jury trial on the fiduciary-duty and unjust-enrichment claims under rules 38 and 39 of the Federal Rules of Civil Procedure.  <u>See</u> Motion for a Bench Trial at 10.  The Plaintiffs parse the language in their Amended Complaint, noting that they demand "a trial by jury in this action for all issues so triable."  Motion for a Bench Trial at 10 (quoting Amended Complaint at 35).  According to the Plaintiffs, their demand did not encompass their fiduciary-duty and unjust-enrichment claims, because those claims are equitable and therefore not "so triable."  Motion for a Bench Trial at 10.  Furthermore, the Plaintiffs say, the Defendants waived their right to a jury trial when they failed to make their own jury demand.  <u>See</u> Motion for a Bench Trial at 10-11 (citing Fed. R. Civ. P. 38(b) & (d)).

    2.    **<u>Defendants' Response</u>.**

On March 3, 2017, the Defendants filed Defendants' Brief in Opposition to Plaintiffs' Motion for a Bench Trial [Doc. No. 253].  <u>See</u> Defendants' Brief in Opposition to Plaintiffs'

Motion for a Bench Trial [Doc. No. 253], filed March 3, 2017 (Doc. 256)("Response"). After a short encomium to the civil jury, the Defendants remark that the Plaintiffs affirm their original jury demand not only in the Amended Complaint that they filed last autumn, but also during discussions about the breach-of-fiduciary-duty claims and fair price during the December 27, 2016, hearing. See Response at 1-2. The Defendants then accuse the Plaintiffs of attempting to reverse course and thereby not only deny the Defendants their right to a jury trial but also subvert the Supreme Court's Seventh Amendment jurisprudence. See Response at 2.

According to the Defendants, they first have a right to a jury trial on the fiduciary-duty claims under the very two-part Granfinanciera test that the Plaintiffs invoke. See Response at 3. The Defendants assert that the United States Court of Appeals for the Tenth Circuit's prevailing view is that fiduciary duty claims' nature is legal and not equitable. See Response at 4. The Defendants dismiss the Plaintiffs' citations to Delaware state case law as non-binding authority, on the grounds that the Supreme Court has held that the characterization of a state-created right as legal or equitable for the purposes of a jury right under the Seventh Amendment must be made by recourse to federal law. See Response at 4 (citing Simler v. Conner, 372 U.S. 221, 222 (1963)). Relying on an opinion out of the United States District Court for the Southern District of Ohio, the Defendants argue that Delaware practice is irrelevant:

> "Delaware has maintained the separation of law and equity courts, so that if this case were being tried in Delaware, it would be tried in Chancery Court without a jury. However, practice in the state courts in 2008 is not determinative, particularly since the state courts are not bound by the Seventh Amendment. The Seventh Amendment is not binding on the States through the Fourteenth Amendment. . . . Instead, it applies only to courts sitting under authority of the United States. . . . The question is not whether this case would be tried in an equity court in Delaware today, but whether it could have been heard in a law court in England in 1791."

Response at 4-5 (quoting Official Committee v. Hendricks, 2008 WL 5428012, at *2 (S.D. Ohio

October 2, 2008)(Merz, J.))(emphasis applied in the Response).  The Defendants contend that applying federal law to make the determination whether this action would have been heard in a law court in England in 1791 yields the certain result that the Plaintiffs' claims would have been tried in a law court.  See Response at 5.  Consequently, the Defendants maintain, they have a right to demand a jury trial.  See Response at 5-6.

Furthermore, the Defendants argue, the remedy available to the Plaintiffs on their breach-of-fiduciary-duty claims is a quintessentially legal remedy: compensatory damages.  See Response at 6.  In contrast, the Defendants continue, the rescissionary damages that the Plaintiffs seek are equitable damages that are unavailable to the Plaintiffs, because -- they allege -- the Plaintiffs' delay in bringing suit made rescission impossible.  See Response at 6-7.  As the Defendants recount these facts, the Plaintiffs received merger notice on December 11, 2013, and then exchanged their shares for the merger consideration later in December, 2013.  See Response at 7.  Moving forward in the merger timeline, the Defendants say that they initiated the Initial Public Offer on January 14, 2014, and that the Plaintiffs did not file this action until nearly six months later on July 3, 2014.  See Response at 7.  From these facts, the Defendants conclude that rescission and rescissionary damages both are unavailable to the Plaintiffs, because (i) the merger was effected so long ago that it cannot be unwound; and (ii) the Plaintiffs' unwarranted delay challenging the merger barred them from seeking rescissionary damages.  See Response at 7-9.

The Defendants concede that the Plaintiffs' unjust-enrichment claim appears to have been an equitable claim in 1791.  See Response at 10.  Nevertheless, the Defendants insist that the two-stage Granfinanciera v. Nordberg analysis gives greater weight to the category of remedy that a plaintiff seeks.  See Response at 10.  According to the Defendants, this fact combines with

a strong bias in federal law toward jury trials to override the historical analysis in the first stage and to make the unjust enrichment claim triable by a jury. <u>See</u> Response at 10. The Defendants assert that the cases which the Plaintiffs present to suggest otherwise are unconvincing and easily distinguishable from this case's facts. <u>See</u> Response at 11 & n. 9.

Briefly turning to their second argument, the Defendants then maintain that rule 38(d) of the Federal Rules of Civil Procedure prevents the Plaintiffs from withdrawing their jury demand without the Defendants' consent. <u>See</u> Response at 12. Moreover, the Defendants continue, they relied on the Plaintiffs' jury demand, and the Court has "more than ample authority" to grant a jury trial under rule 39(b). Response at 12. Consequently, the Defendants request that the Court deny the Plaintiffs' motion for a bench trial. <u>See</u> Response at 12-14.

**3.      Reply.**

On March 17, 2017, the Plaintiffs filed Plaintiffs' Reply Brief in Further Support of Motion for a Bench Trial on Plaintiffs' First Through Fourth Claims for Relief. <u>See</u> Plaintiffs' Reply Brief in Further Support of Motion for a Bench Trial on Plaintiffs' First Through Fourth Claims for Relief, filed March 17, 2017 (Doc. 257)("Reply"). The Plaintiffs first repeat the argument from their Motion for a Bench Trial that their fiduciary-duty and unjust-enrichment claims are equitable in nature. <u>See</u> Reply at 1. The Plaintiffs dismiss the Defendants' assertion that Delaware state court practice is irrelevant to this inquiry, because their breach of fiduciary duty claims are Delaware breach-of-fiduciary-duty claims, which the Delaware Chancery Court on one occasion called "'*the* quintessential equitable claim.'" Reply at 1-2 (emphasis in original)(quoting <u>QC Commens Inc. v. Quartarone</u>, 2013 WL 1970069, at *1 (Del. Ch. May 14, 2013)(Glasscock, V.C.)). Furthermore, the Plaintiffs assert, only equity courts could hear fiduciary-duty claims in 1791, and the Defendants do not cite any case that establishes that the

Plaintiffs' Delaware fiduciary-duty and unjust-enrichment claims are legal rather than equitable. See Reply at 2-3.

Moving to their argument's second part, the Plaintiffs then characterize their fiduciary-duty and unjust-enrichment claims as seeking equitable relief. See Reply at 3. The Plaintiffs note that the Defendants concede that the Plaintiffs allege both legal and equitable remedies even as the Defendants contend that they are constitutionally entitled to a jury trial, because the Plaintiffs predominantly seek the remedy of compensatory damages. See Reply at 3. The Plaintiffs see the Defendants' argument as a unpersuasive, insisting that the Supreme Court never has gone so far as to say that any award of monetary relief must be legal relief, instead holding that the relief may be an equitable remedy if the award is restitutionary in nature, such as in actions for disgorgement of improper profits. See Reply at 3 (citing In re Allied Systems Holdings, Inc., 524 B.R. 598, 611, 609 & n.45 (Bankr. D. Del. 2015)(Sontchi, J.)). The Plaintiffs maintain that they seek just such an equitable remedy in the form of a monetary award for the fair value that they allege rightfully belongs to them. See Reply at 4-5. According to the Plaintiffs, Delaware law expressly provides that an equitable entire-fairness challenge to a merger entitles a plaintiff to this equitable remedy. See Reply at 3 (citing In re Cornerstone Therapeutics Inc. Stockholder Litigation, 2014 WL 4418169, at *6 & nn.42-43 (Del. Ch. September 10, 2014), rev'd on other grounds, 115 A.3d 1173 (Del. 2015)).

The Plaintiffs then tackle the Defendants' assertion that the Plaintiffs are not entitled to rescission or rescissionary damages on account of the delay between the merger and the time that they filed suit challenging the cash out of their TIR shares. See Reply at 6. According to the Plaintiffs, the Defendants argument is unconvincing from the beginning, because rescissionary damages are not the only equitable remedy that the Plaintiffs seek. See Reply at 7. Moreover,

the Plaintiffs insist, the Defendants can cite as proof of their position that a delay waives a plaintiff's right to rescissionary damages only a handful of cases where the delay was measured in years rather in months as in this case. See Reply at 7. The Plaintiffs contend that, ultimately, none of the cases to which the Defendants refer the Court preclude the Plaintiffs from obtaining rescission or rescissionary damages. See Reply at 7-9.

Closing their argument, the Plaintiffs insist that the Defendants have no right to a jury trial on the Plaintiffs' fiduciary-duty and unjust-enrichment claims. See Reply at 9. The Plaintiffs repeat the contention from their Motion for a Bench Trial that their Amendment Complaint demands a jury trial only for "all issues so triable," which they maintain does not encompass the allegedly legal fiduciary-duty and unjust-enrichment claims. Reply at 9. According to the Plaintiffs, the Defendants did not make their own jury demand, so the Court does not have discretion under rule 39(b) to order a jury trial on these claims. See Reply at 10. The Plaintiffs accordingly request that the Court grant their Motion for a Bench Trial. See Reply at 10.

4.   **Surreply.**

On May 1, 2017, the Defendants filed Defendants' Surreply in Further Opposition to Plaintiffs' Motion for Bench Trial [Doc. No. 253]. See Defendants' Surreply in Further Opposition to Plaintiffs' Motion for Bench Trial [Doc. No. 253], filed May 1, 2017 (Doc. 277)("Surreply"). The Defendants first insist that the right to trial by jury is fundamental and sacred to United States citizens, and that the Court must jealously guard this right. See Surreply at 1 (citing Jacob v. New York, 315 U.S. 752, 752-53 (1942)). The Defendants assert that the jury's role as finder of fact under the Seventh Amendment is so important that even an advisory jury fails to satisfy the constitutional requirements under the Seventh Amendment. See Surreply

at 1 (citing <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 337 n. 24 (1979)). Consequently, the Defendants conclude, the Seventh Amendment entitles the Defendants to a jury to determine the amount of damages, if any, that the Defendants must pay the Plaintiffs. <u>See</u> Surreply at 2 (citing <u>Mile High Industries v. Cohen</u>, 222 F.3d 845, 856 (10th Cir. 2000)). According to the Defendants, the Plaintiffs agree that the controlling factor in determining the Defendants' right to a jury trial is the characterization of the remedies that the Plaintiffs seek as either legal or equitable. <u>See</u> Surreply at 2 (citing Motion for a Bench Trial at 7). Under this test, the Defendants contend, four propositions demonstrate that the Defendants' right to a jury trial is indisputable. <u>See</u> Surreply at 2.

First, the Defendants assert, the Plaintiffs' delay in challenging the merger allowed innocent third-party investors to invest in TIR through the anticipated IPO, which makes rescission an impossible remedy. <u>See</u> Surreply at 2. The Defendants report that the Plaintiffs concede rescission is impracticable, and they maintain that the Plaintiffs advised the Court that they do not seek rescission. <u>See</u> Surreply at 2. The Defendants explain that rescission is impracticable, because the Plaintiffs delayed challenging the merger until nearly six months after the IPO. <u>See</u> Surreply at 2.

Second, the Defendants contend, the alternate remedy of rescissory damages also is unavailable, because rescission is not sought and is unavailable. <u>See</u> Surreply at 3. According to the Defendants, case law uniformly holds that, where rescission is made unavailable on account of a plaintiff's post-transaction conduct, rescissionary damages are unavailable. <u>See</u> Surreply at 4. The Defendants insist that the three cases which the Plaintiffs assert come to the opposite conclusion are easy to distinguish from this case. <u>See</u> Surreply at 4. As the Defendants report the first case, <u>In re MAXXAM, Inc.</u>, 659 A.2d 760 (Del. Ch. 1995)(Jacobs, V.C.), the Delaware

Chancery Court specifically concluded that the record evidence was insufficient to determine the possibility of a rescission remedy. See Surreply at 4. As the Defendants report the second case, In re Cornerstone Technologies, 2014 WL 4418169 (Del. Ch. June 5, 2014)(Glasscock, V.C.), the Delaware Chancery Court did not address the issue of rescission. See Surreply at 4. As the Defendants report the third case, In re Orchard Enterprises, Inc. Stockholder Litigation, 88 A.3d 1 (Del. Ch. 2014)(Laster, V.C.), the Delaware Chancery Court, although declining to conclude that rescissionary damages could never be obtained, concluded that the evidentiary record before the Court was insufficient to determine the issue. See Surreply at 5. The Defendants dismiss the Plaintiffs' related "Hail Mary attempt to pass off their claim as disgorgement" to circumvent the ponderous weight of case law against them as "logically fallacious, because Plaintiffs simultaneously say they can't have back what Defendants took but want, instead[,] the value of what they allege Defendants' took -- that is precisely compensatory damages as the law universally holds." Surreply at 5.

Third, the Defendants maintain, the Plaintiffs seek compensatory damages, which necessitate a jury. See Surreply at 6. According to the Defendants, rule 26(a)(I)(A)(iii) of the Federal Rules of Civil Procedure requires the Plaintiffs to provide a computation of the alleged damages that the Plaintiffs seek. See Surreply at 6. The Defendants report that Plaintiffs responded to rule 26(a)(I)(A)(iii)'s requirement by dividing the damages they seek into two categories: (i) the damages that arise from their breach-of-fiduciary-duty and unjust-enrichment claims (counts I-IV); and (ii) the damages that arise from their securities law claims (counts V-VIII). See Surreply at 6. The Defendants assert that the Plaintiffs calculate these damages on the basis of TIR shares' alleged value on the merger date less the $451,000.00 per share merger consideration -- a methodology that the Defendants characterize as a classic compensatory

damages calculation. See Surreply at 7 (citing Owen v. Cannon, 2015 WL 3819204, at *32 (Del. Ch. March 17, 2015)(Bouchard, C.)). The Defendants assert that the Plaintiffs' expert expressly calculated compensatory damages to determine TIR shares' fair value on the merger date. See Surreply at 8. In contrast, the Defendants contend, rescissionary damages are not calculated as of the merger date, but rather "'generally reflects the value of the wrongfully taken property at the time of judgment.'"). Surreply at 8-9 (quoting Reis v. Hazelett Strip-Casting Corp., 28 A.3d 442, 467-68 (Del. Ch. 2011)(Laster, V.C.)). In summary on this third proposition, the Defendants assert: (i) the Plaintiffs seek money in lieu of what the Defendants allegedly took from them, which the Defendants say is not disgorgement; and (ii) the Plaintiffs, throughout the litigation, have calculated and seek classic compensatory damages. See Surreply at 9. Accordingly, the Defendants maintain, the Court should deem: (i) the compensatory damages to be a legal remedy; and (ii) the Defendants, under the Granfinanciera test, to therefore have a right to a jury trial under the Seventh Amendment. See Surreply at 9.

Fourth, the Defendants aver, in partial overlap with their third proposition, the Tenth Circuit has held that the remedy the Plaintiffs seek is legal and therefore falls with the scope of the Seventh Amendment's jury trial guarantee. See Surreply at 10. The Defendants read Elm Ridge Exploration Co. LLC v. Engle 721 F.2d 1199 (10th Cir. 2013), to hold that a compensatory damages claim arising from a breach of fiduciary duty is a legal claim entitling the defendant to a jury trial. See Surreply at 10-11 (citing Elm Ridge Exploration Co. LLC v. Engle, 721 F.3d at 1222-23).[46] According to the Defendants, Elm Ridge Exploration Co. LLC v. Engle stands for the proposition that, even if a claim is equitable in origin, if the relief sought is

---

[46]The Defendants' initial citation to the case contains the incorrect volume of the case reporter. See Surreply at 10. The Court alters the Defendants' assertion only to the extent that it corrects the citation.

compensatory damages, the remedy is "'peculiarly with[in] the province of the law courts. . . .'" Surreply at 11 (quoting, without pincite and with are incorrect word, <u>Elm Ridge Exploration Co. LLC v. Engle</u>, 721 F.3d at 1223)(alteration added). The Defendants assert that it necessarily follows that a defendant is entitled to a jury trial when the plaintiff is faced with a claim for compensatory damages. <u>See</u> Surreply at 11-13.

The Defendants append a fifth proposition with four parts asserting that they did not waive their alleged constitutional right to a jury trial. <u>See</u> Surreply at 13. First, the Defendants argue, the Plaintiffs demanded a jury trial on their breach-of-fiduciary-duty claims in both the Complaint and the Amended Complaint. <u>See</u> Surreply at 13. The Defendants accuse the Plaintiffs of disingenuousness when they "attempt to run from their prior legal position by claiming their prior position related only to their securities law claims." Surreply at 13. Second, the Defendants maintain, the Defendants were entitled to rely on the Plaintiffs' clear demand for a jury trial. <u>See</u> Surreply at 14. Third, the Defendants protest, the Plaintiffs are misguided when they contend that there is a "magic requirement" for a motion to trigger a jury demand. Surreply at 14 (citing Reply to Motion for a Bench Trial at 10; <u>FDIC v. Palermo</u>, 815 F.2d 1329, 1333-34 (10th Cir. 1987)).[47] Fourth, the Defendants insist, district courts should exercise their discretion to grant motions for jury trials under rule 39(b) of the Federal Rules of Civil Procedure absent strong and compelling reasons to deny a particular motion for jury trial. <u>See</u> Surreply at 14 (citing <u>AMF Tuboscope, Inc. v. Cunningham</u>, 352 F.2d 150, 155 (10th Cir. 1965)). According to the Defendants, the Plaintiffs do not offer any reason -- let alone a compelling reason -- to deny the Defendants their purported constitutional right to a jury trial in this case. <u>See</u> Surreply at 14-

---

[47]The Defendants provide a pincite of "133-34," which falls outside of the span of pages that <u>FDIC v. Palermo</u> occupies in the case reporter. Surreply at 14. The Court concludes that the Defendants missed typing the first of three consecutive "3"s and corrects the citation accordingly.

15.  Consequently, the Defendants conclude, the Defendants have not waived their right to a jury trial under the Seventh Amendment.  See Surreply at 14.

**5.      April 26 and 27 Hearing.**

The Court held a hearing on April 26 and 27, 2017.  See Transcript of Motion Hearing Before the Honorable James O. Browning United States District Judge, April 26, 2017, filed June 5, 2017 (Doc. 282); Transcript of Motion Hearing Before the Honorable James O. Browning United States District Judge, April 27, 2017, filed June 5, 2017 (Doc. 283)(collectively "Tr.").[48]  The Plaintiffs broached the topic of its motion for a bench trial by asserting that virtually all cases that are entire-fairness cases -- whether they are heard in Delaware or elsewhere -- go before a "distinguished, experienced judge who has often a decade or more of expertise in determining fair value."  Tr. at 241:21-242:15 (Kagen).  The Plaintiffs pegged the reason for this purported pattern to the complexity inherent to the entire-fairness test.  See Tr. at 242:15-19 (Kagen).  According to the Plaintiffs, the Court -- if it wishes for a jury to be the trier of fact -- will have to explain to the jurors what fair-market value is and distinguish fair value from the value at which TIR's minority shareholders were cashed out of their shares.  See Tr. at 242:20-22 (Kagen).  Furthermore, the Plaintiffs asserted, the Court will need to bring the jurors up to speed on abstruse concepts such as minority discounts and liquidity discounts.  See Tr. at 242:22-24 (Kagen).  Seemingly implying that such concepts are beyond jurors' comprehension, the Plaintiffs argued that the need to educate jurors in these concepts will prejudice the Plaintiffs under rule 403 of the Federal Rules of Evidence in a way that does not normally arise in a Delaware Chancery Court case.  See Tr. at 243:1-3 (Kagen).  When the Court asked the Plaintiffs whether they also feared the possibility of such prejudice in a bench trial, the

_____

[48]The Court will refer to the two days' transcripts collectively by the abbreviation "Tr.," because the transcripts for April 26 and April 27 are continuously paginated.

Plaintiffs responded that the fear was much less than their fear of jury prejudice. See Tr. at 281:24-282:8 (Kagen, Court).

The Court then shared its preliminary thoughts on the need for a bench trial on account of the case's complexity:

> I just finished up at the end of last year a very big accounting trial with the [Securities Exchange Commission]. Of course, some of the accounting terms were difficult and had to be explained with multiple experts, but that's just the way it goes. You just -- you know, you just have to get your experts ready to talk and be teachers and explain.

Tr. at 282:12-18 (Court). The Plaintiffs pushed back, indicating that they appreciated the Court's position and prefer limiting jury instructions if the Court decides to have a jury, but reemphasized that they believe themselves at risk of pronounced prejudice if the case were before a jury. See Tr. at 283:10-16 (Kagen). The Plaintiffs explained that the core concepts in the case are "very complex" and "esoteric at best to the uninitiated," so much so that the Plaintiffs' own expert on pipelines -- who has a doctorate -- made a basic error when computing a fair value discount for the TIR shares' lack of marketability. Tr. at 283:17-285:16 (Kagen). The Plaintiffs rhetorically asked how jurors could be expected to understand topics so recondite, suggesting that any attempt to educate the jurors in these topics would prove futile. See Tr. at 285:17-21 (Kagen). The result of a jury trial, in the Plaintiffs estimation, therefore would be extraordinary prejudice under rule 403 of the Federal Rules of Evidence that jury instructions could not cure. See Tr. at 285:22-290:23 (Kagen). If the financial jargon confuses even one juror out of ten, the Plaintiffs said, then the Plaintiffs would not receive the damages that they are due. See Tr. at 289:1-5 (Kagen). In contrast, the Plaintiffs speculated, the Court has been sufficiently immersed in the parties' discussion of these abstruse topics during hours of hearings that -- combined with its ability to read and comprehend the underlying case law -- the Court is

not nearly as likely as a jury is to be confused or prejudiced.  See Tr. at 289:13-24 (Kagen).  The

Court then called the hearing to close for the day.  See Tr. at 292:2-4 (Court).

On the next day, the parties did not immediately return to discussion of the Motion for a

Bench Trial.  See Tr. at 295:1-369:4 (Court, DeMuro, Kagen).  Feinting toward the topic at one

point, the Court noted its hesitancy to believe that jurors cannot understand complex evidence,

indicating:

> I think they're a lot more capable of understanding issues than sometimes our
> appellate judges, who maybe haven't tried a lot of cases, think.  I mean, they're
> good people. . . .  And sometimes they bring a heavy dose of common sense to --
> sometimes you got a complex case and we all overthink it and everything in the
> world and sometimes they -- I believe in the wisdom of groups and they do a good
> job.

Tr. at 369:19-370:2 (Court).  At the same time, the Court did not minimize the difficulties that

would attend explaining some finer financial and legal points to the jurors.  See Tr. at 380:16-17

(Court).    The Defendants agreed with the Court's sentiment, attesting: "[t]hat's been my

experience too.  I've tried cases that are equally and more complex than this and have found that

if the lawyers do their job and the jury gets the information they need, they're able to make --

and follow the instructions -- make the necessary rulings."  Tr. at 370:2-7 (DeMuro).

The parties detoured to discussing other outstanding motions before returning to the jury

issue after the lunch break.  See Tr. at 370:8-409:14 (Court, DeMuro, Kagen).  The Court shared

that it had not yet come to a tentative inclination on how to decide the Motion for a Bench Trial,

in part on the grounds that the Court had not explored the issue before in any other case.  See Tr.

at 409:24-410:8 (Court).  The Plaintiffs thanked the Court for the status check and then sought to

convince the Court that it is fairly clear that there is no jury trial for the remaining claims.  See

Tr. at 410:9-18 (Kagen).  The Plaintiffs referred the Court to the Granfinanciera v. Nordberg

two-part test to determine whether a jury trial is required.  See Tr. at 410:24-411:7 (Kagen).

Turning to the Granfinanciera v. Nordberg test's first part -- an historical analysis -- the Plaintiffs contended that the Court must determine whether breach-of-fiduciary-duty and unjust-enrichment were claims that form a suit at common law or a suit at equity when the Seventh Amendment was ratified in 1791.  See Tr. at 411:8-412:12 (Kagen).  The Plaintiffs acknowledged that this historical evaluation will be deceptively difficult, insofar as the Court would have to grapple with claims under federal statutes that did not exist before the merger of common law and equity.  See Tr. at 412:12-20 (Kagen).  Nevertheless, in the final analysis, the Plaintiffs insisted, the Court will discover that both breach-of-fiduciary-duty and unjust-enrichment were considered to be equitable claims in 1791.  See Tr. at 412:22-413:1 (Kagen).

Turning to the Granfinanciera v. Nordberg test's first part, the Plaintiffs insisted that it is incontrovertible that these claims would have been properly heard in an equity court in 1791, reasoning by analogy that fiduciary duty "is akin to a claim under a trust, a party is a fiduciary of another, as a trustee is a fiduciary to the trust."  Tr. at 414:2-5 (Kagen).  According to the Plaintiffs, Delaware case law confirms the validity of this analogy, replete with holdings that fiduciary-duty claims are equitable in nature.  See Tr. at 414:19-415:13 (Kagen).  The Plaintiffs contend that other federal district courts likewise have designated fiduciary-duty claims are claims that would have arisen in equity in 1791.  See Tr. at 414:23-415:4 (Kagen).  Regarding their unjust enrichment claims, the Plaintiffs first referred the Court to its previous decision in Bustillos v. Board of County Commissioners of Hidalgo County, 2015 WL 8014565 (D.N.M. October 20, 2015)(Browning, J.), in which the Plaintiffs contended that the Court held an unjust-enrichment claim to be equitable.  See Tr. at 415:14-20 (Kagen).  The Plaintiffs dismissed the cases that the Defendants cite to support their contention that fiduciary duty and unjust enrichment are legal claims as little more than Russian nesting dolls -- cases citing other cases

without conducting an independent historical analysis.  See Tr. at 415:21-417:19 (Kagen).

Turning then to the Granfinanciera v. Nordberg test's second part, the Plaintiffs maintained that the rescissionary damages they seek can be equitable rather than legal.  See Tr. at 418:14-24 (Kagen).  In this case, the Plaintiffs contended, they timely pleaded for a rescission of the merger.  See Tr. at 419:1-8 (Kagen).  According to the Plaintiffs, such rescission is clearly equitable.  See Tr. at 419:9 (Kagen).  The Plaintiffs further argued that the disgorgement that they seek also is equitable, because the law penalizes a faithless fiduciary regardless whether a plaintiff suffered any monetary damages.  See Tr. at 419:21-430:8 (Kagen).  The Plaintiffs rejected the Defendants' argument in the Response that fiduciary-duty claims against corporate officers and directors are legal in nature, thereby invoking a jury right, asserting that the case law that the Defendants cite to support their argument is irrelevant.  See Tr. at 431:1-434:9 (Kagen). The Plaintiffs also rejected the Defendants' assertion that rescissionary damages are unavailable to the Plaintiffs on account of their six-month delay filing this action, stating that multiple Delaware Chancery Court cases say that regulatory relief for rescissionary damages is available in a merger freeze-out context.  See Tr. at 434:10-435:23 (Kagen).  Next, the Plaintiffs discounted the Defendants' contention that the relevant case law evinces a strong bias in favor of a jury trial.  See Tr. at 436:1-442:1 (Kagen).  After repeating and summarizing its argument on the Granfinanciera v. Nordberg test's second part, the Plaintiffs concluded their argument.  See Tr. at 442:2-447:7 (Kagen).

The Defendants then responded to the Plaintiffs' Motion for a Bench Trial, starting with a musing that it seemed as though the Plaintiffs sprang the unjust-enrichment claim suddenly and recently as a deus ex machina after seemingly having abandoned them earlier in the case.  See Tr. at 447:16-451:4 (Dorwart).  The Plaintiffs interjected that they would not proceed with their

unjust enrichment claims, but that they had incorporated them into their Motion for a Bench Trial, because the Court had not dismissed the claims and the Plaintiffs wished to be both comprehensive and forthright. <u>See</u> Tr. at 452:13-453:16 (Kagen). The Court asked the Plaintiffs to confirm that the "ballgame is breach of fiduciary duty," given that the Plaintiffs might not proceed with the unjust enrichment claims, to which the Plaintiffs assured the Court that that assessment was correct. Tr. at 453:17-457:22 (Court, Kagen).

With the unjust enrichment claims therewith withdrawn from the case, the Defendants turned their attention to the Plaintiffs' fiduciary duty claims. <u>See</u> Tr. at 459:3 (Dorwart). According to the Defendants, fiduciary duty claims are for the jury under settled Tenth Circuit law. <u>See</u> Tr. at 459:19-463:3 (Dorwart). Before the Defendants proceeded to the rest of their argument on this point, the Court recessed for fifteen-minute afternoon break. <u>See</u> Tr. at 463:20-21 (Court). After the break, the Court gave its inclination at that point regarding the Motion for a Bench Trial, indicating:

> It would seem to me that probably this claim is probably equitable under historical rules. But whether we use the word 'trump' or we use something else, I do think that the important focus is on the remedies that are sought. It would seem to me that the big request here is for more money. That's something that has never changed hands. That's something that is going to go from, if the Plaintiffs are successful, from this side to that side and it seems to me that is a legal claim or a legal remedy.

> So while I do think that there are a number of things that the Plaintiff[s] asked for in their complaint, that may end up like I was talking about in <u>Comar Pumice</u> case that I tried, where I had to have the trial on the legal issues and then had to come back and do some things on the equitable side[.] [I[t seems to me that we're not going to avoid a trial on the big issues.

> And so my thinking is that on the -- that on the claim of the money that should have been paid or needs to be paid to reflect fair value, that sounds to me like a legal claim so I obviously need to look at this more. But those are my inclinations, that it's not -- we're not going to escape on probably the big issue here a jury trial. And do I say that -- that's my thinking right at the moment.

Tr. at 464:1-23 (Court). The Defendants indicated that they read the law in the same way that the Court had just reported it and that they would expand upon their remainder of their argument in a forthcoming Surreply that the Court had approved earlier during the hearing. See Tr. at 466:23-468:25 (Dorwart). The Defendants added, however, that they were certain that the Plaintiffs' delay in filing this action made rescission and the calculation of rescissionary damages impossible. See Tr. at 469:23-470:22 (Dorwart). The Defendants thereafter insisted that they never had waived their right to a jury trial, and that they were entitled to rely on the Plaintiffs' demand for a jury trial that they made at the December 27, 2016, hearing. See Tr. at 471:5-23 (Dorwart). According to the Defendants, their reliance was reasonable insofar as the Plaintiffs allegedly previously had encompassed the fiduciary duty claims within the scope of their jury demand. See Tr. at 471:23-472:8 (Dorwart). With that observation, the Defendants closed their argument on the Plaintiffs' Motion for a Bench Trial. See Tr. at 472:23 (Dorwart).

At the start of their reply to the Motion for a Bench Trial, the Plaintiffs encouraged the Court to read the cases that they had cited earlier in the hearing, convinced that the Court's inclination had revealed two fundamental errors. See Tr. at 473:1-24 (Kagen). First, the Plaintiffs maintained, disgorgement is return of monies wrongfully taken, and the Delaware Chancery Court, in In re Cornerstone, held that such disgorgement is an equitable claim even if the pleadings call it by another name such as compensatory damages. See Tr. at 473:24-475:15 (Kagen). The Court questioned whether the Plaintiffs' claims for rescission are not just formalistic, to which the Plaintiffs insisted that "we want our shares back." Tr. at 475:20-478:20 (Court, Kagen). The Court was not convinced that the Plaintiffs actually wanted their share back, but the Plaintiffs insisted that they did want them back and were seeking rescissionary damages, because rescission no longer was possible. See Tr. at 478:21-480:14 (Court, Kagen).

The Plaintiffs insisted that the Delaware Chancery Court is clear that the rescissionary damages are equitable in nature and that no case that they had encountered came to the opposite conclusion. See Tr. at 484:8-493:4 (Kagen).

Beginning to wrap up their argument, the Plaintiffs again flagged what they understood to be the Court's mistaken conclusion that any exchange of money is necessarily legal in nature. See Tr. at 493:11-15 (Kagen). According to the Plaintiffs, the damages they seek are considered to be equitable relief, because they are restitutionary, regardless of the terms that one uses to describe the damages. See Tr. at 493:24-496:1 (Kagen). The Plaintiffs strongly reemphasized their assertion that the case law is firmly and univocally on their side in deeming these damages to be equitable. See Tr. at 496:2-500:10 (Kagen). The Plaintiffs concluded their argument, and the Court recessed after completing assorted housekeeping matters. See Tr. at 500:11-502:23 (Kagen, Court).

## **TEXT OF THE SEVENTH AMENDMENT**

Article the ninth[49]... In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.[50]

---

[49]On September 25, 1789, the First Congress of the United States proposed twelve amendments to the Constitution. See Joint Resolution of Congress Proposing 12 Amendments to the U.S. Constitution (1789), reprinted in United States Department of State, 2 Documentary History of the Constitution of the United States, 1786-1870, at 321-324 (1894)("Documentary History of the United States"). The States never ratified the first amendment that Congress proposed, and ratified the second amendment that Congress proposed only in 1992 -- the current Twenty-Seventh Amendment. See United States National Archives and Records Administration, Bill of Rights: A Transcription, https://www.archives.gov/founding-docs/bill-of-rights-transcript ("Archives")(last visited June 14, 2017). The ninth article in the First Congress' Joint Resolution therefore corresponds to the Seventh Amendment to the Constitution. See Archives at 1.

[50]The Court reports capitalization as in the First Congress' Joint Resolution. Capitalization of the Seventh Amendment's individual words varies in individual States' acts ratifying the amendment. See 2 Documentary History of the United States at 325-76.

- 51 -

U.S. Const., amend VII (ellipses in original).

## LAW REGARDING CIVIL JURY TRIALS UNDER THE SEVENTH AMENDMENT

"We have consistently interpreted the phrase 'Suits at common law' to refer to 'suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'" Granfinanciera v. Nordberg, 492 U.S. at 41(emphasis in original)(quoting Parsons v. Bedford et al., 28 U.S. (3 Pet.) 433 (1830)).

> Although "the thrust of the [Seventh] Amendment was to preserve the right to jury trial as it existed in 1791," the Seventh Amendment also applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty.

 Granfinanciera v. Nordberg, 492 U.S. at 41-42 (quoting Curtis v. Loether, 415 U.S. 189, 193 (1974)).  To determine whether an English court of law or an English court of equity would have heard a particular cause of action in 1791, a court must engage in a two-part analysis.  See Granfinanciera v. Nordberg, 492 U.S. at 42.  "'First . . . compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity.'"  Granfinanciera v. Nordberg, 492 U.S. at 42 (quoting Tull v. United States, 481 U.S. 412, 417-18 (1987)).  "'Second . . . examine the remedy sought and determine whether it is legal or equitable in nature.'"  Granfinanciera v. Nordberg, 492 U.S. at 42 (quoting Tull v. United States, 481 U.S. at 418.  "The second stage is more important than the first."  Granfinanciera v. Nordberg, 492 U.S. at 42 (citing Tull v. United States, 481 U.S. at 420).  "If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as a factfinder."  Granfinanciera v.

Nordberg, 492 U.S. at 42. "[W]e do not declare that the Seventh Amendment provides a right to a jury trial on all legal rather than equitable claims." Granfinanciera v. Nordberg, 492 U.S. at 42 n. 4. "If a claim that is legal in nature asserts a 'public right,' as we define that term . . . , then the Seventh Amendment does not entitle the parties to a jury trial if Congress assigns its adjudication to an administrative agency or specialized court of equity." Granfinanciera v. Nordberg, 492 U.S. at 42 n. 4. "The Seventh Amendment protects a litigant's right to a jury trial only if a cause of action is legal in nature and it involves a matter of 'private right.'" Granfinanciera v. Nordberg, 492 U.S. at 42 n.4.

"Whether the trustee's suit should be at law or in equity is to be judged by the same standards that are applied to any other owner of property which is wrongfully withheld." 1 G. Glenn, Fraudulent Conveyances and Preferences § 98, at 183-84 (rev. ed. 1940). "If the subject matter is a chattel, and is still in the grantee's possession, an action in trover or replevin would be the trustee's remedy; and if the fraudulent transfer was of cash, the trustee's action would be for money had and received." 1 G. Glenn, Fraudulent Conveyances and Preferences § 98, at 183-84 (1940). "Such actions at law are as available to the trustee to-day as they were in the English courts of long ago." 1 G. Glenn, Fraudulent Conveyances and Preferences § 98, at 183-84 (1940). "If, on the other hand, the subject matter is land or an intangible, or the trustee needs equitable aid for an accounting or the like, he may invoke the equitable process, and that also is beyond dispute." 1 G. Glenn, Fraudulent Conveyances and Preferences § 98, at 183-84 (1940).

> Characterization of an issue as legal or equitable can be a difficult federal law issue. It is often said that whether an issue involves a legal right depends on the nature of the issue, not the character of the overall action, the form of the complaint or the choice of words used in the pleadings.

Ronald D. Rotunda & John E. Nowak, 3 Treatise on Const. L. § 17.8(f).

Congress can create statutory rights that are enforced by administrative or judicial

tribunals. However, rights created by statutes often are enforced by actions in federal courts. Suits brought under the statute must be tried by a jury, if the statute creates rights and remedies of a type that are closely analogous to those rights and remedies that would have been enforced in actions at "law" (rather than "equity") and would have required trial by jury in common law courts prior to 1791. However, it may be difficult in any given case to determine whether the newly created cause of action is one that involves fact issues that should be subjected to jury resolution at the demand of the parties.

Ronald D. Rotunda & John E. Nowak, 3 Treatise on Const. L. § 17.8(f). "On their face, the Federal Rules of Civil Procedure did not, and could not, make any change in the class of cases for which there is right to trial by jury." Charles Alan Wright et al., 9 <u>Federal Rules and Procedure</u> § 2301 (3d ed. 2017). "The Rules Enabling Act, under which the rules were promulgated, specifically requires that they 'preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution.'" Charles Alan Wright et al., 9 <u>Federal Rules and Procedure</u> § 2301 (3d ed. 2017)(citing <u>Jones v. United Parcel Service, Inc.</u>, 674 F.3d 1187, 1202 (10th Cir. 2012), <u>cert. denied</u>, 133 S. Ct. 413 (2012); <u>Golden v. Kelsey-Hayes Co.</u>, 73 F.3d 648, 659 (6th Cir. 1996)).

Rule 38(a) wisely does not undertake to define the set of cases for which there is a right to a jury trial; instead, the rule, after its restyling in 2007, merely says that the right "as declared by the Seventh Amendment to the Constitution -- or as provided by a federal statute -- is preserved to the parties inviolate."

Charles Alan Wright et al., 9 <u>Federal Rules and Procedure</u> § 2301 (3d ed. 2017). "The provision of the Federal Rules that protects the right to a trial by jury does not grant the defendant any new or independent right to a jury trial, but simply protects the right that the defendant may have been granted elsewhere." Charles Alan Wright et al., 9 <u>Federal Rules and Procedure</u> § 2301 n.20 (3d ed. 2017)(citing <u>Rachal v. Ingram Corp.</u>, 795 F.2d 1210 (5th Cir. 1986)).

It is true that, at a fundamental level, the Federal Rules merely preserve the ancient distinction between those actions that would have been heard at common law, and are now triable to a jury, and those that would have been heard in equity, and are now triable without a jury. When civil and admiralty procedure were

merged in 1966, subdivision (e) was added to Rule 38 so that historical distinctions would continue to govern the right to jury trial in the maritime context.

Despite the neutral stance of Rule 38, the Federal Rules have had the effect of broadening the class of cases triable to a jury of right. Since in the federal courts equity has always acted only when legal remedies were inadequate, the expansion of adequate legal remedies provided by the Declaratory Judgment Act and the Federal Rules necessarily affects the scope of equity. Jury trial in fact is now available under many circumstances in which the matter would have been heard by the court in pre-1938 litigation. In actual practice, however, there has been a significant decline in the number of cases actually tried by a jury in the federal courts in recent years."

Charles Alan Wright et al., 9 Federal Rules and Procedure § 2301 (3d ed. 2017)(internal quotation marks and citations omitted).

"Determining which actions belong to law and which to equity for the purposes of delimiting the jury trial right continues to be one of the most perplexing questions of trial administration." Charles Alan Wright et al., 9 Federal Rules and Procedure § 2302 (3d ed. 2017). "One major problem is that a great deal of overlap existed between the two English judicial systems in 1791. Because the dividing line between law and equity was vague in 1791, no clear standards existed for interpreting the constitutional jury trial mandate." Charles Alan Wright et al., 9 Federal Rules and Procedure § 2302 (3d ed. 2017).

Furthermore, the assertion of both legal and equitable claims in a single action produced confusion as to how the historical test should be applied following the fusion of law and equity. The use of an historical test in the federal courts after the two systems were merged meant that claims formerly triable "at law" were entitled to a jury and those formerly triable "in equity" did not merit a jury as a matter of right. Courts utilized tests under which they attempted to determine whether the action was "basically" legal or equitable. If the action was basically legal, all issues as to which the jury right applied were sent to the jury; after its verdict, the judge determined any undecided issues and ruled on the equitable claims. If the action was basically equitable, the court not only decided the equitable issues, but it also could invoke the quaintly named "clean-up doctrine" and rule on any "incidental" legal issues in the case, thereby obviating the need for a jury.

Charles Alan Wright et al., 9 Federal Rules and Procedure § 2302 (3d ed. 2017).

> The flaw in this approach is that the basic decisional unit in determining the existence of a right to a jury trial is not the case.  It I the particular issues within a case on which a trial by jury is demanded.  "The Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action."

Charles Alan Wright et al., 9 <u>Federal Rules and Procedure</u> § 2302 (3d ed. 2017)(quoting <u>Ross v. Bernhard</u>, 396 U.S. 531, 538 (1970)).

"[T]here is a strong federal policy favoring trial by jury of issues of fact.  The strength of this policy in itself may provide the answer in cases in which the historical test gives no clear guidance." Charles Alan Wright et al., 9 <u>Federal Rules and Procedure</u> § 2302.1 (3d ed. 2017). "[T]he right to a jury trial is not governed only by static history, as such an approach would ignore important developments since 1791 that changed the basic assumptions on which the two systems [of law and equity] operated."  Charles Alan Wright et al., 9 <u>Federal Rules and Procedure</u> § 2302.1 (3d ed. 2017).  "To the extent that procedural and remedial developments since 1791 have made it possible now for common law procedures and remedies to be adequate, these must be taken into account, and a right to a jury trial recognized, even though that would not have been the result in times past."  Charles Alan Wright et al., 9 <u>Federal Rules and Procedure</u> § 2302.1 (3d ed. 2017)(citing <u>In re Harbour</u>, 840 F.2d 1165, 1172 (4th Cir. 1988)). "inasmuch as equity still intervenes only when the remedy at law is inadequate, there is a built-in capacity for adjustment in the scope of the Seventh Amendment as future systemic alterations expand or contract the category of actions at law."  Charles Alan Wright et al., 9 <u>Federal Rules and Procedure</u> § 2302.1 (3d ed. 2017).  "First, the scope of equitable jurisdiction must be measured in light of the legal remedies and procedures currently available, which are always subject to change.  Second, when an issue is common to both legal and equitable claims in the

same proceeding, it must be tried first to a jury."  Charles Alan Wright et al., 9 <u>Federal Rules and Procedure</u> § 2302.1 (3d ed. 2017)(citing <u>Beacon Theatres, Inc. v. Westover</u>, 359 U.S. 500 (1959)).  "[I]f the claim for a money judgment is triable to a jury, it still must be so tried although it is asserted in a suit in which the basic relief sought is equitable."  Charles Alan Wright et al., 9 <u>Federal Rules and Procedure</u> § 2302.1 (3d ed. 2017)(citing <u>Dairy Queen, Inc. v. Wood</u>, 369 U.S. 469 (1962)).  "[A]t a minimum, the Beacon Theatres and Dairy Queen cases lend impetus toward finding a right to trial by jury in doubtful cases."  Charles Alan Wright et al., 9 <u>Federal Rules and Procedure</u> § 2302.1 (3d ed. 2017)(citing <u>Gefen v. United States</u>, 400 F.2d 476, 479 (5th Cir. 1968)).

"The right to a jury trial as declared in the Seventh Amendment is preserved inviolate."  <u>J.R. Simplot v. Chevron Pipeline Co.</u>, 563 F.3d 1102, 1115 (10th Cir. 2009).  For Seventh Amendment jury trial determination purposes, the "nature of the issues presented and the remedies sought determines whether an action qualified as 'legal.'" <u>Elm Ridge Exploration Co., LLC v. Engle</u>, 721 F.3d 1199, 1222 (10th Cir. 2013).  "Whether defendants are entitled to jury trial . . . is determined by the legal or equitable nature of similar claims at the time the Seventh Amendment was ratified."  <u>Parks v. Consumer Law Assoc., LLC</u>, 2010 WL 3905442, at *2 (slip op.)(Bankr. D. Kan. September 29, 2010)(Nugent, J.).

### RELEVANT TEXT OF THE FEDERAL RULES OF CIVIL PROCEDURE

#### Rule 38 – Right to a Jury Trial; Demand

(a) **Right Preserved.** The right of trial by jury as declared by the Seventh Amendment to the Constitution—or as provided by a federal statute—is preserved to the parties inviolate.

(b) **Demand.** On any issue triable of right by a jury, a party may demand a jury trial by:

(1)  serving the other parties with a written

demand—which may be included in a pleading—no later than 14 days after the last pleading directed to the issue is served; and

(2) filing the demand in accordance with Rule 5(d).

(c) **Specifying Issues.** In its demand, a party may specify the issues that it wishes to have tried by a jury; otherwise, it is considered to have demanded a jury trial on all the issues so triable. If the party has demanded a jury trial on only some issues, any other party may—within 14 days after being served with the demand or within a shorter time ordered by the court—serve a demand for a jury trial on any other or all factual issues triable by jury.

(d) **Waiver; Withdrawal.** A party waives a jury trial unless its demand is properly served and filed. A proper demand may be withdrawn only if the parties consent.

(e) **Admiralty and Maritime Claims.** These rules do not create a right to a jury trial on issues in a claim that is an admiralty or maritime claim under Rule 9(h).

Fed. R. Civ. P. 38 (emphases in original).

### Rule 39 – Trial by Jury or by the Court

(a) **When a Demand Is Made.** When a jury trial has been demanded under Rule 38, the action must be designated on the docket as a jury action. The trial on all issues so demanded must be by jury unless:

(1) the parties or their attorneys file a stipulation to a nonjury trial or so stipulate on the record; or

(2) the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial.

(b) **When No Demand Is Made.** Issues on which a jury trial is not properly demanded are to be tried by the court. But the court may, on motion, order a jury trial on any issue for which a jury might have been demanded.

(c) **Advisory Jury; Jury Trial by Consent.** In an action not triable of right by a jury, the court, on motion or on its own:

> (1) may try any issue with an advisory jury; or
>
> (2) may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right, unless the action is against the United States and a federal statute provides for a nonjury trial.

Fed. R. Civ. P. 39 (emphases in original).

## ANALYSIS

The Court disposes of the Motion for a Bench Trial with this Memorandum Opinion. Applying the first prong of the two-part Granfinanciera v. Nordberg test to the case's fiduciary-duty claims, the Court concludes that the Plaintiffs' breach-of-fiduciary-duty claims would have fallen to the English courts of equity in 1791. Applying the second prong of the Granfinanciera v. Nordberg test to the case's fiduciary-duty claims, the Court concludes that the Plaintiffs' breach-of-fiduciary-duty claims are legal in nature. Accordingly, the Court concludes that the Plaintiffs' breach-of-fiduciary-duty claims fall within the Seven Amendment's scope, and that the Defendants accordingly are entitled to a jury trial on the Plaintiffs' breach-of-fiduciary-duty claims.

## I.  FIDUCIARY-DUTY CLAIMS WERE THE PROVINCE OF ENGLISH COURTS OF EQUITY IN 1791.

Treatise writers from Justice Story in the years just after Seventh Amendment's ratification until today frankly acknowledge the difficulties that accompany any court's attempt to discern whether modern claims would have fallen in 1791 within the jurisdiction of the English common-law courts or the English equity courts. See, e.g., 1 Dan B. Dobbs, Dobbs Law of Remedies §2.6(3), at 154-65 (2d ed. 1993). The historical analysis required in Granfinanciera v. Nordberg's first prong to pigeonhole modern claims into centuries-old categories can be an

inexact science that must stitch analogical reasoning to shoe leather. In this part of the analysis, the Court therefore combines analogy to a primary-source analysis of 346 cases the English common-law and equity courts heard from the time the Constitutional Convention submitted the proposed Constitution to the States for ratification in 1789 to the time that States ratified the Seventh Amendment in 1791. This investigation convinces the Court that the English courts of equity would have heard the Plaintiffs' breach-of-fiduciary-duty claims had they brought them in 1791.

A. **DURING THE LATE EIGHTEENTH CENTURY, EQUITY COURTS' JURISDICTION WAS NARROWER IN ENGLAND THAN IN ITS NORTH AMERICAN COLONIES.**

William Blackstone and Thomas Jefferson both believed that jury trials existed in England from Saxon times. See Julian S. Waterman, Thomas Jefferson and Blackstone's Commentaries, 27 Ill. L. Rev. 629, 640 (1933). Whether this lineage is quite so long remains lost, like so much else in medieval Britain, in the fog of time. By the time that rebel barons forced King John to sign the Magna Carta in a muddy field at Runnymede in 1215, however, jury trial in criminal cases was considered an English birthright in most criminal cases. See Magna Carta, 25 Edward I, cl. 29 (1215)("No freeman shall be taken or imprisoned . . . but by lawful judgment of his Peers.")(spelling and orthography modernized). During the half millennium that passed between the great charter and granting of the North American colonial charters, civil juries became the norm in England in law courts as well,[51] so much so that William Blackstone came to consider these juries "the grand bulwark" of every Englishman's liberties. 3 William Blackstone, Commentaries *342. With only slight modifications, the

---

[51]Juries regularly -- but not always -- heard cases in the common-law Court of Common Pleas and the Court of the King's Bench. See Douglas King, Complex Civil Litigation and the Seventh Amendment Right to a Jury Trial, 51 U. Chi. L. Rev. 581, 589-600 (1984).

English North American colonies almost universally adopted the law/equity division and civil jury rights. See, e.g., Government of New Haven Colony (1643), in 1 Jon L. Wakelyn, America's Founding Charters: Primary Documents of Colonial and Revolutionary Era Governance 133-34 ("America's Founding Charters"); Charter of Connecticut (1662), in America's Founding Charters at 137-38; Ordinance for Establishing Courts [Pennsylvania](1706), in America's Founding Charters 487-93; Massachusetts Second Charter (1691), in Samuel Lucas, Charters of the Old English Colonies in America 73 (1850); Establishment of Courts [Georgia] (1754), in America's Founding Charters 109-10; Charter of Georgia (1732), in America's Founding Charters 521-23. But see Fundamental Constitutions of Carolina (1669), in America's Founding Charters 222-28 (creating a much more complex system with eight supreme courts and numerous court systems with overlapping jurisdictions).

By the mid-eighteenth century, however, juries in the North American colonies were becoming much more powerful than juries in the motherland, deciding both law and fact in criminal and civil cases. See generally 2 James Wilson, On Juries, in Works of James Wilson 547-48 (describing how English jurors did not enjoy the same powers as American jurors did). British prosecutors generally begrudged colonial juries' outsized authority as a necessary evil; few colonial judges had any formal legal training, so a jury's collective wisdom about justice and the law was as reliable as a judge's inclination. See Charles Warren, The History of the American Bar 3-41 (1911).[52] Powerful juries also made it more likely that colonists would acquiesce to and abide by verdicts, a nontrivial consideration along a sparsely settled seaboard

---

[52]John Dudley, the Associate Chief Justice of New Hampshire, was especially candid on this point, charging his juries: "[D]o justice between the parties not by any quirks of the law out of Coke or Blackstone -- books that I never read and never will -- but by common sense as between man and man." Gordon S. Wood, Creation of the American Republic 1776-1787, at 298 (1969).

more than three thousand miles from London where enforcement could prove difficult.  See Nathaniel Chipman, Sketches on the Principles of Government 164-65 (1793).

Colonial juries' tendencies to nullify the law nevertheless abraded British sensibilities, particularly when juries disregarded a judge's unusually clear elucidations of the law.  See, e.g., Valerie P. Hans & Neil Vidmar, Judging the Jury 35-36 (1986).  British lawmakers could no longer maintain a stiff upper lip vis-à-vis colonial juries' perceived overreach after jury nullification in Rex v. Zenger, 17 Howell's St. Trials 675, 16 American State Trials 5 (N.Y. 1735), a libel case that the Crown brought against a newspaper publisher in the New York courts. Westminster first tightened the noose on jury trials in New York and thirteen other North American colonies[53] by increasing Crown control over jury selection by empowering local sheriffs to call potential jurors to the town square to question them on their political beliefs and then directly compile venire lists.  See Valerie P. Hans & Neil Vidmar, Judging the Jury 35-36 (1986)(Judging the Jury").  When colonial juries continued to prove more headstrong than the Crown preferred, the Crown increased its appellate powers to more readily overturn jury verdicts and loosened venue requirements to allow for trials in England.  See Judging the Jury at 35-36.

Most importantly for this case's purposes, however, the Crown also maneuvered to avoid jury trials for North American colonials altogether by increasing the equity jurisdiction of colonial judges and creating entirely new courts of equity with broad powers to hear cases without benefit of a jury.  See Judging the Jury at 35-36.  Colonial courts of equity gained broad jurisdiction over entire categories of claims formerly heard at common law, upturning the

---

[53]The affected colonies included not only those that would unite in revolution against England in 1776, but also the colony of Bermuda.  See Valerie P. Hans & Neil Vidmar, Judging the Jury at 35-36.  British Canada had retained many aspects of the French judicial model after the Seven Years' War under which jury trials already were scarcer.  See Seaman Morley Scott, Chapters in the History of the Law of Quebec 1764-1775 (Oct. 2000)(unpublished Ph.D. dissertation, Johns Hopkins University)(on file with Johns Hopkins University).

divisions between law and equity that the colonial courts had inherited from the motherland.  <u>See</u>

Patrick Devlin, Jury Trial in Complex Cases, 80 <u>Colum. L. Rev.</u> 43, 52-53 (1980).  The Crown

reduced colonial common-law courts' jurisdiction yet further in the 1760s by erecting vice-

admiralty courts to separate colonial juries from any cases concerning trade and smuggling.  <u>See</u>

Carl Ubbelohde, <u>Vice-Admiralty Courts and the American Revolution</u> 123-25 (1960); George

Adrian Washburne, <u>Imperial Control of the Administration of Justice in the Thirteen Colonies</u> 20

(1923); Erwin C. Surrency, Courts in the American Colonies, 11 <u>Am. J. Legal Hist.</u> 253, 266

(1967).  John Adams defended his client John Hancock against wine smuggling charges in front

of one such vice-admiralty court in 1769.  <u>See</u> 3 John Adams, <u>Diary and Autobiography</u> 306

(L.H. Butterfield et al. eds. 1961).

    Colonial indignation with such attempts to disempower civil juries simmered for three

decades before boiling over in 1765.  In that year, Parliament passed the Stamp Act of 1765, 5

George III, cl. 12, imposing a tax on all printed materials published in Britain's thirteen colonies

on the Atlantic seaboard in an effort to recoup costs of defending the colonies' frontier.  <u>See</u>

Duties in American Colonies Act 1765, 5 George III, cl. 12 (1765).   Colonial juries regularly

nullified the unpopular law, spurring Parliament to invest jurisdiction over Stamp Act violations

in admiralty courts, <u>i.e.</u>, equity courts without a jury.  <u>See</u> Edmund S. Morgan & Helen M.

Morgan, <u>Stamp Act Crisis: Prologue to Revolution</u> 98 (1963).  For the first time on record,

representatives from all thirteen seaboard colonies gathered in a Stamp Act Congress to officially

protest the narrowed scope of law courts and colonists' jury rights.  <u>See</u> Journal of the First

Congress of the American Colonies in Opposition to the Tyrannical Acts of the British

Parliament, Held at New York, October 7, 1765, at 28 (declaring that "trial by jury is the

inherent and invaluable right of every British subject in these colonies").  With their complaints

unaddressed, the colonies' next congress in 1776 declared their right to dissolve their political bands to Great Britain in part on the grounds of the expanded scope of colonial equity courts that effectively denied colonists, in many cases, of the jury trial right which Englishmen had enjoyed for centuries.  See Unanimous Declaration of the thirteen united States of America at 1.

B.    EQUITY COURTS' JURISDICTION IN THE NEWLY-INDEPENDENT STATES WAS SO INCONSISTENT THAT THE FRAMERS PUNTED ON THE QUESTION OF CIVIL JURY TRIALS IN THEIR PROPOSED CONSTITUTION.

Anger over England's expansion of colonial equity courts' jurisdiction in the 1760s -- and the corresponding narrowing of civil jury rights -- may have made patriots such as Sam Adams froth.  See, e.g., 1 Samuel Adams, Writings of Samuel Adams 8-9 (Harry Alonzo Cushing ed., 1904)(characterizing the jury as one of the two "Pillars of the British Constitution founded in the common Rights of Mankind" and the admiralty courts as depriving colonists of "the most valuable Privileges of our Charter")(spelling modernized).   From the Charles to Charleston, however, this umbrage seemed to be a casualty of the ensuing Revolution.  Not long after muskets fell mute at nearby Yorktown, the Virginia General Assembly decided to grant the Commonwealth's chancery courts broad jurisdiction and allowed bench trials in a wide swath of cases before the Commonwealth's law courts.  See Ellen Holmes Pearson, "A Difference of Customs" (Oct. 2000)(unpublished Ph.D. dissertation, Johns Hopkins University)(on file with Johns Hopkins University)("A Difference of Customs"); St. George Tucker, 4 Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the United States and the Commonwealth of Virginia app. 56-57 (1803)("Tucker").[54] Across the Potomac, the

_____

[54]Virginia's neat jurisdictional division between its courts of common law and courts of equity quickly blurred, however, so that common-law courts oftentimes heard equity claims, and the state gradually reduced personnel appropriations for the chancery courts to the point that they could fund only one chancellor statewide.  See Tucker at app. 18-19.

Maryland General Assembly established state courts of equity more closely modeled on the English courts, but it allowed many claims to slosh freely between the State's common-law and equity courts that did not afford defendants a jury trial right.  See A Difference of Customs at 121-22.   Connecticut created equity courts with broad jurisdiction and a mission to act "according to the dictates of conscience," and "the attainment of abstract right and perfect justice."  David Hoffman, A Course of Legal Study: Respectfully Addressed to the Students of Law in the United States at 205-06 (1817).  Pennsylvania took a different approach, insinuating equity into its common-law courts on the belief that "*equity is a part of our law*; and all our courts exercise *equitable jurisdiction*."   Hugh Henry Brackenridge, Law Miscellanies 166 (1814)(emphasis in original).  See 2 James Wilson, Of the Judicial Department, in Works of James Wilson at 478.

Other States blended law and equity in yet other idiosyncratic ways, with resulting jury trial rights for the same cause varying enormously from State to State.  See 4 James Kent, Commentaries on American Law 163 (1826).  When representatives of the thirteen States gathered in Philadelphia in 1787 began to cobble together a proposed federal constitution, this diverse jury practice among the several States unsurprisingly snarled representatives' efforts to find much common ground.   The Constitutional Convention's Committee of Detail[55] recommended that all criminal cases require a jury trial, but it punted on the question of civil juries in the belief that no specific recommendation would survive a floor vote.  See Edith Guild

---

[55]On July 23, 1787, the Constitutional Convention voted that "the proceedings of the Convention for the establishing of a Natl. Govt, (except the part relating to the Executive), be referred to a Committee to prepare & report a Constitution conformable thereto."   2 James Madison, Records of the Federal Convention of 1787 at 95 (Max Farrand ed., 1966).   The unnamed committee -- later called the Committee of Detail -- consisted of five convention delegates who created a first draft of the proposed federal constitution from disparate resolutions which the Constitutional Convention had adopted.  See David O. Stewart, The Summer of 1787: The Men Who Invented the Constitution 152 (2008).

Henderson, <u>Background of the Seventh Amendment</u>, 80 <u>Harv. L. Rev.</u> 289-90 (1966). James Wilson, a member of the Committee of Detail, recounted the committee's deliberative process about civil juries during subsequent ratification debates:

> When, therefore, this subject was in discussion, we were involved in difficulties, which pressed on all sides, and no precedent could be discovered to direct our course. The cases open to a jury, differed in different states; it was therefore impracticable, on that ground, to have made a general rule. The want of uniformity would have rendered any reference to the practice of the states idle and useless: and it could not, with any propriety, be said, that, "the trial by jury shall be as heretofore:" since there has never been any federal system of jurisprudence, to which the declaration could relate. Besides it is not in all cases that the trial by jury is adopted in civil questions.

James Wilson, Speech by James Wilson, <u>in</u> <u>Pamphlets on the Constitution of the United States: Published During Its Discussion by the People 1787-1788</u>, at 157 (Paul Leicester Ford ed. 1888)(spelling modernized)("<u>Pamphlets</u>"). The Constitutional Convention followed the Committee of Detail's lead by not mentioning jury trials for civil cases in the text of the proposed constitution. <u>See</u> U.S. Const., <u>passim</u>.

C.    **THE SEVENTH AMENDMENT ENSHRINED DEFENDANTS' RIGHT TO A JURY TRIAL IN CASES AT COMMON LAW BUT FAILED TO DEMARCATE LAW FROM EQUITY.**

The Constitutional Convention's decision not to address the civil jury trial question greatly disquieted opponents, later known categorically as Antifederalists, who saw something sinister in the silence. <u>See</u>, <u>e.g.</u>, <u>Anti-Federalist Papers and the Constitutional Convention Debates</u> 202-12 (containing speech from Patrick Henry[56] warning lack of jury trial would be tool

---

[56]Patrick Henry, most common known for his revolutionary oratory -- "[G]ive me liberty or give me death!", William Wirt, <u>Sketches of the Life and Character of Patrick Henry</u> 115-27 (1817) -- had been wartime governor of Virginia during the American Revolution and was sitting as governor of the Commonwealth of Virginia again when the Constitutional Convention convened. <u>See</u> Thomas S. Kidd, <u>Patrick Henry: First Among Patriots</u> 129-212. He refused an offer from Edmund Randolph to attend the Constitutional Convention, and later campaigned against the proposed constitution, because he believed the concentration of power it represented

of oppression).  Elbridge Gerry[57] decried the "*secret conclave*" that had sought to curtail a right to jury trial that formed the "first rudiments of civil government."  Elbridge Gerry, Observations by Elbridge Gerry, in Pamphlets at 9-10 (emphasis in original).  George Mason[58] counted the proposed constitution's lack of a civil jury trial guarantee among a long train of federal intrusions on state rights.  See George Mason, Objections of George Mason in Pamphlets at 331. Writing from the American embassy in Paris, Thomas Jefferson advised James Madison that the Constitutional Convention had been derelict at best for failing to enshrine a civil jury right on the flimsy ground that States' practices varied:

> It is hard to conclude, because there has been a want of uniformity among the States as to the cases triable by jury, because some have been so incautious as to dispense with this mode of trial in certain cases, therefore, the more prudent States shall be reduced to the same level of calamity.  It would have been much more just and wise to have concluded the other way, that as most of the States have preserved this sacred palladium of liberty, those who had wandered, should be brought back to it: and to have established general right rather than general wrong.

---

to be dangerous to republican liberty.  See, e.g., Patrick Henry, Letter from Patrick Henry to George Washington (Oct. 19, 1787), in 2 William Wirt Henry, Patrick Henry; Life Correspondence and Speeches 320 (1891)(informing Washington that, despite the general's lobbying efforts, "I have to lament that I cannot bring my mind to accord with the proposed Constitution.").

[57]Elbridge Gerry was a signatory to the Declaration of Independence, a delegate to the Constitutional Convention, Governor of Massachusetts from 1810 to 1812, and Vice President of the United States under James Madison from 1812 to 1813.  See James T. Austin, Life of Elbridge Gerry, with Contemporary Letters from the Close of the American Revolution 1-78 (1829); id. at 313-405.

[58]George Mason was the principle author of the Virginia Declaration of Rights and a delegate to the Constitutional Convention.  See Jeff Broadwater, George Mason: Forgotten Founder 158-208; id. at 234-35.  Some historians consider him, rather than James Madison, to be the Bill of Rights' father.  See Stephan A. Schwartz, George Mason: Forgotten Founder, He Conceived the Bill of Rights, Smithsonian Magazine (April 30, 2000), http://www.smithsonianmag.com/history/george-mason-forgotten-founder-he-conceived-the-bill-of-rights-64408583/ (last visited June 24, 2017).

Thomas Jefferson, Letter from Thomas Jefferson to James Madison, December 20, 1787, in 6 Writings of Thomas Jefferson 387-89 (Andrew A. Lipscomb & Albert Ellery Bergh eds. 1903).

The intensity of opposition set many a Federalist on his back foot, and prominent Federalists defended the absence of an explicit constitutional civil jury trial guarantee in varied ways as though by stereotype. Alexander Hamilton, seemingly miffed, groused that he did not see why a civil jury trial guarantee was so essential to a federal constitution. See, e.g., The Federalist No. 83 (Alexander Hamilton). James Madison, future Secretary of State and already more diplomatic than Hamilton, lionized trial by jury as "sacred in England as in America," but insisted that the federal legislature ought to have the discretion to depart from civil juries for cases as it deemed necessary. 1 Robertson, Debates of the Convention of Virginia, 1788, at 382 (2d ed. 1805). Edmund Randolph, a member of the Committee of Detail, defended his Committee's work by riposting that absence of an explicit guarantee of civil juries in the proposed constitution preserved the right to its greatest possible extent, on the theory that Congress would need to regulate jury trials so as to suit every state. See 1 Robertson, Debates of the Convention of Virginia, 1788, at 59 (Randolph indicating that he would wager all his property that Congress "will institute the trial by jury in such manner as shall accommodate the conveniences of the inhabitants in every state . . .") George Washington fatherly reached out to Antifederalist governors by personal letter, portraying the Constitution as the culmination of their combined struggle during the Revolution. See, e.g., George Washington, Letter from George Washington to Thomas Jefferson (dated August 31, 1788), in Writings of George Washington 424 (Jared Sparks ed., 1835).

The Federalists' public relations offensive was not as persuasive as they likely hoped. Numerous state ratifying conventions made their ratification of the proposed constitution

contingent upon a future amendment, among other amendments, to guarantee citizens' right to a jury trial in civil cases. Massachusetts called for an amendment that would read: "In civil actions between citizens of different States, every issue of fact arising in actions at common law, shall be tried by a jury, if the parties, or either of them, request it." Commonwealth of Massachusetts, Debates and Proceedings in the Convention of the Commonwealth of Massachusetts, Held in the Year 1788, and Which Finally Ratified the Constitution of the United States 80 (1856). New Hampshire made the identical demand. See 1 J. Elliot, Debates in the Several State Conventions, on the Adoption of the Federal Constitution 326 (2d ed. 1836)("State Debates"). Virginia went a step further, requiring that "in controversies respecting property, and in suits between man and man, the ancient trial by jury is one of the greatest securities to the rights of the people, and [ought] to remain sacred and inviolable." 3 State Debates at 658. See also Virginia Declaration of Rights § 11 (1776)(using identical language). Other States joined the refrain for a guaranteed federal civil jury right, even if they sometimes sang on slightly different keys. See, e.g., 3 State Debates at 525-26; id. at 540-58.

Federalists won the first congressional elections after the Constitution's ratification in a landslide, but they took Antifederalists' demands for a civil jury trial guarantee to heart. Shortly after session began, James Madison rose from his seat in the House of Representatives to propose twelve amendments to the Constitution. See 1 Annals of Congress 431 (1789)(Joseph Gales ed., 1834)(recording Madison's statement as bill sponsor). The ninth amendment that Madison proposed -- later to be ratified as the Seventh Amendment -- guaranteed:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.[59]

---

[59]The Court reports capitalization as in the First Congress' Joint Resolution.

U.S. Const., amend VII.

The Seventh Amendment satisfied Antifederalists that the federal courts would not roll back revolutionary gains by broadly denying defendants a right to trial by jury in civil matters. It did little to clarify, however, what the exact extent of the jury trial right would be. State practice under the Articles of Confederation had varied so much as to make the phrase "Suits at common law" as ambiguous as James Wilson and the rest of the Constitutional Convention's Committee of Detail had feared it might be. The Seventh Amendment's text does not specify what causes of action fall under law and what causes fall under equity, and the Seventh Amendment's legislative history sheds little light. The debate in the United States House of Representatives over the Bill of Rights focused on whether it was advisable to amend the Constitution at all rather than on the proposed amendments' content, and proceedings in the United States Senate at the time still occurred behind closed doors. See Henderson, supra, at 291. Even Madison's statement as bill sponsor for the Bill of Rights provides general aspirations rather than definitions or concrete applications:

> It appears to me that this House is bound by every motive of prudence, not to let the first session pass over without proposing to the State Legislatures, some things to be incorporated into the Constitution, that will render it as acceptable to the whole people of the United States, as it has been found acceptable to a majority of them.

1 Annals of Congress 431-32 (1789)(Joseph Gales ed., 1834).

---

Capitalization of the Seventh Amendment's individual words varies in individual States' acts ratifying the amendment. See 2 Documentary History of the United States at 325-76.

### D. THE SEVENTH AMENDMENT'S AMBIGUITY AND STATES' VARYING PRACTICES AT THE TIME OF RATIFICATION LED THE SUPREME COURT TO DISTINGUISH LAW FROM EQUITY BASED ON ENGLISH PRACTICE IN 1791 RATHER THAN ON AMERICAN LAW.

Congressional inaction brought the Seventh Amendment's ambiguity about the law/equity divide to the Supreme Court's front door when it mandated in the Judiciary Act of 1798 that the Supreme Court have a jury in all trials it heard against a citizen of the United States where there were outstanding issues of fact. See 1 Stat. 81 (1789) cl. 20 § 13.[60] At first the Supreme Court used English common law as a stopgap benchmark, under the impression that it still was permitted to apply English common law in the post-revolutionary United States. See, e.g., United States v. Ravara, 2 U.S. 297 (1793). The ambiguity reemerged at the end of the eighteenth century, however, when the Supreme Court reversed course and concluded that English common law no longer bound citizens in the former colonies. See United States v. Worrall, 2 Dallas 384 (1798). Interpretation of the Seven Amendment's civil jury trial guarantee remained in limbo until 1812, when the United States Court of Appeals for the First Circuit,[61] heard United States v. Wonson, 1 Gall. 5, 28 F. Cas. 745 (1812). Justice Joseph Story, sitting as a circuit court judge, acknowledging that a proper understanding of the law/equity divide needed to be historically astute and recognize the law/equity divide in the colonies before the Revolution and in the States at the time of the Seventh Amendment's ratification. At the same time,

---

[60]The Judiciary Act of 1789 erected the United States Supreme Court as a trial court that could hear jury trials. See Paul Kramer, Jury Trials Before the Supreme Court of the United States (1961). Only three jury trials in front of the Supreme Court seem to have been argued, of which a record remains only of Georgia v. Brailsford, 18 U.S. (3 Dallas) 1 (1794).

[61]The opinion does not refer to the name of the court of appeals, signifying only that it was the court of appeals with appellate jurisdiction over the United States District Court for the District of Massachusetts. See 28 F. Cas. at 745. The Judiciary Act of 1807, 2 Stat. 420 (1807), reorganized the federal courts, placing the Commonwealth of Massachusetts in the First Circuit along with New Hampshire and Rhode Island. See Russell R. Wheeler & Cynthia Harrison, Federal Judicial Center, Creating the Federal Judicial System 11 (2005).

however, Justice Story concluded that the Supreme Court's holding in United States v. Worrall

that English common law no longer applied to Americans did not mean that the common

law/equity division in England did not apply to American federal courts.  Indeed, Justice Story

was convinced that the Seventh Amendment obligated the federal courts to distinguish law from

equity based exclusively on English court practice when the Seventh Amendment was ratified:

> Beyond all question, the common law here alluded to is not the common law of
> any individual state (for it probably differs in all), but it is the common law of
> England, the grand reservoir of all our jurisprudence.  It cannot be necessary for
> me to expound the grounds for this opinion, because they must be obvious to
> every person acquainted with the history of the law.

28 F. Cas. at 750.

In 1812, Justice Story was sufficiently confident in this novel position that he felt no need

to "expound on the grounds for this opinion, because [it] must be obvious to every person

acquainted with the history of the law."  28 F. Cas. at 750.  Eighteen years later, however, Justice

Story -- by then elevated to the Supreme Court -- authored an opinion that offered some textual

and intertextual support for the earlier decision.  See Parsons v. Bedford, 28 U.S. (3 Peters) 433

(1830).  The Parsons v. Bedford court sidestepped the inconsistent division between common

law and equity in the several states by stating that, when the Seventh Amendment was ratified in

1791,

> [t]he phrase "common law," found in this clause, is used in contradistinction to
> equity, and admiralty, and maritime jurisprudence.  The constitution had declared,
> in the third article, "that the judicial power shall extend to all cases in *law and
> equity* arising under the constitution, the laws of the United States, and treaties
> made or which shall be made under their authority," &c. and to all cases of
> *admiralty and maritime jurisdiction*.  It is well known, that in civil causes, in
> courts of equity and admiralty, juries do not intervene, and that courts of equity
> use the trial by jury only in extraordinary cases to inform the conscience of the
> court.  When, therefore, we find that the amendment requires that the right of trial
> by jury shall be preserved in suits at common law, the natural conclusion is, that
> this distinction was present to the minds of the framers of the amendment.  By
> *common law*, they meant what the constitution denominated in the third article

"law," not merely suits, which the *common* law recognized among its old and settled proceedings, but suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered; or where, as in the admiralty, a mixture of public law, and of maritime law and equity was often found in the same suit. Probably there were few, if any, states in the union, in which some new legal remedies differing from the old common law forms were not in use; but in which, however, the trial by jury intervened, and the general regulations in other respects were according to the course of the common law. . . . In a just sense, the amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights.

Parsons v. Bedford, 28 U.S. (3 Peters) at 446-47 (emphases in original). The Supreme Court found support for this interpretation by reading the Seventh Amendment in the context of the Judiciary Act of 1789, which Congress was considering at the same time it was deliberating over the Bill of Rights, noting that the Judiciary Act of 1789 provides: (i) "'the trial of issues in fact in the *district courts* in all causes, except civil causes of *admiralty and maritime jurisdiction*, shall be by jury,'" Parsons v. Bedford, 28 U.S. (3 Peters) at 447 (quoting Judiciary Act of 1789 § 9)(emphasis in Parsons v. Bedford); (ii) "'the trial of issues in fact in the *circuit courts* shall in all suits, except those of equity, and of *admiralty* and *maritime* jurisdiction, be by jury,'" Parsons v. Bedford, 28 U.S. (3 Peters) at 447 (quoting Judiciary Act of 1789 § 12); and (iii) "'the trial of issues in fact in the *supreme* court *in all actions at law* against citizens of the United States, shall be by jury,'" Parsons v. Bedford, 28 U.S. (3 Peters) at 447 (quoting Judiciary Act of 1789 § 13).

E.     **THE PARSONS V. BEDFORD TEST FOR DISTINGUISHING LEGAL FROM EQUITABLE CLAIMS CONTINUES TO PREVAIL, IN A SLIGHTLY REFINED FORM, TO THE PRESENT.**

The Parsons v. Bedford standard for distinguishing, for Seventh Amendment purposes, between legal and equitable claims continues to prevail in slightly refined form in Supreme Court jurisprudence to the present day. In its most recent formulation of the test whether a defendant has a Seventh Amendment right to a jury trial in a civil matter, in Granfinanciera v.

Nordberg v. Nordberg, the Supreme Court quoted Parsons v. Bedford, holding: "We have consistently interpreted the phrase 'Suits at common law' to refer to 'suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered,'" Granfinanciera v. Nordberg 492 U.S. at 41 (quoting Parsons v. Bedford, 28 U.S. (3 Peters) at 443)(emphasis in Parsons v. Bedford), adding that "the thrust of the Amendment was to preserve the right to jury trial as it existed in 1791," Granfinanciera v. Nordberg 492 U.S. at 41 (quoting Curtis v. Loether, 415 U.S. at 193). The Supreme Court then clarified that the Seventh Amendment "also applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." 492 U.S. at 42 (citing Curtis v. Loether, 415 U.S. at 193)). The Supreme Court then provided the two-part test on which both the Plaintiffs and the Defendants based their discussion during the hearing:

> First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second stage of this analysis is more important than the first. If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as a factfinder.

Granfinanciera v. Nordberg, 492 U.S. at 42.

F.  **ABSTRACT APPLICATION OF GRANFINANCIERA V. NORDBERG'S FIRST PRONG IS UNAVAILING, AS EMINENT TREATISE WRITERS HAVE DISAGREED FOR CENTURIES ABOUT THE EXACT JURISDICTIONAL DIVIDE BETWEEN THE ENGLISH LAW AND EQUITY COURTS, EVEN DURING THE FEW YEARS BEFORE THE SEVENTH AMENDMENT'S RATIFICATION.**

The first, historical prong of the Granfinanciera v. Nordberg test helpfully avoids the

complications and perhaps Sisyphean task of trying to reconcile States' varying divisions between law and equity at the time of the Seventh Amendment's ratification. At the same time, it introduces additional complications that the Granfinanciera v. Nordberg court may not have envisioned. The division between law and equity in England in 1791 was not clear cut. Numerous different and byzantine systems of both law and equity existed with overlapping jurisdictions, having arisen over the preceding five centuries more through happenstance than design.[62] See J.H. Baker, An Introduction to Legal History 46 (4th ed. 2005)(briefly laying demarcating the various common law and equity court systems); 1 William Searle Holdsworth , History of English Law 194-264 (1931)(more comprehensively describing the development of these courts). Nor were the law and equity courts the only courts in England; Blackstone details a mosaic of court systems -- including fire courts,[63] forest courts,[64] admiralty courts, ecclesiastical courts, and even courts dedicated exclusively to sewers[65] -- that encroached on both the law and equity courts' jurisdiction. See 3 William Blackstone, Commentaries *71-74.

Even within the law and equity court systems, not as neat a division between English law and equity courts existed as one might suppose:

---

[62]Three major common law courts existed in England in 1791: Exchequer, Common Pleas, and King's Bench. See J.H. Baker, An Introduction to Legal History 86-89. The Chancery was the principal court of equity. See Douglas King, Complex Civil Litigation and the Seventh Amendment Right to a Jury Trial, 51 U. Chi. L. Rev at 586.

[63]Jay Tidmarsh, The English Fire Courts and the American Right to Civil Jury Trial, 83 U. Chi. L. Rev. 1893 (2016).

[64]Forest courts handled all claims for injuries done to the king's deer and their domiciles. See 3 Blackstone, Commentaries 71.

[65]Blackstone described commissioners of sewers as a temporary tribunal erected to overlook the repairs of sea banks and sea walls; and the cleaning of rivers, ditches, and other conduits as the Court of the King's Bench designated. See 3 Blackstone, Commentaries at 73-74.

Before the adoption of the constitutions the line between law and equity (and therefore between jury and non-jury trial) was not a fixed and static one. There was a continual process of borrowing by one jurisdiction from the other; there were less frequent instances of a sloughing off of older functions. An instance of the latter may be seen from early petitions asking the Chancellor to grant ordinary legal remedies because of the corruption of political impotence of the regular courts, a branch of equity jurisdiction that withered and died in the fifteenth century.

In the course of time many matters and issues worked over into law from equity. The growth of general assumpsit, " especially that implied contract, so highly beneficial and useful, of having undertaken to account for money received to another's use," had already become in Blackstone's time a legal action "almost as universally remedial as a bill in equity." Many matters such as duress, fraud, illegality, and perhaps even payment of a specialty, which had once been cognizable only in equity were familiar defenses to a legal action by the end of the eighteenth century.

On the other hand, chancellors came to try an ever-growing number of issues which once they had left to be tried at law. There was a time, for instance, when equity was reluctant to grant specific performance where the existence of the contract was disputed; the parties, it was thought, should settle such disputes at law. Later equity courts had no hesitation about deciding for themselves whether there was a contract. Again the notion developed that if a ground for equitable relief existed, equity would not stop with the granting of equitable relief but would (at least if plaintiff wished) decide all aspects of the controversy, and this would often include issues which were ordinarily for the law courts. Thus, if a plaintiff sought reformation of a contract for mutual mistake, the chancellor, if he found mutual mistake, would not only reform the contract but also try any remaining issues which would determine whether damages should be awarded for breach of the contract as reformed, and decree payment of the proper amount. Ordinarily, where the ground for equitable relief failed, the bill would be dismissed and the parties left to seek in the common law courts whatever legal remedies remained.

James Fleming, Jr., Right to a Jury Trial in Civil Action, 72 Yale L.J. 655, 658-59 (1963)(internal citations removed). English aristocracy also made itself felt in each court system's jurisdictional scope; the court of common law's jurisdiction included those cases concerning the king's wards, personal actions in which any officer of the court was a party, and other various instances regardless of the nature of the underlying claim or the remedy sought. See A Difference of Customs at 120-21. On the other side of the law/equity divide, the Lord

Chancellor[66] regularly heard law cases in the chancery court, even though common-law tasks were a very small portion of his overall duties.  See 3 William Blackstone, Commentaries *49.

Further complicating matters, the English equity courts in 1791 in many ways retained their original character as a quasi-appellate court[67] that the Crown had created in the fifteenth century as the "conscience of the King."  Darien Shanske, Four Theses: Preliminary to an Appeal

---

[66] The English Court of Chancery consisted of the Lord Chancellor, not as a primus inter pares of many equity judges but as the Court itself, even though Masters of Chancery did much of the detailed work in the Lord Chancellor's name.  See Patrick Devlin, Jury Trial of Complex Cases, 80 Colum. L. Rev. at 50-51.

[67]The Lord Chancellor could override verdicts of the common-law courts by issuing injunctions, and the power struggle between the Court of Chancery and the courts of law came to a head during the reign of James I.  See F.W. Maitland, Equity: A Course of Lectures 9-10 (A.H. Chaytor & W.J. Whittaker eds., 1936).  As  F.W. Maitland, longtime professor of law at the University of Cambridge recapped the struggle in lectures he delivered in 1936:

> In James I's day occurred the great quarrel between Lord Chancellor Ellesmere and Chief Justice Coke which finally decided that the Court of Chancery was to have the upper hand over the courts of law.  If the Chancery was to carry out its maxims about trust and fraud it was essential that it should have a power to prevent men from going into the courts of law and to prevent men from putting in execution the judgments that they had obtained in courts of law.  In fraud or in breach of trust you obtain a judgment against me in a court of law; I complain to the Chancellor, and he after hearing what you have to say enjoins you not to put in force your judgment, says in effect that if you do put your judgment in force you will be sent to prison. . . .   [I]t was natural that the judges should take umbrage at this treatment of their judgments.  Coke declared that the man who obtained such an injunction was guilty of the offence denounced by the States of Praemunire, that of calling in question the judgment of the kin's courts in other courts (these statutes had been aimed at the Papal curia).  King James had now a wished-for opportunity of appearing as supreme over all his judges, and all his courts, and acting on the advice of Bacon and other great lawyers he issued a decree in favor of the Chancery.  From this time forward the Chancery had the upper hand.  It did not claim to be superior to the courts of law, but it could prevent men from going to those courts, whereas those courts could not prevent men from going to it.

F.W. Maitland, Equity: A Course of Lectures 9-10 (A.H. Chaytor & W.J. Whittaker eds., 1936).  See also Historical Essay on the Jurisdiction on the Court of Chancery: and Incidentally of the Other Courts at 39 ("[T]he Chancery may adjourn any Cause pending there at Common Law . . . .")(spelling and orthography modernized).

to Equity, 57 <u>Stan. L. Rev.</u> 2053 (2005).[68]  In a world with statutory penalties that did not permit

common-law courts to season justice with mercy or to make the punishment better fit the crime,

the equity courts drew on a tradition of equity stretching back to Aristotle and the Scholastics,

who defined equity as an invocation of justice where law fails on account of its generality.  <u>See</u>

Shanske at 2053.  <u>See also</u> Aristotle, <u>Nicomachean Ethics</u> 317 (G.P. Goold ed., H. Rackham

trans., 1982); Thomas Aquinas, <u>Summa Theologica</u> I-II, q. 96, art. 6.

Turf battles also raged over English law and equity courts' jurisdiction, as the Lord

Chancellors, head of the equity courts, interpreted equity jurisdiction broadly.  In the words of

Thomas More, the first lawyer to serve as the English Lord Chancellor, the scope of the equity

courts consisted of whatever could be "helped in Conscience; Fraud, Accident and things of

Confidence."  1 Rolle's Abridgement 374 (spelling modernized).  Blackstone, more enamored

with the common law than with equity, resisted:

> Again, it hath been said, that *fraud, accident,* and *trust* are the proper and peculiar
> objects of a court of equity.  But every kind of *fraud* is equally cognizable, and
> equally adverted to, in a court of law: and some frauds are only cognizable there,
> as fraud in obtaining a devise of land, which is always sent out of the equity

---

[68]The earliest Lord Chancellors were the English kings' personal chaplains and long thereafter were pulled from the clergy.  <u>See</u> Thomas Maddox, <u>History and Antiquities of the Exchequer of the Kings of England</u> 60 (1769)("In truth, in *England*, the Chancellor was the King's chief Chaplain, and had the superior Care both of the King's Chancery and of his Chapel.")(spelling and orthography modernized).  As Blackstone reported, "in the first place it is said that it is the business of a court of equity in England to abate the rigour of the common law" and "determines according to the spirit of the rule and not according to the strictness of the letter," "not bound by rules or precedents, but acts from the opinion of the judge founded on the circumstances of every particular case."    2 William Blackstone, Commentaries *430.  In the compendious <u>Historical Essay on the Jurisdiction on the Court of Chancery: and Incidentally of the Other Courts</u>, published in 1735, explicitly invested the Court of Chancery's jurisdictional rights in the natural right of English king to be the "sole Fountain of Justice within his Realm . . . having the Power of judging, not only according to the Rule of Law, but of Equity; both of which being in the King, as Sovereign, were afterwards settled in several Courts."  <u>Historical Essay on the Jurisdiction on the Court of Chancery: and Incidentally of the Other Courts</u> 6 (1735).

> courts to be there determined. Many *accidents* are also supplied in a court of law; as, loss of deeds, mistakes in receipts or accounts, wrong payments, deaths which make it impossible to perform a condition literally, and a multitude of other contingencies: and many cannot be relieved even in a court of equity; as, if by accident a recovery is ill suffered, a devise is ill executed, a contingent remainder destroyed, or a power of leasing omitted in a family settlement. A technical *trust* indeed, created by the limitation of a second use, was forced into a court of equity, in the manner formerly mentioned; and this species of trusts, extended by inference and construction, have ever since remained as a kind of *peculium* in those courts. But there are other trusts, which are cognizable in a court of law: as deposits, and all manner of bailments.

3 William Blackstone, Commentaries *431-32 (emphases in original). Justice Story had his own take on the division between law and equity in England in 1791. See 1 Joseph Story, Commentaries on Equity Jurisprudence, As Administered in England and America (1836).

In an academic treatise he wrote six years after his opinion in Parsons v. Bedford, Justice Story sided with Thomas More rather than with Blackstone on the scope of equity in England. See 1 Joseph Story, Commentaries on Equity Jurisprudence, As Administered in England and America § 29, at 28-29 (1836). He then went further, treading where even the saint had feared to tread, asserting that equity's jurisdiction is even broader than More's formulation, adding to fraud, accident, and trust

> [m]any cases of penalties and forfeitures; many cases of impending irreparable injuries, or mediated mischiefs; and many cases of oppressive proceedings, undue advantages and impositions, betrayals of confidence, unconscionable bargains; in all of which Courts of Equity will interfere and grant redress; but which the Common Law takes no notice of, or silently disregards.

1 Joseph Story, Commentaries on Equity Jurisprudence, As Administered in England in America § 29, at 28-29 (1836). In the nearly two centuries hither, other treatise writers have come to their own varying conclusions about the dividing line between law and equity that prevailed in English courts around the time of the Seventh Amendment's ratification. See, e.g., Thomas Carl Spelling, Treatise on Injunctions and Other Extraordinary Remedies §§ 569-70, at 479-80 (2d

ed. 1901).

> **G.  PRIMARY-SOURCE RESEARCH INTO ENGLISH LAW AND EQUITY CASES 1789-91 NEVERTHELESS PROVES DECISIVELY THAT BREACHES OF FIDUCIARY DUTY FELL WITHIN THE JURISDICTION OF THE ENGLISH EQUITY COURTS WHEN THE SEVENTH AMENDMENT WAS RATIFIED.**

The Plaintiffs and Defendants in this case capture the spirit of the historical jurisdictional debate between More and Blackstone.  Adjudicating whether breach of fiduciary duty would have been a legal or equitable claim in 1791 England does not require the Court to subscribe in the abstract to either jurisdictional philosophy.  Under the Granfinanciera v. Nordberg test, the key question instead is whether, as a practical an evidentiary matter, a cause would have been heard in an English court of law or court of equity in the few years leading up to 1791.  See Granfinanciera v. Nordberg 41 ("[W]e compare the statutory action to 18th-century actions brought in the court of England prior to the merger of the courts of law and equity.").  Thanks to storied British recordkeeping, the Court has access to detailed accounts of every case before England's two largest common-law courts and its Court of Chancery from the late eighteenth century via the English Reports and William Brown's compendious work on equity cases during the reign of King George III.  See 126 Eng. Rep. 58-404; 2 William Brown, Reports of Cases Argued and Determined in the High Court of Chancery 490-664.  The Court therefore can conduct a primary-source analysis of the cases of which each court system disposed.  The Court has undertaken such a analysis of all law and equity cases the English courts heard from 1789 to 1791, leading it to the firm conclusion that breach of fiduciary duty was a claim that -- despite the overlapping jurisdiction of English law and equity courts in 1791, as described above -- fell within the Court of Chancery's ambit.

In the first stage of its analysis, the Court tests the hypothesis that breach of fiduciary

duty was a legal claim in 1791 England.  English law courts of the era required a writ spelling

out the subject matter of each claim to accompany a case that a plaintiff brought before them.

See George Burton Adams, Origin of the English Courts of Common Law, 30 Yale L.J. 798, 800

(1921).  The English Reports preserve information about the writs underlying 266 cases that the

Court of Common Pleas[69] and the Court of the King's Bench[70] heard over the period 1789-1791.

Borrowing categorical divisions and coding from a leading law review article on Granfinanciera

v. Nordberg's historical test, the Court notes these 266 law cases fell into the categories as

captured in table 1 below.[71]

---

[69]The Court of Common Pleas was a law court established in the Magna Carta, 25 Edward I, cl. 17 (1215), that adjudicated private suits at Westminster, see 2 William Stubbs, Constitutional History of England in Its Origin and Development § 233, at 266 (1817). Traditionally, it had a jurisdictional monopoly over property cases, but by the end of the eighteenth century, it had expanded its reach to include additional writs as well.  See 2 William Stubbs, Constitutional History of England in Its Origin and Development § 233, at 266 (1817).

[70]The Court of King's Bench, another law court, formally had exclusive power to issue prerogative writs, but during the eighteenth century its docket increasingly mirrored the docket of the Court of Common Pleas.  See 9 William Searle Holdsworth, History of English Law at 4-23.  Part of this mirroring occurred because of encroachments that the Court of King's Bench made on other law courts over that time, most notably leveraging the action of ejectment to break the Court of Common Pleas' monopoly of jurisdiction over real-property cases.  See 9 William Searle Holdsworth, History of English Law at 4-23.  The other part of the mirroring occurred because of encroachments that other common-law courts made on the Court of the King's Bench's exclusive control over prerogative writs.  See 5 Giles Jacob, Law Dictionary 317 (1811)(1729).

[71]The cases that the table captures cover 126 Eng. Rep. 58-404 (reporting on cases from Roe on the Demise of Jordan v. Ward, 1 H. Bl. 95 (Jan. 24, 1789), to Goding v. Ferris, 2 H. Bl. 14 (Nov. 28, 1791)).

|  | Common Pleas | King's Bench |
|---|---|---|
| Assumpsit | 41% | 21% |
| Debt | 23% | 13% |
| Ejectment | 10% | 9% |
| Trespass | 10% | -- |
| Quare impedit[72] | 5% | -- |
| Replevin | 4% | 2% |
| Trespass on the case | 4% | 5% |
| Covenant | 3% | 8% |
| De essendo quietum de theolonio[73] | 1% | -- |
| Quo warranto | -- | 5% |
| Trover | -- | 3% |
| Issues from Chancery | -- | 2% |
| Total cases, 1789-1791 | 73 | 193 |
| Cases with only two parties | 66% | 67% |
| Median amount in controversy | £ 396 18s | £ 200 |

A few observations seem to leap right out of the table. First, despite their different origins and ostensibly different jurisdictions, the Court of Common Pleas and the Court of the King's Bench largely heard the same categories of cases by 1791: contract, real-property, and tort claims. See 126 Eng. Rep. at 58-404. Second, cases in the law courts tended to be simple, pitting only one plaintiff against one defendant. See 126 Eng. Rep. at 58-404. Third, the median amount in controversy in law cases tended to be small -- much smaller, as will be seen below, than the amount in controversy in the Court of Chancery. See 126 Eng. Rep. at 58-404. The most important observation to be drawn from table 1, however, concerns the dog that does not

---

[72]Quare impedit, literally "wherefore he hinders," is an English writ or action which lies for the patron of an advowson, where he or she has been disturbed in his or her right of patronage. See 3 William Blackstone, Commentaries *246, 248.

[73]De essendo quietum de theolonio is a writ which lay under English law for those who were by privilege free from the payment of a toll but were molested for payment of one. See Anthony Fitzherbert, New Natura Brevium 226 (1755).

bite.[74]   Nowhere among the 266 common law cases does one find a breach of fiduciary duty case, seemingly disproving the hypothesis that breach of fiduciary duty fells within the scope of England law courts in 1791.

To confirm or disconfirm this conclusion, the Court engages in a second stage of analysis, testing the hypothesis that breach of fiduciary duty was an equitable claim in 1791 England.   Unlike the more rule-bound law courts, and true to its original constitution as the "king's conscience" that would season justice with mercy when legal punishment did not fit the circumstances of a particular crime, the Court of Chancery did not require that plaintiffs submit writs specifying their claims' precise subject-matter.   See P. Tucker, Early History of the Court of Chancery: A Comparative Study, 115 English Hist. Rev. 791, 791 (2000).   Whatever the merits of this approach, it complicates the Court's effort to distill the main issue in each case the Court of Chancery heard between 1789 and 1791.   That difficulty notwithstanding, the Court energetically dove into a textual analysis of a random sample[75]of eighty of the 226 equity court

_____

[74]The "dog didn't bark" canon derives from a short story from Sir Arthur Conan Doyle, in which Sherlock Holmes deduces the identity of the villain after realizing that the dog of the house did not bark when the individual came to the house. See Sir Arthur Conan Doyle, Adventure of Silver Blaze, Complete Sherlock Holmes 347 (A.C. Doyle Memorial ed. 1960). The Supreme Court repeatedly has invoked this unofficial canon of statutory construction. See, e.g., Zuni Pub. Sch. Dist. No. 89 v. Dep't of Ed., 550 U.S. 81, 88, 127 S. Ct. 1534, 167 L. Ed. 2d 449 (2007); Scheidler v. National Organization for Women, 547 U.S. 9, 20, 126 S. Ct. 1264, 164 L. Ed. 2d 10 (2006).

[75]The Court completely randomized the case selection by subject matter but not by date. On the front end, the Court weighted the case selection toward 1789, when Congress was debating and drafting the Seventh Amendment. The Court also truncated cases as of November 15, 1791, one month before the Seventh Amendment was ratified, on the grounds that: (i) fast mail ships took twenty-five to thirty days to make a trip from London to New York in the late eighteenth century, see United Kingdom Hydrographic Office, Ocean Passages of the World (3d ed. 1973); and, consequently, (ii) even if reports of chancery court cases were immediately available upon disposition of a case -- as a counterfactual to the actual two-to-three-year publishing delay -- Americans would have had no knowledge of decisions before ratification of cases decided after November 1791.

The <u>Reports of Cases Argued and Determined in the High Court of Chancery</u> provides a case reporter citation only for the first case in each year's three court terms. As the Court can best discern, academic treatments of the reporter therefore universally have adopted a practice of citing the cases according to their position in the compendium, somewhat akin to modern citation format for unpublished cases in Westlaw and Lexis. The Court sees no sound reason not to adopt the same citation format and applies that format in this format. The following is a list of the non-trust cases in the subsample of eighty Court of Chancery opinions upon which the Court bases its analysis in this subsection, with the Court highlighting the main issue in each case for future reference:

1. <u>Duke of Leeds v. The Corporation of New Radnor</u>, 2 Bro. C.C. 518 (1789)(dealing with farm rent recovery);
2. <u>Debeze v. Mann</u>, 2 Bro. C.C. 519 (1789)(dealing with rehearing of earlier case on will);
3. <u>Pearson v. Bank of England</u>, 2 Bro. C.C. 529 (1789)(dealing with whether bank could demand transaction costs for paperwork regarding change of identity of a trust's executor and power of attorney);
4. <u>Hanbury v. Hanbury</u>, 2 Bro. C.C. 529 (1789)(dealing with interpretation of a will);
5. <u>Hodsden v. Lloyd</u>, 2 Bro. C.C. 534 (1789)(dealing with reversion of real estate transferred in a marriage contract upon spouse's death);
6. <u>Hoskins v. Featherstone</u>, 2 Bro. C.C. 552 (1789)(dealing with local churchmen seeking injunction against rector's widow to stay waste of church property);
7. <u>Nisbet v. Smith</u>, 2 Bro. C.C. 579 (1789)(dealing with property encumbrance);
8. <u>Ex parte Clowes</u>, 2 Bro. C.C. 595 (1789)(dealing with bankruptcy);
9. <u>Ex parte Leeke</u>, 2 Bro. C.C. 596 (1789)(dealing with bankruptcy);
10. <u>Ex parte Moore</u>, 2 Bro. C.C. 597 (1789)(dealing with bankruptcy);
11. <u>Ex parte Keith</u>, 2 Bro. C.C. 600 (1789)(dealing with bankruptcy);
12. <u>Lewis v. King</u>, 2 Bro. C.C. 601 (1789)(dealing with mortgage in will);
13. <u>Craig v. Bolton</u>, 2 Bro. C.C. 604 (1789)(dealing with collateral for costs incurred);
14. <u>Ex parte English</u>, 2 Bro. C.C. 605 (1789)(dealing with bankruptcy);
15. <u>Ex parte Harrison</u>, 2 Bro. C.C. 615 (1789)(dealing with bankruptcy);
16. <u>Lieutand v. Agassiz</u>, 2 Bro. C.C. 616 (1789)(dealing with devise of property in will);
17. <u>Foster v. Foster</u>, 2 Bro. C.C. 617 (1789)(dealing with payment of back rent from estate upon death);
18. <u>Curtis v. Curtis</u>, 2 Bro. C.C. 620 (1789)(dealing with right of survivorship interest of widow in her dower);
19. <u>Revet v. Braham</u>, 2 Bro. C.C. 640 (1789)(dealing with ejectment of heir);
20. <u>Hankin v. Middleditch</u>, 2 Bro. C.C. 641 (1789)(dealing with motion to examine a witness);
21. <u>Scott v. Nesbit</u>, 2 Bro. C.C. 641 (1789)(dealing with debt payment from estate);
22. <u>Tourle v. Rand</u>, 2 Bro. C.C. 650 (1789)(dealing with mortgage attached to a tenancy for life);
23. <u>Adderley v. Clavering</u>, 2 Bro. C.C. 659 (1789)(dealing with legitimacy of a fine for a lease renewal);
24. <u>Vernon v. Vernon</u>, 2 Bro. C.C. 659 (1789)(dealing with rental fee apportionment among estate's tenants entail);

25. <u>Minet v. Hyde</u>, 2 Bro. C.C. 664 (1789)(dealing with whether spouse can recover portion of an inherited state when heir is living abroad);

26. <u>Ex parte Smith</u>, 3 Bro. C.C. 1 (1789)(dealing with bankruptcy);

27. <u>Fettiplace v. Gorges</u>, 3 Bro. C.C. 8 (1789)(dealing with right of wife to devise property the husband gave her without his assent);

28. <u>Sedgwick v. Watkins</u>, 3 Bro. C.C. 12 (1789)(dealing with whether court can receive a wife's affidavit against her husband);

29. <u>Delancy v. Wallis</u>, 3 Bro. C.C. 13 (1789)(dealing with whether affidavit must accompany subpoena motion);

30. <u>Colman v. Sarel</u>, 3 Bro. C.C. 13 (1789)(stating Court of Chancery will not carry into execution a voluntary deed);

31. <u>Vanderzee v. Willis</u>, 3 Bro. C.C. 21 (1789)(dealing with extent of debtors' lien on an estate);

32. <u>Goate v. Fryer</u>, 3 Bro. C.C. 23 (1789)(dealing with whether execution of a will can be stayed by debt holders);

33. <u>Burke v. Vickars</u>, 3 Bro. C.C. 24 (1789)(dealing with whether affidavit must accompany subpoena motion);

34. <u>Ray v. Fenwick</u>, 3 Bro. C.C. 25 (1789)(dealing with assignment of bond after death);

35. <u>Doran v. Ross</u>, 3 Bro. C.C. 28 (1789)(Court of Chancery cannot vary expression, in this case a gendered pronoun, in will without recital that suggests it can);

36. <u>Cross v. Hudson</u>, 3 Bro. C.C. 31 (1789)(dealing with payments to executor of an estate);

37. <u>Dungey v. Angove</u>, 3 Bro. C.C. 36 (1789)(dealing with bill of interpleader);

38. <u>Lee v. Alston</u>, 3 Bro. C.C. 38 (1789)(dealing with whether plaintiff is entitled to inheritance in tail, though with intermediate remainders which might arise);

39. <u>Williams v. Farrington</u>, 3 Bro. C.C. 39 (1789)(dealing with expiration of discovery order in trial with law and equity elements and, therefore, being heard simultaneously in different courts);

40. <u>Peters v. Erving</u>, 3 Bro. C.C. 55 (1790)(dealing with attempt to collect debt from American after Revolutionary War);

41. <u>Samuda v. Furtado</u>, 3 Bro. C.C. 70 (1790)(dealing with plea for payment of sum into ecclesiastical court);

42. <u>Mussel v. Morgan</u>, 3 Bro. C.C. 75 (1790)(dealing with whether decree obtained through fraud can be set aside by petition);

43. <u>Hughes v. Hughes</u>, 3 Bro. C.C. 80 (1790)(dealing with whether receiver appointed by court was at liberty to distrain);

44. <u>Clinton v. Hooper</u>, 3 Bro. C.C. 201 (1790)(dealing with whether husband could devise property despite terms of contract by which his wife gave him the property);

45. <u>Seal v. Brownton</u>, 3 Bro. C.C. 215 (1791)(dealing with heir's suit against devisee on account of rents and profits);

46. <u>Bridge v. Abbot</u>, 3 Bro. C.C. 225 (1791)(dealing with disposition of residue of will after death of heir).

The following is a list of the trust cases in the subsample of eighty Court of Chancery opinions upon which the Court bases its analysis in this subsection, with the Court highlighting the main issue in each case for future reference:

1. <u>Stratton v. Hale</u>, 2 Bro. C.C. 490 (1789)(dealing with recovery of dividends of trust);
2. <u>Attorney General v. Green and University College, Oxon.</u>, 2 Bro. C.C. 492 (1789)(dealing with trust of advowsons at University of Oxford);
3. <u>Powell v. Cleaver</u>, 2 Bro. C.C. 500 (1789)(dealing with educational trust for child);
4. <u>Coote v. Boyd</u>, 2 Bro. C.C. 522 (1789)(dealing with age of maturity for trust to vest);
5. <u>Slocombe v. Glubb</u>, 2 Bro. C.C. 545 (1789)(dealing with trustees' suit to enforce covenants in marriage contract transferred to minor husband once he reached age of maturity);
6. <u>Attorney General v. Bayley</u>, 2 Bro. C.C. 554 (1789)(dealing with interpretation of will terms as they apply to trust when condition precedent is not met);
7. <u>Whitchurch v. Bevis</u>, 2 Bro. C.C. 559 (1789)(dealing with annuity trust);
8. <u>Knight v. Ellis</u>, 2 Bro. C.C. 570 (1789)(dealing with educational trust);
9. <u>Ward v. St. Paul</u>, 2 Bro. C.C. 578 (1789)(dealing with naming guardian for child with trust);
10. <u>Sprange v. Barnard</u>, 2 Bro. C.C. 585 (1789)(dealing with annuity trust);
11. <u>Madoc v. Jackson</u>, 2 Bro. C.C. 588 (1789)(dealing with survivorship rights in trust);
12. <u>Robinson v. Taylor</u>, 2 Bro. C.C. 589 (1789)(dealing with allegedly faithless trustee);
13. <u>Billinghurst v. Walker</u>, 2 Bro. C.C. 604 (1789)(dealing with trust continuance after marriage);
14. <u>Seton v. Seton</u>, 2 Bro. C.C. 611 (1789)(dealing with promissory note in trust);
15. <u>Hill v. Chapman</u>, 2 Bro. C.C. 612 (1789)(dealing with gifts to trustee);
16. <u>Hughes v. Doulben</u>, 2 Bro. C.C. 614 (1789)(dealing with debts to be paid out of trust);
17. <u>Dean v. Dalton</u>, 2 Bro. C.C. 635 (1789)(dealing with allegedly faithless trustee);
18. <u>Tritton v. Foote</u>, 2 Bro. C.C. 637 (1789)(dealing with whether trust subject to covenant);
19. <u>Bostock v. Blakeney</u>, 2 Bro. C.C. 653 (1789)(dealing with trustees of minor trust who spent money on repairs and improvements on real estate although the trust's terms did not permit this expense);
20. <u>Viner v. Francis</u>, 2 Bro. C.C. 658 (1789)(dealing with whether children born to widow after husband's death should receive portion of trust);
21. <u>Ex parte Bolton School</u>, 2 Bro. C.C. 663 (1789)( concluding that Lord Chancellor has summary power to vary provisions relative to trust but not to alter the trust's general constitution);
22. <u>Molesworth v. Molesworth</u>, 3 Bro. C.C. 5 (1789)(dealing with moral conditions on trust);
23. <u>Dickenson v. Dickenson</u>, 3 Bro. C.C. 19 (1789)(dealing with minor trust);
24. <u>Jolliffe v. East</u>, 3 Bro. C.C. 26 (1789)(dealing with disposition of assets in joint trust);
25. <u>Bennet v. Batchelor</u>, 3 Bro. C.C. 29 (1789)(dealing with executors as trustees);
26. <u>Earl of Lonsdale v. Church</u>, 3 Bro. C.C. 42 (1789)(dealing with breach of fiduciary duty and unjust enrichment by fired trustee who used trust money to buy securities at interest and then to take resulting interest for his own use);
27. <u>Wyndham v. Wyndham</u>, 3 Bro. C.C. 58 (1790)(dealing with disposition of trust);
28. <u>Jones v. Jones</u>, 3 Bro. C.C. 80 (1790)(dealing with delivery of securities to executor);
29. <u>Boyle v. Bishop of Peterborough</u>, 3 Bro. C.C. 243 (1791)(dealing with unequal distribution of trust between son and daughter).

cases[76] before the Court of Chancery during that three-year stretch.[77]

The contrast between the cases heard in the law and equity courts is stark. Although the Court of Chancery, not requiring specific writs, allowed for a greater range of cases than the common-law courts allowed, thirty-nine percent of the cases in the sample deal with trusts. See supra note 75 (listing and briefly describing each trust case). A claim of breach of fiduciary duty arose in three of the trust cases just in the Court's eighty-case sample. See Dean v. Dalton, 2 Bro. C.C. 635 (1789); Bostock v. Blakeney, 2 Bro. C.C. 653 (1789); Earl of Lonsdale v. Church, 3 Bro. C.C. 42 (1789).

In the first case chronologically, Dean v. Dalton, 2 Bro. C.C. 635 (1789), a testatrix bequeathed all her possessions onto the defendants via a trust and appointed her sisters as joint executrixes of her will. See 2 Bro. C.C. at 635. When one of the sisters died, the testatrix made

---

Last, the following is a list of the securities and partnership cases in the subsample of eighty Court of Chancery opinions upon which the Court bases its analysis in this subsection, with the Court highlighting the main issue in each case for future reference:

1. Bancroft v. Wentworth, 3 Bro. C.C. 11 (1789)(dealing with stock-jobber who took five thousand pounds from different investors, and then charged two thousand pounds for fees from purchase and sale of stock, and holding that the Act of the 7th Geo. 2, against stock-jobbing, gives the Court of Chancery jurisdiction to hear the case);
2. Ryan v. Mackmath, 3 Bro. C.C. 15 (1789)(dealing with disagreement over whether a corporation is joint partnership);
3. Jones v. Jones, 3 Bro. C.C. 80 (1790)(dealing with delivery of securities to executor).

[76]The Court has studied a selection of eighty of the opinions to examine the categories of causes heard before the Court of Chancery from 1789 to 1791, a period chosen to: (i) parallel that period in academic treatments of the law courts; and (ii) capture the entire period from the ratification of the Constitution to the ratification of the Seventh Amendment

[77]These cases can be found in the second and third volumes of William Brown's compendious work on equity cases during the reign of King George III. See 2 William Brown, Reports of Cases Argued and Determined in the High Court of Chancery 490-664 (1794)(reporting from Stratton v. Hale (1789) to Minet v. Hyde (1789); 3 id. at 1-434 (reporting from Ex parte Smith (1789) to Franklin v. Frith (1791)).

a codicil to her will appointing the defendants as co-executors of her will alongside her living sister.  <u>See</u> 2 Bro. C.C. at 635.  The second sister subsequently died, with the testatrix also boarding a skiff across the Styx before she could appoint another executor/executrix to replace her.  <u>See</u> 2 Bro. C.C. at 635.  After the testatrix' death, the defendants allegedly plundered her possessions, ostensibly to pay off the testatrix' debts but in a measure much larger than the amount of debt.  <u>See</u> 2 Bro. C.C. at 635.  The plaintiffs, as next of kin to the testatrix, brought a suit against the defendants for breaching their duty as executors of the trust.  <u>See</u> 2 Bro. C.C. at 635.

In the second case chronologically, <u>Bostock v. Blakeney</u>, 2 Bro. C.C. 653 (1789), a field marshal created a trust fund for his minor son, with right of survivorship in his son's sons -- or in the absence of sons, daughters -- and mandated that the trustees should invest the trust money only in the purchase of property.  <u>See</u> 2 Bro. C.C.at  653-54.   They faithfully invested the trust money in manors that the minor son wished to buy, but also allowed the son to sell portions of the trust pay for property improvements and personal expenses.  <u>See</u> 2 Bro. C.C.at  654  When the son died without a son of his own, his entire estate passed to his daughter and her husband.  <u>See</u> 2 Bro. C.C.at  655.  Two years later, the daughter and her husband charged the trustees with breaching their fiduciary duty qua trustees.  <u>See</u> 2 Bro. C.C.at  655.

In the third case chronologically, <u>Earl of Lonsdale v. Church</u>, 3 Bro. C.C. 41 (1789), the defendant, a receiver of a public trust for repairing a harbor, siphoned off money from the trust to invest in securities at interest and then disposed of the interest for his personal use.  <u>See</u> 3 Bro. C.C. at 41.  The trustees fired the receiver after they sought to withdraw money from the trust for harbor maintenance only to discover that nearly all the trust money was invested elsewhere in the receiver's name.  <u>See</u> 3 Bro. C.C. at 42.   The trustees brought suit against the receiver for

disgorgement of interest, on the theory that the receiver effectively was another trustee.  <u>See</u> 3

Bro. C.C. at 43.  The Solicitor General argued, on the defendant's behalf, that the Court of

Chancery lacked jurisdiction over the case, insisting that the receiver could not be a trustee,

because he was a public officer.  <u>See</u> 3 Bro. C.C. at 43.  The Lord Chancellor rejected the

Solicitor General's jurisdictional argument, considered the receiver to be a trustee, and required

the receiver to disgorge the interest.  <u>See</u> 3 Bro. C.C. at 43-45.

The Court agrees with the Plaintiffs and treatise writers that the most natural analogue to

a modern corporate fiduciary duty claim in 1791 English is a trust claim.  <u>See</u> Tr. at 414:2-5

(Kagen); 1 Dobbs <u>Dobbs Law of Remedies</u> §2.6(3), at 154-65 (2d ed. 1993).  If this assessment

is correct, the evidence is overwhelming that the Court of Chancery rather than the Court of

Common Pleas or the Court of the King's Bench heard the closest analogue to corporate

fiduciary duty claims in 1791: thirty-nine percent of equity court cases dealt with trusts, whereas

zero percent of law court cases dealt with trusts.  <u>Compare</u> table 1, <u>supra</u>, <u>with</u> table 2, <u>supra</u>.

Even if this assessment is otherwise, however, the analogy of corporate fiduciary duty to trusts

fails in its broadest scope; that three breach-of-fiduciary-duty claims emerged out of the Court's

midsize sample of Court of Chancery cases while none arose out of the entire universe of

common-law cases 1789-1791 suggests that breach-of-fiduciary-duty claims properly fell within

the Court of Chancery's ambit in 1791.  <u>See</u> <u>Bancroft v. Wentworth</u>, 3 Bro. C.C. 11 (1789);

<u>Ryan v. Mackmath</u>, 3 Bro. C.C. 15 (1789); <u>Jones v. Jones</u>, 3 Bro. C.C. 80 (1790).  The additional

presence of three securities cases on the Court of Chancery's docket during the Court's case

sample fortifies this suggestion.  <u>See</u> 2 William Brown, <u>Reports of Cases Argued and</u>

<u>Determined in the High Court of Chancery</u> at 490-664.  The Court therefore concludes that,

under <u>Granfinanciera v. Nordberg</u>'s first prong, the Plaintiffs' breach-of-fiduciary-duty claims in

this case would have been considered equitable claims in 1791 England.

**II. THE REMEDY THAT THE PLAINTIFFS SEEK IS LEGAL IN NATURE, AND OVERRIDES THE HISTORICAL ANALYSIS TO MAKE THE PLAINTIFFS' CLAIMS LEGAL AND THEREFORE SUBJECT TO THE SEVENTH AMENDMENT'S JURY TRIAL RIGHT FOR SUITS AT COMMON LAW.**

In its most recent formulation of the test whether a party has a Seventh Amendment right to a jury trial in a civil matter, in Granfinanciera v. Nordberg, the Supreme Court quotes Parsons v. Bedford, holding: "We have consistently interpreted the phrase 'Suits at common law' to refer to 'suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered,'" Granfinanciera v. Nordberg, 492 U.S. at 41 (quoting Parsons v. Bedford, 28 U.S. (3 Peters) at 443)(emphasis in Parsons v. Bedford), adding that "the thrust of the Amendment was to preserve the right to jury trial as it existed in 1791," Granfinanciera v. Nordberg, 492 U.S. at 41 (quoting Curtis v. Loether, 415 U.S. at 193). The Supreme Court then clarified that the Seventh Amendment "also applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." Granfinanciera v. Nordberg, 492 U.S. at 42 (citing Curtis v. Loether, 415 U.S. at 193). The Supreme Court then provided the two-part test on which both the Plaintiffs and the Defendants base their discussion during the hearing:

> First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second stage of this analysis is more important than the first. If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as a factfinder.

Granfinanciera v. Nordberg, 492 U.S. at 42.

In the first part of its analysis supra, the Court examined a total of 346 cases brought into English law and equity courts from 1789 to 1791, and concluded that the Plaintiffs' breach-of-fiduciary-duty claims would have fallen within the English equity courts' jurisdiction in 1791. That conclusion does not, however, end the Court's analysis under Granfinanciera v. Nordberg. The Granfinanciera v. Nordberg test's second prong requires that the Court next evaluate whether the remedy that the Plaintiffs seek is equitable or legal, viewing how state courts would characterize the claims only as persuasive evidence rather than binding upon the Court, because the Seventh Amendment, like some other portions of the Bill of Rights, is not incorporated against the States. See Granfinanciera v. Nordberg, 492 U.S. at 42; Simler v. Conner, 372 U.S. 221, 222 (1963).[78] If the claims' nature is equitable, then the Court's task is simple: both prongs

_____

[78]When the Bill of Rights was adopted, none of the rights within it applied against state governments. See Barron v. Baltimore, 32 U.S. 243, 250 (1833)(Marshall, C.J.)(holding that the first ten "amendments contain no expression indicating an intention to apply them to the State governments" and that, thus, "[t]his court cannot so apply them"). Cf. U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion . . . ." (emphasis added)). After the post-Civil War passage of the Fourteenth Amendment to the Constitution, however, the Supreme Court began using that Amendment's Due Process Clause, see U.S. Const. amend. XIV ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." (emphasis added)), to "incorporate" the various individual liberties which the Bill of Rights contains against the states, e.g., McDonald v. City of Chicago, 561 U.S. 742, 752 (2010)(Alito, J.).

The Supreme Court did not incorporate the entire Bill of Rights in one fell swoop, however, but instead relied on a piecemeal process of "selective incorporation" -- basically, incorporating rights against the states one at a time, as the opportunities to do so arose. McDonald v. City of Chicago, 561 U.S. at 752. The standard whether a Bill of Rights provision should be incorporated is whether the right is "implicit in the concept of ordered liberty," and "so rooted in the traditions and conscience of our people as to be ranked as fundamental." McDonald v. City of Chicago, Ill., 561 U.S. at 760. See Washington v. Glucksberg, 521 U.S. 702, 721 (1997); Duncan v. Louisiana, 391 U.S. 145, 149 (1968); Palko v. Connecticut, 302 U.S. 319, 325 (1937). To date, the Supreme Court has incorporated almost all of the Bill of Rights' provisions, including: the First Amendment to the Constitution's Free Speech Clause, see Gitlow v. New York, 268 U.S. 652, 666 (1925), its Free Exercise Clause, see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940), its Establishment Clause, see Everson v. Bd. of Educ., 330 U.S. 1, 16

(1947), and its guarantees of freedom of the press, see Near v. Minnesota, 283 U.S. 697, 707 (1931), freedom of assembly, see DeJonge v. Oregon, 299 U.S. 353, 365 (1937), and the right to petition the government for redress of grievances, see Edwards v. South Carolina, 372 U.S. 229, 237 (1963); the Second Amendment to the Constitution's right to bear arms, see McDonald v. City of Chicago, 561 U.S. at 742; the Fourth Amendment to the Constitution's right against unreasonable search and seizure, see Wolf v. Colorado, 338 U.S. 25, 27-28 (1949), its Warrant Clause, see Aguilar v. Texas, 378 U.S. 108, 110 (1964), and even, to some extent, its remedial gloss, the exclusionary rule, see Mapp v. Ohio, 367 U.S. 643, 655 (1961); the Fifth Amendment to the Constitution of the United States' privilege against self-incrimination, see Miranda v. Arizona, 348 U.S. 436, 467 (1966)(creating new anti-self-incrimination rights and immediately applying them against the states); Griffin v. California, 380 U.S. 609, 615 (1965)(applying pre-established anti-self-incrimination rights against the states), its Double Jeopardy Clause, see Benton v. Maryland, 395 U.S. 784, 796 (1969), and Takings Clause, see Chi., Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. 226, 258 (1897); the Sixth Amendment to the Constitution's rights to a public trial, see In re Oliver, 333 U.S. 257, 273 (1948), to assistance of counsel, see Gideon v. Wainwright, 372 U.S. 335, 343 (1963), to trial by jury, see Duncan v. Louisiana, 391 U.S. 145, 148-49 (1968), and to compulsory process, see Washington v. Texas, 388 U.S. 14, 19 (1967), and its Speedy Trial Clause, see Klopfer v. North Carolina, 386 U.S. 213, 222-23 (1967), and Confrontation Clause, see Pointer v. Texas, 380 U.S. 400, 403-04 (1965); and the Eighth Amendment's Cruel and Unusual Punishments Clause, see Robinson v. California, 370 U.S. 660, 666-67 (1962), and Excessive Bail Clause, see Schilb v. Kuebel, 404 U.S. 357, 365 (1971).

What remains is a collection of seven rights that have either not been incorporated or whose incorporation status is unclear. First, the Third Amendment to the Constitution's right to be free from quartering of soldiers in private homes, unsurprisingly, is not frequently invoked. The United States Court of Appeals for the Second Circuit has held that the Third Amendment is incorporated, and the Tenth Circuit has suggested that it is, but the Supreme Court has not addressed the issue. See United States v. Nichols, 841 F.2d 1485, 1510 n.1 (10th Cir. 1988); Engblom v. Carey, 677 F.2d 957, 961 (2d Cir. 1982). Second, the Supreme Court has expressly held that the Fifth Amendment's right to indictment by grand jury does not apply against the states. See Hurtado v. California, 110 U.S. 516, 538 (1884). Third, the Sixth Amendment's Vicinage Clause does not appear to have been incorporated -- and the Court agrees with this conclusion -- although neither the Supreme Court nor the Tenth Circuit has commented on the subject. See Caudill v. Scott, 857 F.2d 344, 346 (6th Cir. 1988); Cook v. Morrill, 783 F.2d 593, 595-96 (5th Cir. 1986); Zicarelli v. Dietz, 633 F.2d 312, 325-26 (3d Cir. 1980). Fourth, the Supreme Court has held that the Constitution imposes one condition on federal criminal juries that it does not impose on their state counterparts: that their verdicts be unanimous. See Williams v. Florida, 399 U.S. 78, 103 (1970). These unincorporated Sixth Amendment "rights" are unique, in that they have no basis in the Sixth Amendment's text; the Supreme Court read a penumbra onto the Seventh Amendment's use of "trial[] by . . . jury," which it applies against the federal government but not against the states. U.S. Const. amend. VI. Fifth, and probably the most important unincorporated right, the Seventh Amendment to the Constitution's right to a civil jury trial -- and its right against re-examination of a jury verdict, although that right has little meaning without a broader jury-trial right -- does not apply against the states. See Minneapolis & St. Louis R.R. Co. v. Bombolis, 241 U.S. 211, 218 (1916). Sixth, "[t]here is a

surprising amount of confusion as to whether the Excessive Fines Clause has been incorporated." Reyes v. N. Tex. Tollway Auth., 830 F. Supp. 2d 194, 206 (N.D. Tex. 2011)(Fish, J.).

This court previously resolved the confusion as to whether the Excessive Fines Clause has been incorporated. In Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257 (1989)("Browning-Ferris"), the Supreme Court held that the Excessive Fines Clause does not place limits on punitive damages in suits between private parties. 492 U.S. at 260. The Supreme Court did not address incorporation, but the Honorable Sandra Day O'Connor, then-Associate Justice of the Supreme Court, addressed the issue. The case involved a diversity suit and, while the majority saw no reason to delve into the incorporation issue -- the trial, after all, occurred in federal court -- Justice O'Connor apparently felt that, because Vermont state law had supplied the substantive law giving rise to the punitive damages, the incorporation issue was a threshold question. The majority declined to address the issue:

> Because of the result we reach today, we need not answer several questions that otherwise might be necessarily antecedent . . . . We shall not decide whether the Eighth Amendment's prohibition on excessive fines applies to the several States through the Fourteenth Amendment, nor shall we decide whether the Eighth Amendment protects corporations as well as individuals.

Browning-Ferris, 492 U.S. at 276 n.22. Justice O'Connor did not perform much analysis, but she made her position on the issue clear:

> Since Robinson, the Cruel and Unusual Punishments Clause has been regularly applied to the States, most notably in the capital sentencing context. In addition, the Court has assumed that the Excessive Bail Clause of the Eighth Amendment applies to the States. I see no reason to distinguish one Clause of the Eighth Amendment from another for purposes of incorporation, and would hold that the Excessive Fines Clause also applies to the States.

Browning-Ferris, 492 U.S. at 284 (O'Connor, J., concurring in part and dissenting in part, joined by Stevens, J.)(citation omitted). Before Browning-Ferris, apparently no court -- either federal or state -- had addressed whether the Excessive Fines Clause is incorporated. This gap in the case law can perhaps be explained by the fact that -- much like the Seventh Amendment's right to a civil jury trial -- almost every state has an equivalent to the Clause in its state constitution. See Browning-Ferris, 492 U.S. at 264 & n.5.

Over a span of about three years beginning roughly a decade after Browning-Ferris, the United States Courts of Appeals for the Fifth, Seventh, and Ninth Circuits each held that the Excessive Fines Clause is incorporated against the states. See Watson v. Johnson Mobile Homes, 284 F.3d 568, 572 (5th Cir. 2002); Wright v. Riveland, 219 F.3d 905, 915-19 (9th Cir. 2000); Towers v. City of Chicago, 173 F.3d 619, 623-24 (7th Cir. 1999). More importantly, around the same time, the Supreme Court issued a seemingly authoritative word on the matter. In Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424 (2001)("Cooper"), the Honorable John Paul Stevens, then-Associate Justice of the Supreme Court -- who had been the sole Justice to join Justice O'Connor's opinion in Browning-Ferris -- wrote for the majority that,

———————————————

> [d]espite the broad discretion that States possess with respect to the imposition of criminal penalties and punitive damages, the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes substantive limits on that discretion. That Clause makes the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishments applicable to the States.

Cooper, 532 U.S. at 433-34 (citation omitted).

Although this proclamation would seem to have closed discussion on the question of incorporation, the Supreme Court reopened it again in 2010. In McDonald v. City of Chicago, the Supreme Court welcomed the Second Amendment's right to bear arms into the pantheon of incorporated rights (it remains its newest member). The Honorable Samuel A. Alito, Jr., Associate Justice of the Supreme Court, writing for the majority, described the doctrine of selective incorporation in detail, noting:

> In addition to the right to keep and bear arms (and the Sixth Amendment right to a unanimous jury verdict), the only rights not fully incorporated are (1) the Third Amendment's protection against quartering of soldiers; (2) the Fifth Amendment's grand jury indictment requirement; (3) the Seventh Amendment right to a jury trial in civil cases; and (4) the Eighth Amendment's prohibition on excessive fines.

> We never have decided whether the Third Amendment or the Eighth Amendment's prohibition of excessive fines applies to the States through the Due Process Clause. See Browning-Ferris, 492 U.S. at 276, n.22 (declining to decide whether the excessive-fines protection applies to the States).

McDonald v. City of Chicago, Ill., 561 U.S. at 765 n.13. The most recent word from the Supreme Court is, thus, that the right against excessive fines is "not fully incorporated," because the Supreme Court "never ha[s] decided whether" it is incorporated. 561 U.S. at 765 n.13. See 2 William J. Rich, MODERN CONSTITUTIONAL LAW § 26:3 n.14 (3d ed.)(Incorporation of the Bill of Rights)(listing the right against excessive fines as an unincorporated right); 1 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, CRIMINAL PROCEDURE § 2.6(b) (3d ed.) (Guarantees not yet incorporated)(listing the Excessive Fines Clause).

That the Supreme Court has not yet issued a case expressly incorporating the Excessive Fines Clause, however, does not mean that it is not incorporated. It seems to the Court that there are three rungs on the incorporation ladder: (i) rights that the Supreme Court has expressly incorporated; (ii) rights on which the Supreme Court has either remained silent or has stated that they "remain unincorporated," "have not yet been incorporated," or "are not incorporated"; and (iii) rights that the Supreme Court has expressly held do not apply against the states. Most rights in the Bill of Rights are now in the first category. The Third Amendment's protection against quartering soldiers, Sixth Amendment's Vicinage Clause, and the Eight Amendment's Excessive Fines Clause are the second category. The Fifth Amendment's grand-jury right, the Sixth Amendment's rights to a unanimous, twelve-person criminal jury, and the Seventh Amendment's civil jury right are in the third category.

The Supreme Court's placement of rights into the first and third categories constitutes

legal holdings on issues of federal law, and thus binds all state and federal courts nationwide. The Court notes that, while the third category is binding as a matter of vertical stare decisis -- no federal court, nor technically any state court, may hold that, e.g., the federal constitutional grand-jury right applies to the states, because there is a Supreme Court case, Hurtado v. California, which expressly holds to the contrary -- the vitality of those cases, as a matter of horizontal stare decisis, is suspect. See McDonald v. City of Chicago, Ill., 561 U.S. at 765 n.13 ("Our governing decisions regarding the Grand Jury Clause of the Fifth Amendment and the Seventh Amendment's civil jury requirement long predate the era of selective incorporation."). The second category, however, reflects the Supreme Court's decision not to pass on the incorporation question -- and subsequent acknowledgements of the decision not to pass on the question -- as a matter of constitutional avoidance. These decisions do not constitute "holdings" and thus do not bind either the state or federal courts. In fact, several federal appellate courts have held that rights in the second category are incorporated. See United States v. Nichols, 841 F.2d 1485, 1510 n.1 (10th Cir. 1988)(Third Amendment); Engblom v. Carey, 677 F.2d at 961 (same); Caudill v. Scott, 857 F.2d at 346; Cook v. Morrill, 783 F.2d at 595-96 (Vicinage Clause); Zicarelli v. Dietz, 633 F.2d at 325-26 (same); Watson v. Johnson Mobile Homes, 284 F.3d at 572 (Excessive Fines Clause); Wright v. Riveland, 219 F.3d at 915-19 (same); Towers v. City of Chicago, 173 F.3d at 623-24 (same).

Two particularities of the incorporation context often obfuscate this seemingly mundane observation -- that the Supreme Court's avoidance of a question is not binding as a negative answer to that question. First, only the Supreme Court -- and not the Courts of Appeals -- can bind state courts, even on matters of federal law (no federal court, including the Supreme Court, can bind state courts on matters of state law). See Steffel v. Thompson, 415 U.S. 452, 482 n.3 (1974)(Rehnquist, J., joined by Burger, C.J., concurring); Perez v. Ledesma, 401 U.S. 82, 125 (1971)(Brennan, J., joined by White & Marshall, JJ., dissenting)(referring to "the persuasive force" of a decision of a lower federal court on state courts); Daniel J. Meltzer, State Court Forfeitures of Federal Rights, 99 HARV. L. REV. 1130, 1231 n.495 (1986); David L. Shapiro, State Courts and Federal Declaratory Judgments, 74 NW. U. L. REV. 759, 771 (1979). At least some state courts consider themselves bound by federal lower-court interpretations of federal law; it is not clear whether they view federal district court opinions, or only intermediate-appellate decisions, as binding. See Handy v. Goodyear Tire & Rubber Co., 160 So. 530 (Ala. 1935)(holding that the federal appellate courts' "decision[s] involv[ing] construction and application of [a] federal statute . . . [are] binding on state courts"). The Supreme Court of Utah expressed a similar opinion:

> If, therefore, there is a decision from a federal court which is decisive of the question here, and especially if the federal decision is one that is more recent than the one cited from a state court, it is our duty to follow the federal court rather than the state court, since the question involved is one upon which the federal courts have the ultimate right to speak.

Kuchenmeister v. Los Angeles & S.L.R., 172 P. 725, 727 (Utah 1918). This rule -- that only the Supreme Court can bind the states -- is always true -- its application is not limited to decisions about incorporation, but its impact in the incorporation context virtually nullifies any decision that the lower federal courts might make whether a right is incorporated. Because the only effect

of a holding that a right is incorporated is that the right applies against the state -- the holding says nothing about the right's substance or scope -- and because the state courts are free to ignore lower federal court holdings on the issue, the only binding effect that such a holding has is the potential creation of a federal court-only civil cause of action against the state; the rights that the lower federal courts incorporate cannot even give rise to federal habeas relief. <u>See</u> Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("[A] writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted . . . unless the adjudication . . . was contrary to . . . clearly established Federal law, <u>as determined by the Supreme Court of the United States</u> . . . ." (emphasis added)).

To some extent, this situation always exists between the lower federal courts and the state courts; for example, if the Supreme Court of New Mexico interpreted the Supreme Court's First Amendment precedent as not protecting expressive activity *X*, and the Tenth Circuit interpreted the First Amendment to protect *X*, then citizens that New Mexico punished for partaking in *X* would be limited to the federal courts in seeking recourse. That example, however, follows the pattern that the Court already laid out as being the only effective result of a lower federal court incorporation holding: case-by-case resolution of individual claims in the federal courts. The more systemic impacts that judicial opinions often have -- the ones that have an effect on individuals beyond those who come directly before the courts, such as striking down statutes and invalidating programs -- would seem to be off the table as it relates to rights that only the lower federal courts have incorporated. For example, the Second Circuit held that the Third Amendment's protection against quartering soldiers is incorporated against the states. <u>See</u> <u>Engblom v. Carey</u>, 677 F.2d at 961. While that holding may seem to entail that the Third Amendment prohibits the states of Connecticut, New York, and Vermont from quartering soldiers in private residences, any of those states' legislatures could adopt a soldier-quartering program, and the state's supreme court could, without flouting the law, uphold it. This example is designed for a specific purpose; in all likelihood such a program would violate the federal Fourth Amendment, and several other federal and state laws. The program's victims could, on a case-by-case basis, file for individual relief in federal court, and the federal courts could grant the relief, but the state courts would be under no obligation to align their rulings with the federal courts' until the Supreme Court speaks on the issue. It is not entirely clear whether, under such circumstances, a federal judgment purporting to strike down the program would be valid. <u>See</u> <u>Yniguez v. Mofford</u>, 939 F.2d 727, 730 n.1, 735-37 & nn.7-11 (9th Cir. 1991)(Reinhardt, J.). Lower federal court holdings regarding incorporation are thus different from other lower federal court interpretations of federal law: the applicability of most federal law -- <u>i.e.</u>, the United States Code -- to the states is not in dispute, even if its precise scope and meaning is, <u>see</u> U.S. Const. art. VI, cl. 2 (Supremacy Clause); the only other context in which the potential for such a standoff between the lower federal courts and the state courts exists is with federal preemption doctrine.

The second peculiarity that causes incorporation doctrine to be decided almost exclusively at Supreme Court-level is that, although they can, state courts have little incentive to hold that a federal constitutional right is incorporated if the Supreme Court has left the question open. The Bill of Rights is a floor, not a ceiling, and state courts can interpret their own constitutions -- which often contain provisions closely mirroring the federal Bill of Rights -- or statutes to provide for the right in question. <u>See</u> <u>Pena v. Greffet</u>, No. CIV 12-0710 JB/KBM, 2015 WL 3860084, at *25 (D.N.M. June 17, 2015)(Browning, J.)(citing <u>State v. Cardenas-</u>

2001-NMSC-017, ¶¶ 32–35, 25 P.3d 225, 237-40)(discussing the New Mexico state courts' embrace of "New Federalism," a doctrine of state-level expansion on federal constitutional rights, which the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, championed). By voluntarily holding that an as-yet unincorporated federal constitutional provision binds them, they risk (i) that the Supreme Court will overrule them and hold that the provision is not incorporated -- possibly even resulting in an unfixable reversal in the case in which the state supreme court applied the right, if the state supreme court did not go out of its way to additionally base its decision on an adequate and independent state ground, see Michigan v. Long, 463 U.S. 1032 (1983); or (ii) that the Supreme Court will, in subsequent decision, go on to define the contours of the right in a way that the state supreme court does not like.

For its part, the Court concludes that the Excessive Fines Clause is incorporated against the states. The Court does not fully subscribe to Justice O'Connor's reasoning that there is "no reason to distinguish one Clause of the Eighth Amendment from another for the purposes of incorporation." Browning-Ferris, 492 U.S. at 287. Whatever the merits of Justice O'Connor's stance may be, the Supreme Court parses amendments down into their constituent clauses and rights for incorporation purposes -- sometimes incorporating some, but not all, of an amendment. Compare Hurtado v. California, 110 U.S. at 538 (holding that states need not honor the Fifth Amendment grand-jury right); with Griffin v. California, 380 U.S. at 615 (incorporating the Fifth Amendment right against self-incrimination against the states); Benton v. Maryland, 395 U.S. at 796 (incorporating the Fifth Amendment probation on successive prosecutions); and Chi., Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. at 258 (incorporating the Fifth Amendment right against deprivation of property without just compensation). To the Court, however, the nature of a criminal fine is that each of its properties -- its purpose, the severity of its incursion on liberty, and the legal process attendant to its imposition -- overlap with at least one of the following: (i) punitive damages; (ii) criminal imprisonment; and (iii) bail. Each of those three incursions on personal liberty is subject to federal constitutional constraints, even when a state imposes them. See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574-75 (1996) (holding that punitive damages that a state court imposed pursuant to state law violated the federal Due Process Clause); Kennedy v. Louisiana, 554 U.S. 407, 419 (2008)(holding that the federal Cruel and Unusual Punishments Clause imposes on state court proceedings a proportionality requirement between the severity of a crime and the magnitude of its sentence); Schilb v. Kuebel, 404 U.S. at 365 (incorporating the Excessive Bail clause against the states). The Court will compare criminal fines with each of these other penalties and describe how their similarities support incorporation of the Excessive Fines Clause.

Punitive damages involve the same liberty incursion -- deprivation of money -- for much the same purpose -- to punish -- and are imposed subject to a similar process -- a trial on the merits. The case for applying constitutional strictures to criminal fines is, in most ways, stronger than the case for applying them to civil fines: a government has a greater incentive to abuse monetary impositions when it is the direct recipient of the money than when it is refereeing a dispute between private third parties. Cf. U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."). The recent unrest in Ferguson, Missouri, provides a good example of the hazards of vesting governments with the unchecked authority to fine:

> The City budgets for sizeable increases in municipal fines and fees each year, exhorts police and court staff to deliver those revenue increases, and closely monitors whether those increases are achieved. . . .
>
> . . . .
>
> Ferguson has allowed its focus on revenue generation to fundamentally compromise the role of Ferguson's municipal court. The municipal court does not act as a neutral arbiter of the law or a check on unlawful police conduct. Instead, the court primarily uses its judicial authority as the means to compel the payment of fines and fees that advance the City's financial interests. . . .
>
> . . . .
>
> To handle the increasing caseload, the City Manager also requested and secured City Council approval to fund additional court positions, noting in January 2013 that "each month we are setting new all-time records in fines and forfeitures," that this was overburdening court staff, and that the funding for the additional positions "will be more than covered by the increase in revenues."
>
> . . . .
>
> [F]or fiscal year 2015, the City's budget anticipates fine and fee revenues to account for $3.09 million of a projected $13.26 million in general fund revenues.
>
> . . . .
>
> Even more recently, the City's Finance Director stated publicly that Ferguson intends to make up a 2014 revenue shortfall in 2015 through municipal code enforcement, stating to Bloomberg News that "[t]here's about a million-dollar increase in public-safety fines to make up the difference." . . .

United States Department of Justice Civil Rights Division, Investigation of the Ferguson Police Department, 2, 3, 9, 10, 13 (March 4, 2015)(footnotes omitted). Originally intended primarily to investigate the shooting death of an African-American teenager at the hands of a Ferguson police officer, the DOJ's investigation ultimately produced a 105-page final report devoted primarily to the city's allegedly exploitative and excessive fine-administration and -collection system.

The constitutional procedural protections attendant to criminal proceedings, namely the beyond-a-reasonable-doubt standard and the right to assistance of counsel -- which existence (and incorporation) might seem to obviate the need for the additional incorporation of a protection against excessive criminal fines -- do not typically apply unless the crime or violation also carries the potential for a prison sentence, in addition to a fine. See Blanton v. City of N. Las Vegas, 489 U.S. 538 (1989)(holding that the Sixth Amendment does not guarantee a jury trial on petty offenses, which presumptively includes all crimes whose maximum sentence of incarceration is below six months, but leaving room for the possibility that "additional penalties

[such as monetary fines] . . . [may be] so severe [as to indicate] that the legislature clearly determined that the offense is a serious one" meriting a jury trial); <u>Scott v. Illinois</u>, 440 U.S. 367 (1979)(holding that there is presumptively no right to assistance of counsel when the defendant does not face the possibility of incarceration). Even when the threshold finding of criminal guilt is predicated on a jury verdict (or waiver thereof) by proof beyond a reasonable doubt, a judge -- by way of a combination of preponderance-of-the-evidence factfinding and judicial discretion -- typically decides both the binary determination whether to impose a find and the incremental determination of its amount.

     The similarities between fines, and cruel and unusual punishment, also cut in favor of incorporation. Criminal fines exist to effectuate the same goals as the "punishments" to which the Cruel and Unusual Punishments Clause refers: deterrence -- both specific and general; incapacitation; rehabilitation; and punishment. <u>See</u> 18 U.S.C. § 3553(a) (titled "Factors to be considered in imposing a sentence"); <u>id.</u> § 3572(a) (directing district courts to consider "the factors set forth in section 3553(a)" in "determining whether to impose a fine, and the amount"). <u>See also</u> <u>United States v. Courtney</u>, No. CR 11-2860 JB, 2014 WL 7472975, at *32 n.13 (D.N.M. Dec. 15, 2014)(Browning, J.)(outlining the differences between specific and general deterrence). It is important to note that fines, unlike restitution and costs of prosecution -- and unlike non-punitive damages, for that matter -- lack any compensatory purpose. Fines and incarceration are typically imposed via the same basic procedural mechanisms: a beyond-a-reasonable-doubt trial (or waiver thereof) at the liability phase, followed by preponderance-of-the-evidence judicial factfinding and discretion at the penalty phase. Moreover, there is a key overlap in the analytical standards of both the Cruel and Unusual Punishments Clause, and the Excessive Fines Clause: both require a loose proportionality between the crime committed and the penalty imposed. <u>See</u> <u>Kennedy v. Louisiana</u>, 554 U.S. at 419 ("[T]he Eighth Amendment's protection against excessive or cruel and unusual punishments flows from the basic 'precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense.'" (citing <u>Weems v. United States</u>, 217 U.S. 349, 367 (1910))(alterations in <u>Kennedy v. Louisiana</u> but not in <u>Weems v. United States</u>)); <u>United States v. Bajakajian</u>, 524 U.S. 321, 334 (1998)("The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality." (citing <u>Austin v. United States</u>, 509 U.S. 602, 622-23 (1993))). Of course, the nature of the penalties with which the Cruel and Unusual Punishments Clause deals -- incarceration and the death penalty -- are more serious than those with which the Excessive Fines Clause deals, and that fact cuts against incorporation of the latter Clause against the states, but the similarities between the two Clauses are still great enough to be instructive.

     Last, criminal fines share some features with bail. Both are monetary impositions associated with a criminal case. Bail has the fewest procedural safeguards associated with it of any of the penalties discussed -- bail is imposed while the defendant is presumed innocent, with relatively minimal process -- and thus the justifications for incorporating the Excessive Bail Clause's substantive constraints on the magnitude of the bail are strong. Still, one's failure to pay a designated fine, like one's failure to pay an assigned bail amount, often results in jail. In the bail context, the Constitution deals with this potentially hazardous opportunity for governmental abuse by imposing substantive limitations on bail -- <u>i.e.</u>, limiting its amount -- rather than procedural ones, such as requiring a certain burden of proof or factfinding process. While there are procedural protections built into the federal bail-setting process, they are statutory, not constitutional, and apply only to the federal courts. <u>See</u> 18 U.S.C. §§ 3141-3150.

indicate that the claim is equitable, and the Defendants are not guaranteed a jury trial under the Seventh Amendment.  See Granfinanciera v. Nordberg, 492 U.S. at 42.  If, on the other hand, the claims' nature is legal, the Court faces the more complicated analysis of weighing the competing verdicts of the second prong against the first prong, granting more importance to the second prong than to the first.  See Granfinanciera v. Nordberg, 492 U.S. at 42.

A.     **THE RESCISSIONARY DAMAGES THAT THE PLAINTIFFS SEEK ARE EQUITABLE IN NATURE, BUT ARE UNAVAILABLE IN THIS CASE, BECAUSE THE PLAINTIFFS' DELAY IN BRINGING SUIT MADE RESCISSION IMPOSSIBLE.**

With the Court's earlier dismissal of the Plaintiffs' securities claims and the Plaintiffs' choice to abandon their unjust enrichment claims, they presently contend to seek only two remedies: (i) rescission of the merger so that they can recover the shares which they previously cashed out; and, in the alternative, (ii) rescissionary damages.  See Tr. at 452:13-453:16 (Kagen). The Defendants challenge the Plaintiffs' assertion that they seek rescission, arguing that the Plaintiffs' long delay between the merger date and the date when the Plaintiffs filed this suit: (i) allowed innocent third-party investors to invest in TIR through the anticipated IPO; and (ii) makes rescission impracticable at this time.  See Surreply at 2.  Furthermore, the Defendants see the Plaintiffs' assertion that they seek rescission to be smoke and mirrors, hiding a fact that they really seek money damages.  See Surreply at 7.  According to the Defendants, these monetary damages also are unavailable to the Plaintiffs on the grounds that rescission is unavailable to

---

The Supreme Court has incorporated the Excessive Bail Clause's substantive safeguards against the states.  See Schilb v. Kuebel, 404 U.S. at 365.  If the Supreme Court deemed it to be "implicit in the concept of ordered liberty" to have substantive safeguards against one form of "excessive" imprisonment-threatening monetary imposition, then it probably follows that the Constitution's analogous constraints on the other form mentioned in the same amendment should, likewise, be incorporated.

them.  See Surreply at 2.  Invoking Juliet Capulet's wistful remonstrance to the stars that a "rose

by any other name would smell as sweet," Surreply at 7 (quoting William Shakespeare, Romeo

and Juliet act 2, sc. 2), the Defendants insist that the Plaintiffs seek compensatory damages

regardless whether the Plaintiffs refer to them as rescissionary damages or any other category of

damages, see Surreply at 7 & n. 5.

The Court notes that the Plaintiffs insisted during the hearing that they seek rescission.

See Tr. at 419:1 (Kagen).  The Court, somewhat surprised at the Plaintiffs' assertion, engaged in

the following colloquy with the Plaintiffs:

> THE COURT:  Are you still seeking, though, rescission? I mean, I always thought
> that probably what you wanted was money.  Do you really want rescission?
>
> MR. KAGEN: I don't know that it's possible at this point to unring the bell and re-
> create what . . . once existed.  So I think rescissory damages are what we seek now,
> restitution, but also, as I said, disgorgement of the directors, officers, compensation
> is also available to us.  But that's disgorgement.

Tr. at 419:12-20 (Court, Kagen)(emphasis added).  After further explaining their desire for

disgorgement, the Plaintiffs then reemphasized that the first remedy they seek is "all rescissory

damages.  We drafted it as such.  We've asked for it."  Tr. at 419:21-420:19 (Kagen).

Consequently, because both the Plaintiffs and the Defendants agree that the Plaintiffs do not

presently seek rescission of the merger -- a category of rescission that the Plaintiffs admitted

having never before seen a court award to any plaintiff -- the Court need not address the

erstwhile rescission that the Defendants sought.   See Tr. at 419:4-6 (Kagen).

**B.     THE RESTITUTIONARY DAMAGES THAT THE PLAINTIFFS SEEK
ARE, DESPITE THE PLAINTIFFS' LABELS, CORRECTLY
IDENTIFIED AS COMPENSATORY DAMAGES, A LEGAL REMEDY.**

Although both rescission and rescissionary damages are unavailable to the Plaintiffs per

the Court's analysis supra, the Plaintiffs also seek another remedy with regard to their breach-of-

fiduciary-duty claims that the Plaintiffs characterize as disgorgement or restitution.  See Motion for a Bench Trial at 8 (citing Amended Complaint ¶ 160, at 30).  The Defendants insist that these terms are smoke and mirrors, beclouding what they contend is the actual compensatory nature of these remedies which the Plaintiffs seek.  Under the Supreme Court's decision in Dairy Queen v. Wood, 369 U.S. 469 (1962), the labels that the Plaintiffs use to characterize the remedies they seek do not control the Court's Seventh Amendment analysis.  As the Supreme Court indicated in that case, "The constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings."  Dairy Queen v. Wood, 369 U.S. at 477-78.  The Court instead must evaluate the nature of the remedies that the Plaintiffs seek.

Consulting the Amended Complaint's sections that present the Plaintiffs' breach-of-fiduciary-duty claims, the Court notes that the Plaintiffs insist that the "Defendants acquired Plaintiffs' stock at a price far below the fair value of TIR's shares through the Merger." Amended Complaint ¶ 5, at 2.  The Amended Complaint further alleges that the merger "canceled Plaintiffs' shares in TIR and gave Plaintiffs the right to a cash payment of $451,000 per share."  Amended Complaint ¶ 17, at 3.  Further, the Amended Complaint asserts that the "Defendants themselves, rather than accepting such inadequate consideration, used the Merger to obtain 100% ownership of the Company precisely because they knew the shares were worth considerably more than the price paid to Plaintiffs."  Amended Complaint ¶ 22, at 5.  Expanding upon this last point, the Plaintiffs contend that the "TIR Controlling Shareholder Defendants . . . caus[ed] TIR's minority shareholders to be paid grossly inadequate merger consideration while, at the same time, paying significantly more valuable merger consideration to themselves." Amended Complaint ¶ 144, at 28.  The Plaintiffs then pray the Court to grant rescission of the merger, or "in the alternative, awarding compensatory and/or rescissionary damages in favor of

Plaintiffs against all Defendants, jointly and severally." Amended Complaint ¶ B, at 34.

In their treatise on federal practice and procedure, Charles Wright and Arthur Miller explain that "[i]ssues are not inherently legal or equitable. They are like chameleons which take their color from surrounding circumstance." 9 Charles Wright & Andrew Miller, Federal Practice & Procedure § 2302 (quoting Fleming James, Right to a Jury Trial in Civil Actions, 72 Yale L.J. 655, 692 (1963)). This ability of remedies to change their color from equitable to legal and vice versa had led courts, as Judge Posner once noted, to dispense the remedy of restitution "in law and equity proceedings alike." Reich v. Cont'l Cas. Co., 33 F.3d 754, 755-56 (7th Cir. 1994). The Supreme Court has given courts a color wheel to determine whether restitution is an equitable or a legal claim in a particular case in the 2002 case Great-West Life & Annuity Insurance Company v. Knudson. See 534 U.S. 204 (2002)("Great-West").

In Great-West, the Supreme Court said that that "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession. 534 U.S. at 214 (emphasis added). Interpreting Great-West three years later in Pereira v. Farace, 413 F.3d 330 (2d Cir. 2005), the United States Court of Appeals for the Second Circuit indicated that it was compelled to read Great-West as broadly as it is written, highlighting that the Supreme Court makes clear in footnote two of Great-West that equitable restitution only lies if the defendant possesses the funds at issue, which the Second Circuit understood to be an accounting of profits. The Second Circuit also took note of Justice Ginsburg's dissent, in which she provided further guidance by pointing out that restitution is measured by a defendant's "unjust gain, rather than [by a plaintiff's] loss." Great-West, 534 U.S. at 708 (citing 1 Dobbs, Law of Remedies § 12.1(1)). Because the plaintiffs in Pereira v. Farace sought only to recover funds attributable to their loss,

not the director's unjust gain, the Second Circuit held that the plaintiffs' claim for restitution really was a claim for compensation, a legal rather than an equitable remedy.

The Tenth Circuit, as far as the Court has been able to determine, has not spoken directly to this issue. The United States Bankruptcy Court for the District of Kansas, a court within the Tenth Circuit, nevertheless has cited Pereira with approval. See In re Hassan, 376 B.R. 1, 20 & n. 33 (D. Kan. 2007)(Somers, J.). The Court sees no sound reason to depart from a similar application of the Great-West test as the Pereira court interpreted it. In this case, the Plaintiffs do not seek, under what they term "restitution," a constructive trust or an equitable lien, where money or property identified as belonging in good faith to the Plaintiffs can clearly be traced to particular funds or property in the Defendants' possession. After all, the shares that were cashed out in this case no longer exist; as the Plaintiffs themselves noted in an earlier motion hearing, their shares were extinguished. See December Tr. at 15:16-20 (Kagen)(indicating that the Plaintiffs' shares were "automatically canceled and extinguished and converted"). Only shares in the merged company remain, meaning that the Plaintiffs' shares cannot be traced to particular funds or property in the Defendants' possession. Furthermore, the Plaintiffs, instead, like the plaintiff in Pereira, calculate their damages as their loss rather than the Defendants' gain from cashing out the Plaintiffs' share. See Corrected Expert Report of Jeff D. Makholm, Ph.D., filed October 13, 2015 (Doc. 174-2).[79]

Judge Newman, in his concurring opinion in Pereira v. Farace, notes that "whether a jury is available for a claim against a fiduciary for money damages for breach of fiduciary duties is . .

_____

[79]In Table 6.1 of his expert report, Makholm completed a discounted cash flow model in which he: (i) multiplied estimated fair share value by the number of the Plaintiffs' shares; and (ii) then subtracted the product of the number of the Plaintiffs' shares and the cash out amount received per share to derive total damages. See Corrected Expert Report of Jeff D. Makholm, Ph.D. § 6.2.1.4, tbl. 6.1.

. a close question." 413 F.3d at 344 (Newman, J.)(concurring). On the one hand, (i) centuries of equitable proceedings exist in cases involving claims against trustees; (ii) the Restatement (Second) of Trusts intones that remedies against a fiduciary are exclusively equitable, with narrow exceptions inapplicable to this case, see Restatement (Second) of Trusts §§ 197, 198 (1959); and (iii) some notable remedies treatises mark remedies for breach of fiduciary trust as equitable, see, e.g., III William F. Fratcher, Scott on Trusts § 199, at 203-04 (4th ed. 1988). The Court's task is not, however, to apply the law as it is summarized in a restatement or in a treatise. Rather, the Court, as a federal district court, is obligated to apply precedent. Here the Supreme Court's decision in Great-West counsels that the remedy that the Plaintiffs characterize as equitable restitution is legal restitution, that is, compensation.

This conclusion leaves the two Granfinanciera prongs pointing in opposite directions. The first historical analysis prong characterizes the Plaintiffs' breach-of-fiduciary-duty claims as equitable. The second prong, however, assesses the remedies that the Plaintiffs seek as legal. The Supreme Court in Granfinanciera instructs courts to weigh the second prong more heavily than the first. Moreover, the Supreme Court in an earlier case cautioned that "the right to a jury trial is a constitutional one," so a court must exercise its discretion, "wherever possible," "to preserve jury trial." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510 (1959). Accordingly, the Court determines that the legal nature of the remedies that the Plaintiffs seek outweighs the equitable nature their claim would have had in 1791 England. The Court therefore concludes that the Defendants enjoy a Seventh Amendment right to a jury trial on the Plaintiffs' breach-of-fiduciary-duty claims, and denies the Plaintiffs' Motion for a Bench Trial.

Having examined the calculations the Plaintiffs employ to calculate their breach-of-fiduciary-duty damages, the Court concludes that it most naturally should interpret the remedy

that the Plaintiffs seek and characterize as "restitution" and "disgorgement" as what treatise-writers such as Dobbs refer to as legal restitution, i.e., compensation for their perceived loss rather than for the Defendants' purported gain.  See, e.g., 1 Dan B. Dobbs, Dobbs Law of Remedies §2.6(3), at 154-65.  The Plaintiffs' withdrawal at the motion hearing of their unjust enrichment claim at the hearing, see Tr. at 452:13-453:16 (Kagen), fortifies the Court's confidence in this interpretation.  Even were the remedy to normally fall within the scope of equitable restitution, however, application of two other principles that the Supreme Court has laid down would result in the same conclusion that the Defendants are entitled to a jury trial on the Plaintiffs' breach-of-fiduciary-duty claims.

First, treatise-writers generally subdivide equitable restitution in breach-of-fiduciary-duty cases into just two categories: (i) constructive trusts; and (ii) equitable liens.  See, e.g., 1 Dobbs § 4.3(2), at 595-97.  A constructive trust generally attaches to an unjust enrichment claim, and it occurs only if a defendant seeks to benefit financially from a plaintiff's property that it has acquired unfairly.  See 1 Dobbs § 4.3(2), at 595-97.  An equitable lien generally attaches to real estate that a defendant wrongfully acquired from the plaintiff and upon which the defendant makes improvements.  See 1 Dobbs § 4.3(2), at 595-97.  In both cases, the property at issue must not only currently exist, but also must be strictly traceable to the plaintiff.  See 1 Dobbs § 4.3(2), at 595-97.

The Court concludes that this case's facts do not allow it to naturally characterize the remedy that the Plaintiffs seek as either a constructive trust or an equitable lien.  Most glaringly, the property at issue -- the Plaintiffs' TIR shares -- no longer exists.  As the Court previously noted in its analysis above and as the Plaintiffs asserted at a hearing on an earlier hearing in this case, their shares have been extinguished.  See December Tr. at 15:16-20 (Kagen).  In addition,

(i) the Plaintiffs have withdrawn the unjust enrichment claim to which constructive trusts normally attach; (ii) no real property is at issue; (iii) the Defendants have not made -- nor could they have made -- improvements to the property that they acquired; and (iv) the extinguishment of the Plaintiffs' TIR shares -- even with a conversion ratio between erstwhile TIR shares and shares in the merger corporation -- creates a discontinuity that prevents the Plaintiffs from strictly tracing their shares to property in the Plaintiffs' possession.

Second, even if treatise-writers have failed to notice a potpourri category of equitable restitution in breach-of-fiduciary-duty cases that falls outside of the scope of both constructive trusts and equitable liens, this residual category likely would fail to deprive the Defendants of a jury trial right under the Seventh Amendment. The Supreme Court has held that equitable restitutionary remedies can override the strong presumption of a jury trial right when a bench trial by its very nature offers a plaintiff the possibility of greater fairness than a jury trial offers. See 1 Dobbs, Dobbs Law of Remedies §2.6(3), at 156-59 (2d ed. 1993). Most commonly, the courts have applied this nebulous standard only to those cases in which it is manifest that the issues to be tried are too complex for a jury to comprehend. See, e.g., 1 Dobbs, Dobbs Law of Remedies §2.6(3), at 156-59 (2d ed. 1993).

The Plaintiffs alluded to this complexity argument during the hearing, confiding to the Court its concern that arcane financial concepts such as EBITDA,[80] discounted cash flow,[81] and

---

[80]EBITDA is an acronym standing for "earnings before interest, taxes, depreciation, and amortization." Benton Gup & Rawley Thomas, The Valuation Handbook: Valuation Techniques from Today's Top Practitioners 526 (2010)("Gup and Thomas"). EBITDA became popular in the mid-1980s among leveraged buyout sponsors and bankers to evaluate cash flow, and to calculate multiples for companies in a near-bankruptcy state, on the theory that noncash depreciation and amortization charges should be available to service debt if large-scale capital expenditure programs would not be necessary for the foreseeable future. See Pamela Strup, Moody's Investors Service, Inc., Putting EBITDA in Perspective: 10 Critical Failings of EBITDA as the Principal Determinant of Cash Flow (June 2000). During the dot-com bubble

the time value of money would prove impenetrable to a jury.  <u>See</u> Tr. at 283:17-285:16 (Kagen).

The Plaintiffs noted that even their expert, who holds a doctorate, had demonstrated a muddled

understanding of how to correctly specify the inputs for one value calculation by applying a

marketability discount to his fair value calculations, calling into question the ability of jurors

with perhaps little or no training in finance to deal intelligently with the models and math that

undergird the Plaintiffs' fair price estimates.  <u>See</u> Tr. at 284:2-17 (Kagan).

The Court does not find this complexity argument to be persuasive.   As a careful reading

of Table 1, <u>supra</u>, shows, cases in the English law courts in 1791 tended to be simpler than cases

in the English equity courts.  <u>See also</u> Patrick Devlin, Jury Trial in Complex Cases, 80 <u>Colum. L.

Rev.</u> at 73; 43James S. Campbell & Nicholas Le Poidevin, Complex Cases and Jury Trials: A

Reply to Professor Arnold, 128 <u>U. Pa. L. Rev.</u> 965 (1980).   The law court cases had fewer

parties, handled simpler issues, and dealt with smaller amounts in dispute. <u>See</u> table 1, <u>supra</u>, at

82.  The English courts today have almost entirely abolished the jury trial in civil cases, mostly

on the grounds that almost all civil cases are too complicated for an average juror to understand.

<u>See</u> Delavan J. Dickson, Autonomy, Discretion and Representation: A Comparative Study of

Jury Development in Athens, England, and the United States of America 476 (Aug.

1988)(unpublished Ph.D. dissertation, University of Southern California)(on file with University

of Southern California)("Autonomy")("The civil jury likewise has all but disappeared during the

---

era of the mid-1990s until the 2001 recession, EBITDA became a widely used profitability and
performance measure for most companies, and was used to calculate companies' enterprise
value, because it is easy to understand and to calculate.  <u>See</u> Gup and Thomas at 527-28.

[81]Discounted cash flow ("DCF") refers to a basket of related valuation approaches of
greater or lesser complexity that calculate value using the four factors of (i) investments; (ii) cash
flows; (iii) assets' economic life; and (iv) the cost of capital.  <u>See</u> Daniela Venanzi, <u>Financial
Performance Measures and Value Creation: The State of the Art</u> 1-15 (Springer Briefs in
Business 2012).

course of the 20th century, and the right to trial by jury in criminal cases has also been restricted, and now applies only to the more serious indictable crimes.").  The United States, however, long has vested more confidence in jurors' ability to puzzle out difficult concepts than its sibling common-law states have.  See, e.g., Autonomy at 476.  During the colonial era, American courts defied English strictures on jury power by entrusting jurors to decide not only the facts but the law to apply to each case before them.  Unlike in English, civil cases involving the greatest sums in dispute in the United States were heard by juries.  See, e.g., Robert Mark Savage, Where Subjects Were Citizens: The Emergence of a Republican Language and Polity in Colonial American Law Court Culture, 1750-1776, at 102-07 (unpublished Ph.D. dissertation, Columbia University)(2011)(analyzing verdicts and awards in colonial Massachusetts).  After the Revolution, this belief in American jurors' sagacity and perspicacity remained so steadfast that the first article of impeachment against Supreme Court Justice Samuel Chase in 1796 was that he had failed to accord proper deference to juries in their then-unchallenged power to decide both facts and law.  See Alexander pope Humphrey, Impeachment of Samuel Chase, 5 Virg. L. Rev. 281, 286-87 (1899).  In one of the only trials it ever heard, the Supreme Court unanimously instructed the jury that it was the best judge not only of facts but of law.  See Georgia v. Brailsford, 18 U.S. (3 Dallas) 1, 4 (1794).  In the very year that Seventh Amendment was ratified, future Justice Wilson remained was so adamant in his belief in the collective wisdom of juries that he went on the lecture circuit insisting in juries' right to nullify and to ignore judges' interpretations of facts and law whenever the court's and the jury's interpretations differed.  See 2 James Wilson, Works of James Wilson 540-42 (1967).

The Defendants might counter that financial concepts are much more complex than anything that a jury in 1791 could have faced and that the Court therefore errs when it abides by

a tradition as old as the Republic of trusting juries' collective wisdom. The Defendants' position is not completely meritless in the abstract. A few courts have held that, where a civil action is particularly complex, a jury trial is inappropriate, because such complexity places it beyond the practical abilities and limitations of juries, in effect determining that the Fifth Amendment right to due process trumps the Seventh Amendment right to a jury trial. See, e.g., In Re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238 (3d Cir. 1983)(basing its conclusion on the presence of intricate, complex antitrust issues in the case). This case does not does not meet such a complexity benchmark. Acronyms such as EBITDA and concepts such as present value might at first seem intimidating to a juror unfamiliar with financial jargon. The underlying ideas, however, are intuitive, easily explained, and require little more than high school math. The Court is confident that experts, in their essential role as teachers to the jury, can explain these concepts sufficiently well to a jury that a bench trial would not by virtue of its form offer the Plaintiffs greater fairness than a jury trial would offer.

The Court has seen such pedagogy in action in cases over which it has presided with financial concepts much more complex and intricate than those present in this case. See, e.g., Securities Exchange Commission v. Goldstone, (interpreting I/O strip transactions, repurchase agreements, margin calls, and other financial concepts). Working backward, this jury capability means that the strong presumption in favor of jury trials when a remedy with an ambiguous nature is deemed equitable is not overcome. The Court concludes that the Defendants are entitled to a jury trial -- that palladium of liberty which John Adams considered one of the two wheels of a free government and which Tocqueville in his magisterial treatment of democracy in America saw as the best way not only of ensuring that America remains free but also ensuring that it remains just and civil. See Thomas Jefferson, Letter from Thomas Jefferson to James

Madison, December 20, 1787, in 6 Writings of Thomas Jefferson at 387-89; John Adams, 2 Works of John Adams 253-55 (Charles Francis Adams ed., 1856); Alexis de Tocqueville, Democracy in America 258-60 (2002).[82]

**IT IS ORDERED** that the Plaintiffs' Motion for Bench Trial on Plaintiffs' First Through Fourth Claims for Relief, and Brief in Support, filed February 17, 2017 (Doc. 253), is denied.

_____
UNITED STATES DISTRICT JUDGE

---

[82]Tocqueville saw the civil jury as a hallmark of the American experiment in democracy and, besides its immediate effects in safeguarding liberty as a check on the judiciary, postulated that civil juries were an incubator of civic virtue that would suffuse society and transform rugged colonists into a people capable and worthy of democracy:

> Juries, especially civil juries, instill some of the habits of the judicial mind into every citizen, and just those habits are the very best way of preparing people to be free. It spreads respect for the courts' decisions and for the idea of right throughout all classes. . . . Juries teach men equity in practice. Each man, when judging his neighbor, thinks that he may be judged himself. That is especially true of juries in civil suits; hardly anyone is afraid that he will have to face a criminal trial, but anybody may have a lawsuit." "Juries invest each citizen with a sort of magisterial office; they make all men feel that they have duties toward society and that they take a share in its government….Juries are wonderfully effective in shaping a nation's judgment and increasing its natural lights. That, in my view, is its greatest advantage. It should be regarded as a free school which is always open and in which each juror learns his rights, comes into daily contact with the best-educated and most-enlightened members of the upper classes, and is given practical lessons in the law, lessons which the advocate's efforts, the judge's advice, and also the very passions of the litigants bring within his mental grasp. I think that the main reason for the practical intelligence and the political good sense of the Americans is their long experience with juries in civil cases.

Alexis de Tocqueville, Democracy in America at 274-75.

*Counsel:*

Jamison A. Diehl
Akin Gump Strauss Hauer & Feld LLP (NY)
New York, New York

-- and --

R. Stratton Taylor
Mark H. Ramsey
Clinton Derek Russell
Taylor Burrage Foster Mallett Downs Ramsey & Russell
Claremore, Oklahoma

-- and --

Stuart Kagen
Daniel A. Cohen
Joshua C. Gillette
Kyla Janine Grant
Kagen & Caspersen
New York, New York

      *Attorneys for the Plaintiffs*

Toney Daniel Foster
Taylor Burrage Foster Mallett Downs Ramsey & Russell
Claremore, Oklahoma

      *Attorneys for Plaintiff Stuart 2005 GST Family Trust*

Frederic Dorwart
Paul DeMuro
Sarah Wishard Poston
Nora Rose O'Neill
Fredric Dorwart Lawyers
Tulsa, Oklahoma

      *Attorneys for the Defendants*